Kristin A. VanOrman (7333)
Matt Harrison (13735)
**STRONG AND HANNI**
102 South 200 East, Suite 800
Salt Lake City, Utah 84111
Telephone: (801) 532-7080
Facsimile: (801) 596-1508

*Attorneys for Defendant Weber County,*
*James H. Harvey, Kerry W. Gibson, and Charles J. Ebert*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| LAW OFFICE OF SAMUEL P. NEWTON, P.C. and SAMUAL P. NEWTON, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> WEBER COUNTY, a political subdivision of the state of Utah; JAMES H. HARVEY, KERRY W. GIBSON, and CHARLES J. EBERT, in their official and individual capacities <br><br> Defendant. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** <br><br><br> Civil No.1:18-cv-00015 RJS <br><br> Judge Robert J. Shelby |

Defendants Weber County ("Weber" or "the County"), James H. Harvey, Kerry W. Gibson, and Charles J. Ebert (collectively "Defendants"), by and through their attorney of record, hereby submit the following motion for summary judgment and memorandum in support, pursuant to Rule 56 of the Federal Rules of Civil Procedure. As there is no genuine dispute as to any material fact and Defendant is entitled to judgment as a matter of law, summary judgment should be granted.

**INTRODUCTION AND REQUESTED RELIEF**

Plaintiff has alleged a violation of his First Amendment right to free speech. He claims that Defendants Harvey, Gibson, and Ebert violated 42 U.S.C. §§ 1983 and 1985, and that Weber County, through the actions of its Commissioners violated 42 U.S.C. § 1983. Even in the light most favorable to Plaintiff, he cannot show the Defendants violated his constitutional rights. Specifically, under the *Garcetti/Pickering* analysis, Plaintiff's actions in representing his client, and the misrepresentations he made to the court and news media constituted speech pursuant to his official capacity and is not protected under the First Amendment. Even if the Court finds that Plaintiff did not speak pursuant to his official capacity, hi speech was not protected, as it did not affect a public concern, his interested in his speech does not outweigh Defendants' interest, protected speech by the Plaintiff did not substantially motivate Defendants' decision to terminate his contract, which Defendants would have done, even if the absence of protected speech by Plaintiff. In addition, even if the court finds that Defendants violated one of Plaintiff's constitutional rights, they are entitled to qualified immunity, as the law relating to Plaintiff's rights are not clear, as the Tenth Circuit has not addressed independent contractors under *Garcetti v. Caballos*, 547 U.S. 410, 126 S.Ct. 1951, 1958, (2006).

For these reasons, Plaintiff cannot show that Defendants violated his First Amendment rights, and even if a constitutional violation is found, Defendants are entitled to qualified immunity. For these reasons, Defendants are requesting that the Court grant Defendants' motion for summary judgement, and dismiss Plaintiffs' First Amendment claims, under 42 U.S.C. § 1983 and § 1985(2), with prejudice.

# BACKGROUND

Plaintiff is an attorney who worked under contract with Weber County to handle indigent defense appeals.[1] As part of that contract, Plaintiff represented Douglas Lovell on appeal, after a jury sentenced Mr. Lovell to death for the murder of Joyce Yost.[2] Under that contract, Plaintiff agreed to represent Mr. Lovell in his first appeal of right, for $150/hour, up to the amount of $75,000, which could only be exceeded upon a showing of good cause with the court.[3] After drafting his appellate brief, Mr. Newton also drafted a motion to remand the proceedings for a hearing pursuant to Rule 23B of the Utah Rules of Appellate Procedure. The Utah Supreme Court granted that motion and remanded the case back to the district court for a hearing to seeking information about the potential ineffective assistance of Lovell's trial counsel. At the time of the remand, Plaintiff had exhausted approximately $70,000 of the compensation allowed in his contact. Plaintiff requested additional funding, estimating that the remand hearing could take from 500-700 hours of additional work. During this time, Plaintiff filed a motion for attorney fees with the court, which was denied. Defendants' eventually agreed to pay additional compensation for the remand hearing, for 100 hours of work, or $15,000 in addition to the previous contracted amount. The county also discussed approving additional compensation with Plaintiff, related to previous work completed on the 23B motion. As part of that negotiation, Defendants asked for explanation of certain items billed by Plaintiff and informed him that continuing to bill items which were not appropriate might result in termination of his contract. Due in part to the ongoing discussions about additional funding, and his billing practices,

---

[1] Plaintiff's Complaint ("Compl."), Dkt. No. 2, ¶ 11.
[2] *Id*. at ¶ 14.
[3] Newton contract for Lovell Appeal, attached as Exhibit A, pp. 1-2.

Plaintiff filed a motion to withdraw as counsel for Lovell. Defendants eventually approved compensation in the amount of $22,500 for Plaintiff's work on the 23B motion. Throughout this period, Plaintiff made incorrect or false representations to the court related to his motion for attorney's fees, his motion to withdraw, a motion filed by the state relating to a potential conflict, and in the hearing for his motion to withdraw. Plaintiff also misrepresented facts in statements which appeared in two separate new articled in the Salt Lake Tribune. Plaintiff's misrepresentations and false information had to do with the county's decisions and negotiations regarding additional funding, the county's view of his billing practices, his access to investigative services, and how those items affected his ability to represent his client. Plaintiff misrepresented several of the facts on multiple occasions, and several after he had been informed that his previous statements were incorrect. The court eventually granted Plaintiff's motion to withdraw from the Lovell case, and due to Plaintiffs' misrepresentation of facts the county decided to terminate Plaintiff's other indigent appellant contract.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On June 28, 1993, Douglas Lovell ("Lovell") pled guilty to aggravated murder of Joyce Yost. On August 20, 1993, the district court sentenced Lovell to death.

2.      Lovell filed a motion to withdraw his guilty plea which was denied by the district court as being untimely. The Utah Supreme Court reversed the denial and remanded the case for consideration of the motion. On remand, the district court denied Lovell's Motion again, and in 2010, the Supreme Court reversed the second denial.

3.      In March 2015, Lovell was given a new trial. He was represented by two attorneys, Michael Bouwhuis and Sean Young. On April 1, 2015, the jury sentenced Lovell to death.

4.      In April 2015, the County entered into a contract with Samuel Newton Plaintiff to represent Lovell on appeal (the "Contract").[4]

5.      The contract with Plaintiff provided $75,000 to represent Lovell on appeal at a rate of $150 per hour. The contract also provides that the $75,000 limit may only be exceeded upon showing of good cause.[5]

6.      In Section Three, the contract provides that the County will reimburse expenses for investigative services and other costs.[6]

7.      On May 18, 2016, Plaintiff filed a motion under Rule 23B of the Utah Rules of Appellate Procedure to remand Lovell's case to the district court to develop a record on a claim of ineffective assistance of counsel. [7]

---

[4] Exhibit A.
[5] *Id*. at p. 2
[6] *Id*.

8.      The Utah Supreme Court granted the 23B motion on March 6, 2017, ordering an

evidentiary hearing related to the whether trial counsel Sean Young performed deficiently, and,

if so, whether that deficient performance prejudiced Lovell.[8]

9.      In December 2016, Plaintiff was getting close to the $75,000 limit in the

contract.[9]

10.     On January 5, 2017, prior to the Utah Supreme Court remanding the case,

Plaintiff sent a letter to the Weber County Commissioners regarding additional funding.[10]

11.     On March 7, 2017, Plaintiff sent an update to the Commissioners indicating that

Lovell's case had been remanded and stating his request for funding again, noting that the

Supreme Court had requested that the remand proceedings be completed within 90 days,

pursuant to Utah R. App. P. 23B(c).[11]

12.     On March 9, 2016 Plaintiff indicated that he believed that it would probably take

"several hundred hours" for the remand proceedings, indicating a range of 500-700 hours.[12]

13.     On March 14, 2017, the Commissioner Harvey responded to Plaintiff's request

for additional funding, indicating that he believed Plaintiff's estimate was high and that the

additional work would likely only take 100 hours, totaling $15,000 at the rate of $150/hour.[13]

14.     Plaintiff responded to Commissioner Harvey immediately, providing additional

information about remand proceedings, and suggesting that the county authorize approval of his

---

[7] Docket Report, State v. Lovell Docket No. 20150632, attached as Exhibit B; Utah Supreme Court Order on 23B Motion, attached as Exhibit C.
[8] *Id*.
[9] Baron December 2016 Emails, attached as Exhibit D.
[10] Emails re additional funding, attached as Exhibit E, p. 2.
[11] *Id*.; Exhibit C, p. 2
[12] March 2017 email chain, attached as Exhibit F, p. 2.
[13] Harvey March 14, 2017 email, attached as Exhibit G.

past work, in addition to 100 hours of future work, stating that after he completed the 100 hours

on remand, he would be able to better estimate if additional time were needed, indicating that

there was a chance he overestimated the necessary work.[14]

      15.    On March 20, 2017, Plaintiff filed an Ex Parte Motion for Payment of Attorney

Fees and Litigation Expenses, where he only requested that the court pre-authorize 200 hours of

additional work.[15]

      16.    Commissioner Harvey responded to Plaintiff's supplemental request on March 23,

2017, indicating that he felt that Plaintiff had shown good cause for additional funds, and while

they considered 100 hours to be a reasonable estimate, he assured Plaintiff that if the remand did

take longer than 100 hours, the Commission would consider additional funding requests.[16]

      17.    On March 31, 2017, the County filed a Memo in Opposition to Plaintiff's Ex

Parte Motion for Payment of Attorney Fees.[17]

      18.    In its memorandum, the county noted that Commissioner Harvey had informed

Plaintiff on March 23, 2017 that if the remand took longer than 100 hours, the county would

consider an additional request for funding, if it were justified.[18]

      19.    On April 10, 2017 Plaintiff emailed Mr. Baron and asked if it was the county's

position that he would not be paid for past work, but only for future work.[19]

---

[14] Newton March 14, 2017 email, attached as Exhibit H.
[15] Intervenor's Memorandum in Opposition to Ex Parte Motion for Attorney Fees, attached as Exhibit I.
[16] Harvey March 23, 2017 email, attached as Exhibit J.
[17] Exhibit I.
[18] *Id*. at NEWTON 000316.
[19] April 10-11, 2017 Email Chain, attached as Exhibit K.

20.     Mr. Baron replied on April 11, 2017, informing Plaintiff that the commissioners agreed that the 23B remand was good cause for exceeding the contract, but that the main communication between Plaintiff and the county had concerned future events, specifically, the evidentiary hearing and correlating edits to Plaintiff's brief.[20]

21.     Mr. Baron also informed Plaintiff that he believed the commissioners would be willing to consider a request for additional funding related to Plaintiff's previous work on the 23B motion but did not believe the commissioners would offer additional money for the oral argument and the reply brief which were contemplated in the original contract.[21]

22.     On April 17, 2017, Plaintiff filed a Reply Brief in support of his Ex Parte Motion for Payment of Attorney Fees (the "Reply").[22]

23.     In his Reply, Plaintiff made the following statements:

    a.      Plaintiff states that the County only authorized $15,000 for work related to the 23B remand, claiming that "[t]he county has plainly indicated that counsel will not be allowed additional funding."[23]

    b.      Plaintiff informed the Court that "[t]he hearings alone will take fifty-plus hours and preparation will take two or three times that number of hours."[24]

    c.      Plaintiff indicated that "[t]here is already a clash of interests over payment of fees, since the county will not reimburse Mr. Lovell for actual expenditures already made, and this issue will imminently escalate to greater detriment to Mr. Lovell when the

---

[20] *Id.*

[21] *Id.*

[22] Reply to Memorandum in Opposition to Ex Parte Motion for Payment of Attorney Fees, attached as Exhibit L.

[23] *Id.* at p. 3.

[24] *Id.*

county refuses to fund anything beyond its offer of $15,000 which Mr. Lovell contends is not adequate for the remainder of work to be done."[25]

24.     On May 22, 2017 Mr. Baron contacted Plaintiff, and informed him that after reviewing Plaintiff's Reply, he believed that Plaintiff had either misrepresented or misunderstood the county's position, as Mr. Baron had noted in his email on April 11, 2017 that he was sure the commissioners would be willing to consider a request for additional funding relating to Plaintiff's previous work on the 23B Remand, which Plaintiff had included as an Exhibit in his Reply.[26]

25.     Plaintiff acknowledged in a reply email to Mr. Baron that same day that "I guess I did misunderstand the county's position" and asked if he needed to provide additional information to the commissioners.[27]

26.     Mr. Newton sent an additional email to Mr. Baron on the same day, indicating that his total hours spent on the 23B motion totaled $8,730.[28]

27.     Mr. Baron then replied to Mr. Newton, again on May 22, 2017 informing Plaintiff that he would need to send the request for additional funding related to the 23B motion to the commissioners directly, explaining both the need for the 23B remand, as well as the factors that affected the amount of time spent on the 23B motion.[29]

---

[25] *Id*. at p. 4.
[26] May 19-22, 2017 emails, attached as Exhibit M.
[27] *Id*.
[28] *Id*.
[29] *Id*.

28.     On May 25th, Plaintiff sent an email to Commissioner Harvey asking for $22,500 in additional funding for time previously spent on the 23B motion, as well his reasons supporting the need for a remand.[30]

29.     When Mr. Baron asked Plaintiff about the discrepancy in amounts, Plaintiff indicated that he had originally only provided the time spent drafting the 23B motion, totaling $8,730, but when he included all work related to preparing and drafting the 23B motion, it totaled $22,500.[31]

30.     After discussing Plaintiff's request with other county personnel, including Chris Allred and Mr. Harvey, Mr. Baron emailed Plaintiff on June 5, 2017 indicating three concerns that the county had related to Plaintiff's billing: 1) that Plaintiff billed the county for time related to Sean Young's discipline proceedings at the Utah State Bar; 2) billing the county for the time Plaintiff spent on his motion for attorney fees, which the court had denied; and 3) his billing related to frequent communication with Lovell, indicating specifically that the county did not understand why such frequent contact was required in an appellate case.[32]

31.     Mr. Baron also indicated that refusal to correct Plaintiff's invoices, or future billing practices, would result in the county seeking a new appellate attorney.[33]

32.     Mr. Baron asked that Plaintiff revise his request for additional funding for his previous work on the 23B motion and requested that he resubmit the revised request to the county.[34]

---

[30] May 25, 2017 emails, attached as Exhibit N.
[31] *Id.*
[32] Deposition of Bryan Baron ("Baron Dep."), attached as Exhibit O, 129:7-24; June 5, 2017 email, attached as Exhibit P.
[33] *Id.*

33.     Although Plaintiff occasionally recorded his time with multiple items under one amount of time, Plaintiff conservatively spent more than 50 hours speaking on the phone, writing letters to, or meeting with Lovell in 2016, and close to 30 hours in 2017, or approximately thirty percent of the time billed to his case in 2017.[35]

34.     Shortly after he sent that email, possibly the next day, Mr. Baron contacted Mr. Newton by telephone to explain that the county did not intend to limit Plaintiff's ability to communicate with his client, but rather to inquire why Plaintiff needed such extensive communication with his client on an appeal.[36]

35.     Mr. Baron also informed Plaintiff on that phone call that the county's statement about seeking new appellate counsel referred to capital cases, not Plaintiff's underlying appellate contract.[37]

36.     On June 6, 2017 Plaintiff responded to Mr. Baron regarding the county's concerns, explaining why he felt that time related to Mr. Young's discipline by the Utah Bar should have been billed to the county, and his reasons for such frequent communication with Lovell.[38]

37.     Plaintiff also acknowledged that he would withdraw his request for payment for time spent on his motion for attorney's fees.[39]

38.     On June 8, 2017 Mr. Baron circulated an email within the county which indicated that while the county disagreed with the amount of communication needed to adequately

---

[34] *Id.*
[35] Newton Time Records for 2016 and 2017, attached as Exhibit Y.
[36] Baron Dep., 54:24-55:14; 58:23-60:12.
[37] *Id.*
[38] June 6-9, 2017 emails, attached as Exhibit Q.
[39] *Id.*

represent Lovell on appeal, they would not require that he reduce his requested amount related to those communications.[40]

    39.    On June 9, 2017, before he received a response from the county regarding the additional information he had provided related to communications with Lovell or Sean Young's bar discipline, Plaintiff filed a motion to withdraw from Lovell's case.[41]

    40.    In his Motion to Withdraw, Plaintiff made various misrepresentations regarding his communications with the County:

    a.    Plaintiff estimates that it may take 252 hours for the remand proceeding, totaling $37,800 "which the county is currently taking a position that they will likely refuse to pay."[42]

    b.    Plaintiff also stated that "[h]e can abandon his own interests in getting paid and not try to compel the county to pay for his services and talk or speak with Mr. Lovell less" and that "[i]n essence, the county has told counsel that he must not bill them for what he believes to be necessary work on Mr. Lovell's case, such as communications, or it will terminate him from his major contract. This irreparably puts counsel's and Mr. Lovell's interests at odds."[43]

    c.    Plaintiff states that the county and the state have created the conflict between Mr. Lovell and himself "[b]y underfunding Mr. Lovell, by telling counsel that he

---

[40] *Id.*
[41] Plaintiff's Motion to Withdraw as appellate counsel for Lovell, attached as Exhibit R.
[42] *Id.* at p. 3.
[43] *Id.* p. 4

must limit his communications with Mr. Lovell or not insist on full funding or risk his appellate contract."[44]

       d.     Plaintiff stated "[t]he county attorney's suggestion that counsel limit his conversations with Mr. Lovell is equally problematic."[45]

       e.     Plaintiff also stated that "[b]ecause the county will not guarantee funding and has created an ethical quandary: represent Lovell and lose your contract, Mr. Lovell has lost the effective assistance of the counsel to which he is entitled."[46]

41.     At the time Plaintiff filed his motion to withdraw, the county believed that Plaintiff's motions contained misrepresentations.[47]

42.     On or around June 21, 2017 Plaintiff also filed a Response to the State's Motion to Inquire Into Defense Counsel's Potential Conflict of Interest to the Utah Supreme Court, which contained the following misrepresentations:[48]

       a.     "Despite counsel's recommendation that the remand proceeding and revisions to the brief would take between 200-400 hours, conservatively, the Commissioners would only authorize an additional $15,000, or 100 hours of work. The commissioners indicated that they would not authorize any additional funds for the remand proceeding, the brief, reply brief or other work on the appeal."[49]

---

[44] *Id*. at p. 6.
[45] *Id*.
[46] *Id*. at p. 8.
[47] June 9, 2017 email re misrepresentations in Motion to Withdraw, attached as Exhibit S.
[48] Response to the State's Motion to Inquire Into Defense Counsel's Potential Conflict of Interest, attached as Exhibit T.
[49] *Id*. at p. 3.

b.      "Though they did indicate that if those funds were exhausted, counsel

could reapproach the Commission for more funding, both only if he demonstrated good

cause, which they believed was doubtful. They do not intend to reimburse counsel for

work done on the appeal totaling almost $10,000."[50]

c.      "the county has not only refused to adequately fund the appeal and

remand, but has indicated that it would "need[ ] to look for another attorney for future

appeals."[51]

d.      "Because the bulk of counsel's income comes from an appellate contract

with Weber County, he faces a terrible catch-22: represent Mr. Lovell zealously and lose

his livelihood or compromise Mr. Lovell's case and save his practice."[52]

e.      "The county attorney told counsel that if he revised his invoices to remove

the disputed items that the commissioners would likely grant some additional funding.

However, he also indicated that the commissioners were not pleased with what they

deemed counsel's over-billing and that they would no longer be contracting with counsel

in the future."[53]

f.      "Counsel asked specifically if that meant that he would lose his major

contract (and his livelihood by association) and the attorney told him that the

commissioners had yet to make their decision. However, counsel takes the statement for

what it means: the county will no longer contract with him, so whether he loses his

_____

[50] *Id*. at p. 3, n. 1.
[51] *Id*. at p. 7.
[52] *Id*.
[53] *Id*. at p. 8.

appellate contract sooner or later, he must begin the process to seek different employment."[54]

      g.     "[the county] has indicated it will not pay for any more than $15,000 for the entire remand proceeding."[55]

      h.     "Perhaps most problematically is that the county has told counsel that he must limit his conversations with Mr. Lovell and not 'overbill' so much."[56]

      i.     "The county has also indicated that it will not contract with counsel in the future because of these concerns. This means a loss of counsel's entire livelihood . . ."[57]

      j.     "For example, the $15,000 the county has allowed for the remand proceeding also includes investigative services, which will be woefully lacking."[58]

      k.     "On this case, counsel faces a loss of his entire livelihood by litigating Mr. Lovell's case . . ."[59]

43.     The county first discussed potentially finding a replacement for Plaintiff, to take over the indigent appeals contract, in June 2017.[60]

44.     On June 30, 2017 Plaintiff sent an email indicating that he would be sending in an updated invoice for the 23B motion.[61]

45.     On July 18, 2017 Mr. Baron sent Plaintiff an email indicating that he still hadn't seen a revised invoice for the 23B motion.[62]

---

[54] *Id.*
[55] *Id.* at p. 12, n. 3.
[56] *Id.* at p. 15.
[57] *Id.* at p. 16.
[58] *Id.* at p. 18.
[59] *Id.* at p. 19.
[60] Baron Dep. 16:02-20.
[61] June 30, 2017 email, attached as Exhibit U.

46.     On July 18, 2017 Plaintiff sent in the same invoice that he had sent on June 6th for the $22,500 with no changes. Mr. Baron notified him that his updated invoice hadn't been updated, but Plaintiff never sent a revised version.[63]

47.     The Salt Lake Tribune published an article on July 18, 2017 which stated "Newton says the hearing will require hundreds of hours of investigation and preparation, which he estimates will cost more than $37,000. The county, however, has only authorized $15,000, up to this point. County officials also have expressed concern that Newton was overbilling, he wrote, and said he spoke to Lovell too frequently. County officials indicated in an email to Newton that if his billing practices don't change, they will have to find someone else for future appeals. 'That's the bind,' Newton said in a recent interview. 'Do I represent my client zealously like I'm constitutionally required to do? Or do I tread lightly so I don't lose my livelihood?'"[64]

48.     On August 29, 2017 Plaintiff appeared in court with Mr. Lovell to argue his Motion to Withdraw. During his oral argument, he repeated the allegation that the county had refused to provide him with anything more than the $15,000 that had been pre-authorized. He also told the court that the county had taken issue with his communication with Mr. Lovell and threatened to terminate his contract.[65]

49.     Mr. Baron informed Plaintiff on August 31, 2017 that the commissioners had approved his request for additional funding related to the 23B motion and requested an updated invoice.[66]

---

[62] June 18 and 21, 2017 emails, attached as Exhibit V.
[63] *Id.*
[64] Salt Lake Tribune article, July 18, 2017 attached as Exhibit W, pp. Weber County 052-053.
[65] Baron Dep. 86:01-91:06.
[66] August 31, 2017 invoice, attached as Exhibit X.

50.     Ultimately, of the $22,500 which Plaintiff requested in additional funding for previous work on the 23B motion, the commissioners approved additional funding in the amount of $18,232.50.[67]

51.     As Plaintiff had already been paid for much of his time spent on the 23B motion under his original contract, the approval of additional funding for the 23B motion acted to reduce the amount paid under the contract cap (or increase the overall cap, to the same effect), allowing Plaintiff to be reimbursed not only for any unpaid time spent on the 23B motion, but for any work on the appeal for which Plaintiff had not been paid for at that point, up to the combined amount of the contract and the additional funding approved for the 23B motion.[68]

52.     The $15,000 approved by the County would have acted to increase that cap further, for work related to the evidentiary hearing on the 23B remand, but Plaintiff never billed any time related to that hearing.[69]

53.     By the end of August 2017, the county decided that they would terminate Plaintiff's appellate contract and began looking at options for his replacement.[70]

54.     The court granted Plaintiff's motion to withdraw on June 9, 2017.[71]

55.     During their search for qualified counsel to represent Lovell after Plaintiff's withdrawal, the county only had one applicant due to the belief that the county would not pay defense attorneys.[72]

---

[67] Reimbursement Emails from Sep. 29 and Oct. 25, 2017, attached as Exhibit Z.
[68] Sep. 4, 2017 email, explaining payment to Plaintiff, attached as Exhibit AA.
[69] *Id.*
[70] Baron Dep. 96:24-97:05.
[71] Exhibit AA.
[72] Baron Dep. 171:1-172:6; 179:19-19; 166:16-172:6.

56.     Because of Plaintiff's misrepresentations, the attorney who did agree to represent Lovell asked for additional contractual considerations and refused to begin work until after she had received a payment from the county.[73]

57.     The county paid Plaintiff an additional $11,927.30 for his previous work on the 23B remand, and, after consulting with Plaintiff, paid him an additional $4,651.41 for work related to Lovell, constituting payment in full for Plaintiff's past work on the Lovell case.[74]

58.     Mr. Baron again discussed terminating Plaintiff's contract with county officials, including Commissioner Harvey, and the county decided it would not be in the best interests of the county to continue contracting with an attorney that was willing to misrepresent facts to both the court and to the media.[75]

59.     On October 26, 2017, Commissioner Jim Harvey informed Plaintiff via letter that the county would be terminating his appellate contract. [76]

---

[73] Baron Dep. 171:1-172:6; 179:19-19; 166:16-172:6.
[74] September 29 and October 25 emails, attached as Exhibit Z.
[75] Baron Dep. 8:10-23; Termination Letter, attached as Exhibit BB,
[76] *Id*.

**ARGUMENT**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  To apply this standard, the court must view "the evidence and draw reasonable inferences there from in the light most favorable to the nonmoving party."[77] To avoid summary judgment, "the party opposing the motion must establish, at a minimum, an inference of the existence of each essential element to the case."[78]

**I.      PLAINTIFF'S CONSTITUTIONAL RIGHTS WERE NOT VIOLATED**

In *Garcetti v. Ceballos,* the Supreme Court found that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."[79] While the First Amendment limits the ability of a public employer use the employment relationship to restrict "the liberties employees enjoy in their capacities as private citizens" which requires that when a government employee speaks on matters of public concern, they may only face "those speech restrictions that are necessary for their employers to operate efficiently and effectively."[80] To determine if an employee's constitutional rights were denied, the Court applies the five prongs of the *Garcetti/Pickering* analysis:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether

---

[77] *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
[78] *Id*. (Citations omitted).
[79] 547 U.S. 410, 126 S.Ct. 1951, 1958, (2006).
[80] *Id*.

the protected speech was a motivating factor in the adverse employment action;
and (5) whether the defendant would have reached the same employment decision
in the absence of the protected conduct.[81]

Courts have found that while "the first three inquiries involve matters of law, the last two

are questions of fact."[82] The Supreme Court also found that as "[i]ndependent

government contractors are similar in most relevant respects to government employees"

the same form of balancing analysis applies.[83] Specifically, in order for a public

contractor to show that her or his criticism "of the contracting government agency is

protected activity" it must pass the *Garcetti/Pickering* test.[84]

### A.    Plaintiff's Speech In His Capacity as Lovell's Counsel is Not Protected.

The first prong of the *Garcetti/Pickering* analysis requires that the Court decide whether

the Plaintiff spoke pursuant to his official duties, or as a citizen.[85] The Tenth Circuit has found

that if an employee speaks pursuant to his official duties, there is no constitutional protection, the

restriction on speech "simply reflects the exercise of employer control over what the employer

itself has commissioned."[86] The U.S. Supreme Court acknowledged that a citizen entering

government service "by necessity must accept certain limitations on his or her freedom."[87]

What's more, because of their positions, expressions by public employees can "contravene

governmental policies or impair the proper performance of government functions."[88] The court

---

[81] *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009) (citations omitted).
[82] *Id.*
[83] *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 684–85 (1996).
[84] *Glover v. Mabrey*, 384 F. App'x 763, 769 (10th Cir. 2010).
[85] B*rammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202–04 (10th Cir. 2007)
(quoting *Garcetti*, 547 U.S. at 422).
[86] *Id.*
[87] *Garcetti*, 547 U.S. at 418
[88] *Id.* at 419.

also noted that while the First Amendment "invests employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.' "[89] The Tenth Circuit has clarified that the ultimate question is whether the employee is speaking "in his or her professional capacity."[90] The Tenth Circuit stated that if the engages in speech in the course of an official duty, and "the speech reasonably contributes to or facilitates the employee's performance of the official duty" then the speech has been made pursuant to an official duty.[91] Here, there is no genuine issue of material fact that Plaintiff's representations to the court stemmed from his contractual relationship with the county, and occurred pursuant to his official duties as Lovell's attorney.

The present case is analogous to *Garcetti*, and the comparison clearly illustrates that Plaintiff's speech related to his representation of Lovell is not protected under the First Amendment. In that case, the Supreme Court determined that the plaintiff's speech was not protected, as it arose pursuant to his position (even though the same speech might be subject to the First Amendment balancing is the employee had spoken  a citizen addressing a matter of public concern).[92] The Plaintiff in *Garcetti*, Ceballos, a deputy district attorney for the Los Angeles County D.A.'s office, found misrepresentations in an affidavit used to obtain a critical search warrant.[93] Caballos informed his supervisors, both verbally and in a memo, and recommended dismissal.[94] When they met to discuss the case, a Sheriff's Office Lieutenant

---

[89] *Id*. at 420 (*quoting* Connick v. Myers, 461 U.S. 138, 154 (1983)).
[90] *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007) (citations and quotations omitted).
[91] *Id*. (citations omitted).
[92] *Garcetti*, 547 U.S. at 423.
[93] *Id*. at 413-414.
[94] *Id*. at 414.

sharply criticized Caballos and his supervisors decided to move forward with the case.[95] In a hearing challenging the warrant, the defense attorney called Ceballos to testify about the affidavit, but the judge rejected the defense's challenge.[96] Ceballos claimed that his office retaliated against him by reassigning him from a calendar deputy to a trial deputy position, moved him to another courthouse, and denying him a promotion.[97] The trial court granted Defendants' motion for summary judgment.

The Ninth Circuit reversed the trial court, finding that Ceballos' memo was inherently a matter of public concern and that Ceballos' interest in his speech outweighed his supervisors' interest in responding to it, as they had not shown that the speech led to disruption or inefficiency.[98] The Supreme Court, however, rejected that reasoning, finding that the Ninth Circuit failed to determine if Ceballos had spoken as a private citizen.[99]

The Supreme Court determined that "the controlling factor in Caballos' case" was that his expressions were "made pursuant to his duties as a calendar deputy" and that he wrote his memo "because that is part of what he, [in his position], was employed to do."[100] The Supreme Court also clarified that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."[101] The Supreme Court also distinguished the speech in *Garcetti* from that of *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968),

---

[95] *Id*.
[96] *Id*. at 414-415.
[97] *Id*. at 415.
[98] *Id*. at 415-416.
[99] *Id*. at 416.
[100] *Id*. at 412.
[101] *Id*. at 421-422.

4

demonstrating the difference in speech from a private citizen and an individual acting in an official capacity. Caballos' speech stemmed from his position, i.e. the memorandum, which he wrote pursuant to his employment duties.[102] In *Pickering*, where the speaker's letter "had no official significance and bore similarities to letters submitted by numerous citizens every day.[103]

1.   Plaintiff's Communications With the Court Are Not Protected.

Here, even drawing all reasonable inferences in the Plaintiff's favor, there is no dispute that Plaintiff's communications with the court were pursuant to his official duty as a defense attorney contracted with the county to represent Lovell. Plaintiff's arguments were not general complaints about rights under the Sixth Amendment but were specific to his client and his representation. For example, Plaintiff argued in his reply in support of his motion for attorneys fees that the county's position on the fees acted as a detriment to Lovell, and stated in his motion to withdraw that the failure to provide adequate funding created a conflict for his client.[104] Clearly, Plaintiff would not have communicated with the court regarding a detriment to, or a conflict with, Lovell, but for his agreement with the county to officially represent Lovell. Similarly, his complaints to the court relating to funding were inseparable from his official representation, as he argued that the additional funding were required to adequately represent Lovell, stating that Lovell's "right to the effective assistance of his appellate counsel is compromised" if the county did not provide adequate funds.[105]

Furthermore, by his signature on the documents filed with the court Plaintiff indicated his actions were those of the attorney for appellant, and his actions in seeking compensation for his

---

[102] *Garcetti*, 547 U.S. at 424.
[103] *Id*. at 422.
[104] Exhibit L, pp. 3-4; Exhibit R, pp. 3-4.
[105] Exhibit L, pp. 4, 7.

representation, as well as his arguments about the detriment to his client, provide for no other conclusion: Plaintiff's did not act as a concerned citizen in speaking to the court regarding additional funding or a request to withdraw, but in his official capacity representing his client as a county contractor.[106]

       2.    <u>Plaintiff's Communications With the Media Are Not Protected.</u>

When Plaintiff's comments to the media are considered, even though there may be a slight difference from his comments to the court, that speech also occurred pursuant to Plaintiff's official duties as Lovell's attorney. First, there is no evidence that Plaintiff would have communicated his concerns, or even had information to provide, if he had not been acting as Lovell's attorney, pursuant to his contract with the county. Additionally, his comments to the news media once again demonstrate that he is acting pursuant to his official duties as Lovell's attorney. For example, in the July 18, 2017 story by the Salt Lake Tribune, it noted that in a recent interview, Plaintiff asked "[d]o I represent my client zealously like I am constitutionally require to do? Or do I tread lightly so I don't lose my livelihood?"[107] This comment is directly related to Plaintiff's official duty to represent his client, but his statement also indicates that he is speaking, in that moment, as Lovell's attorney, or in his official capacity. Due to the specific nature of his comments to the news media, as well as his apparent intent to use that medium to advocate for his client's rights, it is clear that Plaintiff is commenting in his official role, as Lovell's attorney. Once again, as in *Garcetti*, Plaintiff would not have been in the position to speak on Lovell's representation, or his claims about funding, except for his official position through his contract with the county.

---

[106] *Id*. at p. 7.
[107] Exhibit W, p. 4.

Even if the court finds that Plaintiff's comments to the news media should be addressed differently than his communications with the court, Plaintiff cannot show that the *Pickering/Garcetti* analysis weighs in his favor. As explained in Section I(B)(4), below, even if Newton's comments to the news media are considered protected under the First Amendment, the county would have taken the same action against Plaintiff, due to his repeated misrepresentations to the court, even after he had been corrected by the county, and had admitted his mistakes.

Importantly, and as addressed more thoroughly, below, the county terminated Plaintiff's contract based on "untruthful and harmful" comments.[108] While Plaintiff's complaint makes expansive claims relating to his protected speech, there is no evidence to indicate that county terminated Plaintiff's contract for any reason beyond the untruthful comments related to Plaintiff's billing practices and requests for funding, as laid out below. As such, there is no genuine dispute of material fact as to the specific statements the county considered when it terminated Plaintiff's contract, and those statements were made either directly to the court in Plaintiff's official capacity as Lovell's attorney, or were made by Plaintiff to the media in that same capacity.

As noted above, the Supreme Court had clearly delineated types of speech that are not protected under the First Amendment, including speech pursuant to an individual's official duties.[109] Here, even in the light most favorable to Plaintiff, he communicated with both the court and news media in his official capacity as a public contractor representing Lovell, and for

---

[108] Exhibit BB.
[109] *Id.* at 425-426. *Garcetti* notes various other safeguards for speech which is not protected, such as whistleblower laws or labor codes, and references rules of conduct and other constitutional obligations which provide safeguards for attorneys and others. However, those safeguards do not apply to this case.

that reason his speech was not protected under the First Amendment. As the specific speech

considered by the county in terminating Plaintiff's contract was made pursuant to his official

duties, Plaintiff cannot show a constitutional violation, and Defendants respectfully request that

the Court grant their motion for summary judgment and dismiss Plaintiff's claims under 42

U.S.C. § 1983, with prejudice.

**B.     The Remainer of the *Garcetti/Pickering* Analysis Does not Weigh in Plaintiff's Favor.**

1.     Plaintiff's Misrepresentations Are Not A Matter of Public Concern.

Even if the Court finds that Plaintiff spoke as a citizen, either to the court or the news

media, Plaintiff cannot demonstrate that the subject of his speech was a matter of public concern.

If the court finds that the speech is not a matter of public concern, "then the speech is

unprotected, and the inquiry ends."[110] Speech involves matters of public concern when it can be

fairly considered "as relating to an matter of political, social, or other concern to the community,

or when it is the subject of legitimate news interest; that is, a subject of general interest and value

to the public."[111] However, speech "aimed at airing grievances of a purely personal nature is

generally not on a matter of public concern."[112] The Tenth Circuit has also found that when a

public employee speaks about "matters only of personal interest, absent the most unusual

circumstances, a federal court is not the appropriate forum in which to review the wisdom of a

personnel decision taken by a public agency."[113] When an employees expression is not

considered to relate to a "matter of political, social, or other concern to the community,

---

[110] *Brammer-Hoelter*, 492 F.3d at 1203.
[111] *Butler v. Bd. of Cty. Commissioners for San Miguel Cty.*, 920 F.3d 651, 655–56 (10th Cir. 2019) (quoting *Lane v. Franks*, 573 U.S. 228, 236-37 (2014)).
[112] *Id*. at 565 (citations and quotations omitted).
[113] *Id*. at 656 (quoting *Connick*, 461 U.S. at 147).

government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."[114] The Tenth Circuit has also found that the court "may consider the motive of the speaker, and whether the speech merely deals with personal disputes and grievances."[115] "Speech that exposes official impropriety generally involves matters of public concern, while speech that simply airs grievances of a purely personal nature typically does not.

In addition, the U.S. Supreme Court has found that factors that may tip the scale in the employer's favor include evidence that the plaintiff's testimony was false or erroneous.[116] The Tenth Circuit has stated that it may be assumed that "deliberately false or recklessly false statements by public employees are either unprotected by the First Amendment or, at least, that such intentional falsity would weigh heavily against protection."[117] Here, Plaintiff's statements at issue in this case were of a personal nature, generally related to his contract. Further, his repeated misrepresentation of material facts, to the court and others, which continued after he had been corrected by the county, weight against protection under the First Amendment.

In order to determine whether Plaintiff's statements are protected, it must first be clarified which statements are genuinely at issue in this case, as Plaintiff's complaint contains vague references to speech Plaintiff claims is protected.[118] Notwithstanding Plaintiff's complaint, the undisputed facts demonstrate that the county based its decision to terminate Plaintiff's contract on a limited number of "untruthful and harmful" statement made by Plaintiff to the court and

---

[114] *Id.* (quoting *Connick*, 461 U.S. at 146).
[115] *Id.* at 663 (citations and quotations omitted).
[116] *Lane v. Franks*, 134 S. Ct. 2369, 2373 (2014)
[117] *Moore v. City of Wynnewood*, 57 F.3d 924, 933 (10th Cir. 1995) (citing *Pickering*, 391 U.S. at 574).
[118] *See* Complaint, Dkt. No. 2, ¶¶ 48-49.

news media.[119] Specifically, the county took issue with the following statements made by

Plaintiff:

    a.    Plaintiff's Reply Brief in Support of his Motion for Attorney's fees, filed on April 17, 2017.[120]

        1.    The county believed Plaintiff misrepresented that the county had refused to fund anything beyond $15,000 for the remand hearing;[121]

        2.    The county believed Plaintiff misrepresented that the county would refuse to provide additional funding in the future.[122]

    b.    Plaintiff's Motion to Withdraw, filed on June 9, 2017.[123]

        1.    The county believed Plaintiff misrepresented that the county had refused to fund anything beyond $15,000 for the remand hearing;[124]

        2.    The county believed Plaintiff misrepresented his situation, that it underfunded him, and that the county was requiring that he limit his communications with his client, or his contract would be terminated.[125]

    c.    Salt Lake Tribune Article, July 18, 2017.[126]

        1.    The county believed that Plaintiff misrepresented the intent of their discussion related to billing practices;[127]

    d.    Plaintiff's Response to State's Motion to Inquire into Defense Counsel's Potential Conflict of Interest, filed on June 21, 2017.[128]

        1.    The county believed Plaintiff misrepresented that he could not receive additional funds, or that the county believed it was doubtful he would receive additional fund for the remand proceeding.[129]

        2.    The county believed Plaintiff misrepresented that they would not provide additional funding.[130]

---

[119] Exhibit BB.

[120] Exhibit L.

[121] *Id*. at pp. 3-4; Baron Dep.38:17-39:03.

[122] *Id*. at. P. 4; Baron Dep. 39:4-40:13.

[123] Exhibit R.

[124] *Id*. at p. 3; Baron Dep. 42:03-16; 44:03-17.

[125] *Id*. at 4, 6, 8; 46:11-47:11; 49:12-51:19.

[126] Exhibit W.

[127] *Id*. at p. 4; Baron Dep. 29:01-15.

[128] Exhibit T.

[129] *Id*. at 3; Baron Dep. 72:22-73:20.

[130] *Id*. at 9, 12; Baron Dep. 76:2-19; 77:15-78:24.

> 3. The county believed Plaintiff misrepresented that he was required to limit his communication with Lovell.[131]
>
> 4. The county believed Plaintiff misrepresented that they would terminate his appellate contract for zealous representation.[132]
>
> 5. The county believed Plaintiff misrepresented that he was allowed investigative resources in his contract.[133]
>
> 6. The county believed Plaintiff misrepresented that he would be terminated for litigation Lovell's case. [134]

e.   August 29, 2017 Hearing on Plaintiff's Motion to Withdraw.[135]

> 1. The county believed Plaintiff misrepresented that he was required to limit his communication with Lovell.[136]
>
> 2. The county believed Plaintiff misrepresented his underlying payments and contract.[137]
>
> 3. The county believed Plaintiff misrepresented that he was contacting Lovell too often, and concerns with his billing.[138]

f.   Salt Lake Tribune Article, September 2, 2017.[139]

> 1. The county believed that Plaintiff misrepresented his need to choose between representation and his family.[140]

g.   Ex Parte Motion for Attorney's fees, filed March 2017.[141]

> 1. The county believed Plaintiff misrepresented that he did not have access to investigative resources.[142]

While Plaintiff made various other statements to the court and news media, the county did not

consider those in its decision to terminate Plaintiff's contract, and there is no evidence that the

county considered any other statements, beyond those outlined above.

---

[131] *Id*. at 15: Baron Dep. 92:03-19.
[132] *Id*. at 16; 79:23-80:18.
[133] *Id*. at 18; Baron Dep. 81:14-82:24.
[134] *Id*. at 19; Baron Dep. 83:18-84:06.
[135] Transcript of Hearing on Motion to Withdraw, attached as Exhibit CC.
[136] *Id*. at p. 3, 10:30; Baron Dep. 86:7-8:05.
[137] *Id*. at p. 4; Baron Dep. 87:07-89:02
[138] *Id*. at p. 7; Baron Dep. 89:03-91:04
[139] Baron Dep. 29:19-30:2
[140] *Id*.
[141] Baron Dep. 126:10-17
[142] *Id*. at p. 2; Baron Dep. 126:10-17

In addition, these statements should not be considered protective, as they either misrepresented material facts known to Plaintiff at the time he made the statement, or he continued to make an incorrect statement, even after he had been informed of his error. For example, on April 11, 2017 Mr. Baron had informed Plaintiff that he believed that the commissioners would be willing to consider a request for additional funding related to work Plaintiff had already completed for the 23B remand.[143] in his Reply in Support of His Motion for Attorney's Fees, filed on April 17, 2017 Plaintiff indicated that "[t]he county had plainly indicated that counsel will not be allowed additional funding" beyond the additional $15,000 the county had already authorized for remand proceedings.[144]

On May 22, 2017 Mr. Baron informed Plaintiff by email that Plaintiff had misrepresented the county's position, and directed him to April 11th email (which Plaintiff had attached as an exhibit in his earlier Reply).[145] That same day, Plaintiff admitted in an email that he had misunderstood the county's position, and inquired about sending additional information to the commissioners related to such a request.[146] Plaintiff then sent a request for additional funding to the commissioners on May 25, 2017.[147] Then, in his motion to withdraw, although he acknowledged that the county had stated that it would consider granting additional funding, he still claimed to be in a "catch-22" due to worries about getting paid.[148]

Another example of Plaintiff's misrepresentations relates to his claims that the county failed to provide investigative resources. Plaintiff's contract indicates that he will be reimbursed

---

[143] Exhibit K.
[144] Exhibit L, p. 3.
[145] Exhibit M.
[146] *Id*.
[147] Exhibit N.
[148]Exhibit R, p. 4.

by the county for investigation expenses and authorizes him to utilize an investigator at the rate of up to $60/hour.[149] However, in his Ex Part Motion for Attorney's Fees, filed in March 2017, Plaintiff claimed that he had been unable to interview witnesses due to a lack of funds, and needed investigative resources.[150] In its Opposition to Plaintiff's Ex Parte Motion, the county informed the court of the provision in the contract authorizing use of an investigator, and informed the judge that Plaintiff knew of that provision, as he had previously used an investigator on the case.[151] Notwithstanding that information, Plaintiff again complained about a lack of investigative resources in his Response to the State's Motion to Inquire into Defense Counsel's Potential Conflict, which he filed on June 21, 2017.[152] Plaintiff also indicated in that motion that the investigation costs were included in the $15,000 additional funding he had been granted, even though they were part of his original contract. He also complained to the court that the state had greater resources, even though there is no indication that he had taken advantage of the investigative resources available to him, and which he had been reminded of several months earlier.[153]

These examples indicate two things. First, that the statements which concerned the county were disputes between Plaintiff and the county regarding his contract and other funding or monetary disputes. Plaintiff attempts to conflate these disputes with violations of Lovell's rights to effective assistance of counsel, among other things, but the facts do not support his claims. For instance, Plaintiff knew the amount of the contract before he began his representation

---

[149] Exhibit A, p. 2.
[150] Baron Dep. 126:10-17.
[151] Exhibit I, p. 15.
[152] Exhibit T, p. 18.
[153] *Id.*; Exhibit I, p. 15.

and agreed to undertake the case for the amount indicated. In addition, Plaintiff's complaint

indicates his experience with appellate matters, and thus should understand what such an appeal

will, or might, require.[154] Furthermore, the evidence shows that the county engaged in a good

faith effort to negotiate additional funding for Plaintiff. on March 14, 2017, within a week of

learning that the case had been remanded, the county approved an additional $15,000 in funding

for work related to the remand hearing.[155] Further, by March 23, 2017 the county had informed

Plaintiff that they would be willing to consider additional funds related to the remand hearing, if

Plaintiff exhausted the additional $15,000 that had already been granted.[156]

      The county also addressed Plaintiff's concerns about approving funding for past work.

After Plaintiff inquired if the county would not authorize past work, the next day, April 11, 2017

Mr. Baron informed Plaintiff that the commissioners agreed that the prior work on the 23B

motion would be good cause for exceeding the contract.[157] After discussing concerns that they

had with Plaintiff's billing, the county did ultimately approve additional funding for past work

related to the 23B motion, in the amount of $22,500.[158] The additional funding approved by the

county was well in excess of his original contract, totaling more than $33,000 additional funds,

based on Plaintiff's requests, or more than 30% in additional funding.[159]

      These facts demonstrate that while Plaintiff has alleged significant issues relating to the

county, they consistently addressed his concerns, and provided additional funding as he

requested. The county's good faith efforts to address Plaintiff's requests and needs demonstrate

---

[154] Complaint, Dkt. No. 2, ¶ 9.
[155] Exhibit C; Exhibit G.
[156] Exhibit J.
[157] Exhibit K.
[158] Exhibit AA.
[159] *Id*.

that Plaintiff's statements to the court and media were not based on significant political, social, or other community concerns, but merely hyperbole and exaggeration by the Plaintiff, creating the illusion of a greater issue, and further undermining his credibility. Finally, while the county and Plaintiff may have disagreed about portions of their contractual agreement, there is no evidence that the county engaged in any impropriety, and Plaintiff cannot show that his allegations against the county amounted to more than personal disputes and grievances, based on the contractual relationship between the parties, which is not a political or social concern.

Second, the examples about show that Mr. Newton repeatedly misrepresented his interactions with the county related to funding, resources, his communication with counsel, and his underlying appellate contract. Further, the examples above show that Plaintiff made several knowingly false statements. While any false or erroneous statements may reduce the likelihood that a statement is protected, knowingly false statements should either lose that protection altogether, or weigh heavily against protection.

For these reasons, Plaintiff cannot show that his statements contained any substance related to political or social concerns or impropriety, which would support his claim that his statements were protected. What's more, the undisputed facts demonstrate that Plaintiff not only made several misrepresentations, but that he also made knowingly false or untrue statements to the court, which weight heavily against a finding that his statements are protected under the First Amendment.  Because of this, Plaintiff's statements are not a matter of public concern, especially those statements listed above, which the county relied on in its decision to terminate Plaintiff's contract. As Plaintiff cannot show Defendant's took any action based on a protected

statement, he cannot show a constitutional violation, and the Court's inquiry is at an end. For these reasons, Defendant requests that Plaintiff's claims are dismissed with prejudice.

> 2.   The County's Interests in Promoting the Efficiency of its Public Service Outweighed Plaintiff's Interests in His Speech.

Even if the Court finds that parts of Plaintiff's speech were protected, the County's interests in promoting the efficiency of its public service outweighed Plaintiff's interest in his speech. In weighing an employee's First Amendment speech interest against an employer's interest in an efficient and disciplined work environment, "the question is whether the employer has an efficiency interest which would justify it in restricting the particular speech at issue."[160] Considerations include whether the speech impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise" but the only public employer interest that can outweigh a public employee's recognized speech rights "is the interest in avoiding direct disruption, *by the speech itself*, of the public employer's *internal* operations and employment relationships."[161]

The county does not deny that providing counsel to indigent defendants is an important service required under the U.S. Constitution, including ensuring that individuals charged with capital crimes are provided effective counsel. Because of this, it is vital that the county can find effective and qualified counsel to represent its indigent defendants. Plaintiff's speech directly disrupted the internal affairs of the office, and employment relationships. Specifically, Plaintiff's speech caused a shortage of attorneys to provide appellate services to indigent individuals,

---

[160] *Brammer-Hoelter*, 492 F.3d at 1207 (citations and quotations omitted).
[161] *Id*.

16

caused additional work and disarray as the county employees struggled to meet deadlines and find new appellate counsel.[162]

Specifically, due to Plaintiff's comments and misrepresentations, the county had difficulty finding a qualified attorney to take his place as Lovell's counsel.[163] In fact, only one qualified person applied for the position, and she expressed concern about receiving payment from the county; and other attorneys raised concerns as well. Furthermore, the county had to pay the new attorney a premium, presumably due to Plaintiff's comments.[164]

While Plaintiff claimed that the county's actions affected the rights of his client, his actions disrupted the office, and caused disruption in the process to find appellate attorneys, caused the county to have to pay more for their services, and his comments may continue to affect the county's reputation and ability to serve its residents for years to come.  For these reasons, the county's interest in an efficient and disciplined work environment outweigh Plaintiff's interest in his speech. For these reasons, the Court should find that Plaintiff's speech is not protected, and no constitutional violation occurred.

3.    The County's Decision to Termination Plaintiff's Contract Was Not Motivated by Protected Speech.

As noted above in Section I(B)(1), Plaintiff has alleged a broad range of speech that he claims is protected. Plaintiff bears the burden in demonstrating that his speech was a motivating factor for the county's decision.[165] However, as noted above, it is undisputed that the county only relied on a few statements, which constituted misrepresentations and knowingly false statements,

---

[162] Baron Dep. 171:1-172:6; 18:21-19:9; 166:16-172:6.
[163] Baron Dep. 68:19-69:17; 166:16-172:6.
[164] Baron Dep. 171:1-172:6; 179:19-19; 166:16-172:6.
[165] B*rammer-Hoelter* 492 F.3d at 1207.

in its decision to terminate Plaintiff's contract. Those statements are not a public concern, or protected, as noted above as well.

For these reasons, Plaintiff cannot meet his burden to show that Defendants were motivated by any protected statements, and so he cannot show a constitutional violation.

        4.    <u>The County Would Have Terminated Plaintiff's Contract in the Absence of Any Protected Conduct.</u>

As noted above, Plaintiff's speech was pursuant to his official duties, the statements at issue in this case were not protected, and so the county's decision to terminate his contract was not motivated by protected speech. However, in the event that the Court finds that Plaintiff's comments reported in the July 18 and September 2 Salt Lake Tribune articles, or any other speech by Plaintiff which the county considered as part of its decision to terminate plaintiff's contract, which are referred to in Section I(B)(2), above,  the county can "demonstrate that it would have taken the same action against the employee even in the absence of the protected speech."[166]

First, even if the articles are considered protected speech, they represent only a portion of the misrepresentations and falsehood communicated by Plaintiff.  In addition, the other statements listed in the section above were more serious. Specifically, they had been communicated to the court, where Plaintiff has an obligation to act ethically, and several of them, had been corrected or pointed out by the county, and Plaintiff continued to knowingly misrepresent those items to the court.[167] Further, the misrepresentations to the court were much more numerous, and were repeated more than once.

---

[166] *Id*. at 1208.
[167] *See* pp. 12-13, above.

As the misrepresentations to the news media duplicated other misrepresentations made by Plaintiff, and the communications to the court, even on their own, represent more serious errors and a refusal to address known errors, the county can show that it would have taken the same action, even in the absence of protected statements. For these reasons, Plaintiff cannot demonstrate a constitutional violation by the county.

### C.      Plaintiff Cannot Show a Conspiracy Under 42 U.S.C. § 1985(2)

Plaintiff claims that the county is liable for a constitutional violation under 42 U.S.C. § 1985(2).[168] Under § 1985(2), an obstruction of justice conspiracy claim requires three elements: "(1) a conspiracy, (2) to deter attendance in court or testimony by force or intimidation or to injure a witness for having appeared in court or testified, and (3) injury to the plaintiff."[169] "For the conspiracy element, the sequence of events alleged must be sufficient to allow a jury to infer from the circumstances that the conspirators had a meeting of the minds."[170]

Plaintiff has not plead any facts alleging that a meeting of the minds occurred, let alone one that indicated the type of harm contemplated by the statute. Further, there are no facts to support a claim that the county, or any of its officers or employees intended or attempted to deter Plaintiff from attending or testifying in court, or acted to intimidate or injure him. In fact, after Plaintiff withdrew from Lovell's case, the county continued to address the approved requests for additional funds, for work he had already completed.[171]

As there are no allegations and no evidence to support a claim under 42 U.S.C. § 1985(2), Defendants respectfully request that the Court dismiss this claim with prejudice.

---

[168] Complaint, Dkt. No. 2, ¶ 60.
[169] *Hogan v. Winder*, 762 F.3d 1096, 1113 (10th Cir. 2014).
[170] *Id.* at 1114.
[171] Exhibit AA.

## II.      DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

For a Plaintiff to overcome a qualified immunity defense, the Plaintiff must show that: "(1) the individual Defendants violated [Plaintiff's] constitutional rights, and that (2) those rights were clearly established at the time of the alleged violation."[172] The Supreme Court has stated that "[i]f, and only if, court finds a violation of a constitutional right" the next step is to "ask whether right was clearly established in light of the specific context of the case."[173] If the Court finds that a constitutional violation did occur, Defendants are entitled to qualified immunity, as Plaintiff's rights, as an independent contractor with the county, were not clearly established at the time of the alleged violation.

Based on the *Garcetti/Pickering* analysis, in order to find that the county violated Plaintiff's First Amendment right, the Court must find that Plaintiff did not speak pursuant to his official capacity, as there is no protection for individuals speaking pursuant to their official capacity.[174] If the court determined that Plaintiff, as an independent contractor, did not speak pursuant to his official capacity as a contractor with the county, as an attorney for his client, or otherwise pursuant to his relationship with the county, the Defendants are entitled to qualified immunity, as Plaintiff's constitutional rights were not clearly established at the time of Plaintiff's allegations.

Specifically, the county is aware that the Supreme Court, in *Garcetti*, implemented a test to determine if public employees spoke pursuant to their official duties.[175] If the speech is pursuant to the employee's official capacity, the speech does not receive the protection of the

---

[172] *Butler*, 920 F.3d at 655.
[173] *Scott v. Harris*, 550 U.S. 372, 377 (2007) (citations and quotations omitted).
[174] B*rammer-Hoelter* 492 F.3d at 1203.
[175] *See* generally, *Garcetti*, 547 U.S. 410.

First Amendment.[176] In addition, the county is aware that the Supreme Court has found that "[i]ndependent government contractors are similar in most relevant respects to government employees."[177] However, the courts have not determined specifically whether an individual under contract with a public entity would be subject to the same standard as an employee of that public entity, to determine if the independent contractor's speech was pursuant to his official capacity.

In the specific context of this case, it is clear that if our plaintiff had been an attorney employed by a public entity (and not an independent contractor), who is acting in his position, including writing briefs, would be considered speaking pursuant to his official capacity, and therefore have no protection for his speech, the Supreme Court undertook that exact analysis in setting out the official capacity test in *Garcetti*.[178] Further, while the courts have treated employees and independent contractors in a similar manner in the balancing test, it does not appear that the test has been applied to an independent contractor since *Garcetti* provided an additional prong.

Therefore, if the court found that Plaintiff was not actin pursuant to his official capacity as an independent contractor, it would be implementing an area of law where employees and independent contractors diverged under the test. As the courts have not ruled on that possible divergence yet, the law for such a decision is not clear, and Plaintiff's rights in the specific context of this case are not clearly established.

---

[176] *Id.*
[177] *Umbehr*, 518 U.S. at 684.
[178] *Garcetti*, 547 U.S. at 413-424.

For this reason, if the Court finds a constitutional violation occurred, the Defendants are entitled to qualified immunity, as Plaintiff's rights were not clearly established at the time of the violation. As Defendants are entitled to qualified immunity, they request that the Court grant their motion for summary judgment and dismiss Plaintiff's claims with prejudice.

## CONCLUSION

As Plaintiff speech was not protected Defendants did not violate his constitutional rights under the First Amendment. In the alternative, if the Court finds that a constitutional violation did occur, Defendants are entitled to qualified immunity, as the law relating to independent contractors and the official capacity doctrine was not clearly established at the time of the violation. For these reasons, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss Plaintiff's claims with prejudice.

DATED this 14th day of June, 2019.

STRONG & HANNI


_/s/_____
Kristin A. VanOrman
Matt Harrison
*Attorneys for Defendants Weber County,*
*James H. Harvey, Kerry W. Gibson, and*
*Charles J. Ebert*

22

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 14th day of June, 2019, I did cause a true and correct

copy of the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND**

**MEMORANDUM IN SUPPORT** to be served via email, upon the following:

> Karra J. Porter
> J.D. Lauritzen
> CHRISTENSEN & JENSEN
> 257 East 200 South, Suite 1100
> Salt Lake City, UT  84111
> karra.porter@chrisjen.com
> jd.lauritzen@chrisjen.com

_____/s/_____
