Kristin A. VanOrman (7333)
Matt Harrison (13735)
**STRONG AND HANNI**
102 South 200 East, Suite 800
Salt Lake City, Utah 84111
Telephone: (801) 532-7080
Facsimile: (801) 596-1508
kvanorman@strongandhanni.com
mharrison@strongandhanni.com

*Attorneys for Defendant Weber County,*
*James H. Harvey, Kerry W. Gibson, and Charles J. Ebert*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| LAW OFFICE OF SAMUEL P. NEWTON, P.C. and SAMUEL P. NEWTON, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> WEBER COUNTY, a political subdivision of the state of Utah; JAMES H. HARVEY, KERRY W. GIBSON, and CHARLES J. EBERT, in their official and individual capacities <br><br> Defendant. | **DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** <br><br><br> Civil No.1:18-cv-00015 HCN-EJF <br><br> Judge Howard C. Nielson, Jr. <br> Magistrate Judge Evelyn J. Furse |

Defendants Weber County ("Weber" or "the County"), James H. Harvey, Kerry W. Gibson, and Charles J. Ebert (collectively "Defendants"), by and through their attorney of record, hereby submit the following amended motion for summary judgment and their memorandum in support, pursuant to Rule 56 of the Federal Rules of Civil Procedure. As there is

no genuine dispute as to any material fact and Defendant is entitled to judgment as a matter of law, summary judgment should be granted.

## INTRODUCTION AND REQUESTED RELIEF

Plaintiff has alleged a violation of his First Amendment right to free speech. He claims that Defendants Harvey, Gibson, and Ebert violated 42 U.S.C. §§ 1983 and 1985, and that Weber County, through the actions of its Commissioners, violated 42 U.S.C. § 1983. Even construing the facts in the light most favorable to Plaintiff, he cannot show Defendants violated his constitutional rights. Specifically, under the *Garcetti/Pickering* analysis, Plaintiff's actions in representing his client, and the misrepresentations he made to the court and news media, constituted speech pursuant to his official capacity and is not protected under the First Amendment. Even if the Court finds that Plaintiff did not speak pursuant to his official capacity, his constitutional rights were not denied, as the *Garcetti/Pickering* analysis does not weigh in his favor for the following reasons: his speech did not affect a public concern; his interest in his speech did not outweigh Defendants' interest; and any protected speech by the Plaintiff did not substantially motivate Defendants' decision to terminate his contract, as Plaintiff's contact would have been terminated even in the absence of protected speech. In addition, even if the court finds that Defendants violated one of Plaintiff's constitutional rights, they are entitled to qualified immunity, as the law relating to Plaintiff's rights is not clear, as the Tenth Circuit has not addressed independent contractors under *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 1958, (2006).

For these reasons, Plaintiff cannot show that Defendants violated his First Amendment rights, and even if a constitutional violation is found, Defendants are entitled to qualified

immunity. Defendants request that the Court grant their motion for summary judgement and dismiss Plaintiff's First Amendment claims, under 42 U.S.C. § 1983 and § 1985(2), with prejudice.

## BACKGROUND

Plaintiff is an attorney who worked under contract with Weber County to handle indigent defense appeals.[1] Under an agreement with the County, Plaintiff represented Douglas Lovell on appeal, after a jury sentenced Mr. Lovell to death for the murder of Joyce Yost.[2] Per his contract, Plaintiff agreed to represent Mr. Lovell for $150/hour in his first appeal of right, up to the amount of $75,000, which could only be exceeded upon a showing of good cause with the court and the County.[3] While drafting his appellate brief, Plaintiff also drafted a motion to remand the proceedings for a hearing pursuant to Rule 23B of the Utah Rules of Appellate Procedure. The Utah Supreme Court granted that motion and remanded the case back to the district court for a hearing about the potential ineffective assistance of Lovell's trial counsel. At the time of the remand, Plaintiff had exhausted approximately $70,000 of the compensation allowed in his contract. Plaintiff requested additional funding, estimating that the remand hearing could take from 500-700 hours of additional work. During this time, Plaintiff filed a motion for attorney fees with the court, which was denied. Defendants agreed to pay additional compensation for the remand hearing, for 100 hours of work, or $15,000 in addition to the previous contracted amount. The County also discussed approving additional compensation with Plaintiff, related to previous work completed on the 23B motion. As part of that negotiation, Defendants asked for

[1] Plaintiff's Complaint ("Compl."), Dkt. No. 2, ¶ 11.
[2] *Id*. at ¶ 14.
[3] Newton contract for Lovell Appeal, attached as Exhibit A, pp. 1-2.

an explanation of certain items billed by Plaintiff and informed him that continuing to bill inappropriately might result in termination of his contract. Due in part to the ongoing discussions about additional funding, and his billing practices, Plaintiff filed a motion to withdraw as counsel for Lovell. Defendants also eventually approved $18,232.50 in additional compensation for Plaintiff's work on the 23B motion. Throughout this period, Plaintiff made incorrect or false representations to the court in his motion for attorney's fees, his reply to the county's memorandum in opposition, his motion to withdraw, his response to a motion filed by the state relating to a potential conflict, and during the hearing on his motion to withdraw. Plaintiff also misrepresented facts in statements which appeared in two separate Salt Lake Tribune articles. Plaintiff's misrepresentations and false information had to do with the County's decisions and negotiations regarding additional funding, the County's view of his billing practices, his access to investigative services, and how those items affected his ability to represent his client. Plaintiff misrepresented several of the facts on multiple occasions and several after he had been informed that his previous statements were incorrect. The court eventually granted Plaintiff's motion to withdraw from the Lovell case, and due to Plaintiffs' misrepresentation of facts the County decided to terminate Plaintiff's other indigent appellant contract.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On June 28, 1993, Douglas Lovell ("Lovell") pled guilty to aggravated murder of Joyce Yost. On August 20, 1993, the district court sentenced Lovell to death.

2.      Lovell filed a motion to withdraw his guilty plea which was denied as untimely by the district court. The Utah Supreme Court reversed the denial and remanded the case for consideration of the motion. On remand, the district court denied Lovell's motion again, but in 2010, the Supreme Court reversed the second denial.

3.      In March 2015, Lovell was given a new trial. He was represented by two attorneys, Michael Bouwhuis and Sean Young. On April 1, 2015, the jury sentenced Lovell to death.

4.      In April 2015, the County entered into a contract with Plaintiff to represent Lovell on appeal (the "contract").[4]

5.      The contract with Plaintiff contemplates a limit of $75,000 to represent Lovell on appeal at a rate of $150 per hour. The contract also provides that the $75,000 limit may only be exceeded upon a showing of good cause.[5]

6.      In Section Three, the contract provides that the County will reimburse expenses for investigative services and other costs.[6]

7.      On May 18, 2016, Plaintiff filed a motion under Rule 23B of the Utah Rules of Appellate Procedure to remand Lovell's case to the district court to develop a record on a claim of ineffective assistance of counsel. [7]

---

[4] Exhibit A.
[5] *Id*. at p. 2
[6] *Id*.

v

8.      The Utah Supreme Court granted the 23B motion on March 6, 2017, ordering an evidentiary hearing to decide whether trial counsel Sean Young performed deficiently, and, if so, whether that deficient performance prejudiced Lovell.[8]

9.      In December 2016, Plaintiff was getting close to the $75,000 limit in the contract.[9]

10.     On January 5, 2017, prior to the Utah Supreme Court's remand of the case, Plaintiff sent a letter to the Weber County Commissioners regarding additional funding.[10]

11.     On March 7, 2017, Plaintiff sent an update to the Commissioners indicating that Lovell's case had been remanded and restated his request for funding, noting that the Supreme Court had requested that the remand proceedings be completed within 90 days, pursuant to Utah R. App. P. 23B(c).[11]

12.     On March 9, 2016, Plaintiff indicated that he believed that it would probably take "several hundred hours" for the remand proceedings, indicating a range of 500-700 hours.[12]

13.     On March 14, 2017, Commissioner Harvey responded to Plaintiff's request for additional funding, indicating that he believed Plaintiff's estimate was high and that the additional work would likely only take 100 hours, totaling $15,000 at the rate of $150/hour.[13]

14.     Plaintiff responded to Commissioner Harvey immediately, providing additional information about remand proceedings, and suggesting that the County authorize approval of his

---

[7] Docket Report, State v. Lovell Docket No. 20150632, attached as Exhibit B; Utah Supreme Court Order on 23B Motion, attached as Exhibit C.
[8] *Id*.
[9] Baron December 2016 Emails, attached as Exhibit D.
[10] Emails re additional funding, attached as Exhibit E, p. 2.
[11] *Id*.; Exhibit C, p. 2
[12] March 2017 email chain, attached as Exhibit F, p. 2.
[13] Harvey March 14, 2017, email attached as Exhibit G.

past work, in addition to 100 hours of future work, stating that after he completed the 100 hours

on remand, he would be able to better estimate if additional time were needed, and indicating

that there was a chance he overestimated the necessary work.[14]

      15.    On March 20, 2017, Plaintiff filed an Ex Parte Motion for Payment of Attorney

Fees and Litigation Expenses, where he requested that the court pre-authorize only 200 hours of

additional work.[15]

      16.    Commissioner Harvey responded to Plaintiff's supplemental request on March 23,

2017, indicating that he felt that Plaintiff had shown good cause for additional funds, and while

they considered 100 hours to be a reasonable estimate, he assured Plaintiff that if the remand did

take longer than 100 hours, the Commission would consider additional funding requests.[16]

      17.    On March 31, 2017, the County filed a Memo in Opposition to Plaintiff's Ex

Parte Motion for Payment of Attorney Fees.[17]

      18.    In its memorandum, the County noted that Commissioner Harvey had informed

Plaintiff on March 23, 2017, that if the remand took longer than 100 hours, the County would

consider an additional request for funding, if it were justified.[18]

      19.    On April 10, 2017, Plaintiff emailed Mr. Baron and asked if it was the County's

position that he would not be paid for past work, but only for future work.[19]

---

[14] Newton March 14, 2017, email attached as Exhibit H.
[15] Intervenor's Memorandum in Opposition to Ex Parte Motion for Attorney Fees, attached as Exhibit I.
[16] Harvey March 23, 2017, email attached as Exhibit J.
[17] Exhibit I.
[18] *Id.* at NEWTON 000316.
[19] April 10-11, 2017, Email Chain attached as Exhibit K.

20.     Mr. Baron replied on April 11, 2017, informing Plaintiff that the commissioners agreed that the 23B remand was good cause for exceeding the contract, but that the main communication between Plaintiff and the County had concerned future events, specifically, the evidentiary hearing and correlating edits to Plaintiff's brief.[20]

21.     Mr. Baron also informed Plaintiff that he believed the commissioners would be willing to consider a request for additional funding related to Plaintiff's previous work on the 23B motion but did not believe the commissioners would offer additional money for the oral argument and the reply brief, which were contemplated in the original contract.[21]

22.     On April 17, 2017, Plaintiff filed a Reply Brief in support of his Ex Parte Motion for Payment of Attorney Fees (the "Reply").[22]

23.     In his Reply, Plaintiff made the following statements:

a.      Plaintiff states that the County only authorized $15,000 for work related to the 23B remand, claiming that "[t]he county has plainly indicated that counsel will not be allowed additional funding."[23]

b.      Plaintiff informed the Court that "[t]he hearings alone will take fifty-plus hours and preparation will take two or three times that number of hours."[24]

c.      Plaintiff indicated that "[t]here is already a clash of interests over payment of fees, since the county will not reimburse Mr. Lovell for actual expenditures already made, and this issue will imminently escalate to greater detriment to Mr. Lovell when the

---

[20] *Id*.
[21] *Id*.
[22] Reply to Memorandum in Opposition to Ex Parte Motion for Payment of Attorney Fees, attached as Exhibit L.
[23] *Id*. at p. 3.
[24] *Id*.

county refuses to fund anything beyond its offer of $15,000 which Mr. Lovell contends is not adequate for the remainder of work to be done."[25]

24.     On May 22, 2017, Mr. Baron contacted Plaintiff and informed him that after reviewing Plaintiff's Reply he believed that Plaintiff had either misrepresented or misunderstood the County's position, as Mr. Baron's email on April 11, 2017 noted that the commissioners would be willing to consider a request for additional funding relating to Plaintiff's previous work on the 23B Remand, and which Plaintiff had included as an exhibit in his Reply.[26]

25.     Plaintiff acknowledged in a reply email to Mr. Baron that same day that "I guess I did misunderstand the county's position" and asked if he needed to provide additional information to the commissioners.[27]

26.     Plaintiff then followed up with an additional email to Mr. Baron on the same day, indicating that the hours spent on the 23B motion totaled $8,730.[28]

27.     Mr. Baron replied to that email immediately, informing Plaintiff that he would need to send the request for additional funding related to the 23B motion to the commissioners directly, and indicating that Plaintiff would need to explain both the need for the 23B remand, as well as the factors that affected the amount of time spent on the 23B motion.[29]

---

[25] *Id*. at p. 4.
[26] May 19-22, 2017, emails attached as Exhibit M.
[27] *Id*.
[28] *Id*.
[29] *Id*.

28.     On May 25th, Plaintiff sent an email to Commissioner Harvey asking for $22,500 in additional funding for time previously spent on the 23B motion, and outlined the reasons supporting a remand.[30]

29.     When Mr. Baron asked Plaintiff about the discrepancy in the totals, Plaintiff indicated that he had originally provided only the time spent drafting the 23B motion, totaling $8,730, but when he included all work related to preparing and drafting the 23B motion, it totaled $22,500.[31]

30.     After discussing Plaintiff's request with other county personnel, including Chris Allred and Mr. Harvey, Mr. Baron emailed Plaintiff on June 5, 2017. That email indicated three concerns that the County had regarding Plaintiff's billing: 1) that Plaintiff billed the county for time related to Sean Young's discipline proceedings at the Utah State Bar; 2) billing for the time Plaintiff spent on his motion for attorney fees, which the court had denied; and 3) billing related to frequent communication with Lovell, stating that the County did not understand why such frequent contact was required in an appellate case.[32]

31.     Mr. Baron also indicated that refusal to correct Plaintiff's invoices, or future billing practices, would result in the County looking for a new appellate attorney.[33]

32.     Mr. Baron also asked that Plaintiff revise his request for additional funding related to the 23B motion and directed him to submit the revised request to the County.[34]

_____

[30] May 25, 2017, emails attached as Exhibit N.
[31] *Id.*
[32] Deposition of Bryan Baron ("Baron Dep."), attached as Exhibit O, 129:7-24; June 5, 2017, email attached as Exhibit P.
[33] *Id.*
[34] *Id.*

33.     Although Plaintiff occasionally recorded his time with multiple items under one entry, a conservative estimate shows that Plaintiff spent more than 50 hours speaking on the phone, writing letters, or meeting with Lovell in 2016, and close to 30 hours in 2017, or, in other words, approximately thirty percent of the time Plaintiff billed to Lovell's case in 2017.[35]

34.     Shortly after he sent that email, possibly the next day, Mr. Baron contacted Mr. Newton by telephone to provide additional explanation for his email. Mr. Baron told Plaintiff that the County did not intend to limit his ability to communicate with his client, but the County was simply inquiring as to why such extensive communication was needed on an appeal.[36]

35.     Mr. Baron also informed Plaintiff on that phone call that the County's statement about seeking new appellate counsel referred only to capital cases, not Plaintiff's underlying appellate contract.[37]

36.     On June 6, 2017, Plaintiff responded to the County's concerns, explaining why he felt that time related to Mr. Young's discipline by the Utah Bar should have been billed to the County, and his reasons for such frequent communication with Lovell.[38]

37.     Plaintiff also acknowledged that he would withdraw his request for payment for time spent on his motion for attorney's fees.[39]

38.     On June 8, 2017, Mr. Baron circulated an email within the county which indicated that while the County disagreed with the amount of communication needed to adequately

---

[35] Newton Time Records for 2016 and 2017, attached as Exhibit Y.
[36] Baron Dep., 54:24-55:14; 58:23-60:12.
[37] *Id*.
[38] June 6-9, 2017, emails attached as Exhibit Q.
[39] *Id*.

represent Lovell on appeal, they would not require that he reduce his requested amount related to those communications.[40]

39.     On June 9, 2017, before he received a response from the County regarding the additional information he had provided about communications with Lovell or Sean Young's bar discipline, Plaintiff filed a motion to withdraw from Lovell's case.[41]

40.     In his Motion to Withdraw, Plaintiff made various misrepresentations regarding his communications with the County:

    a.     Plaintiff estimated that it might take 252 hours for the remand proceeding, totaling $37,800 "which the county is currently taking a position that they will likely refuse to pay."[42]

    b.     Plaintiff stated that "[h]e can abandon his own interests in getting paid and not try to compel the county to pay for his services and talk or speak with Mr. Lovell less" and that "[i]n essence, the county has told counsel that he must not bill them for what he believes to be necessary work on Mr. Lovell's case, such as communications, or it will terminate him from his major contract. This irreparably puts counsel's and Mr. Lovell's interests at odds."[43]

    c.     Plaintiff states that the County and the state have created the conflict between Mr. Lovell and himself "[b]y underfunding Mr. Lovell, by telling counsel that he

---

[40] *Id.*
[41] Plaintiff's Motion to Withdraw as appellate counsel for Lovell, attached as Exhibit R.
[42] *Id.* at p. 3.
[43] *Id.* p. 4

must limit his communications with Mr. Lovell or not insist on full funding or risk his

appellate contract."[44]

      d.     Plaintiff stated "[t]he county attorney's suggestion that counsel limit his

conversations with Mr. Lovell is equally problematic."[45]

      e.     Plaintiff also claimed that "[b]ecause the county will not guarantee

funding and has created an ethical quandary: represent Lovell and lose your contract, Mr.

Lovell has lost the effective assistance of the counsel to which he is entitled."[46]

41.     At the time Plaintiff filed his motion to withdraw, the County believed that the

motion contained misrepresentations.[47]

42.     On or around June 21, 2017, Plaintiff also filed a Response to the State's Motion

to Inquire Into Defense Counsel's Potential Conflict of Interest to the Utah Supreme Court,[48]

which contained the following misrepresentations:

      a.     "Despite counsel's recommendation that the remand proceeding and

revisions to the brief would take between 200-400 hours, conservatively, the

Commissioners would only authorize an additional $15,000, or 100 hours of work. The

commissioners indicated that they would not authorize any additional funds for the

remand proceeding, the brief, reply brief or other work on the appeal."[49]

---

[44] *Id*. at p. 6.
[45] *Id*.
[46] *Id*. at p. 8.
[47] June 9, 2017, email re misrepresentations in Motion to Withdraw, attached as Exhibit S.
[48] Response to the State's Motion to Inquire Into Defense Counsel's Potential Conflict of
Interest, attached as Exhibit T.
[49] *Id*. at p. 3.

b.      "Though they did indicate that if those funds were exhausted, counsel could reapproach the Commission for more funding, both [*sic*] only if he demonstrated good cause, which they believed was doubtful. They do not intend to reimburse counsel for work done on the appeal totaling almost $10,000."[50]

c.      "[T]he county has not only refused to adequately fund the appeal and remand, but has indicated that it would 'need to look for another attorney for future appeals.' "[51]

d.      "Because the bulk of counsel's income comes from an appellate contract with Weber County, he faces a terrible catch-22: represent Mr. Lovell zealously and lose his livelihood or compromise Mr. Lovell's case and save his practice."[52]

e.      "The county attorney told counsel that if he revised his invoices to remove the disputed items that the commissioners would likely grant some additional funding. However, he also indicated that the commissioners were not pleased with what they deemed counsel's over-billing and that they would no longer be contracting with counsel in the future."[53]

f.      "Counsel asked specifically if that meant that he would lose his major contract (and his livelihood by association) and the attorney told him that the commissioners had yet to make their decision. However, counsel takes the statement for what it means: the county will no longer contract with him, so whether he loses his

---

[50] *Id.* at p. 3, n. 1.
[51] *Id.* at p. 7 (quotation uncited in original).
[52] *Id.*
[53] *Id.* at p. 8.

appellate contract sooner or later, he must begin the process to seek different employment."[54]

      g.      "[the county] has indicated it will not pay for any more than $15,000 for the entire remand proceeding."[55]

      h.      "Perhaps most problematically is that the county has told counsel that he must limit his conversations with Mr. Lovell and not 'overbill' so much."[56]

      i.      "The county has also indicated that it will not contract with counsel in the future because of these concerns. This means a loss of counsel's entire livelihood . . ."[57]

      j.      "For example, the $15,000 the county has allowed for the remand proceeding also includes investigative services, which will be woefully lacking."[58]

      k.      "On this case, counsel faces a loss of his entire livelihood by litigating Mr. Lovell's case . . ."[59]

43.     In June 2017, the County discussed potentially finding a replacement for Plaintiff, to take over the indigent appeals contract.[60]

44.     On June 30, 2017, Plaintiff sent an email indicating that he would be sending in an updated invoice for the 23B motion.[61]

45.     On July 18, 2017, Mr. Baron sent Plaintiff an email indicating that he still hadn't seen a revised invoice for the 23B motion.[62]

---

[54] *Id.*
[55] *Id.* at p. 12, n. 3.
[56] *Id.* at p. 15 (quotation uncited in original).
[57] *Id.* at p. 16.
[58] *Id.* at p. 18.
[59] *Id.* at p. 19.
[60] Baron Dep. 16:02-20.
[61] June 30, 2017, email attached as Exhibit U.

46.     On July 18, 2017, Plaintiff sent in the same invoice that he had sent on June 6th,

requesting $22,500, with no changes. Mr. Baron notified him that his invoice had not been

updated, but Plaintiff never sent a revised version.[63]

47.     The Salt Lake Tribune published an article on July 18, 2017, which stated:

"Newton says the hearing will require hundreds of hours of investigation and preparation, which

he estimates will cost more than $37,000. The County, however, has only authorized $15,000, up

to this point. County officials also have expressed concern that Newton was overbilling, he

wrote, and said he spoke to Lovell too frequently. County officials indicated in an email to

Newton that if his billing practices don't change, they will have to find someone else for future

appeals. 'That's the bind,' Newton said in a recent interview. 'Do I represent my client zealously

like I'm constitutionally required to do? Or do I tread lightly so I don't lose my livelihood?' "[64]

48.     On August 29, 2017, Plaintiff appeared in court with Mr. Lovell to argue his

Motion to Withdraw. During his oral argument, he repeated the allegation that the County would

not provide him with anything more than the $15,000 that had been pre-authorized. He also told

the court that the County had taken issue with the frequency of his communication with Mr.

Lovell and threatened to terminate his contract.[65]

49.     Mr. Baron informed Plaintiff on August 31, 2017, that the commissioners had

approved his request for additional funding related to the 23B motion and requested an updated

invoice from Plaintiff.[66]

---

[62] June 18 and 21, 2017, emails attached as Exhibit V.
[63] *Id.*
[64] Salt Lake Tribune article, July 18, 2017, attached as Exhibit W, pp. Weber County 052-053.
[65] Baron Dep. 86:01-91:06.
[66] August 31, 2017, invoice attached as Exhibit X.

50.     Ultimately, of the $22,500 which Plaintiff requested in additional funding for previous work on the 23B motion, the commissioners approved funding for past work in the amount of $18,232.50.[67]

51.     As Plaintiff had already been paid for much of his time spent on the 23B motion under his original contract, the approval of additional funding for the 23B motion acted to reduce the amount paid under the contract cap (or increase the overall cap, to the same effect), allowing Plaintiff to be reimbursed not only for any unpaid time spent on the 23B motion, but for other work on the appeal for which Plaintiff had not been paid, up to the combined amount of the contract and the additional funding approved for the 23B motion.[68]

52.     The $15,000 approved by the County would have acted to increase that cap further, at least for work related to the evidentiary hearing on the 23B remand, but Plaintiff never billed the County for any time related to that hearing.[69]

53.     By the end of August 2017, the County decided that they would terminate Plaintiff's underlying appellate contract and began looking at options for his replacement.[70]

54.     The court granted Plaintiff's Motion to Withdraw from the Lovell case during the hearing for that motion, held on August 29, 2017.[71]

55.     During their search for qualified counsel to represent Lovell after Plaintiff's withdrawal the County only had one applicant due to the belief that the County would not pay defense attorneys.[72]

---

[67] Reimbursement Emails from Sep. 29 and Oct. 25, 2017, attached as Exhibit Z.
[68] Sep. 4, 2017, email explaining payment to Plaintiff, attached as Exhibit AA.
[69] *Id*.
[70] Baron Dep. 96:24-97:05.
[71] *Id*. at 167:12-15.

56.     Because of Plaintiff's misrepresentations, the attorney who did agree to represent Lovell asked for additional contractual considerations and refused to begin work until after she had received a payment from the County.[73]

57.     The County paid Plaintiff an additional $11,927.30 for his previous work on the 23B remand, and, after consulting with Plaintiff, paid him an additional $4,651.41 for work related to Lovell, constituting payment in full for Plaintiff's past work on the Lovell case.[74]

58.     In October 2017, Mr. Baron again discussed terminating Plaintiff's contract with county officials, including Commissioner Harvey, and the County decided it would not be in the best interests of the County to continue contracting with an attorney that was willing to misrepresent facts to both the court and to the media.[75]

59.     On October 26, 2017, Commissioner Jim Harvey informed Plaintiff via letter that the County would be terminating his appellate contract. [76]

---

[72] Baron Dep. 171:1-172:6; 179:19-19; 166:16-172:6.
[73] *Id.*
[74] September 29 and October 25 emails, attached as Exhibit Z.
[75] Baron Dep. 8:10-23; 23:19-24:4; Termination Letter, attached as Exhibit BB.
[76] Exhibit BB.

**ARGUMENT**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." To apply this standard, the court must view "the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."[77] To avoid summary judgment, "the party opposing the motion must establish, at a minimum, an inference of the existence of each essential element to the case." [78]

**I.     PLAINTIFF'S CONSTITUTIONAL RIGHTS WERE NOT VIOLATED**

In *Garcetti v. Ceballos,* the Supreme Court found that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."[79] The First Amendment limits the ability of a public employer to use the employment relationship to restrict "the liberties employees enjoy in their capacities as private citizens," meaning that, when a government employee speaks on matters of public concern, they may only face "those speech restrictions that are necessary for their employers to operate efficiently and effectively."[80] To determine if an employee's constitutional rights were restricted, the Court applies the five prongs of the *Garcetti/Pickering* analysis:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether

---

[77] *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
[78] *Id*. (Citations omitted).
[79] 547 U.S. 410, 126 S.Ct. 1951, 1958, (2006).
[80] *Id*.

the protected speech was a motivating factor in the adverse employment action;
and (5) whether the defendant would have reached the same employment decision
in the absence of the protected conduct.[81]

Courts have found that while "the first three inquiries involve matters of law, the last two
are questions of fact."[82] The Supreme Court also found that as "[i]ndependent
government contractors are similar in most relevant respects to government employees"
the same form of balancing analysis applies.[83] Specifically, in order for a public
contractor to show that her or his criticism "of the contracting government agency is
protected activity" it must pass the *Garcetti/Pickering* test.[84]

### A.      Plaintiff's Speech In His Capacity as Lovell's Counsel is Not Protected.

The first prong of the *Garcetti/Pickering* analysis requires that the Court decide whether
the Plaintiff spoke pursuant to his official duties, or as a citizen.[85] The Tenth Circuit found that if
an employee speaks pursuant to his official duties, there is no constitutional protection, the
restriction on speech "simply reflects the exercise of employer control over what the employer
itself has commissioned."[86] The U.S. Supreme Court acknowledged that a citizen entering
government service "by necessity must accept certain limitations on his or her freedom."[87]
What's more, because of their positions, expressions by public employees can "contravene
governmental policies or impair the proper performance of government functions."[88] The court

---

[81] *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009) (citations omitted).
[82] *Id.*
[83] *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 684–85 (1996).
[84] *Glover v. Mabrey*, 384 F. App'x 763, 769 (10th Cir. 2010).
[85] B*rammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202–04 (10th Cir. 2007)
(quoting *Garcetti*, 547 U.S. at 422).
[86] *Id.*
[87] *Garcetti*, 547 U.S. at 418.
[88] *Id.* at 419.

also noted that while the First Amendment "invests employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.' "[89] The Tenth Circuit clarified that the ultimate question is whether the employee is speaking "in his or her professional capacity."[90] The Tenth Circuit provided guidance on this element, noting that if "the speech reasonably contributes to or facilitates the employee's performance of the official duty" then the speech has been made pursuant to the employee's official duties.[91] Here, there is no genuine issue of material fact that Plaintiff's representations to the court stemmed from his contractual relationship with the County, and occurred pursuant to his official duties as Lovell's attorney.

The present case is analogous to *Garcetti*, and the comparison illustrates that Plaintiff's speech pursuant to his representation of Lovell is not protected under the First Amendment. In *Garcetti*, the Supreme Court determined that the plaintiff's speech was not protected, as it arose pursuant to his position (even though the same speech might have been subject to First Amendment balancing if the employee had spoken as a citizen).[92] The Plaintiff in *Garcetti*, Ceballos, a deputy district attorney for the Los Angeles County D.A.'s office, found misrepresentations in an affidavit used to obtain a critical search warrant.[93] Ceballos informed his supervisors, both verbally and via memo, and recommended dismissal of the case.[94] When they met to discuss the case, a Sheriff's Office Lieutenant sharply criticized Ceballos, and his

---

[89] *Id.* at 420 (*quoting* Connick v. Myers, 461 U.S. 138, 154 (1983)).
[90] *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007) (citations and quotations omitted).
[91] *Id.* (citations omitted).
[92] *Garcetti*, 547 U.S. at 423.
[93] *Id.* at 413-414.
[94] *Id.* at 414.

supervisors decided to move forward with the case.[95] In a hearing challenging the warrant, the defense attorney called Ceballos to testify about the affidavit, but the judge rejected the defense's challenge.[96] Ceballos claimed that his office retaliated by reassigning him from a calendar deputy to a trial deputy position, moving him to another courthouse, and denying him a promotion.[97] The trial court granted the defendants' motion for summary judgment.

The Ninth Circuit reversed, finding that Ceballos' memo was inherently a matter of public concern and that Ceballos' interest in his speech outweighed his supervisors' interest in responding to it, as they had not shown that the speech led to disruption or inefficiency.[98] The Supreme Court, however, rejected the Ninth Circuit's reasoning, finding that the appellate court failed to determine if Ceballos had spoken as a private citizen.[99]

The Supreme Court concluded that "the controlling factor in Ceballos' case" was that his expressions were "made pursuant to his duties as a calendar deputy" and that he wrote his memo "because that is part of what he, [in his position], was employed to do."[100] The Supreme Court also clarified that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."[101] The Supreme Court also distinguished the speech in *Garcetti* from that of *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968), differentiating the speech of a person acting as a private citizen from an individual acting in an

---

[95] *Id*.
[96] *Id*. at 414-415.
[97] *Id*. at 415.
[98] *Id*. at 415-416.
[99] *Id*. at 416.
[100] *Id*. at 412.
[101] *Id*. at 421-422.

official capacity. Ceballos' speech stemmed from his position, i.e., the memorandum, which he wrote pursuant to his employment duties.[102] In *Pickering*, the speaker's letter "had no official significance and bore similarities to letters submitted by numerous citizens every day.[103]

    1.    <u>Plaintiff's Communications With the Court Are Not Protected.</u>

Here, even drawing all reasonable inferences in the Plaintiff's favor, there is no dispute that Plaintiff's communications with the court were pursuant to his official duty as a defense attorney contracted with the County to represent Lovell. Plaintiff's arguments were not general complaints about rights under the Sixth Amendment but were specific to his client and his representation. For example, Plaintiff argued in his reply in support of his motion for attorneys fees that the County's position on the fees acted as a detriment to Lovell, and stated in his motion to withdraw that the failure to provide adequate funding created a conflict for his client.[104] Clearly, Plaintiff would not have communicated with the court regarding a detriment to, or a conflict with, Lovell, but for his agreement with the County to officially represent Lovell. Similarly, his complaints to the court relating to funding were inseparable from his official representation, as he argued that additional funding was required to adequately represent Lovell, and that Lovell's "right to the effective assistance of his appellate counsel is compromised" if the County did not provide adequate funds.[105]

By his signature on the documents filed with the court Plaintiff indicated his actions were those of the attorney for appellant, and his actions in seeking compensation for his representation, as well as his arguments about the detriment to his client, provide for no other

---

[102] *Garcetti*, 547 U.S. at 424.
[103] *Id.* at 422.
[104] Exhibit L, pp. 3-4; Exhibit R, pp. 3-4.
[105] Exhibit L, pp. 4, 7.

conclusion.[106] Plaintiff did not act as a concerned citizen in speaking to the court regarding additional funding or a request to withdraw, but in his official capacity representing his client as a county contractor.

      2.    <u>Plaintiff's Communications With the Media Are Not Protected.</u>

When Plaintiff's comments to the media are considered, even though there may be a slight difference from his comments to the court, that speech also occurred pursuant to Plaintiff's official duties as Lovell's attorney. First, there is no evidence that Plaintiff would have communicated his concerns, or even had information to provide, if he had not been acting as Lovell's attorney, pursuant to his contract with the County. Additionally, his comments to the news media once again demonstrate that he is acting pursuant to his official duties as Lovell's attorney.

On the July 18, 2017, an article in the Salt Lake Tribune noted that in a recent interview Plaintiff asked "[d]o I represent my client zealously like I am constitutionally require to do? Or do I tread lightly so I don't lose my livelihood?"[107] This comment is directly related to Plaintiff's official duties, as Plaintiff indicated in that quote that his concerns arose from his responsibilities as Lovell's attorney. The specific nature of his comments to the news media, as well as his apparent intent to use that medium to advocate for his client's rights, further clarifies that Plaintiff is commenting in his official role as Lovell's attorney. Once again, as in *Garcetti*, Plaintiff's speech stems directly from his representation of Lovell pursuant to his official position as a contractor with the County.

---

[106] *Id*. at p. 7.
[107] Exhibit W, p. 4.

Even if the court finds that Plaintiff's comments to the news media should be addressed differently than his communications with the court, Plaintiff cannot show that the *Pickering/Garcetti* analysis weighs in his favor. As explained in Section I(B)(4), below, even if Newton's comments to the news media are considered protected, the undisputed facts demonstrate that the County would have taken the same action to terminate the contract, due to Plaintiff's repeated misrepresentations to the court. As addressed more thoroughly below, the County terminated Plaintiff's contract based on "untruthful and harmful" comments.[108] While Plaintiff's complaint makes expansive claims relating to protected speech, there is no evidence to indicate that County terminated Plaintiff's contract for any reason beyond the untruthful comments made by Plaintiff. As such, there is no genuine dispute of material fact as to the specific statements the County considered when it terminated Plaintiff's contract, as those statements were made either directly to the court in Plaintiff's official capacity as Lovell's attorney, or were made by Plaintiff to the media in that same capacity.

As noted above, the Supreme Court has clearly delineated the types of speech that are not protected under the First Amendment, including speech pursuant to an individual's official duties. [109] Here, even in the light most favorable to Plaintiff, his communications with both the court and news media were in his official representing Lovell under contract with the County, and for that reason his speech is not protected under the First Amendment. As Plaintiff spoke pursuant to his official duties, he cannot show a constitutional violation and Defendants

---

[108] Exhibit BB.
[109] *Id*. at 425-426. *Garcetti* notes that there are various other safeguards for speech which is not protected, such as whistleblower laws or labor codes, and references rules of conduct and other constitutional obligations which provide safeguards for attorneys and others. However, those safeguards do not apply to this case.

respectfully request that the Court grant their motion for summary judgment and dismiss

Plaintiff's claims under 42 U.S.C. § 1983, with prejudice.

**B.     The Remainder of the *Garcetti/Pickering* Analysis Does not Weigh in Plaintiff's Favor.**

1.     Plaintiff's Misrepresentations Are Not a Matter of Public Concern.

Even if the Court finds that Plaintiff spoke as a citizen, either to the court or the news

media, Plaintiff cannot demonstrate that the subject of his speech was a matter of public concern.

If the court finds that the speech is not a matter of public concern, "then the speech is

unprotected, and the inquiry ends."[110] Speech involves a matter of public concern when it can be

fairly considered "as relating to an matter of political, social, or other concern to the community,

or when it is the subject of legitimate news interest; that is, a subject of general interest and value

to the public."[111] However, speech "aimed at airing grievances of a purely personal nature is

generally not on a matter of public concern."[112] The Tenth Circuit also found that when a public

employee speaks about "matters only of personal interest, absent the most unusual

circumstances, a federal court is not the appropriate forum in which to review the wisdom of a

personnel decision taken by a public agency."[113] When an employee's expression is not related

to a "matter of political, social, or other concern to the community, government officials should

enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the

name of the First Amendment."[114] The Tenth Circuit also provided that the court "may consider

---

[110] *Brammer-Hoelter*, 492 F.3d at 1203.
[111] *Butler v. Bd. of Cty. Commissioners for San Miguel Cty.*, 920 F.3d 651, 655–56 (10th Cir. 2019) (quoting *Lane v. Franks*, 573 U.S. 228, 236-37 (2014)).
[112] *Id*. at 656 (citations and quotations omitted).
[113] *Id*. at 656 (quoting *Connick*, 461 U.S. at 147).
[114] *Id*. (quoting *Connick*, 461 U.S. at 146).

the motive of the speaker, and whether the speech merely deals with personal disputes and grievances."[115] "Speech that exposes official impropriety generally involves matters of public concern, while speech that simply airs grievances of a purely personal nature typically does not."[116]

In addition, the U.S. Supreme Court has found that factors which may tip the scale in the employer's favor include evidence that the plaintiff's testimony was false or erroneous.[117] The Tenth Circuit noted that there is an assumption that "deliberately false or recklessly false statements by public employees are either unprotected by the First Amendment or, at least, that such intentional falsity would weigh heavily against protection."[118] Here, Plaintiff's statements at issue in this case were of a personal nature, generally related to his contract. Further, his repeated misrepresentation of material facts, to the court and others, which continued after he had been corrected by the County, weigh against protection under the First Amendment.

In order to determine whether Plaintiff's statements are protected, it must first be clarified which statements are genuinely at issue as Plaintiff's complaint contains vague references to protected speech.[119] Notwithstanding Plaintiff's complaint, the undisputed facts demonstrate that the County based its decision to terminate Plaintiff's contract on a limited number of "untruthful and harmful" statements made by Plaintiff to the court and news media.[120] Specifically, the County took issue with the following statements:

---

[115] *Id*. at 663 (citations and quotations omitted).
[116] *Id*. (Citations and quotations omitted).
[117] *Lane v. Franks*, 134 S. Ct. 2369, 2373 (2014)
[118] *Moore v. City of Wynnewood*, 57 F.3d 924, 933 (10th Cir. 1995) (citing *Pickering*, 391 U.S. at 574).
[119] *See* Complaint, Dkt. No. 2, ¶¶ 48-49.
[120] Exhibit BB.

a.    Plaintiff's Reply Brief in Support of his Motion for Attorney's fees, filed on April 17, 2017.[121]

  1.  The County believed Plaintiff misrepresented that the County had refused to fund anything beyond $15,000 for the remand hearing;[122]

  2.  The County believed Plaintiff misrepresented that the County would refuse to provide additional funding in the future.[123]

b.    Plaintiff's Motion to Withdraw, filed on June 9, 2017.[124]

  1.  The County believed Plaintiff misrepresented that the County had refused to fund anything beyond $15,000 for the remand hearing;[125]

  2.  The County believed Plaintiff misrepresented his situation, that it underfunded him, and that the County was requiring that he limit his communications with his client, or his contract would be terminated.[126]

c.    Salt Lake Tribune Article, July 18, 2017.[127]

  1.  The County believed that Plaintiff misrepresented the intent of their discussion related to billing practices;[128]

d.    Plaintiff's Response to State's Motion to Inquire into Defense Counsel's Potential Conflict of Interest, filed on June 21, 2017.[129]

  1.  The County believed Plaintiff misrepresented that he could not receive additional funds, or that the County believed it was doubtful he would receive additional fund for the remand proceeding.[130]

  2.  The County believed Plaintiff misrepresented that they would not provide additional funding.[131]

  3.  The County believed Plaintiff misrepresented that he was required to limit his communication with Lovell.[132]

  4.  The County believed Plaintiff misrepresented that they would terminate his appellate contract for zealous representation.[133]

---

[121] Exhibit L.
[122] Exhibit L, pp. 3-4; Baron Dep.38:17-39:03.
[123] Exhibit L, p. 4; Baron Dep. 39:4-40:13.
[124] Exhibit R.
[125] Exhibit R, p. 3; Baron Dep. 42:03-16; 44:03-17.
[126] Exhibit R, pp. 4, 6, 8; 46:11-47:11; 49:12-51:19.
[127] Exhibit W.
[128] Exhibit W, p. 4; Baron Dep. 29:01-15.
[129] Exhibit T.
[130] Exhibit T, p. 3; Baron Dep. 72:22-73:20.
[131] Exhibit T, pp. 9, 12; Baron Dep. 76:2-19; 77:15-78:24.
[132] Exhibit T, p. 15: Baron Dep. 92:03-19.

> 5. The County believed Plaintiff misrepresented that he was not allowed investigative resources in his contract.[134]
>
> 6. The County believed Plaintiff misrepresented that he would be terminated for litigating Lovell's case.[135]

e. August 29, 2017, Hearing on Plaintiff's Motion to Withdraw.[136]

> 1. The County believed Plaintiff misrepresented that he was required to limit his communication with Lovell.[137]
>
> 2. The County believed Plaintiff misrepresented the County's willingness to pay him more than the $15,000.[138]
>
> 3. The County believed Plaintiff misrepresented that his appellate contract was being threatened.[139]

f. Salt Lake Tribune Article, September 2, 2017.[140]

> 1. The County believed that Plaintiff misrepresented that his appellate contract was being threatened.[141]

g. Ex Parte Motion for Attorney's fees, filed March 2017.[142]

> 1. The County believed Plaintiff misrepresented that he did not have access to investigative resources.[143]

While Plaintiff made various other statements to the court and news media, the County did not consider those in its decision to terminate Plaintiff's contract, and there is no evidence that the County considered any other statements beyond those outlined above.

In addition, these statements should not be considered protected, as they either misrepresented material facts known to Plaintiff when he made the statement, or he continued to make an incorrect statement after he had been informed of his error. For example, on April 11,

---

[133] Exhibit T, p. 16; 79:23-80:18.
[134] Exhibit T, p. 18; Baron Dep. 81:14-82:24.
[135] Exhibit T, p. 19; Baron Dep. 83:18-84:06.
[136] Transcript of Hearing on Motion to Withdraw, attached as Exhibit CC.
[137] Exhibit CC, p. 3, 10:30; Baron Dep. 86:7-8:05.
[138] Exhibit CC, p. 4; Baron Dep. 87:07-89:02
[139] Exhibit CC, p. 7; Baron Dep. 89:03-91:04
[140] Baron Dep. 29:19-30:2
[141] *Id*.
[142] Baron Dep. 126:10-17
[143] Baron Dep. 126:10-17

2017, Mr. Baron informed Plaintiff that he believed that the commissioners would be willing to

consider a request for additional funding related to work Plaintiff had completed on the 23B

remand.[144] In his Reply in Support of His Motion for Attorney's Fees, filed on April 17, 2017,

Plaintiff indicated that "[t]he county had plainly indicated that counsel will not be allowed

additional funding" beyond the additional $15,000 the County had already authorized for remand

proceedings.[145]

On May 22, 2017, Mr. Baron informed Plaintiff by email that Plaintiff had

misrepresented the County's position, and directed him to the April 11th email (which Plaintiff

had attached as an exhibit in his earlier Reply).[146] That same day, Plaintiff admitted in an email

that he had misunderstood the County's position and inquired about sending additional

information to the commissioners related to such a request.[147] Plaintiff then sent a request for

additional funding to the commissioners on May 25, 2017.[148] Then, in his motion to withdraw,

filed on June 9, 2017, although he acknowledged that the County had stated that it would

consider granting additional funding, he still claimed to be in a "catch-22" due to worries about

getting paid.[149]

Another example of Plaintiff's misrepresentations relates to his claims that the County

failed to provide investigative resources. Plaintiff's contract indicated that he would be

reimbursed by the County for investigation expenses and authorized him to utilize an

---

[144] Exhibit K.
[145] Exhibit L, p. 3.
[146] Exhibit M.
[147] *Id.*
[148] Exhibit N.
[149]Exhibit R, p. 4.

investigator at a rate of up to $60/hour.[150] However, in his Ex Part Motion for Attorney's Fees, filed in March 2017, Plaintiff claimed that he had been unable to interview witnesses due to a lack of funds, and stated that he needed investigative resources.[151] In its Opposition to Plaintiff's Ex Parte Motion, the County informed the court of the provision in the contract authorizing use of an investigator, and informed the judge that Plaintiff knew of that provision, as he had previously used an investigator on the case.[152] Notwithstanding that information, Plaintiff again complained about a lack of investigative resources in his Response to the State's Motion to Inquire into Defense Counsel's Potential Conflict, which he filed on June 21, 2017.[153] Plaintiff also indicated in that motion that the investigation costs were included in the $15,000 additional funding he had been granted, even though they were provided as part of his original contract, with no cap on the amount. He also complained to the court that the state had greater resources, even though there is no indication that he had taken advantage of the investigative resources available to him, and which he had been reminded of several months earlier.[154]

These examples indicate two things. First, that the statements which concerned the County were disputes between Plaintiff and the County regarding his contract and other funding or monetary disputes. Plaintiff attempts to conflate these disputes with violations of Lovell's rights to effective assistance of counsel, among other things, but the facts do not such a claim. For instance, Plaintiff knew the amount of the contract before he began his representation and still agreed to undertake the case. In addition, based on Plaintiff's stated experience with

---

[150] Exhibit A, p. 2.
[151] Baron Dep. 126:10-17.
[152] Exhibit I, p. 15.
[153] Exhibit T, p. 18.
[154] *Id*.; Exhibit I, p. 15.

appellate matters he should have understood what such an appeal would, or might have, required.[155] Furthermore, the evidence shows that the County engaged in a good faith effort to negotiate additional funding for Plaintiff. On March 14, 2017, within a week of learning that the case had been remanded, the County approved an additional $15,000 in funding for work related to the remand hearing.[156] Further, by March 23, 2017, the County had informed Plaintiff that it would be willing to consider additional funds related to the remand hearing if Plaintiff exhausted the additional $15,000 that had already been approved.[157]

The County also addressed Plaintiff's concerns about approving funding for past work. After Plaintiff inquired about authorizing past work, the next day, April 11, 2017, Mr. Baron informed Plaintiff that the commissioners agreed that the prior work on the 23B motion would be good cause for exceeding the contract.[158] After discussing concerns that they had with Plaintiff's billing, the County did ultimately approve additional funding for past work related to the 23B motion, in the amount of $18,232.50.[159] The additional funding approved by the County was well in excess of his original contract, totaling more than $33,000 of additional funds approved based on Plaintiff's requests; a more than 30% increase on his original agreement.[160]

These facts demonstrate that while Plaintiff has alleged significant issues relating to the County, they consistently addressed his concerns, and provided additional funding as he requested. The County's good faith efforts to address Plaintiff's requests and needs demonstrate that Plaintiff's statements to the court and media were not based on significant political, social,

---

[155] Complaint, Dkt. No. 2, ¶ 9.
[156] Exhibit C; Exhibit G.
[157] Exhibit J.
[158] Exhibit K.
[159] Exhibit AA.
[160] *Id.*

or other community concerns, but merely hyperbole and exaggeration by the Plaintiff, creating the illusion of a greater issue, and further undermining his credibility. Finally, while the County and Plaintiff may have disagreed about portions of their contractual agreement, there is no evidence that the County engaged in any impropriety, and Plaintiff cannot show that his allegations against the County amounted to more than personal disputes and grievances, based on the contractual relationship between the parties, which is not a political or social concern.

Second, the examples above show that Mr. Newton repeatedly misrepresented his interactions with the County about funding, resources, his communication with his client, and his underlying appellate contract. Further, the examples show that Plaintiff made several knowingly false statements. While any false or erroneous statements may reduce the likelihood that a statement is protected, the established case law indicates that knowingly false statements should either lose protection, altogether, or the weight of the analysis is heavily against protection.

For these reasons, Plaintiff cannot show that his statements addressed political or social concerns or indicated impropriety by the County. What's more, the undisputed facts demonstrate that Plaintiff not only made several misrepresentations, but that he also made knowingly false or untrue statements to the court, which weight heavily against a finding that his statements are protected under the First Amendment. Because of this, Plaintiff cannot show that his statements are a matter of public concern, including those statements listed above, which the County relied on in its decision to terminate Plaintiff's contract. As Plaintiff cannot show Defendants took any action based on a protected statement, he cannot show a constitutional violation, and the Court's inquiry is at an end. For these reasons, Defendants requests that the Court dismiss Plaintiff's claims with prejudice.

2.    The County's Interests in Promoting the Efficiency of its Public Service Outweighed Plaintiff's Interests in His Speech.

Even if the Court finds that portions of Plaintiff's speech were protected, the County's interests in promoting the efficiency of its public service outweigh Plaintiff's interest in his speech. In weighing an employee's First Amendment speech interest against an employer's interest in an efficient and disciplined work environment "the question is whether the employer has an efficiency interest which would justify it in restricting the particular speech at issue."[161] Considerations include whether the speech impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise" but the only public employer interest that can outweigh a public employee's recognized speech rights "is the interest in avoiding direct disruption, *by the speech itself*, of the public employer's *internal* operations and employment relationships."[162]

The County does not deny that providing counsel to indigent defendants is an important service required under the U.S. Constitution, which includes ensuring that individuals charged with capital crimes are provided effective counsel. Because of this, it is vital that the County can find effective and qualified counsel to represent its indigent defendants. Plaintiff's speech directly interfered with the County's ability to provide that service by disrupting the internal affairs of the office and the County's employment and contractual relationships. Specifically, Plaintiff's speech interfered with the County's ability to find qualified attorneys to provide

---

[161] *Brammer-Hoelter*, 492 F.3d at 1207 (citations and quotations omitted).
[162] *Id*. (emphasis in original).

appellate services to indigent individuals and caused additional work and disarray as County employees struggled to meet court deadlines and find new appellate counsel.[163]

For example, due to Plaintiff's comments and misrepresentations the County had difficulty finding a qualified attorney to take his place as Lovell's counsel.[164] In fact, only one qualified person applied for the position and she expressed concern about receiving payment from the County; a concern that other attorneys raised as well. Furthermore, the County had to pay the new attorney a premium to provide representation, presumably due to Plaintiff's comments.[165]

While Plaintiff claimed that the County's actions affected the rights of his client, his actions disrupted the office, and stymied the County's ability to provide appellate attorneys, caused the County to have to pay more for the services of appellate attorneys, and interfered with the County's ability to replace him as counsel in his own client's case. On top of that, his comments may continue to affect the County's reputation and ability to serve its residents and indigent defendants for years to come. For these reasons, the County's interest in an efficient and disciplined work environment outweigh Plaintiff's interest in his speech and Plaintiff cannot show that a constitutional violation occurred.

3.     The County's Decision to Termination Plaintiff's Contract Was Not Motivated by Protected Speech.

As noted above in Section I(B)(1), Plaintiff has alleged a broad range of protected speech. Plaintiff bears the burden in demonstrating that his speech was a motivating factor in the

---

[163] Baron Dep. 171:1-172:6; 18:21-19:9; 166:16-172:6.
[164] Baron Dep. 68:19-69:17; 166:16-172:6.
[165] Baron Dep. 171:1-172:6; 179:19-19; 166:16-172:6.

County's decision.[166] As noted in Section I(B)(1) and (2) above, it is undisputed that the County based its decision to terminate Plaintiff's contract on a few specific statements. As those statements were misrepresentations and/or knowingly false statements, they do not address matters of public concern and are not protected under the First Amendment. For these reasons, Plaintiff cannot meet his burden to show that Defendants were motivated by protected statements, and his claim of a constitutional violation fails.

      4.      <u>The County Would Have Terminated Plaintiff's Contract in the Absence of Any Protected Conduct.</u>

As noted above, Plaintiff's speech was pursuant to his official duties, the statements at issue in this case were not protected, and so the County's decision to terminate his contract was not motivated by protected speech. However, even assuming, for purposes of this motion only, that the Court finds that Plaintiff's comments reported in the July 18th and September 2nd Salt Lake Tribune articles, or any other speech referred to in Section I(B)(2), which the County relied on in its decision to terminate plaintiff's contract, constitutes protective speech, the County can "demonstrate that it would have taken the same action against the employee even in the absence of the protected speech."[167]

First, if the articles are considered protected speech, they represent only a portion of the misrepresentations and falsehood communicated by Plaintiff. In addition, the other statements listed in Section (B)(2) represent more serious misconduct. Specifically, most of those statements were communicated to the court, where Plaintiff has an obligation to act ethically, and several of them were communicated after the County had corrected Plaintiff's misunderstanding or prior

---

[166] B*rammer-Hoelter* 492 F.3d at 1207.
[167] *Id*. at 1208.

misrepresentations.[168] Further, the misrepresentations to the court were more numerous, and were repeated more than once and over a significant period of time.

As the misrepresentations to the news media duplicated other misrepresentations made by Plaintiff, and the communications to the court, on their own, represent more serious errors and a refusal to address errors after correction, the County can show that it would have taken the same action, even in the absence of a protected statement. For these reasons, Plaintiff cannot demonstrate a constitutional violation by the County.

### C.   Plaintiff Cannot Show a Conspiracy Under 42 U.S.C. § 1985(2)

Plaintiff claims that the County is liable for a constitutional violation under 42 U.S.C. § 1985(2).[169] Under § 1985(2), an obstruction of justice conspiracy claim requires three elements: "(1) a conspiracy, (2) to deter attendance in court or testimony by force or intimidation or to injure a witness for having appeared in court or testified, and (3) injury to the plaintiff."[170] "For the conspiracy element, the sequence of events alleged must be sufficient to allow a jury to infer from the circumstances that the conspirators had a meeting of the minds."[171]

Plaintiff has not plead any facts alleging that a meeting of the minds occurred, let alone one that indicated the type of harm contemplated by the statute. Further, there are no facts to support a claim that the County, or any of its officers or employees, intended or attempted to deter Plaintiff from attending or testifying in court, or acted to intimidate or injure him. In fact,

---

[168] *See* pp. 12-13, above.
[169] Complaint, Dkt. No. 2, ¶ 60.
[170] *Hogan v. Winder*, 762 F.3d 1096, 1113 (10th Cir. 2014).
[171] *Id*. at 1114.

after Plaintiff withdrew from Lovell's case, the County continued to cooperate with him to address his requests for additional funds and provide payment for work he had completed.[172]

As there are no allegations and no evidence to support a claim under 42 U.S.C. § 1985(2), Defendants respectfully request that the Court dismiss that claim with prejudice.

## II.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

To overcome a qualified immunity defense, the Plaintiff must show that: "(1) the individual Defendants violated [Plaintiff's] constitutional rights, and that (2) those rights were clearly established at the time of the alleged violation."[173] The Supreme Court has stated that "[i]f, and only if, court finds a violation of a constitutional right" the next step is to "ask whether the right was clearly established in light of the specific context of the case."[174] In this case, if the Court finds that a constitutional violation did occur, Defendants are entitled to qualified immunity, as Plaintiff's rights as an independent contractor with the County were not clearly established at the time of the alleged violation.

Under the *Garcetti/Pickering* analysis, to find that the County violated Plaintiff's First Amendment right the Court must first determine that Plaintiff did not speak pursuant to his official capacity, as there is no protection when an individual speaks pursuant to his/her official capacity.[175] If the court determines that Plaintiff's statements were not made pursuant to his official capacity, Defendants are entitled to qualified immunity as Plaintiff's constitutional rights were not clearly established at the time the alleged violations occurred.

---

[172] Exhibit AA.
[173] *Butler*, 920 F.3d at 655.
[174] *Scott v. Harris*, 550 U.S. 372, 377 (2007) (citations and quotations omitted).
[175] B*rammer-Hoelter* 492 F.3d at 1203.

Specifically, the Supreme Court in *Garcetti* implemented a test to determine when public employees speak pursuant to their official duties.[176] As explained above, if the speech is pursuant to the employee's official capacity, the speech does not receive the protection of the First Amendment.[177] In addition, the Supreme Court has found that "[i]ndependent government contractors are similar in most relevant respects to government employees."[178] However, the courts have not specifically examined whether an individual under contract with a public entity would be subject to the same standard as an employee of that public entity for the purpose of determining if the independent contractor spoke pursuant to his/her official capacity.

In the specific context of this case, there is no dispute that if Plaintiff had been an attorney employed by a public entity (and not an independent contractor), the actions taken in his position, including writing briefs and arguing to the court, would be considered speech pursuant to his official capacity and would not be protected by the First Amendment. In fact, the Supreme Court undertook that exact analysis in setting out the official capacity test in *Garcetti*.[179] Further, while the courts had previously treated employees and independent contractors in a similar manner following the decision in *Pickering*, counsel for Defendants could not find authority to show that the balancing test had been applied to an independent contractor since the Supreme Court added additional considerations to that test in *Garcetti*. As the *Garcetti* analysis provides an additional prong to the balancing test and outlines the exception for an employee's speech pursuant to her or his official duties, there is a question of how the courts might apply that adjusted test to the speech of an independent contractor.

---

[176] *See* generally, *Garcetti*, 547 U.S. 410.
[177] *Id*.
[178] *Umbehr*, 518 U.S. at 684.
[179] *Garcetti*, 547 U.S. at 413-424.

Therefore, if the Court finds that Plaintiff's speech did not occur pursuant to his official capacity under his contact with the County, that ruling would diverge from how the courts have applied the *Garcetti* factors to employees in the past, and from the past rulings which indicate that employees and independent contractors should be treated in a similar manner under *Garcetti/Pickering*. As the courts have not ruled on that issue, the law was uncertain at the time of the alleged violations and Plaintiff's rights were not clearly established.

For this reason, if the Court finds a constitutional violation occurred, Defendants are entitled to qualified immunity as Plaintiff's rights were not clearly established at the time of the alleged violation. In that instance, and based on that immunity, Defendants request that the Court grant their motion for summary judgment and dismiss Plaintiff's claims with prejudice.

## CONCLUSION

As Plaintiff speech was not protected Defendants did not violate his constitutional rights under the First Amendment. In the alternative, if the Court finds that a constitutional violation occurred, Defendants are entitled to qualified immunity as the law was not clearly established at the time of the violation. For these reasons Defendants respectfully request that the Court grant their motion for summary judgment and dismiss Plaintiff's claims with prejudice.

DATED this 30th day of July, 2019.

STRONG & HANNI

*/s/ Matt Harrison*
Kristin A. VanOrman
Matt Harrison
*Attorneys for Defendants Weber County,*
*James H. Harvey, Kerry W. Gibson, and*
*Charles J. Ebert*

22

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 30th day of July, 2019, I did cause a true and correct copy of the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** to be served via email, upon the following:

> Karra J. Porter
> J.D. Lauritzen
> CHRISTENSEN & JENSEN
> 257 East 200 South, Suite 1100
> Salt Lake City, UT 84111
> karra.porter@chrisjen.com
> jd.lauritzen@chrisjen.com

*/s/ Jennifer L. Blazek*