# EXHIBIT O

LAW OFFICE OF SAMUEL P. NEWTON

vs

WEBER COUNTY

BRYAN BARON

February 04, 2019





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            DISTRICT OF UTAH, NORTHERN DIVISION

 3                         *  *  *

 4    LAW OFFICE OF SAMUEL P.      )
      NEWTON, P.C. and SAMUEL P.   ) No: 1:18-cv-00015 RJS
 5    NEWTON, an individual,       )
                                   ) 30(b)(6) Deposition of
 6            Plaintiffs,          ) Weber County:
                                   )
 7        v.                       ) and
                                   )
 8    WEBER COUNTY, a municipal    ) Individual Deposition of:
      corporation; JAMES H.        )
 9    HARVEY, an individual;       ) BRYAN BARON
      KERRY W. GIBSON, an          )
10    individual; CHARLES J.       )
      EBERT, an individual,        )
11                                 )
              Defendants.          )
12                                 )
                                   )
13                                 )
                                   )
14                                 )

15                         *  *  *

16

17              February 4, 2019
                   8:40 a.m.

18


19        Law Offices of Christensen & Jensen
            257 East 200 South, Suite 1100
20              Salt Lake City, Utah

21
                          *  *  *
22

23              Shelly Wadsworth
          - Certified Realtime Reporter -
24        Registered Professional Reporter
             Certified Realtime Captioner
25
```

2

1                    A P P E A R A N C E S

2   For the Plaintiffs:          Karra J. Porter
                                 John D. Lauritzen
3                                CHRISTENSEN & JENSEN
                                 257 East 200 South
4                                Suite 1100
                                 Salt Lake City, Utah 84111
5
    For the Defendants:          Kristin A. VanOrman
6                                STRONG & HANNI
                                 102 South 200 East
7                                Suite 800
                                 Salt Lake City, Utah 84111
8
    Also Present:                Sam Newton
9
                                 *  *  *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          I N D E X

2      EXAMINATION                                          PAGE

3
       By Ms. Porter                                        7
4


5
       EXHIBITS
6

7      No. 1      Notice of 30(b)(6) Deposition of          7
                  Weber County
8
       No. 2      10/26/17 Letter to Newton                 8
9                 In re: Termination of Contract
                  Bates NEWTON000440
10
       No. 3      10/26/17 E-mail Baron to Others           12
11                In re: Suggestions?
                  Bates Weber County 1919
12
       No. 4      Timeline                                  15
13
       No. 5      Salt Lake Tribune Article 7/18/17         27
14                Bates Weber County 050 - 057

15     No. 6      Salt Lake Tribune Article 9/2/17          27
                  Bates Weber County 2187 - 2194
16
       No. 7      Memorandum in Opposition to Ex Parte      37
17                Motion for Payment of Attorney Fees
                  and Litigation Expenses
18                Bates NEWTON000314343

19     No. 8      Reply to Memorandum in Opposition to      37
                  Ex Parte Motion for Payment of
20                Attorney Fees and Litigation Expenses
                  Bates NEWTON000344 - 357
21
       No. 9      Motion to Withdraw                        41
22                Bates NEWTON000366 - 388

23     No. 10     Response to State's Motion to Inquire     71
                  Into Defense Counsel's Potential
24                Conflict of Interest
                  Bates Weber County 030 - 049
25

4

1   No. 11      Transcript from Court Hearing              84
                Bates Weber County 2206 - 2222
2
    No. 12      Motion for Payment of Attorney Fees        93
3               and Expenses and Request to File
                Monetary Requests Under Seal
4               Bates NEWTON000133 - 143

5   No. 13      December 2017 E-mail Chain                 106
                In re: Grant Info and Application
6               Bates Weber County 1955 - 1956

7   No. 14      2/13/18 E-mail Chain                       108
                In re: Capital Defense Costs
8               Bates Weber County 2035

9   No. 15      11/21/17 E-mail Chain                      110
                In re: Lovell Case Costs
10              Bates Weber County 1942

11  No. 16      Invoices                                   118

12  No. 17      Payment History                            118

13  No. 18      Ex Parte Motion for Payment of             126
                Attorney Fees and Litigation Expenses
14
    No. 19      E-mail Chain                               127
15              In re: Funding Request on Doug Lovell
                Bates Weber County 1123 - 1127
16              Bates Weber County 1123 - 1127

17  No. 20      E-mail Chain                               138
                In re: Funding Request on Doug Lovell
18              Bates Weber County 1117 - 1122

19  No. 21      3/7/17 E-mail Newton to Others             142
                In re: Lovell Public Defender Appeal
20              Bates Weber County 007 - 008

21  No. 22      3/14/17 E-mail Harvey to Others            142
                In re: Lovell Public Defender Appeal
22              Bates Weber County 009

23  No. 23      3/14/17 E-mail Newton to Others            149
                In re: Lovell Public Defender Appeal
24              Bates Weber County 010

25

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                    30(b)(6)                    Bryan Baron

5

1    No. 24        3/23/17 E-mail Harvey to Newton          149
                   In re: Lovell Public Defender Appeal
2                  Bates Weber County 011

3    No. 25        E-mail Chain                             151
                   In re: Funding Request on Lovell
4                  Bates Weber County 1128 - 1133

5    No. 26        E-mail Chain                             151
                   In re: Funding Request on Lovell
6                  Bates Weber County 1134 - 1140

7    No. 27        E-mail Chain                             155
                   In re: Funding Request on Lovell
8                  Bates Weber County 1148 - 1154

9    No. 28        E-mail Chain                             157
                   In re: Funding Request on Lovell
10                 Bates Weber County 1164 - 1170

11   No. 29        E-mail Chain                             158
                   In re: Lovell Withdrawal
12                 Bates Weber County 1175 - 1176

13   No. 30        E-mail Chain                             159
                   In re: Tribune Article
14                 Bates Weber County 1218

15   No. 31        7/17/17 E-mail Baron to Reidhead         162
                   In re: Maestas Billing & Payments
16                 Bates Maestas 1219

17   No. 32        E-mail Chain                             163
                   In re: Tribune Article
18                 Bates Weber County 1224 - 1225

19   No. 33        E-mail Chain                             166
                   In re: State v. Lovell
20                 Bates Weber County 1288 - 1289

21   No. 34        9/25/17 E-mail Baron to Ebert            170
                   In re: Lovell Case Summary
22                 Bates Weber County 1588 - 1589

23   No. 35        E-mail Chain                             173
                   In re: Capital Appeal Case
24                 Bates Weber County 1325 - 1326

25

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                     30(b)(6)                     Bryan Baron

6

| 1 | No. 36 | E-mail Chain | 173 |
|   |        | In re: Court of Appeals Opinion | |
| 2 |        | Bates Weber County 1294 - 1295 | |
| 3 | No. 37 | E-mail Chain | 177 |
|   |        | In re: Question - Nadia at Examiner | |
| 4 |        | Bates Weber County 1384 - 1386 | |
| 5 | No. 38 | 9/18/17 E-mail Baron to Others | 177 |
|   |        | In re: Tribune Article | |
| 6 |        | Bates Weber County 1435 | |
| 7 | No. 39 | 9/27/17 E-mail Baron to Others | 178 |
|   |        | In re: Lovell Article from Standard | |
| 8 |        | Bates Weber County 1721 | |
| 9 | No. 40 | E-mail Chain | 179 |
|   |        | In re: $10k Retainer for Colleen | |
| 10 |       | Coebergh | |
|    |       | Bates Weber County 1733 - 1734 | |
| 11 | | | |
| 12 | No. 41 | E-mail Chain | 180 |
|    |        | In re: Jaime Martinez | |
|    |        | Bates Weber County 1907 - 1908 | |
| 13 | | | |
| 14 | No. 42 | E-mail Chain | 181 |
|    |        | In re: Jaime Martinez | |
|    |        | Bates Weber County 1909 - 1910 | |

15

16

17

18

19

20

21

22

23

24

25

7

```
 1                    P R O C E E D I N G S
 2                         BRYAN BARON,
 3     called as a witness by and on behalf of the
 4     plaintiffs, being duly sworn, was examined and
 5     testified as follows:
 6                         EXAMINATION
 7     BY MS. PORTER:
 8         Q.    Could you please state your name for the
 9     record.
10         A.    Bryan Baron.
11         Q.    Mr. Baron, are you here today to testify
12     on behalf of Weber County?
13         A.    Yes, I am.
14               (Exhibit No. 1 was marked.)
15         Q.    Let me show you what has been marked
16     Deposition Exhibit 1.  Just have a look at that and
17     let me know when you're ready for a question.
18         A.    Okay.
19         Q.    So Deposition Exhibit 1 is a Notice of
20     30(b)(6) Deposition of Weber County.  Have you seen
21     this before?
22         A.    I have.
23         Q.    Do you know which items for which you are
24     designated to testify?
25         A.    All five items.
```

8

1      Q.    Let's start with item number 1, "The

2   October 26, 2017, letter to Samuel P. Newton/Law

3   Office of Samuel P. Newton, including the letter's

4   contents."

5      A.    Okay.

6            (Exhibit No. 2 was marked.)

7      Q.    You've been handed what's been marked as

8   Deposition Exhibit 2.  Do you recognize Exhibit 2?

9      A.    Yes, I do.

10     Q.    Is Exhibit 2 a letter that was sent by

11  Weber County to the Law Office of Samuel P. Newton,

12  PC on or about October 26, 2017?

13     A.    Yes, it is.

14     Q.    Who drafted Exhibit 2?

15     A.    I did.

16     Q.    Did you do that on your own or did someone

17  from the county direct you to prepare such a letter?

18     A.    I was directed to prepare it.

19     Q.    By whom?

20     A.    Jim Harvey and Chris Allred.

21     Q.    Now, did Jim Harvey have the authority to

22  unilaterally terminate a contract?

23     A.    He did.

24     Q.    The contract that's referenced in Exhibit

25  2, had that been voted on at a prior county

1   commission meeting?

2       A.    I'm sorry, the contract -- can you repeat

3   the question?

4       Q.    Sure.  I'll try to rephrase it more

5   sensibly.  Exhibit 2 is stating an intention to

6   terminate Newton's contract, correct?

7       A.    Yes.

8       Q.    The contract that is referred to here, was

9   that contract approved in a county commission

10  meeting?

11      A.    Yes, it was.

12      Q.    By a majority of the Weber County

13  commissioners.

14      A.    Yes, it was.

15      Q.    An open meeting?

16      A.    Yes.

17      Q.    Was there a decision made in an open

18  meeting to terminate that contract?

19      A.    No, there was not.

20      Q.    Was there a decision made by a majority of

21  the Weber County commissioners to terminate that

22  contract?

23      A.    I don't know.  I know that

24  Commissioner Harvey informed the other two

25  commissioners, but I don't know what the other two

1    commissioners' involvement was in making this

2    decision.

3        Q.    Just so we're clear, you're here on behalf

4    of Weber County, right, not Bryan Baron?

5        A.    Right.

6        Q.    So when you say, "I don't know," are you

7    saying that Weber County does not know what

8    involvement two of its commissioners had, if any, in

9    terminating a county contract?

10       A.    No.  It's something that I didn't talk to

11   the other two commissioners about prior to coming

12   here today.  It's something I'd be happy to look

13   into and give you more information at a later date.

14       Q.    This is my shot at the 30(b)(6).  Is Weber

15   County prepared to tell me today what involvement,

16   if any, the other two commissioners had in

17   connection with the sending of Exhibit 2?

18       A.    No.

19       Q.    What did Weber County do to prepare for

20   testimony with respect to item number 1 in the

21   30(b)(6)?

22       A.    I reviewed through e-mails and I spoke

23   with several individuals at the county,

24   Commissioner Harvey, Chris Allred, Dave Wilson,

25   Chris Crockett, and Courtlan Erickson.

11

 1      Q.     I'm sorry, what were the last two?

 2      A.     Chris Crockett and Courtlan Erickson.

 3      Q.     Did Weber County communicate with the

 4   other two commissioners in any way in preparing to

 5   testify with respect to item number 1?

 6      A.     No.

 7      Q.     What e-mails did Weber County review in

 8   preparation for testifying as to item number 1?

 9      A.     The e-mails that were provided via a

10   discovery request, I reviewed through all of those.

11      Q.     All of the e-mails produced by Weber

12   County and Mr. Newton or just the ones produced by

13   Weber County?

14      A.     Just the ones produced by Weber County.

15      Q.     Let me just ask a really quick question.

16   I would have asked it later this afternoon.  You,

17   Bryan Baron, had been involved in helping with that

18   production to begin with, hadn't you?

19      A.     Yes, I had.

20      Q.     So you were already familiar as

21   Bryan Baron with the Weber County production.

22      A.     Yes, I was.

23      Q.     At the time that Weber County spoke with

24   James Harvey in preparation for testifying about

25   item number 1, what was Mr. Harvey's title, if any?

 1        A.    He is a commissioner with Weber County.

 2        Q.    At the time that the county spoke with

 3   Mr. Allred, what, if anything, was his title?

 4        A.    He's the county attorney for the county.

 5        Q.    And at the time that Weber County spoke

 6   with Mr. Wilson, what, if anything, was his title?

 7        A.    He would be a deputy civil attorney for

 8   the county.

 9        Q.    At the time that Weber County spoke with

10   Mr. Crockett, what, if anything, was his title?

11        A.    He is the chief civil deputy attorney.

12        Q.    And at the time that Weber County spoke

13   with Mr. Erickson, what, if anything, was his title?

14        A.    He's a deputy civil attorney.

15        Q.    Exhibit 2 is the final iteration of the

16   letter to Mr. Newton, correct?

17        A.    Yes, it is.

18        Q.    And there was at least one prior draft,

19   correct?

20        A.    Yes, that's correct.

21              (Exhibit No. 3 was marked.)

22        Q.    Let me show you what has been marked as

23   Deposition Exhibit No. 3.  Have you had a chance to

24   look at that?

25        A.    Yes, I have.

13

1      Q.     Can you identify Exhibit 3 for us?

2      A.     Yeah.  This is an e-mail that I sent to

3   Christopher Crockett and Courtlan Erickson on

4   October 26, 2017.

5      Q.     And does Exhibit 3 include a draft of

6   language to Mr. Newton?

7      A.     Yes, it does.

8      Q.     I notice that there were some changes

9   between the language in Exhibit 3 and the language

10  in Exhibit 2.  I could point them out to you or you

11  could have a look.

12     A.     Sure.  If you wouldn't mind pointing them

13  out to me.

14     Q.     For example, on the final version, which

15  is Exhibit 2, in the second paragraph, the second

16  sentence says, "We would like you to continue your

17  work as appellate counsel for indigent defendants."

18  The words "for indigent defendants" were not in

19  Exhibit 3.  I mean, there are a couple of others.

20  I'm not going to necessarily ask you about those

21  specific changes.  I just want to know, I couldn't

22  find a written response to this draft or anything in

23  the e-mails in which you received feedback to make

24  those changes.  Let me just ask, was there a

25  response to Exhibit 3 that was received by

14

1   Mr. Baron?

2        A.    Not a written response, no.

3        Q.    What type of response was received, if

4   any?

5        A.    Verbal.

6        Q.    From?

7        A.    In response to this specific e-mail.

8        Q.    Exhibit 3?

9        A.    Yes.  Chris Crockett and Courtlan Erickson

10  both came to my office, after they had a chance to

11  take a look at it, and came and provided me with

12  feedback on the letter.

13       Q.    And what feedback was provided in that

14  meeting?

15       A.    I don't recall, except I recall

16  Mr. Erickson saying he felt like it was a breath of

17  fresh air to provide a reason as to why the contract

18  was being terminated.

19       Q.    And Exhibit 2 does tell Mr. Newton the

20  reason why the contract is being terminated,

21  correct?

22       A.    It does.

23       Q.    Let's go back to Exhibit 2, the letter to

24  Mr. Newton.  Tell me the circumstances by which this

25  letter came to be.

15

 1        A.    Again, I've got some notes here I'd like

 2    to refer to.

 3        Q.    Is that like a timeline or something?

 4        A.    It is kind of a rough timeline of how this

 5    letter came to be.  In my discussions with various

 6    county representatives, I created this timeline.

 7        Q.    Did you review it in anticipation of your

 8    testimony?

 9        A.    Yes, it did.

10        Q.    Did it help refresh your recollection?

11        A.    The timeline that I created?

12        Q.    Yeah.

13        A.    It did.

14        Q.    Did you bring extra copies?

15        A.    I'd be happy to give you a copy of it, but

16    I didn't bring an extra copy with me.

17        Q.    Can we take a two-minute break?  I think

18    this may actually speed this whole thing up, I'm

19    guessing.  I will be right back.

20        A.    Sure.

21              (Recess.)

22                (Exhibit No. 4 was marked.)

23        Q.    Let me show you what has been marked as

24    Exhibit 4.  Would you check to satisfy yourself that

25    it is a true and correct copy of the notes that you

1    brought with you.

2         A.    Yes, it is.  So the county had been

3    discussing Sam Newton and his appellate contract for

4    some time.  The first time I recall it being brought

5    up was at a meeting in June of 2017.  This was a

6    meeting in which we were discussing Sam's request

7    for additional funds for his 23B motion.  In that

8    meeting Dave Wilson had mentioned that perhaps it

9    was time for the county to look for new appellate

10   counsel for Sam's regular indigent appeals contract.

11           That comment wasn't really seriously

12   discussed at that time.  Dave brought it up probably

13   a couple more times over the summer.  And then

14   finally in August, towards the end of August, Sam

15   had a hearing on his motion to withdraw in which he

16   made misrepresentations to the court that the county

17   had corrected in the past.  We were frustrated that

18   he continued to make those misrepresentations.  And

19   so at that point we decided that we were going to

20   terminate his underlying contract.

21        Q.    I'm sorry.  Which underlying contract?

22   And then you can continue.

23        A.    So he had two contracts with the county.

24   One was specifically to handle the Doug Lovell case.

25   And the underlying contract that I was referring to

1    is the contract to handle all of the other appeals

2    for the county.

3        Q.    But you said underlying contract,

4    singular.  I'm asking which contract you were

5    referring to when you said "underlying contract."

6        A.    It's the contract to handle all of the

7    regular appeals.

8        Q.    You were talking about what you

9    characterized as misrepresentations made in the

10   hearing on the motion to withdraw.

11       A.    Yeah.  It was after that that the county

12   had decided to terminate that underlying appellate

13   contract.  I was instructed to begin --

14            MS. VANORMAN:  I was just going to say,

15   wait until there's a question pending.

16            MS. PORTER:  There is one.  It was what

17   led to this.  And he's choosing to give me the

18   entire Gone With the Wind as a response, which is

19   his right.

20            MS. VANORMAN:  I think it might flow

21   better if you have her ask a question and you

22   respond rather than just a narrative.

23       Q.    What happened next?  There's your

24   question.

25       A.    So I was instructed to begin looking for

18

```
 1    new appellate counsel and specifically asked to

 2    contact the Legal Defenders Association to see if

 3    they would be willing to take on that

 4    responsibility.

 5         Q.    What happened next?

 6         A.    The Legal Defenders Association wasn't

 7    able to take on that underlying contract.  And so we

 8    began reaching out to other attorneys to see who

 9    would be interested or available.

10         Q.    And all of the communications that you're

11    referring to are reflected in the e-mails that Weber

12    County produced, right?

13         A.    They are, yes.

14         Q.    So we can get the dates of all of those

15    from the e-mails, correct?

16         A.    Right.

17         Q.    And their content.

18         A.    Yes, you can.

19         Q.    So what happened next with respect to how

20    Exhibit 2 came to be?

21         A.    So we got sidetracked trying to find a

22    replacement for the Lovell case.  We had a deadline

23    in the Lovell case by the court where we had to have

24    a new attorney within 20 days.  And so the focus was

25    put into finding a replacement for the Lovell
```

19

1    contract and not the base appellate contract.

2        Q.    And then what?  See, I'm mixing it up now.

3        A.    We finally entered into a contract with

4    Colleen Coebergh to take on the Lovell case.  I

5    think that at that point we probably would have

6    forgotten about Sam's base contract and that we had

7    decided to terminate him from that, except shortly

8    after we hired Colleen Coebergh there was another

9    issue that came up with Sam and his contract.

10       Q.    Another issue that is referenced in

11   Exhibit 2?

12       A.    No.

13       Q.    Well, my question is with respect to

14   Exhibit 2.  Exhibit 2 did state the reasons for the

15   termination, didn't it?

16       A.    It stated the primary reason.  But there

17   were some other reasons that Weber County was

18   frustrated with Sam Newton and decided to terminate

19   him.

20       Q.    Didn't mention that at all in Exhibit 2,

21   though, did the county?

22       A.    No, they weren't mentioned.

23       Q.    If anything is in writing somewhere, I'm

24   not going to ask you about it because to me it

25   doesn't make a lot of sense.  The documents say what

1    they say and they have their dates.

2         So you're saying something else arose

3    after Coebergh that is not mentioned in the letter

4    that was sent to Mr. Newton.

5         A.    Right.

6         Q.    Did it arise prior to the sending of

7    Exhibit 2 to Mr. Newton?

8         A.    Yes, it did.

9         Q.    What are you referring to?

10        A.    I'm referring to four cases that were

11   assigned to Sam Newton which he requested conflict

12   counsel on.  In those cases I was asked by one of

13   our prosecutors, Gage Arnold, to find new appellate

14   counsel for at least two and perhaps all four of

15   those cases.  And so I began looking into the

16   reasons for why we needed appellate counsel.  And it

17   turns out that Mr. Newton had met with two of the

18   defendants at the same time and something had come

19   up in the course of the conversation which

20   conflicted him off of all four cases.

21        Q.    Keep going.  I'm waiting to hear how that

22   relates -- well, I guess it doesn't relate to

23   Exhibit 2.  But how that also contributed to Exhibit

24   2 in some way.

25        A.    So when I went to Dave Wilson to discuss

1    conflict counsel, this issue just brought up the

2    feelings that the county had for Sam Newton and

3    reminded us that we were going to terminate that

4    underlying contract.  And so, as I said earlier, I

5    think we would have forgotten about it, but then

6    having this other issue come up just kind of opened

7    the wound again and made us recall that we had

8    issues with Sam Newton and his contract and we were

9    going to terminate him.

10        Q.    And I apologize, did you say that

11   Bryan Baron went to Dave Wilson about that issue?

12        A.    Yes.

13        Q.    Now, Mr. Wilson had expressed on a number

14   of occasions some disdain for the fact that the

15   county was having to spend so much money on a

16   confessed murderer, hadn't he?

17        A.    He had.

18        Q.    And the county was aware of that at the

19   time and continued to let Mr. Wilson play a role in

20   making decisions about defense counsel?

21        A.    Yes.

22        Q.    To the county's knowledge, was there ever

23   any discussion about perhaps recusing Mr. Wilson

24   from discussions about defense counsel given his

25   expressly-stated views on providing defense counsel

22

1    to murderers?

2         A.     No.

3         Q.     And so I think we left off in our saga

4    with Bryan Baron speaking to Dave Wilson about this

5    conflict issue that you just described.  And then

6    what was the next thing that happened that led to

7    the sending of Exhibit 2?

8         A.     So I had contacted Chris Allred and

9    Commissioner Harvey -- let me back up.  So

10   Dave Wilson and I worked together to find conflict

11   counsel to handle those cases.  And at that time we

12   remembered that we were going to terminate that

13   underlying contract.  And so I was asked to contact

14   Chris Allred and Commissioner Harvey regarding

15   termination of the contract.

16        Q.     You were asked by whom?

17        A.     Dave Wilson.

18        Q.     At that time where was Dave Wilson in the

19   hierarchy compared to Bryan Baron?

20        A.     He was the chief civil deputy attorney, so

21   he directly oversaw my responsibilities.

22        Q.     To the county's knowledge, Mr. Wilson's

23   duties included the supervision of appointed counsel

24   for indigent defendants.

25        A.     Yes.

23

1        Q.      Including the Lovell case.

2        A.      Yes.

3        Q.      I apologize if you just told me this.  So

4   Mr. Wilson instructed Bryan Baron to contact

5   Mr. Allred and Mr. Harvey?

6        A.      Yes.

7        Q.      And to say what or for what purpose?

8        A.      Because the termination of the contract

9   needed to come from Commissioner Harvey.  And so I

10  was instructed to discuss with him as to whether he

11  was prepared to move forward with the termination.

12       Q.      Did you speak with Commissioner Harvey

13  about that subject?

14       A.      Yes, I did.

15       Q.      On how many occasions?

16       A.      I can't recall.  There were numerous

17  occasions that we talked about Sam Newton and the

18  issues regarding the Lovell case.

19       Q.      Let me make sure that my question is

20  sufficiently narrow.  Did Bryan Baron speak with

21  Jim Harvey specifically about terminating the

22  underlying contract for all appeals?

23       A.      Yes.

24       Q.      On how many occasions?

25       A.      At least one, but I don't recall.

1       Q.    Can you approximate when that conversation

2    took place?

3       A.    It would have been right around the time

4    the letter was sent out, October 25th or 26th.

5       Q.    Bryan Baron did not have the authority to

6    terminate that contract, correct?

7       A.    Correct.

8       Q.    Dave Wilson did not have the authority to

9    unilaterally terminate that contract, did he?

10      A.    No, he did not.

11      Q.    But it's the county's position that

12   Mr. Harvey had the unilateral authority to terminate

13   that contract?

14      A.    Yes.

15      Q.    Was the communication between Mr. Baron

16   and Mr. Harvey an in-person meeting?

17      A.    I don't recall.

18      Q.    Was it an oral meeting of some kind?

19      A.    I don't recall if it was e-mail or a phone

20   call or an in-person meeting or something.

21      Q.    Well, let me indicate that, like you, I've

22   been through all of the Weber County production

23   quite recently as well, and I don't recall seeing

24   any sort of e-mail exchange where the merits of

25   terminating the underlying contract were debated

1    between Mr. Baron and Mr. Harvey.  If there's one

2    there that we find later, I will apologize.  You're

3    not sure whether it was oral or in writing, but will

4    you give me the gist of the conversation between

5    Mr. Baron and Mr. Harvey with respect to terminating

6    the underlying contract.

7         A.    I don't recall the details of the

8    conversation.  The only thing I recall is that

9    Commissioner Harvey was in support of terminating

10   the contract and requested I prepare the letter

11   going out to Mr. Newton and to Mr. Bouwhuis.

12        Q.    Did Commissioner Harvey offer any

13   suggestions as to the content of the letter?

14        A.    No, he did not.

15        Q.    Did Commissioner Harvey state any reasons

16   for which the contract was being terminated?

17        A.    No, he did not.

18        Q.    Let's go back to Exhibit 2.  It's not very

19   long, so let's just go through it sentence by

20   sentence and see if there's anything interesting.

21   The first sentence of the letter says, "Over the

22   past several years, you have provided representation

23   to indigent defendants on behalf of the County."

24   That's a true statement, correct?

25        A.    Yes.

1    Q.    During those past several years had Weber

2    County ever received any complaints from a court or

3    opposing counsel or an indigent defendant claiming

4    that Mr. Newton had made a misrepresentation?

5    A.    So you're asking over the past several

6    years had the county received any complaints about

7    Mr. Newton from the court and who else?

8    Q.    From a court, opposing counsel, or an

9    indigent defendant/client alleging that Mr. Newton

10   had made misrepresentations.

11   A.    Not to my knowledge.  But that's not

12   something that I was requested to prepare for today,

13   and so I haven't looked into that any further.  But

14   just based on my own personal knowledge, I'm not

15   aware of any.

16   Q.    And how long have you personally been with

17   Weber County?

18   A.    Since June of 2015.

19   Q.    Next sentence, "While we have appreciated

20   your hard work and dedication, this past year you

21   have made various representations to the media and

22   to the court that have been untruthful and harmful

23   to the County's reputation."  Now, you didn't

24   mention in your answer earlier anything about

25   representations to the media.  So tell me what

1   representations to the media were referenced in

2   Exhibit 2.

3        A.    I recall two articles that were published

4   by the Salt Lake Tribune where misrepresentations

5   were made that were the basis for this.

6                (Exhibit No. 5 was marked.)

7                (Exhibit No. 6 was marked.)

8        Q.    You've been handed what has been marked as

9   Deposition Exhibit 5, which has the document control

10  numbers Weber County 050 to 057.  And you've also

11  been handed what has been marked as Exhibit 6, which

12  has document control numbers Weber County 2187 to

13  2194.  Do you see those?

14       A.    Yes.

15       Q.    Are those the two Tribune articles that

16  you were just referring to?

17       A.    Yes, they are.

18       Q.    And I noticed at the top of Exhibits 5 and

19  6 there appears to be a printing date.  Do you see

20  that?

21       A.    10/26/2017.

22       Q.    Yes.  Do you believe that you or someone

23  for the county printed these articles off on

24  October 26, 2017?

25       A.    I don't recall.

1      Q.   Do you know where these articles came

2   from?  I mean, they were part of the Weber County

3   production, as you can see.  They must have been in

4   a file somewhere or such.  Can you help me out with

5   that?

6      A.   They likely would have been stored in our

7   Dropbox file.  We have an electronic Dropbox file

8   that's shared between the civil attorneys, and they

9   were likely stored in there.

10     Q.   Let's look at these exhibits starting with

11  Exhibit 5.  Is Exhibit 5 a Tribune article that was

12  originally published on or around July 18, 2017?

13     A.   Yes, it is.

14     Q.   So can you identify for me the

15  misrepresentations to which Exhibit 2 is referring

16  in that article?

17     A.   So this would be page 4 out of 10 at the

18  top.

19     Q.   Weber County 053?

20     A.   Yes.  And there's a quote here from

21  Mr. Newton where he says, "'That's the bind,' Newton

22  said in a recent interview, 'Do I represent my

23  client zealously like I'm constitutionally required

24  to do or do I tread lightly so I don't lose my

25  livelihood?'"

```
 1        Q.    Let's look at the sentence immediately

 2   preceding that in the article.  It says, "County

 3   officials indicated in an e-mail to Newton that if

 4   his billing practices don't change, they will have

 5   to find someone else for future appeals."  Do you

 6   see that?

 7        A.    Yes, I do.

 8        Q.    And that hadn't occurred, correct?

 9        A.    Yes.

10        Q.    Did the county understand Mr. Newton's

11   quote to be referencing the e-mail about changing

12   his billing practices or else the county would find

13   someone else for future appeals?

14        A.    Yes.  But we saw it as a misrepresentation

15   of that e-mail and the intent of that e-mail.

16        Q.    Anything else in Exhibit 5 that the county

17   was referring to in its termination letter?

18        A.    No.

19        Q.    How about Exhibit 6, what alleged

20   misrepresentation or misrepresentations was the

21   county referring to from Exhibit 6?

22        A.    So this would be on page 3 out of 9, Weber

23   County 2189.  And it's the second paragraph, another

24   quote from Mr. Newton.  It says, "Newton told The

25   Tribune on Friday, 'It is unfortunate that I was
```

1    placed in a position where I had to choose between

2    supporting my family and representing Mr. Lovell.'"

3         Q.    Are there any other alleged

4    misrepresentations in Exhibit 6 that Exhibit 2 was

5    referring to?

6         A.    No.   That's the only one.

7         Q.    And how do you know which statements in

8    Exhibits 5 and 6 allegedly formed a basis of Exhibit

9    2?

10        A.    Because I'm the one who drafted Exhibit 2.

11        Q.    Was there any discussion with

12   Commissioner Harvey about statements to the media?

13        A.    Yes.   Not specifically, though.   Not that

14   I recall.

15        Q.    What did Commissioner Harvey say in any

16   way about statements to the media?

17        A.    I don't recall any specific statement

18   about them.

19        Q.    How about generally?

20        A.    I don't recall general statements either.

21        Q.    So you recall that there was some

22   discussion with Commissioner Harvey about statements

23   to the media, but you can't tell us even the general

24   parameters of them?

25        A.    Right.   I recall speaking with

31

 1    Commissioner Harvey about wanting to terminate

 2    Mr. Newton's contract because of various reasons,

 3    including the misrepresentations to the court and

 4    the media.  And Commissioner Harvey was in support

 5    of that decision.  That's all I recall.

 6        Q.    Was there further discussion with

 7    Commissioner Harvey about what media statements were

 8    being discussed, or does the county just not know?

 9        A.    No, there were not.

10        Q.    Did Mr. Baron identify for

11    Commissioner Harvey which statements Mr. Baron

12    thought were misstatements to the media?

13        A.    No, I did not.

14        Q.    Was there any discussion between

15    Bryan Baron and Dave Wilson about misstatements to

16    the media allegedly made by Mr. Newton?

17        A.    Yes.

18        Q.    On how many occasions?

19        A.    I don't recall.  There would have been

20    multiple occasions when we discussed this decision.

21        Q.    Is there any way to put a time frame on

22    any of those discussions?

23        A.    They all would have occurred -- I'm sorry.

24    Which discussions specifically?  Discussions

25    regarding the reasons for terminating Mr. Newton's

32

 1    underlying contract, or are we just talking

 2    specifically about the media statements?

 3              MS. PORTER:  Will you read the question

 4    back.

 5              (Question read.)

 6        A.    Yes.  They would have occurred between

 7    July 18, 2017 and October 26, 2017.

 8        Q.    Were there any discussions between

 9    Bryan Baron and Dave Wilson with respect to Exhibit

10    5?

11        A.    Yes.

12        Q.    Can we narrow the time frame of that

13    discussion?

14        A.    It would have occurred shortly after the

15    article was published.

16        Q.    And was that an in-person discussion?

17        A.    I believe so, yes.

18        Q.    Where did that discussion take place?

19        A.    It would have been in the Weber County

20    Attorney's Office.  I don't recall if it was

21    specifically in Dave Wilson's office or in my

22    office, but one of those two.

23        Q.    Can you generally walk us through what was

24    said by each person in that conversation.

25        A.    I cannot.  I only recall that each time an

33

1   issue came up on this case I would go to Dave Wilson

2   to seek his advice.

3       Q.    Can you generally tell us anything that

4   was said in that discussion between Bryan Baron and

5   Dave Wilson with respect to Exhibit 5?

6       A.    I can't.

7       Q.    Were there any discussions between

8   Bryan Baron and Dave Wilson with respect to

9   Exhibit 6?

10      A.    Yes, there would have been.

11      Q.    Would it also have been shortly after the

12  article came out?

13      A.    Yes, it would have been.

14      Q.    Also in person?

15      A.    Yes.

16      Q.    Can you tell us, even generally, about

17  anything that was said in that discussion?

18      A.    No.  I recall the discussion of being

19  frustrated that Mr. Newton continued to make

20  misrepresentations.

21      Q.    Is that something that Bryan Baron said in

22  that meeting?  Who said that?

23      A.    That would have been the general

24  discussion in the meeting.

25      Q.    And can you identify for me what

1    misrepresentations, if any, were specified in that

2    discussion?

3         A.    I don't recall.

4         Q.    Back to Exhibit 2.  I'm going to go ahead,

5    for discussion purposes, and reread the sentence

6    that I read previously.  The second sentence of

7    Exhibit 2 says, "While we have appreciated your hard

8    work and dedication, this past year you have made

9    various representations to the media and to the

10   court that have been untruthful and harmful to the

11   County's reputation."  Let's talk about what

12   representations to the court were referenced in this

13   letter.

14        A.    So in Exhibit 4 on the second page I have

15   a summary of the misrepresentations that were made

16   and when they were made and when they were corrected

17   by the county.

18        Q.    Let me make it clear.  This list, I guess,

19   in Exhibit 4 was prepared when?

20        A.    I started preparing on Friday and finished

21   up on Saturday.

22        Q.    Prior to this past weekend, was there any

23   sort of list of misrepresentations to the court that

24   the county believed had occurred?

25        A.    There was no list, no.

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                    30(b)(6)                    Bryan Baron

35

1      Q.    Now, earlier in this deposition there was

2    a reference made about misrepresentations made

3    during the hearing on a motion to withdraw.

4      A.    Yes.

5      Q.    Is it the county's testimony that there

6    were also additional misrepresentations to the court

7    that just weren't mentioned earlier in the

8    deposition?

9      A.    Yes.

10     Q.    Let's look at those.  So the

11   misrepresentations generally occurred in

12   Mr. Newton's reply to the memorandum in opposition

13   for attorney fees?

14     A.    Yes.  That's correct.  That's one of the

15   documents.

16     Q.    Right.  I'm just making my way down here.

17   I'm trying to understand your outline.  And in the

18   motion to withdraw.

19     A.    Yes.

20     Q.    And response to the state's motion to

21   inquire into conflict and at the oral argument on

22   the motion to dismiss.

23     A.    Yes.

24     Q.    What motion to dismiss?

25     A.    That would have been oral argument on the

36

1    motion to withdraw.  Sorry.

2        Q.    Now, in the reply to the memo in

3    opposition, the memo in opposition that's referenced

4    here is the memo in opposition that the county had

5    submitted, correct?

6        A.    Yes.

7        Q.    And the county had submitted these e-mails

8    that are referenced as exhibits, correct?

9        A.    No.  Which e-mails are you specifically

10   referring to?

11       Q.    Well, you have here corrected e-mail

12   5/22/2017.

13       A.    Right.  Those e-mails were not referenced

14   in the memo in opposition.  The memo in opposition

15   came before those e-mails were sent out.  I can

16   explain.

17       Q.    Let's do that.  It may save some time.

18       A.    Do you want me to specifically point out

19   the misrepresentations in the documents?

20       Q.    I thought you wanted to explain something.

21       A.    If I had the documents, then I could

22   specifically point them out.  But regarding e-mails

23   in the memo in opposition, Mr. Newton filed a motion

24   for attorney fees in March.  The county filed a memo

25   in opposition to that motion.  And then Mr. Newton

1   filed a reply to the memo in opposition.  And then

2   an e-mail came after the reply to the memo in

3   opposition and was stating that Mr. Newton had --

4   this is generally speaking because I don't have the

5   e-mail in front of me -- stating that Mr. Newton had

6   misrepresented or misunderstood the county's

7   position.  And then the reference admitted --

8        Q.    Hold on.  Let's go ahead and try to take

9   these one at a time here.

10       A.    Sure.

11             (Exhibit No. 7 was marked.)

12             (Exhibit No. 8 was marked.)

13             MS. VANORMAN:  So, for the record, Exhibit

14   7 starts with the NEWTON000314 and Exhibit 8 starts

15   with NEWTON000344.

16             MS. PORTER:  I was going to have him go

17   ahead and read that in, but yes.

18             MS. VANORMAN:  Sorry.

19             MS. PORTER:  That's correct.

20       Q.    Let me show you what has been marked as

21   Deposition Exhibit 7.  And I will ask if you

22   recognize that.

23       A.    Yes, I do.

24       Q.    Is Exhibit 7 a document that you prepared

25   and filed with the court?

38

1        A.    Yes, it is.

2        Q.    And you had an opportunity to attach all

3    e-mails and other communications that you believed

4    were relevant to the motion to which this was

5    responding, correct?

6        A.    Yes, I did.

7        Q.    Let's look at Exhibit 8, please.

8        A.    Okay.

9        Q.    Can you identify Exhibit 8 for us?

10       A.    This is the Reply to Memorandum in

11   Opposition to Ex Parte Motion for Payment of

12   Attorney Fees and Litigation Expenses.  And it was

13   filed by Sam Newton on April 17, 2017.

14       Q.    And will you identify the alleged

15   misrepresentations on which the county was relying

16   in sending Exhibit 2.

17       A.    On page 3 of Exhibit 8, this is

18   NEWTON000346.  And this would be the third full

19   paragraph on that page, the third sentence which

20   reads, "The county has plainly indicated that

21   counsel will not be allowed additional funding."  It

22   may be helpful if I read the preceding sentences.

23       Q.    I just want to know the

24   misrepresentations.  The misrepresentation that

25   you're referring to on NEWTON 346 is the sentence,

39

1    "The county has plainly indicated that counsel will

2    not be allowed additional funding"?

3        A.    Yes.

4        Q.    What other alleged misrepresentations is

5    the county relying on from Exhibit 8?

6        A.    So this is on the fourth page,

7    NEWTON000347.  This is towards the bottom of the

8    second paragraph.  And it starts with, "There is

9    already a clash of interests over payment of fees,

10   since the county will not reimburse Mr. Lovell for

11   actual expenditures already made, and this issue

12   will imminently escalate to greater detriment to

13   Mr. Lovell when the county refuses to fund anything

14   beyond its offer of $15,000 which Mr. Lovell

15   contends is not adequate for the remainder of work

16   to be done."

17       Q.    Does the county contend there is a

18   misrepresentation about a matter of existing fact in

19   that sentence or that he is incorrectly predicting

20   what will happen in the future?

21       A.    It's a misrepresentation of an existing

22   fact.

23       Q.    What is the existing fact that is

24   misrepresented in that sentence you just read to us?

25       A.    The existing fact is that the county had

1   preauthorized $15,000 to Mr. Newton for the

2   evidentiary hearing specifically.  And in

3   negotiations, the county had said it would be

4   willing to consider providing additional funds to

5   Mr. Newton, but they would have to be justified.

6        Q.   And with respect to the sentence you just

7   read me, which portion of that sentence contains the

8   misrepresentation of existing fact rather than an

9   incorrect prediction or potentially incorrect

10   prediction of the future?

11        A.   The portion that reads, "The county

12   refuses to fund anything beyond its offer of

13   $15,000."

14        Q.   Wait.  You left some words out before

15   that, didn't you?  Did you intend to leave out the

16   words "when the county refuses"?

17        A.   You asked which part of the sentence was

18   the misrepresentation.

19        Q.   Of existing fact.

20        A.   Of existing fact.

21        Q.   Starting with the words "the county

22   refuses to fund anything."

23        A.   Yeah.  The county refuses to fund anything

24   beyond its offer of $15,000.

25        Q.   So the county in its testimony today is

41

1    not including the word "when" when it is identifying

2    the misrepresentation to us, correct?

3        A.    Correct.

4        Q.    Can you identify any and all other alleged

5    misrepresentations in Exhibit 8 upon which the

6    county was relying in terminating the contract?

7        A.    No.  I believe that those are the only two

8    in that particular document.

9            MS. PORTER:  Kristin, come on.  You can't

10   be pointing out stuff on the thing.

11           MS. VANORMAN:  I'll ask him when it's my

12   turn.  I get it.

13           MS. PORTER:  Yeah, you do.

14               (Exhibit No. 9 was marked.)

15       Q.    Let me show you what has been marked as

16   Deposition Exhibit 9.  And I will ask you if you can

17   identify it.

18       A.    Yes.  This is the Motion to Withdraw that

19   was filed by Mr. Newton in the Second District

20   Court.

21       Q.    And is that the motion to withdraw that is

22   referenced on the second page of your notes, which

23   are Exhibit 4?

24       A.    Yes, it is.

25       Q.    So if I'm reading your notes correctly,

1    the county contends that there is a

2    misrepresentation on page 3.  Could you please

3    identify it for us.

4         A.    So the first is the beginning of the

5    second paragraph, and it says, "First, the county

6    has only authorized $15,000 for the entire remand

7    proceeding, preparations and revisions to the brief,

8    which is wholly and totally inadequate for the work

9    and preparations that need to be done to represent

10   Mr. Lovell."

11        Q.    Which portion or portions of that sentence

12   are factual misrepresentations?

13        A.    The first part which says, "The county has

14   only authorized $15,000 for the entire remand

15   proceeding, preparations and revisions to the

16   brief."

17        Q.    At the time of this writing, had the

18   county, in fact, authorized more than $15,000?

19        A.    They had specifically authorized $15,000

20   and said they would consider additional requests.

21        Q.    So it is a true statement that as of the

22   date of this document the county had only authorized

23   $15,000, correct?

24        A.    15,000 had only been authorized at that

25   point.

1      Q.     Now, the county had flat out refused to

2   even consider any additional funds for revising the

3   reply brief, correct?

4      A.     At that point they had said that they

5   wouldn't consider additional funds for the reply

6   brief, yes.

7      Q.     You said wouldn't, right?

8      A.     Wouldn't, yeah.

9      Q.     And, in fact, that was told to Mr. Newton

10  on at least three or four occasions, correct?

11     A.     Right.

12     Q.     So there was not going to be any

13  consideration of any additional funds for revising

14  of the brief, right?

15     A.     Not at that point, right.

16     Q.     When you say "not at that point," you mean

17  as of June 9, 2017?

18     A.     I would say at the time that the offer was

19  made to provide $15,000 and the statement was made

20  that the revisions of the initial brief and the

21  reply brief were considered to have been covered

22  under the initial $75,000 cap.  At that point there

23  was no intent to provide additional funding for

24  those.

25     Q.     Let's move on to any other

44

1   misrepresentations of fact on page 3 or anywhere, I

2   guess, in Exhibit 9.

3       A.    So at the bottom of that paragraph, the

4   last sentence, it says, "The 252 hours at $150 an

5   hour would total $37,800, which the county is

6   currently taking a position that they will likely

7   refuse to pay."

8       Q.    And what is the factual misrepresentation

9   contained therein?

10      A.    The county is currently taking a position

11  that they will likely refuse to pay.

12      Q.    Does the county believe that it was taking

13  a position that they would likely pay another

14  $37,800?

15      A.    The county was taking a position that they

16  would authorize $15,000 and that they were open to

17  additional requests if they could be justified.

18      Q.    Now, Mr. Newton had previously sent the

19  county various e-mails explaining what he believed

20  was necessary for the remaining proceedings,

21  correct?

22      A.    Yes, he had.

23      Q.    In response to those explanations, the

24  county had told Mr. Newton it believed that 100

25  hours was a reasonable estimate of what was needed,

 1    correct?

 2         A.    Yes, that's correct.

 3         Q.    And 100 hours at $150 an hour is $15,000,

 4    right?

 5         A.    Yes, that's correct.

 6         Q.    Did you see any e-mails in which the

 7    county, prior to June 9, 2017, ever told Mr. Newton,

 8    "You know what?  We now believe it's more than 100

 9    hours it will take"?

10         A.    No.

11         Q.    Now, your notes only reference page 3 of

12    the motion to withdraw.  If there's something else

13    you think you left off, now is your time.

14         A.    Well, specifically in the Motion to

15    Withdraw, there are other misrepresentations besides

16    the $15,000 pre-approval.  On pages 4, 6, and 8.

17         Q.    Thank you.  You're right.  Let's cover all

18    of the misrepresentations in one fell swoop.  And,

19    actually, just so we're clear later when we're

20    looking at your notes, as I understand it, you're

21    characterizing the alleged misrepresentation on page

22    3 under the general heading of "No additional

23    funding beyond the $15,000."

24         A.    Yes.

25         Q.    And then there's another general heading

1   of "County says limit communication with Lovell."

2       A.    Yes.

3       Q.    Let's look at those which you have cited,

4   page 4 and page 6.  Where on 4 and 6 are those

5   alleged misrepresentations?

6       A.    So this would be the final paragraph on

7   the page starting with "while the county."  Would

8   you like me to read the paragraph?

9       Q.    I want you to read to me the alleged

10  factual misrepresentations.

11      A.    I would start with the word "counsel" in

12  the first sentence down on the second line.  It

13  says, "Counsel has been placed in a veritable

14  catch-22.  He can abandon his own interests in

15  getting paid and not try to compel the county to pay

16  for his services and talk or speak with Mr. Lovell

17  less."

18      Q.    Why is the county leaving out the

19  introductory clause of that text?

20      A.    Well, you asked me to specifically point

21  out the statements that the county believed were

22  false, and so it's that last part of the sentence.

23      Q.    So then the county acknowledges that it's

24  true that Mr. Newton prefaced that paragraph with

25  the statement, "While the county indicated that it

1    would consider granting additional funding on the

2    case."

3          A.     Yes.

4          Q.     What other factual misrepresentations does

5    the county claim reliance on?

6          A.     So I would skip the next sentence.  The

7    sentence that starts, "In essence, the county has

8    told counsel that he must not bill them for what he

9    believes to be necessary work on Mr. Lovell's case,

10   such as communications, or it will terminate him

11   from his major contract."

12         Q.     Did the county understand that sentence to

13   be referring to the preceding paragraph?

14         A.     Where the e-mail is quoted, yes.

15         Q.     There were two places, right?  Let's look

16   at the preceding paragraph.  The county agrees, does

17   it not, that it had sent an e-mail indicating that

18   it was concerned about counsel's billings in these

19   three areas that are listed?

20         A.     Yes.

21         Q.     And then there's a quote or a partial

22   quote from that e-mail, right?

23         A.     Yes.

24         Q.     So did the county understand that the

25   sentence beginning "in essence," was offering an

1   interpretation of the preceding paragraph?

2       A.    You're saying that the quoted part is an

3   interpretation of the preceding part?

4       Q.    No.  In my mind, the quote was part of the

5   same paragraph.  That could be weird later.  Let me

6   do this.  I'm interpreting the block quote as part

7   of the second paragraph on that page just because it

8   follows a colon.

9       A.    Yes.

10      Q.    So for purposes of my questions, there are

11  three full paragraphs on this page.

12      A.    Yes.

13      Q.    With that clarification, did the county

14  understand that the sentence Mr. Newton wrote that

15  began, "in essence," was offering an interpretation

16  of the e-mail discussed in the second paragraph?

17      A.    Yes.

18      Q.    Your notes also reference an alleged

19  misrepresentation on page 6.  But also please feel

20  free to tell me any that you left off.

21      A.    So this is the first full sentence that

22  reads, "But counsel cannot afford to raise these

23  claims without jeopardizing his finances or his

24  health or his appellate contract and because he must

25  make that choice, he can no longer ethically

1    represent Mr. Lovell."

2         Q.    What is the factual misrepresentation in

3    that sentence?

4         A.    It's that his appellate contract is at

5    jeopardy.

6         Q.    Anything else on page 6 that the county

7    contends is a misrepresentation?  And I'll just

8    refer you to your notes because you also have an

9    alleged misrepresentation on page 6 that you put

10   under the heading, "County will terminate my

11   appellate contract for zealous representation."

12        A.    This would be down in the second full

13   paragraph, the second sentence, and it reads, "By

14   under-funding Mr. Lovell, by telling counsel that he

15   must limit his communications with Mr. Lovell or not

16   insist on full funding or risk his appellate

17   contract, and by indicating that counsel's continued

18   representation may well violate the Rules of

19   Professional Conduct, counsel must withdraw because

20   his personal interests and those of Mr. Lovell now

21   diverge."

22        Q.    What is the factual misrepresentation or

23   misrepresentations in the sentence you've just read

24   us?

25        A.    Mr. Newton is representing that the county

50

1    has informed him that he must limit his

2    communications with Mr. Lovell or risk his appellate

3    contract, and that's not true.

4         Q.    Did the county understand the sentence

5    that was just read to be Mr. Newton's interpretation

6    of the e-mail that was discussed on the prior page?

7         A.    Yes.

8         Q.    Any other factual misrepresentations on

9    page 6 upon which the county relied in terminating

10   Mr. Newton's contract?

11        A.    The first sentence of the third paragraph

12   which reads, "The county attorney's suggestion that

13   counsel limit his conversations with Mr. Lovell is

14   equally problematic."

15        Q.    What is the factual misrepresentation

16   there?

17        A.    The county never told Mr. Newton that he

18   needed to limit his conversations with Mr. Lovell.

19        Q.    It doesn't say "told," does it?

20        A.    The county never suggested that he needed

21   to limit his conversations with Mr. Lovell.

22        Q.    Does the county believe there is no

23   reasonable way to interpret the e-mail discussed on

24   the prior page as suggestion that counsel limit his

25   conversations with Mr. Lovell?

1      A.    Yeah.   I don't see how you can get that

2   out of that e-mail.

3      Q.    Anything else on page 6?

4      A.    No.

5      Q.    And, again, you can look at any page, but

6   I notice that your notes also refer to an alleged

7   misrepresentation on page 8.  Are there any more

8   alleged misrepresentations in this document?  And I

9   mean misrepresentations of fact.

10      A.    So on page 8 at the bottom of the first

11   full paragraph, it states, "Because the county will

12   not guarantee funding and has created an ethical

13   quandary, represent Mr. Lovell and lose your

14   contract, Mr. Lovell has lost the effective

15   assistance or the counsel to which he is entitled."

16      Q.    What is the alleged factual

17   misrepresentation in that sentence?

18      A.    That Mr. Newton would lose his contract

19   for representing Mr. Lovell.

20      Q.    The county did not believe that it could

21   terminate Mr. Newton's contract for statements of

22   opinion, did it?

23      A.    No, we did not.

24      Q.    The county knew it could not do that

25   within the realm of the constitution, correct?

52

1      A.     Right.

2      Q.     And the county knew at the time that it

3  could not terminate Mr. Newton for differing

4  interpretations of a document, correct?

5      A.     Right.  As long as those interpretations

6  are reasonably based on the document.

7      Q.     The county knew that it would be

8  unconstitutional to terminate him.

9      A.     Right.  Yes.

10      Q.     Are there any other misrepresentations in

11  Exhibit 9 upon which the county was relying in

12  terminating Mr. Newton's contract?

13      A.     Not that I recall, no.

14      Q.     I'll have to get you the other documents.

15  I'll do that during a break.  Let me ask you this.

16  Did the county have an opportunity to tell its side

17  of the story with respect to Mr. Newton's request

18  for attorney fees that was filed in approximately

19  March of 2017?

20      A.     Yes and no.

21      Q.     Can you elaborate?

22      A.     The county had an opportunity to respond

23  to the motion for attorney fees, but the county did

24  not have an opportunity to correct all of the

25  misrepresentations that were made in the reply to

53

1    the motion in opposition.

2        Q.    Did the county seek leave to file a

3    sur-reply?

4        A.    No.

5        Q.    Did the county take any steps to be

6    allowed to correct alleged misrepresentations in the

7    reply?

8        A.    As far as I recall, we did not.  Not until

9    the court did we seek to correct those.

10       Q.    The county was aware that there is a

11   mechanism by which sur-replies can be requested,

12   correct?

13       A.    I personally am not aware of that.  And I

14   can't speak to what the other attorneys might be

15   aware of.

16       Q.    Did the county make any effort to find out

17   if there was a mechanism by which sur-replies can be

18   filed with the court?

19       A.    No.

20       Q.    On the Motion to Withdraw, the county had

21   an opportunity to tell its side of the story on that

22   motion, correct?

23       A.    I recall drafting a response.  And

24   currently I can't recall if that response was filed.

25   I remember there was a response that was drafted but

54

1    wasn't filed.  I can't recall if this one was filed.

2         Q.    I'm asking about opportunity.  Not whether

3    you took the opportunity, just whether you had the

4    opportunity.  You drafted something, so presumably

5    the county believed it had an opportunity to file

6    something if it so chose.

7         A.    That's debatable.  And that's because this

8    is a Motion to Withdraw.  I recall there being some

9    discussion about whether we, as the county, could

10   file a response to this Motion to Withdraw because

11   we were representing the county and not the state.

12   The state, of course, would have an opportunity to

13   file a response.  But I remember there was some

14   discussion as to whether the county would have that

15   right or not.

16        Q.    The county had filed things in the past in

17   this prosecution that was being brought by the

18   state, correct?

19        A.    Yes.

20        Q.    And did the county take any steps to

21   determine whether it could file something in

22   response to the Motion to Withdraw?

23        A.    I don't recall at this moment.

24        Q.    There's a reference in your note on the

25   second page under the heading, "County says limit

55

1    communication with Lovell."  There's sort of a

2    bullet point that says, "Corrected:  Phone call

3    around 6/6/2017."  Can you tell me what that refers

4    to.

5         A.    In the e-mail where the county called out

6    concerns with Mr. Newton's billing practices, one of

7    the concerns was regarding Mr. Newton's frequent

8    communication with Mr. Lovell.  And there was a

9    phone call that was made to Mr. Newton shortly after

10   that e-mail was sent to further explain that the

11   county was not trying to limit Mr. Newton's ability

12   to communicate with his client.  We were simply

13   inquiring as to why he needed to have so much

14   communication with his client on appeal.

15        Q.    Now, Mr. Newton had already provided an

16   explanation on that exact question in 2016, correct?

17        A.    He had, yes.

18        Q.    And the county had still come back in 2017

19   and was raising that question again, correct?

20        A.    Yes.  Because the circumstances had

21   changed since 2016.

22        Q.    But in 2016, the county had specifically

23   asked, "Why are you speaking to Mr. Lovell so much?"

24        A.    Yes.  That's right.

25        Q.    And he had given a fairly lengthy

1    explanation, correct?

2        A.    Yes, that's right.

3        Q.    What circumstance had changed to where his

4    prior explanation was no longer good enough for the

5    county?

6        A.    If I remember correctly, in the 2016

7    response Mr. Newton cited his need to talk to

8    Mr. Lovell frequently to prepare the Rule 23B

9    motion.  And I believe he said in that e-mail that

10   once the Rule 23B motion had been completed, he

11   would no longer need to communicate with Mr. Lovell

12   as frequently.

13       Q.    And by this June 6, 2017, had the Utah

14   Supreme Court issued a ruling on the 23B?

15       A.    Yes, they had.

16       Q.    And the Supreme Court had actually

17   remanded for purposes of having a hearing about the

18   witnesses that were interviewed, etc., correct?

19       A.    Yes, they had.

20       Q.    Did the county think that Mr. Newton would

21   not need to speak to Mr. Lovell now that the Supreme

22   Court had said, "Yeah, you actually can have your

23   evidentiary hearing"?

24       A.    Yes.

25       Q.    You believe he did or did not need to

57

1    speak to Mr. Lovell now that the Supreme Court had

2    actually granted the 23B just as when he was

3    drafting the 23B?

4        A.    There's no question that he needs to speak

5    to Mr. Lovell.  The question in the county's mind

6    is, "How much do you need to speak to Mr. Lovell?"

7        Q.    When you say "in the county's mind," who

8    was primarily raising the issue about whether

9    Mr. Newton was speaking to his client on death row

10   too much?

11       A.    So it was my responsibility to review all

12   of the invoices that came in.  As I saw things in

13   the invoices that looked like they may be of

14   concern, I would take those concerns to Dave Wilson

15   and Chris Allred initially and then to

16   Commissioner Harvey.

17       Q.    Was Mr. Allred only over the civil

18   department or division of the county attorney's

19   office?

20       A.    No, he was not.  He's the county attorney.

21   So he was over both.

22       Q.    So he was also over the prosecution of

23   Mr. Lovell?

24       A.    At this point the case was up on appeal,

25   and so the prosecution was being handled by the

58

1   attorney general's office.  He's not over the

2   attorney general's office.  Just the deputy county

3   attorneys.

4       Q.    At two different times Mr. Newton proposed

5   to Weber County that Weber County save all the

6   expense of the evidentiary hearing, etc. by simply

7   allowing a new penalty phase hearing, correct?

8       A.    I believe so, yes.

9       Q.    And that request went to Mr. Allred,

10  correct?

11      A.    Yes.  That's correct.

12      Q.    And so at that point, even though there's

13  still an appeal and all of that going on, Mr. Allred

14  is, in fact, involved with that process, correct?

15      A.    He would have been involved in the ability

16  to negotiate the case, yes.

17      Q.    On both occasions, Weber County turned

18  down that offer, correct?

19      A.    Yes, that's correct.

20      Q.    If that offer had been accepted,

21  Mr. Newton's role would have ended, correct?

22      A.    Yes.  I believe so.

23      Q.    Now, let's go back to what we were

24  originally talking about.  And that is on or around

25  June 6, 2017, there was a phone call that you

1    referenced.  Let me just ask you, if you can, to

2    walk us through with as much detail as possible what

3    was said during that phone call.

4         A.    So the only two things I specifically

5    recall from the phone call -- well, three things.  I

6    recall the desire to call Mr. Newton and speak with

7    him because I recognized that he did not seem to

8    understand the intent of the county's e-mail calling

9    out the concerns regarding his billing practices.

10   Specifically regarding the request to explain why he

11   communicated with Mr. Lovell so frequently and also

12   regarding the termination of his contract.

13          And so I recall wanting to call and

14   explain those two elements of the e-mail to him.

15   And I remember when I called, we talked about how it

16   wasn't his underlying appeals contract that was at

17   risk.  That it was the consensus of the meeting that

18   we had had that we needed to seek new counsel for

19   future cases, meaning future aggravated murder

20   cases, capital cases.

21          And I also remember specifying that the

22   county did not desire to in any way limit

23   Mr. Newton's ability to speak with his client.  We

24   were just seeking an explanation as to why he needed

25   to communicate so frequently with his client.

60

 1      Q.    Did the county ever put in writing, "We're

 2    fine, just talk to him whenever you want or talk to

 3    him as your judgment dictates," anything like that?

 4      A.    I do remember drafting up an e-mail, but I

 5    don't believe it was sent.

 6      Q.    You mentioned that when you called

 7    Mr. Newton, you told him it was not his underlying

 8    appellate contract that was at risk.

 9      A.    Right.

10      Q.    So as of June 6, 2017, Mr. Newton's

11    underlying appellate contract was not at risk?

12      A.    It was not.

13      Q.    Going back to that discussion between

14    Bryan Baron and Dave Wilson about the communications

15    with Lovell.  Can you tell us anything that was said

16    between Bryan Baron and Dave Wilson about

17    Mr. Newton's communications with Lovell?

18      A.    I recall a meeting between Mr. Wilson and

19    Mr. Allred where we discussed the communications.

20    Is that the meeting you're referring to?

21      Q.    Yes.  I think you referenced it earlier.

22      A.    Yeah.  It was right around June 6th.

23    Again, it was my responsibility to review the

24    invoices and to handle the area of indigent defense

25    contracts and requests for funding.  And so as the

1    invoices and requests for funding would come in, I

2    would do an initial review and then I would take my

3    analysis to Mr. Wilson and frequently to Mr. Allred

4    because that had been his responsibility prior to

5    becoming the county attorney.

6           And so I would call, pointing out to them,

7    that in Mr. Newton's invoices he was frequently

8    communicating with Mr. Lovell and that I had a

9    concern regarding the amount of communication and

10   why it was necessary.  And they agreed that that was

11   a good question as to why he would need to

12   communicate with his client so frequently on an

13   appeal.

14      Q.   Do you remember anything else being

15   discussed with Mr. Wilson and/or Mr. Allred in that

16   meeting relating to Mr. Newton's billings?

17      A.   Yes.  And I'm struggling to recall right

18   now.  There were a couple of other issues with the

19   billing that I indicated in the e-mail that I sent

20   out to Mr. Newton.  One was his inclusion of time

21   that he spent before the Utah State Bar in

22   Sean Young's disciplinary proceedings.  And the

23   other one was his inclusion of time he spent in

24   preparing and litigating the motion for attorney

25   fees and litigation costs.

62

1        Q.    Did your duties at the time include

2    dealing with attorney fee applications in civil

3    rights cases?

4        A.    I don't recall that we had any civil

5    rights cases.  And I don't think that I would have

6    been responsible in reviewing the requests for

7    attorney fees for those types of cases.  My

8    responsibilities were limited to indigent defense

9    and reviewing requests for funding and attorney fees

10   in those criminal-type cases.

11       Q.    As of June 6, 2017, did the county have

12   any understanding of whether time spent preparing

13   attorney fee applications in civil rights cases was

14   also compensable?

15            MS. VANORMAN:  I'm going to object that

16   that goes beyond the scope of the 30(b)(6), but you

17   can answer if you have any knowledge on that.

18            THE WITNESS:  Can you restate the

19   question.  Sorry.

20            (Question read.)

21       A.    I personally didn't know the answer to

22   that as of June 6th.  I can't speak for what the

23   other attorneys at the county might know regarding

24   that.

25       Q.    In any event, Mr. Newton agreed to remove

1    any such billing for that, correct?

2         A.    I believe so.  I believe he agreed to

3    remove the billing for the motion for attorney fees.

4         Q.    Did Bryan Baron have any conversations

5    with Mr. Newton, oral conversations with Mr. Newton,

6    in June of 2017 about time spent in connection with

7    the Utah State Bar proceeding against Mr. Young?

8         A.    I don't recall having any oral

9    conversations on that concern with him.

10        Q.    What was the county's concern about

11   Mr. Newton's billing in connection with the

12   disciplinary proceedings against Mr. Young?

13        A.    So the county hired Mr. Newton to

14   represent Doug Lovell on an appeal.  And the county

15   felt like going out and actively participating in

16   disciplinary proceedings against another attorney

17   was not something that was included under the

18   contract.

19        Q.    The county understood at the time that a

20   big part of the 23B motion was that Mr. Young had

21   been completely ineffective, correct?

22        A.    Yes, that's correct.

23        Q.    Did the county still believe that time

24   spent in connection with a disciplinary proceeding

25   making the same allegation was irrelevant to the

64

1    appeal?

2        A.    No.  Not irrelevant to the appeal.  But

3    not necessarily something that Mr. Newton should be

4    invoicing the county for, his time spent working on

5    that.

6        Q.    In whose judgment?

7        A.    It would have been initially a question

8    that I would have raised and then brought to the

9    attention of Mr. Wilson and Mr. Allred in that

10   meeting on or about June 6th.

11       Q.    Has Bryan Baron had any experience with

12   death penalty appeals from the perspective of having

13   to write them?

14       A.    No, I don't.

15       Q.    And do you know whether Mr. Wilson does?

16       A.    No, I don't.

17       Q.    And do you know whether Mr. Allred does?

18       A.    I don't.

19       Q.    I believe you indicated that your duties

20   included oversight of the indigent defense process

21   there at the county, right?

22       A.    Yes.

23       Q.    Was there a procedure in place when a

24   defense lawyer expressed a need to do something,

25   such as the State Bar disciplinary proceeding, and

1    the county's civil attorneys disagreed?

2         A.    The procedure -- I'm sorry, can you

3    restate the question?

4         Q.    Well, I'll take it out of the hypothetical

5    and just talk the actual circumstances here.  The

6    county understood that Mr. Newton believed that the

7    time he spent at the State Bar was important to the

8    work he was doing for Mr. Lovell; is that right?

9         A.    Yes.

10        Q.    The county's civil attorneys did not share

11   that same opinion, correct?

12        A.    So we believed it was relevant to the

13   appeal, but we don't believe that the time spent

14   working on that should have fallen under the

15   contract to represent Mr. Lovell on the appeal.

16        Q.    Did the county believe that Mr. Bouwhuis

17   or some other attorney should be compensated for

18   that work?

19        A.    No.

20        Q.    So did the county believe that that work

21   was relevant to the appeal but should not be paid

22   for by the county?

23        A.    The fact that Mr. Young was disciplined

24   was relevant to the appeal.  I did not believe that

25   work pursuing that discipline was something that

1     should be compensated by the county.

2          Q.     And what mechanism was in place to resolve

3     that difference of opinion?

4          A.     Well, Mr. Newton could certainly approach

5     the county commissioners under the contract and make

6     an argument that he had good cause to pursue that

7     and be compensated for it.

8          Q.     Did Mr. Newton do that?

9          A.     He had submitted the request for

10    additional funding for the Rule 23B motion to the

11    county for that specific intent to show that he had

12    good cause to exceed the contract for the work done

13    on the 23B motion.  And those hours spent

14    representing Sean Young or spent working on

15    Sean Young's disciplinary proceeding were included

16    in that.

17         Q.     Did the county make a determination of

18    good cause one way or the other with respect to the

19    Sean Young issue?

20         A.     I can't recall what the ultimate decision

21    was on that specific issue.  The county did

22    ultimately approve 18-plus thousand dollars for work

23    done on the 23B motion, but I don't recall which

24    work was included in coming up with that number.

25         Q.     When we were talking about what mechanism

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY

February 04, 2019                    30(b)(6)                    Bryan Baron

67

1    was in place to resolve the difference of opinion,

2    for example, in connection with Sean Young, you

3    mentioned that Mr. Newton could approach the

4    commissioners and argue for good cause.  Was there

5    also a mechanism in place whereby Mr. Newton could

6    approach the court for an opinion?

7         A.    The provision in the contract stated --

8    and this is just from memory.  I don't have the

9    contract before me.  But it stated that he needed to

10   show good cause to the court and to the county

11   commissioners.  As I reviewed that provision in

12   January of 2017 when Mr. Newton first approached me

13   regarding additional funding, I didn't see that

14   there was any type of a statutory mechanism or any

15   rule that would authorize the court to make that

16   kind of determination.  And so I told Mr. Newton

17   that he didn't need to go to the court.  That he

18   could simply submit requests to the county

19   commissioners.

20        Q.    But under the contract the county had

21   agreed that Mr. Newton could go to the court with

22   such a dispute.

23        A.    Yes.

24        Q.    Let's just take a quick look at the other

25   sources.  And I'll have to get some of them printed

68

 1    during our upcoming break here.  With respect to

 2    page 2 of your notes, which are Exhibit 4, is it the

 3    county's testimony that each of the alleged

 4    misrepresentations identified on page 2 was

 5    contemplated by the county at the time that Exhibit

 6    2 was sent to Mr. Newton?

 7         A.    Yes.

 8         Q.    Did you make any effort prior to sending

 9    Exhibit 2 to go through and itemize

10    misrepresentations as you did in preparation for

11    this deposition?

12         A.    No, I did not.

13         Q.    Let's just finish this paragraph here.

14    Referring back to Exhibit 2.  I'm going to reread

15    the sentence that we've been analyzing from Exhibit

16    2, just so that our record is cleaner.

17         A.    Okay.

18         Q.    This is the second sentence of Exhibit 2.

19    "While we have appreciated your hard work and

20    dedication, this past year you have made various

21    representations to the media and to the court that

22    have been untruthful and harmful to the county's

23    reputation."  What was the county referring to when

24    it said "harmful to the county's reputation"?

25         A.    The difficulty that the county had in

1    obtaining appellate counsel to take over the

2    Doug Lovell case specifically.

3         Q.    And how was that caused by the alleged

4    representations or misrepresentations?

5         A.    The county was informed when we were

6    discussing taking over the Doug Lovell contract with

7    other appellate attorneys that there was hesitation

8    in the defense community to take that contract

9    because there were concerns that the attorneys would

10   not be compensated.

11        Q.    Who made those statements to the county?

12        A.    I remember specifically talking with

13   Emily Adams.  She was contemplating taking that

14   contract.  She indicated that she had heard and also

15   seen comments on the UACDL regarding the defense

16   community's concern about the ability to be paid on

17   this contract.

18        Q.    Who else?

19        A.    That's the only one I can specifically

20   recall.

21        Q.    Now, Ms. Adams actually wanted and applied

22   for the contract, correct?

23        A.    She did, yes.

24        Q.    She wasn't qualified, correct?

25        A.    Right.

70

1    Q.    So regardless of whatever she said, she

2    tried to get the job, correct?

3    A.    Right.  She was initially concerned as

4    well.  However, I spoke with her about how much

5    Mr. Newton had been paid under the contract and how

6    much had been approved.  And after informing her of

7    those amounts, she continued to submit her

8    application despite that concern.

9    Q.    And she had tried to get another attorney

10   to join up with her, right?  Is it Doug Mitchell?

11   A.    I don't recall his last name.  He worked

12   for Utah County.

13   Q.    Right.  She even tried to pair up with him

14   since he had the qualifications needed for the job,

15   right?

16   A.    Right.  That's true.

17   Q.    Earlier in the deposition you talked about

18   the case where Mr. Newton had been conflicted out

19   because he had spoken with two defendants.  Do you

20   recall that?

21   A.    Yes, I do.

22   Q.    And Ms. Adams was approached about taking

23   one of those contracts, right?

24   A.    Yes, she was.

25   Q.    Did she take one?

71

1      A.    Yeah, she did.

2      Q.    And she ultimately contracted with the

3  county on a case-by-case basis to do indigent

4  defense appeals?

5      A.    Yes, she did.

6            MS. PORTER:  Let's take a break.

7            (Recess.)

8            (Exhibit No. 10 was marked.)

9      Q.    You've been handed what has been marked as

10  Deposition Exhibit 10.  And I will note for the

11  record that it was previously marked as Deposition

12  Exhibit 14 in the deposition of Mr. Newton.  So

13  you'll see a photocopy of that stamp.  The document

14  control numbers for this Exhibit 10 are Weber County

15  30 through Weber County 49.  Can you identify

16  Exhibit 10 for us?

17      A.    Yes.  This is the Response to State's

18  Motion to Inquire Into Defense Counsel's Potential

19  Conflict of Interest filed in the Utah Supreme Court

20  by Sam Newton.

21      Q.    Was that on or around June 21, 2017?

22      A.    Yeah.  I believe so.

23      Q.    Is Exhibit 10 what you are referring to in

24  your notes as "Response to state's motion to inquire

25  into conflict"?

72

1     A.    Yes.

2     Q.    So the county understood that this

3    response was to something that the state had

4    initially filed, correct?

5     A.    Yes.

6     Q.    In your notes you reference some potential

7    misrepresentations in this Exhibit 10.  So let's

8    take a look at those.  I see a reference to pages 3

9    and 12.  Do you see that in your notes?

10     A.    Yes.

11     Q.    And feel free to look anywhere else in the

12    document.  I'm assuming you looked over this

13    document when you were preparing this list, right?

14     A.    Yes.

15     Q.    And your notes here would accurately

16    reflect the misrepresentations that the county was

17    relying on in terminating Mr. Newton, correct?

18     A.    That's correct.

19     Q.    Let's turn to page 3.  And please identify

20    for me any misrepresentations upon which the county

21    was relying.

22     A.    So the first one is right at the top of

23    the page.  There's not a full sentence here, but if

24    you go to the end of the first line starting with

25    the word "the."  It says, "the commissioners would

1    only authorize an additional $15,000, or 100 hours

2    of work.  The commissioners indicated that they

3    would not authorize any additional funds for the

4    remand proceeding, the brief, reply brief or other

5    work on the appeal."

6         Q.    And are you also including the footnote 1

7    that is at the end of the sentence you just read?

8         A.    Yes.  There's another misrepresentation in

9    that footnote.  And that is, "Though they did

10   indicate that if those funds were exhausted, counsel

11   could reapproach the Commission for more funding,

12   both only if he demonstrated good cause, which they

13   believed was doubtful."  And it's that last part,

14   "which they believed was doubtful," that we

15   considered the misrepresentation.  Also, that last

16   line, "They do not intend to reimburse counsel for

17   work done on the appeal totaling almost $10,000."

18        Q.    Did the county reimburse counsel for that

19   almost $10,000 referenced in that sentence?

20        A.    Yes.

21        Q.    What does the county understand that

22   sentence to be referring to in terms of what work?

23        A.    That last sentence, I believe it refers to

24   work that was invoiced to the county from January

25   2017 to the time that this was filed and that the

1    county had not paid.

2        Q.    As of the date of Exhibit 10, Mr. Newton

3    had not been paid anything by Weber County in

4    connection with the Lovell case for the year 2017,

5    correct?

6        A.    He had been paid on two invoices.  One

7    that was submitted in January 2017.  The other, I

8    believe, was submitted in March of 2017.  The

9    January invoice was paid in part.  And the March

10   invoice was paid in full.

11       Q.    The January 2017 invoice was for work done

12   in 2016?

13       A.    I believe so, yes.

14       Q.    And the March 2017 invoice, is that the

15   one that was inadvertently paid?

16       A.    Yes.  That's correct.

17       Q.    And you informed Mr. Newton that he should

18   not have received any payment in March of 2017,

19   correct?

20       A.    That's correct.

21       Q.    So other than the inadvertent payment that

22   was made to Mr. Newton in March of 2017, Mr. Newton

23   had not been paid anything for 2017 in connection

24   with the Lovell case.

25       A.    Yes.  I believe that's correct.

1    Q.    You mentioned that the January 2017

2    invoice for some 2016 work had been paid in part.

3    A.    Uh-huh.

4    Q.    Can you clarify which part was paid, which

5    part wasn't paid.

6    A.    There was a cap on Mr. Newton's contract

7    of $75,000 before he had to make a showing of good

8    cause to receive additional funding.  And so on that

9    invoice he had invoiced the county for $9,450 for

10   Lovell litigation work.  And that would have

11   exceeded the cap of $75,000.  And so we paid up to

12   the cap of $75,000 and the rest was not paid.

13   Q.    Did the county take a position in

14   connection with that payment that nothing that

15   Mr. Newton had submitted to that point constituted

16   or showed good cause?

17   A.    Yes.

18   Q.    What other misrepresentations, if any, are

19   on page 3 of Exhibit 10 that the county was relying

20   on?

21   A.    That's the only one on that page.

22   Q.    What other misrepresentations, if any,

23   does the county contend are in Exhibit 10?

24   A.    The next one is on page 9.

25   Q.    What misrepresentation or

1    misrepresentations are on page 9 of Exhibit 10?

2         A.    So it would be the beginning of the second

3    full paragraph that states, "Additionally, as

4    detailed infra, the county attorney's office has

5    also interfered with Mr. Lovell's counsel to deny

6    him funding (and potentially his entire appellate

7    contract) for zealous representation of Mr. Lovell."

8         Q.    What is the factual misrepresentation in

9    that?

10        A.    The fact that the county was denying

11   Mr. Newton funding.  The fact that we were

12   potentially denying his entire appellate contract

13   for zealous representation of Mr. Lovell.

14        Q.    Does the county contend that it was not

15   denying funding at that point?

16        A.    The county had not outright denied funding

17   for Mr. Newton at that point.

18        Q.    Well, it had outright denied any

19   additional funding for the reply brief, correct?

20        A.    We had stated that the work done for the

21   reply brief would be considered as part of the

22   $75,000 payment.  However, if Mr. Newton could show

23   good cause as to why the reply brief needed to be

24   longer, he could apply for additional funds.

25        Q.    Did you see a single e-mail that added

1    that last bit in there?

2         A.    No.

3         Q.    There are several e-mails that flat out

4    say there will be no additional funding, period, for

5    the reply brief, correct?

6         A.    I don't recall.  But that may be correct.

7         Q.    Did the county understand that the

8    sentence you just read was Mr. Newton's

9    interpretation of the county's communications with

10   him?

11        A.    Yes.

12        Q.    Where is the next misrepresentation or

13   misrepresentations the county claims is in Exhibit

14   10?

15        A.    That would be on page 12.  So there are

16   two on this page.  The final paragraph states, the

17   second sentence in the final paragraph, "However,

18   the county has also indicated that it expects

19   counsel to move forward on a two-week hearing, with

20   the attendant preparation costs, with no additional

21   funding."  The other is in the footnote.

22        Q.    We'll do the second one in just a second.

23        A.    Sure.

24        Q.    Does the county contend that the sentence

25   you just read is not a reasonable interpretation of

1     the county's communications with Mr. Newton?

2          A.     Yes.

3          Q.     And what is the next alleged

4     misrepresentation?

5          A.     The second sentence of the footnote,

6     bottom of the page, "The county has refused to pay

7     almost $10,000 it owes counsel for prior work and it

8     has indicated it will not pay for any more than

9     $15,000 for the entire remand proceedings."

10         Q.     As of June 21, 2017, had the county paid

11    Mr. Newton almost $10,000 that it owed counsel for

12    prior work?

13         A.     The county did not believe it owed counsel

14    for prior work because that prior work would have

15    fallen underneath the $75,000 cap, unless Mr. Newton

16    were to show good cause that the $10,000 amount

17    should be paid despite that cap.

18         Q.     And with respect to the portion that

19    talked about not paying more than $15,000 for the

20    entire remand proceeding, the county felt that was a

21    misrepresentation for reasons previously stated in

22    the deposition?

23         A.     Yes.  Because the county had said it would

24    consider requests for additional money.

25         Q.     The county had not committed to pay more

1    than $15,000; is that a true statement?

2         A.    That's true.

3         Q.    Is it the county's position that there is

4    nothing in its e-mails to Mr. Newton prior to

5    June 21, 2017 that could be interpreted as an

6    indication that it would not pay more than $15,000?

7    Do you need that question read back?  It was kind of

8    a long one.

9         A.    Sure.

10             (Question read.)

11        A.    I don't believe so.  There is the initial

12   e-mail that was sent to Mr. Newton in March stating

13   that we would be willing to authorize $15,000.  And

14   I can't remember the specific language of that

15   e-mail at this time.  But taken into context with

16   the other e-mails, I don't believe there's any

17   reasonable way you could interpret the county's

18   response, to me, that we would not authorize more

19   than $15,000.

20        Q.    Let's keep going through Exhibit 10.  What

21   other misrepresentation or misrepresentations does

22   the county claim are in Exhibit 10?

23        A.    This would be on page 16.  So the first

24   misrepresentation would be the first two sentences

25   of the first full paragraph, which say, "The county

1    had also indicated that it will not contract with

2    counsel in the future because of these concerns.

3    This means a loss of counsel's entire livelihood

4    because of his advocacy and representation of

5    Mr. Lovell."

6        Q.    Which portion or portions of those two

7    sentences contain factual misrepresentations, in the

8    county's view?

9        A.    I think you have to look at both of these

10   sentences together.  The county had said that if

11   billing practices were not changed it would need to

12   look for counsel on future appeals cases, meaning

13   aggravated murder and capital cases.  And these two

14   sentences read together indicate that Mr. Newton is

15   representing to the court that the county intends to

16   terminate his base appellate contract with the

17   county because of his advocacy and representation of

18   Mr. Lovell.  And that was not the case.

19            MS. PORTER:  Could I have that answer

20   back, please.

21            (Answer read.)

22       Q.    The county had also in the same e-mail

23   said not only do billing practices need to change

24   but that prior invoices needed to be revised,

25   correct?

81

1      A.    I don't recall that requirement in the

2   e-mail.  Perhaps if I had the e-mail in front of me,

3   I could look at it.

4      Q.    You will.  Your memory is much worse after

5   this break than it was before the break.

6      A.    It's been a long morning.

7      Q.    Well, actually, let me put it this way,

8   the county is not going to deny the content of any

9   e-mails that it produced.

10     A.    No.

11     Q.    What else, if anything, on page 16 of

12  Exhibit 10?

13     A.    That's the only one on 16.  The next would

14  be on page 18.  And this starts the first paragraph,

15  the second sentence, "He needs the services of at

16  least another lawyer and adequate resources.  For

17  example, the $15,000 the county has allowed for the

18  remand proceeding also includes investigative

19  services, which will be woefully lacking compared to

20  the State, which has the investigative resources of

21  two offices as well as many attorneys working on the

22  case."

23     Q.    Did the county understand that as part of

24  preparing for the evidentiary hearing that the

25  attorney handling the evidentiary hearing would have

1    to do some investigation?

2         A.    Yes.

3         Q.    Then which portion or portions of the

4    sentences you just read to us contain factual

5    misrepresentations?

6         A.    The misrepresentation here is that the

7    investigative services are not covered separately

8    from the $15,000.  And in Mr. Newton's contract it

9    specifically provides investigative services at the

10   rate of $60 an hour with no cap.

11        Q.    But in terms of investigation that was

12   conducted by Mr. Newton, that's not in a separate

13   contract, right?

14        A.    Right.

15        Q.    The county understood that the attorney

16   who would be handling this evidentiary hearing would

17   himself have to conduct some investigation, correct?

18        A.    I don't control how Mr. Newton researches,

19   prepares for the evidentiary hearing, but he did

20   have investigation resources built into his

21   contract.  And I think that this statement here can

22   be taken in context with the misstatement he made at

23   the motion for attorney fees where he also indicated

24   that he did not have an investigator.

25        Q.    The Supreme Court, was it the recipient of

1    that motion you just referenced?

2          A.    No, it was not.

3          Q.    So as far as the statements to the Utah

4    Supreme Court about investigative services, the

5    county decided that the only interpretation of

6    investigative services would be the private

7    investigator services?

8          A.    Based on my reading of this sentence, it

9    sounds like Mr. Newton is referring to a private

10   investigator because of the way he says "includes

11   investigative services."

12         Q.    Did the county ask Mr. Newton at any point

13   what he meant when he referred to "investigative

14   services"?

15         A.    No, it did not.

16         Q.    Any other alleged misrepresentations in

17   Exhibit 10?

18         A.    On page 19.  So it would be, I guess, the

19   first and only full paragraph.  The fourth sentence

20   states, "On this case, counsel faces a loss of his

21   entire livelihood by litigating Mr. Lovell's case as

22   he is constitutionally required to do."

23         Q.    And what about that is a

24   misrepresentation?

25         A.    I see this statement as referring to

84

1    Mr. Newton's underlying appellate contract with the

2    county and that he believes he is going to lose that

3    contract as a direct result of litigating

4    Mr. Lovell's case as he's constitutionally required

5    to do so.  And the county never threatened that

6    underlying contract.

7              (Exhibit No. 11 was marked.)

8         Q.    Let me show you what has been marked

9    Deposition Exhibit 11 in here.  You'll see there is

10   a notation that this was previously introduced by

11   the county's counsel as Exhibit 13 in Mr. Newton's

12   deposition.  You can ignore that reference.

13             Is Exhibit 11 a transcript, albeit

14   informal, of the 8/29/17 oral argument on Motion to

15   Withdraw that is referenced in your notes?

16        A.    Yes, it is.

17        Q.    So let's go through it looking for things

18   that the county believes were factual

19   misrepresentations upon which you relied in

20   terminating Mr. Newton's contract.

21        A.    I apologize.  I'm not as familiar with

22   this transcript as I am with my own notes that were

23   taken.  It would take me a little while to find

24   this.

25        Q.    Do you have those?  Maybe we could just

85

1    try to use those to guide us into the transcript.

2        A.    I have an electronic copy on my phone or

3    on my computer that I could pull up and refer to.

4    Or if you want to point me to where it's at in here,

5    the page even.

6        Q.    I don't see any misrepresentations in

7    here, so I can't do that.  But there aren't that

8    many times in which Mr. Newton is the speaker.

9        A.    Sure.  If you want to give me a few

10   minutes, I can find it in this transcript.

11           MS. VANORMAN:  Do you want him to go off

12   the record and check his notes on his phone?  Would

13   that expedite things?

14           MS. PORTER:  Sure.  If that's something he

15   can do.

16           MS. VANORMAN:  Sure.

17           (Recess.)

18       A.    So in my notes I have the time on the

19   audio recording at which the statements were made.

20   And so I can read to you what was stated based on my

21   own notes, or I can search through the transcript

22   and find it.

23       Q.    Why don't you give us the gist of what's

24   in your notes, and we'll see if we can find it in

25   the transcript.

86

1      A.    Sure.  So at approximately 10 minutes and

2   30 seconds, Mr. Newton stated, "The county had

3   indicated, we went back and forth, they would

4   authorize an additional $15,000 to complete all

5   remand proceedings."

6      Q.    Page 3 of the transcript.

7      A.    I found it.  So at the bottom of page 3,

8   it's the last full sentence.  And it says, "The

9   county had indicated, we went back and forth, they

10   would authorize an additional $15,000 to complete

11   all the remand proceedings.  I told them I believe

12   that was unrealistic, given the nature of the remand

13   and what needed to happen, and the county

14   essentially said they weren't going to fund anything

15   more beyond that."

16      Q.    And the county believes there is no

17   reasonable reading of its communications to

18   Mr. Newton that would be consistent with that

19   statement?

20      A.    Right.  And I may have been willing to

21   forgive Mr. Newton for a single misrepresentation.

22   But on May 22, 2017 I sent him an e-mail and I

23   specifically called out this misrepresentation and

24   said, "You have misrepresented the county's position

25   in your reply."  And he responded in an e-mail and

 1    acknowledged that he had misunderstood the county's

 2    position.  And so I don't believe that there's any

 3    excuse from that time going forward to misunderstand

 4    or misrepresent the county's position on the

 5    $15,000.

 6        Q.    What else in Exhibit 11?

 7        A.    So at 11 minutes 50 seconds, Mr. Newton

 8    stated, "I'm already approaching I think about

 9    $30,000 that the county owes me, and I am fearful

10    that to continue an involuntary pro bono

11    representation for Mr. Lovell compromises my ability

12    to adequately represent him on appeal."

13        Q.    Let's try to find that.

14            MS. VANORMAN:  It's in the same paragraph

15    on page 4.

16        Q.    It doesn't seem like it would be that many

17    minutes later.

18        A.    There it is.

19        Q.    I'm sorry.  Where does that sentence

20    begin?

21        A.    It's about the middle of the paragraph.

22    And I actually started reading in the middle of a

23    sentence.  It says, "I'm already approaching I think

24    about $30,000."

25        Q.    Let's take the full sentence there.  Was

88

1    the first part of that sentence true, "So other than

2    that payment," which refers to one discussed above,

3    "I probably haven't been paid for a year on

4    Mr. Lovell's case"?

5         A.    Yeah.  It had been about eight months

6    since he hit the $75,000 cap.

7         Q.    So you would start the misrepresentation

8    at the word "I'm"?

9         A.    Yes.

10        Q.    And where does it end?

11        A.    So it goes, "I'm already approaching I

12   think about $30,000 that the county owes me, and I

13   am fearful that to continue involuntary pro bono

14   representation for Mr. Lovell comprises" -- probably

15   should be compromises -- "my ability to adequately

16   represent him on appeal."  And it's that

17   representation that he is being forced to represent

18   Mr. Lovell pro bono that I believe is a

19   misrepresentation to the court.

20        Q.    For the reasons that you've previously

21   discussed.

22        A.    Right.  He had the contract.  He'd already

23   been paid $75,000.  He'd been approved to receive an

24   additional 15-, with the ability to request

25   additional funding.  There was nothing pro bono

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                    30(b)(6)                    Bryan Baron

89

 1    about this.

 2        Q.    What else in Exhibit 11?

 3        A.    There was one more misrepresentation, and

 4    that is at 23 minutes and 42 seconds.  Mr. Newton

 5    indicated, "The county indicated to me they had some

 6    concerns about my billing.  Of note, I was speaking

 7    too frequently with Mr. Lovell.  They indicated that

 8    if I did not resolve" --

 9        Q.    Page 7.  It says "JN," but I think it

10    means SN as the speaker.  Do you see it?

11        A.    Yeah.  I could pick up where I left off.

12        Q.    Let's actually just read it from the

13    transcript, if you can.

14        A.    Sure.

15        Q.    Where do we start?

16        A.    So it's the second sentence.  And it

17    starts, "Which is, the county indicated to me action

18    concerns about my billing.  Of note, was I was

19    speaking too frequently with Mr. Lovell.  They

20    indicated if I did not resolve those concerns about

21    my billing that it would jeopardize my ability to

22    contract with them.  So the court knows I, and the

23    court is probably aware, I do all of the appeals out

24    of Weber County and I do feel that zealous advocacy

25    for Mr. Lovell on this case may jeopardize my

1   livelihood."

2       Q.    Of what you just read, which portion or

3   portions does the county consider to be factual

4   misrepresentations rather than statements about

5   Mr. Newton's subjective feelings?

6       A.    So it would be "I was speaking too

7   frequently with Mr. Lovell."  The county asked for

8   clarification as to why Mr. Newton needed to speak

9   so frequently with Mr. Lovell but never limited his

10  ability to speak with Mr. Lovell.  I never stated he

11  was speaking too frequently with Mr. Lovell.

12      Q.    You say you never stated that he was

13  speaking too frequently.  The county did raise a

14  concern about the frequency with which Mr. Newton

15  was speaking with Mr. Lovell, correct?

16      A.    Correct.  We raised that as a concern in

17  his billing.

18      Q.    What other portion or portions of what you

19  just read to us does the county contend were factual

20  misrepresentations rather than statements of

21  subjective feeling?

22      A.    Mr. Newton stated that his underlying

23  appellate contract would be jeopardized by zealous

24  advocacy for Mr. Lovell.

25      Q.    And you believe that's a misrepresentation

1    for reasons you've previously described, correct?

2        A.    Yes.   The county had not threatened his

3    underlying contract.

4        Q.    Anything else?

5        A.    No.   Those are the only misrepresentations

6    I'm aware of in that transcript.

7             MS. PORTER:   I should just note this for

8    the record.   I believe, Kristin, you indicated this

9    was sort of an informal transcript that your office

10   had put together.

11            MS. VANORMAN:   Correct.   You have the

12   audio.   We can use that.

13            MS. PORTER:   No.   And there may be an

14   occasional glitch.   I don't know whether it really

15   said "action concerns."   Maybe it did.   I don't

16   know.   It was very functional.

17       Q.    Let me clarify something on Exhibit 10,

18   which was the response to the state's motion.   There

19   was a reference that was brought to my attention,

20   which I appreciate, that I think we accidentally

21   overlooked when looking at the response to state's

22   motion.   In your notes, you mention page 15.

23       A.    I do have that, yes.

24       Q.    I don't think we did the page 15 one.

25   Let's see what, if anything, is on page 15 that the

92

 1    county claims it relied on as a factual

 2    misrepresentation.

 3        A.    So it's the last paragraph.  And it's the

 4    first sentence of that paragraph, "Perhaps most

 5    problematically is that the county has told counsel

 6    that he must limit his conversations with Mr. Lovell

 7    and not 'overbill' so much."

 8        Q.    And the county contends that was a factual

 9    misrepresentation for the reasons it has previously

10    discussed?

11        A.    Yes.

12        Q.    Did the county understand that Mr. Newton

13    was claiming that his interpretation implicated the

14    Sixth Amendment to the United States Constitution?

15            THE WITNESS:  Can you repeat that

16    question?  It didn't go where I was thinking it was

17    going.

18            (Question read.)

19        A.    Yes.

20            MS. PORTER:  Kristin, if you see any more

21    like that, I would appreciate it so our record will

22    be cleaner.  That was useful.

23            MS. VANORMAN:  I didn't want to interfere.

24            MS. PORTER:  If it's on his list, I want

25    to go over it.  I appreciated that.

 1          MS. VANORMAN:  No problem.

 2            (Exhibit No. 12 was marked.)

 3      Q.    Do you recognize what has been marked as

 4  Deposition Exhibit 12?

 5      A.    Yes.

 6      Q.    Is Deposition Exhibit 12 what you refer to

 7  in your notes as motion for attorney fees and

 8  litigation expenses?

 9      A.    Yes.

10      Q.    Where in Exhibit 12 does the county claim

11  that factual misrepresentations were made?

12      A.    Unfortunately, I didn't put a page number

13  on here.  Give me just a minute and I'll look at it.

14          MS. PORTER:  Kristin, that raises a thing

15  here.  Can we stipulate that Exhibit 12 in its

16  original form included a huge, long motion for

17  remand pursuant to Rule 23B of the Utah Rules of

18  Appellate Procedure but not include that document

19  which is Newton 144 through Newton 313 in the

20  exhibit?

21          MS. VANORMAN:  Yes.

22          MS. PORTER:  Thank you so much.  That way

23  we can save on trees and depo pages and all of that.

24      A.    I skimmed through it and didn't see it.

25      Q.    Tell us generically what you think it is

1    and we'll look too.

2        A.    It's regarding investigative resources, a

3    statement.

4        Q.    Let's look here.

5        A.    I also have a highlighted copy on my

6    phone, if you allow me to refer to that.

7        Q.    You can look at anything to help us figure

8    it out.

9        A.    So it's on page 2.

10       Q.    Where is the factual misrepresentation on

11   page 2?

12       A.    I'm not finding it.  This is different

13   than the copy I have on my phone.  On the phone I

14   have one named Ex Parte Motion for Payment of

15   Attorney Fees and Litigation Expenses.  This one is

16   Motion for Payment of Attorney Fees and Expenses and

17   Request to File Monetary Requests Under Seal.  I

18   don't recognize this document.

19       Q.    What date are you thinking?  Tell me the

20   date on yours, and I will get a copy of that.

21       A.    So the one that I was referring to today

22   was filed with the court on the 17th of March 2017

23   or signed by Sam Newton on that date.

24       Q.    I will get us a copy of that.  I probably

25   didn't give very good directions to my assistant.

95

 1    The motion that you're referring to, the one that

 2    was filed March 17, 2017 or thereabouts, did the

 3    county have a chance to respond to that and tell its

 4    side of the story?

 5         A.    Yes, we did.

 6         Q.    And so did the county have an opportunity

 7    to correct anything that it perceived as a

 8    misstatement in the initial motion?

 9         A.    Yes, we did.

10         Q.    Motion for the attorney fees, if that was

11    filed in March of 2017, there's a notation in your

12    notes that says "corrected" in the county's memo in

13    opposition.

14         A.    Yes.

15         Q.    So corrected by the county?

16         A.    Yes.

17         Q.    In other words, the county had an

18    opportunity to correct the alleged misrepresentation

19    to the court.

20         A.    Yes, we did.  We attached the contract and

21    also some e-mails as exhibits where it was clearly

22    indicated that Mr. Newton had investigative

23    resources as part of his contract.  And he had

24    understood that because he had used an investigator

25    in the past.

96

 1        Q.    Did the county consider Mr. Newton's

 2   complaints about investigative resources to be the

 3   heart of his complaint?

 4        A.    No.

 5        Q.    That was a relatively minor issue, wasn't

 6   it?

 7        A.    It was.

 8        Q.    Probably during a lunch break I'll go

 9   ahead and get a copy of the corrected thing and

10   we'll run through that.  We've gotten through the

11   rest of it.  Let's see how far we can get through

12   the 30(b)(6).

13        A.    Sure.

14        Q.    Earlier in the deposition you mentioned

15   something that was not mentioned in the termination

16   letter.  By that I'm referring to a reference you

17   made to a case in which Mr. Newton had met with some

18   defendants which had led to him being conflicted

19   out, or words to that effect that would be reflected

20   in the record.

21        A.    Yes.

22        Q.    Tell me more about that situation and why

23   you believe it contributed to his termination.

24        A.    So as I had mentioned, the county had

25   decided to terminate Mr. Newton's underlying

 1    appellate contract at the end of August.  And we

 2    initially contacted LDA to see if they would be

 3    willing to take that responsibility on.  But when

 4    they declined, that issue was set aside and largely

 5    forgotten about.

 6            Then I was sent an e-mail from Gage Arnold

 7    indicating that we needed to find conflict counsel

 8    on some appellate cases.  I don't remember exactly

 9    how things transpired, but I remember e-mailing back

10    and forth with Mr. Newton about the reasons for the

11    conflict and whether he could represent any of the

12    defendants.  And I recall that in one of his

13    responses he stated that he couldn't tell me why he

14    was conflicted because it would violate

15    attorney-client privilege and that he would not be

16    able to represent any of the defendants.

17            The county, as a result, had to go out and

18    find appellate counsel to handle those four cases.

19    And this was frustrating because we saw this as a

20    conflict that was created by Mr. Newton and that he

21    should be responsible at least in part for that

22    conflict and the county's need to contract with

23    additional attorneys to take care of the conflict.

24    Q.    You say "we saw this conflict as having

25    been created by Newton."  Who is the "we"?

98

1      A.     It would have been Dave Wilson and myself.

2      Q.     And how did Bryan Baron perceive that

3  Mr. Newton had created the conflict?

4      A.     We had discussed this conflict with

5  Gage Arnold.  And it was his understanding that the

6  conflict arose when Mr. Newton met with two of the

7  defendants together.  And I don't practice appeals,

8  but it was either Dave Wilson or Gage Arnold that

9  said that a defense attorney should meet with each

10 defendant separately and not together to avoid

11 situations like this.

12         We didn't feel like the creation of this

13 conflict was sufficient that we could go after

14 Mr. Newton for the costs of hiring conflict counsel

15 because we didn't have any specific details about

16 how the conflict was created.  And so we just kind

17 of let the issue drop.

18     Q.     What, if anything, did the county do to

19 investigate whether Mr. Newton had met with these

20 two defendants together?

21     A.     Speaking with Gage Arnold and e-mailing

22 Sam Newton to ask what had happened.

23     Q.     Now, the e-mail to Sam Newton did not ask

24 Mr. Newton whether he had met with the defendants

25 together, did it?

99

```
 1       A.    I don't recall.

 2       Q.    You'll stand by whatever your e-mail says,

 3  right?

 4       A.    Yes, I will.

 5       Q.    And was it the county's understanding that

 6  Mr. Arnold was present during this alleged meeting

 7  of the three of them together?

 8       A.    No.  I don't believe so.  I believe it was

 9  something he just heard about.

10       Q.    So the county certainly wouldn't just rely

11  on rumor that was repeated by a third party, right?

12       A.    Right.  We didn't have grounds.  We didn't

13  even feel that we had enough information to pursue

14  this to require him to pay for conflict counsel.

15       Q.    The county felt like it did not even have

16  enough information to investigate whether it had the

17  grounds for making him pay.

18       A.    Right.  We didn't feel like the

19  investigation would go anywhere because the only one

20  who really had knowledge about why the conflict had

21  been created was Mr. Newton, and he wasn't willing

22  to tell us because of the violation of

23  attorney-client privilege.

24       Q.    Wait.  He wasn't willing to tell you

25  whether he had met with them together?
```

1    A.    No.  He wasn't willing to tell us the root

2    of the conflict and why there was a conflict there

3    that prevented him from representing any of the

4    defendants.

5    Q.    But the county does not know today whether

6    or not it even asked him whether or not he had met

7    with the two defendants together rather than

8    separately.

9    A.    Right.  I don't recall that.  As I recall,

10   our communications were in the e-mails.  This issue,

11   as I stated before, reminded us that we had made the

12   determination to terminate Sam Newton's contract.

13   And, ultimately, led to us following through with

14   that termination.

15   Q.    Maybe we can zip through a couple of the

16   other topics in the 30(b)(6).  I notice from your

17   notes that you said you brought things like

18   invoices, etc.  It may be, if we can just get copies

19   of those, that I won't need to ask you very many

20   questions, if any, about them.

21   A.    Sure.

22   Q.    Meanwhile, what did I do with my copy of

23   the notice?  Let's look at item number 2 in the

24   30(b)(6) notice.  And I'm thinking, based on your

25   notes, that we might be able to just do that in one

1    or two questions if you brought with you the actual

2    records of invoices and payments.  I hope I'm

3    understanding your notes correctly.

4         A.    I do have a copy of all of the invoices.

5    And I have a record of payment that goes back to

6    January 2016.  So I believe I have a record of all

7    of the payments as well for those invoices.

8         Q.    Can I just see what you brought?  What I

9    might do is simply have the county state on the

10   record this is what this is.  You've handed me the

11   invoices?

12        A.    Those are the invoices.

13        Q.    And then is there something separate that

14   reflects payment?

15        A.    Yes.  Our computer system allows us to

16   create an Excel spreadsheet of all payments.  And so

17   those are the payments.  And I believe that I

18   removed the payments that were made to Sam Newton

19   for his underlying appellate contract.  He received

20   a monthly payment for that.  I think I took all of

21   those out.  So those payments, I believe, are all

22   for the Lovell case.

23             MS. PORTER:  Let me just grab copies

24   really quickly.  I may just have you state what they

25   are, how to interpret these columns, and we may be

1    able to dispense with that.  Let's take a very short

2    break, everybody.

3              (Recess.)

4        Q.    While we're waiting for those copies, let

5    me skip to one other item that maybe we can address

6    in the meantime.  Number 4 on the 30(b)(6) notice

7    is, "Why Weber County does not participate in the

8    Utah Indigent Defense Fund."  What is the answer to

9    that?

10       A.    So, initially, Weber County contracts with

11   public defenders required public defenders to cover

12   capital cases along with their regular caseload.

13   And at some point I think the general attitude of

14   defense counsel changed so that defense counsel felt

15   like it should be compensated separately for those

16   capital cases.  And so Weber County amended their

17   contracts to indicate that that would be contracted

18   for and paid for separately.

19             It was sometime around then, and I spoke

20   to Dave Wilson to get this information, and he

21   couldn't recall exactly when, but it was sometime

22   around then that the county looked into the Indigent

23   Defense Fund.  They contacted the Indigent Defense

24   Fund to get a quote, and they were told that they

25   would need to come up with three years of payments

```
1    up front.  And the total, according to Mr. Wilson's

2    recollection, was around $300,000.  And so faced

3    with that large number, the county decided to

4    self-fund capital cases.  The commissioners believed

5    if they set some money aside, they would be better

6    off paying for those cases themselves.

7              The issue came up again last year because

8    the county has two capital cases.  And so the

9    commissioners requested that I look into the

10   Indigent Defense Fund again.  I e-mailed the

11   Indigent Defense Fund director.  I believe his name

12   is John Reidhead.  And he sent me a quote.  It was

13   about $330,000 up front that the county would have

14   to pay to participate and approximately $110,000

15   annually thereafter.  And, once again, the county

16   commissioners felt like it would be better to

17   self-fund capital defense cases.

18       Q.    What was the county's understanding of

19   what it would get in return for the $334,000 up

20   front and approximately $110,000 thereafter

21   annually?

22       A.    That the state would cover the

23   compensation for attorneys representing defendants,

24   indigent defendants, who had been charged with a

25   capital crime.  And I believe that Indigent Defense
```

1    Fund also covers defense resources, expert

2    witnesses, investigators, things like that.

3        Q.    What understanding, if any, did the county

4    have about what the $334,000 represented?  Was that

5    some sort of deposit to pay people to get up to

6    speed on cases, or did the county have any

7    understanding?

8        A.    It was three years of premiums is how it

9    was calculated, but I don't believe there's any

10   representation made as to what that money would be

11   going for or why it was required to have those three

12   payments up front.  I don't recall.

13       Q.    And that would be consistent with about

14   $110,000 annual payment, right?

15       A.    Right.

16       Q.    So the $110,000 would have been kicked in

17   annually like in year four?

18       A.    I've got the e-mail from Mr. Reidhead here

19   for that.  We looked into this in 2018, and we were

20   required to pay an assessment for 2017, 2018, and

21   2019.  And that was all.

22       Q.    That's what the $334,000 would have been?

23       A.    Yeah.  $330,410 is the total.  And that is

24   an estimate.  He said that the ultimate decision

25   would have to be made by the board, but he was

1    fairly confident that it would be in that ballpark.

2        Q.    Has the county ever done any sort of

3    analysis or study about the cost savings of either

4    the Indigent Defense Fund or self-funding?

5        A.    The county has looked at capital cases

6    that they have had to fund in the past and totaled

7    up those costs to see how much it has been costing

8    to self-fund.  How much they would save, if any, by

9    going with the Indigent Defense Fund.  And I don't

10   believe it was any kind of a formal analysis.  I

11   think it was just kind of off the cuff looking at

12   the numbers and approximating.

13       Q.    And if a person wanted to find records of

14   that, I'll call it an analysis, where would one

15   look?

16       A.    The county has a spreadsheet that was

17   created for both Doug Lovell's litigation expenses

18   at the trial level and one other case that was done

19   at the trial level.  We also did a GRAMA request of

20   records of capital cases from the Indigent Defense

21   Fund this last time that we asked for a quote to see

22   how much the average capital case in Utah was

23   costing.

24       Q.    And what was the response to that GRAMA

25   request?

1    A.    The Indigent Defense Fund sent us their

2    records, which showed how much they had spent on

3    various capital cases.  I can't recall the timeline.

4    I want to say it was within the last 10 years.  And

5    the cases averaged between 200- and $250,000 a case.

6          Q.    Was that for trial and appellate?

7          A.    I don't recall what the amounts included.

8    I know it included attorney fees, expert witnesses,

9    investigative fees, that type of stuff.  But I can't

10   recall specifically if it included appellate

11   counsel.

12         Q.    Did the county keep a copy of what it

13   received?

14         A.    Yes, it did.

15         Q.    Has it produced a copy of that to anyone

16   pursuant to a GRAMA request?

17         A.    No, I don't believe so.

18              (Exhibit No. 13 was marked.)

19         Q.    Let me show you what has been marked

20   Deposition Exhibit 13.  And I will ask you, meaning

21   Weber County, if you recognize Exhibit 13.

22         A.    I have seen this e-mail in previous

23   e-mails for this litigation.  But it wasn't sent to

24   or received by me.

25         Q.    Not by Bryan Baron.  As far as the county

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                   30(b)(6)                   Bryan Baron

107

1    is concerned, the county is familiar with this

2    e-mail; is that correct?

3        A.    Yes.

4        Q.    What is the context surrounding Exhibit

5    13?  In other words, what was being looked into or

6    considered in connection with Exhibit 13?

7        A.    If you wouldn't mind if I just read it

8    quickly.

9        Q.    Sure.

10       A.    So, initially, Dave Wilson had sent an

11   e-mail on December 15, 2017 to Joanna Landau, who I

12   can't remember the exact title of her position.

13   Perhaps the director of the Indigent Defense

14   Commission.  And he asked for information regarding

15   a grant for indigent defense services and a copy of

16   the application because the county was considering

17   applying.  He also indicated that he wanted to give

18   her the other side of the story relating to

19   Sam Newton and his capital appeal.

20       Q.    Is it the county's understanding that

21   Exhibit 13 was related to the county's investigation

22   of whether to participate in the Indigent Defense

23   Fund that you described earlier?

24       A.    No.  I believe the Indigent Defense Fund

25   and the Indigent Defense Commission are two separate

1    things.  I believe that the fund specifically covers

2    capital cases and allows counties to participate

3    kind of like an insurance.  The counties contribute

4    an annual premium, and in return, they get costs for

5    capital cases paid out.  The Indigent Defense

6    Commission is separate, and they offer grants to

7    assist with indigent defense in general.

8         Q.    Has Weber County applied for grants in

9    connection with indigent defense?

10        A.    No.  We haven't applied for any grants

11   with the Indigent Defense Commission.

12        Q.    With anyone?

13        A.    No.  I don't believe we've applied for any

14   grants.

15             (Exhibit No. 14 was marked.)

16        Q.    Please take a look at what's been marked

17   as Deposition Exhibit 14.  And let me know when

18   you're ready for a question.

19        A.    Okay.

20        Q.    Is the county familiar with Exhibit 14?

21        A.    Yes.

22        Q.    What is the context of Exhibit 14?

23   Something internal the county was doing or something

24   that was being provided to someone else or can you

25   tell me?

1    A.    Adam Trupp, I believe, is associated with

2    the Utah Association of Counties, and he was looking

3    for information on how much the county spends on

4    capital cases.  I believe that the clerk/auditor's

5    office provided an estimate of costs by entering in

6    criteria into our computer program and producing an

7    Excel spreadsheet that entailed those costs.

8    Q.    Who is Ricky Hatch?

9    A.    Ricky Hatch is our clerk/auditor.

10    Q.    Eventually this e-mail stream made it to

11    Bryan Baron; is that right?

12    A.    That's correct.

13    Q.    And did Bryan Baron conclude that the

14    figures that had apparently been texted to Mr. Trupp

15    were incorrect?

16    A.    Yes.

17    Q.    Did Mr. Baron ever ask Ricky Hatch where

18    Ricky Hatch came up with such incorrect figures?

19    A.    I don't believe so.  I believe I simply

20    looked at the Excel spreadsheet, and based off of my

21    records, stated to Mr. Allred my opinion about

22    Ricky Hatch's numbers.

23    Q.    Does the county have any understanding of

24    the purpose of Mr. Trupp's inquiry?

25    A.    No.

February 04, 2019                30(b)(6)                Bryan Baron

110

```
 1              (Exhibit No. 15 was marked.)
 2       Q.    Will you look at Exhibit 15 and let me
 3    know when you're ready for a question.
 4       A.    Okay.
 5       Q.    By the way, I should have mentioned that
 6    I'm sort of segueing into another item of our
 7    30(b)(6).  They do kind of relate.
 8              Is the county familiar with Exhibit 15?
 9       A.    Yes.  I've seen this before.
10       Q.    Did the Standard Examiner ask the county
11    to provide figures on the amount of money that Weber
12    County Attorney's Office has spent over the years on
13    prosecution and defense in the Doug Lovell capital
14    murder case?
15       A.    Yes.
16       Q.    In response to that inquiry, did
17    Dave Wilson indicate to Chris Allred in the second
18    sentence, "I'm not sure we will have such records
19    without research but it may be one we consider doing
20    to help inform the public of the costs of
21    prosecuting and defending a confessed murderer."
22       A.    Yes, he did.
23       Q.    How much money has Weber County spent over
24    the years on prosecution of the Doug Lovell capital
25    murder case?
```

1        A.      We don't have records for the prosecution

2    side.  Our prosecuting attorneys aren't paid

3    anything in addition to their regular salary to

4    handle that caseload.  They don't get anything extra

5    for capital cases.  The only other records we'd have

6    regarding the cost of prosecution would be the cost

7    for expert witnesses, investigators, transcripts,

8    things like that.  And we don't have those records

9    organized in a way that we can easily refer to them

10   and put a number on the cost of prosecution.

11       Q.      Did the county make any attempt to provide

12   the Standard Examiner with figures regarding the

13   cost of prosecuting the Doug Lovell capital murder

14   case?

15       A.      I don't believe so.

16       Q.      Did the county make an effort to provide

17   the Standard Examiner with figures regarding the

18   cost of defending the Doug Lovell capital murder

19   case?

20       A.      I don't recall if we did or not.  If we

21   did, there would have been an e-mail going out to

22   Mr. Shenefelt with that information.

23       Q.      With respect to the cost of prosecution,

24   let me see if I understand.  The cost of experts,

25   etc., you're saying it's not organized in a way that

1    it could be compiled?

2         A.    Right.  At least not easily compiled.  We

3    have records going back a number of years.  I think

4    all the way back to 2000.  But those records don't

5    have any kind of a notation on them to indicate that

6    this expert was paid and that payment is tied to the

7    Doug Lovell case.

8         Q.    So when experts submit invoices, they

9    don't put on there a case number or case name or

10   anything like that?  That seems really weird.

11        A.    I think they generally do.  But in the

12   county's system we don't designate payments.  We

13   don't link payments to specific cases.  And so

14   without going through each invoice, we can't

15   determine what the total costs of prosecution are.

16        Q.    I think I understand what you're telling

17   me.  Correct me if I misstate it.  The experts

18   themselves give the county case-specific information

19   on their invoices.  But the county does not, I

20   guess, log that specific case information when it is

21   listing payments made.

22        A.    That's correct.  So we could easily do a

23   search in the computer system for all payments made

24   to a particular expert.  But when those payments are

25   pulled up, we couldn't tell which case he had worked

113

1    on or where you could get that payment.

2         Q.    Was that the case as of November 21, 2017?

3         A.    Yes.

4         Q.    Is it still the case?

5         A.    It is.

6         Q.    Does the county have an estimate of the

7    amount of money it has spent over the years on

8    defense in the Doug Lovell capital murder case?

9         A.    It does.  But only for the fairly recent

10   past.  And I have a summary in my notes under item 5

11   as to what those expenses are.  They include

12   expenses for defense counsel at the trial level.

13   Not the initial trial that happened in the 1990s,

14   but the retrial that happened more recently in 2015,

15   2016 that went to Bouwhuis and Young.  It also

16   included expenses for experts and transcripts and

17   things of that nature as well as defense counsel on

18   the appeal to Mr. Newton, investigative expenses,

19   and recent expenses to the new defense counsel,

20   Ms. Colleen Coebergh, and investigative expenses she

21   has incurred.

22        Q.    Let me just see if I understand how a

23   couple of these break down.  By the way, when we're

24   referring to number 5 of your notes, we're referring

25   to the paragraph marked 5 in Exhibit 4?

114

1          A.     Yes.   Thank you.

2          Q.     Real quickly, let me just break this down.

3     The $120,035 to Bouwhuis and Young was for trial

4     counsel in the more recent trial.

5          A.     Yes.

6          Q.     And is that the Young who was later

7     disciplined by the Bar for not appropriately

8     defending Mr. Lovell?

9          A.     Yes.   That's correct.

10         Q.     Has the county ever communicated with

11    Mr. Young or with Mr. Young's liability carrier

12    about the fact that he received this money and the

13    Bar and the Utah Supreme Court found that his

14    performance was deficient?

15         A.     The county has not communicated directly

16    with Mr. Young.  Mr. Bouwhuis has communicated with

17    Mr. Young on behalf of the county.

18         Q.     And what was the nature of that

19    communication?

20         A.     Mr. Bouwhuis communicated with Mr. Young

21    regarding the Lovell case and his work that was done

22    on the Lovell case.  Mr. Bouwhuis was the lead

23    counsel, and so he oversaw the Lovell case and

24    communicated with Mr. Young regarding his role

25    there.

1    Q.    Has either the county or Mr. Bouwhuis on

2    the county's behalf made a claim against Mr. Young

3    for negligence in connection with his representation

4    of Mr. Lovell?

5    A.    No.  The county has not.

6    Q.    I'm just going to round these figures,

7    okay?  The $102,000 to experts and other, does that

8    include all experts at all phases of this more

9    recent phase?

10    A.    That's at the trial level when

11    Mr. Bouwhuis and Mr. Young were representing

12    Mr. Lovell.

13    Q.    And then the rounded $94,000 to

14    Sam Newton, is that inclusive of any expert or

15    investigative fees?

16    A.    No.  That's just attorney fees to

17    Mr. Newton for the appeal.

18    Q.    And then the, roughly, 2,400 and 1,400 to

19    Kelly Madsen, are those investigative?

20    A.    Those are investigative costs that

21    occurred when Mr. Newton was representing

22    Mr. Lovell.

23    Q.    The, roughly, $43,000 to Colleen Coebergh,

24    what date is that through?

25    A.    Those are attorney fees that were paid to

116

 1    Ms. Coebergh from September 2017 to the present.

 2         Q.    What is the status of the Lovell appeal,

 3    including the 23B component?

 4         A.    I believe that the remand here was

 5    scheduled for January but was continued to April,

 6    and so it hasn't happened yet.

 7         Q.    I guess it's an evidentiary hearing, is

 8    that what it's going to be?

 9         A.    Right.

10         Q.    So the 23B evidentiary hearing has not

11    occurred.

12         A.    Right.

13         Q.    Are you one of the people charged with

14    reviewing the invoices of Ms. Coebergh?

15         A.    Yes.

16         Q.    That, roughly, $43,000 to Ms. Coebergh,

17    that's just attorney fees and no experts or anything

18    in there?

19         A.    Correct.

20         Q.    Generally, very generally, like airplane

21    view, what has Ms. Coebergh done to accumulate the,

22    roughly, $43,000 so far?

23         A.    I believe that would primarily be going to

24    her getting up to speed on the case and preparing

25    for this evidentiary hearing.

1    Q.    And she's under a soft cap, correct?

2    A.    She is.

3    Q.    The $8,000, roughly, to Kelly Madsen, is

4    that in connection with work -- is that a he or a

5    she?

6          MR. NEWTON:  She.

7    Q.    Is that in connection with work she has

8    done in association with Ms. Coebergh?

9    A.    Yes.  Exactly.

10   Q.    Do you happen to know when the last

11   invoice was from Ms. Coebergh?

12   A.    I don't recall when I received that.

13   Q.    Did you bring any other sort of list or

14   spreadsheet or is paragraph 5 basically the list?

15   A.    Paragraph 5 I think is all I have, but let

16   me check really quick.  I do have a breakdown of

17   money that was paid to trial counsel, expert

18   witnesses, investigators, transcripts on the Lovell

19   case.  It further breaks out those first two --

20   well, just the second entry to experts and other,

21   the $102,000 approximately.

22   Q.    And I know that we are into the lunch

23   hour, but I think it will be so much cleaner if I

24   just quickly ask you about this.

25         MS. VANORMAN:  Let's just wrap up the

118

1    30(b)(6) before.

2              MS. PORTER:  We've got a ways to go on

3    that.

4              MS. VANORMAN:  That's fine.  Do what you

5    need to do.

6              (Off the record.)

7              (Exhibit No. 16 was marked.)

8         Q.    Could you look at Exhibit 16 and indicate

9    whether it appears to be a true and correct copy of

10   a document that you gave me earlier.

11        A.    Yes.

12        Q.    And what is Exhibit 16?

13        A.    These are the invoices that were received

14   from Sam Newton by the county for work done on the

15   Lovell case and other printing expenses on other

16   cases.

17        Q.    Is there a start and stop time period on

18   these?

19        A.    The first invoice is back to April 1,

20   2016.  And the last invoice is dated August 3, 2017.

21             (Exhibit No. 17 was marked.)

22        Q.    Let me show you what has been marked as

23   Deposition Exhibit 17.  And, first, let me ask you

24   to check and let me know if it appears to be a true

25   and correct copy of another document that you

1    brought with you and gave to me earlier.

2         A.    Yes, it is.

3         Q.    Also, will you confirm for the record I

4    gave you back your originals.

5         A.    Yes, you did.

6         Q.    I think this might help with my next

7    question, which is, in the year 2017, other than the

8    inadvertent payment that was made, when is the first

9    payment that Mr. Newton received in connection with

10   the Lovell case?

11        A.    So he received a payment in January of

12   2017, but that was for work that was done in 2016.

13   That was sent out January 13, 2017 in the amount of

14   $5,087.06.

15        Q.    And then looking at this Exhibit 17, I

16   show the next payment as, I guess -- actually, what

17   do these columns mean?  The one column says "Date"

18   and it says March 31, 2017.  And then there's a

19   "Check Date."  What are the differences between

20   those?

21        A.    So the date column is a little confusing.

22   It either indicates the date on the invoice or the

23   date that the invoice was entered into the computer

24   system.  And it just depends on who entered it as to

25   which date they entered.

120

1        Q.     And that's the inadvertent payment, right?

2        A.     Yes.

3        Q.     So that inadvertent payment to Mr. Newton

4   was by a check dated May 5, 2017?

5        A.     That's what this record indicates is it

6   went out on the 5th of May, 2017.

7        Q.     Is this a record that you either prepared

8   or supervised the preparation of?

9        A.     I requested this from our comptroller and

10  he prepared it for me.

11       Q.     Any reason to question that May 5, 2017

12  was the check date for the inadvertent payment made

13  to Mr. Newton?

14       A.     That doesn't sound accurate to me, but I

15  don't have anything with me to suggest that it was

16  sent out on a different date.

17       Q.     I will try to check on that during the

18  lunch hour.  So we'll see if we can help that at

19  all.

20       A.     It was for sure right around the March,

21  April, May time period when it went out.

22       Q.     Now, when that payment went out, at some

23  point Bryan Baron sent an e-mail to Mr. Newton

24  stating that there had been an inadvertent payment,

25  right?

1        A.    Yes.   That's correct.

2        Q.    And telling Mr. Newton that it either

3   needed to be refunded or offset against a future

4   payment?

5        A.    Yes.   That's correct.

6        Q.    And why was it that there was not even to

7   be a partial payment at that time?

8        A.    So there would have been a partial payment

9   because Mr. Newton combines his printing costs for

10  his appellate briefs with the Lovell litigation

11  expenses.  So he would have been paid for the

12  printing of various briefs.  But the $3,360 marked

13  "Lovell Litigation Expenses" on Invoice 1099 should

14  have been withheld.

15       Q.    I think I'm looking at the right one.

16  You're looking at invoice 1099?

17       A.    Yes.   That's right.

18       Q.    I see there's a reference there to $3,360

19  that says, "Lovell Litigation Expenses."  And it

20  says, "Attorney Fees."

21       A.    Yes.

22       Q.    That's what you're saying should not have

23  been paid.  But the rest of it, as far as you know,

24  was paid then or thereafter.

25       A.    It was paid then.  And it was

1    appropriately paid then.

2        Q.    So as of the inadvertent payment, had the

3    county authorized anything more than the $75,000 cap

4    for attorney fees?

5        A.    Yes.  The county had preauthorized $15,000

6    for the evidentiary hearing.

7        Q.    So then why would the $3,360 not have been

8    applied against that $15,000?

9        A.    The $15,000, as I recall, was limited to

10   the evidentiary hearing.  And the request for

11   attorney fees here, if I remember correctly, was not

12   tied to preparation for the evidentiary hearing.

13       Q.    As I understand it, then, there were some

14   checks issued on or around August 11, 2017 to

15   Mr. Newton.  Am I reading that right?

16       A.    Yes.

17       Q.    And those look like kind of small things.

18   Do you know what those relate to?  I guess we can

19   look at the invoice number, can't we?

20       A.    Yes.  So the 1106 invoice, he was paid

21   $181.41.  That's for costs incurred for printing a

22   brief and a reply brief not connected with the

23   Lovell case.

24       Q.    There are three items on that invoice,

25   right?

123

```
 1        A.     Uh-huh.

 2        Q.     And one of them relates to Lovell, right?

 3        A.     Correct.

 4        Q.     And I see a line has been drawn through

 5    that entry.  Do you know who drew that line?

 6        A.     I did.

 7        Q.     And what was the reason why none of the

 8    $4,470 was approved for payment?

 9        A.     Again, it relates back to that $15,000

10    essentially being earmarked/approved for the

11    evidentiary hearing.

12        Q.     The county knew that once the evidentiary

13    hearing had occurred on the 23B that information

14    from that hearing would need to be incorporated in

15    the reply brief, correct?

16        A.     I don't know that it would need to be

17    included in the reply brief.  But I believe

18    Mr. Newton indicated that he may need to revise his

19    initial brief.

20        Q.     Some appellate briefing would need to be

21    either revised or have that information incorporated

22    within it.

23        A.     Yes.

24        Q.     The county knew that.

25        A.     Yes.
```

124

1      Q.    But the county was not going to pay

2   anything for that, correct, anything more than had

3   already been paid?

4      A.    No.  I think the county was good for

5   additional payments to revise that initial brief if

6   they were justified by good cause.

7      Q.    And do you believe the county conveyed

8   that in an e-mail to Mr. Newton?

9      A.    I'd have to look at the specific language

10  of the e-mails.

11     Q.    So the county is not prepared to say today

12  whether it ever conveyed such an offer to

13  Mr. Newton.

14     A.    Not without the e-mails in front of me.  I

15  can't recall specifically if we conveyed that.

16     Q.    And just to complete the circle, I guess.

17  We then have another check that was dated around

18  September 15, 2017 for total of $11,927.30.  Is that

19  for a prior invoice?  Is that what that 1015 means

20  on there?

21     A.    I'm not sure what the 1015 number is.

22  This payment was a culmination of prior invoices.

23  Mr. Newton had submitted a request for approval for

24  additional funds for the time he spent working on

25  the 23B motion.  And the county had approved that in

125

1    the amount of approximately $18,000.  And so what I

2    did is I went back through these prior invoices that

3    had been sent to us in 2017 that had been denied and

4    paid out any money that had been denied in that one

5    lump sum.

6        Q.    What is the invoice or source, I guess, of

7    the amount of payment for the check that was dated

8    November 9, 2017?

9        A.    So after I made the $11,927 payment to

10   Mr. Newton, Mr. Newton contacted me and asked what

11   the basis was for coming up with that amount.  I

12   sent him an e-mail detailing out which invoices were

13   included, which amounts, and the total equaled

14   $11,927.30.  Mr. Newton wrote back and asked about

15   several other invoices that he believed hadn't been

16   paid.  And after reviewing my records and asking

17   Kim Lee, our office manager, to review her records,

18   we determined that one of the invoices hadn't been

19   paid.  And so we sent him another check for the

20   $4,651.41 to cover that missed invoice.

21           MS. PORTER:  Why don't we take our lunch

22   break.  That will let me clean up what's left and

23   find some other exhibits really quickly, and I think

24   it will save us a lot of time.

25           (Noon recess.)

126

1              (Exhibit No. 18 was marked.)

2        Q.    Could you please take a look at Exhibit 18

3    and tell me whether that is the motion for attorney

4    fees and litigation expenses referenced on page 2 of

5    your notes.

6        A.    Yes.  Exhibit 4.

7        Q.    Please identify for us any

8    misrepresentations of fact that the county intends

9    are found in Exhibit 18.

10       A.    So this is on page 2.  And it's the second

11   full paragraph, the second sentence in that

12   paragraph.  It says, "Some of the Supreme Court's

13   listed witnesses counsel has been unable (because of

14   a lack of funding) to interview and would need some

15   investigative resources so his investigator could

16   speak with those witnesses prior to their

17   testimony."

18       Q.    Anything else in Exhibit 18?

19       A.    That's the only one in this exhibit.

20       Q.    Let me see if I understand the county's

21   view of one thing.  If Mr. Newton himself

22   interviewed a witness, is that an investigative

23   activity?  Does that come out of his attorney fee

24   thing?  Can he bill investigative rates for that?

25   What's the county's view on that?

1        A.      If Mr. Newton is interviewing a witness,

2    he would bill at his own hourly rate.

3        Q.      So that would be part of the $15,000 that

4    had already been authorized and then potentially

5    additional sums if good cause was found?

6        A.      Right.

7        Q.      This apparently was printed off with one

8    of those auto date things or something.  Can I just

9    state the obvious, that it was not filed on

10   22 December 2018.  We could check the docket and see

11   when it was filed.

12       A.      Yeah.

13       Q.      That's obvious.

14       A.      Yeah.  It was sometime in March 2017.

15       Q.      There was one item in the 30(b)(6) we

16   haven't touched on yet, and then a lot of what we'll

17   be doing is clearing up some things that we did talk

18   about.  Item number 3 in the 30(b)(6) notice talks

19   about a meeting with elected officials, etc.,

20   referencing in a particular document.  And I'm going

21   to give you that document.

22       A.      Okay.

23               (Exhibit No. 19 was marked.)

24       Q.      Can you identify Exhibit 19 for us?

25       A.      Yes.  This is an e-mail that Bryan Baron

128

1    sent to Sam Newton on Monday, June 5, 2017.

2         Q.    And was it preceded by a bit of an e-mail

3    stream that goes back to May 25, 2017?

4         A.    Yes, it was.

5         Q.    The first sentence of Exhibit 19 says, "I

6    attended a meeting with elected officials here in

7    the county, and we briefly discussed your request

8    for additional funding for the Rule 23B motion."

9    Who were the elected officials that Bryan Baron

10   attended a meeting with?

11        A.    So the only elected official in the

12   meeting was Chris Allred.  As I recall, it was

13   Chris Allred and Dave Wilson and myself who were in

14   the physical meeting.

15        Q.    Why did you write "officials," plural?

16        A.    That's a good question.  As I was drafting

17   this e-mail, I was trying to think how best to

18   phrase it.  I had contacted Commissioner Harvey in

19   advance.  He had asked me to meet with Chris Allred.

20   And then I sent Commissioner Harvey a draft of this

21   e-mail to get his approval.  And I remember kind of

22   being stuck and thinking of the most concise way to

23   phrase this sentence.  And that, to me, made the

24   most sense to just say, "I attended a meeting with

25   elected officials," instead of saying that I talked

1    to Commissioner Harvey and then I met with

2    Chris Allred and Dave Wilson and then I followed up

3    with Commissioner Harvey and this is the outcome of

4    that discussion.  And so just for brevity sake, I

5    summarized "attended meeting with elected

6    officials."

7        Q.    Let me read part of the next sentence.

8    "The county officials understand your argument as to

9    why the 23B motion was necessary, and they are

10   inclined to grant you additional funding for it."

11   I'll get to the rest of that in a minute.  So the

12   county officials to whom you're referring are

13   Dave Wilson and Chris Allred?

14       A.    And Commissioner Jim Harvey.

15       Q.    And had Commissioner Harvey been in the

16   meeting that you had attended?

17       A.    He was not in the meeting.  I had

18   consulted with him via telephone.

19       Q.    When did you consult with

20   Commissioner Harvey?

21       A.    I don't recall the exact date.  It was

22   sometime after Sam Newton sent the e-mail with the

23   request for $22,500 and prior to sitting down with

24   Chris Allred and Dave Wilson.

25       Q.    It says, "they are inclined to grant you

130

1    additional funding for it."  Who had the authority

2    to grant or deny additional funding for the defense

3    of Doug Lovell?

4         A.    It would be Commissioner Harvey.

5         Q.    Then why did you say "they"?

6         A.    I was just referring to the meeting, the

7    people who were in the meeting, the general

8    consensus that came out of the meeting.  Because

9    Commissioner Harvey, in this case, had asked for

10   Chris Allred specifically to sit down with me and to

11   come up with a recommendation on how to move

12   forward.

13        Q.    And the final decision-making authority

14   was . . .

15        A.    Commissioner Harvey.

16        Q.    And can you explain to me why the final

17   decision-making authority was not the county

18   commission itself.

19        A.    Well, the county commission in Weber

20   County fulfills two of the roles of branches of

21   government.  They are the executive branch and the

22   legislative branch.  And under their executive

23   authority they break out the different county

24   departments and areas into specific assignments so

25   that each county commissioner oversees a particular

 1    area or department and makes decisions regarding

 2    that area.

 3           And at this particular time,

 4    Commissioner Harvey was assigned over the public

 5    defender contracts.  So he's the one that made the

 6    decision regarding how to handle requests coming

 7    from that area.

 8       Q.    The original contract, though, had to be

 9    signed by the entire commission, correct?

10       A.    The original contract was voted on by the

11    entire commission and signed by the chair.

12       Q.    But it's the county's understanding that a

13    single commissioner has the authority to terminate a

14    contract that had been voted on at a public meeting

15    by the entire commission.

16       A.    Yes.

17       Q.    Where we left off on the third line of

18    Exhibit 19, it says, "but they aren't happy about

19    the cost of $22,500 for the motion and $15,000 for

20    the evidentiary hearings."

21           Next paragraph, "As we got into the

22    specifics of your invoices, the group expressed

23    concern that you are taking advantage of the county

24    by overbilling for your services."  Now, who is the

25    group?

1     A.    The group in this case would be

2    Commissioner Harvey, Dave Allred, and Chris Wilson.

3     Q.    Had Commissioner Harvey delegated his

4    supervisory role to someone else?

5     A.    No, he had not.

6     Q.    "A few examples of their concerns include:

7    (1) billing the county for work related to

8    Sean Young's discipline with the Utah Bar (they are

9    unsure why the county should pay anything for that

10   as it is unrelated to your representation of

11   Mr. Lovell in the appeal)."  Is it the county's

12   position that the Sean Young discipline was

13   unrelated to Mr. Lovell's appeal?

14    A.    No.  Not specifically unrelated.  It was

15   related and it was relevant, but unrelated to

16   Mr. Newton's representation of Mr. Lovell, meaning

17   that it didn't fall within the scope of his

18   contract.

19    Q.    And I apologize for being dense, but was

20   there anyone that the county believed should be

21   participating in some way with the disciplinary

22   proceeding involving Mr. Young?

23    A.    Perhaps.  But the county should not be

24   required to pay for that participation.

25    Q.    Number 2, we talked about that earlier,

```
 1    didn't we?  We talked about the request for fees,

 2    etc.

 3         A.    Yes.

 4         Q.    Let's go to number 3.  "Billing for the

 5    frequent phone calls, letters, and meeting with

 6    Doug Lovell (they are unsure why you need to

 7    communicate with him so frequently on an appellate

 8    case)."  Now, who is the "they" there?

 9         A.    I'm referring back to the same group that

10    I referred to previously.

11         Q.    We've had two or three different

12    configurations.

13         A.    So the county commissioner, Jim Harvey,

14    Chris Allred, Dave Wilson, and myself.

15         Q.    Next paragraph, "The consensus from the

16    meeting was that unless significant changes are made

17    to the invoices and future billing practices, the

18    county needs to look for another attorney for future

19    appeals."  So when there's a reference there to

20    significant changes being made to the invoices,

21    those are the invoices that were previously

22    submitted, correct?

23         A.    That's a reference to the Excel

24    spreadsheet that Mr. Newman sent to support his

25    request for additional money on the 23B motion.
```

1    Q.    Well, what invoices was Bryan Baron

2    referring to when he used the word "invoices" in

3    this exhibit?

4    A.    They weren't, per se, invoices.  It was

5    that request for that 23B funding and the

6    documentation that supported that was the intent.

7    Q.    Then what was Bryan Baron referring to

8    when he said "future billing practices"?

9    A.    Future billing practices would have meant

10    invoices in the future sent to the county.

11    Q.    Next sentence, "Again, they don't have a

12    problem with the quality of your work."  That part

13    was true, correct?

14    A.    Right.

15    Q.    "Their concern is with the amounts that

16    you are billing and the items that you are billing

17    them for."  Correct?

18    A.    Yes.

19    Q.    Prior to the Doug Lovell case, Mr. Newton

20    had handled at least 25 prior appeals for Weber

21    County; is that correct?

22    A.    I don't recall how many he'd handled.

23    He'd handled a significant amount under his base

24    appellate contract.

25    Q.    On any of the prior cases where Mr. Newton

1    had performed appellate work on an indigent defense

2    case, had he requested money beyond a

3    previously-agreed-upon figure?

4        A.    Not that I'm aware of.  However, those

5    cases fell under a different contract that didn't

6    allow for additional funding based upon a finding of

7    good cause or anything.

8        Q.    A, I couldn't hear that.  B, can I have

9    the answer back anyway.

10       A.    Sorry.

11             (Answer read.)

12       Q.    Are you saying that even if good cause

13   existed on one of Mr. Newton's other indigent

14   defense appellate contracts, there would have been

15   no mechanism for obtaining such funding?

16       A.    As far as I'm aware, there's nothing in

17   the contract that allows for additional funding on

18   typical appellate cases.

19       Q.    Has Weber County ever sought an analysis

20   of the constitutionality of that type of

21   arrangement?

22       A.    No, we haven't.

23       Q.    Has Weber County ever sought an analysis

24   of the constitutionality of its death penalty

25   appeals?

1          MS. VANORMAN:  I'm just going to object

2     that that goes beyond the scope of the 30(b)(6), but

3     you can answer, if you know.

4          A.     Not to my knowledge.

5          MS. PORTER:  I think you're right on that.

6          Q.     She's right on that, so I will zoom back

7     to the Exhibit 19 here.

8               Last paragraph, "I've been asked to give

9     you an opportunity to revise your request for

10    additional funding for the 23B motion as well as

11    your most recent invoice in light of the county's

12    concerns."  So does that mean that there was, in

13    fact, a past invoice that Mr. Newton was being asked

14    to revise?

15         A.     There may have been.  I'm trying to think.

16    Billing the county for attorney fees associated with

17    filing a motion for attorney fees, that may have

18    been in a separate invoice from the request for

19    additional funding in the Rule 23B.  And so I may

20    have misspoken earlier.  There may have been an

21    invoice and the request for the 23B.

22         Q.     What about the billing for the

23    representation associated with Sean Young's

24    discipline?  Was that a future request that had been

25    made or was that part of an invoice that had already

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                    30(b)(6)                    Bryan Baron

137

1    been submitted?

2         A.    I believe that was just included in the

3    23B request for additional funding.

4         Q.    Where it says, "I've been asked," who had

5    asked Mr. Baron?

6         A.    So in sitting down with Chris Allred and

7    Dave Wilson, the consensus of that meeting was that

8    we should ask Mr. Newton to revise his request for

9    funding.  Because the amount of $22,500 just seemed

10   like an outrageous number for any kind of a motion.

11   It's more than three times the amount that we pay

12   for a typical appeal.  And so it was the consensus

13   of that group that I should give him an opportunity

14   to reduce that amount, to look at his numbers and

15   see if we could bring him down at all.  And

16   Commissioner Harvey indicated his support for that.

17             MS. PORTER:  Could I have my question

18   back, please.

19             (Question read.)

20        Q.    That's just a who.  At the end of that

21   response, you mentioned Mr. Harvey.  Who, if anyone,

22   else?

23        A.    So Mr. Harvey had asked me to consult with

24   Chris Allred.  And Chris Allred and Dave Wilson and

25   I sat down and came up with a recommendation for

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                    30(b)(6)                         Bryan Baron

138

1    Commissioner Harvey.  We sent the recommendation to

2    Commissioner Harvey, and he approved it.  So,

3    ultimately, it was Commissioner Harvey who was

4    making this decision after advice from counsel.

5                (Exhibit No. 20 was marked.)

6         Q.    Let me ask you to look at Exhibit 20 and

7    tell me if you can identify that for me.

8         A.    Yes.  So we have several e-mails here.

9    There's an e-mail from me to Commissioner Harvey

10   with a draft of this e-mail that was sent to

11   Mr. Newton.  And then there's a response from

12   Commissioner Harvey indicating his support for the

13   e-mail.  And then there's an e-mail from me back to

14   Commissioner Harvey.

15        Q.    So document control number Weber County

16   1118 has a draft that was sent to

17   Commissioner Harvey, correct?

18        A.    Yes.

19        Q.    And then changes were made between the

20   draft that was sent to Commissioner Harvey and the

21   final version that went out to Sam Newton, correct?

22        A.    Yes.  That's right.

23        Q.    I didn't find any sort of written

24   authorization from Commissioner Harvey to make

25   changes to the draft he had approved.  Is there one

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                    30(b)(6)                    Bryan Baron

139

1    that you're aware of?

2         A.    No, there isn't one.

3         Q.    So Commissioner Harvey approved the

4    version on 1118.  Is it fair to say that an

5    unapproved version went out with the document

6    control number Weber County 1123?

7         A.    It was, in essence, the same message that

8    was being conveyed.  And so I considered it

9    approved, even though it was slightly different.

10        Q.    So did you just take it upon yourself,

11   Bryan Baron, to make the changes after

12   Commissioner Harvey had approved the version?

13        A.    Yes, I did.

14        Q.    Let's next look at the third paragraph in

15   both 1118 and 1123.  In the version that

16   Commissioner Harvey approved, it would have said,

17   "The consensus from the meeting was that the county

18   plans to look for another attorney for future

19   capital and aggravated murder cases.  There was also

20   some discussion about whether they should start

21   looking for a replacement for the public defender

22   appellate contract."  You changed those two

23   sentences into, "The consensus from the meeting was

24   that unless significant changes are made to the

25   invoices and future billing practices, the county

1    needs to look for another attorney for future

2    appeals."  So you changed it to cover all future

3    appeals; whereas, the one that Commissioner Harvey

4    had authorized had limited the county's plans to

5    future capital and aggravated murder cases.

6        A.    I did, yes.

7        Q.    Now, the version that Commissioner Harvey

8    had authorized flat out said the county plans to

9    look for another attorney.  Do you see that?

10       A.    Uh-huh.

11       Q.    And you changed it to "unless significant

12   changes are made to the invoices and future billing

13   practices."  You never ran that change past

14   Commissioner Harvey; is that correct?

15       A.    Correct.  I didn't.

16       Q.    In the second paragraph of both 1118 and

17   1123, under the sort of item 1 where it's talking

18   about the concerns, the version that was authorized

19   by Commissioner Harvey said, "Billing the county for

20   work related to Sean Young's discipline with the

21   Utah Bar (they are unsure why the county should pay

22   anything for that)."  And I guess it was you,

23   Bryan Baron, who added the words, "as it is

24   unrelated to your representation of Mr. Lovell in

25   the appeal."

1      A.    Yes.   That's correct.

2      Q.    Did you run that past Commissioner Harvey?

3      A.    No, I did not.

4      Q.    Did Commissioner Harvey delegate to

5    Bryan Baron the authority to make the final

6    decisions with respect to whether or not

7    Sam Newton's contract would be terminated?

8      A.    No, he did not.

9      Q.    Did the county receive a response to

10   Exhibit 19?

11     A.    Yes.

12     Q.    In that response did Mr. Newton provide

13   some rationale for his viewpoint?

14     A.    Yes, he did.

15     Q.    You know what would potentially save us

16   some time, but you don't have to do it?   Kristin

17   doesn't have to let me ask this question.   Some of

18   the exhibits are just ones that were produced with

19   Weber County document control numbers that either

20   say "by" or "to" or "cc" or "from Bryan Baron."

21   You've been through those recently; is that right?

22     A.    Not in detail.   But, yes, I've skimmed

23   through them recently.

24     Q.    Did you see any e-mails that were either

25   to you or cc'd to you or from you, according to the

142

1    e-mail, that you don't believe were really to you or

2    cc'd to you or from you?

3         A.    No.

4         Q.    Then I'm not going to go through one after

5    another after another.  Let's see if we can skip

6    some things here.

7                (Exhibit No. 21 was marked.)

8         Q.    Let me show you what's been marked as

9    Deposition Exhibit 21.  Is this a document that the

10   county commissioners had received prior to the

11   June 5, 2017 e-mail that was sent to Mr. Newton?

12        A.    Yes.

13        Q.    Did the county make an assessment of

14   whether Exhibit 21 demonstrated good cause for any

15   additional funding?

16        A.    Yes, we did.

17        Q.    What was that determination?

18        A.    The determination was that Mr. Newton had

19   shown good cause to get additional funding for the

20   evidentiary hearing and that some amount should be

21   provided to him to cover his work for that hearing.

22                (Exhibit No. 22 was marked.)

23        Q.    Please look at Exhibit 22 and tell me if

24   that's the county's response to Exhibit 21.

25        A.    Yes, that is.

143

1      Q.    First of all, did you have any role in

2   drafting Exhibit 22?

3      A.    Yes, I did.

4      Q.    And what was that role?

5      A.    I drafted this on behalf of

6   Commissioner Harvey.

7      Q.    In the first paragraph, the third sentence

8   says, "After speaking with our civil attorneys and

9   the other commissioners, the county is prepared to

10  provide you with an additional $15,000 to finish

11  this appeal."  Was it a true statement that

12  Commissioner Harvey had spoken to the other

13  commissioners before sending Exhibit 22?

14     A.    I am not aware of that.  I think I just

15  assumed that in putting together this letter that he

16  had included them in on discussions.

17     Q.    Next sentence, "While we recognize that

18  the remand of the Lovell case was unanticipated in

19  the original contract and will cause you additional

20  work, we don't agree that it will take an additional

21  500 to 750 hours to complete that work.  It is

22  highly likely that the majority of the witnesses you

23  wish to call will have little to no helpful

24  information."  What was the source of information

25  for the statement that it was highly unlikely that

1    the witnesses that Mr. Newton wished to call would

2    have little to no information?

3        A.    That statement was based on our discussion

4    that we had.  What was it, 26 witnesses?  And just

5    thinking about how well those witnesses would have

6    known Mr. Lovell and what kind of relevant

7    information they would have to present to the court,

8    we had a hard time believing that they knew that

9    much, all of those witnesses knew that much about

10   Doug Lovell, that it would take that amount of time

11   to question them.

12       Q.    And where did that information come from,

13   how well they knew each other, how well they knew

14   Mr. Lovell, etc.?

15       A.    It was just based off of general trial

16   experience.

17       Q.    I'm asking about the factual information.

18   General trial experience doesn't tell you how well

19   Jim and Joe know each other, right?

20       A.    No.  But general trial experience tells

21   you that when you have 26 witnesses, the odds are

22   that each witness isn't going to know a great deal

23   about Doug Lovell.  These were witnesses that we

24   speculated knew him but probably didn't have hours'

25   worth of testimony to give concerning him.

145

1        Q.    The sentence says it's "highly likely that

2   the majority of the witnesses will have little to no

3   helpful information."  Are you telling me that

4   Commissioner Harvey relied on just general trial

5   experience of some civil lawyers to conclude that

6   the majority of the witnesses would have little to

7   no helpful information?

8        A.    Yeah.  It was speculation.  Our attempt in

9   sending this e-mail was to try and get Mr. Newton

10  down into a ballpark range that was more reasonable.

11  His initial request, if I remember right, would have

12  more than doubled the $75,000 contract.  And so we

13  were trying to negotiate here.  This was a

14  negotiation.  We thought we would offer him $15,000

15  based on what we thought was reasonable and see what

16  he came back with.

17       Q.    So the statement that it was highly likely

18  the majority of the witnesses he wished to call will

19  have little to no helpful information was a

20  negotiating tactic?

21       A.    Yeah.  I would say that.

22       Q.    So was it a true statement or not?  Did

23  Mr. Harvey truly believe that this was highly

24  likely, or was it just some effort to lowball

25  Mr. Newton?

 1          MS. VANORMAN:  Objection, calls for

 2    speculation as to Mr. Harvey's thoughts.  You can

 3    answer, if you know.

 4          A.    No, I don't know what Mr. Harvey's

 5    thoughts were here.

 6          Q.    And that's a fair objection.  Let me ask

 7    it from the county's perspective because it is the

 8    county that is sending this to Mr. Newton, correct?

 9          A.    It was, yeah.

10          Q.    Are you telling me that the county said it

11    was highly likely, etc. simply as a negotiating

12    tactic?

13          A.    Primarily.  That was speculation.  We

14    didn't believe that it would require that number of

15    hours.  I believe it would fall back to Mr. Newton

16    to show us why it would take that amount of hours.

17          Q.    Now, Mr. Newton had already sent a

18    statement indicating why he believed it, correct?

19          A.    He had.

20          Q.    This is basically saying, "We don't

21    agree."  It's literally saying that, correct?

22          A.    Yeah.

23          Q.    Now, the next sentence says, "As such" --

24    And I'm assuming that refers back to the previous

25    sentence.

147

1        A.    Yes.

2        Q.    "As such, we estimate that it will only

3   take approximately one week, or 40 hours, to conduct

4   the hearings."  Let me stop there for a second.  As

5   I understand it, the remand hearing has yet to

6   occur; is that right?

7        A.    Correct.

8        Q.    Do you know how long it is set for?

9        A.    I don't know.

10        Q.    "40 hours to prepare for the hearings, and

11   another 20 hours to revise your initial brief."  And

12   where were those figures coming from?

13        A.    There was an estimation, as I stated, just

14   based on general trial experience.

15        Q.    And also based on the speculation that the

16   majority of the witnesses would have little to no

17   helpful information.

18        A.    Yes.

19        Q.    Then it says, "The total additional hours

20   of work should in no way exceed 100."  That sounds

21   like a pretty definitive statement.  Was it intended

22   to be?

23        A.    That was just a conclusion of our

24   estimate.  We didn't believe that the total hours

25   would exceed 100 hours.

1    Q.    In fact, the county said in no way should

2    it exceed 100, correct?

3    A.    Yes.

4    Q.    And then $150 per hour, that would equal a

5    total of $15,000, right?

6    A.    Yes.

7    Q.    So if you take those two sentences

8    together, what the county was telling Mr. Newton was

9    that in no way should the additional costs exceed

10   $15,000, correct?

11   A.    Yes.

12   Q.    Next sentence, "The $75,000 that was

13   provided to you initially was intended to cover the

14   reply brief which shouldn't be impacted by this

15   remand, so we are not offering additional

16   compensation for that."  That's a flat no.

17   A.    At this point in time, yes, there would be

18   no additional compensation for the reply brief based

19   on this request for additional funds.

20   Q.    It says, "Please advise me soon with

21   acceptance of this offer so I can have Mr. Baron

22   prepare a contract to that effect."  So am I correct

23   that the contract would have said "in no way will

24   the cost exceed $15,000"?

25   A.    I don't know if that's what would have

1    been included in the contract.  The contract likely

2    would have said that he is granted an additional 100

3    hours or $15,000 for the evidentiary hearing.  So it

4    probably wouldn't include that specific "in no way

5    shall exceed" language.

6         Q.   Do you know one way or the other whether

7    that language would have been in the contract?

8         A.   I never drafted the contract, but I'm

9    fairly confident that drafting a contract, I

10   wouldn't have included that type of language in it.

11        Q.   You would have included language to that

12   same effect.

13        A.   I would have included language indicating

14   that he had been authorized another 100 hours or

15   $15,000 to proceed.

16             (Exhibit No. 23 was marked.)

17        Q.   Quick question.  Did the county receive

18   Exhibit No. 23 in response to Exhibit No. 22?

19        A.   Yes.

20             (Exhibit No. 24 was marked.)

21        Q.   Let me show you Exhibit 24 and ask if you

22   can identify that.

23        A.   Exhibit 24 is a message sent from

24   Commissioner Harvey to Sam Newton in response to his

25   e-mail which is labeled as Exhibit 23.

1    Q.    Did you draft any portion of Exhibit 24?

2    A.    I believe I did.

3    Q.    What did you draft?

4    A.    I believe I drafted the entire thing.

5    Q.    Where it says in the second paragraph,

6    "100 hours seems to be a reasonable estimate," that

7    was the same 100-hour figure that had been in the

8    earlier March 14th response from the county,

9    correct?

10    A.    Yes.

11    Q.    And that was after the county had received

12    further information from Mr. Newton as to why he did

13    not believe 100 hours was a reasonable estimate.

14    A.    No.  In Exhibit 23 Mr. Newton himself

15    states that 100 hours would be reasonable.

16    Q.    For all the rest of the work?

17    A.    He specifically indicated, "At 100 hours,

18    I can give you a better estimate of where we are and

19    what it will take.  Perhaps I will have

20    overestimated and we won't need any or much more."

21    So in Exhibit 24 I would say that we are agreeing

22    with Mr. Newton's assessment in Exhibit 23.

23    Q.    Is Exhibit 24 saying that 100 hours seems

24    to be a reasonable estimate of the time he put into

25    the evidentiary hearings and revising the initial

1  brief, or is it saying, "Let's talk again in 100

2  hours"?

3       A.    I would say both.  It's saying, "This

4  seems like a reasonable estimate.  If it's not, if

5  we get to that 100 hours, let's talk again.  We will

6  remain open to another request."  Can I just add to

7  that last statement I made?  Being open to another

8  request comes directly from Exhibit 24.  It's the

9  last line of that second paragraph.

10              (Exhibit No. 25 was marked.)

11       Q.    Could you take a look at Deposition

12  Exhibit 25 and tell me whether it is Mr. Newton's

13  response to the June 5th e-mail that you had sent

14  him, June 5th of 2017.

15       A.    Yes, this is it.

16              (Exhibit No. 26 was marked.)

17       Q.    Could you look at Exhibit 26 and tell us

18  what it is.

19       A.    So after receiving Exhibit 25, I forwarded

20  on to Chris Allred and Dave Wilson along with an

21  e-mail of my own indicating that Mr. Newton wasn't

22  willing to back down from the $22,500 amount that

23  he'd requested for the 23B motion.

24       Q.    It says in the third paragraph of what you

25  wrote, "Let me know when you have a minute to talk.

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                    30(b)(6)                    Bryan Baron

152

1    I'd like to know your opinion on how to handle it

2    from here: pay the full $22,500 or pay a lesser

3    amount."  First of all, why didn't you ask

4    Commissioner Harvey for his opinion or to meet with

5    him?

6        A.    Commissioner Harvey was a fairly new

7    commissioner and relied heavily on the county

8    attorney's office and often referred issues back to

9    us to provide him legal advice.  And so in this case

10   I went directly to Chris Allred and Dave Wilson to

11   get advice on how to handle it.

12       Q.    Would you say that at least with respect

13   to the Lovell case, Commissioner Harvey

14   rubber-stamped what he was told by the civil

15   attorneys?

16       A.    I would say that he always supported us in

17   our analysis.  He would refer things to us.  We

18   would go back to him.  And he did, I think, almost

19   always agree with what we recommended.

20       Q.    Can you identify circumstances in which he

21   did not agree with what was recommended?

22       A.    I can't think of any at this moment.

23       Q.    Did Bryan Baron end up speaking with

24   Mr. Allred and/or Mr. Wilson in connection with

25   Mr. Newton's response?

153

```
1        A.    Yes, I did.

2        Q.    Was that a face-to-face meeting?

3        A.    Yes, it was.

4        Q.    And was it shortly after the receipt of

5   Mr. Newton's response?

6        A.    Yes, it was.

7        Q.    Where did that take place?

8        A.    It would have been in Mr. Allred's office.

9        Q.    And to the best of your ability, walk us

10  through what was said by each of you in that

11  meeting.

12       A.    I don't recall what each individual said,

13  but I recall the consensus of the meeting.

14       Q.    I'm going to stop you.  This is one where

15  I don't want the consensus of the meeting.  If you

16  can't remember who said what in the meeting, you can

17  go ahead and tell me that.

18       A.    I don't recall.

19            MS. VANORMAN:  And I also want to object

20  that it goes beyond the 30(b)(6).  You can ask him

21  what he recalls about it during his deposition.

22            MS. PORTER:  I could.  But I actually

23  think it is part of the 30(b)(6).  My take on it,

24  just for the record, is number 3 says, "The 'meeting

25  with elected officials' referenced in (doc. ID)
```

1    Weber County 1123, including the meeting's content,

2    drafts of Weber County 1123, and further discussion

3    or communication that occurred related to the

4    meeting or Weber County 1123."  It seems to me since

5    the e-mail went out and said, "This is what we

6    decided at the meeting," and then this is a

7    response.  That's just my position, for the record.

8         Q.   I was just asking you whether you can

9    recall anything that anyone in particular said at

10   that meeting.

11        A.   No.  I don't recall any specifics of who

12   said what in that meeting.

13        Q.   What about generally or the gist of what

14   someone said at that meeting?

15        A.   Generally, I can't assign any quotes from

16   anyone in particular.  I can tell you that the

17   outcome, the consensus, of the three of us in the

18   meeting --

19        Q.   Nope.  You're defining it as speculation

20   in your answer.  Thank you, though.

21        A.   I was assigned after that meeting to take

22   certain actions.  And I can tell you what those

23   actions are.

24        Q.   Okay.  Assigned by whom?

25        A.   It would have been Chris Allred ultimately

155

1   who made the decision.

2        Q.    That's helpful.  What were you assigned to

3   do during that meeting?

4        A.    To go back and look at the $22,500 and to

5   take out anything that I didn't believe was

6   reasonably related or supported by good cause under

7   the contract to get additional funding.

8        Q.    You were delegated the final

9   decision-making authority as to what constituted

10  good cause?

11       A.    I was asked to make that specific

12  determination and then bring it back.

13       Q.    Bring it back to them for a review?

14       A.    Yes.

15       Q.    And at what point was a county

16  commissioner going to be involved in this good cause

17  review?

18       A.    Commissioner Harvey was always included

19  before we took any final action.  But we would

20  discuss strategy amongst ourselves and what advice

21  we were going to provide to Commissioner Harvey.

22             (Exhibit No. 27 was marked.)

23       Q.    Could you identify Exhibit 27.

24       A.    So this is a draft e-mail I had prepared

25  and sent to Dave Wilson to ask for his feedback.

156

1  Q.   This includes an e-mail stream, does it

2  not, that includes the June 5, 2017 e-mail from

3  Bryan Baron to Sam Newton, correct?

4  A.   Yes, it does.

5  Q.   If I'm reading this correctly, there was

6  the June 5th e-mail followed by Mr. Newton's

7  response followed by a draft of your reply that you

8  were sending to Dave Wilson.

9  A.   That's correct.

10  Q.   And you wrote, "Would you be willing to

11  give me your feedback on this response to Sam?  Is

12  there anything you would add or change?  I

13  personally wanted to say a lot more, but I felt it

14  wasn't very professional."

15       And I'll be up front.  This is probably

16  more of a Bryan Baron question.  And I'm willing, in

17  the interest of saving time, because I might not

18  even have any of him, could we sort of say this

19  following question and answer are going to be a

20  Bryan Baron question and answer?

21       MS. VANORMAN:  Yes.  We'll stipulate to

22  that.

23       MS. PORTER:  Thank you.

24  Q.   Mr. Baron, what was it you personally

25  wanted to say that you felt wouldn't be very

 1   professional?

 2        A.    I don't recall.  I just recall there was a

 3   high degree of frustration with Mr. Newton at this

 4   point in time and his billing practices.

 5        Q.    Was it his billing practices or was it

 6   that he hadn't gone for your negotiation tactic?

 7        A.    It was the billing practices and the

 8   misrepresentations that had been made.  We felt like

 9   he was taking advantage of the county here.

10        Q.    Back to the 30(b)(6).  Did Mr. Wilson

11   provide you with a feedback of the draft proposed in

12   Weber County 1148?

13        A.    I don't recall getting any feedback on

14   this from Mr. Wilson.

15        Q.    And this was never sent to Mr. Newton,

16   correct?

17        A.    Right.  It wasn't.

18        Q.    And is that because before a response was

19   sent to Mr. Newton, he filed his Motion to Withdraw?

20        A.    Yes, that's correct.

21              (Exhibit No. 28 was marked.)

22        Q.    Would you please look at Exhibit 28 and

23   tell us what that is.

24        A.    So this is a response from Dave Wilson to

25   my drafted e-mail.  And he says, "Bryan, can this

1    wait until Monday as I would like to visit with you

2    about this.  Thx."

3        Q.    Is that an e-mail that you received on or

4    around June 9, 2017 at 12:59 p.m.?

5        A.    Yes, it is.

6            (Exhibit No. 29 was marked.)

7        Q.    Let me show you Exhibit 29 and ask you to

8    identify that.

9        A.    This is a string of e-mails starting with

10   one from Sam Newton on June 9th indicating that he

11   had moved to withdraw as Mr. Lovell's counsel.

12       Q.    And then Bryan Baron forwarded that to

13   Mr. Allred and Mr. Wilson asking especially for a

14   discussion.

15       A.    Right.  That's correct.

16       Q.    And Mr. Allred said he'd be around all

17   week.  And then Mr. Baron responded by saying that

18   he would stop in in the afternoon and discuss how to

19   respond.  Let me ask you about the next part.

20   "Options: (1) Allow Sam to withdraw and hire a new

21   attorney to pick up the Lovell appeal (2) Object to

22   the Motion to Withdraw and try to force Sam to

23   finish the appeal (3) Call Sam and discuss his

24   misconceptions to try to convince him to stay on the

25   case."  And then it says, "a.  We didn't threaten to

1    take away his contract.  We just said we would look

2    elsewhere for future capital and aggravated murder

3    cases."  Now, we now know that is not what the

4    letter said that went to Mr. Newton, correct?

5         A.    Correct.  Not specifically.

6         Q.    Well, in fact, language to that effect had

7    been removed by you and replaced with a general

8    reference to appeals, correct?

9         A.    That's correct.

10        Q.    "b.  We haven't limited funding on the

11   evidentiary hearing to $15,000, that is pre-approved

12   estimate that he agreed to."  Preapproved estimate,

13   do you believe that he agreed to a preapproved

14   estimate of $15,000 for the entirety of the 23B

15   hearing?

16        A.    I do believe that.

17        Q.    "c.  We have not set a limit on how much

18   he can talk to Doug Lovell.  We just raised the

19   amount of time he has been spending with him as a

20   concern."  And, in fact, it had been raised with him

21   at least twice, correct?

22        A.    Yes.  That's correct.

23              (Exhibit No. 30 was marked.)

24        Q.    Can you tell us what Exhibit 30 is.

25        A.    So on July 17, 2017, I forwarded a link to

1    the Salt Lake Tribune article that was published on

2    that same day to Chris Allred and Dave Wilson.

3         Q.    And then Mr. Allred responded and then

4    Mr. Wilson responded.  Am I reading that right?

5         A.    Yes.  That's correct.

6         Q.    I believe it's the third sentence in

7    Mr. Wilson's response that says, "All of this for a

8    defendant who admitted killing a person and then a

9    witness.  The world must laugh at our stupidity."

10   Upon reading that sentence, did it occur to the

11   county that perhaps Mr. Wilson's personal views

12   should lead to his recusal from these discussions?

13        A.    No, it did not.  Mr. Lovell had indeed

14   admitted, confessed, and the appeal was strictly

15   limited to the sentencing.

16        Q.    Whether he should be killed by the state,

17   right?

18        A.    Right.

19        Q.    Pretty important issue, isn't it?

20        A.    Yeah.

21        Q.    Let me ask you about something Mr. Allred

22   wrote in his portion of this e-mail stream.  He

23   says, "I'm really sick of this BS!  I at least want

24   to expose just how much Sam is getting paid for

25   these two cases at taxpayer expense."  Let me stop

1    there for a second.  Which two cases?

2        A.    I don't know what two cases he's talking

3    about.  I could speculate, but I don't know exactly

4    what he's talking about.

5        Q.    Were you, in fact, given an assignment to

6    not only look into how much Mr. Newton was being

7    paid by Weber County but also how much Mr. Newton

8    had been paid in a completely unrelated case of

9    Floyd Eugene Maestas?

10       A.    Yes, he was.

11           MS. VANORMAN:  Is that a question directed

12   directly at Mr. Baron or as the 30(b)(6) witness?

13           MS. PORTER:  I think it's a 30(b)(6)

14   question.  I know I said "you," though.

15           MS. VANORMAN:  But the question is what

16   does that question relate to?  I don't mind if you

17   ask the question.  But I think it should be directed

18   to Bryan Baron and not to the 30(b)(6) witness.

19           MS. PORTER:  I think that's fair.  And I

20   very much appreciate you kind of letting me go in

21   and out.  I think we can make our record very clear

22   and we'll get out of here sooner.  So I appreciate

23   that accommodation.  This request is for Mr. Baron

24   personally.

25       Q.    Mr. Baron, were you given an assignment to

1    investigate payments to Mr. Newton in connection

2    with an unrelated death penalty case?

3         A.    Yes, I was.

4              (Exhibit No. 31 was marked.)

5         Q.    And was that assignment given to you in

6    response to the Salt Lake Tribune article?

7              MS. VANORMAN:  Objection, calls for

8    speculation.  You can answer, if you know.

9         A.    No, I don't recall.

10             MS. VANORMAN:  Assuming that was directed

11   to Bryan Baron.

12             MS. PORTER:  In fact, I'm going to do

13   this.  The next few questions are going to be

14   directed to Bryan Baron.  And I'll try to make it

15   clear when we are switching back.

16        Q.    Let me ask it this way.  Bryan Baron, you

17   were assigned to look into payments on the Maestas

18   case; were you not?

19        A.    Yes, I was.

20        Q.    And that was within a few minutes of the

21   e-mail string that we looked at in Exhibit 30,

22   correct?

23        A.    Yes.

24        Q.    In your mind, as Mr. Baron, did you

25   believe there was a connection between this

1    assignment to look into these two cases, meaning

2    Lovell and Maestas, and the Tribune article that had

3    started that e-mail stream in Exhibit 30?

4        A.    I can't recall what my train of thought

5    was back then.

6        Q.    Back to 30(b)(6).  What concern was it of

7    Weber County how much a different entity had paid

8    Mr. Newton on the Maestas case?

9             MS. VANORMAN:  I'm going to object that

10   goes beyond the scope of the 30(b)(6) notice.

11            THE WITNESS:  Can you repeat the question.

12            (Question read.)

13       A.    Weber County was trying to figure out how

14   to deal with Sam Newton in the Lovell case.  And I

15   think that it's helpful to know how a different

16   governmental entity is handling Mr. Newton and his

17   invoices and whether they were experiencing the same

18   types of problems as Weber County was experiencing.

19       Q.    And it had nothing to do with wanting to

20   expose just how much Sam is getting paid for these

21   two cases at taxpayer expense?

22       A.    I honestly don't recall.

23            (Exhibit No. 32 was marked.)

24       Q.    Back on the 30(b)(6).  Let me just ask if

25   the county is familiar with Exhibit 32.

164

1    A.    Yes.

2    Q.    And to shorten this up a little bit, is

3  this an e-mail exchange among the people it purports

4  to be?

5    A.    Yes, it is.

6    Q.    So on Monday, July 17, 2017 at 3:46 p.m.,

7  Mr. Wilson is now saying, "So we have never reached

8  that point since the Utah Supreme Court doesn't want

9  this admitted murderer to die."  Correct?

10   A.    Yes, he did say that.

11   Q.    And in response to seeing that statement,

12  was there any discussion of whether Mr. Wilson

13  should be recusing himself from issues involving the

14  funding of death penalty defenses?

15   A.    No, there wasn't.

16   Q.    Question for Bryan Baron.  Did you, in

17  fact, send information to Christopher Allred about

18  payments made to Mr. Newton on the Maestas case?

19   A.    I believe that I did.

20   Q.    I know you told me this earlier and I

21  apologize.  The county is still not a member or

22  participant in the Indigent Defense Fund, correct?

23   A.    Correct.

24   Q.    So is there a case involving gypsies

25  charged with aggravated murder that's going on right

1    now?  Do you know what I'm talking about?

2        A.    Yes, there is.

3        Q.    Is it really gypsies?

4        A.    Yes.  There were two gypsies who moved

5    into Ogden and shortly after arriving their daughter

6    was found dead, starved and beaten.  And so that is

7    a case that's ongoing in the Second District Court.

8        Q.    Has there been any indication one way or

9    the other yet of whether Weber County is seeking the

10   death penalty?

11       A.    Yes.  Weber County is seeking the death

12   penalty on both of those cases.

13       Q.    So has counsel been appointed for both of

14   those capital cases?

15       A.    Yes.

16       Q.    And who is that, if you know?

17       A.    James Retallick and Randy Marshall,

18   Martin Gravis and Jason Widdison.

19            MS. PORTER:  And I'm going to say that at

20   this point, I believe the rest of these questions

21   are probably for Bryan Baron in his individual

22   capacity.  Can we stipulate that the oath he took on

23   behalf of Weber County can extend?

24            MS. VANORMAN:  I sure hope so since he's

25   already answering questions on behalf of

1    Bryan Baron.  Yes, absolutely.  And you're just

2    going to continue the same numbers, right?  We're

3    not starting new exhibits?

4              MS. PORTER:  I think I will because this

5    is going to be a bit different.  I apologize for

6    that.  I think it will be clear enough.

7              MS. VANORMAN:  So this will be 33 or you

8    want to go number 1?

9              MS. PORTER:  I think this will be 33.  I

10   hope I don't screw everybody up too much.

11             (Exhibit No. 33 was marked.)

12       Q.    Please look at Exhibit 33 and let me know

13   when you are ready for a question.

14       A.    Okay.

15       Q.    Can you identify Exhibit 33?

16       A.    Yes.  This is a string of e-mails, the

17   first of which is from Mark Field at the Attorney

18   General's Office to myself and Chris Shaw and

19   Aaron Murphy are cc'd.  It looks like I then

20   forwarded that e-mail to Dave Wilson, and he

21   responded saying, "Let's talk when you get a

22   minute."

23       Q.    Now, as of August 22, 2017, the Attorney

24   General's Office was the prosecutor or a prosecutor

25   in the Lovell case, correct?

 1      A.    Yes, they were.

 2      Q.    So when it says that, "The AG's office may

 3   have some recommendations for us next week," what

 4   you were saying is that, "The prosecutors may have

 5   some recommendations for lawyers for us to hire for

 6   the defendant"?

 7      A.    Yes.  That's correct.

 8      Q.    Did you get any recommendations from the

 9   prosecutor as to someone to hire for the defendant?

10      A.    We did.  Although, I can't recall exactly

11   who they recommended at this point.

12      Q.    As I understand it, there was a hearing on

13   August 29, 2017 at which time Mr. Newton's Motion to

14   Withdraw was granted.

15      A.    Yes.  That's correct.

16      Q.    In fact, I think you may have said

17   something earlier in this deposition about how there

18   was then a deadline, a 20-day deadline, to get

19   replacement counsel lined up.

20      A.    That's correct.

21      Q.    Did counsel have to be under contract

22   within 20 days?

23      A.    Yes.

24      Q.    And, if not, the court would appoint

25   someone and then the court would supervise the

168

1    payments; is that correct?

2         A.    Yes, that's correct.

3         Q.    So why didn't you recommend just letting

4    the court appoint someone and letting the court

5    supervise payments to the lawyer?

6         A.    I recall discussing the options with

7    Commissioner Harvey and explaining that there were

8    pros and cons to each.  And that one of the

9    advantages of Weber County choosing appellate

10   counsel is that we could specify the terms of the

11   contract and have at least some control over how

12   much is ultimately paid out.

13        Q.    Was there anything said during that

14   conversation about whether or not the court might

15   approve more fees than the county would have

16   approved?

17        A.    I believe that I represented that to

18   Commissioner Harvey as well.  The county has control

19   if we pick.  On the other hand, the court has

20   complete control on what's paid out and it very well

21   could exceed.  I don't recall specifically what I

22   said, but I remember going over those pros and cons

23   with Commissioner Harvey.

24        Q.    One of the cons of letting the court do it

25   that you were attempting to convey to

169

 1    Commissioner Harvey was that the court might

 2    authorize higher payment.

 3        A.    Yes.

 4        Q.    Did Weber County have anyone under

 5    contract as of September 20, 2017?

 6        A.    I don't think we did on that date.  I

 7    think it was the 26th the contract was finalized.

 8        Q.    What did you represent to the court on the

 9    20th was the status of new counsel?

10        A.    I recall representing to the court that we

11    had found an attorney and we were in the process of

12    negotiating the contract.

13        Q.    And the court set a deadline to file a

14    statement of qualifications by the 29th of

15    September.  Does that sound correct?

16        A.    That sounds correct.  I don't recall

17    specifically the date, but I recall that was a

18    requirement.

19        Q.    You went ahead and filed one on behalf of

20    Ms. Coebergh because she had not yet authorized you

21    to do so, correct?

22        A.    That's correct.  She had sent me a draft

23    that was signed by her.  And I filed that with the

24    court in order to meet the deadline and then

25    followed up with her afterwards.

1     Q.    You basically filed and then told her

2     afterwards, "Hey, I filed this."

3     A.    I did.

4     Q.    But you did not have an e-mail from her

5     authorizing you to file that.

6     A.    Right.  I wasn't able to get ahold of her

7     on that specific day.

8              (Exhibit No. 34 was marked.)

9     Q.    Can you tell me what Exhibit 34 is.

10    A.    So Commissioner Ebert had asked for an

11    update on the Lovell case.  And I provided that

12    update to him in this e-mail, which is dated

13    September 25th.

14    Q.    So was Commissioner Ebert a new member of

15    the commission or somebody who had taken over for

16    Commissioner Harvey?

17    A.    No, he wasn't.

18    Q.    Did you have any understanding why

19    Commissioner Ebert was now injecting himself into

20    the conversation?

21    A.    I believe that I had forwarded the

22    Colleen Coebergh contract to all three county

23    commissioners prior to a commission meeting.  And he

24    was asking about the background of it -- this is

25    speculation -- for that purpose.

1    Q.    It says here, "Ms. Coebergh initially

2    proposed to handle the case for $125 per hour with a

3    soft cap of $115,000.  I negotiated her down to a

4    $100,000 soft cap."  Was that something that you had

5    done personally was to negotiate her down?

6    A.    I believe so.

7    Q.    Did you tell Ms. Coebergh that it was the

8    commissioners who had come up with the $100,000 soft

9    cap?

10   A.    I don't recall.

11   Q.    The last sentence in that paragraph says,

12   "She wouldn't be my first, second, or even third

13   choice to handle this case, but we don't really have

14   any other options."  Now, the county did have an

15   option of letting the court appoint a lawyer, right?

16   A.    That's correct.

17   Q.    And why was it you said she wouldn't be

18   your first, second, or even third choice to handle

19   the case?

20   A.    I had participated in interviewing her and

21   in calling around at the various references that she

22   had made on her proposal.  And, frankly, I wasn't

23   incredibly impressed.

24   Q.    But that concern was overridden by the

25   desire not to let the court have control over the

1    defense funding.  Is that a fair statement?

2         A.    I'd been given the direction to find

3    someone to contract with the county when I had

4    presented the options.  And so that's the direction

5    I was pursuing.  And so I don't know I was even

6    thinking about that as an option at this point.

7         Q.    On the next page, Weber County 1589, that

8    last paragraph says, "You also asked why the county

9    doesn't participate in the Utah Indigent Defense

10   Fund.  It is my understanding that when the fund was

11   set up, the county decided that it was too expensive

12   to join and that the county could arrange for

13   capital appeal representation for significantly less

14   money."  We talked a little bit about that earlier

15   in the 30(b)(6) deposition.  But can you quantify

16   what you meant when you said "significantly less

17   money"?

18        A.    I can't put a hard number on it, but the

19   cost to participate in the Indigent Defense Fund is

20   over $100,000 a year.  And Weber County doesn't have

21   that many capital cases to where we felt it was

22   justifiable.

23        Q.    You've got the two now.  You had Lovell.

24   And there was a guy named Jeremy or something like

25   that.

1        A.      Valdez.

2        Q.      Have there been any others since 2015?

3        A.      Not to my knowledge, no.

4               (Exhibit No. 35 was marked.)

5        Q.      Can you identify Exhibit 35 for us.

6        A.      This is an e-mail exchange between myself

7   and Rich Mauro with the Legal Defenders Association.

8        Q.      On this Weber County 1325 you wrote, "Sam

9   has handled 29 cases for us since January 1, 2015."

10  Is that something you had looked up and found

11  somewhere?

12       A.      Yes.  That's the number of cases that he

13  had handled under his regular appeals contract.

14       Q.      And were you providing this information as

15  part of the discussions to see whether or not Legal

16  Defenders might take over the underlying contract?

17       A.      Yes, I was.

18       Q.      Those discussions that were mentioned in

19  the earlier 30(b)(6) deposition?

20       A.      Yes, that's correct.

21              (Exhibit No. 36 was marked.)

22       Q.      Could you look at Exhibit 36 and tell us

23  what it is.

24       A.      So this is an e-mail chain.  It looks like

25  initially it came from a Rachel Buchi at the courts

174

1    and went to Chris Allred, among some other

2    attorneys.  And then Chris Allred forwarded a copy

3    to myself and Dave Wilson.  And then I sent a

4    response to Chris Allred and Dave Wilson.

5         Q.    So the initial e-mail was the issuance of

6    an opinion in State versus Rogers, correct?

7         A.    Yes, that's correct.

8         Q.    And then Mr. Allred wrote, "This decision

9    reveals, in my opinion, another instance of Sam's

10   willingness to misrepresent the facts."  Do you see

11   that?

12        A.    Yes.

13        Q.    And so then you read the ruling apparently

14   and said, "Agree.  As stated by the court in

15   paragraph 10, 'the record does not support the

16   claim.'"  So was that you saying that the Court of

17   Appeals is accusing Mr. Newton of misrepresentation?

18        A.    That's what I got out of the opinion when

19   I read it.

20        Q.    And what is your appellate experience as a

21   lawyer?

22        A.    Well, it's very limited.

23        Q.    The next sentence, you wrote, "If Sam is

24   willing to misrepresent the facts in Lovell and in

25   this case, how many other cases is he doing the same

1   thing?"  Now, we just saw that according to you, he

2   had handled 29 cases for the county up to that

3   point, right?

4        A.    Yes, that's correct.

5        Q.    So you have now expressed a concern that

6   maybe he's misrepresenting the facts all over the

7   place, right?

8        A.    Yes, that's true.

9        Q.    So what investigation did you launch into

10  to determine whether Mr. Newton was making

11  misrepresentations in these other cases?

12       A.    None at all.  I just had the

13  misrepresentations that were made repeatedly in the

14  Lovell case and then a case here that appeared to

15  indicate another misrepresentation.  And so I was

16  raising the concern.

17       Q.    Let me just rattle off a few things.  Let

18  me ask you whether you did any of these things to

19  address the stated concern that there might be other

20  cases where Mr. Newton was making

21  misrepresentations.  Lightning round.

22       A.    Okay.

23       Q.    Did you talk to opposing counsel in that

24  appeal?

25       A.    No, I did not.

1      Q.     Did you talk to any appellate lawyers

2   about what that language means in an appellate

3   opinion?

4      A.     No, I didn't.

5      Q.     Did you speak with any appellate judges or

6   former appellate judges to ask, "What does that

7   language mean?"

8      A.     No, I did not.

9      Q.     Did you look at any other appeals,

10  appellate rulings in which Mr. Newton was involved

11  to see if there had been any alleged accusations of

12  misrepresentations in those cases?

13     A.     No, I did not.

14     Q.     Now, I'm assuming that any appellate

15  ruling that had come down from 2015 on is one that

16  you would have seen, correct?

17     A.     No, not necessarily.

18     Q.     Did you do any investigation whatsoever

19  about your claimed concern that there were

20  potentially many other cases in which he was making

21  misrepresentations?

22     A.     No, I did not.

23     Q.     Are you aware of whether anyone in Weber

24  County made any investigation in response to your

25  claimed concern?

1       A.      No.  Not as far as I know.

2              (Exhibit No. 37 was marked.)

3       Q.      Could you look at Exhibit 37 and identify

4    it for us.

5       A.      So these are e-mails between myself and a

6    reporter from the Standard Examiner named

7    Nadia Pflaum.

8       Q.      I had color copies made so we would be

9    able to see the blue.  The blue type is something

10   that you wrote in response; is that correct?

11      A.      Yes, that's correct.

12             (Exhibit No. 38 was marked.)

13      Q.      Can you tell us what Exhibit 38 is.

14      A.      This is an e-mail sent from myself to

15   Dave Wilson and Chris Allred containing a link to

16   the Salt Lake Tribune article that was published on

17   September 18, 2017.

18      Q.      On the second paragraph, you wrote,

19   "Jessica Miller, from the Tribune, is the one who

20   didn't ask many questions and didn't request any

21   e-mails."  Now, Ms. Miller had written to you and

22   asked if the county had any more comments or wanted

23   to add any information; did she not?

24      A.      I don't recall that.  I recall having a

25   very brief phone conversation with her and that's

1    all.

2         Q.    You wrote, "I'm hoping the Standard

3    Examiner's article is better."  Better in what

4    respect?

5         A.    I felt like the Salt Lake Tribune article

6    was telling Mr. Newton's side of the Lovell

7    litigation.  And I was hopeful that the Standard

8    Examiner's article would provide more information

9    from the county's perspective because they had asked

10   significantly more questions and had requested

11   copies of e-mails, which I had provided.

12                (Exhibit No. 39 was marked.)

13        Q.    What is Exhibit 39?

14        A.    This is an e-mail that I sent to

15   Chris Allred and Dave Wilson after an article was

16   published in the Standard Examiner on September 27,

17   2017.

18        Q.    You say, "It's not what I would have

19   written, but it's not a bad article.  I would have

20   titled it 'Greedy defense lawyer drops case after

21   county refuses to give him unlimited funds.'"  Was

22   that basically your take on the Sam Newton

23   situation?

24        A.    I was frustrated with Sam at this point

25   because I had felt like he overbilled significantly

1    for his work.  And I felt like a lot of the

2    frustration between himself and the county came from

3    our unwillingness to provide him with a blank

4    checkbook for that case.

5         Q.    Can you direct us to any particular e-mail

6    in which Mr. Newton requested unlimited funds?

7         A.    No.  I cannot.

8         Q.    Can you point us to any statement that

9    Mr. Newton made anywhere requesting unlimited funds?

10        A.    No.

11        Q.    Can you point to any e-mail or statement

12   in which Mr. Newton requested a blank check?

13        A.    No.

14        Q.    Mr. Newton was stating a different opinion

15   as to what was needed to fulfill the Sixth Amendment

16   right, the right of counsel; isn't that true?

17        A.    Yes.

18              (Exhibit No. 40 was marked.)

19        Q.    Can you identify Exhibit 40?

20        A.    Yes.  This is an e-mail correspondence

21   between Carla Cordova and the clerk/auditor's office

22   and myself regarding a request from Colleen Coebergh

23   to be paid to her a $10,000 retainer on the Lovell

24   case.

25        Q.    Ms. Coebergh was pretty insistent that she

1    get that retainer before she start any work.

2        A.    Very insistent, yes.

3        Q.    In this e-mail string you had said in the

4    third e-mail down, "I don't want her to think she

5    can get paid on demand every time."  And then

6    Carla Jean Cordova says, "Hahaha isn't that just

7    part of being a public defender's job?"  And you

8    wrote, "It does seem to be a common complaint from

9    them."  And what were you referring to there?  What

10   was a common complaint from them?

11       A.    In my time working for the county, I have

12   had to oversee payment to public defenders.  And

13   frequently they are frustrated that they can't get a

14   check written the same day.  They're frustrated with

15   the amount of time it takes the county to process a

16   payment.

17       Q.    You're talking about people other than

18   Mr. Newton.

19       A.    Yes.  That's correct.

20             (Exhibit No. 41 was marked.)

21       Q.    Can you tell me what Exhibit 41 is.

22       A.    These are e-mails between myself and

23   Sam Newton regarding the conflict cases that arose

24   in October of 2017.

25       Q.    I think, but may be misremembering, that

1    in the 30(b)(6) I was asking whether or not

2    Mr. Newton had been asked the question of whether or

3    not he met with the defense together.  I may be

4    misremembering that.  We'll leave it to the record.

5    But is there anything in your inquiry to Mr. Newton

6    that asked whether he had met with those defendants

7    together?

8         A.    No, there isn't.

9         Q.    Now, there's a reference in the first

10   e-mail in the second paragraph that says,

11   "Unfortunately, Emily is now saying that she doesn't

12   think she can represent two defendants on appeal, so

13   we need to hire another attorney."  Was there any

14   sort of discussion about whether or not Emily's pay

15   should be reduced or anything like that because she

16   didn't think she could represent two defendants on

17   appeal?

18        A.    No.  Emily didn't have a contract like

19   Sam Newton did with a specific provision stating

20   that she would be responsible for paying for

21   conflict counsel.

22              (Exhibit No. 42 was marked.)

23        Q.    What is Exhibit 42?

24        A.    So after receiving Sam Newton's

25   explanation as to why he couldn't represent the

182

1    defendants, I forwarded that to Gage Arnold, who was

2    the prosecutor, asking him if he had any additional

3    information.

4        Q.    So let me see if I understand this.  You

5    forwarded to the prosecutor a communication you were

6    having with Mr. Lovell's defense counsel.

7        A.    Yes.

8        Q.    Did that not raise any issues with you at

9    all about whether you should be forwarding defense

10   counsel communications to the prosecutor?

11       A.    This didn't have anything to do with the

12   Lovell case.  Sam had withdrawn from that case

13   already.  No, in this situation I don't think

14   there's anything confidential in Sam's e-mail that I

15   would need to withhold from the prosecutor.

16       Q.    Is there a policy that you're aware of in

17   the Weber County office about what should or

18   shouldn't be forwarded from defense counsel to the

19   prosecutor?

20       A.    There's an informal policy often referred

21   to as the Chinese Wall.  And according to that

22   policy, when I receive requests for expert funding

23   or some kind of additional funding on a case and I'm

24   trying to determine whether to pay that or not, I

25   don't reveal that the defense counsel is seeking

```
 1    additional funding from the prosecutor.  Does that

 2    make sense?

 3              MS. PORTER:  Sorry.  Could I have that

 4    answer back?  And actually my questions, too.

 5              (Question read.)

 6              (Answer read.)

 7         Q.    Additional funding from the prosecutor?

 8    I'm not following.  I'm sorry.

 9         A.    I don't reveal to the prosecutor that

10    defense counsel is seeking additional funding.

11         Q.    What else, as you understand it, are you

12    not supposed to forward to the prosecutor that you

13    learn from defense counsel?

14         A.    That's pretty much the gist of it, as far

15    as I'm aware.  If there's something that defense

16    counsel has that would reveal their strategy for

17    their case when they're discussing funding with me,

18    I don't reveal that to the prosecutors.

19         Q.    And I think you said that's an informal

20    policy.  Has there ever been some sort of e-mail or

21    written policy to guide this?

22         A.    Not that I'm aware of.

23         Q.    Have you, since you joined in 2015,

24    communicated to a Weber County prosecutor anything

25    about a request for funding that you had learned
```

1    about from defense counsel?

2        A.    Not without defense counsel's permission

3    to speak with the prosecutor about it.

4        Q.    Now, you said Gage Arnold was or is a

5    prosecutor, right?

6        A.    Yes.

7        Q.    Was it Gage Arnold who had said something

8    to you that he thought that Mr. Newton had met with

9    those two defendants together?

10       A.    Yes.  He's the one who initially informed

11   me that we would need to get conflict counsel on

12   this case.

13       Q.    But I want to know whether it was

14   Gage Arnold who specifically indicated to you that

15   Mr. Newton had met with those two defendants

16   together.

17       A.    Yes.

18       Q.    So given the fact that was the opposing

19   counsel who was saying that, then did you launch any

20   sort of independent investigation into the veracity

21   of what Mr. Arnold was telling you?

22       A.    The only thing I did was ask Mr. Newton

23   about the conflicts, as is depicted in Exhibit 42.

24       Q.    Did you receive a response to Exhibit 42?

25       A.    I don't recall receiving a written

LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                30(b)(6)                Bryan Baron

185

1    response.  But I did talk to Gage, and he didn't

2    have any additional information.

3          Q.    What did you ask him?

4          A.    Just what I had here in this e-mail.  If

5    he had any additional information about the conflict

6    and how it was created.

7          Q.    And he did not.

8          A.    Correct.

9          MS. PORTER:  Let's take a short break and

10   see if I'm possibly done.

11          (Recess.)

12          MS. PORTER:  I have no further questions.

13          MS. VANORMAN:  I want him to read and

14   sign.

15          (Signature requested.)

16      (Whereupon the taking of this deposition was

17   concluded at 3:10 p.m.)

18                    * * *

19      Original transcript filed with Ms. Porter.

20       Reading copy submitted to Ms. VanOrman.

21

22

23

24

25

Case 1:18-cv-00015-HCN-EJF   Document 26-16   Filed 07/30/19   Page 188 of 455
LAW OFFICE OF SAMUEL P. NEWTON vs WEBER COUNTY
February 04, 2019                    30(b)(6)                    Bryan Baron

186

1                    C E R T I F I C A T E

2    STATE OF UTAH              )

3    COUNTY OF _____ )

4        I HEREBY CERTIFY that I have read the foregoing

5    testimony consisting of 179 pages, numbered

6    from 7 through 185 inclusive, and the same is a true

7    and correct transcription of said testimony except as

8    I have indicated said changes on enclosed errata sheet.

9

10

11

12                              _____

13                              BRYAN BARON

14

15

16        Subscribed and sworn to at _____

17    this _____ day of _____ 2019.

18

19

20

21

22                              _____

23                              Notary Public

24    My commission expires:

25                              * * *

```
 1                 C E R T I F I C A T E

 2   STATE OF UTAH              )

 3   COUNTY OF SALT LAKE        )

 4         THIS IS TO CERTIFY that the deposition of

 5   BRYAN BARON was taken before me, Shelly Wadsworth, a

 6   Registered Professional Reporter in and for the State of

 7   Utah.

 8         That the said witness was by me, before

 9   examination, duly sworn to testify the truth, the whole

10   truth, and nothing but the truth in said cause.

11         That the testimony was reported by me in Stenotype,

12   and thereafter transcribed by computer under my

13   supervision, and that a full, true, and correct

14   transcription is set forth in the foregoing pages,

15   numbered 7 through 185 inclusive.

16         I further certify that I am not of kin or otherwise

17   associated with any of the parties to said cause of

18   action and that I am not interested in the event thereof.

19         WITNESS MY HAND this 13th day of February, 2019.

20

21

22         _____
           Shelly Wadsworth, RPR, CRR
23

24

25
```

## Exhibits

**Baron Exhibit 01** 7:14, 16,19

**Baron Exhibit 02** 8:6,8, 10,14,24,25 9:5 10:17 12:15 13:10,15 14:19,23 18:20 19:11,14,20 20:7,23, 24 22:7 25:18 27:2 28:15 30:4,8,9,10 34:4,7 38:16 68:5,6,9,14,15,16,18

**Baron Exhibit 03** 12:21, 23 13:1,5,9,19,25 14:8

**Baron Exhibit 04** 15:22, 24 34:14,19 41:23 68:2 113:25 126:6

**Baron Exhibit 05** 27:6,9 28:11 29:16 32:9,10 33:5

**Baron Exhibit 06** 27:7,11 29:19,21 30:4 33:9

**Baron Exhibit 07** 37:11, 13,14,21,24

**Baron Exhibit 08** 37:12, 14 38:7,9,17 39:5 41:5

**Baron Exhibit 09** 41:14, 16 44:2 52:11

**Baron Exhibit 10** 71:8, 10,14,16,23 72:7 74:2 75:19,23 76:1 77:13,14 79:20,22 81:12 83:17 91:17

**Baron Exhibit 11** 84:7,9, 13 87:6 89:2

**Baron Exhibit 12** 93:2,4, 6,10,15

**Baron Exhibit 13** 84:11 106:18,20,21 107:4,5,6,21

**Baron Exhibit 14** 71:12 108:15,17,20,22

**Baron Exhibit 15** 110:1, 2,8

**Baron Exhibit 16** 118:7, 8,12

**Baron Exhibit 17** 118:21, 23 119:15

**Baron Exhibit 18** 126:1, 2,9,18

**Baron Exhibit 19** 127:23, 24 128:5 131:18 136:7 141:10

**Baron Exhibit 20** 138:5,6

**Baron Exhibit 21** 142:7, 9,14,24

**Baron Exhibit 22** 142:22, 23 143:2,13 149:18

**Baron Exhibit 23** 149:16, 18,25 150:14,22

**Baron Exhibit 24** 149:20, 21,23 150:1,21,23 151:8

**Baron Exhibit 25** 151:10, 12,19

**Baron Exhibit 26** 151:16, 17

**Baron Exhibit 27** 155:22, 23

**Baron Exhibit 28** 157:21, 22

**Baron Exhibit 29** 158:6,7

**Baron Exhibit 30** 159:23, 24 162:21 163:3

**Baron Exhibit 31** 162:4

**Baron Exhibit 32** 163:23, 25

**Baron Exhibit 33** 166:11, 12,15

**Baron Exhibit 34** 170:8,9

**Baron Exhibit 35** 173:4,5

**Baron Exhibit 36** 173:21, 22

**Baron Exhibit 37** 177:2,3

**Baron Exhibit 38** 177:12, 13

**Baron Exhibit 39** 178:12, 13

**Baron Exhibit 40** 179:18, 19

**Baron Exhibit 41** 180:20, 21

**Baron Exhibit 42** 181:22, 23 184:23,24

## $

**$10,000** 73:17,19 78:7,11, 16 179:23

**$100,000** 171:4,8 172:20

**$102,000** 115:7 117:21

**$11,927** 125:9

**$11,927.30** 124:18 125:14

**$110,000** 103:14,20 104:14,16

**$115,000** 171:3

**$120,035** 114:3

**$125** 171:2

**$15,000** 39:14 40:1,13,24 42:6,14,18,19,23 43:19 44:16 45:3,16,23 73:1 78:9,19 79:1,6,13,19 81:17 82:8 86:4,10 87:5 122:5,8, 9 123:9 127:3 131:19 143:10 145:14 148:5,10,24 149:3,15 159:11,14

**$150** 44:4 45:3 148:4

**$18,000** 125:1

**$181.41** 122:21

**$22,500** 129:23 131:19 137:9 151:22 152:2 155:4

**$250,000** 106:5

**$3,360** 121:12,18 122:7

**$30,000** 87:9,24 88:12

**$300,000** 103:2

**$330,000** 103:13

**$330,410** 104:23

**$334,000** 103:19 104:4,22

**$37,800** 44:5,14

**$4,470** 123:8

**$4,651.41** 125:20

**$43,000** 115:23 116:16,22

**$5,087.06** 119:14

**$60** 82:10

**$75,000** 43:22 75:7,11,12 76:22 78:15 88:6,23 122:3 145:12 148:12

**$8,000** 117:3

**$9,450** 75:9

**$94,000** 115:13

## (

**(1)** 132:7 158:20

**(2)** 158:21

**(3)** 158:23

## 0

**050** 27:10

**053** 28:19

**057** 27:10

## 1

**1** 7:14,16,19 8:1 10:20 11:5, 8,25 73:6 118:19 140:17 166:8 173:9

**1,400** 115:18

**10** 28:17 71:8,10,14,16,23 72:7 74:2 75:19,23 76:1 77:14 79:20,22 81:12 83:17 86:1 91:17 106:4 174:15

**10/26/2017** 27:21

**100** 44:24 45:3,8 73:1 147:20,25 148:2 149:2,14 150:6,13,15,17,23 151:1,5

**$150** — (note)

**100-hour** 150:7

**1015** 124:19,21

**1099** 121:13,16

**11** 84:7,9,13 87:6,7 89:2 122:14

**1106** 122:20

**1118** 138:16 139:4,15 140:16

**1123** 139:6,15 140:17 154:1,2,4

**1148** 157:12

**12** 72:9 77:15 93:2,4,6,10, 15

**12:59** 158:4

**13** 84:11 106:18,20,21 107:5,6,21 119:13

**1325** 173:8

**14** 71:12 108:15,17,20,22

**144** 93:19

**14th** 150:8

**15** 91:22,24,25 107:11 110:1,2,8 124:18

**15,000** 42:24

**15-** 88:24

**1589** 172:7

**16** 79:23 81:11,13 118:7,8, 12

**17** 38:13 95:2 118:21,23 119:15 159:25 164:6

**17th** 94:22

**18** 28:12 32:7 81:14 126:1, 2,9,18 177:17

**18-plus** 66:22

**19** 83:18 127:23,24 128:5 131:18 136:7 141:10

**1990s** 113:13

## 2

**2** 8:6,8,10,14,25 9:5 10:17 12:15 13:10,15 14:19,23 18:20 19:11,14,20 20:7,23, 24 22:7 25:18 27:2 28:15 30:4,9,10 34:4,7 38:16 68:2,4,6,9,14,16,18 94:9, 11 100:23 124:6,10 132:25

**2,400** 115:18

**20** 18:24 138:5,6 147:11 167:22 169:5

**20-day** 167:18

**200-** 106:5

**2000** 112:4

**2015** 26:18 113:14 173:2,9 176:15 183:23

**2016** 55:16,21,22 56:6
74:12 75:2 101:6 113:15
118:20 119:12

**2017** 8:2,12 13:4 16:5
27:24 28:12 32:7 38:13
43:17 45:7 52:19 55:18
56:13 58:25 60:10 62:11
63:6 67:12 71:21 73:25
74:4,7,8,11,14,18,22,23
75:1 78:10 79:5 86:22
94:22 95:2,11 104:20
107:11 113:2 116:1 118:20
119:7,12,13,18 120:4,6,11
122:14 124:18 125:3,8
127:14 128:1,3 142:11
151:14 156:2 158:4 159:25
164:6 166:23 167:13 169:5
177:17 178:17 180:24

**2018** 104:19,20 127:10

**2019** 104:21

**20th** 169:9

**21** 71:21 78:10 79:5 113:2
142:7,9,14,24

**2187** 27:12

**2189** 29:23

**2194** 27:13

**22** 86:22 127:10 142:22,23
143:2,13 149:18 166:23

**23** 89:4 149:16,18,25
150:14,22

**23B** 16:7 56:8,10,14 57:2,3
63:20 66:10,13,23 93:17
116:3,10 123:13 124:25
128:8 129:9 133:25 134:5
136:10,19,21 137:3 151:23
159:14

**24** 149:20,21,23 150:1,21,
23 151:8

**25** 128:3 134:20 151:10,12,
19

**252** 44:4

**25th** 24:4 170:13

**26** 8:2,12 13:4 27:24 32:7
144:4,21 151:16,17

**26th** 24:4 169:7

**27** 155:22,23 178:16

**28** 157:21,22

**29** 158:6,7 167:13 173:9
175:2

**29th** 169:14


─────────

**3**

**3** 12:21,23 13:1,5,9,19,25
14:8 29:22 38:17 42:2 44:1
45:11,22 72:8,19 75:19
86:6,7 118:20 127:18
133:4 153:24

**30** 71:15 86:2 159:23,24
162:21 163:3

**30(b)(6)** 7:20 10:14,21
62:16 96:12 100:16,24
102:6 110:7 118:1 127:15,
18 136:2 153:20,23 157:10
161:12,13,18 163:6,10,24
172:15 173:19 181:1

**31** 119:18 162:4

**313** 93:19

**32** 163:23,25

**33** 166:7,9,11,12,15

**34** 170:8,9

**346** 38:25

**35** 173:4,5

**36** 173:21,22

**37** 177:2,3

**38** 177:12,13

**39** 178:12,13

**3:10** 185:17

**3:46** 164:6


─────────

**4**

**4** 15:22,24 28:17 34:14,19
41:23 45:16 46:4 68:2
87:15 102:6 113:25 126:6

**40** 147:3,10 179:18,19

**41** 180:20,21

**42** 89:4 181:22,23 184:23,
24

**49** 71:15


─────────

**5**

**5** 27:6,9,18 28:11 29:16
30:8 32:10 33:5 113:10,24,
25 117:14,15 120:4,11
128:1 142:11 156:2

**5/22/2017** 36:12

**50** 87:7

**500** 143:21

**5th** 120:6 151:13,14 156:6


─────────

**6**

**6** 27:7,11,19 29:19,21 30:4,
8 33:9 45:16 46:4 48:19
49:6,9 50:9 51:3 56:13
58:25 60:10 62:11

**6/6/2017** 55:3

**6th** 60:22 62:22 64:10

─────────

**7**

**7** 37:11,14,21,24 89:9

**750** 143:21

─────────

**8**

**8** 37:12,14 38:7,9,17 39:5
41:5 45:16 51:7,10

**8/29/17** 84:14

─────────

**9**

**9** 29:22 41:14,16 43:17 44:2
45:7 52:11 75:24 76:1
125:8 158:4

**9th** 158:10

─────────

**A**

**Aaron** 166:19

**abandon** 46:14

**ability** 55:11 58:15 59:23
69:16 87:11 88:15,24
89:21 90:10 153:9

**absolutely** 166:1

**acceptance** 148:21

**accepted** 58:20

**accidentally** 91:20

**accommodation** 161:23

**accumulate** 116:21

**accurate** 120:14

**accurately** 72:15

**accusations** 176:11

**accusing** 14:17

**acknowledged** 87:1

**acknowledges** 46:23

**action** 89:17 91:15 155:19

**actions** 154:22,23

**actively** 63:15

**activity** 126:23

**actual** 39:11 65:5 101:1

**Adam** 109:1

**Adams** 69:13,21 70:22

**add** 151:6 156:12 177:23

**added** 76:25 140:23

**addition** 111:3

**additional** 16:7 35:6 38:21
39:2 40:4 42:20 43:2,5,13,
23 44:17 45:22 47:1 66:10
67:13 73:1,3 75:8 76:19,24
77:4,20 78:24 86:4,10

**88**:24,25 97:23 124:5,24
127:5 128:8 129:10 130:1,
2 133:25 135:6,17 136:10,
19 137:3 142:15,19
143:10,19,20 147:19
148:9,15,18,19 149:2
155:7 182:2,23 183:1,7,10
185:2,5

**Additionally** 76:3

**address** 102:5 175:19

**adequate** 39:15 81:16

**adequately** 87:12 88:15

**admitted** 37:7 160:8,14
164:9

**advance** 128:19

**advantage** 131:23 157:9

**advantages** 168:9

**advice** 33:2 138:4 152:9,
11 155:20

**advise** 148:20

**advocacy** 80:4,17 89:24
90:24

**afford** 48:22

**afternoon** 11:16 158:18

**AG's** 167:2

**aggravated** 59:19 80:13
139:19 140:5 159:2 164:25

**agree** 143:20 146:21
152:19,21 174:14

**agreed** 61:10 62:25 63:2
67:21 159:12,13

**agreeing** 150:21

**agrees** 47:16

**ahead** 34:4 37:8,17 96:9
153:17 169:19

**ahold** 170:6

**air** 14:17

**airplane** 116:20

**albeit** 84:13

**allegation** 63:25

**alleged** 29:19 30:3 38:14
39:4 41:4 45:21 46:5,9
48:18 49:9 51:6,8,16 53:6
68:3 69:3 78:3 83:16 95:18
99:6 176:11

**allegedly** 30:8 31:16

**alleging** 26:9

**allowed** 38:21 39:2 53:6
81:17

**allowing** 58:7

**Allred** 8:20 10:24 12:3
22:8,14 23:5 57:15,17
58:9,13 60:19 61:3,15
64:9,17 109:21 110:17
128:12,13,19 129:2,13,24

130:10 132:2 133:14
137:6,24 151:20 152:10,24
154:25 158:13,16 160:2,3,
21 164:17 174:1,2,4,8
177:15 178:15

**Allred's** 153:8

**amended** 102:16

**Amendment** 92:14 179:15

**amount** 61:9 78:16 110:11
113:7 119:13 125:1,7,11
134:23 137:9,11,14 142:20
144:10 146:16 151:22
152:3 159:19 180:15

**amounts** 70:7 106:7
125:13 134:15

**analysis** 61:3 105:3,10,14
135:19,23 152:17

**analyzing** 68:15

**and/or** 61:15 152:24

**annual** 104:14 108:4

**annually** 103:15,21 104:17

**answering** 165:25

**anticipation** 15:7

**apologize** 21:10 23:3 25:2
84:21 132:19 164:21 166:5

**apparently** 109:14 127:7
174:13

**appeal** 55:14 57:24 58:13
61:13 63:14 64:1,2 65:13,
15,21,24 73:5,17 87:12
88:16 107:19 113:18
115:17 116:2 132:11,13
137:12 140:25 143:11
158:21,23 160:14 172:13
175:24 181:12,17

**appeals** 16:10 17:1,7
23:22 29:5,13 59:16 64:12
71:4 80:12 89:23 98:7
133:19 134:20 135:25
140:2,3 159:8 173:13
174:17 176:9

**appeared** 175:14

**appears** 27:19 118:9,24

**appellate** 13:17 16:3,9
17:12 18:1 19:1 20:13,16
48:24 49:4,11,16 50:2
60:8,11 69:1,7 76:6,12
80:16 84:1 90:23 93:18
97:1,8,18 101:19 106:6,10
121:10 123:20 133:7
134:24 135:1,14,18 139:22
168:9 174:20 176:1,2,5,6,
10,14

**application** 70:8 107:16

**applications** 62:2,13

**applied** 69:21 108:8,10,13
122:8

**apply** 76:24

**applying** 107:17

**appoint** 167:24 168:4
171:15

**appointed** 22:23 165:13

**appreciated** 26:19 34:7
68:19 92:25

**approach** 66:4 67:3,6

**approached** 67:12 70:22

**approaching** 87:8,23
88:11

**appropriately** 114:7
122:1

**approval** 124:23 128:21

**approve** 66:22 168:15

**approved** 9:9 70:6 88:23
123:8 124:25 138:2,25
139:3,9,12,16 168:16

**approximate** 24:1

**approximately** 52:18 86:1
103:14,20 117:21 125:1
147:3

**approximating** 105:12

**April** 38:13 116:5 118:19
120:21

**area** 60:24 131:1,2,7

**areas** 47:19 130:24

**argue** 67:4

**argument** 35:21,25 66:6
84:14 129:8

**arise** 20:6

**Arnold** 20:13 97:6 98:5,8,
21 99:6 182:1 184:4,7,14,
21

**arose** 20:2 98:6 180:23

**arrange** 172:12

**arrangement** 135:21

**arriving** 165:5

**article** 28:11,16 29:2 32:15
33:12 160:1 162:6 163:2
177:16 178:3,5,8,15,19

**articles** 27:3,15,23 28:1

**assessment** 104:20
142:13 150:22

**assign** 154:15

**assigned** 20:11 131:4
154:21,24 155:2 162:17

**assignment** 161:5,25
162:5 163:1

**assignments** 130:24

**assist** 108:7

**assistance** 51:15

**assistant** 94:25

**association** 18:2,6 109:2
117:8 173:7

**assumed** 143:15

**assuming** 72:12 146:24
162:10 176:14

**attach** 38:2

**attached** 95:20

**attempt** 111:11 145:8

**attempting** 168:25

**attendant** 77:20

**attended** 128:6,10,24
129:5,16

**attention** 64:9 91:19

**attitude** 102:13

**attorney** 12:4,7,11,14
18:24 22:20 35:13 36:24
38:12 52:18,23 57:20 58:1,
2 61:5,24 62:2,7,9,13 63:3,
16 65:17 70:9 81:25 82:15,
23 93:7 94:15,16 95:10
98:9 106:8 115:16,25
116:17 121:20 122:4,11
126:3,23 133:18 136:16,17
139:18 140:1,9 158:21
166:17,23 169:11 181:13

**attorney's** 32:20 50:12
57:18 76:4 110:12 152:8

**attorney-client** 97:15
99:23

**attorneys** 18:8 28:8 53:14
58:3 62:23 65:1,10 69:7,9
81:21 97:23 103:23 111:2
143:8 152:15 174:2

**audio** 85:19 91:12

**August** 16:14 97:1 118:20
122:14 166:23 167:13

**authority** 8:21 24:5,8,12
130:1,13,17,23 131:13
141:5 155:9

**authorization** 138:24

**authorize** 44:16 67:15
73:1,3 79:13,18 86:4,10
169:2

**authorized** 42:6,14,18,19,
22,24 122:3 127:4 140:4,8,
18 149:14 169:20

**authorizing** 170:5

**auto** 127:8

**average** 105:22

**averaged** 106:5

**avoid** 98:10

**aware** 21:18 26:15 53:10,
13,15 89:23 91:6 135:4,16
139:1 143:14 176:23
182:16 183:15,22

                    **B**

**back** 14:23 15:19 22:9
25:18 32:4 34:4 55:18
58:23 60:13 68:14 79:7
80:20 86:3,9 97:9 101:5
112:3,4 118:19 119:4
123:9 125:2,14 128:3
133:9 135:9 136:6 137:18
138:13 145:16 146:15,24
151:22 152:8,18 155:4,12,
13 157:10 162:15 163:5,6,
24 183:4

**background** 170:24

**bad** 178:19

**ballpark** 105:1 145:10

**Bar** 61:21 63:7 64:25 65:7
114:7,13 132:8 140:21

**Baron** 7:2,10,11 10:4
11:17,21 14:1 21:11 22:4,
19 23:4,20 24:5,15 25:1,5
31:10,11,15 32:9 33:4,8,21
60:14,16 63:4 64:11 98:2
106:25 109:11,13,17
120:23 127:25 128:9
134:1,7 137:5 139:11
140:23 141:5,20 148:21
152:23 156:3,16,20,24
158:12,17 161:12,18,23,25
162:11,14,16,24 164:16
165:21 166:1

**base** 19:1,6 80:16 134:23

**based** 26:14 52:6 83:8
85:20 100:24 109:20 135:6
144:3,15 145:15 147:14,15
148:18

**basically** 117:14 146:20
170:1 178:22

**basis** 27:5 30:8 71:3
125:11

**beaten** 165:6

**began** 18:8 20:15 48:15

**begin** 11:18 17:13,25
87:20

**beginning** 42:4 47:25 76:2

**behalf** 7:3,12 10:3 25:23
114:17 115:2 143:5
165:23,25 169:19

**believed** 34:24 38:3 44:19,
24 46:21 54:5 65:6,12
73:13,14 103:4 125:15
132:20 146:18

**believes** 47:9 84:2,18
86:16

**believing** 144:8

**big** 63:20

**bill** 47:8 126:24 127:2

**billing** 29:4,12 55:6 59:9
61:19 63:1,3,11 80:11,23
89:6,18,21 90:17 132:7
133:4,17 134:8,9,16
136:16,22 139:25 140:12,
19 157:4,5,7

**billings** 47:18 61:16

**bind,'** 28:21

**bit** 77:1 128:2 164:2 166:5
172:14

**blank** 179:3,12

**block** 48:6

**blue** 177:9

**board** 104:25

**bono** 87:10 88:13,18,25

**bottom** 39:7 44:3 51:10
78:6 86:7

**Bouwhuis** 25:11 65:16
113:15 114:3,16,20,22
115:1,11

**branch** 130:21,22

**branches** 130:20

**break** 15:17 52:15 68:1
71:6 81:5 96:8 102:2
113:23 114:2 125:22
130:23 185:9

**breakdown** 117:16

**breaks** 117:19

**breath** 14:16

**brevity** 129:4

**briefing** 123:20

**briefly** 128:7

**briefs** 121:10,12

**bring** 15:14,16 117:13
137:15 155:12,13

**brought** 16:1,4,12 21:1
54:17 64:8 91:19 100:17
101:1,8 119:1

**Bryan** 7:2,10 10:4 11:17,
21 21:11 22:4,19 23:4,20
24:5 31:15 32:9 33:4,8,21
60:14,16 63:4 64:11 98:2
106:25 109:11,13 120:23
127:25 128:9 134:1,7
139:11 140:23 141:5,20
152:23 156:3,16,20 157:25
158:12 161:18 162:11,14,
16 164:16 165:21 166:1

**BS** 160:23

**Buchi** 173:25

**built** 82:20

**bullet** 55:2

---

**C**

**calculated** 104:9

**call** 24:20 55:2,9 58:25
59:3,5,6,13 61:6 105:14
143:23 144:1 145:18
158:23

**called** 7:3 55:5 59:15 60:6
86:23

**calling** 59:8 171:21

**calls** 133:5 146:1 162:7

**cap** 43:22 75:6,11,12
78:15,17 82:10 88:6 117:1
122:3 171:3,4,9

**capacity** 165:22

**capital** 59:20 80:13
102:12,16 103:4,8,17,25
105:5,20,22 106:3 107:19
108:2,5 109:4 110:13,24
111:5,13,18 113:8 139:19
140:5 159:2 165:14
172:13,21

**care** 97:23

**Carla** 179:21 180:6

**carrier** 114:11

**case** 16:24 18:22,23 19:4
23:1,18 33:1 47:2,9 57:24
58:16 69:2 70:18 74:4,24
80:18 81:22 83:20,21 84:4
88:4 89:25 96:17 101:22
105:18,22 106:5 110:14,25
111:14,19 112:7,9,20,25
113:2,4,8 114:21,22,23
116:24 117:19 118:15
119:10 122:23 130:9 132:1
133:8 134:19 135:2 143:18
152:9,13 158:25 161:8
162:2,18 163:8,14 164:18,
24 165:7 166:25 170:11
171:2,13,19 174:25 175:14
178:20 179:4,24 182:12,23
183:17 184:12

**case-by-case** 71:3

**case-specific** 112:18

**caseload** 102:12 111:4

**cases** 20:10,12,15,20
22:11 59:19,20 62:3,5,7,
10,13 80:12,13 97:8,18
102:12,16 103:4,6,8,17
104:6 105:5,20 106:3,5
108:2,5 109:4 111:5
112:13 118:16 134:25
135:5,18 139:19 140:5
159:3 160:25 161:1,2
163:1,21 165:12,14 172:21
173:9,12 174:25 175:2,11,
20 176:12,20 180:23

**catch-22** 46:14

---

**caused** 69:3

**cc'd** 141:25 142:2 166:19

**chain** 173:24

**chair** 131:11

**chance** 12:23 14:10 95:3

**change** 29:4 80:23 140:13
156:12

**changed** 55:21 56:3 80:11
102:14 139:22 140:2,11

**changing** 29:11

**characterized** 17:9

**characterizing** 45:21

**charged** 103:24 116:13
164:25

**check** 15:24 85:12 117:16
118:24 119:19 120:4,12,17
124:17 125:7,19 127:10
179:12 180:14

**checkbook** 179:4

**checks** 122:14

**chief** 12:11 22:20

**Chinese** 182:21

**choice** 48:25 171:13,18

**choose** 30:1

**choosing** 17:17 168:9

**chose** 54:6

**Chris** 8:20 10:24,25 11:2
14:9 22:8,14 57:15 110:17
128:12,13,19 129:2,13,24
130:10 132:2 133:14
137:6,24 151:20 152:10
154:25 160:2 166:18
174:1,2,4 177:15 178:15

**Christopher** 13:3 164:17

**circle** 124:16

**circumstance** 56:3

**circumstances** 14:24
55:20 65:5 152:20

**cited** 46:3 56:7

**civil** 12:7,11,14 22:20 28:8
57:17 62:2,4,13 65:1,10
143:8 145:5 152:14

**claim** 47:5 79:22 93:10
115:2

**claim.'** 174:16

**claimed** 176:19,25

**claiming** 84:23 92:13

**claims** 48:23 77:13 92:1

**clarification** 48:13 90:8

**clarify** 75:4 91:17

**clash** 39:9

**clause** 46:19

---

**clean** 125:22

**cleaner** 68:16 92:22
117:23

**clear** 10:3 34:18 45:19
161:21 162:15 166:6

**clearing** 127:17

**clerk/auditor** 109:9

**clerk/auditor's** 109:4
179:21

**client** 28:23 55:12,14 57:9
59:23,25 61:12

**Coebergh** 19:4,8 20:3
113:20 115:23 116:1,14,
16,21 117:8,11 169:20
170:22 171:1,7 179:22,25

**Colleen** 19:4,8 113:20
115:23 170:22 179:22

**colon** 48:8

**color** 177:8

**column** 119:17,21

**columns** 101:25 119:17

**combines** 121:9

**comment** 16:11

**comments** 69:15 177:22

**commission** 9:1,9 73:11
107:14,25 108:6,11
130:18,19 131:9,11,15
170:15,23

**commissioner** 9:24 10:24
12:1 22:9,14 23:9,12 25:9,
12,15 30:12,15,22 31:1,4,
7,11 57:16 128:18,20
129:1,3,14,15,20 130:4,9,
15,25 131:4,13 132:2,3
133:13 137:16 138:1,2,3,9,
12,14,17,20,24 139:3,12,
16 140:3,7,14,19 141:2,4
143:6,12 145:4 149:24
152:4,6,7,13 155:16,18,21
168:7,18,23 169:1 170:10,
14,16,19

**commissioners** 9:13,21,
25 10:8,11,16 11:4 66:5
67:4,11,19 72:25 73:2
103:4,9,16 142:10 143:9,
13 170:23 171:8

**commissioners'** 10:1

**committed** 78:25

**common** 180:8,10

**communicate** 11:3 55:12
56:11 59:25 61:12 133:7

**communicated** 59:11
174:10,15,16,20,24 183:24

**communicating** 61:8

**communication** 24:15
46:1 55:1,8,14 61:9 114:19
154:3 182:5

**communications** 18:10
38:3 47:10 49:15 50:2
60:14,17,19 77:9 78:1
86:17 100:10 182:10

**community** 69:8

**community's** 69:16

**compared** 22:19 81:19

**compel** 46:15

**compensable** 62:14

**compensated** 65:17 66:1,
7 69:10 102:15

**compensation** 103:23
148:16,18

**compiled** 112:1,2

**complaint** 96:3 180:8,10

**complaints** 26:2,6 96:2

**complete** 86:4,10 124:16
143:21 168:20

**completed** 56:10

**completely** 63:21 161:8

**component** 116:3

**comprises** 88:14

**compromises** 87:11
88:15

**comptroller** 120:9

**computer** 85:3 101:15
109:6 112:23 119:23

**concern** 57:14 61:9 63:9,
10 69:16 70:8 90:14,16
131:23 134:15 159:20
163:6 171:24 175:5,16,19
176:19,25

**concerned** 47:18 70:3
107:1

**concerns** 55:6,7 57:14
59:9 69:9 80:2 89:6,18,20
91:15 132:6 136:12 140:18

**concise** 128:22

**conclude** 109:13 145:5

**concluded** 185:17

**conclusion** 147:23

**conduct** 49:19 82:17
147:3

**conducted** 82:12

**confessed** 21:16 110:21
160:14

**confident** 105:1 149:9

**confidential** 182:14

**configurations** 133:12

**confirm** 119:3

**conflict** 20:11 21:1 22:5,10
35:21 71:19,25 97:7,11,20,
22,23,24 98:3,4,6,13,14,16
99:14,20 100:2 180:23

181:21 184:11 185:5

**conflicted** 20:20 70:18
96:18 97:14

**conflicts** 184:23

**confusing** 119:21

**connected** 122:22

**connection** 10:17 63:6,
11,24 67:2 74:4,23 75:14
107:6 108:9 115:3 117:4,7
119:9 152:24 162:1,25

**cons** 168:8,22,24

**consensus** 59:17 130:8
133:15 137:7,12 139:17,23
153:13,15 154:17

**consideration** 43:13

**considered** 43:21 73:15
76:21 107:6 139:8

**consistent** 86:18 104:13

**constituted** 75:15 155:9

**constitution** 51:25 92:14

**constitutionality** 135:20,
24

**constitutionally** 28:23
83:22 84:4

**consult** 129:19 137:23

**consulted** 129:18

**contact** 18:2 22:13 23:4

**contacted** 22:8 97:2
102:23 125:10 128:18

**contained** 44:9

**contemplated** 88:5

**contemplating** 69:13

**contend** 39:17 75:23
76:14 77:24 90:19

**contends** 39:15 42:1 49:7
92:8

**content** 18:17 25:13 81:8
154:1

**contents** 8:4

**context** 79:15 82:22 107:4
108:22

**continue** 13:16 16:22
87:10 88:13 166:2

**continued** 16:18 21:19
33:19 49:17 70:7 116:5

**contract** 8:22,24 9:2,6,8,9,
18,22 10:9 14:17,20 16:3,
10,20,21,25 17:1,3,4,5,6,
13 18:7 19:1,3,6,9 21:4,8
22:13,15 23:8,22 24:6,9,
13,25 25:6,10,16 31:2 32:1
41:6 47:11 48:24 49:4,11,
17 50:3,10 51:14,18,21
52:12 59:12,16 60:8,11
63:18 65:15 66:5,12 67:7,
9,20 69:6,8,14,17,22 70:5

75:6 76:7,12 80:1,16 82:8,
13,21 84:1,3,6,20 88:22
89:22 90:23 91:3 95:20,23
97:1,22 100:12 101:19
131:8,10,14 132:18 134:24
135:5,17 139:22 141:7
143:19 145:12 148:22,23
149:1,7,8,9 155:7 159:1
167:21 168:11 169:5,7,12
170:22 172:3 173:13,16
181:18

**contracted** 71:2 102:17

**contracts** 16:23 60:25
70:23 102:10,17 131:5
135:14

**contribute** 108:3

**contributed** 20:23 96:23

**control** 27:9,12 71:14
82:18 138:15 139:6 141:19
168:11,18,20 171:25

**conversation** 20:19 24:1
25:4,8 32:24 168:14
170:20 177:25

**conversations** 50:13,18,
21,25 63:4,5,9 92:6

**convey** 168:25

**conveyed** 124:7,12,15
139:8

**convince** 158:24

**copies** 15:14 100:18
101:23 102:4 177:8 178:11

**copy** 15:15,16,25 85:2
94:5,13,20,24 96:9 100:22
101:4 106:12,15 107:15
118:9,25 174:2 185:20

**Cordova** 179:21 180:6

**correct** 9:6 12:16,19,20
14:21 15:25 18:15 24:6,7
25:24 29:8 35:14 36:5,8
37:19 38:5 41:2,3 42:23
43:3,10 44:21 45:1,2,5
51:25 52:4,24 53:6,9,12,22
54:18 55:16,19 56:1,18
58:7,10,11,14,18,19,21
63:1,21,22 65:11 69:22,24
70:2 72:4,17,18 74:5,16,
19,20,25 76:19 77:5,6
80:25 82:17 90:15,16 91:1,
11 95:7,18 107:2 109:12
112:17,22 114:9 116:19
117:1 118:9,25 121:1,5
123:3,15 124:2 131:9
133:22 134:13,17,21
138:17,21 140:14,15 141:1
146:8,18,21 147:7 148:2,
10,22 150:9 156:3,9
157:16,20 158:15 159:4,5,
8,9,21,22 160:5 162:22
164:9,22,23 166:25 167:7,
15,20 168:1,2 169:15,16,
21,22 171:16 173:20

174:6,7 175:4 176:16
177:10,11 180:19 185:8

**corrected** 16:17 34:16
36:11 55:2 95:12,15 96:9

**correctly** 41:25 56:6 101:3
122:11 156:5

**correspondence** 179:20

**cost** 105:3 111:6,10,13,18,
23,24 131:19 148:24
172:19

**costing** 105:7,23

**costs** 61:25 77:20 98:14
105:7 108:4 109:5,7
110:20 112:15 115:20
121:9 122:21 148:9

**counsel** 13:17 16:10 18:1
20:12,14,16 21:1,20,24,25
22:11,23 26:3,8 38:21 39:1
46:11,13 47:8 48:22 49:14,
19 50:13,24 51:15 59:18
69:1 73:10,16,18 76:5
77:19 78:7,11,13 80:2,12
83:20 84:11 92:5 97:7,18
98:14 99:14 102:14 106:11
113:12,17,19 114:4,23
117:17 126:13 138:4
158:11 165:13 167:19,21
168:10 169:9 175:23
179:16 181:21 182:6,10,
18,25 183:10,13,16 184:1,
11,19

**counsel's** 47:18 49:17
71:18 80:3 184:2

**counties** 108:2,3 109:2

**county** 7:12,20 8:11,17,25
9:9,12,21 10:4,7,9,15,19,
23 11:3,7,12,13,14,21,23
12:1,2,4,5,8,9,12 15:6
16:2,9,16,23 17:2,11 18:12
19:17,21 21:2,15,18 24:22
25:23 26:2,6,17 27:10,12,
23 28:2,19 29:2,10,12,16,
21,23 31:8 32:19 34:17,24
36:4,7,24 38:15,20 39:1,5,
10,13,17,25 40:3,11,16,21,
23,25 41:6 42:1,5,13,18,22
43:1 44:5,10,12,15,19,24
45:7 46:1,7,15,18,21,23,25
47:5,7,12,16,24 48:1 49:3
49:6,10,25 50:4,9,12,17,
20,22 51:11,20,24 52:2,7,
11,16,22,23 53:2,5,10,16,
20 54:5,9,11,14,16,20,25
55:5,11,18,22 56:5,20
57:18,20 58:2,5,17 59:22
60:1 61:5 62:11,23 63:13,
14,19,23 64:4,21 65:6,16,
20,22 66:1,5,11,17,21
67:10,18,20 68:5,23,25
69:5,11 70:12 71:3,14,15
72:2,16,20 73:18,21,24
74:1,3 75:9,13,19,23 76:4,
10,14,16 77:7,13,18,24

78:6,10,13,20,23,25 79:22,
25 80:10,15,17,22 81:8,17,
23 82:15 83:5,12 84:2,5,18
86:2,9,13,16 87:9 88:12
89:5,17,24 90:3,7,13,19
91:2 92:1,5,8,12 93:10
95:3,6,15,17 96:1,24 97:17
98:18 99:10,15 100:5
101:9 102:7,10,16,22
103:3,8,13,15 104:3,6
105:2,5,16 106:12,21,25
107:1,16 108:8,20,23
109:3,23 110:8,10,12,23
111:11,16 112:18,19 113:6
114:10,15,17 115:1,5
118:14 122:3,5 123:12,24
124:1,4,7,11,25 126:8
128:7 129:8,12 130:17,19,
20,23,25 131:23 132:7,9,
20,23 133:13,18 134:10,21
135:19,23 136:16 138:15
139:6,17,25 140:8,19,21
141:9,19 142:10,13 143:9
146:8,10 148:1,8 149:17
150:8,11 152:7 154:1,2,4
155:15 157:9,12 160:11
161:7 163:7,13,18,25
164:21 165:9,11,23 168:9,
15,18 169:4 170:22 171:14
172:3,7,8,11,12,20 173:8
175:2 176:24 177:22
178:21 179:2 180:11,15
182:17 183:24

county's 21:22 22:22
24:11 26:23 34:11 35:5
37:6 57:5,7 59:8 63:10
65:1,10 68:3,22,24 77:9
78:1 79:3,17 80:8 84:11
86:24 87:1,4 95:12 97:22
99:5 103:18 107:20,21
112:12 115:2 126:20,25
131:12 132:11 136:11
140:4 142:24 146:7 178:9

couple 13:19 16:13 61:18
100:15 113:23

court 16:16 18:23 26:2,7,8,
22 31:3 34:10,12,23 35:6
37:25 41:20 53:9,18 56:14,
16,22 57:1 67:6,10,15,17,
21 68:21 71:19 80:15
82:25 83:4 88:19 89:22,23
94:22 95:19 114:13 144:7
164:8 165:7 167:24,25
168:4,14,19,24 169:1,8,10,
13,24 171:15,25 174:14,16

Court's 126:12

Courtlan 10:25 11:2 13:3
14:9

courts 173:25

cover 45:17 102:11 103:22
125:20 140:2 142:21
148:13

covered 43:21 82:7

covers 104:1 108:1

create 101:16

created 15:6,11 51:12
97:20,25 98:3,16 99:21
105:17 185:6

creation 98:12

crime 103:25

criminal-type 62:10

criteria 109:6

Crockett 10:25 11:2 12:10
13:3 14:9

cuff 105:11

culmination 124:22

_____

D

date 10:13 27:19 42:22
74:2 94:19,20,23 115:24
119:17,19,21,22,23,25
120:12,16 127:8 129:21
169:6,17

dated 118:20 120:4 124:17
125:7 170:12

dates 18:14 20:1

daughter 165:5

Dave 10:24 16:8,12 20:25
21:11 22:4,10,17,18 24:8
31:15 32:9,21 33:1,5,8
57:14 60:14,16 98:1,8
102:20 107:10 110:17
128:13 129:2,13,24 132:2
133:14 137:7,24 151:20
152:10 155:25 156:8
157:24 160:2 166:20
174:3,4 177:15 178:15

day 160:2 170:7 180:14

days 18:24 167:22

dead 165:6

deadline 18:22 167:18
169:13,24

deal 144:22 163:14

dealing 62:2

death 57:9 64:12 135:24
162:2 164:14 165:10,11

debatable 54:7

debated 24:25

December 107:11 127:10

decided 16:19 17:12 19:7,
18 83:5 96:25 103:3 154:6
172:11

decision 9:17,20 10:2
31:5,20 66:20 104:24
131:6 138:4 155:1 174:8

decision-making 130:13,
17 155:9

decisions 21:20 131:1
141:6

declined 97:4

dedication 26:20 34:8
68:20

defendant 26:3 98:10
160:8 167:6,9

defendant/client 26:9

defendants 13:17,18
20:18 22:24 25:23 70:19
96:18 97:12,16 98:7,20,24
100:4,7 103:23,24 181:6,
12,16 182:1 184:9,15

defender 131:5 139:21

defender's 180:7

defenders 18:2,6 102:11
173:7,16 180:12

defending 110:21 111:18
114:8

defense 21:20,24,25 60:24
62:8 64:20,24 69:8,15
71:4,18 98:9 102:8,14,23
103:10,11,17,25 104:1
105:4,9,20 106:1 107:13,
15,22,24,25 108:5,7,9,11
110:13 113:8,12,17,19
130:2 135:1,14 164:22
172:1,9,19 178:20 181:3
182:6,9,18,25 183:10,13,
15 184:1,2

defenses 164:14

deficient 114:14

defining 154:19

definitive 147:21

degree 157:3

delegate 141:4

delegated 132:3 155:8

demand 180:5

demonstrated 73:12
142:14

denied 76:16,18 125:3,4

dense 132:19

deny 76:5 81:8 130:2

denying 76:10,12,15

department 57:18 131:1

departments 130:24

depends 119:24

depicted 184:23

depo 93:23

deposit 104:5

deposition 7:16,19,20 8:8
12:23 27:9 35:1,8 37:21
41:16 68:11 70:17 71:10,
11,12 78:22 84:9,12 93:4,6
96:14 106:20 108:17

decisions 21:20 131:1

118:23 142:9 151:11
153:21 167:17 172:15
173:19 185:16

deputy 12:7,11,14 22:20
58:2

designate 112:12

designated 7:24

desire 59:6,22 171:25

detail 59:2 141:22

detailed 76:4

detailing 125:12

details 25:7 98:15

determination 66:17
67:16 100:12 142:17,18
155:12

determine 54:21 112:15
175:10 182:24

determined 125:18

detriment 39:12

dictates 60:3

die 164:9

difference 66:3 67:1

differences 119:19

differing 52:3

difficulty 68:25

direct 8:17 84:3 179:5

directed 8:18 161:11,17
162:10,14

direction 172:2,4

directions 94:25

directly 22:21 114:15
151:8 152:10 161:12

director 103:11 107:13

disagreed 65:1

disciplinary 61:22 63:12,
16,24 64:25 66:15 132:21

discipline 65:25 132:8,12
136:24 140:20

disciplined 65:23 114:7

discovery 11:10

discuss 20:25 23:10
155:20 158:18,23

discussed 16:12 31:8,20
48:16 50:6,23 60:19 61:15
88:2,21 92:10 98:4 128:7

discussing 16:3,6 69:6
168:6 183:17

discussion 21:23 30:11,
22 31:6,14 32:13,16,18
33:4,17,18,24 34:2,5 54:9,
14 60:13 129:4 139:20
144:3 154:2 158:14 164:12
181:14

**discussions** 15:5 21:24 31:22,24 32:8 33:7 143:16 160:12 173:15,18

**disdain** 21:14

**dismiss** 35:22,24

**dispense** 102:1

**dispute** 67:22

**District** 41:19 165:7

**diverge** 49:21

**division** 57:18

**doc** 153:25

**docket** 127:10

**document** 27:9,12 37:24 41:8 42:22 51:8 52:4,6 71:13 72:12,13 93:18 94:18 118:10,25 127:20,21 138:15 139:5 141:19 142:9

**documentation** 134:6

**documents** 19:25 35:15 36:19,21 52:14

**dollars** 66:22

**doubled** 145:12

**doubtful** 73:13,14

**Doug** 16:24 63:14 69:2,6 70:10 105:17 110:13,24 111:13,18 112:7 113:8 130:3 133:6 134:19 144:10,23 159:18

**draft** 12:18 13:5,22 128:20 138:10,16,20,25 150:1,3 155:24 156:7 157:11 169:22

**drafted** 8:14 30:10 53:25 54:4 143:5 149:8 150:4 157:25

**drafting** 53:23 57:3 60:4 128:16 143:2 149:9

**drafts** 154:2

**drawn** 123:4

**drew** 123:5

**drop** 98:17

**Dropbox** 28:7

**drops** 178:20

**duly** 7:4

**duties** 22:23 62:1 64:19

—————————————
E
—————————————

**e-mail** 13:2 14:7 24:19,24 29:3,11,15 36:11 37:2,5 47:14,17,22 48:16 50:6,23 51:2 55:5,10 56:9 59:8,14 60:4 61:19 76:25 79:12,15 80:22 81:2 86:22,25 97:6 98:23 99:2 104:18 106:22 107:2,11 109:10 111:21

**e-mailed** 103:10

**e-mailing** 97:9 98:21

**e-mails** 10:22 11:7,9,11 13:23 18:11,15 36:7,9,13, 15,22 38:3 44:19 45:6 77:3 79:4,16 81:9 95:21 100:10 106:23 124:10,14 138:8 141:24 158:9 166:16 177:5,21 178:11 180:22

**earlier** 21:4 26:24 35:1,7 60:21 70:17 96:14 107:23 118:10 119:1 132:25 136:20 150:8 164:20 167:17 172:14 173:19

**earmarked/approved** 123:10

**easily** 111:9 112:2,22

**Ebert** 176:10,14,19

**effect** 96:19 148:22 149:12 159:6

**effective** 51:14

**effort** 53:16 68:8 111:16 145:24

**elaborate** 52:21

**elected** 127:19 128:6,9,11, 25 129:5 153:25

**electronic** 28:7 85:2

**elements** 59:14

**Emily** 69:13 181:11,18

**Emily's** 181:14

**end** 16:14 72:24 73:7 88:10 97:1 137:20 152:23

**ended** 58:21

**entailed** 109:7

**entered** 19:3 119:23,24,25

**entering** 109:5

**entire** 17:18 42:6,14 76:6, 12 78:9,20 80:3 83:21 131:9,11,15 150:4

**entirety** 159:14

**entitled** 51:15

**entity** 163:7,16

**entry** 117:20 123:5

**equal** 148:4

**equaled** 125:13

**equally** 50:14

**Erickson** 10:25 11:2 12:13 13:3 14:9,16

**escalate** 39:12

**essence** 47:7,25 48:15 139:7

**essentially** 86:14 123:10

**estimate** 44:25 104:24 109:5 113:6 147:2,24 150:6,13,18,24 151:4 159:12,14

**estimation** 147:13

**ethical** 51:12

**ethically** 48:25

**Eugene** 161:9

**event** 62:25

**Eventually** 109:10

**evidentiary** 40:2 56:23 58:6 81:24,25 82:16,19 116:7,10,25 122:6,10,12 123:11,12 131:20 142:20 149:3 150:25 159:11

**exact** 55:16 107:12 129:21

**EXAMINATION** 7:6

**examined** 7:4

**Examiner** 110:10 111:12, 17 177:6 178:16

**Examiner's** 178:3,8

**examples** 132:6

**exceed** 66:12 147:20,25 148:2,9,24 149:5 168:21

**exceeded** 75:11

**Excel** 101:16 109:7,20 133:23

**exchange** 24:24 164:3 173:6

**excuse** 87:3

**executive** 130:21,22

**exhausted** 73:10

**exhibit** 7:14,16,19 8:6,8, 10,14,24 9:5 10:17 12:15, 21,23 13:1,5,9,10,15,19,25 14:8,19,23 15:22,24 18:20 19:11,14,20 20:7,23 22:7 25:18 27:2,6,7,9,11 28:11, 15 29:16,19,21 30:4,8,10 32:9 33:5,9 34:4,7,14,19 37:11,12,13,14,21,24 38:7, 9,16,17 39:5 41:5,14,16,23 44:2 52:11 68:2,5,9,14,15, 18 71:8,10,12,14,16,23 72:7 74:2 75:19,23 76:1 77:13 79:20,22 81:12 83:17 84:7,9,11,13 87:6 89:2 91:17 93:2,4,6,10,15, 20 106:18,20,21 107:4,6,

21 108:15,17,20,22 110:1, 2,8 113:25 118:7,8,12,21, 23 119:15 126:1,2,6,9,18, 19 127:23,24 128:5 131:18 134:3 136:7 138:5,6 141:10 142:7,9,14,22,23, 24 143:2,13 149:16,18,20, 21,23,25 150:1,14,21,22, 23 151:8,10,12,16,17,19 155:22,23 157:21,22 158:6,7 159:23,24 162:4, 21 163:3,23,25 166:11,12, 15 170:8,9 173:4,5,21,22 177:2,3,12,13 178:12,13 179:18,19 180:20,21 181:22,23 184:23,24

**exhibits** 27:18 28:10 30:8 36:8 95:21 125:23 141:18 166:3

**existed** 135:13

**existing** 39:18,21,23,25 40:8,19,20

**expects** 77:18

**expedite** 85:13

**expenditures** 39:11

**expense** 58:6 160:25 163:21

**expenses** 38:12 93:8 94:15,16 105:17 113:11, 12,16,18,19,20 118:15 121:11,13,19 126:4

**expensive** 172:11

**experience** 64:11 144:16, 18,20 145:5 147:14 174:20

**experiencing** 163:17,18

**expert** 104:1 106:8 111:7 112:6,24 115:14 117:17 182:22

**experts** 111:24 112:8,17 113:16 115:7,8 116:17 117:20

**explain** 36:16,20 55:10 59:10,14 130:16

**explaining** 44:19 168:7

**explanation** 55:16 56:1,4 59:24 181:25

**explanations** 44:23

**expose** 160:24 163:20

**expressed** 21:13 64:24 131:22 175:5

**expressly-stated** 21:25

**extend** 165:23

**extra** 15:14,16 111:4

—————————————
F
—————————————

**face-to-face** 153:2

**faced** 103:2

**faces** 83:20

**fact** 21:14 39:18,22,23,25 40:8,19,20 42:18 43:9 44:1 51:9 58:14 65:23 76:10,11 114:12 126:8 136:13 148:1 159:6,20 161:5 162:12 164:17 167:16 184:18

**facts** 174:10,24 175:6

**factual** 42:12 44:8 46:10 47:4 49:2,22 50:8,15 51:16 76:8 80:7 82:4 84:18 90:3, 19 92:1,8 93:11 94:10 144:17

**fair** 139:4 146:6 161:19 172:1

**fairly** 55:25 105:1 113:9 149:9 152:6

**fall** 132:17 146:15

**fallen** 65:14 78:15

**false** 46:22

**familiar** 11:20 84:21 107:1 108:20 110:8 163:25

**family** 30:2

**fearful** 87:9 88:13

**fee** 62:2,13 126:23

**feedback** 13:23 14:12,13 155:25 156:11 157:11,13

**feel** 48:19 72:11 89:24 98:12 99:13,18

**feeling** 90:21

**feelings** 21:2 90:5

**fees** 35:13 36:24 38:12 39:9 52:18,23 61:25 62:7,9 63:3 82:23 93:7 94:15,16 95:10 106:8,9 115:15,16, 25 116:17 121:20 122:4,11 126:4 133:1 136:16,17 168:15

**fell** 45:18 135:5

**felt** 14:16 63:15 78:20 99:15 102:14 103:16 156:13,25 157:8 172:21 178:5,25 179:1

**Field** 166:17

**figure** 94:7 135:3 150:7 163:13

**figures** 109:14,18 110:11 111:12,17 115:6 147:12

**file** 28:4,7 53:2 54:5,10,13, 21 94:17 169:13 170:5

**filed** 36:23,24 37:1,25 38:13 41:19 52:18 53:18, 24 54:1,16 71:19 72:4 73:25 94:22 95:2,11 127:9, 11 157:19 169:19,23 170:1,2 185:19

**filing** 136:17

**final** 12:15 13:14 46:6 77:16,17 130:13,16 138:21 141:5 155:8,19

**finalized** 169:7

**finally** 16:14 19:3

**finances** 48:23

**find** 13:22 18:21 20:13 22:10 25:2 29:5,12 53:16 84:23 85:10,22,24 87:13 97:7,18 105:13 125:23 138:23 172:2

**finding** 18:25 94:12 135:6

**fine** 62:13

**finish** 68:13 143:10 158:23

**finished** 34:20

**flat** 43:1 77:3 140:8 148:16

**flow** 17:20

**Floyd** 161:9

**focus** 18:24

**footnote** 73:6,9 77:21 78:5

**force** 158:22

**forced** 88:17

**forgive** 86:21

**forgotten** 19:6 21:5 97:5

**form** 93:16

**formal** 105:10

**formed** 30:8

**forward** 23:11 77:19 87:3 130:12 183:12

**forwarded** 151:19 158:12 159:25 166:20 170:21 174:2 182:1,5,18

**forwarding** 182:9

**found** 86:7 114:13 126:9 127:5 165:6 169:11 173:10

**fourth** 39:6 83:19

**frame** 31:21 32:12

**frankly** 171:22

**free** 48:20 72:11

**frequency** 90:14

**frequent** 55:7 133:5

**frequently** 56:8,12 59:11, 25 61:3,7,12 89:7,19 90:7, 9,11,13 133:7 180:13

**fresh** 14:17

**Friday** 29:25 34:20

**front** 37:5 81:2 103:1,13,20 104:12 124:14 156:15

**frustrated** 16:17 19:18 33:19 178:24 180:13,14

**frustrating** 97:19

**frustration** 157:3 179:2

**fulfill** 179:15

**fulfills** 130:20

**full** 38:18 48:11,21 49:12, 16 51:11 72:23 74:10 76:3 79:25 83:19 86:8 87:25 126:11 152:2

**functional** 91:16

**fund** 39:13 40:12,22,23 86:14 102:8,23,24 103:10, 11 104:1 105:4,6,9,21 106:1 107:23,24 108:1 164:22 172:10,19

**funding** 38:21 39:2 43:23 45:23 47:1 49:16 51:12 60:25 61:1 62:9 66:10 67:13 73:11 75:8 76:6,11, 15,16,19 77:4,21 88:25 126:14 128:8 129:10 130:1,2 134:5 135:6,15,17 136:10,19 137:3,9 142:15, 19 155:7 159:10 164:14 172:1 182:22,23 183:1,7, 10,17,25

**funds** 16:7 40:4 43:2,5,13 73:3,10 76:24 124:24 148:19 179:6,9

**funds.'** 178:21

**future** 29:5,13 39:20 40:10 59:19 80:2,12 121:3 133:17,18 134:8,9,10 136:24 139:18,25 140:1,2, 5,12 159:2

---

**G**

**Gage** 20:13 97:6 98:5,8,21 182:1 184:4,7,14 185:1

**gave** 118:10 119:1,4

**general** 30:20,23 33:23 45:22,25 102:13 108:7 130:7 144:15,18,20 145:4 147:14 159:7

**general's** 58:1,2 166:18, 24

**generally** 30:19 32:23 33:3,16 35:11 37:4 112:11 116:20 154:13,15

**generically** 93:25

**gist** 25:4 85:23 154:13 183:14

**give** 10:13 15:15 17:17 25:4 85:9,23 93:13 94:25 107:17 112:18 127:21 136:8 137:13 144:25 150:18 156:11 178:21

**glitch** 91:14

**good** 56:4 61:11 66:6,12, 18 67:4,10 73:12 75:7,16

76:23 78:16 94:25 124:4,6 127:5 128:16 135:7,12 142:14,19 155:6,10,16

**government** 130:21

**governmental** 163:16

**grab** 101:23

**GRAMA** 105:19,24 106:16

**grant** 107:15 129:10,25 130:2

**granted** 57:2 149:2 167:14

**granting** 47:1

**grants** 108:6,8,10,14

**Gravis** 165:18

**great** 144:22

**greater** 39:12

**Greedy** 178:20

**grounds** 99:12,17

**group** 131:22,25 132:1 133:9 137:13

**guarantee** 51:12

**guess** 20:22 34:18 44:2 83:18 112:20 116:7 119:16 122:18 124:16 125:6 140:22

**guessing** 15:19

**guide** 85:1 183:21

**guy** 172:24

**gypsies** 164:24 165:3,4

---

**H**

**Hahaha** 180:6

**hand** 168:19

**handed** 8:7 27:8,11 71:9 101:10

**handle** 16:24 17:1,6 22:11 60:24 97:18 111:4 131:6 152:1,11 171:2,13,18

**handled** 57:25 134:20,22, 23 173:9,13 175:6

**handling** 81:25 82:16 163:16

**happen** 39:20 86:13 117:10

**happened** 17:23 18:5,19 22:6 98:22 113:13,14 116:6

**happy** 10:12 15:15 131:18

**hard** 26:20 34:7 68:19 144:8 172:18

**harmful** 26:22 34:10 68:22,24

**Harvey** 8:20,21 9:24 10:24 11:24 22:9,14 23:5,9,12,21

24:12,16 25:1,5,9,12,15
30:12,15,22 31:1,4,7,11
57:16 128:18,20 129:1,3,
14,15,20 130:4,9,15 131:4
132:2,3 133:13 137:16,21,
23 138:1,2,3,9,12,14,17,
20,24 139:3,12,16 140:3,7,
14,19 141:2,4 143:6,12
145:4,23 149:24 152:4,6,
13 155:18,21 168:7,18,23
169:1 170:16

**Harvey's** 11:25 146:2,4

**Hatch** 109:8,9,17,18

**Hatch's** 109:22

**heading** 45:22,25 49:10
54:25

**health** 48:24

**hear** 20:21 135:8

**heard** 69:14 99:9

**hearing** 16:15 17:10 35:3
40:2 56:17,23 58:6,7 77:19
81:24,25 82:16,19 116:7,
10,25 122:6,10,12 123:11,
13,14 142:20,21 147:5
149:3 159:11,15 167:12

**hearings** 131:20 147:4,10
150:25

**heart** 96:3

**heavily** 152:7

**helpful** 38:22 143:23
145:3,19 147:17 155:2
163:15

**helping** 11:17

**hesitation** 69:7

**Hey** 170:2

**hierarchy** 22:19

**high** 157:3

**higher** 169:2

**highlighted** 94:5

**highly** 143:22,25 145:1,17,
23 146:11

**hire** 158:20 167:5,9 181:13

**hired** 19:8 63:13

**hiring** 98:14

**hit** 88:6

**Hold** 37:8

**honestly** 163:22

**hope** 101:2 165:24 166:10

**hopeful** 178:7

**hoping** 178:2

**hour** 44:5 45:3 82:10
117:23 120:18 148:4 171:2

**hourly** 127:2

**hours** 44:4,25 45:3,9 66:13
73:1 143:21 146:15,16

147:3,10,11,19,24,25
149:3,14 150:6,13,15,17,
23 151:2,5

**hours'** 144:24

**huge** 93:16

**hypothetical** 65:4


I

**ID** 153:25

**identified** 68:4

**identify** 13:1 28:14 31:10
33:25 38:9,14 41:4,17 42:3
71:15 72:19 126:7 127:24
138:7 149:22 152:20
155:23 158:8 166:15 173:5
177:3 179:19

**identifying** 41:1

**ignore** 84:12

**immediately** 29:1

**imminently** 39:12

**impacted** 148:14

**implicated** 92:13

**important** 65:7 160:19

**impressed** 171:23

**in-person** 24:16,20 32:16

**inadequate** 42:8

**inadvertent** 74:21 119:8
120:1,3,12,24 122:2

**inadvertently** 74:15

**inclined** 129:10,25

**include** 13:5 62:1 93:18
113:11 115:8 132:6 149:4

**included** 22:23 63:17
64:20 66:15,24 93:16
106:7,8,10 113:16 123:17
125:13 137:2 143:16
149:1,10,11,13 155:18

**includes** 81:18 83:10
156:1,2

**including** 8:3 23:1 31:3
41:1 73:6 116:3 154:1

**inclusion** 61:20,23

**inclusive** 115:14

**incorporated** 123:14,21

**incorrect** 40:9 109:15,18

**incorrectly** 39:19

**incredibly** 171:23

**incurred** 113:21 122:21

**independent** 184:20

**indicating** 47:17 49:17
97:7 138:12 146:18 149:13
151:21 158:10

**indication** 79:6 165:8

**indigent** 13:17,18 16:10
22:24 25:23 26:3,9 60:24
62:8 64:20 71:3 102:8,22,
23 103:10,11,24,25 105:4,
9,20 106:1 107:13,15,22,
24,25 108:5,7,9,11 135:1,
13 164:22 172:9,19

**individual** 153:12 165:21

**individuals** 10:23

**ineffective** 63:21

**inform** 110:20

**informal** 84:14 91:9
182:20 183:19

**information** 10:13 99:13,
16 102:20 107:14 109:3
111:22 112:18,20 123:13,
21 143:24 144:2,7,12,17
145:3,7,19 147:17 150:12
164:17 173:14 177:23
178:8 182:3 185:2,5

**informed** 9:24 50:1 69:5
74:17 184:10

**informing** 70:6

**infra** 76:4

**initial** 43:20,22 61:2 79:11
95:8 113:13 123:19 124:5
145:11 147:11 150:25
174:5

**initially** 57:15 64:7 70:3
72:4 97:2 102:10 107:10
148:13 171:1 173:25
184:10

**injecting** 170:19

**inquire** 35:21 71:18,24

**inquiring** 55:13

**inquiry** 109:24 110:16
181:5

**insist** 49:16

**insistent** 179:25 180:2

**instance** 174:9

**instructed** 17:13,25 23:4,
10

**insurance** 108:3

**intend** 40:15 73:16

**intended** 147:21 148:13

**intends** 80:15 126:8

**intent** 29:15 43:23 59:8
66:11 134:6

**intention** 9:5

**interest** 71:19 156:17

**interested** 18:9

**interesting** 25:20

**interests** 39:9 46:14 49:20

**interfere** 92:23

**interfered** 76:5

**internal** 108:23

**interpret** 50:23 79:17
101:25

**interpretation** 48:1,3,15
50:5 77:9,25 83:5 92:13

**interpretations** 52:4,5

**interpreted** 79:5

**interpreting** 48:6

**interview** 28:22 126:14

**interviewed** 56:18 126:22

**interviewing** 127:1
171:20

**introduced** 84:10

**introductory** 46:19

**investigate** 98:19 99:16
162:1

**investigation** 82:1,11,17,
20 99:19 107:21 175:9
176:18,24 184:20

**investigative** 81:18,20
82:7,9 83:4,6,11,13 94:2
95:22 96:2 106:9 113:18,
20 115:15,19,20 126:15,
22,24

**investigator** 82:24 83:7,
10 95:24 126:15

**investigators** 104:2 111:7
117:18

**invoice** 74:9,10,11,14
75:2,9 112:14 117:11
118:19,20 119:22,23
121:13,16 122:19,20,24
124:19 125:6,20 136:11,
13,18,21,25

**invoiced** 73:24 75:9

**invoices** 57:12,13 60:24
61:1,7 74:6 80:24 100:18
101:2,4,7,11,12 112:8,19
116:14 118:13 124:22
125:2,12,15,18 131:22
133:17,20,21 134:1,2,4,10
139:25 140:12 163:17

**invoicing** 64:4

**involuntary** 87:10 88:13

**involved** 11:17 58:14,15
155:16 176:10

**involvement** 10:1,8,15

**involving** 132:22 164:13,
24

**irrelevant** 63:25 64:2

**issuance** 174:5

**issue** 19:9,10 21:1,6,11
22:5 33:1 39:11 57:8
66:19,21 96:5 97:4 98:17

100:10 103:7 160:19
**issued** 56:14 122:14
**issues** 21:8 23:18 61:18
152:8 164:13 182:8
**item** 8:1 10:20 11:5,8,25
100:23 102:5 110:6 113:10
127:15,18 140:17
**itemize** 68:9
**items** 7:23,25 122:24
134:16
**iteration** 12:15

___

**J**

**James** 11:24 165:17
**January** 67:12 73:24 74:7,
9,11 75:1 101:6 116:5
119:11,13 173:9
**Jason** 165:18
**Jean** 180:6
**jeopardize** 89:21,25
**jeopardized** 90:23
**jeopardizing** 48:23
**jeopardy** 49:5
**Jeremy** 172:24
**Jessica** 177:19
**Jim** 8:20,21 23:21 129:14
133:13 144:19
**JN** 89:9
**Joanna** 107:11
**job** 70:2,14 180:7
**Joe** 144:19
**John** 103:12
**join** 70:10 172:12
**joined** 183:23
**judges** 176:5,6
**judgment** 60:3 64:6
**July** 28:12 32:7 159:25
164:6
**June** 16:5 26:18 43:17
45:7 56:13 58:25 60:10,22
62:11,22 63:6 64:10 71:21
78:10 79:5 128:1 142:11
151:13,14 156:2,6 158:4,
10
**justifiable** 172:22
**justified** 40:5 44:17 124:6

___

**K**

**Kelly** 115:19 117:3
**kicked** 104:16

**killed** 160:16
**killing** 160:8
**Kim** 125:17
**kind** 15:4 21:6 24:18 67:16
79:7 98:16 105:10,11
108:3 110:7 112:5 122:17
128:21 137:10 144:6
161:20 182:23
**knew** 51:24 52:2,7 123:12,
24 144:8,9,13,24
**knowledge** 21:22 22:22
26:11,14 62:17 99:20
136:4 173:3
**Kristin** 41:9 91:8 92:20
93:14 141:16

___

**L**

**labeled** 149:25
**lack** 126:14
**lacking** 81:19
**Lake** 27:4 160:1 162:6
177:16 178:5
**Landau** 107:11
**language** 13:6,9 79:14
124:9 149:5,7,10,11,13
159:6 176:2,7
**large** 103:3
**largely** 97:4
**laugh** 160:9
**launch** 175:9 184:19
**Law** 8:11
**lawyer** 64:24 81:16 168:5
171:15 174:21 178:20
**lawyers** 145:5 167:5 176:1
**LDA** 97:2
**lead** 114:22 160:12
**learn** 183:13
**learned** 183:25
**leave** 40:15 53:2 181:4
**leaving** 46:18
**led** 17:17 22:6 96:18
100:13
**Lee** 125:17
**left** 22:3 40:14 45:13 48:20
89:11 125:22 131:17
**legal** 18:2,6 152:9 173:7,15
**legislative** 130:22
**lengthy** 55:25
**lesser** 152:2
**letter** 8:2,10,17 12:16
14:12,23,25 15:5 20:3 24:4
25:10,13,21 29:17 34:13
96:16 143:15 159:4

**letter's** 8:3
**letters** 133:5
**letting** 161:20 168:3,4,24
171:15
**level** 105:18,19 113:12
115:10
**liability** 114:11
**light** 136:11
**lightly** 28:24
**Lightning** 175:21
**limit** 46:1 49:15 50:1,13,18,
21,24 54:25 55:11 59:22
92:6 159:17
**limited** 62:8 90:9 122:9
140:4 159:10 160:15
174:22
**lined** 167:19
**link** 112:13 159:25 177:15
**list** 34:18,23,25 72:13
92:24 117:13,14
**listed** 47:19 126:13
**listing** 112:21
**literally** 146:21
**litigating** 61:24 83:21 84:3
**litigation** 38:12 61:25
75:10 93:8 94:15 105:17
106:23 121:10,13,19 126:4
178:7
**livelihood** 83:3 83:21 90:1
**livelihood?'** 28:25
**log** 112:20
**long** 25:19 26:16 52:5 79:8
81:6 93:16 147:8
**longer** 48:25 56:4,11 76:24
**looked** 26:13 57:13 72:12
102:22 104:19 105:5 107:5
109:20 162:21 173:10
**lose** 28:24 51:13,18 84:2
**loss** 36:24 53:20
**lost** 51:14
**lot** 19:25 125:24 127:16
156:13 179:1
**Lovell** 16:24 18:22,23,25
19:4 23:1,18 39:10,13,14
42:10 46:1,16 49:1,14,15,
20 50:2,13,18,21,25 51:13,
14,19 55:1,8,23 56:8,11,21
57:1,5,6,23 59:1 60:15,17
61:8 63:14 65:8,15 69:2,6
74:4,24 75:10 76:7,13
80:5,18 87:11 88:14,18
89:7,19,25 90:7,9,10,11,
15,24 92:6 101:22 110:13,
24 111:13,18 112:7 113:8
114:8,21,22,23 115:4,12,
22 116:2 117:18 118:15

**letter's** 8:3

119:10 121:10,13,19
122:23 123:2 130:3
132:11,16 133:6 134:19
140:24 143:18 144:6,10,
14,23 152:13 158:21
159:18 160:13 163:2,14
166:25 170:11 172:23
174:24 175:14 178:6
179:23 182:12
**Lovell's** 47:9 76:5 83:21
84:4 88:4 105:17 132:13
158:11 182:6
**Lovell.'** 30:2
**lowball** 145:24
**lump** 125:5
**lunch** 96:8 117:22 120:18
125:21

___

**M**

**made** 9:17,20 16:16 17:9
21:7 26:4,10,21 27:5 31:16
34:8,15,16 35:2 39:11
43:19 52:25 55:9 68:20
69:11 74:22 82:22 85:19
93:11 96:17 100:11 101:18
104:10,25 109:10 112:21,
23 115:2 119:8 120:12
125:9 128:23 131:5
133:16,20 136:25 138:19
139:24 140:12 151:7 155:1
157:8 164:18 171:22
175:13 176:24 177:8 179:9
**Madsen** 115:19 117:3
**Maestas** 161:9 162:17
163:2,8 164:18
**major** 47:11
**majority** 9:12,20 143:22
145:2,6,18 147:16
**make** 13:23 16:18 19:25
23:19 33:19 34:18 48:25
53:16 66:5,17 67:15 68:8
75:7 111:11,16 138:24
139:11 141:5 142:13
155:11 161:21 162:14
183:2
**makes** 131:1
**making** 10:1 21:20 35:16
63:25 99:17 138:4 175:10,
20 176:20
**manager** 125:17
**March** 36:24 52:19 74:8,9,
14,18,22 79:12 94:22 95:2,
11 119:18 120:20 127:14
150:8
**Mark** 166:17
**marked** 7:14,15 8:6,7
12:21,22 15:22,23 27:6,7,
8,11 37:11,12,20 41:14,15
71:8,9,11 84:7,8 93:2,3

106:18,19 108:15,16 110:1
113:25 118:7,21,22 121:12
126:1 127:23 138:5 142:7,
8,22 149:16,20 151:10,16
155:22 157:21 158:6
159:23 162:4 163:23
166:11 170:8 173:4,21
177:2,12 178:12 179:18
180:20 181:22

**Marshall** 165:17

**Martin** 165:18

**matter** 39:18

**Mauro** 173:7

**meaning** 59:19 80:12
106:20 132:16 163:1

**means** 80:3 89:10 124:19
176:2

**meant** 83:13 134:9 172:16

**meantime** 102:6

**mechanism** 53:11,17
66:2,25 67:5,14 135:15

**media** 26:21,25 27:1
30:12,16,23 31:4,7,12,16
32:2 34:9 68:21

**meet** 98:9 128:19 152:4
169:24

**meeting** 9:1,10,15,18
14:14 16:5,6,8 24:16,18,20
33:22,24 59:17 60:18,20
61:16 64:10 99:6 127:19
128:6,10,12,14,24 129:5,
16,17 130:6,7,8 131:14
133:5,16 137:7 139:17,23
153:2,11,13,15,16,24
154:4,6,10,12,14,18,21
155:3 170:23

**meeting's** 154:1

**member** 164:21 170:14

**memo** 36:2,3,4,14,23,24
37:1,2 95:12

**memorandum** 35:12
38:10

**memory** 67:8 81:4

**mention** 19:20 26:24
91:22

**mentioned** 16:8 19:22
20:3 35:7 60:6 67:3 75:1
96:14,15,24 110:5 137:21
173:18

**merits** 24:24

**message** 139:7 149:23

**met** 20:17 96:17 98:6,19,24
99:25 100:6 129:1 181:3,6
184:8,15

**middle** 87:21,22

**Miller** 177:19,21

**mind** 13:12 48:4 57:5,7
107:7 161:16 162:24

**minor** 96:5

**minute** 93:13 129:11
151:25 166:22

**minutes** 85:10 86:1 87:7,
17 89:4 162:20

**misconceptions** 158:24

**misremembering** 180:25
181:4

**misrepresent** 87:4
174:10,24

**misrepresentation** 26:4
29:14,20 38:24 39:18,21
40:8,18 41:2 42:2 44:8
45:21 48:19 49:2,7,9,22
50:15 51:7,17 73:8,15
75:25 76:8 77:12 78:4,21
79:21,24 82:6 83:24 86:21,
23 88:7,19 89:3 90:25
92:2,9 94:10 95:18 174:17
175:15

**misrepresentations**
16:16,18 17:9 26:10 27:4
28:15 29:20 30:4 31:3
33:20 34:1,15,23 35:2,6,11
36:19 38:15,24 39:4 41:5
42:12 44:1 45:15,18 46:5,
10 47:4 49:23 50:8 51:8,9
52:10,25 53:6 68:4,10 69:4
72:7,16,20 75:18,22 76:1
77:13 79:21 80:7 82:5
83:16 84:19 85:6 90:4,20
91:5 93:11 126:8 157:8
175:11,13,21 176:12,21

**misrepresented** 37:6
39:24 86:24

**misrepresenting** 175:6

**missed** 125:20

**misspoken** 136:20

**misstate** 112:17

**misstatement** 82:22 95:8

**misstatements** 31:12,15

**misunderstand** 87:3

**misunderstood** 37:6 87:1

**Mitchell** 70:10

**mixing** 19:2

**moment** 54:23 152:22

**Monday** 128:1 158:1 164:6

**Monetary** 94:17

**money** 21:15 78:24 103:5
104:10 110:11,23 113:7
114:12 117:17 125:4
133:25 135:2 172:14,17

**monthly** 101:20

**months** 88:5

**morning** 81:6

**motion** 16:7,15 17:10
35:3,18,20,22,24 36:1,23,
25 38:4,11 41:18,21 45:12,
14 52:23 53:1,20,22 54:8,
10,22 56:9,10 61:24 63:3,
20 66:10,13,23 71:18,24
82:23 83:1 84:14 91:18,22
93:7,16 94:14,16 95:1,8,10
124:25 126:3 128:8 129:9
131:19 133:25 136:10,17
137:10 151:23 157:19
158:22 167:13

**move** 23:11 43:25 77:19
130:11

**moved** 158:11 165:4

**multiple** 31:20

**murder** 59:19 80:13
110:14,25 111:13,18 113:8
139:19 140:5 159:2 164:25

**murderer** 21:16 110:21
164:9

**murderers** 22:1

**Murphy** 166:19

---

**N**

**Nadia** 177:7

**named** 94:14 172:24 177:6

**narrative** 17:22

**narrow** 23:20 32:12

**nature** 86:12 113:17
114:18

**necessarily** 13:20 64:3
176:17

**needed** 20:16 23:9 44:25
50:18,20 55:13 59:18,24
67:9 70:14 76:23 80:24
86:13 90:8 97:7 121:3
179:15

**negligence** 115:3

**negotiate** 58:16 145:13
171:5

**negotiated** 171:3

**negotiating** 145:20
146:11 169:12

**negotiation** 145:14 157:6

**negotiations** 40:3

**Newman** 133:24

**Newton** 8:3,11 11:12
12:16 13:6 14:19,24 16:3
19:18 20:4,7,11,17 21:2,8
23:17 25:11 26:4,7,9 28:21
29:3,24 31:16 33:19 36:23,
25 37:3,5 38:13,25 40:1,5
41:19 43:9 44:18,24 45:7
46:24 48:14 49:25 50:17

51:18 52:3 55:9,15 56:7,20
57:9 58:4 59:6 60:7 61:20
62:25 63:5,13 64:3 65:6
66:4,8 67:3,5,12,16,21
68:6 70:5,18 71:12,20
72:17 74:2,17,22 75:15
76:11,17,22 78:1,11,15
79:4,12 80:14 82:12,18
83:9,12 85:8 86:2,18,21
87:7 89:4 90:8,14,22 92:12
93:19 94:23 95:22 96:17
97:10,20,25 98:3,6,14,19,
22,23,24 99:21 101:18
107:19 113:18 115:14,17,
21 117:6 118:14 119:9
120:3,13,23 121:2,9
122:15 123:18 124:8,13,23
125:10,14 126:21 127:1
128:1 129:22 134:19,25
136:13 137:8 138:11,21
141:12 142:11,18 144:1
145:9,25 146:8,15,17
148:8 149:24 150:12,14
151:21 156:3 157:3,15,19
158:10 159:4 161:6,7
162:1 163:8,14,16 164:18
174:17 175:10,20 176:10
178:22 179:6,9,12,14
180:18,23 181:2,5,19
184:8,15,22

**Newton's** 9:6 29:10 31:2,
25 35:12 50:5,10 51:21
52:12,17 55:6,7,11 58:21
59:23 60:10,17 61:7,16
63:11 75:6 77:8 82:8 84:1,
11,20 90:5 96:1,25 100:12
132:16 135:13 141:7
150:22 151:12 152:25
153:5 156:6 167:13 178:6
181:24

**Newton/law** 8:2

**NEWTON000314** 37:14

**NEWTON000344** 37:15

**NEWTON000346** 38:18

**NEWTON000347** 39:7

**noon** 125:25

**notation** 84:10 95:11
112:5

**note** 54:24 71:10 89:6,18
91:7

**notes** 15:1,25 41:22,25
45:11,20 48:18 49:8 51:6
68:2 71:24 72:6,9,15
84:15,22 85:12,18,21,24
91:22 93:7 95:12 100:17,
25 101:3 113:10,24 126:5

**notice** 7:19 13:8 51:6
100:16,23,24 102:6 127:18
163:10

**noticed** 27:18

**November** 113:2 125:8

**number** 8:1 10:20 11:5,8, 25 21:13 66:24 93:12 100:23 102:6 103:3 111:10 112:3,9 113:24 122:19 124:21 127:18 132:25 133:4 137:10 138:15 139:6 146:14 153:24 166:8 172:18 173:12

**numbers** 27:10,12 71:14 105:12 109:22 137:14 141:19 166:2

**numerous** 23:16

## O

**oath** 165:22

**object** 62:15 136:1 153:19 158:21 163:9

**objection** 146:1,6 162:7

**obtaining** 69:1 135:15

**obvious** 127:9,13

**occasional** 91:14

**occasions** 21:14 23:15, 17,24 31:18,20 43:10 58:17

**occur** 147:6 160:10

**occurred** 29:8 31:23 32:6, 14 34:24 35:11 115:21 116:11 123:13 154:3

**October** 8:2,12 13:4 24:4 27:24 32:7 180:24

**odds** 144:21

**offer** 25:12 39:14 40:12,24 43:18 58:18,20 108:6 124:12 145:14 148:21

**offering** 47:25 48:15 148:15

**office** 8:3,11 14:10 32:20, 21,22 57:19 58:1,2 76:4 91:9 109:5 110:12 125:17 152:8 153:8 166:18,24 167:2 179:21 182:17

**offices** 81:21

**official** 128:11

**officials** 29:3 127:19 128:6,9,15,25 129:6,8,12

**officials'** 153:25

**offset** 121:3

**Ogden** 165:5

**ongoing** 165:7

**open** 9:15,17 44:16 151:6, 7

**opened** 21:6

**opinion** 51:22 65:11 66:3 67:1,6 109:21 152:1,4 174:6,9,18 176:3 179:14

**opportunity** 38:2 52:16, 22,24 53:21 54:2,3,4,5,12 95:6,18 136:9 137:13

**opposing** 26:3,8 175:23 184:18

**opposition** 35:12 36:3,4, 14,23,25 37:1,3 38:11 53:1 95:13

**option** 171:15 172:6

**options** 158:20 168:6 171:14 172:4

**oral** 24:18 25:3 35:21,25 63:5,8 84:14

**order** 169:24

**organized** 111:9,25

**original** 93:16 131:8,10 143:19 185:19

**originally** 28:12 58:24

**originals** 119:4

**outcome** 129:3 154:17

**outline** 35:17

**outrageous** 137:10

**outright** 76:16,18

**overbill** 92:7

**overbilled** 178:25

**overbilling** 131:24

**overestimated** 150:20

**overlooked** 91:21

**overridden** 171:24

**oversaw** 22:21 114:23

**oversee** 180:12

**oversees** 130:25

**oversight** 64:20

**owed** 78:11,13

**owes** 78:7 87:9 88:12

## P

**p.m.** 158:4 164:6 185:17

**pages** 45:16 72:8 93:23

**paid** 46:15 65:21 69:16 70:5 74:1,3,6,9,10,15,23 75:2,4,5,11,12 78:10,17 88:3,23 102:18 108:5 111:2 112:6 115:25 117:17 121:11,23,24,25 122:1,20 124:3 125:4,16,19 160:24 161:7,8 163:7,20 168:12, 20 179:23 180:5

**pair** 70:13

**paragraph** 13:15 29:23 38:19 39:8 42:5 44:3 46:6, 8,24 47:13,16 48:1,5,7,16 49:13 50:11 51:11 68:13

76:3 77:16,17 79:25 81:14 83:19 87:14,21 92:3,4 113:25 117:14,15 126:11, 12 131:21 133:15 136:8 139:14 140:16 143:7 150:5 151:9,24 171:11 172:8 174:15 177:18 181:10

**paragraphs** 48:11

**parameters** 30:24

**part** 28:2 40:17 42:13 46:22 48:2,3,4,6 63:20 73:13 74:9 75:2,4,5 76:21 81:23 88:1 95:23 97:21 127:3 129:7 134:12 136:25 153:23 158:19 173:15 180:7

**Parte** 38:11 94:14

**partial** 47:21 121:7,8

**participant** 164:22

**participate** 102:7 103:14 107:22 108:2 172:9,19

**participated** 171:20

**participating** 63:15 132:21

**participation** 132:24

**party** 99:11

**past** 16:17 25:22 26:1,5,20 34:8,22 54:16 68:20 95:25 105:6 113:10 136:13 140:13 141:2

**pay** 44:7,11,13 46:15 78:6, 8,25 79:6 99:14,17 103:14 104:5,20 124:1 132:9,24 137:11 140:21 152:2 181:14 182:24

**paying** 78:19 103:6 181:20

**payment** 38:11 39:9 74:18,21 75:14 76:22 88:2 94:14,16 101:5,14,20 104:14 112:6 113:1 119:8, 9,11,16 120:1,3,12,22,24 121:4,7,8 122:2 123:8 124:22 125:7,9 169:2 180:12,16

**payments** 101:2,7,16,17, 18,21 102:25 104:12 112:12,13,21,23,24 124:5 162:1,17 164:18 168:1,5

**PC** 8:12

**penalty** 58:7 64:12 135:24 162:2 164:14 165:10,12

**pending** 17:15

**people** 104:5 116:13 130:7 164:3 180:17

**perceive** 98:2

**perceived** 95:7

**performance** 114:14

**performed** 135:1

**period** 77:4 118:17 120:21

**permission** 184:2

**person** 32:24 33:14 105:13 160:8

**personal** 26:14 49:20 160:11

**personally** 26:16 53:13 62:21 156:13,24 161:24 171:5

**perspective** 64:12 146:7 178:9

**Pflaum** 177:7

**phase** 58:7 115:9

**phases** 115:8

**phone** 24:19 55:2,9 58:25 59:3,5 85:2,12 94:6,13 133:5 177:25

**photocopy** 71:13

**phrase** 128:18,23

**physical** 128:14

**pick** 89:11 158:21 168:19

**place** 24:2 32:18 64:23 66:2 67:1,5 153:7 175:7

**places** 47:15

**plainly** 38:20 39:1

**plaintiffs** 7:4

**plans** 139:18 140:4,8

**play** 21:19

**plural** 128:15

**point** 13:10 16:19 19:5 36:18,22 42:25 43:4,15,16, 22 46:20 55:2 57:24 58:12 75:15 76:15,17 83:12 85:4 102:13 120:23 148:17 155:15 157:4 164:8 165:20 167:11 172:6 175:3 178:24 179:8,11

**pointing** 13:12 41:10 61:6

**policy** 182:16,20,22 183:20,21

**Porter** 7:7 17:16 32:3 37:16,19 41:9,13 71:6 80:19 85:14 91:7,13 92:20, 24 93:14,22 101:23 118:2 125:21 136:5 137:17 153:22 156:23 161:13,19 162:12 165:19 166:4,9 183:3 185:9,12,19

**portion** 40:7,11 42:11 78:18 80:6 82:3 90:2,18 150:1 160:22

**portions** 42:11 80:6 82:3 90:3,18

**position** 24:11 30:1 37:7 44:6,10,13,15 75:13 79:3

86:24 87:2,4 107:12
132:12 154:7

**possibly** 185:10

**potential** 71:18 72:6

**potentially** 40:9 76:6,12
127:4 141:15 176:20

**practice** 98:7

**practices** 29:4,12 55:6
59:9 80:11,23 133:17
134:8,9 139:25 140:13
157:4,5,7

**pre-approval** 45:16

**pre-approved** 159:11

**preapproved** 159:12,13

**preauthorized** 40:1 122:5

**preceded** 128:2

**preceding** 29:2 38:22
47:13,16 48:1,3

**predicting** 39:19

**prediction** 40:9,10

**prefaced** 46:24

**premium** 108:4

**premiums** 104:8

**preparation** 11:8,24 68:10
77:20 120:8 122:12

**preparations** 42:7,9,15

**prepare** 8:17,18 10:19
25:10 26:12 56:8 147:10
148:22

**prepared** 10:15 23:11
34:19 37:24 120:7,10
124:11 143:9 155:24

**prepares** 82:19

**preparing** 11:4 34:20
61:24 62:12 72:13 81:24
116:24

**present** 99:6 116:1 144:7

**presented** 172:4

**pretty** 147:21 160:19
179:25 183:14

**prevented** 100:3

**previous** 106:22 146:24

**previously** 34:6 44:18
71:11 78:21 84:10 88:20
91:1 92:9 133:10,21

**previously-agreed-upon**
135:3

**primarily** 57:8 116:23
146:13

**primary** 19:16

**printed** 27:23 67:25 127:7

**printing** 27:19 118:15
121:9,12 122:21

**prior** 8:25 10:11 12:18 20:6
34:22 45:7 50:6,24 56:4
61:4 68:8 78:7,12,14 79:4
80:24 124:19,22 125:2
126:16 129:23 134:19,20,
25 142:10 170:23

**private** 83:6,9

**privilege** 97:15 99:23

**pro** 87:10 88:13,18,25

**problem** 93:1 134:12

**problematic** 50:14

**problematically** 92:5

**problems** 163:18

**procedure** 64:23 65:2
93:18

**proceed** 149:15

**proceeding** 42:7,15 63:7,
24 64:25 66:15 73:4 78:20
81:18 132:22

**proceedings** 44:20 61:22
63:12,16 78:9 86:5,11

**process** 58:14 64:20
169:11 180:15

**produced** 11:11,12,14
18:12 81:9 106:15 141:18

**producing** 109:6

**production** 11:18,21
24:22 28:3

**professional** 49:19
156:14 157:1

**program** 109:6

**proposal** 171:22

**proposed** 58:4 157:11
171:2

**pros** 168:8,22

**prosecuting** 110:21
111:2,13

**prosecution** 54:17 57:22,
25 110:13,24 111:1,6,10,
23 112:15

**prosecutor** 166:24 167:9
182:2,5,10,15,19 183:1,7,
9,12,24 184:3,5

**prosecutors** 20:13 167:4
183:18

**provide** 14:17 43:19,23
110:11 111:11,16 141:12
143:10 152:9 155:21
157:11 178:8 179:3

**provided** 11:9 14:11,13
25:22 55:15 108:24 109:5
142:21 148:13 170:11
178:11

**providing** 21:25 40:4
173:14

**provision** 67:7,11 181:19

**public** 102:11 110:20
131:4,14 139:21 180:7,12

**published** 27:3 28:12
32:15 160:1 177:16 178:16

**pull** 85:3

**pulled** 112:25

**purports** 164:3

**purpose** 23:7 109:24
170:25

**purposes** 34:5 48:10
56:17

**pursuant** 93:17 106:16

**pursue** 66:6 99:13

**pursuing** 65:25 172:5

**put** 18:25 31:21 49:9 60:1
81:7 91:10 93:12 111:10
112:9 150:24 172:18

**putting** 143:15

**Q**

**qualifications** 70:14
169:14

**qualified** 69:24

**quality** 134:12

**quandary** 51:13

**quantify** 172:15

**question** 7:17 9:3 11:15
17:15,21,24 19:13 23:19
32:3,5 55:16,19 57:4,5
61:11 62:19,20 64:7 65:3
79:7,10 92:16,18 108:18
110:3 119:7 120:11 128:16
137:17,19 141:17 144:11
149:17 156:16,19,20
161:11,14,15,16,17
163:11,12 164:16 166:13
181:2 183:5

**questions** 48:10 100:20
101:1 162:13 165:20,25
177:20 178:10 183:4
185:12

**quick** 11:15 67:24 117:16
149:17

**quickly** 101:24 107:8
114:2 117:24 125:23

**quote** 28:20 29:11,24
47:21,22 48:4,6 102:24
103:12 105:21

**quoted** 47:14 48:2

**quotes** 154:15

**R**

**Rachel** 173:25

**raise** 48:22 90:13 182:8

**raised** 64:8 90:16 159:18,
20

**raises** 93:14

**raising** 55:19 57:8 175:16

**ran** 140:13

**Randy** 165:17

**range** 145:10

**rate** 82:10 127:2

**rates** 126:24

**rationale** 141:13

**rattle** 175:17

**reached** 164:7

**reaching** 18:8

**read** 32:3,5 34:6 37:17
38:22 39:24 40:7 46:8,9
49:23 50:5 62:20 73:7
77:8,25 79:7,10 80:14,21
82:4 85:20 89:12 90:2,19
92:18 107:7 129:7 135:11
137:19 163:12 174:13,19
183:5,6 185:13

**reading** 41:25 83:8 86:17
87:22 122:15 156:5 160:4,
10 185:20

**reads** 38:20 40:11 48:22
49:13 50:12

**ready** 7:17 108:18 110:3
166:13

**Real** 114:2

**realm** 51:25

**reapproach** 73:11

**reason** 14:17,20 19:16
120:11 123:7

**reasonable** 44:25 50:23
77:25 79:17 86:17 145:10,
15 150:6,13,15,24 151:4

**reasons** 19:14,17 20:16
25:15 31:2,25 78:21 88:20
91:1 92:9 97:10

**recall** 14:15 16:4 21:7
23:16,25 24:17,19,23 25:7,
8 27:3,25 30:14,17,20,21,
25 31:5,19 32:20,25 33:18
34:3 52:13 53:8,23,24
54:1,8,23 59:5,6,13 60:18
61:17 62:4 63:8 66:20,23
69:20 70:11,20 77:6 81:1
97:12 99:1 100:9 102:21
104:12 106:3,7,10 111:20
117:12 122:9 124:15
128:12 129:21 134:22
153:12,13,18 154:9,11
157:2,13 162:9 163:4,22
167:10 168:6,21 169:10,
16,17 171:10 177:24
184:25

**recalls** 153:21

**receipt** 153:4

**receive** 75:8 88:23 141:9 149:17 182:22 184:24

**received** 13:23,25 14:3 26:2,6 74:18 101:19 106:13,24 114:12 117:12 118:13 119:9,11 142:10 150:11 158:3

**receiving** 151:19 181:24 184:25

**recent** 28:22 113:9,19 114:4 115:9 136:11

**recently** 24:23 113:14 141:21,23

**recess** 15:21 71:7 85:17 102:3 125:25 185:11

**recipient** 82:25

**recognize** 8:8 37:22 93:3 94:18 106:21 143:17

**recognized** 59:7

**recollection** 15:10 103:2

**recommend** 168:3

**recommendation** 130:11 137:25 138:1

**recommendations** 167:3,5,8

**recommended** 152:19,21 167:11

**record** 7:9 37:13 68:16 71:11 85:12 91:8 92:21 96:20 101:5,6,10 118:6 119:3 120:5,7 153:24 154:7 161:21 174:15 181:4

**recording** 85:19

**records** 101:2 105:13,20 106:2 109:21 110:18 111:1,5,8 112:3,4 125:16, 17

**recusal** 160:12

**recusing** 21:23 164:13

**reduce** 137:14

**reduced** 181:15

**refer** 15:2 49:8 51:6 85:3 93:6 94:6 111:9 152:17

**reference** 35:2 37:7 45:11 48:18 54:24 72:6,8 84:12 91:19 96:16 121:18 133:19,23 159:8 181:9

**referenced** 8:24 19:10 27:1 34:12 36:3,8,13 41:22 59:1 60:21 73:19 83:1 84:15 126:4 153:25

**references** 171:21

**referencing** 29:11 127:20

**referred** 9:8 83:13 133:10 152:8 182:20

**referring** 16:25 17:5 18:11 20:9,10 27:16 28:15 29:17, 21 30:5 36:10 38:25 47:13 60:20 68:14,23 71:23 73:22 83:9,25 94:21 95:1 96:16 113:24 129:12 130:6 133:9 134:2,7 180:9

**refers** 55:3 73:23 88:2 146:24

**reflect** 72:16

**reflected** 18:11 96:19

**reflects** 101:14

**refresh** 15:10

**refunded** 121:3

**refuse** 44:7,11

**refused** 43:1 78:6

**refuses** 39:13 40:12,16,22, 23 178:21

**regular** 16:10 17:7 102:12 111:3 173:13

**Reidhead** 103:12 104:18

**reimburse** 39:10 73:16,18

**relate** 20:22 110:7 122:18 161:16

**related** 107:21 132:7,15 140:20 154:3 155:6

**relates** 20:22 123:2,9

**relating** 61:16 107:18

**relevant** 38:4 65:12,21,24 132:15 144:6

**reliance** 47:5

**relied** 50:9 84:19 92:1 145:4 152:7

**rely** 99:10

**relying** 38:15 39:5 41:6 52:11 72:17,21 75:19

**remain** 151:6

**remainder** 39:15

**remaining** 44:20

**remand** 42:6,14 73:4 78:9, 20 81:18 86:5,11,12 93:17 116:4 143:18 147:5 148:15

**remanded** 56:17

**remember** 53:25 54:13 56:6 59:15,21 60:4 61:14 69:12 79:14 97:8,9 107:12 122:11 128:21 145:11 153:16 168:22

**remembered** 22:12

**reminded** 21:3 100:11

**remove** 62:25 63:3

**removed** 101:18 159:7

**repeat** 9:2 92:15 163:11

**repeated** 99:11

**repeatedly** 175:13

**rephrase** 9:4

**replaced** 159:7

**replacement** 18:22,25 139:21 167:19

**reply** 35:12 36:2 37:1,2 38:10 43:3,5,21 52:25 53:7 73:4 76:19,21,23 77:5 86:25 122:22 123:15,17 148:14,18 156:7

**reporter** 177:6

**represent** 28:22 42:9 49:1 51:13 63:14 65:15 87:12 88:16,17 97:11,16 169:8 181:12,16,25

**representation** 25:22 49:11,18 76:7,13 80:4,17 87:11 88:14,17 104:10 115:3 132:10,16 136:23 140:24 172:13

**representations** 26:21,25 27:1 34:9,12 68:21 69:4

**representatives** 15:6

**represented** 104:4 168:17

**representing** 30:2 49:25 51:19 54:11 66:14 80:15 100:3 103:23 115:11,21 169:10

**reputation** 26:23 34:11 68:23,24

**request** 11:10 16:6 52:17 58:9 59:10 66:9 88:24 94:17 105:19,25 106:16 122:10 124:23 128:7 129:23 133:1,25 134:5 136:9,18,21,24 137:3,8 145:11 148:19 151:6,8 161:23 177:20 179:22 183:25

**requested** 20:11 25:10 26:12 53:11 103:9 120:9 135:2 151:23 178:10 179:6,12 185:15

**requesting** 179:9

**requests** 42:20 44:17 60:25 61:1 62:6,9 67:18 78:24 94:17 131:6 182:22

**require** 99:14 146:14

**required** 25:23 83:22 84:4 102:11 104:11,20 132:24

**requirement** 81:1 169:18

**reread** 34:5 68:14

**research** 110:19

**researches** 82:18

**resolve** 66:2 67:1 89:8,20

**resources** 81:16,20 82:20 94:2 95:23 96:2 104:1 126:15

**respect** 10:20 11:5 18:19 19:13 25:5 32:9 33:5,8 40:6 52:17 66:18 68:1 78:18 111:23 141:6 152:12 178:4

**respond** 17:22 52:22 95:3 158:19

**responded** 86:25 158:17 160:3,4 166:21

**responding** 38:5

**response** 13:22,25 14:2,3, 7 17:18 35:20 44:23 53:23, 24,25 54:10,13,22 56:7 71:17,24 72:3 79:18 91:18, 21 105:24 110:16 137:21 138:11 141:9,12 142:24 149:18,24 150:8 151:13 152:25 153:5 154:7 156:7, 11 157:18,24 160:7 162:6 164:11 174:4 176:24 177:10 184:24 185:1

**responses** 97:13

**responsibilities** 22:21 62:8

**responsibility** 18:4 57:11 60:23 61:4 97:3

**responsible** 62:6 97:21 181:20

**rest** 75:12 96:11 121:23 129:11 150:16 165:20

**restate** 62:18 65:3

**result** 84:3 97:17

**retainer** 179:23 180:1

**Retallick** 165:17

**retrial** 113:14

**return** 103:19 108:4

**reveal** 182:25 183:9,16,18

**reveals** 174:9

**review** 11:7 15:7 57:11 60:23 61:2 125:17 155:13, 17

**reviewed** 10:22 11:10 67:11

**reviewing** 62:6,9 116:14 125:16

**revise** 123:18 124:5 136:9, 14 137:8 147:11

**revised** 80:24 123:21

**revising** 43:2,13 150:25

**revisions** 42:7,15 43:20

**Rich** 173:7

**Ricky** 109:8,9,17,18,22

**rights** 62:3,5,13

**risk** 49:16 50:2 59:17 60:8, 11

**Rogers** 174:6

**role** 21:19 58:21 114:24 132:4 143:1,4

**roles** 130:20

**root** 100:1

**rough** 15:4

**roughly** 115:18,23 116:16, 22 117:3

**round** 115:6 175:21

**rounded** 115:13

**row** 57:9

**rubber-stamped** 152:14

**rule** 56:8,10 66:10 67:15 93:17 128:8 136:19

**Rules** 49:18 93:17

**ruling** 56:14 174:13 176:15

**rulings** 176:10

**rumor** 99:11

**run** 96:10 141:2

**S**

**saga** 22:3

**sake** 129:4

**salary** 111:3

**Salt** 27:4 160:1 162:6 177:16 178:5

**Sam** 16:3,14 19:9,18 20:11 21:2,8 23:17 38:13 71:20 94:23 98:22,23 100:12 101:18 107:19 115:14 118:14 128:1 129:22 138:21 141:7 149:24 156:3,11 158:10,20,22,23 160:24 163:14,20 173:8 174:23 178:22,24 180:23 181:19,24 182:12

**Sam's** 16:6,10 19:6 174:9 182:14

**Samuel** 8:2,3,11

**sat** 137:25

**satisfy** 15:24

**Saturday** 34:21

**save** 36:17 58:5 93:23 105:8 125:24 141:15

**saving** 156:17

**savings** 105:3

**scheduled** 116:5

**scope** 62:16 132:17 136:2 163:10

**screw** 166:10

**Seal** 94:17

**Sean** 61:22 66:14,15,19 67:2 132:8,12 136:23 140:20

**search** 85:21 112:23

**seconds** 86:2 87:7 89:4

**seek** 33:2 53:2,9 59:18

**seeking** 59:24 165:9,11 182:25 183:10

**segueing** 110:6

**self-fund** 103:4,17 105:8

**self-funding** 105:4

**send** 164:17

**sending** 10:17 20:6 22:7 38:16 68:8 143:13 145:9 146:8 156:8

**sense** 19:25 128:24 183:2

**sensibly** 9:5

**sentence** 13:16 25:19,20, 21 26:19 29:1 34:5,6 38:19,25 39:19,24 40:6,7, 17 42:11 44:4 46:12,22 47:6,7,12,25 48:14,21 49:3,13,23 50:4,11 51:17 68:15,18 72:23 73:7,19,22, 23 77:8,17,24 78:5 81:15 83:8,19 86:8 87:19,23,25 88:1 89:16 92:4 110:18 126:11 128:5,23 129:7 134:11 143:7,17 145:1 146:23,25 148:12 160:6,10 171:11 174:23

**sentences** 38:22 79:24 80:7,10,14 82:4 139:23 148:7

**sentencing** 160:15

**separate** 82:12 101:13 107:25 108:6 136:18

**separately** 82:7 98:10 100:8 102:15,18

**September** 116:1 124:18 169:5,15 170:13 177:17 178:16

**services** 46:16 81:15,19 82:7,9 83:4,6,7,11,14 107:15 131:24

**set** 97:4 103:5 147:8 159:17 169:13 172:11

**share** 65:10

**shared** 28:8

**Shaw** 166:18

**Shenefelt** 111:22

**short** 102:1 185:9

**shorten** 164:2

**shortly** 19:7 32:14 33:11 55:9 153:4 165:5

**shot** 10:14

**show** 7:15 12:22 15:23 37:20 41:15 66:11 67:10 76:22 78:16 84:8 106:19 118:22 119:16 142:8 146:16 149:21 158:7

**showed** 75:16 106:2

**showing** 75:7

**shown** 142:19

**sick** 160:23

**side** 52:16 53:21 95:4 107:18 111:2 178:6

**sidetracked** 18:21

**sign** 185:14

**signature** 185:15

**signed** 94:23 131:9,11 169:23

**significant** 133:16,20 134:23 139:24 140:11

**significantly** 172:13,16 178:10,25

**simply** 55:12 58:6 67:18 101:9 109:19 146:11

**single** 76:25 86:21 131:13

**singular** 17:4

**sit** 130:10

**sitting** 129:23 137:6

**situation** 96:22 178:23 182:13

**situations** 98:11

**Sixth** 92:14 179:15

**skimmed** 93:24 141:22

**skip** 47:6 102:5 142:5

**slightly** 139:9

**small** 122:17

**SN** 89:10

**soft** 117:1 171:3,4,8

**sooner** 161:22

**sort** 24:24 34:23 55:1 91:9 104:5 105:2 110:6 117:13 138:23 140:17 156:18 181:14 183:20 184:20

**sought** 135:19,23

**sound** 120:14 169:15

**sounds** 83:9 147:20 169:16

**source** 125:6 143:24

**sources** 67:25

**speak** 23:12,20 46:16 53:14 56:21 57:1,4,6 59:6, 23 62:22 90:8,10 126:16

176:5 184:3

**speaker** 85:8 89:10

**speaking** 22:4 30:25 37:4 55:23 57:9 89:6,19 90:6, 11,13,15 98:21 143:8 152:23

**specific** 13:21 14:7 30:17 66:11,21 79:14 98:15 112:13,20 124:9 130:24 149:4 155:11 170:7 181:19

**specifically** 16:24 18:1 23:21 30:13 31:24 32:2,21 36:9,18,22 40:2 42:19 45:14 46:20 55:22 59:4,10 69:2,12,19 82:9 86:23 106:10 108:1 124:15 130:10 132:14 150:17 159:5 168:21 169:17 184:14

**specifics** 131:22 154:11

**speculate** 161:3

**speculated** 144:24

**speculation** 145:8 146:2, 13 147:15 154:19 162:8 170:25

**speed** 15:18 104:6 116:24

**spend** 21:15

**spending** 159:19

**spends** 109:3

**spent** 61:21,23 62:12 63:6, 24 64:4 65:7,13 66:13,14 106:2 110:12,23 113:7 124:24

**spoke** 10:22 11:23 12:2,5, 9,12 70:4 102:19

**spoken** 70:19 143:12

**spreadsheet** 101:16 105:16 109:7,20 117:14 133:24

**stamp** 71:13

**stand** 99:2

**Standard** 110:10 111:12, 17 177:6 178:2,7,16

**start** 8:1 46:11 88:7 89:15 118:17 139:20 180:1

**started** 34:20 87:22 163:3

**starting** 28:10 40:21 46:7 72:24 158:9 166:3

**starts** 37:14 39:8 47:7 81:14 89:17

**starved** 165:6

**state** 7:8 19:14 25:15 54:11,12,18 61:21 63:7 64:25 65:7 72:3 81:20 101:9,24 103:22 127:9 160:16 174:6

**state's** 35:20 71:17,24
91:18,21

**stated** 19:16 67:7,9 76:20
78:21 85:20 86:2 87:8
90:10,12,22 97:13 100:11
109:21 147:13 174:14
175:19

**statement** 25:24 30:17
42:21 43:19 46:25 79:1
82:21 83:25 86:19 94:3
143:11,25 144:3 145:17,22
146:18 147:21 151:7
164:11 169:14 172:1
179:8,11

**statements** 30:7,12,16,20,
22 31:7,11 32:2 46:21
51:21 69:11 83:3 85:19
90:4,20

**states** 51:11 76:3 77:16
83:20 92:14 150:15

**stating** 9:5 37:3,5 79:12
120:24 179:14 181:19

**status** 116:2 169:9

**statutory** 67:14

**stay** 158:24

**steps** 53:5 54:20

**stipulate** 93:15 156:21
165:22

**stop** 118:17 147:4 153:14
158:18 160:25

**stored** 28:6,9

**story** 52:17 53:21 95:4
107:18

**strategy** 155:20 183:16

**stream** 109:10 128:3 156:1
160:22 163:3

**strictly** 160:14

**string** 158:9 162:21 166:16
180:3

**struggling** 61:17

**stuck** 128:22

**study** 105:3

**stuff** 41:10 106:9

**stupidity** 160:9

**subject** 23:13

**subjective** 90:5,21

**submit** 67:18 70:7 112:8

**submitted** 36:5,7 66:9
74:7,8 75:15 124:23
133:22 137:1 185:20

**sufficient** 98:13

**sufficiently** 23:20

**suggest** 120:15

**suggested** 50:20

**suggestion** 50:12,24

**suggestions** 25:13

**sum** 125:5

**summarized** 129:5

**summary** 34:15 113:10

**summer** 16:13

**sums** 127:5

**supervise** 167:25 168:5

**supervised** 120:8

**supervision** 22:23

**supervisory** 132:4

**support** 25:9 31:4 133:24
137:16 138:12 174:15

**supported** 134:6 152:16
155:6

**supporting** 30:2

**supposed** 183:12

**Supreme** 56:14,16,21 57:1
71:19 82:25 83:4 114:13
126:12 164:8

**sur-replies** 53:11,17

**sur-reply** 53:3

**surrounding** 107:4

**switching** 162:15

**swoop** 45:18

**sworn** 7:4

**system** 101:15 112:12,23
119:24

———————

**T**

**tactic** 145:20 146:12 157:6

**takes** 180:15

**taking** 44:6,10,12,15 69:6,
13 70:22 131:23 157:9
185:16

**talk** 10:10 34:11 46:16 56:7
60:2 65:5 127:17 151:1,5,
25 159:18 166:21 175:23
176:1 185:1

**talked** 23:17 59:15 70:17
78:19 128:25 132:25 133:1
172:14

**talking** 17:8 32:1 58:24
66:25 69:12 140:17 161:2,
4 165:1 180:17

**talks** 127:18

**taxpayer** 160:25 163:21

**telephone** 129:18

**telling** 49:14 112:16 121:2
145:3 146:10 148:8 178:6
184:21

**tells** 144:20

**terminate** 8:22 9:6,18,21
16:20 17:12 19:7,18 21:3,9
22:12 24:6,9,12 31:1 47:10
49:10 51:21 52:3,8 80:16
96:25 100:12 131:13

**terminated** 14:18,20
25:16 141:7

**terminating** 10:9 23:21
24:25 25:5,9 31:25 41:6
50:9 52:12 72:17 84:20

**termination** 19:15 22:15
23:8,11 29:17 59:12 96:15,
23 100:14

**terms** 73:22 82:11 168:10

**testified** 7:5

**testify** 7:11,24 11:5

**testifying** 11:8,24

**testimony** 10:20 15:8 35:5
40:25 68:3 126:17 144:25

**text** 46:19

**texted** 109:14

**thereabouts** 95:2

**thing** 15:18 22:6 25:8
41:10 93:14 96:9 126:21,
24 150:4 175:1 184:22

**things** 54:16 57:12 59:4,5
84:17 85:13 97:9 100:17
104:2 108:1 111:8 113:17
122:17 127:8,17 142:6
152:17 175:17,18

**thinking** 92:16 94:19
100:24 128:22 144:5 172:6

**thought** 31:12 36:20
145:14,15 163:4 184:8

**thoughts** 146:2,5

**thousand** 66:22

**threaten** 158:25

**threatened** 84:5 91:2

**Thx** 158:2

**tied** 112:6 122:12

**time** 11:23 12:2,5,9,12
16:4,9,12 20:18 21:19
22:11,18 24:3 31:21 32:12,
25 36:17 37:9 42:17 43:18
45:13 52:2 61:20,23 62:1,
12 63:6,19,23 64:4 65:7,13
68:5 73:25 79:15 85:18
87:3 105:21 118:17 120:21
121:7 124:24 125:24 131:3
141:16 144:8,10 148:17
150:24 156:17 157:4
159:19 167:13 180:5,11,15

**timeline** 15:3,4,6,11 106:3

**times** 16:13 58:4 85:8
137:11

**title** 11:25 12:3,6,10,13
107:12

**titled** 178:20

**today** 7:11 10:12,15 26:12
40:25 94:21 100:5 124:11

**told** 23:3 29:24 43:9 44:24
45:7 47:8 50:17,19 60:7
67:16 86:11 92:5 102:24
152:14 164:20 170:1

**top** 27:18 28:18 72:22

**topics** 100:16

**total** 44:5 103:1 104:23
112:15 124:18 125:13
147:19,24 148:5

**totaled** 105:6

**totaling** 73:17

**totally** 42:8

**touched** 127:16

**train** 163:4

**transcript** 84:13,22 85:1,
10,21,25 86:6 89:13 91:6,9
185:19

**transcripts** 111:7 113:16
117:18

**transpired** 97:9

**tread** 28:24

**trees** 93:23

**trial** 105:18,19 106:6
113:12,13 114:3,4 115:10
117:17 144:15,18,20 145:4
147:14

**Tribune** 27:4,15 28:11
29:25 160:1 162:6 163:2
177:16,19 178:5

**true** 15:25 25:24 42:21
46:24 50:3 70:16 79:1,2
88:1 118:9,24 134:13
143:11 145:22 175:8
179:16

**Trupp** 109:1,14

**Trupp's** 109:24

**turn** 41:12 72:19

**turned** 58:17

**turns** 20:17

**two-minute** 15:17

**two-week** 77:19

**type** 14:3 67:14 106:9
135:20 149:10 177:9

**types** 62:7 163:18

**typical** 135:18 137:12

———————

**U**

**UACDL** 69:15

**Uh-huh** 75:3 123:1 140:10

**ultimate** 66:20 104:24

**ultimately** 66:22 71:2 100:13 138:3 154:25 168:12

**unable** 126:13

**unanticipated** 143:18

**unapproved** 139:5

**unconstitutional** 52:8

**under-funding** 49:14

**underlying** 16:20,21,25 17:3,5,12 18:7 21:4 22:13 23:22 24:25 25:6 32:1 59:16 60:7,11 84:1,6 90:22 91:3 96:25 101:19 173:16

**underneath** 78:15

**understand** 29:10 35:17 45:20 47:12,24 48:14 50:4 59:8 73:21 77:7 81:23 92:12 111:24 112:16 113:22 122:13 126:20 129:8 147:5 167:12 182:4 183:11

**understanding** 62:12 98:5 99:5 101:3 103:18 104:3,7 107:20 109:23 131:12 170:18 172:10

**understood** 63:19 65:6 72:2 82:15 95:24

**unfortunate** 29:25

**unilateral** 24:12

**unilaterally** 8:22 24:9

**United** 92:14

**unlimited** 178:21 179:6,9

**unrealistic** 86:12

**unrelated** 132:10,13,14,15 140:24 161:8 162:2

**unsure** 132:9 133:6 140:21

**untruthful** 26:22 34:10 68:22

**unwillingness** 179:3

**upcoming** 68:1

**update** 170:11,12

**Utah** 56:13 61:21 63:7 70:12 71:19 83:3 93:17 102:8 105:22 109:2 114:13 132:8 140:21 164:8 172:9

---

**V**

**Valdez** 173:1

**Vanorman** 17:14,20 37:13,18 41:11 62:15 85:11,16 87:14 91:11 92:23 93:1,21 117:25 118:4 136:1 146:1 153:19 156:21 161:11,15 162:7,10 163:9 165:24 166:7

185:13,20

**veracity** 184:20

**Verbal** 14:5

**veritable** 46:13

**version** 13:14 138:21 139:4,5,12,15 140:7,18

**versus** 174:6

**view** 80:8 116:21 126:21, 25

**viewpoint** 141:13

**views** 21:25 160:11

**violate** 49:18 97:14

**violation** 99:22

**visit** 158:1

**voted** 8:25 131:10,14

---

**W**

**wait** 17:15 40:14 99:24 158:1

**waiting** 20:21 102:4

**walk** 32:23 59:2 153:9

**Wall** 182:21

**wanted** 36:20 69:21 105:13 107:17 156:13,25 177:22

**wanting** 31:1 59:13 163:19

**ways** 118:2

**Weber** 7:12,20 8:11 9:12, 21 10:4,7,14,19 11:3,7,11, 13,14,21,23 12:1,5,9,12 18:11 19:17 24:22 26:1,17 27:10,12 28:2,19 29:22 32:19 58:5,17 71:14,15 74:3 89:24 102:7,10,16 106:21 108:8 110:11,23 130:19 134:20 135:19,23 138:15 139:6 141:19 154:1,2,4 157:12 161:7 163:7,13,18 165:9,11,23 168:9 169:4 172:7,20 173:8 176:23 182:17 183:24

**week** 147:3 158:17 167:3

**weekend** 34:22

**weird** 48:5 112:10

**whatsoever** 176:18

**wholly** 42:8

**Widdison** 165:18

**willingness** 174:10

**Wilson** 10:24 12:6 16:8 20:25 21:11,13,19,23 22:4, 10,17,18 23:4 24:8 31:15 32:9 33:1,5,8 57:14 60:14, 16,18 61:3,15 64:9,15 98:1,8 102:20 107:10

110:17 128:13 129:2,13,24 132:2 133:14 137:7,24 151:20 152:10,24 155:25 156:8 157:10,14,24 158:13 160:2,4 164:7,12 166:20 174:3,4 177:15 178:15

**Wilson's** 22:22 32:21 103:1 160:7,11

**Wind** 17:18

**wished** 144:1 145:18

**withdraw** 16:15 17:10 35:3,18 36:1 41:18,21 45:12,15 49:19 53:20 54:8, 10,22 84:15 157:19 158:11,20,22 167:14

**withdrawn** 182:12

**withheld** 121:14

**withhold** 182:15

**witnesses** 56:18 104:2 106:8 111:7 117:18 126:13,16 143:22 144:1,4, 5,9,21,23 145:2,6,18 147:16

**woefully** 81:19

**word** 41:1 46:11 72:25 88:8 134:2

**words** 13:18 40:14,16,21 95:17 96:19 107:5 140:23

**work** 13:17 26:20 34:8 39:15 42:8 47:9 65:8,18, 20,25 66:12,22,24 68:19 73:2,5,17,22,24 74:11 75:2,10 76:20 78:7,12,14 114:21 117:4,7 118:14 119:12 132:7 134:12 135:1 140:20 142:21 143:20,21 147:20 150:16 179:1 180:1

**worked** 22:10 70:11 112:25

**working** 64:4 65:14 66:14 81:21 124:24 180:11

**world** 160:9

**worse** 81:4

**worth** 144:25

**wound** 21:7

**wrap** 117:25

**write** 64:13 128:15

**writing** 19:23 25:3 42:17 60:1

**written** 13:22 14:2 138:23 177:21 178:19 180:14 183:21 184:25

**wrote** 48:14 125:14 151:25 156:10 160:22 173:8 174:8,23 177:10,18 178:2 180:8

---

**Y**

**year** 26:20 34:8 68:20 74:4 88:3 103:7 104:17 119:7 172:20

**years** 25:22 26:1,6 102:25 104:8 106:4 110:12,24 112:3 113:7

**Young** 63:7,12,20 65:23 66:14,19 67:2 113:15 114:3,6,11,16,17,20,24 115:2,11 132:12,22

**Young's** 61:22 66:15 114:11 132:8 136:23 140:20

---

**Z**

**zealous** 49:11 76:7,13 89:24 90:23

**zealously** 28:23

**zip** 100:15

**zoom** 136:6

Karra J. Porter, #5223
JD Lauritzen, #14237
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323-5000
Karra.Porter@chrisjen.com
JD.Lauritzen@chrisjen.com
*Attorneys for Plaintiff Samuel P. Newton*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| LAW OFFICE OF SAMUEL P. NEWTON, P.C. and SAMUEL P. NEWTON, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>WEBER COUNTY, a municipal corporation; JAMES H. HARVEY, an individual; KERRY W, GIBSON, an individual; CHARLES J. EBERT, an individual,<br><br>        Defendants. | **NOTICE OF 30(b)(6) DEPOSITION OF WEBER COUNTY**<br><br><br>Civil No. 1:18-cv-00015 RJS<br><br>Judge Robert Shelby |

TO:    The above named parties and their counsel of record.

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Utah Rules of Civil Procedure, Plaintiff will take the deposition of one or more officers, directors, managing agents, or other persons to testify on behalf of Defendant Weber County. Said deposition will be taken on **Monday, February 4, 2019 at 8:30 a.m.** and continuing thereafter until completed, at the offices of Christensen & Jensen, P.C., 257 East 200 South, Suite 1100, Salt Lake City, Utah 84111, before a certified shorthand reporter.



DEPOSITION EXHIBIT
1
Baron
PENGAD 800-631-6989

A list of the matters on which examination is requested is set forth below.  Defendant Weber County is required to designate the person or persons who will testify on behalf of Weber County regarding the matters set forth below, and for each such person designated, must indicate which matters on which such person or persons will testify.  Such person or persons must testify as to matters known or reasonably available to Defendant Weber County regarding the particular matter as to which such persons are designated to testify.

### Matters on which Examination is Requested

1.  The October 26, 2017, letter to Samuel P. Newton/Law Office of Samuel P. Newton ("Newton"), including the letter's contents.

2.  Invoices received from, and payments made to, Newton with respect to the Doug Lovell case, including the amounts and timing thereof.

3.  The "meeting with elected officials" referenced in (doc. ID) Weber County 1123, including the meeting's content, drafts of Weber County 1123, and further discussion or communication that occured related to the meeting or Weber County 1123.

4.  Why Weber County does not participate in the Utah indigent defense fund.

5.  The amount of money Weber County has spent over the years on prosecution and defense in the Doug Lovell capital murder case.

DATED this 9th day of January, 2018.

CHRISTENSEN & JENSEN, P.C.

/s/ *Karra J. Porter*
Karra J. Porter
*Attorneys for Plaintiff Samuel P. Newton*

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of January, 2018, a copy of the foregoing **NOTICE OF 30(b)(6) DEPOSITION OF WEBER COUNTY** was sent via e-mail to the following:

Kristin A. VanOrman
Matt Harrison
Strong & Hanni
Kvanorman@strongandhanni.com
mharrison@strongandhanni.com

/s/ *Miranda Riley*

3



**WEBER COUNTY**

| James H. "Jim" Harvey | Kerry W. Gibson | Charles J. Ebert | County Commission |
|---|---|---|---|
| Commissioner | Commissioner | Commissioner | Weber Center |
| jharvey@co.weber.ut.us | kgibson@co.weber.ut.us | jebert@co.weber.ut.us | 2380 Washington Blvd. |
| | | | Suite 360 |
| | | | Ogden, UT 84401 |
| | | | (801) 399-8406 |
| | | | FAX (801) 399-8305 |
| | | | www.co.weber.ut.us |

October 26, 2017

Law Office of Samuel P. Newton, Pc
1267 Quarter Horse Ln.
Kalispell, MT 59901

Dear Mr. Newton,

Over the past several years, you have provided representation to indigent defendants on behalf of the County. While we have appreciated your hard work and dedication, this past year you have made various representations to the media and to the court that have been untruthful and harmful to the County's reputation. As a result, we have made the decision to terminate your contract and seek new appellate counsel.

This letter constitutes notice under paragraph 27 of your contract that we intend to terminate the contract. We would like you to continue your work as appellate counsel for indigent defendants through January 31st with the expectation that the new attorney will begin work on February 1st. Please let me know if you are willing to continue through January 31st or if we will need the new attorney to start sooner.

We wish you the best in future endeavors.

Sincerely,

James H. Harvey
Weber County Commission

Cc:     Kerry Gibson
        James Ebert
        Chris Allred




Printed on recycled paper


DEPOSITION
EXHIBIT
2
Baron

**NEWTON000440**

**Baron, Bryan**

| | |
|---|---|
| **From:** | Baron,Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Thursday, October 26, 2017 9:11 AM |
| **To:** | Crockett,Christopher;Erickson,Courtlan |
| **Subject:** | Suggestions? |

Would you please read through the following letters and let me know if either of you have suggestions?  Commissioner Harvey will send out both letters.  The first is to Mike Bouwhuis notifying him of our intent to terminate Sam Newton's contract.  The second is to Sam notifying him that we are terminating his contract.  I anticipate that one or both letters will be sent to the news, so I'd like to be careful about the way I put things.

**Mike Bouwhuis**

"Sam Newton has provided representation to indigent defendants on appeal for the past several years.  While the majority of his work has been of good quality, his representations to the media and to the court in the past year have been untruthful and have been harmful to the county's reputation.  As a result, we have made the decision to terminate his contract and seek new appellate counsel.

I have instructed our civil department to prepare a request for proposals which will go out in the next couple of weeks seeking a qualified appellate attorney or law firm that can take over for Mr. Newton.  We will continue to utilize Mr. Newton's services through January 31st with the expectation that the new attorney will begin work on February 1st.  Because you will be involved in supervising the new appellate attorney, I would like you to assist in evaluating the proposals.  I will have someone get in touch with you with more information as that process gets underway.

Please keep this information confidential for the time being, as I plan to inform Mr. Newton myself of the change."

**Sam Newton**

"Over the past several years you have provided representation to indigent defendants on behalf of the County.  While we have appreciated your hard work and dedication, this past year you have made various representations to the media and to the court that have been untruthful and harmful to the County's reputation.  As a result, we have made the decision to terminate your contract and seek new appellate counsel.

This letter constitutes notice under paragraph 27 of your contract that we intend to terminate the contract within 60 days.  We would like you to continue your work at appellate counsel through January 31st with the expectation that the new attorney will begin work on February 1st.  Please let me know if you are willing to continue through January 31st or if we will need the new attorney to start sooner.

We wish you the best in your future endeavors."

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us



DEPOSITION
EXHIBIT
3
Baron

137

Weber County 1919

**(1) The October 26, 2017 letter to Newton including its contents**

- Dave had mentioned terminating Sam from his primary contract around June 2017.
- We discussed termination of the contract several times: health concerns on post-conviction (ineffective assistance), misrepresentation in Lovell and State v. Rogers.
- We decided to terminate Sam after his misrepresentations at the withdrawal hearing.
- We asked LDA to take his contract and the Lovell case, but they declined.
- We got tied up finding a replacement for the Lovell case.
- We probably would have forgotten if it wasn't for the conflict cases (Davy Martinez).
- When Sam said he was conflicted from all 4 defendants, we decided to pull the trigger.
- I drafted the letter at the request of Jim Harvey.
- Dave requested the termination date be at the end of January.
- Chris Crockett, Courtlan Erickson, and Jim Harvey reviewed the letter.

**(2) Invoices received from, and payments made to, Newton with respect to the Lovell case, including the amounts and timing thereof.**

- I created a folder with all the information.

**(3) The "meeting with elected officials" referenced in (doc. ID) Weber County 1123, including the meeting's content, drafts of Weber County 1123, and further discussion related to the meeting or Weber County 1123.**

- I spoke with Jim Harvey regarding my concerns, he asked me to get Chris Allred's input.
- Who attended the meeting?
  - Chris Allred
  - Dave Wilson
  - Bryan Baron
- I consulted with Jim Harvey afterwards
- I made a follow up phone call to Sam re:
  - Communication with Doug Lovell
  - Base Contract – I said that the base contract was not the focus and that the focus was on future aggravated murder and capital appeal cases.

**(4) Why Weber County doesn't participate in the Indigent Defense Fund**

- Initially, PD contracts required capital representation.
- PD attorneys requested the contracts be amended to exclude capital representation.
- We considered joining.  IDF required 3 years payment up front.  County decided to self-fund.
- I looked into it last year at the request of Commissioner Ebert, I created a folder with the email to Commissioner Ebert that contains the cost information.



DEPOSITION
EXHIBIT
4
Baron

PENGAD 800-631-6989

**(5) The amount of money Weber County has spent over the years on prosecution and defense in the Doug Lovell capital murder case.**

- $120,035 to Bouwhuis and Young;
- $102,163.06 to experts and other;
- $94,757.30 to Sam Newton;
- $2,477.50 Kelly Madsen (1/2016); $1,438.10 (5/2016);
- $43,968.75 to Colleen Coeberg;
- $8,097.31 to Kelley Madseb

   $372,937.02

**Misrepresentations**
- No additional funding beyond the $15,000
    - Reply to Memo in Opposition (pg. 3, 4)
    - Corrected: Email 5/22/2017
    - Admitted: Email 5/22/2017
    - Motion to Withdraw (pg. 3)
    - Response to State's Motion to Inquire into Conflict (pg. 3, 12)
    - 8/29/17 Oral Argument on Motion to ~~Dismiss~~ at 10:30
- County says limit communication with Lovell
    - Motion to Withdraw (pg. 4, 6)
    - Corrected: Phone call around 6/6/2017
    - Response to State's Motion to Inquire into Conflict (pg. 15)
- County will terminate my appellate contract for zealous representation
    - Motion to Withdraw (pg. 4, 6, 8)
    - Corrected: Phone call around 6/6/2017
    - Response to State's Motion to Inquire into Conflict (pg. 3, 9,16,19)
    - 8/29/17 Oral Argument on Motion to Dismiss at 10:30
- No investigative resources
    - Motion for Attorney Fees and Litigation Expenses
    - Corrected: In the County's Memo in Opposition (contract and emails w/ Dave)
    - Corrected:  Email 5/22/2017
    - Response to State's Motion to Inquire into Conflict (pg. 18 "included in the $15k")

# The Salt Lake Tribune

## Attorney representing Utah death row inmates says he's not being paid adequately — and he's not the first to raise concerns

*Appellate attorney not the first to cite lack of financial incentive in pursuing review of capital murder cases.*





Douglas Stewart Carter. Courtesy Utah Department of Corrections.



DEPOSITION
EXHIBIT
5
Baron

Weber County 050

By Jessica Miller: The Salt Lake Tribune   •   July 18, 2017

An appellate attorney for a Utah death row inmate is asking the state's highest court to follow through on a promise made nearly a decade ago: The justices said they would reverse death penalty convictions if inmates couldn't get an adequate defense.

The time is now, attorney Samuel Newton wrote in a recent motion in the appeal for Douglas Anderson Lovell, who in 2015 was sentenced to be executed for killing 39-year-old Joyce Yost in 1985 to keep her from testifying that he had previously raped her.

Newton, who is based in Montana, said that defense attorneys are not being given enough money to support thorough death penalty case reviews — and in the cases for two Utah death row inmates Newton represents, he said he has had trouble getting paid.

Newton points to a 2008 Utah Supreme Court opinion for death row inmate Michael Anthony Archuleta in which the high court expressed concern that there was a diminishing pool of competent attorneys to work on capital cases. The justices wrote then that if qualified attorneys could not be found, the court might be forced to overturn death penalties and send the cases back to district court for imposition of life-without-parole sentences.

"This court should end the punishment [of execution] in this state once and for all," Newton wrote in his motion on behalf of Lovell.

Newton also laments in the motion a financial cap that Weber County officials have put on him to represent Lovell at an upcoming evidentiary hearing, where he is expected to question witnesses over several days about what work Lovell's trial attorney did on the case — and whether The Church of Jesus Christ of Latter-day Saints interfered with the trial by limiting what bishops who worked with Lovell at the prison could say on the stand.

Newton says the hearing will require hundreds of hours of investigation and preparation, which he estimates will cost more than $37,000. The county, however, has only authorized $15,000, up to this point. County officials also have expressed concern that Newton was overbilling, he wrote, and said he spoke to Lovell too frequently.

County officials indicated in an email to Newton that if his billing practices don't change, they will have to find someone else for future appeals.

Weber County 052

"That's the bind," Newton said in a recent interview. "Do I represent my client zealously like I'm constitutionally required to do? Or do I tread lightly so I don't lose my livelihood?"

Lawyers for Weber County wrote in court papers that the county is open to requests for additional funding in Lovell's case, and said that while Newton continues to be paid, he is "not entitled to an open checkbook."

But Newton said he has already lost tens of thousands of dollars representing Lovell, 59, and another death row inmate, 61-year-old Floyd Eugene Maestas, who was sentenced to be executed for stomping to death 72-year-old Donna Lou Bott during a burglary at her Salt Lake City in 2004.

The financial burden has caused him stress-related heart problems, Newton said, to the point where he asked to be removed from the Maestas case — a request that lawyers with the Utah attorney general's office opposed because it would cause further delays in the case. A judge has denied Newton's request. State attorneys, however, have asked that Newton be removed from Lovell's case because of his health concerns.

The attorney general's office declined to comment for this story.

Newton is not the first attorney to raise concerns about payment in Utah death penalty appeals. A decade ago, as an appeal for death row inmate Ralph Menzies was underway, no qualified attorneys would take the case for the amount of money offered. It got to the point where a judge briefly appointed defense attorney Richard Mauro to represent Menzies, though the lawyer said he took the case unwillingly.

Weber County 053

In an amicus brief filed by the Utah Association of Criminal Defense Lawyers in Menzies' case in 2007, several well-known defense attorneys wrote affidavits detailing the financial difficulties they encountered by accepting death penalty appeals. One lawyer wrote that his final hourly wage came to under $17 an hour, though he normally bills at a rate about ten times higher than that. Another said he made $19 an hour representing a death row inmate in a state appeal.

Some attorneys said they paid for expenses out of pocket and were never reimbursed. And one attorney wrote that he left private practice after representing a death row inmate because the costs had left his practice "in shambles."

Mauro said recently that it is especially difficult for a private practitioner to take on a weighty death penalty appeal, as opposed to having the support and resources of a law firm. He said that when he worked in private practice, he only willingly took on one state appeal.

"They were too difficult to do," Mauro told The Tribune. "Too time consuming. If you are doing the work the way it's supposed to be done — and trying to keep the lights on and run the copy machine — it's really not a feasible thing to do."

Weber County 054

Back in 2008, when Mauro was appointed to represent Menzies, the state's Division of Finance capped the pay for attorneys in death-penalty appeals at $37,000. Now, that cap has been increased to $60,000, and an appellate attorney also has the option to ask for more funding if a judge determines there is "sufficient cause." But Newton said he has exceeded that amount already in both Lovell's and Maestas' appeals.

Robert Dunham, executive director for the national non-profit organization Death Penalty Information Center, said underfunding for defense in capital cases happens in every state where the death penalty is used — especially in places where counties are expected to foot the bill, as in Utah.

When county budgets are tight, Dunham said, officials generally want to spend money earmarked for public safety on police and fire services, not on defense lawyers and experts for those accused of capital crimes.

"Underfunding defense lawyers is bad for the criminal justice system," Dunham said. "Not just because it risks unfair and unconstitutional trials, but because it costs taxpayers more in the long-run when the cases have to be re-done."

Weber County 055

There are nine men on Utah's death row. Maestas was sentenced to be executed in 2008, and Lovell was given the death penalty in 2015 after a retrial. They are the most recent inmates to receive death sentences.

They are the only two death row inmates who have pending appeals solely at the state level; the remaining seven have various appeals pending in state and federal court.

It is not apparent from a review of Utah death penalty cases filed in U.S. District Court that funding issues are being raised by federal defenders.

The next death penalty trial is scheduled for November, where a jury will decide whether 36-year-old Steven Crutcher should be executed for killing his cell mate, 62-year-old Roland Cardona-Gueton, at the Gunnison prison in 2013. Crutcher pleaded guilty to aggravated murder last May, so the jurors at his trial will not be asked to determine guilt, only what punishment he should face.

Legislative fiscal analysts estimated in 2012 that it costs an additional $1.6 million to handle all the appeals and costs of a death sentence over 20 years, compared to a sentence of life without parole.

Weber County 056

During the last legislative session, lawmakers considered studying the costs of the death penalty more in-depth — but the bill never came up for a final Senate vote. State lawmakers came close to abolishing capital punishment altogether in 2016, but the bill never reached the House floor before the midnight deadline on the last night of the session.

jmiller@sltrib.com

Comments (0)



Weber County 057

10/26/2017   Appellate attorney withdraws from Utah death penalty case, saying, 'I had to choose' between financially supporting family or representing Dou...

# The Salt Lake Tribune

## Appellate attorney withdraws from Utah death penalty case, saying, 'I had to choose' between financially supporting family or representing Douglas Lovell

*Payment issues caused a conflict of interest, attorney argued.*





Francisco Kjolseth | The Salt Lake Tribune A new murder trial begins for Douglas Anderson Lovell, 57, center, charged with aggravated murder for allegedly kidnapping and killing 39-year-old Joyce Yost in 1985 to keep her from testifying against him in a rape case. Lovell who appeared in 2nd District Court, in Ogden on Monday, March, 16, 2015, is seen facing into the courtroom gallery where the jury was being selected for his trial.

 By Jessica Miller  •  September 02, 2017

DEPOSITION
EXHIBIT
6
Baron

PENGAD 800-631-6989

Weber County 2187

A judge last week granted a lawyer's request to withdraw from representing a Utah death row inmate after the appellate attorney said payment issues were causing a conflict of interest.

Attorney Samuel Newton asked for the withdrawal in June after lamenting a financial cap that Weber County officials had put on him to represent Douglas Anderson Lovell, who was sentenced in 2015 to be executed for killing 39-year-old Joyce Yost in 1985 to keep her from testifying that he had previously raped her.

The funding dispute centered around an upcoming multiday evidentiary hearing, where Newton was expected to question witnesses about what work Lovell's trial attorney did on the case — and whether The Church of Jesus Christ of Latter-day Saint interfered with the trial by limiting what bishops who worked with Lovell at the prison could say on the stand.

Newton argued in court papers that the hearing would require hundreds of hours of investigation and preparation, which he estimated would cost more that $37,000. The county, however, had authorized payment of only $15,000. The attorney said concerns about inadequate pay on Lovell's case and another death penalty appeal was causing him stress-related heart problems.

Weber County 2188

Second District Judge Michael DiReda, who is presiding over the evidentiary hearing that was ordered by the Utah Supreme Court, ruled on Tuesday that Newton could withdraw, finding there was a conflict of interest because of Newton's health concerns. DiReda ordered Weber County to appoint a new attorney for Lovell by Sept. 20.

Newton told The Tribune on Friday, "It is unfortunate that I was placed in a position where I had to chose between supporting my family and representing Mr. Lovell.

"I hope that the state of Utah and Weber County will commit in the future to adequately and fully paying for these necessary appellate reviews in such serious matters."

It is unlikely that the evidentiary hearing, currently scheduled to begin Sept. 25, will go forward.

Ahead of DiReda's decision, Lovell, himself, typed two letters to the judge, pleading with him to keep Newton on the case and asking the judge to order Weber County to renegotiate Newton's contract.

Doug Lovell letter by The Salt Lake Tribune on Scribd

Weber County 2189

State of Utah v. Douglas A. Lovell

**FILED**

AUG 29 2017

SECOND
DISTRICT COURT

I, Douglas A. Lovell, pro se, asks this court to order Weber County (or the State of Utah) to pay for Samuel Newton, along with a second Rule 8 qualified attorney, to represent me not only in the 23B Remand proceedings pending before this court, but with the rest of my appeal before the Utah Supreme Court.

I believe that this court's orders have violated my Sixth Amendment right to counsel. I have the right to effective assistance of counsel for my defense. And I had just that! I had an attorney who was competent, who actually read my entire file, who met regularly with me & who, I believe, had my best interests at heart. He diligently worked on my case, met with & interviewed numerous witnesses & prepared a lengthy motion for the Rule 23B remand. I also know that he largely finished my brief on appeal, which I have reviewed.

This court has said that it will not get into a contract dispute between Mr. Newton & Weber County. However, this court needs to do just that! The Constitution of the State of Utah & the United States Constitution trumps any statute or rule which would deny my attorney funding because I am entitled to effective assistance

"For the first time, I got an attorney who represented me to the fullest," Lovell wrote, "who knows my case inside & out & now the county had pulled the rug on funding him. I am left, in the middle of my appeal, with numerous delays that are not my fault, but the state's fault. I do not feel I will get a better attorney and, like before, I will be stuck with someone who won't work properly on this case."

In another letter, Lovell listed many of the attorneys the county has appointed to represent him during the past two decades.

There was a lawyer in 1992 who represented Lovell for $49, whom he met once or twice.

Weber County 2190

There was another attorney who represented him sometime in the 1990s, according to court records, but Lovell doesn't remember ever seeing him in the courtroom.

And after his case came back to the district court on appeal in 2011, he was appointed two attorneys that Lovell said he liked, but who asked to be taken off the case because they weren't qualified.

Doug Lovell letter by The Salt Lake Tribune on Scribd

Weber County 2191

August 28, 2017

Dear Judge DiReda,

Because of the problems I have had in the past with attorneys from Weber County, I feel the need to address this issue at this time, before counsel is again appointed to represent me.

In 1992, Weber County appointed John Caine & Bernie Allen to represent me. From May of 1992 through August of 1993, I talked with Mr. Caine on the phone maybe 1 or 2 times & legal visits about the same. He filed maybe 3 or 4 motions; 2 of which were at my request. After I received the death penalty, Mr. Caine admitted in a deposition that he represented me for a total amount of $49.00. He also admitted that had he done my direct appeal, he would have received a total amount of $500.00.

In a 2005 evidentiary hearing, he said that he didn't hire a mitigation specialist or had a mental evaluation done on me because things like that weren't being done in 1992 & 93. Mr. Caine obviously had no knowledge of the 1989 ABA Guidelines.

As for Bernie Allen, although court dockets & records show that he was my attorney, I have no recollection of ever meeting Mr.

That's when he was appointed the attorneys who represented him in a 2015 trial, Michael Bouwhuis and Sean Young. The work that Young did preparing witnesses in the penalty phase is at the heart of the upcoming evidentiary hearing, as Newton claims Young did not contact a number of character witnesses who wanted to testify on Lovell's behalf.

"On appeal, we discovered that Mr. Lovell's trial attorney committed serious errors when he failed to interview and call dozens of witnesses who would have testified that Mr. Lovell has tried to change his life," Newton said, "that he feels tremendous remorse, and that he has tried, to the best he is able, to repay some of the the debt he owes to society and to the Yost family."

Weber County 2192

Bouwhuis, who oversees Weber County's contracts for public defenders, wrote in an affidavit that Young's public defender contract was terminated after Lovell's trial.

A Utah judge ruled last month that Young violated attorney rules in Lovell's case by failing to contact the witnesses and by refusing to provide Lovell's case file to Newton until a judge ordered him to do so. Young also faces discipline for an unrelated immigration case. A sanctions hearing has not yet been scheduled.

Weber County Attorney Christopher Allred did not respond to a request for comment on Friday.

Lovell in April 1985 followed Yost home from a Clearfield restaurant, kidnapped her from her apartment parking lot and sexually assaulted her in the parking lot and at his home, according to trial testimony.

After she reported the crime, Lovell began to plot the woman's death to keep her from testifying. He tried twice to hire men to kill the woman, then decided to do it himself.

On Aug. 10, 1985, he kidnapped Yost again from her South Ogden apartment and took her to the mountains east of Ogden, where he strangled her and left her body under handfuls of dirt and leaves.

Her body was never found, despite an extensive search to the area by police in 1993, after Lovell struck a plea deal that spared him the death penalty if he could lead authorities to her body.

Weber County 2193

10/26/2017   Appellate attorney withdraws from Utah death penalty case, saying, 'I had to choose' between financially supporting family or representing Dou...

After the fruitless search, an Ogden judge sentenced Lovell to death by lethal injection. But he was allowed to withdraw his plea in 2011 after the Utah Supreme Court ruled he should have been better informed of his rights during court proceedings. A jury again convicted him to death after the 2015 trial.

Comments (31)                                                    f   🐦   ✉



jmiller@sltrib.com
🐦 Follow @jm_miller

Weber County 2194

CHRISTOPHER F. ALLRED, NO. 7801
Weber County Attorney
BRYAN R. BARON, NO. 13635
Weber County Attorney's Office
2380 Washington Blvd., Suite 230
Ogden, Utah 84401
Telephone: (801) 399-8377
Facsimile: (801) 399-8304
bbaron@co.weber.ut.us
*Attorneys for Weber County*

## IN THE SECOND JUDICIAL DISTRICT COURT
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br><br>    **Plaintiff,**<br><br>vs.<br><br>DOUGLAS A. LOVELL,<br><br>    **Respondent,**<br><br>WEBER COUNTY,<br><br>    **Intervenor.** | \*\*\*UNDER SEAL\*\*\*<br><br>**MEMORANDUM IN OPPOSITION TO EX PARTE MOTION FOR PAYMENT OF ATTORNEY FEES AND LITIGATION EXPENSES**<br><br>**Case No.: 921900407**<br><br>**Judge: MICHAEL D. DIREDA** |

Intervenor, Weber County ("County"), by and through its counsel of record, hereby submits this memorandum in opposition to Defendant's *Ex Parte Motion for Payment of Attorney Fees and Litigation Expenses*, filed in this criminal action on March 17, 2017 ("Defendant's Motion").

### FACTS

1.  On June 28, 1993, Douglas Lovell ("Defendant") pled guilty to aggravated murder of Joyce Yost. On August 20, 1993, the district court sentenced Defendant to death.



DEPOSITION
EXHIBIT
7
Baron

2.    Defendant filed a motion to withdraw his guilty plea which was denied by the district court as being untimely. The Utah Supreme Court reversed the denial and remanded the case for consideration of the motion. On remand, the district court denied Defendant's Motion again, and in 2010, the Supreme Court reversed the second denial.

3.    In March 2015, Defendant was given a new trial. He was represented by two attorneys, Michael Bouwhuis and Sean Young, who were hired by the County to provide a defense and who were paid over $120,000 for that defense.

4.    Although Defendant did not plead guilty, he did not contest the guilt phase of the trial. He only contested the sentencing phase. On April 1, 2015, the jury sentenced Defendant to death.

5.    In April 2015, the County entered into a contract with Samuel Newton ("Mr. Newton") to represent Defendant on appeal.

6.    The contract with Mr. Newton provided $75,000 to represent Defendant on appeal at a rate of $150 per hour. The contract also provided that "the $75,000 limit may only be exceeded upon showing of good cause to both the court and the County." (Exhibit A, Section Two, Paragraph A). In Section Three, the contract provides that the County will reimburse expenses for investigative services and other costs.

7.    On January 2, 2017, Mr. Newton sent a letter to Bryan Baron ("Mr. Baron"), counsel for the County, and indicated that he planned to file a motion with the court seeking additional funding. Mr. Baron called Mr. Newton and discussed the contract provision for obtaining additional attorney fees. Mr. Baron indicated that in his opinion it wouldn't be necessary to involve the court because the County would likely find good cause and approve additional funding.

8.     On January 5, 2017, Mr. Newton sent a letter to the Weber County Commissioners requesting additional funding and indicating that he believed the additional work would require 600 to 700 hours (i.e. $90,000 to $105,000). At that point in time the Supreme Court had not yet remanded the case to the district court.

9.     On March 7, 2017, Mr. Newton sent an update to the Commissioners indicating that Defendant's case had been remanded and again requested additional funding. (Exhibit B).

10.    On March 14, 2017, the County Commissioners responded to Mr. Newton's request for additional funding indicating that they believed Mr. Newton's estimate was high and that the additional work would likely only take 100 hours (i.e. $15,000) to complete. (Exhibit C).

11.    Later that day, Mr. Newton requested authorization for all past work and 100 hours of future work. He then stated "At 100 hours, I can give you a better estimate of where we are and what it will take. Perhaps I will have over-estimated and we won't need any or much more." (Exhibit D).

12.    On March 23, 2017, the Commissioners responded by agreeing that 100 hours seemed to be a reasonable estimate and then stating "[i]f the remand takes longer than 100 hours, and you can justify the additional time, we will remain open to another request for additional funding." (Exhibit E).

13.    Defendant's Ex Parte Motion for Payment of Attorney Fees and Litigation Expenses was filed on March 20, 2017.

## ARGUMENT

### I.    THE COUNTY IS FULFILLING ITS OBLIGATION TO PROVIDE AN ATTORNEY FOR THE DEFENDANT

The County has an obligation to provide Defendant with an attorney on appeal, and the County is fulfilling that obligation.

The County's obligation to provide a legal defense for indigent defendants is found in the Indigent Defense Act, which is located in Title 77, Chapter 32 of the Utah Code.  Pursuant to Section 77-32-301 "Each county . . . shall provide for the legal defense of an indigent in criminal cases . . . in accordance with legal defense standards as defined in Subsection 77-32-201(12)." Subsection 77-32-201(12) states "Legal Defense" means to "provide defense counsel for each indigent who faces the potential deprivation of the indigent's liberty; . . . provide the defense resources necessary for a complete defense . . . provide a first appeal of right; and prosecute other remedies before or after a conviction, considered by defense counsel to be in the interest of justice except for other and subsequent discretionary appeals or discretionary writ proceedings."[1]

As a result of the above requirements, the County contracts with public defenders to represent indigent defendants in the district court and in the appellate courts. Mr. Newton is one of those public defenders who has a contract with the County to represent defendants on appeal. In fact, Mr. Newton has two contracts with the County.  Mr. Newton's first contract with the County is to handle general appeals from the district court and specifically provides that "aggravated murder appeals . . . will be contracted separately."  As a result, when Defendant's case was appealed, the County entered into a second contract with Mr. Newton to represent Defendant on appeal.

Under the terms of that second contract, Mr. Newton is provided with $75,000 for attorney fees as well as reimbursement for costs of printing briefs, transcripts, investigation expenses, and travel expenses.  In addition, the County has provided a method for Mr. Newton to obtain additional attorney fees upon a showing of good cause.

---

[1] According to Utah Code § 77-32-201(4) the term "Defense resources" does not include "legal counsel," and the process of obtaining financing for defense resources by filing a motion with the court pursuant to Utah Code § 77-32-305.5 is not applicable here.

Mr. Newton argues in Defendant's Motion that he doesn't have an investigator; however, his contract specifically provides that Mr. Newton will be reimbursed for investigator fees at the rate of $60 per hour.  (Exhibit A, Section Three).  Mr. Newton is well aware of that provision as he has hired an investigator for this case in the past. (Exhibit F).

The County has been meeting its legal obligation to Defendant by providing him with counsel throughout the trial and the appellate phases of his case.

## II.    MR. NEWTON'S COMPENSATION UNDER HIS CONTRACT WITH THE COUNTY SHOULD BE DETERMINED BY NEGOTIATION BETWEEN THE PARTIES TO THE CONTRACT

The amount of compensation for an attorney that contracts with the County is a contractual matter that should be determined by the parties.

None of the 18 cases cited in Defendant's Motion addresses compensation for appointed attorneys, and there is no provision in the Indigent Defense Act that establishes requirements for the County to pay a specific amount to an attorney who has contracted to provide defense services.  The only sections that address compensation are Section 77-32-304 and 304.5.

Section 77-32-304 indicates when an assigned attorney should be entitled to compensation, but it doesn't provide any guidance on how much a contract attorney should be paid.  Furthermore, 77-32-304 wouldn't even apply in this situation because Mr. Newton is providing services "under this chapter or under a separate fee arrangement." *Id.* at (3)(c).

Section 77-32-304.5 deals specifically with "Reasonable compensation for defense counsel for indigents" and sets forth various guidelines for determining the rate of compensation.  However, paragraph (1) of that section specifically states that "[t]his section does not apply to any attorney acting as a defense services provider or otherwise under contract with the county or municipality for defense or an indigent person." *Id.*  In passing that provision, the Legislature

NEWTON000318

recognized that attorneys who contract with the County are capable of negotiating the terms of compensation in their own contract and that only those attorneys who are appointed without a contract require assistance from the Legislature and the court in establishing their rate of compensation.

As has been stated previously, Mr. Newton has two contracts with the County to provide appeals for indigent defendants: one for general appeals, and one specifically for Defendant's case. Mr. Newton knew going into this case that he was handling a capital case and that it would require a substantial amount of time to complete the case. He negotiated terms that provided a substantial amount of funding for the case and a means to negotiate additional funds if needed.

Mr. Newton argues that "there are constitutional problems with Mr. Lovell even having to ask the county commission for funding in this matter. It violates principles of separation of powers, attorney-client privilege and independence. The State should have no part in the resources of their opponent." First, the County is not the State, and the State is not the County. The two entities are separate and distinct. The State is prosecuting Mr. Lovell and has no part in the financing of the defense. The County is responsible for financing the defense and rightfully has a say in how much of its taxpayers dollars are spent to ensure that defendants are provided with counsel. If the contract attorney isn't satisfied with the rate of compensation under his contract, it is his obligation to negotiate new terms to the contract—not the Defendant's.

Mr. Newton argues that "Mr. Lovell would not have to make any of those requests were he independently wealthy." Unfortunately, most of us don't have the privilege of being independently wealthy, but fortunately the law provides for the defense of indigent defendants including Defendant. Not many of us could afford the type of defense that Defendant has already been provided. Just in this most recent trial and appeal Defendant has already received

NEWTON000319

over $120,000 for his trial counsel and $75,000 for his appellate counsel, not to mention the tens of thousands of dollars that have been spent on transcripts, investigator fees, and witness fees. Mr. Lovell is already receiving defense resources far above what most of us could afford, and he will continue to receive the resources he needs whether or not Mr. Newton continues with his representation.

Mr. Newton argues that "[t]his court must authorize, under the constitution, additional funding so that Mr. Lovell has access to the counsel he is entitled." The County has already met the Constitutional requirements of providing Defendant with counsel. Neither the Constitution nor statute nor case law require the County to pay a certain amount for an attorney or for a specific attorney. Mr. Newton negotiated his contract with the County back in 2015. He is not entitled to "additional funding" ordered by the court just because he has contracted to represent a defendant. Mr. Newton is being generously compensated, and he will continue to be compensated, but he needs to justify his requests for additional compensation based on work that is reasonably related to the defense.

On remand the Supreme Court is requiring the district court to make findings regarding approximately 22 witnesses. Mr. Newton predicts that the evidentiary hearing will take a full 10 to 15 days, and he has estimated that it will take him an additional 600 to 700 hours to conduct the hearing and incorporate the new evidence into his brief. Because it has been 25 years since Defendant was first convicted, there is a high likelihood that many of the witnesses remember little about Defendant. After contacting those witnesses through his investigator, Mr. Newton may even decide that many of them don't need to appear in court to testify on the record. Even if some of the witnesses have relevant information, it is highly speculative that it will take a full 10 to 15 days to question them.

NEWTON000320

Mr. Newton argues that he will need to incorporate the trial court's findings into his initial brief. It's difficult to speculate how much time that will actually take to accomplish that task until the evidentiary hearing has taken place and Mr. Newton knows whether the information from the hearing is relevant. The County has already approved additional funds for Mr. Newton to perform 100 hours of additional work on this case and has indicated that it is open to additional requests for funding in the event the work required on remand takes longer than 100 hours.

## III.   THE COURT IS LIMITED TO DETERMINING WHETHER GOOD CAUSE EXISTS TO EXCEED THE $75,000 CAP AND NOT TO WHAT EXTENT THE CAP SHOULD BE EXCEEDED

The court's only involvement in this matter should be to determine whether Mr. Newton has good cause to exceed the contract's $75,000 cap.

Because the County is meeting its legal obligation by providing Defendant with an attorney, and because the compensation of that attorney should be determined by the parties to the contract, the court's only authority to become involved in this matter is provided by the parties' contract. That authority is found in Section Two, Paragraph A of the contract and limits the court's input to deciding if Mr. Newton has demonstrated "good cause" to exceed the cap of $75,000 in attorney fees. The contract does not grant the court authority to order the County to pay a certain sum over $75,000, the decision as to how much to pay Mr. Newton rests with the County. As a result, the only finding the court should make in response to Defendant's Motion should be a finding that good cause exists to exceed the $75,000 cap.

In this case, the County has already found good cause to exceed the $75,000 cap by 100 hours (i.e. $15,000) and has waived the requirement for Mr. Newton to go to the court to obtain a

finding of good cause as well.  In the event Mr. Newton can justify additional hours, the County

has indicated that it would be open to additional requests for funding.

## IV.  DEFENDANT'S REQUEST FOR ADDITIONAL FUNDING SHOULD BE DENIED BECAUSE THE ISSUE IS NOT RIPE FOR DECISION

In the event the court determines that it has a legal obligation to dictate to the

County how much Mr. Newton is being compensated for his work, the court should find

that Defendant's request for additional funding is not ripe because the County has already

agreed to provide Mr. Newton with additional funding.

In the case of *Fundamentalist Church of Jesus Christ of Latter-Day Saints v.*

*Lindberg*, 238 P.3d 1054, 1065-66 (Utah 2010) the Utah Supreme Court explained when

a dispute is and when it is not ripe.

> "A dispute is ripe when a conflict over the application of a legal provision has
> sharpened into *an actual or imminent clash of legal rights* and obligations
> between the parties thereto. An issue is not ripe . . . if there exists no more than a
> difference of opinion regarding the *hypothetical application of a provision* to a
> situation in which the parties might, at some future time, find themselves."

*Id* at 1065–66 (internal quotations, citations, and emphasis omitted).

In this case, the County has provided and continues to provide a legal defense for

Defendant.  The disagreement at this point in time is over the *estimate* of time it will take for Mr.

Newton to complete the work required of him on remand.  The County has already agreed to pay

Mr. Newton up to 100 hours for that work, and the County has indicated that it would be willing

to consider a request to pay more than 100 hours if those additional hours can be justified by Mr.

Newton.

Mr. Newton's request for the court to approve 200 additional hours is based on a

hypothetical situation that may or may not arise at some future time, and Mr. Newton even

admits that he may have "over-estimated." (Exhibit D).  Until Mr. Newton completes the

evidentiary hearing, it will be impossible to determine how much time it will take and what relevant evidence will be uncovered.  Until Mr. Newton has exhausted the additional 100 hours of time he has been provided and has been denied a request for additional revenue, there is no actual dispute that the court can rule upon.

### CONCLUSION

The County asks the court to find that it has met its legal obligation by providing a legal defense to Defendant and that the court has no obligation to dictate to the County how much Mr. newton is being compensated under his contract.

In the alternative, the County asks the court to determine that this claim is not yet ripe for decision as the disagreement only involves speculation over how much time Mr. Newton will spend completing the work required of him on remand.

DATED this 31st day of March, 2017.

/s/ Bryan R. Baron
BRYAN R. BARON
Deputy County Attorney

## CERTIFICATE OF MAILING

I do hereby certify that I delivered a true and correct copy of the foregoing to the

following as outlined herein:

Samuel Newton                          [x] U.S. Mail
Attorney for Defendant                 [ ] Facsimile
40 2nd Street E, Suite 222             [ ] Hand delivery
Kalispell, MT 59901-2514               [ ] E-filing


The foregoing was performed on this 31st day of March, 2017.


/s/ Bryan R. Baron
BRYAN R. BARON
Deputy County Attorney

# EXHIBIT A

NEWTON000325

C 2015-137    4-14

## CONTRACT FOR APPELLATE DEFENSE COUNSEL SERVICES
## FOR AN INDIGENT DEFENDANT

THIS CONTRACT is made and entered into by and between Weber County, a body corporate, politic and political subdivision of the State of Utah, hereinafter "COUNTY," and Samuel Newton, who shall be called "APPELLATE COUNSEL" in this contract.

### RECITALS

**WHEREAS,** Douglas Lovell (hereinafter "the defendant"), an inmate in the Utah State Prison, was charged with the commission of the offense of Capital Murder; and

**WHEREAS,** the Court found the defendant to be indigent and entitled to the assignment of defense counsel pursuant to § 77-32-1, *Utah Code Ann.*, at public expense; and

**WHEREAS,** the defendant was convicted on March 18, 2015, by a duly seated jury of the offense of one count of Aggravated Murder, Aggravated Sexual Assault, Forcible Sodomy, Conspiracy to Commit Murder with William Wiswell, conspiracy to Commit Murder with Tom Peters and Witness Tampering and was also given a sentence of death by the jury on April 1, 2015; and

**WHEREAS,** the defendant has decided to appeal his conviction and under the provisions of Section 77-32-301(5) *Utah Code Ann.*, COUNTY is obligated to provide the services of legal appellate counsel for the first appeal of right of an indigent defendant in a criminal case; and

**WHEREAS,** APPELLATE COUNSEL is an attorney duly licensed to practice law in the State of Utah and is qualified to be appointed as defense APPELLATE COUNSEL in this first appeal of right; and

**WHEREAS,** The parties have negotiated a reasonable compensation for the services of APPELLATE Counsel as appellate counsel for the defendant for this appeal and it is the intent of the parties that the terms of that compensation be set forth in this contract;

**NOW THEREFORE,** in consideration of the mutual terms and conditions set forth herein, the parties hereto do hereby agree as follows:

### SECTION ONE
### SERVICES

APPELLATE COUNSEL shall represent the defendant, Douglas Lovell, in Criminal Case No. 921900407 before the Utah Supreme Court in the first appeal of right of the conviction of the offenses of Aggravated Murder, a capital offense.  A first appeal of right shall not include other and discretionary appeals or discretionary writ proceedings.

Page 1 of  5

NEWTON000326

APPELLATE COUNSEL will file petitions for writs of certiorari to the Utah Supreme Court when, in the APPELLATE COUNSEL'S judgment, such petitions satisfy the grounds for certiorari review detailed in Utah Rule of Appellate Procedure 46. APPELLATE COUNSEL will also respond to petitions for writs of certiorari that the prosecution files.

APPELLATE COUNSEL may, if counsel deems it legally necessary, petition for certiorari to the United State's Supreme Court.

## SECTION TWO
## COMPENSATION

A.    The total compensation to be paid to APPELLATE COUNSEL in this case shall be at the rate of $150 per hour up to the amount of $75,000. The $75,000 limit may only be exceeded upon showing of good cause to both the court and the COUNTY.

B.    APPELLATE COUNSEL shall submit statements sufficiently itemizing and describing the services performed for which compensation is claimed and such other information as may be reasonably required by the COUNTY in order to properly review, evaluate, and process the statement.

C.    If the appeal is resolved, withdrawn, or rendered moot for whatever reason, COUNTY shall be obligated to pay and APPELLATE COUNSEL entitled to receive only those fees and expenses due up to and at that point.

D.    In the event APPELLATE COUNSEL receives payment from another source as payment of fees in representing the defendant in this appeal, APPELLATE COUNSEL shall reimburse COUNTY for any consideration paid under this contract to the extent of such payments.

## SECTION THREE
## REIMBURSEMENT OF EXPENSES

The COUNTY shall reimburse APPELLATE COUNSEL for the expenses of printing or typewriting briefs, including expenses of depositions and other transcripts as prescribed by §77-32-305, *Utah Code Ann.* The COUNTY will pay the cost of the transcript directly to the court reporter. The COUNTY shall also reimburse expenses, exclusive of overhead and extraordinary expense not approved by the court in accordance with §77-32-305.5, *Utah Code Ann.,* reasonably incurred by APPELLATE COUNSEL in hiring investigators, mental health or other experts, such as may be necessary if a Rule 23B motion is required. Travel reimbursement will be paid at the State of Utah rates. Investigators will be paid a maximum of $60 per hour and mitigations specialist will be paid a maximum of $75 per hour. "Extraordinary expense" means the collective expense which exceeds Five Hundred Dollars ($500) for any particular service or item such as experts, investigators, surveys, or demonstrative evidence

NEWTON000327

## SECTION FOUR
## WITHDRAWAL OR DISMISSAL

In the event APPELLATE COUNSEL is unable to undertake or continue the representation of the defendant or in the event of the court-approved dismissal or withdrawal of APPELLATE COUNSEL, compensation shall be paid only to the date of that dismissal or withdrawal.

## SECTION FIVE
## INDEPENDENT CONTRACTOR

APPELLATE COUNSEL is an independent contractor providing professional legal services and is not an employee of the COUNTY and is therefore not entitled to any of the benefits of employment such as, but not limited to, retirement, health, or Workers Compensation coverage.

## SECTION SIX
## INDEMNIFICATION AND INSURANCE

A.   APPELLATE COUNSEL shall indemnify and save the COUNTY and its officers, agents, and employees harmless from and against all claims for damages or injuries resulting from any claimed malpractice, injury, death, damages, and any other causes of action arising directly or indirectly from the performance of this contract by APPELLATE COUNSEL.

B.   APPELLATE COUNSEL shall maintain such insurance as will cover APPELLATE COUNSEL from any and all claims for malpractice, property damages, injuries, or death made by any person that may arise from the performance of this contract. APPELLATE COUNSEL shall provide the COUNTY with appropriate certificates of insurance as evidence of that coverage upon the execution of this contract. APPELLATE COUNSEL agrees not to cancel such insurance during the pendency of this contract.

## SECTION SEVEN
## RECORDS AND REPORTS

APPELLATE COUNSEL shall maintain such records and accounts as may be deemed reasonable and necessary by the COUNTY to assure a proper accounting for all compensation and reimbursements paid to APPELLATE COUNSEL under this contract. APPELLATE COUNSEL shall, upon request, make those records available to the COUNTY for audit purposes and shall maintain those records for a period of three (3) years or such other longer period as may be required by law after the expiration of this contract. Any attorney/client privileged information is specifically excluded from the terms of this disclosure provision, and will not be disclosed.

NEWTON000328

**SECTION EIGHT**
**NOTICE**

All notices to be given under this contract shall be delivered to the parties at:

Samuel Newton, Attorney at Law
1267 Quarter Horse Ln.
Kalispell, MT 59901-2514
info@snewtonlaw.com


Weber County Clerk/Auditor's Office
2380 Washington Blvd., Ste 320
Ogden, UT 84401

with a copy to:

David C. Wilson
Civil Division Chief
Weber County Attorney's Office
2380 Washington Blvd., Ste 230
Ogden, UT 84401

**SECTION NINE**
**MISCELLANEOUS**

A.   APPELLATE COUNSEL may not assign this contract or the performance under it, in whole or in part, without the prior written approval of COUNTY.

B.   This contract sets forth the complete agreement between the parties and may be modified only by a subsequent written instrument approved and signed by both parties.

C.   This Agreement can be changed, modified or amended only by written agreement of the parties hereto.

D.   Attorney is an independent contractor and is responsible to pay any and all taxes and fees which may result from the compensation paid to Attorney pursuant to this Agreement.

E.   This Agreement shall constitute the entire agreement between the parties and by prior understanding or representation of any kind preceding the date of this Agreement shall not be binding upon either party except to the extent incorporated in this Agreement.

F.   This Agreement shall be governed by the laws of the State of Utah.

Page 4 of 5

NEWTON000329

**IN WITNESS WHEREOF** this contract has been signed in triplicate by the parties, each of which shall be deemed an original, on the 14 day of April, 2015.

APPELLATE COUNSEL

By_____
        Samuel P. Newton

BOARD OF COUNTY COMMISSIONERS
OF WEBER COUNTY

By_____
        Kerry W. Gibson, Chair

ATTEST:

_____
Ricky Hatch, CPA
Weber County Clerk/Auditor

Page 5 of  5

NEWTON000330

**IN WITNESS WHEREOF** this contract has been signed in triplicate by the parties, each of which shall be deemed an original, on the ___day of April, 2015.

APPELLATE COUNSEL

By_____
       Samuel P. Newton

BOARD OF COUNTY COMMISSIONERS
OF WEBER COUNTY

By_____
       Kerry W. Gibson, Chair

ATTEST:

_____
Ricky Hatch, CPA
Weber County Clerk/Auditor

NEWTON000331

# EXHIBIT B

NEWTON000332

 Gmail

Bryan Baron <bryanrbaron@gmail.com>

## Fwd: Douglas Lovell Public Defender Appeal

1 message

**Bryan R. Baron** <bryanrbaron@gmail.com>
To: "Baron,Bryan" <bbaron@co.weber.ut.us>

Tue, Mar 7, 2017 at 12:02 PM

——— Forwarded message ———
From: **Sam Newton** <sam@snewtonlaw.com>
Date: Tue, Mar 7, 2017 at 11:38 AM
Subject: Re: Douglas Lovell Public Defender Appeal
To: jharvey@co.weber.ut.us, jebert@co.weber.ut.us, kgibson@co.weber.ut.us, "Bryan R. Baron"
<bryanrbaron@gmail.com>
Cc: Mike Bouwhuis <barrister63@comcast.net>

Hello again Commissioners. Yesterday, the Utah Supreme Court issued an order remanding Doug Lovell's case for
further proceedings in the trial court related to ineffective assistance of counsel. I have attached that order. The order
involves calling at least 26 witnesses to testify and I would also include Mike Bouwhuis in there as well as attorneys for
the LDS church and potentially some church leaders who communicated with witnesses. I anticipate that this will involve
a week or two of evidentiary hearings. From there, I will need to revise Mr. Lovell's brief on appeal given a whole new
record that will need to be developed.

As you recall, I am completely out of funding on Mr. Lovell's case. I, along with everyone, did not anticipate that there
would be this level of ineffectiveness on appeal. In fact, I just attended bar disciplinary proceedings against Mr. Young
for this case and the bar has determined the misconduct to be quite serious. I have continued to meet with Mr. Lovell
and work on his case without pay. But I cannot continue on the appeal without further funding. This will need to be
resolved expeditiously because the Supreme Court's order calls for the matter to be addressed and resolved in the next
90 days.

If the commission is not inclined to grant funding, then I will need to file something with the District Court asking for
funding, or alternatively, to withdraw. If you could get back to me soon, that would be appreciated. Thanks for
everything!

sam



**Samuel P. Newton** / Attorney at Law
sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC**
Office: (406) 407-7323 / Fax: (406) 203-1144
40 2nd Street E, Suite 222
Kalispell, MT 59901
www.snewtonlaw.com



On Jan 5, 2017, at 10:41 AM, Sam Newton <sam@snewtonlaw.com> wrote:

Hi Commissioners,

Bryan Baron asked me to contact you about funding on this case. I was appointed to represent Douglas
Lovell on appeal to the Utah Supreme Court as his public defender. I have included a letter from the Utah
State Bar.

NEWTON000333

Let me know if I can answer any questions. Thanks again!

sam



**Samuel P. Newton** / Attorney at Law
sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC**
Office: (406) 407-7323 / Fax: (406) 203-1144
40 2nd Street E, Suite 222
Kalispell, MT 59901
www.snewtonlaw.com



<2017_01_05, Letter to WCC.pdf>
<2016_12_13, Sean Young Complaint .pdf>

**20150632-ORDER.pdf**
182K

# EXHIBIT C

NEWTON000335

 Gmail

Bryan Baron <bryanrbaron@gmail.com>

---

## RE: [CAUTION]Re: Douglas Lovell Public Defender Appeal
1 message

---

**Harvey, Jim H.** <jharvey@co.weber.ut.us>                     Tue, Mar 14, 2017 at 5:57 PM
To: Sam Newton <sam@snewtonlaw.com>, "Ebert,James" <jebert@co.weber.ut.us>, "Gibson,Kerry"
<kgibson@co.weber.ut.us>, "Bryan R. Baron" <bryanrbaron@gmail.com>
Cc: Mike Bouwhuis <barrister63@comcast.net>

Dear Mr. Newton

I received your email requesting additional funds on the Doug Lovell case.  I also received the email that you sent to
Mr. Baron estimating that the remand to district court would add approximately 500 to 750 hours of work to the
case.  After speaking with our civil attorneys and the other commissioners, the county is prepared to provide you with
an additional $15,000 to finish this appeal.

While we recognize that the remand of the Lovell case was unanticipated in the original contract and will cause you
additional work, we don't agree that it will take an additional 500 to 750 hours to complete that work.  It is highly
likely that the majority of the witnesses you wish to call will have little to no helpful information.  As such, we
estimate that it will only take approximately one week, or 40 hours, to conduct the hearings, 40 hours to prepare for
the hearings, and another 20 hours to revise your initial brief.  The total additional hours of work should in no way
exceed 100.  At $150 per hour that would equal a total of $15,000.

The $75,000 that was provided to you initially was intended to cover the Reply brief which shouldn't be impacted by
this remand, so we are not offering additional compensation for that.

Please advise me soon with acceptance of this offer so I can have Mr. Baron prepare a contract to that effect.

Regards,


James H. **"Jim" Harvey**



# EXHIBIT D

NEWTON000337

 Gmail                                    Bryan Baron <bryanrbaron@gmail.com>

## Re: [CAUTION]Re: Douglas Lovell Public Defender Appeal
1 message

**Sam Newton** <sam@snewtonlaw.com>                              Tue, Mar 14, 2017 at 6:37 PM
To: "Harvey, Jim H." <jharvey@co.weber.ut.us>
Cc: "Ebert,James" <jebert@co.weber.ut.us>, "Gibson,Kerry" <kgibson@co.weber.ut.us>, "Bryan R. Baron"
<bryanrbaron@gmail.com>, Mike Bouwhuis <barrister63@comcast.net>

Thanks for replying. I appreciate the commissioners considering additional funding and your offer of more funding. I have
to disagree about the amounts for a few reasons:

1. Right now, the county's current balance with me is $8294. That is billed amounts, (which I stopped billing in January
2017 because we went over the caps) that went over the $75,000 contract. For unbilled amounts from January to the
present, it is now at $3015.00. That included attending a hearing at the Utah State Bar where I was asked to testify and
a meeting with Sean Young, filing a reply to the State's 23B response and correspondence with Mr. Lovell. So, already, I
have exceeded the contract by $11,000, leaving only $4,000 for the rest of the work.

2. The Supreme Court's remand contemplates over two dozen witnesses. It names 22, but I think I will have to call three
or four other witnesses for much closer to 25 or 26 witnesses. I don't think their testimony is insignificant. I have
interviewed most of them personally and find that their testimony would have been compelling in Mr. Lovell's case. I
wouldn't have raised the issue if I did not think it meritorious. Indeed, I think it's important to consider that the Supreme
Court deemed the issues I raised worthy of remand and required the trial court to consider that evidence. Because these
witnesses did not testify, I will need to put their testimony on, as if this were the penalty phase of the capital case so the
judge can decide if their testimony would have been helpful and if Sean was ineffective in not calling or preparing them.
My review of Mr. Lovell's penalty phase shows that they called on average 5-7 witnesses a day.  One day, they called
only two. That is why I assume that the evidentiary hearing will take about 10-14 days. Court time alone, not including
witness and prep would take 40-60 hours.

3. From there, in my experience, it is not a simple revision of Mr. Lovell's appeal. These may be the major issues in his
appeal. The average penalty phase transcript was around 250 pages. Multiply that by 10-14 and you get 2500 - 3000
pages of new record. The process of drafting, citing to, and creating an appellate document from that much information
will not go quickly, especially if I decide that these are the critical issues to brief. I honestly believe that this will take at
least 100-200 hours. Then you have to factor in a reply brief. My brief, as it stands now, is 307 pages. Adding this new
information may well be 100-150 extra pages of briefing. The reply brief would arguably be upwards, then of 200 pages,
which will be no small task to write. While I can write quickly, I'm not that fast! And, a reply brief is not a simple revision.
In many ways, I will have to incorporate a host of unanticipated testimony.

I have to be realistic here and I'm really not trying to waste everyone's money. I try to be very conservative with it. I
recognize your stewardship over county funds and the importance of that. I have never, in all my years with Weber
County, had to ask for more money than my contract. I recall in the Riqo Perea case actually coming in close to budget
and offering to take a loss on that case. But I also have a family to feed and cannot afford to donate my services for
what I know will take me a significant amount of work. I just cannot do what it takes with that amount of time.

What if we consider a few options: what if the county authorizes some funds now and we can revisit it as things go
along? Say authorize past work and 100 hours of future work. At 100 hours, I can give you a better estimate of where we
are and what it will take. Perhaps I will have over-estimated and we won't need any or much more.

If this does not work, I will need to, as soon as possible, file a motion with the district court for funding or to allow me to
withdraw as his attorney.

Thanks again.

sam



**Samuel P. Newton** / Attorney at Law
sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC**
Office: (406) 407-7323 / Fax: (406) 203-1144
40 2nd Street E, Suite 222

NEWTON000338

# EXHIBIT E

NEWTON000339

**Baron, Bryan**

| | |
|---|---|
| **From:** | Harvey, Jim H. |
| **Sent:** | Thursday, March 23, 2017 6:12 AM |
| **To:** | Sam Newton |
| **Subject:** | Re: [CAUTION]Re: Douglas Lovell Public Defender Appeal |

Dear Mr. Newton,

The original contract was for $75,0000 and additional funds are only authorized upon a showing of good cause. At this point, we feel that you have met that burden to some degree by demonstrating that the case has been remanded and will require additional work.

While it's uncertain how much time and effort will need to be put into the evidentiary hearings and revising the initial brief, 100 hours seems to be a reasonable estimate. If the remand takes longer than 100 hours, and you can justify the additional time, we will remain open to another request for additional funding.

Any work that has been completed to date and any work required for the reply brief or oral arguments we consider covered under the initial $75,000 amount.


Regards

Jim Harvey

NEWTON000340

# EXHIBIT F

NEWTON000341

## Baron,Bryan

**From:** Sam Newton <sam@snewtonlaw.com>
**Sent:** Friday, January 22, 2016 1:55 PM
**To:** Baron,Bryan
**Subject:** Re: Investigator for Lovell

Pay her directly.

Samuel P. Newton
*Attorney at Law*

 Law Office of Samuel P. Newton, PC
ATTORNEY & COUNSELOR AT LAW

1267 Quarter Horse Lane
Kalispell, MT 59901-2514
**Tel MT** (406) 407-7323
**Tel UT** (801) 624-6530
**Fax** (406) 203-1144
sam@snewtonlaw.com

> On Jan 22, 2016, at 1:54 PM, Baron,Bryan <bbaron@co.weber.ut.us> wrote:
>
> Good to know! ☺ I'll have Kim get that paid. Do you want it paid to you and then you can cut the check
> to the investigator, or would you like us to pay the investigator directly?
>
> **Bryan R. Baron**
> Deputy County Attorney
> WEBER COUNTY ATTORNEY'S OFFICE
> 2380 Washington Blvd., Suite 230, Ogden, UT 84401
> Office: 801.399.8471
> Fax: 801.399.8304
> Email: bbaron@co.weber.ut.us
>
> _____
>
> **From:** Sam Newton [mailto:sam@snewtonlaw.com]
> **Sent:** Friday, January 22, 2016 1:52 PM
> **To:** Baron,Bryan
> **Cc:** Kelly Madsen
> **Subject:** Fwd: Investigator for Lovell
>
> Hey Bryan, I know my contract says $60 an hour, but Dave agreed to $75 for 50 hours. See
> below...
>
>
> Begin forwarded message:
>
> **From:** "Wilson, Dave C." <dwilson@co.weber.ut.us>

NEWTON000342

**Subject: RE: Investigator for Lovell**
**Date:** November 9, 2015 at 9:47:33 AM MST
**To:** Sam Newton <sam@snewtonlaw.com>, "Allred, Christopher F."
<callred@co.weber.ut.us>

Sam,

That's my fault as I thought I had replied.  We are OK with the 50 hours at $75 an hour.  Let me know if you have questions.

Dave

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Monday, November 09, 2015 9:46 AM
**To:** Wilson, Dave C. <dwilson@co.weber.ut.us>; Allred, Christopher F. <callred@co.weber.ut.us>
**Subject:** Investigator for Lovell

Hey, I have asked several times about whether you are ok with me having the investigator do some work on Lovell—about 50 hours right now. I have yet to hear back. I just need an ok to get started. If you're opposed, that's fine and I can litigate it. I just need to know either way. Thanks all.

sam


Samuel P. Newton
*Attorney at Law*


<image001.png>

1267 Quarter Horse Lane
Kalispell, MT 59901-2514
**Tel MT** (406) 407-7323
**Tel UT** (801) 624-6530
**Fax** (801) 469-5879
sam@snewtonlaw.com

NEWTON000343

SAMUEL P. NEWTON (9935)
Counsel for Defendant/Appellant
Law Office of Samuel P. Newton, PC
The Historic KM Building
40 2nd Street E, Suite 222
Kalispell, MT 59901-2514
Tel. 801-624-6530 (UT)
Tel. 406-407-7323 (MT)
Fax 406-203-1144
sam@snewtonlaw.com



2017 APR 17 P 1:27

___ DISTRICT COURT

IN THE SECOND DISTRICT COURT
WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br>Plaintiff,<br><br>vs.<br><br>DOUGLAS A. LOVELL,<br>Defendant. | \*\*\* UNDER SEAL \*\*\*<br><br>**REPLY TO MEMORANDUM IN OPPOSITION TO EX PARTE MOTION FOR PAYMENT OF ATTORNEY FEES AND LITIGATION EXPENSES**<br><br>Case No. 921900407<br><br>Judge Michael D. DiReda |

Defendant, DOUGLAS A. LOVELL, by and through counsel of record, Samuel P. Newton, replies to Weber County's response[1] to his motion.[2]

The County estimates that it has fulfilled the obligation to give Mr. Lovell an attorney. Memo in Opposition ("Opp.") at 3. It argues that this is a contractual matter that should be

---

[1] Mr. Lovell does not agree that Weber County has standing to object to this request. As he noted, the State should have no part in the selection and funding of its adversary. Motion at 4. The County funds both the prosecution and the defense and has, already, sought to limit the work appellate counsel has done and needs to do in this case. He recognizes that this court has already denied a similar motion at the trial level, and so, consequently, he served this motion on the county. He, nonetheless, renews his objection here.

[2] This reply is filed later than allowed under the rules. Counsel did not receive a copy of the County's opposition until the date the reply was due. Mr. Baron indicated in email correspondence that he would not oppose a late response.

DEPOSITION
EXHIBIT
8
Baron

NEWTON000344

1

governed by the parties. Opp. at 5. Essentially, it argues that counsel "knew going into this case that he was handling a capital case" which "would require a substantial amount of time to complete ..." Opp. at 6. Yet, somewhat contradictory, the county argues that counsel "is being generously compensated, and he will continue to be compensated" so long as he justifies the expenditures. Opp. at 7.

Mr. Lovell agrees that the county has authorized $15,000 in additional funding toward handling the 23B Remand motion as well as revising the brief. However, the county has taken the position that the original $75,000 authorized constitutes the entirety of the amount it will pay for preparation of the brief and the reply brief. *See* email correspondence with Bryan Baron (Exhibit A). To date, counsel has exceeded that amount by over $7,000. Those excesses were prompted by major abnormalities that counsel did not, and realistically could not, contemplate at the outset: that Mr. Young did virtually nothing in representing Mr. Lovell. Indeed, he was fired for this misconduct specifically and the bar has opted to pursue formal disciplinary action against Mr. Young. This required counsel to spend an inordinate amount of time interviewing witnesses who were not called at trial (or inadequately prepared), collaborating on the creation of witness affidavits and writing and preparing a several hundred-page motion for 23B remand.

In fact, standard practice on a capital defense appeal would be to *not* raise ineffective assistance of counsel claims on direct appeal because of the difficulty of securing an adequate record to support the claims. However, because the ineffective assistance appeared to be major and serious, Mr. Lovell, after careful consultation with counsel decided that the best approach would be to raise these issues now. No party anticipated the major nature of counsel's failures at the outset. Certainly the county did not anticipate the failures because it was only after counsel's work on the appeal and the discovery of these issues that the county opted to terminate Mr. Young.

NEWTON000345

That termination was specifically related to Mr. Young's misconduct. *See* Affidavit of Michael Bouwhuis (Exhibit B).

Additionally, after filing the motion for Rule 23B remand, the Utah Supreme Court denied ruling on the motion until after the briefs were completed. This required counsel to fully brief Mr. Lovell's direct appeal. Counsel nearly completed that work, resulting in an over 300-page brief on direct appeal. However, on the eve of filing Mr. Lovell's brief, the State filed a response to the Rule 23B Motion, indicating that it would not oppose a remand. Given the State's lack of opposition, the Utah Supreme Court granted the Rule 23B motion.

Between that time, the Utah State Bar has moved forward with disciplinary proceedings against Mr. Young. Counsel represented Mr. Lovell before that body and was asked to testify as a witness at a formal disciplinary proceeding. Counsel spent time preparing for that proceeding, which has been important to Mr. Lovell's case as further evidence of his trial counsel's misconduct. He also has regularly communicated with Mr. Lovell about updates on the case.

The county has indicated that it will not pay for any of the foregoing work that exceeded the $75,000 soft cap in the contract. Indeed, the county's position is that counsel contracted for $75,000 for the appeal and that any work related to the 23B Remand will be covered by the additional $15,000 authorized. The county has plainly indicated that counsel will not be allowed additional funding. Coupled with the denial of $7,000+ for work already performed, that leaves counsel with a mere fifty hours (or so) for work related to a seven-day evidentiary hearing involving at least twenty-five witnesses and revisions to his brief. The hearings alone will take fifty-plus hours and preparation will take two or three times that number of hours.

The extra hearings will likely substantially add to the length of the brief and Mr. Lovell also must consider that the Utah Supreme Court will deny a motion to file an overlength brief, in which case, he will have to substantially cut the brief to fit within page limitations. The process of writing

NEWTON000346

and revising the brief will not be short and will likely take at least more than 100 hours. Had counsel known the nature of the case and the nature of the ineffective assistance claims that would be raised, he would have asked the county for a minimum of at least two to three times the requested amount.

Thus, while the county characterizes this is a non-ripe issue, it has already resulted in its refusal to fund over $7,000 in work conducted on the case. It has also refused to fund any work related to revising the brief or writing the reply that exceed the $15,000 it has authorized. Because that will likely be exceeded in preparation for the 23B hearing, this court should address the issue. "A dispute is ripe when a conflict over the application of a legal provision has sharpened into an actual *or imminent clash* of legal rights and obligations between the parties thereto." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 40, 238 P.3d 1054, 1065–66 (quoting *Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 29, 215 P.3d 933 (emphasis added); *see also Utah Safe to Learn–Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶ 20, 94 P.3d 217 ("[A]n issue is not ripe for review where there is no actual or *imminent clash* between the parties.") (emphasis added). There is already a clash of interests over payment of fees, since the county will not reimburse Mr. Lovell for actual expenditures already made, and this issue will imminently escalate to greater detriment to Mr. Lovell when the county refuses to fund anything beyond its offer of $15,000 which Mr. Lovell contends is not adequate for the remainder of work to be done. Therefore, the issue is ripe.

This court has the constitutional responsibility to guarantee that Mr. Lovell has adequately funded counsel on his direct appeal independent of any statutory provision and to the extent Utah's Indigent Defense Act conflicts with this constitutional mandate, it is unconstitutional under both the United States and Utah constitutions. "The Sixth Amendment right to counsel extends to a defendant's first appeal as of right. This right includes the right to state-paid counsel for indigent defendants." *State v. Gailey*, 2016 UT 35, ¶ 26, 379 P.3d 1278 (citing *Pennsylvania v. Finley*, 481 U.S.

4

NEWTON000347

551, 554, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) (("[D]enial of counsel to indigents on first appeal as of right amount[s] to unconstitutional discrimination against the poor."); *Gardner v. Holden*, 888 P.2d 608, 622 (Utah 1994) (statute "provides for the assignment of counsel at state expense only during the trial proceedings and the first appeal of right or other remedies before or after conviction that the attorney considers to be in the interest of justice.").

Mr. Lovell's right to the effective assistance of his appellate counsel is compromised if the county is allowed to underfund counsel's representation. "Defendants additionally have the right to the effective assistance of counsel on direct appeal." *Gailey*, 2016 UT 35, ¶ 27 (citing *Bruner v. Carver*, 920 P.2d 1153, 1157 (Utah 1996) ("The Due Process Clause of the Fourteenth Amendment guarantees the right to effective assistance of appellate counsel."); *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) ("A first appeal as of right ... is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."). "For counsel to be effective in the case of an indigent defendant, the state must provide a defendant with access to 'the raw materials integral to the building of an effective defense.'" *State v. Carreno*, 2006 UT 59, ¶ 8, 144 P.3d 1152 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 76–77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Indeed, it creates a conflict of interest since appellate counsel will have an incentive to work less—and may have to out of economic necessity—on the case given the lack of adequate funding.

As the Utah Supreme Court put it, almost fifty years ago, "[w]e think a wise legislature intended to and did remove the burden of affording counsel for impecunious defendants in criminal cases from the tired shoulders of the legal profession and placed it upon society, where it has always rightfully belonged." *Washington Cty. v. Day*, 22 Utah 2d 6, 10, 447 P.2d 189, 191 (1968); see also State v. Dixon, 22 Utah 2d 58, 59–60, 448 P.2d 716, 717 (1968) ("the legislature obligated the counties to provide, at their expense, legal services for indigent defendants").

NEWTON000348

However, the county's proposal here would place the burden squarely on Mr. Lovell's appellate counsel. The county should not be "in a poor position to try to avoid its statutory obligation" to provide the resources to an indigent's counsel. *Hatch v. Weber Cty.*, 23 Utah 2d 144, 148, 459 P.2d 436, 439 (1969). Nor should it place that burden on appellate counsel. It is troubling that the State has no less than six attorneys (plus two or three attorneys on the civil side) representing its interests at the upcoming 23B hearing at a significant cost to the taxpayers, but the county is unwilling to completely fund *one* attorney for Mr. Lovell.

The court also has a statutory responsibility to guarantee adequately funded counsel. As the Utah Supreme Court put it, the Indigent Defense Act "plainly intends to give the district court the authority to consider" the appropriate costs for an indigent defendant. *Carreno*, 2006 UT 59, ¶ 15.  As the statute indicates, the county must adequately fund counsel for an indigent defendant. Utah Code Ann. § 77-32-301. Particularly, Mr. Lovell has shown that a failure to adequately fund him denies him his constitutional rights, an express purpose for expending additional funding. *See* Utah Code Ann. § 77-32-304(3)(b)(i) and discussion *supra*.

The statute clearly expresses, contrary to the county's position, that this court should compensate counsel so long as the "legal services rendered by counsel" were "under a separate fee arrangement" and "necessary for the adequate defense of the indigent." Utah Code Ann. § 77-32-304(3). That is the case here as preparation of his brief on appeal and conducting the 23B hearing are necessary for Mr. Lovell's appeal. And, even if the contract governed the general costs of the appeal, the additional expenses should be authorized as extraordinary expenses, governed by Utah Code Ann. § 77-32-305.5. The court can consider and order the payment of those expenses "reasonably incurred" after considering a motion filed by the indigent defendant and conducting a hearing on the matter. *Id.* This court may also depart from the standard contract in cases where

NEWTON000349

there is a "compelling reason" to expend additional defense resources. Utah Code Ann. § 77-32-306(5). This is just such a case.

## CONCLUSION

Counsel for Mr. Lovell did not anticipate at the outset that this case would involve much more than simply writing and filing a brief on a capital case. He did not anticipate the extensiveness of counsel's ineffectiveness, which necessitated a few-hundred-page motion for Rule 23B remand, which was subsequently stipulated to and granted by the Utah Supreme Court. He did not anticipate that this hearing would involve over two dozen witnesses which evidence will need to be incorporated into a revised brief on appeal. For these reasons, the court should authorize the payment of fees for work already done on this case and preauthorize up to 200 hours[3] in future work.

RESPECTFULLY SUBMITTED this 13 day of April, 2017.


_____/s/ Samuel P. Newton_____
SAMUEL P. NEWTON
Attorney for Appellant

---

[3] Counsel cannot fully estimate how much time it will take, but has made the following estimate: 50-100 hours in preparation for the 23B hearing, 50-60 hours in evidentiary hearing, 50-100 hours in revising the brief, 50-100 hours in writing the reply brief. In all, the number of hours may well exceed the 200 asked for.

NEWTON000350

**EXHIBIT A**

(Email Correspondence Between Counsel and Weber County)

NEWTON000351

From: **Baron,Bryan** bbaron@co.weber.ut.us
Subject: RE: Telephone Conference
Date: April 11, 2017 at 8:56 AM
To: Sam Newton sam@snewtonlaw.com

Sam,

The commissioners' position is that you signed a contract to handle this appeal for $75,000. They feel like that was a lot of money to pay for the appeal of the sentencing phase only, even if it is a capital case.

The contract is clear that the $75,000 cap may only be exceeded upon a showing of good cause. They agree that the 23B remand is good cause, but the focus of their discussion with you has been on the evidentiary hearing and revising your initial brief. For that work, they have agreed to increase your contract by $15,000.

If you want to make a request for additional funding for the time you spent putting together the 23B motion, I'm sure they would be willing to consider that, but they are not open to paying you additional money for the oral arguments or the reply brief because those were both contemplated in the original contract.

Bryan R. Baron
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT 84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Monday, April 10, 2017 3:22 PM
**To:** Baron,Bryan
**Subject:** Re: Telephone Conference

Bryan, I sure hope I'm misunderstanding. Is the county's position that they will not pay me for over $7,000 of work I have already done on this case and will only pay me for future work? The end of last year's invoice was related to preparing the brief, which was over 300 pages, before the State stipulated to a remand. The stuff this year has had to do with responding to the Motion for 23B remand (which the Supreme Court granted), issues with Doug Lovell's bar complaint (which I was asked to testify to by the bar and which the Supreme Court screening panel recommended a formal district court proceeding against Sean Young) and responding to the AG's subpoenas for the 23B remand. All of the work to date has been related to getting the brief and remand motion ready and dealing with issues related to the now granted remand. There would be a significant number of hours I would have to donate to this case and as a solo practitioner, I cannot afford to work for free on this.

Anyway, unless I'm misunderstanding, it sounds like I need to file a reply and ask for a hearing with Judge DiReda. If you're willing to stipulate and avoid the hearing, let me know.

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com
Law Office of Samuel P. Newton, PC Office: (406) 407-7323 /
Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT
59901 www.snewtonlaw.com

On Apr 10, 2017, at 2:53 PM, Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

As I understand the commissioners position, they have pre-approved 100 hours to go towards the work that is required on the remand. That includes the evidentiary hearing and reworking your initial brief. The county will not release additional funds until that work has been done. Any other work (e.g. the last invoice for 2016 as well as any work that is required for your reply brief and oral arguments) should be covered by the $75,000.

Bryan R. Baron
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT 84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

NEWTON000352

Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Monday, April 10, 2017 1:59 PM
**To:** Baron,Bryan
**Subject:** Re: Telephone Conference

Sure. We can do that if you want. It was thinking a telephone conference could let us dialogue about the issues and see if we need a hearing. I haven't filed a reply yet. I haven't quite figured out how to respond to your response. On the one hand, I agree the issue is moot because if the county has authorized 100 more hours, then we're technically ok for the short term. But if I send you my outstanding invoice, which is just over $3,000 for this year and I think about $4,000 still has not been paid from that invoice for last year, then there's only a few more hours left, and not enough for the remainder of the work. Would you rather hold things down the road or should we just address it now? If the commissioners' position is no more money, no matter what, which is how I read it, then I think we should just address things with the judge. I hope this makes sense. Also, are you willing to release the money on the last invoice from 2016? And should I send you one for January-March 2017? Thanks again.

sam

> On Apr 10, 2017, at 1:52 PM, Baron,Bryan <bbaron@co.weber.ut.us> wrote:
>
> Sam,
>
> I'm not clear on why we need a telephone conference. Is this in relation to the motion for attorney fees and litigation expenses? If so, shouldn't we just schedule a hearing date?
>
> Bryan R. Baron
> Deputy County Attorney
> WEBER COUNTY ATTORNEY'S OFFICE
> 2380 Washington Blvd., Suite 230, Ogden, UT 84401
> Office: 801.399.8471
> Fax: 801.399.8304
> Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Monday, April 10, 2017 11:55 AM
**To:** Juana Quintero
**Cc:** Baron,Bryan
**Subject:** Re: Telephone Conference

Can we schedule a telephone conference to discuss the funding issues on Lovell with me and Bryan Baron?

sam



Samuel P. Newton / Attorney at Law sam@snewtonlaw.com
Law Office of Samuel P. Newton, PC Office: (406) 407-7323 /
Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT
59901 www.snewtonlaw.com

> On Apr 10, 2017, at 11:09 AM, Sam Newton <sam@snewtonlaw.com> wrote:
>
> That's just fine.
>
>> On Apr 10, 2017, at 11:08 AM, Juana Quintero <juanaq@utcourts.gov> wrote:
>>
>> **Yes, just waiting on the judge. We are calling 801-624-6530, is that correct?**
>>
>>> On Mon, Apr 10, 2017 at 11:06 AM, Sam Newton <sam@snewtonlaw.com> wrote:
>>> I assume you're calling today?

NEWTON000353

**EXHIBIT B**

**(Affidavit of Michael Bouwhuis)**

NEWTON000354

**MICHAEL D. BOUWHUIS #6498**
Attorney at Law
PO Box 150801
Ogden, Utah 84415
Telephone:   (801) 393-6452

---

## IN THE SECOND JUDICIAL DISTRICT COURT, WEBER COUNTY
### OGDEN DEPARTMENT, STATE OF UTAH
### 2525 Grant Avenue, Ogden, UT  84401

---

| | | |
|---|---|---|
| STATE OF UTAH, | ) | **AFFIDAVIT OF ATTORNEY** |
| Plaintiff, | ) | **MICHAEL D. BOUWHUIS RE ATTORNEY SEAN YOUNG** |
| vs. | ) | |
| DOUGLAS A. LOVELL, | ) | Case No.  921900407 |
| Defendant. | ) | Judge Michael D. DiReda |

---

STATE OF UTAH     )
                          : SS
COUNTY OF WEBER)

        MICHAEL D. BOUWHUIS,  being first duly sworn, deposes and states upon his oath as

follows:

        1.        That I am an attorney licensed to practice law in the State of Utah.

        2.        That I was lead trial counsel for Douglas A. Lovell.

        3.        That Sean Young was an attorney assigned to assist me in representing

        Mr. Lovell.

        4.        That as part of Mr. Young's assignment he was to handle a certain number

        of witnesses, to wit: Judy Humphries, Amy Humphrey, Kent and Betty

NEWTON000355

Tucker, Brent Scharman, Dr. John Newton, Pamela Madison, Debbie

Motteshard, Russ Minas, Holly Neville, Brad Burch, Terry Bartlett, Tony

Milar, Bob Brunson, Richard Boyer, Leon Denney, Jack Ford, Paul

Kirkpatrick, Chuck Thompson, and Gary Webster. Specifically, Mr.

Young was to review any materials we had on these witnesses, contact

them, interview them, prepare them for trial, and get subpoenas prepared

and served on them to ensure their appearance at trial.

5.     That as we prepared for trial Mr. Young assured me that he was doing the

work referred to in paragraph 4 above, and that he never gave me any

indication that these witnesses were refusing to cooperate.

FURTHER your Affiant saith not.

DATED this _13_ day of October 2015.

MICHAEL D. BOUWHUIS
Attorney for Defendant
Affiant

Subscribed and sworn to before me on this _13th_ day of October 2015.

KAREN VON COLLN
NOTARY PUBLIC • STATE of UTAH
COMMISSION NO. 684814
COMM. EXP. 09-01-2019

NOTARY PUBLIC

2

NEWTON000356

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing REPLY TO MEMORANDUM IN

OPPOSITION TO EX PARTE MOTION FOR PAYMENT OF ATTORNEY FEES AND

LITIGATION EXPENSES was mailed by first class mail or electronically delivered April 13,

2017 to the following:

Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden UT 84401


_____/s/ Devlin Foubert_____
DEVLIN FOUBERT

NEWTON000357

SAMUEL P. NEWTON (9935)
Counsel for Defendant/Appellant
Law Office of Samuel P. Newton, PC
The Historic KM Building
40 2nd Street E, Suite 222
Kalispell, MT 59901-2514
Tel. 801-624-6530 (UT)
Tel. 406-407-7323 (MT)
Fax 406-203-1144
sam@snewtonlaw.com

## IN THE SECOND DISTRICT COURT
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br>Plaintiff,<br><br>vs.<br><br>DOUGLAS A. LOVELL,<br>Defendant. | **MOTION TO WITHDRAW**<br><br>Case No. 921900407<br><br>Judge Michael DiReda |

SAMUEL P. NEWTON, counsel for DOUGLAS A. LOVELL, hereby moves the court

to allow him to withdraw because of the stress associated with the State's litigation strategies in

this case.

The State has sent counsel a letter outlining why it believes counsel is no longer medically

fit and has a continuing conflict of interest representing Mr. Lovell. *See* Exhibit A (Letter from

Andrew Peterson). It indicates its belief that "capital case work may kill you" and that having Mr.

Lovell's "life in your hands" adds to this stress. *Id.* at 2. The State "respectfully request[s]" that

counsel "withdraw from your representation of Mr. Lovell" and that if counsel fails to

"voluntarily withdraw" the State will have to take additional steps. *Id.* at 2-3.

DEPOSITION
EXHIBIT
9
Baron

NEWTON000366

The State is taking an extremely odd position. It references a separate capital case and the stress related to *that* case as a basis to exclude counsel from *this* case. On Maestas, counsel is owed over $100,000 in attorney fees. *See* Declaration of Samuel P. Newton, Exhibit B. The stress of *that case* and its associated financial burdens, led counsel into the emergency room after having had a cardiac event. *Id.* Both counsel's doctor and his cardiologist requested that counsel withdraw from his representation of Maestas. *Id.* Counsel so moved the court in December of last year. *Id.* The court has yet to rule on that request. *Id.*

In May of this year, on a follow up visit with counsel's doctor, his doctor again strongly indicated his belief that counsel should withdraw from Maestas's case. *See* Letter from Shane A. Hill, M.D., Exhibit C. In the letter, Dr. Hill indicates that after evaluating counsel "on May 17, 2016 for chest pain, hypertension and anxiety" he "recommended that [counsel] seek to be released or resign from *the legal case* which I felt was directly threat to his health." *Id.* (emphasis added). When counsel told his doctor that he was not being allowed to withdraw, the doctor indicated:

> I unequivocally told him that he needed to cease work *on this case* to avoid the potential deadly consequences of aggravating his cardiac issues. It continues to be my most emphatic medical recommendation that Samuel arrange his personal and professional responsibilities in a manner that reduces the probability of suffering an acute cardiac event. It is my responsibility as a medical professional to advise Samuel regarding the risks of neglecting the appropriate medical recommendations. He is aware that his noncompliance, whether forced or voluntary is a direct risk to his health up to and including death.

*Id.* (emphasis added).

The stresses on Maestas were based on an extreme lack of funding and how counsel had to personally guarantee and financially prop up the litigation. Decl. Samuel P. Newton. Indeed, counsel had to secure the services of a pro bono law firm so that he could continue to work on the case and still pay his own personal bills. *Id.*

NEWTON000367

However, counsel entered into a contract with the Weber County Attorney's office to represent Mr. Lovell in April of 2015. Because counsel was fully funded on this case, he has not felt the stress that he felt on Maestas. *Id.* However, the State and the county's recent litigation strategy have changed matters significantly, such that counsel feels compelled to move to withdraw here because of the conflicts of interest the State and county have created.

First, the county has only authorized $15,000 for the entire remand proceeding, preparations and revisions to the brief, which is wholly and totally inadequate for the work and preparations that need to be done to represent Mr. Lovell. *Id.* The case is currently set for a Rule 23B remand evidentiary hearing for six days in September and October, in which it is anticipated that 28-30 witnesses will be called by appellate counsel. A six-day hearing would require at least eight additional days in preparation at 10 hours a day, and 12-hours a day during the hearing for a total estimate of 152 hours. In addition, there are a number of other witnesses that counsel believes would be necessary for the 23B hearing, many of which are refusing to cooperate and several whose identities, such as the attorneys representing the church, are being hidden despite and subpoena and request by counsel. The estimate for hours in uncovering these witnesses and doing the necessary subpoenas, investigation and discovery would conservatively take an additional 100 hours. The 252 hours, at $150 an hour would total $37,800, which the county is currently taking a position that they will likely refuse to pay.

The parties must also litigate the State's request for access to the defense file, which may well take significant time and resources. There are several other potential issues to litigate, as detailed *infra*, that also add to the bill. To date, counsel has spent (but not received) nearly $5,000 of the $15,000 authorized on these mere preliminary matters, close to $15,000 for unpaid work on the appeal and the county has already paid almost $5,000, leaving counsel in the hole close to $20,000.

3

This is not an optional hearing, since it was ordered by the Supreme Court of the State of Utah.  In addition, counsel estimates that it will take 200-400 hours to properly accomplish this task and to revise the brief. *Id.* The county currently owes counsel well over $15,000 and this court recently denied a motion to order the county to pay Mr. Lovell's attorney fees, indicating that this was more properly a contract dispute.

But more troubling, the county, in an email to counsel indicated that it was concerned about counsel's billing in three specific areas: 1) for work done in representing Mr. Lovell before the Utah State bar on his complaint against Sean Young, 2) for work done in attempting to compel the county to pay Mr. Lovell's attorney fees and 3) billing for "frequent phone calls, letters and meetings with Doug Lovell …" *Id.* The county then indicated the following:

> The consensus from the [county commission] meeting was that unless significant changes are made to the invoices and future billing practices, *the county needs to look for another attorney for future appeals*. Again, they don't have a problem with the quality of your work. Their concern is with the amounts that you are billing and the items that you are billing them for.

*Id.* (emphasis added).

While the county indicated that it would consider granting additional funding on the case, counsel has been placed in a veritable catch-22. He can abandon his own interests in getting paid and not try to compel the county to pay for his services and talk or speak with Mr. Lovell less. Additionally, counsel has the appellate contract for Weber County, which provides the vast majority of his income. *Id.* In essence, the county has told counsel that he must not bill them for what he believes to be necessary work on Mr. Lovell's case, such as communications, or it will terminate him from his major contract. This irreparably puts counsel's and Mr. Lovell's interests at odds.

NEWTON000369

Second, the State attempts to use the stresses from Maestas to procure a withdrawal on this case. Counsel moved to withdraw on Maestas because he believed the stress on that case led to his medical event. Ironically, the same Attorney General's office has fought counsel's motions to withdraw on Maestas on medical, financial, and other conflict grounds, but is now insisting that he withdraw from the Lovell case for the same reasons.

Counsel did not move to withdraw on this case because the stress had yet to occur. But because of looming funding concerns with Weber County, coupled with counsel's concern that appropriately litigating this case will result in a loss of his appellate contract, and now the State's insistence that he will commit an ethics violation to continue to represent Mr. Lovell, counsel now has and counsel feels compelled to take the same step. He believes that his doctor's order that counsel must "arrange his personal and professional responsibilities in a manner that reduces the probability of suffering an acute cardiac event" becomes ever more acute in this case. Counsel cannot take the additional stress this case will now take and must follow his doctor's orders.

There are several reasons why counsel should stay on this case. Counsel is familiar with the file, has largely written the brief, gets along well with Mr. Lovell, and could easily and competently continue representing Mr. Lovell on remand proceedings. Indeed, counsel has contemplated a litigation strategy in this case that includes: 1) moving to disqualify Mark Field or the Attorney General's office for knowingly violating a federal court order that prohibited Mr. Field from appearing on a capital case where he worked as a law clerk for the court; 2) moving to have funding orders decided ex parte and under seal, since the county attorney's office has attempted to limit the attorney-client relationship, 3) a motion to provide a second attorney for the evidentiary hearing and 4) an interlocutory appeal to the Utah Supreme Court regarding these issues; 5) a motion to compel Kirton & McConkie to turn over the names of attorneys who

NEWTON000370

worked on the case for the LDS church since that office will not respond to a subpoena for information. But counsel cannot afford to raise these claims without jeopardizing his finances or his health or his appellate contract and because he must make that choice, he can no longer ethically represent Mr. Lovell.

Mr. Lovell has a right to counsel of his choice which is being interfered with, which is structural error. *State v. Maestas*, 2012 UT 46, ¶ 57, 299 P.3d 892 ("The denial of counsel is a structural error that does not require a showing of harm where assistance of counsel has been denied entirely or during a critical stage of the proceeding.") (internal quotations and emphases omitted). The State and county have interfered with the attorney-client relationship, which is a constitutional violation. *See Weatherford v. Bursey*, 429 U.S. 545, 547, 97 S. Ct. 837, 839, 51 L. Ed. 2d 30 (1977). Additionally, the State lacks standing to object to counsel the court has appointed and its interference violates separation of powers and due process, since this is a matter for the court to decide.

The State and the county have created this conflict. By under-funding Mr. Lovell, by telling counsel that he must limit his communications with Mr. Lovell or not insist on full funding or risk his appellate contract, and by indicating that counsel's continued representation may well violate the Rules of Professional Conduct, counsel must withdraw because his personal interests and those of Mr. Lovell now diverge.

The county attorney's suggestion that counsel limit his conversations with Mr. Lovell is equally problematic. Counsel has a duty to regularly communicate with Mr. Lovell and adequate and full communications, as well as adequate funding are at the heart of the Sixth Amendment, which guarantees Mr. Lovell the effective assistance of counsel. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases, Guideline 10.5 ("Counsel at all stages of the case should engage in a continuing interactive dialogue with the client

NEWTON000371

concerning all matters that might reasonably be expected to have a material impact on the case"). "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Because "death is different," the United States Constitution requires that "'extraordinary measures [be taken] to insure that [defendant] 'is afforded process that will guarantee, as much as is humanly possible, that [a sentence of death not be] imposed out of whim, passion, prejudice, or mistake.'" *Caldwell v. Mississippi*, 472 U.S. 320, 329 n.2 (1985) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1981) (O'Connor, J., concurring)). Indeed, "[t]ime and again the [Supreme] Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case." *Caspari v. Bolden*, 510 U.S. 383, 393 (1994) (quoting *Strickland v. Washington*, 466 U.S. 668, 704-05 (1984) (Brennan, J., concurring in part and dissenting in part)), *see also Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (noting that the Court's duty to search for constitutional error with painstaking care is never more exacting than in a capital case (internal citations omitted)).

The United States Supreme Court has held that defense counsel cannot be effective without "access to the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). This is a constitutional right based on the Sixth Amendment which provides that an accused has the right to counsel for his defense. U.S. Const. Amend. VI. The court has repeatedly held that this right to counsel involves the right to *effective* assistance of that counsel. *See Evitts v. Lucey*, 469 U.S. 387, 391-97, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Reece v. Georgia*, 350 U.S. 85, 89–90, 76 S.Ct. 167, 100 L.Ed. 77 (1955); *Powell v. Alabama*, 287 U.S. 45, 71–73, 53 S.Ct. 55, 77 L.Ed. 158 (1932). The United States Supreme Court has similarly held that the State "must 'provide indigent [defendants] with the basic tools of an

NEWTON000372

adequate defense or appeal, when[ever] those tools are available for a price to other

[defendants].'" *State v. Parduhn*, 2011 UT 55, ¶ 18, 283 P.3d 488 (quoting *Britt v. North Carolina*,

404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971) (alterations in *Parduhn*).

Weber County has an obligation to provide these resources. In *Parduhn*, the Supreme

Court noted its prior decision in *State v. Burns*, which stated that "a county must provide the

investigatory [resources] ... necessary for a complete defense to every indigent person ..."

*Parduhn*, 2011 UT 55, ¶ 24 (quoting *State v. Burns*, 2000 UT 56, ¶ 28, 4 P.3d 795) (alterations in

*Parduhn*). Because the county will not guarantee funding and has created an ethical quandary:

represent Mr. Lovell and lose your contract, Mr. Lovell has lost the effective assistance of the

counsel to which he is entitled.

According to Utah Rule of Professional Conduct 1.16(a)(2) the lawyer "shall withdraw if

...: (a)(2) the lawyer's physical or mental condition materially impairs the lawyer's ability to

represent the client." This is now the case. Counsel must, under the rules, avoid conflicts of

interest and competently represent the client. Utah Rules of Prof'l Cond. Rule 1.1 ("A lawyer

shall provide competent representation to a client."); *id*. Rule 1.3 ("A lawyer shall act with

reasonable diligence and promptness in representing a client."), Rule 1.7(b)(1) (a lawyer shall not

represent a client if "[t]here is a significant risk that the representation of one or more clients will

be materially limited ... by a personal interest of the lawyer."). Additionally, "[t]he moment

allegations of a personal violation are filed against capital defense counsel, the interests of

attorney and client diverge." *Archuleta v. Galetka*, 2008 UT 76, ¶ 11, 197 P.3d 650, 653.

NEWTON000373

## CONCLUSION

Mr. Lovell and counsel no longer have the same interests and because of counsel's conditions, he is compelled to withdraw from this case.

RESPECTFULLY SUBMITTED this 9 day of June, 2017.


_____/s/ Samuel P. Newton_____
SAMUEL P. NEWTON
Attorney for Appellant

9

NEWTON000374

**EXHIBIT A**

*Letter from Assistant Attorney General Andrew Peterson*

NEWTON000375

# STATE OF UTAH
### OFFICE OF THE ATTORNEY GENERAL



# SEAN D. REYES
### ATTORNEY GENERAL

| Spencer E. Austin | Parker Douglas | Tyler R. Green | Missy W. Larsen | Bridget K. Romano |
|---|---|---|---|---|
| Chief Criminal Deputy | Chief Federal Deputy & General Counsel | Solicitor General | Chief of Staff | Chief Civil Deputy |

June 5, 2017

Samuel P. Newton
The Historic KM Building
40 2nd Street E, Suite 222
Kalispell, MT 59901-6114

     Re: *State v. Lovell*, Case No. 20150632-SC

Dear Sam:

Your recent correspondence with me about your health issues, including your doctor's note, leaves me very concerned about your health and ability to continue on capital cases. You and I spoke on the phone about your willingness to continue on *Maestas v. State* because the work going forward may be substantially limited by the case's current procedural posture. I indicated, and you agreed, that *State v. Lovell* may be a different matter. That is, the health concerns you have raised in *Maestas* are no less compelling in *Lovell*, and *Lovell* is nowhere near a conclusion.

As a preliminary matter, please understand that I am deeply sympathetic with the difficult circumstances you are in. We are adversaries in court, but we are colleagues in law and fellows in humanity. I regret the health issues you are facing, and I wish for your sake that circumstances were otherwise. I also hope that you make a full recovery, and that your legal work does not further damage your health or that your health damages your livelihood.

---

STATE OF UTAH
OFFICE OF THE ATTORNEY GENERAL

*State v. Lovell*, Case No. 20150632-SC                                   Page 2

But given your doctor's very clear and direct advice that capital case work
may kill you, and your own statements to me that the stress of having your
client's life in your hands contributes to your health problems, we believe
that you now have a conflict of interest with Mr. Lovell.

That is, Mr. Lovell has a compelling interest in—indeed, a constitutional
right to—an attorney who will do whatever work the case requires to press
his claims.   But you have an equally compelling personal interest in
minimizing the work you do on capital cases since your doctor told you
that such work could kill you.

After careful consideration, I do not believe that you can properly continue
to represent Mr. Lovell.  The conflict of interest goes to the very heart of
Mr. Lovell's case, will continue indefinitely, and probably cannot be
waived by Mr. Lovell because there is no telling how your illness will
change over time.  And because a conflict of interest that works to a client's
detriment is not subject to harmless error analysis in a later challenge, your
continued representation may sow reversible error into these proceedings,
even if your work for Mr. Lovell is above and beyond what is
constitutionally required.

I respectfully request that you withdraw from your representation of Mr.
Lovell.  Given that we are currently in time-sensitive rule 23B litigation, I
understand that your withdrawal may delay the proceedings while new
counsel can be appointed and come up to speed.  We are willing to work
with new counsel to assure that reasonable delays will not unfairly
prejudice Mr. Lovell.

I assure you that I do not make this request to gain any unfair strategic
advantage over Mr. Lovell.  I am equally concerned with your health, with
Mr. Lovell receiving the full promise of the Sixth Amendment, and with
ensuring that Mr. Lovell's conviction cannot be later challenged because of
an error we can correct up front.

Please consider my request, and let me know quickly what you decide to
do.  If you do not voluntarily withdraw, we will then need to consider

NEWTON000377

STATE OF UTAH
OFFICE OF THE ATTORNEY GENERAL

*State v. Lovell*, Case No. 20150632-SC                                      Page 3

what further steps to take.  Every day that passes with this conflict of
interest in place could potentially impair Mr. Lovell's ability to properly
litigate his rule 23B claims, making the conviction potentially harder to
defend.  And every day you work on this case, according to your doctor,
harms you more.  Those outcomes are in no one's interests.

I wish you the best, and await your response.

Sincerely,

Andrew F. Peterson
Assistant Solicitor General

160 EAST 300 SOUTH, SIXTH FLOOR • P.O. BOX 140854 • SALT LAKE CITY, UTAH 84114-0854

**EXHIBIT B**

*Declaration of Samuel P. Newton*

NEWTON000379

SAMUEL P. NEWTON (9935)
Counsel for Defendant/Appellant
Law Office of Samuel P. Newton, PC
The Historic KM Building
40 2nd Street E, Suite 222
Kalispell, MT 59901-6114
Tel. 406-407-7323 (MT)
Tel. 801-624-6530 (UT)
Fax 406-203-1144
sam@snewtonlaw.com

IN THE SECOND DISTRICT COURT
WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br>Petitioner,<br><br>v.<br><br>DOUGLAS A. LOVELL,<br>Respondent. | DECLARATION OF SAMUEL P.<br>NEWTON<br><br>Case Number: 921900407<br><br>JUDGE MICHAEL DIREDA |

SAMUEL P. NEWTON, under oath, swears and testifies the following:

1. I have represented Floyd Maestas in a state post-conviction proceeding since 2013. In that case, I have been denied over $100,000 in funding for attorney time spent working on the matter.

2. The stress of non-payment and the associated financial difficulties on that case led to me experiencing what I felt was a heart attack. My doctor and the cardiologist believed, after further testing, that the symptoms were stress-related. Both advised me to withdraw from Maestas's case. I moved the court in December of 2016,

1

NEWTON000380

but the court has not ruled on that motion, but the Attorney General has opposed my release on that case.

3. Because of Maestas, I was overwhelmed with how to pay my family's bills and maintain my law practice without adequate funding. I had significant work to do and I struggled with how I could financially prop up the litigation. The American Bar Association was able to secure a pro bono law firm to work on the case, which is the only way I have been able to continue my work on it.

4. However, a few weeks ago, I again visited my doctor. He told me in no uncertain terms that I needed to withdraw from Maestas and wrote me a letter to that effect, which I shared with the prosecutor, Andrew Peterson. We had a telephone conversation where I expressed my concerns, indicating that the stress of non-payment led to the issues in Maestas. Mr. Peterson told me he believed I could stay on Maestas. I did not agree with that assertion. I, at no point, told him that Mr. Lovell's case was causing me stress or that I did not feel I could represent people who had been sentenced to death. However, I did tell him that I feel a tremendous burden, as any capital defense attorney would, at how serious it is to hold your client's life in your hands. I did not ever state that I could not cope with such a burden.

5. I saw my doctor again for a follow up a few days ago. I brought up the specific allegations in this case and asked him his opinion. He told me that a stress-related heart attack was just as deadly as a blockage related one. He encouraged me to get off of any case that was causing me undue stress, but opined that non-payment would certainly, and probably was, the most likely stressor. While Mr. Lovell's case has not caused me stress in the past—because I have been

NEWTON000381

adequately funded—the new funding concerns, the scope of the remand proceeding, the county's position that I may lose my appellate contract which is my entire livelihood, as well as the State's allegations that I cannot represent Mr. Lovell have aggravated my stress exceptionally.

6.  The Weber County civil attorneys and county commission have indicated to me that they would approve up to $15,000 of additional funding to engage in the Rule 23B remand evidentiary hearings and revisions of the brief. I believe that to be woefully inadequate. A six-day evidentiary hearing will at least require 12 hours a day of work, including at least an additional six days of preparation of approximately 10 hours a day. The hearing alone would amount to 96-144 hours of work, at $150 an hour ($14,400 to $21,600). To make revisions to the brief, I conservatively estimate that it will take an additional 100-150 hours.

7.  A six-day hearing with would require at least eight additional days in preparation at 10 hours a day, and 12-hours a day during the hearing for a total estimate of 152 hours.

8.  In addition, I have yet to contact several witnesses and need to locate and interview them. This includes many of the church witnesses, including their lawyers, whom the Supreme Court ordered to testify. The church's law firm will not give me the names of the lawyers who worked on the case or respond to my requests to interview these people. The work in preparation will at least take another 100 hours. I also must litigate a host of issues I have yet to raise because of pending concerns, such as a motion to disqualify Mark Field or the Attorney General's office because Mr. Field worked as a law clerk on this matter and advised the court, a motion to appoint a second attorney to assist in the

3

NEWTON000382

evidentiary hearings, a motion to allow ex parte funding motions, given the county's creation of conflicts of interest, an interlocutory appeal to the Utah Supreme Court of this court's order relegating funding concerns as contract disputes and a motion to compel Kirton & McConkie to turn over the names of attorneys who worked on the case.

9. Additionally, the county owes almost all of the money it has authorized for work I have already performed, but which have exceeded the initially contracted amount.

10. I believe it will take 200-400 hours, at a minimum, to accomplish the tasks I have been ordered to accomplish per the Supreme Court's remand order.

11. In response to my requests for funds, the county civil attorney, Bryan Baron, told me in an email that the county was concerned about my billing in three specific areas: 1) the commissioners did not believe that I should have represented Mr. Lovell in his bar complaint before the Utah bar; 2) they did not want to pay for my motion to compel them to provide attorney fees; 3) and they believed I did not need to engage in "frequent phone calls, letters and meetings with Doug Lovell ..."

12. The county then told me the following: "The consensus from the [county commission] meeting was that unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals. Again, they don't have a problem with the quality of your work. Their concern is with the amounts that you are billing and the items that you are billing them for."

NEWTON000383

13. I told the county that representing Mr. Lovell before the bar was critical to Mr. Lovell's appeal, because if the bar found/finds Sean disbarred for that conduct, then it would be further evidence that Mr. Lovell was prejudiced during his trial. On top of that, the bar asked me to be a witness, asked me to give them documentation and repeatedly consulted me on the case. So, not only did I have an obligation to respond, but I also felt like it was in Mr. Lovell's best interests for his appeal. Indeed, I indicated in filings with the court that Sean Young has been formally reprimanded and is facing possible disbarment.

14. I told the county I was willing to withdraw my request for funds on the second issue since the court ruled against me.

15. I also told the county that I believed it highly important that I engage in regular conversation with Mr. Lovell and that it would violate his constitutional right to counsel for me to limit communications and asked them to state what amount of time I was allowed to visit and speak with him.

16. While the email indicated that the county would consider and may grant additional funding—and I have a pending request for funds for drafting and creating the 23B Remand motion—I am fearful that their statement that "unless significant changes are made … the county needs to look for another attorney for future appeals" means that if I zealously advocate for Mr. Lovell, which is my duty, especially on a capital case, that the county will terminate my contract for appeals. This would reap significant repercussions on me and on my family.

17. I have agonized over this decision. I feel tremendous loyalty to Doug Lovell, to the claims we have made and to my competency to represent him. But I worry about whether my litigation on this case will result in the loss of my appellate

NEWTON000384

contract with Weber County. That contract provides the bulk of my income and I support a large family, including foster children. I am extremely fearful that I will have to litigate this case for free, like Maestas, because the court has indicated that it will not be involved in the funding dispute and Weber County seems reticent to give me the funds I need to complete the tasks ahead of me. I also worry that, given the State's allegations, that were I to continue to represent Mr. Lovell, the State would and could raise potential ethical violations. The stress of the last few days has been excruciating, at best. I have been unable to sleep and this case has consumed my mind. No matter how I think about it or what course of action to take, the decision seems to be a lose-lose.

18. I decided, in the end, that those feelings reveal exactly the conflict. Mr. Lovell is entitled to conflict-free counsel and I decided I would move to withdraw.


SWORN TO this ____9____ day of __June_____.


_____
SAMUEL P. NEWTON


SUBSCRIBED AND SWORN BEFORE ME THIS _9th_ day of

_June_____, 20_17_.

_____
Notary Public

DEVLIN FOUBERT
NOTARY PUBLIC for the
State of Montana
Residing at Polson, Montana
My Commission Expires
May 03, 2021

My commission expires: ___May 03, 2021___

6

NEWTON000385

**EXHIBIT C**

*Letter from Shane A. Hill, M.D.*

NEWTON000386



www.mednorth.net

May 4, 2017

Re: Samuel Newton.

To whom it may concern,

      With Samuel's permission, I write this letter out of concern for his health. Samuel is a patient of mine and I recently had the opportunity to reevaluate him regarding his medical condition. I first evaluated Sam on May 17, 2016 for chest pain, hypertension and anxiety and had recommended that he seek to be released or resign from the legal case which I felt was directly threat to his health. In my professional medical opinion, I continue to believe that his personal history of hyperlipidemia and hypertension, in addition to a strong family medical history of cardiovascular disease, his risk for an acute cardiac event was valid reason to resign from the death penalty case. During my more recent encounter with Sam, I asked him whether he was still working on the death penalty case in Utah. I was quite surprised to hear that he was doing so against medical advice. Sam informed me that he is not being allowed to withdraw from the case. I unequivocally told him that he needed to cease work on this case to avoid the potential deadly consequences of aggravating his cardiac issues. It continues to be my most emphatic medical recommendation that Samuel arrange his personal and professional responsibilities in a manner that reduces the probability of suffering an acute cardiac event. It is my responsibility as a medical professional to advise Samuel regarding the risks of neglecting the appropriate medical recommendations. He is aware that his noncompliance, whether forced or voluntary is a direct risk to his health up to and including death.

      Don't hesitate to contact me if you need any further information or wish to discuss this matter in more detail.

Sincerely,

Shane a Hill, MD.

Shane A. Hill, M.D.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing MOTION TO WITHDRAW was mailed

by first class mail or electronically delivered June 9, 2017 to the following:

Utah Attorney General
Appeals Division
160 East 300 South, 6th Floor Bx 0854
PO BOX 140854
Salt Lake City, UT 84114-0854
criminalappeals@utah.gov

Weber County Attorney
2380 Washington Blvd. #230
Ogden UT 84401


_____/s/ Devlin Foubert_____
DEVLIN FOUBERT

NEWTON000388

DEPOSITION
EXHIBIT
_14_
NEWTON
PENGAD 800-631-6989

DEPOSITION
EXHIBIT
_10_
Baron
PENGAD 800-631-6989

SAMUEL P. NEWTON (9935)
Counsel for Defendant/Appellant
Law Office of Samuel P. Newton, PC
The Historic KM Building
40 2nd Street E, Suite 222
Kalispell, MT 59901-6114
Tel. 406-407-7323 (MT)
Tel. 801-624-6530 (UT)
Fax 406-203-1144
sam@snewtonlaw.com

## IN THE UTAH SUPREME COURT

| | |
|---|---|
| STATE OF UTAH,<br>    Plaintiff/Appellee,<br><br>    vs.<br><br>DOUGLAS A. LOVELL,<br>    Defendant/Appellant. | RESPONSE TO STATE'S MOTION TO INQUIRE INTO DEFENSE COUNSEL'S POTENTIAL CONFLICT OF INTEREST<br><br>Case No. 20150632-SC |

Defendant, DOUGLAS A. LOVELL, by and through counsel of record, Samuel

P. Newton, responds to the State's motion to inquire into defense counsel's potential

conflict of interest. Mr. Lovell does not oppose having the district court inquire into the

nature of this conflict. However, he believes the inquiry should be broader than the

State's request. This court should allow the district court to examine: 1) whether defense

counsel's medical condition has any relevance to Mr. Lovell's case; 2) whether the

Attorney General has improperly created a conflict between Mr. Lovell and his counsel

by using the litigation on a separate capital case to procure a withdrawal on Mr. Lovell's

case; 3) whether Mark Field, and the Attorney General's office, by association, also have a

conflict of interest; 4) whether the Weber County Attorney's Office has created a conflict

1

between Mr. Lovell and his counsel by interfering with the attorney-client relationship; 5) whether funding decisions ought to be decided by the court, ex parte, or a defense service provider without the participation of the county attorney's office; 6) whether Mr. Lovell needs new counsel or additional counsel to adequately represent his interests. This court should also consider fulfilling its ultimatum made almost a decade ago that if the State failed to adequately support defense counsel, then it would be compelled to strike down the death penalty in Utah. As this case and counsel's other capital case demonstrate, defense attorneys bear the brunt of the losses in capital litigation in this State and it compels this court to take action to end the punishment once and for all or substantially change the state of affairs to remedy the problems.

## RELEVANT FACTS

Counsel began working on Mr. Lovell's appeal in April of 2015 pursuant to a contract with Weber County. Mr. Lovell filed an extensive motion for Rule 23B remand which was initially denied by this court. In the interim, counsel worked diligently on, and nearly completed, Mr. Lovell's brief on appeal. As the brief deadline approached, the State filed a response to the Rule 23B motion, conceding that it would not oppose remand. After receiving that response, this court granted the Rule 23B remand motion, which contemplates an extensive hearing including over two dozen witnesses.

Counsel approached the Weber County civil attorneys as well as the Weber County Commissioners regarding funding for the 23B remand proceeding since he has exhausted funding for the appeal and the county owes him almost $10,000 for work already performed. Despite counsel's recommendation that the remand proceeding and

2

revisions to the brief would take between 200-400 hours, conservatively, the Commissioners would only authorize an additional $15,000, or 100 hours of work. The commissioners indicated that they would not authorize any additional funds for the remand proceeding, the brief, reply brief or other work on the appeal.[1]

Because of these funding concerns, counsel moved the district court to authorize additional funding. The district court denied that motion, reasoning that this was a civil dispute between counsel and Weber County and that if counsel needed additional funding, he would need to pursue a civil action against the county. The county also told counsel that it believed he was over-billing in three areas: representing Mr. Lovell before the bar on his complaint against his trial counsel, the motion to compel payment of attorney fees, and frequent conversations and visits with Mr. Lovell about his case. The county told counsel in an email that "unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals. Again, they don't have a problem with the quality of your work. Their concern is with the amounts that you are billing and the items that you are billing them for." *See* Motion to Withdraw, attached as Exhibit A.

Counsel has represented a petitioner, Floyd Maestas, on a state post-conviction capital case since 2013. Counsel has suffered financial losses on that case approaching $120,000. The stress of that financial loss was excruciating for counsel and his law

---

[1] Though they did indicate that if those funds were exhausted, counsel could reapproach the Commission for more funding, both only if he demonstrated good cause, which they believed was doubtful. They do not intend to reimburse counsel for work done on the appeal totaling almost $10,000.

Weber County 032

practice. He ended up having heart difficulties due to the associated financial stress and both his doctor and his cardiologist recommended withdrawal in the summer of 2016. Despite providing these recommendations to the State six months ago, in a motion to withdraw on that case, it has not only failed to move to have counsel withdraw from that case, but has actively opposed the request. In a strange turn of events, the Attorney General has moved for counsel's withdrawal on *this* case because of the stress created on Maestas, another capital case in which it opposes counsel's withdrawal.

Mr. Lovell also recently discovered that Mark Field, the attorney general who has appeared on this case, worked as a law clerk for the trial court judge on this case. Mr. Field indicated in a letter to counsel dated June 6, 2017 that he participated in Mr. Lovell's plea withdrawal motion between August and October 2006. Letter from Mark Field to counsel, June 6, 2017 (Exhibit B). He indicated that he "research[ed] and provid[ed] legal advice to the district court judge" on Mr. Lovell's case. *Id.* Mr. Field spoke with the judge about the case and the court's ruling and either drafted the ruling or edited a draft of that ruling. *Id.*

The problem with Mr. Field's participation here is that he had already been ordered in federal court not to appear on a capital case in which he participated as a law clerk. *Archuleta v. Turley*, 904 F. Supp. 2d 1185 (D. Utah 2012). As the court pointed out, Rule 1.12 of the Utah Rules of Professional Conduct indicates that "a lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as a judge ... or law clerk ... unless all parties to the proceeding give informed consent, confirmed in writing." Utah R. Prof'l Cond. 1.12(a). The federal

4

district court found that the "matter" Mr. Field worked on as a law clerk and with the attorney general was the same: Archuleta's case and the parties were the same, Mr. Archuleta and the State. *Id.* at 1190. "Mr. Field's appearance in Mr. Archuleta's matter before the court violates Rule 1.12," the court found. *Id.* at 1191. The court continued:

> The Attorney General hired Mr. Field one month after Mr. Archuleta's case concluded in state court. Part of what made Mr. Field an attractive candidate was his intimate knowledge of Mr. Archuleta's case *(and others)*. Mr. Field has a facility with the facts and law involved in Mr. Archuleta's case that no one else has, and because of that, he appears ideally suited to litigate Mr. Archuleta's federal habeas appeal on behalf of the state.

*Id.* at 1192 (emphasis added). The court found that "allowing Mr. Field to represent the state in Mr. Archuleta's federal habeas action would unmistakably taint the litigation." *Id.*

"Mr. Field's experience as a specialized law clerk for capital cases in state court, as well as his specific work on Mr. Archuleta's state habeas appeal," the court found, "gives him an unfair advantage in the present case that he will leverage to the state's advantage, even if unintentionally." *Id.* (internal quotation omitted). For example, particularly troublesome was that Mr. Field was "privy to judicial thinking about Mr. Archuleta's case …" *Id.*

> The ethical imperative against representing "anyone" in a matter that the lawyer worked on "personally and substantially" as a judge or law clerk guards against the possibility of abuse, and recognizes that lawyers themselves may not always be the best guardians of the confidential information they obtained in such positions. The court should not have to second-guess what Mr. Field knows, or parse through case histories and docket reports to determine whether or not Mr. Field has confidential information that he is going to use for the benefit his new client. Mr. Archuleta should not be asked to bear that risk.

*Id.* at 1192-93.

5

Particularly worrying here is that the State has disregarded the federal district court's specific admonition related to Mr. Lovell's case. As the federal district court found, Mr. Field "cannot appear in federal court as an advocate for one of the parties whose case he was personally and substantially involved with as a law clerk in state court. To date, that would bar him from six cases in the District of Utah: Mr. Archuleta's *and five others*. The Criminal Appeals Division has many other cases that are open to Mr. Field." *Id.* at 1193 (emphasis added and internal quotation omitted). Mr. Field worked on Mr. Lovell's case as a law clerk and his participation at now was knowingly in violation of the Rules of Professional Conduct.

The State sent counsel a letter on June 5, 2017—the day before Mr. Field also sent counsel a letter acknowledging his work on Mr. Lovell's case—informing counsel that he must voluntarily withdraw on Mr. Lovell's case or it would have to pursue more serious options, like the motion it has filed in this court.

Counsel weighed the options carefully. The decision was extremely difficult. Counsel has profound loyalties to Mr. Lovell and is familiar with his case, with the issues to be argued on appeal and with the nature of the remand proceeding. Indeed, counsel investigated and prepared the motion for Rule 23B remand and has interviewed most of the witnesses. It took counsel almost two years to be familiar with all the issues that the remand proceeding would encompass and any associated delays reek a severe detriment to Mr. Lovell's interests in a speedy resolution of his appeal. Counsel has largely written the brief on appeal and he has a good and trusting relationship with Mr. Lovell.

6

Weber County 035

In the end, however, counsel decided that he must voluntarily move to withdraw because he had a conflict in two major areas: 1) the attorney general has accused counsel of a conflict of interest which could constitute an ethics violation, even though the Attorney General has a clear conflict; 2) the county has not only refused to adequately fund the appeal and remand, but has indicated that it would "need[ ] to look for another attorney for future appeals." Because the bulk of counsel's income comes from an appellate contract with Weber County, he faces a terrible catch-22: represent Mr. Lovell zealously and lose his livelihood or compromise Mr. Lovell's case and save his practice. Counsel is also owed over $10,000 in this case and cannot repeat the financial disaster that occurred to his practice in representing Maestas.

Additionally, the civil division of the Weber County attorney's office filed a response to Mr. Lovell's motion to withdraw, despite the fact that the county attorney's office had not been granted leave to appear on the substantive criminal case.

The district court declined to rule on the motion to withdraw, reasoning that this court retains jurisdiction over that issue. The court directed defense counsel to move this court to withdraw (or withdraw his motion) before June 21, 2017. The State was to have until June 28, 2017 to file its response. At the hearing on the motion, counsel for both the criminal and the civil division of the county attorney's office sat in the same room and participated in the hearing, despite the supposed "Chinese Wall" that was supposed to exist between the prosecuting agency and the civil funding authority. Mr. Lovell objected to their joint presence.

7

After the hearing, counsel contacted the Weber County Attorney's civil division. He wanted to see if the parties could resolve the funding dispute. The county attorney told counsel that if he revised his invoices to remove the disputed items that the commissioners would likely grant some additional funding. However, he also indicated that the commissioners were not pleased with what they deemed counsel's over-billing and that they would no longer be contracting with counsel in the future. Counsel asked specifically if that meant that he would lose his major contract (and his livelihood by association) and the attorney told him that the commissioners had yet to make their decision. However, counsel takes the statement for what it means: the county will no longer contract with him, so whether he loses his appellate contract sooner or later, he must begin the process to seek different employment.

Since the hearing, the State has taken the first step and moved this court to inquire into the supposed conflict.

### THIS COURT SHOULD BROADEN THE STATE'S REMAND REQUEST TO INQUIRE INTO WHETHER THE STATE AND WEBER COUNTY HAVE IMPERMISSIBLY INTERFERED WITH MR. LOVELL'S RIGHT TO COUNSEL[2]

#### A. The State has no standing to protect Mr. Lovell's Sixth Amendment rights.

There are two parties that protect Mr. Lovell's Sixth Amendment rights: Mr. Lovell and his attorney. To the extent the State is worried about future proceedings, such as habeas proceedings, and any claims Mr. Lovell may make there, those concerns are and should be wholly and totally irrelevant to this proceeding. The State, therefore, has

---

[2] These arguments are fully briefed in the Motion to Withdraw, Exhibit A.

8

no standing to make the claim that it makes here. "Like any litigant, the State lacks standing to assert rights not its own." *State v. Anderson*, 72 Wash. App. 253, 259, 863 P.2d 1370, 1374 (1993); *see Powers v. Ohio*, 499 U.S. 400, 410, 111 S. Ct. 1364, 1370, 113 L. Ed. 2d 411 (1991) ("a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."); *State v. B.C.*, 2016 VT 66, ¶ 20, 149 A.3d 143, 149 (Vt. 2016) (state lacks standing to raise defendant's claims); *People v. Kent*, 40 Ill. App. 3d 256, 265, 350 N.E.2d 890, 898 (1976) (state lacked standing to challenge defendant's sentence). The State does not protect Mr. Lovell's rights. He does. And if he is satisfied with his counsel, as he is here, the State has no part in that decision.

It is the State, rather, that has seriously interfered with Mr. Lovell's Sixth Amendment right to counsel. He has an attorney he is happy with, who knows his case, who has competently argued his issues before this court and the district court. But rather than let Mr. Lovell proceed with counsel of his choice, the Attorney General has attempted to remove his counsel which will only substantially delay Mr. Lovell's case and prevent his counsel from meaningfully working on his case.

Additionally, as detailed *infra*, the county attorney's office has also interfered with Mr. Lovell's counsel to deny him funding (and potentially his entire appellate contract) for zealous representation of Mr. Lovell. Thus, the conflicts were not created by counsel or Mr. Lovell but by the State. That said, Mr. Lovell believes the district court should resolve whether the State has created these conflicts and supports a request to broaden the remand only if it addresses these corollary interests.

9

## B. Counsel's medical condition was related to a separate capital case and the State improperly uses it in this case to create a conflict between Mr. Lovell and his counsel

The State has used the health concerns that arose out of a case in which counsel bore the financial burden of losing tens of thousands of dollars to argue that counsel has a conflict on this case. Interestingly, and revealing, the State has not only failed to move for counsel's withdrawal on that case, but it has actively opposed it. This shows the State seeks this withdrawal for mere strategic advantage, despite its assurances to the contrary.

Problematically, based on a feeble conflict of interest claim on *Maestas*, the Attorney General's office simply wants to pick their opponent to the detriment of Mr. Lovell. As a direct consequence of the extreme lack of funding on *Maestas*, counsel was forced to personally guarantee and financially fortify that litigation and had to eventually secure the services of a pro bono law firm so that he could pay his own personal bills.

In May of 2016, saddled with financial pressure and afflicted with severe stress from the financial battles waged in *Maestas*, counsel suffered a cardiac event that landed him in the emergency room. Counsel's doctor warned that continuing to work on *Maestas* could subject counsel to the danger of triggering a potentially life-threatening cardiac condition. Both counsel's doctor and his cardiologist requested that counsel withdraw from his representation of *Maestas*, on account of the arduous amount of stress owing to the financial issues peculiar to that case. Upon the recommendation of his doctor and cardiologist, counsel moved to withdraw from *Maestas* in December of last year after having obtained two medical-based stays. Despite the direct correlation between counsel's

10

cardiac complications and the funding issues in *Maestas*, the State firmly opposed counsel's motion to withdraw there.

Because counsel has been fully funded on this case in the past few years, he has not felt the finance-induced stress that he suffered in *Maestas*. However, in an unabashed strategic move, the State now attempts to leverage the health concerns counsel raised in *Maestas* to have counsel removed from this case.

It is interesting that the State simultaneously stakes out contrary positions in *Maestas* and *Lovell*. It claims the sole conflict here stems from the letter written by counsel's doctor, explaining that counsel was under too much stress to stay on *Maestas*. Counsel's doctors clearly and unequivocally attributed their concerns about counsel's health to excessive stress brought on by the financial issues involved in *Maestas*.

Thus, for the State to base its conflict of interest claim on the letter from counsel's doctor, it must necessarily contend that Mr. Lovell's case also involves similar financial concerns that also create a dangerously high degree of stress for counsel. Logically, if there is no funding issue here, there can be no conflict of interest.

This is not the position that the State has taken, however. The State argues that counsel's conflict of interest in this case is not attributable to a lack of funding or related financial concerns, but is "singularly based on Mr. Newton's health issues." State's Response to Motion to Withdraw, 2. Again, the health issues to which the State refers in this case—those addressed in the letter from counsel's doctor—are dependent upon stress induced specifically by counsel's financial burdens in *Maestas*. Though it believed that stress was insufficient to amount to a conflict in *Maestas*, it now seeks to have counsel

11

excluded from this case when the underlying financial pressures that caused the stress in *Maestas* are, according to Weber County, absent from this case. Weber County's Response to Motion to Withdraw, 2.[3]

If counsel is medically unfit on one case, he is surely unfit on both. *See* Utah R. Prof'l Cond. 1.16(a)(2) (a lawyer "shall withdraw" if his physical condition "impairs the lawyer's ability to represent the client"). Counsel's doctors' recommendations were specific to Mr. Maestas's case, not Mr. Lovell's.[4]

If the funding concerns and ethics concerns in this case are not addressed and resolved by the district court, then counsel acknowledges that this case may well result in serious medical conditions. Counsel cannot, as a sole practitioner, support the costs of litigating a complex capital case without adequate funding. The losses on Maestas were so severe that they led to medical conditions and counsel will not repeat those problems here. Thus, if the district court will not guarantee funding and independent counsel, then counsel has no choice but to withdraw for medical reasons.

The only reason counsel moved to withdraw from this case was based on an anticipated deprivation of funding from the county. However, the county has also indicated that it expects counsel to move forward on a two-week hearing, with the attendant preparation costs, with no additional funding. Thus, if a conflict of interest

---

[3] Mr. Lovell, however, does not concede that the concerns are absent at this stage. The county has refused to pay almost $10,000 it owes counsel for prior work and it has indicated it will not pay for any more than $15,000 for the entire remand proceeding. *See* point D.

[4] Counsel does acknowledge, however, that his doctor has told him that he needs to withdraw from any case that is causing him undue stress, which may implicate this case if funding concerns are not addressed.

Weber County 041

claim does exist, based on stress induced by funding issues, it is being choreographed by the county's refusal to provide counsel with adequate financial resources to defend Mr. Lovell in this case. If the State, county or court can resolve the financial and ethical issues, then that stress will evaporate, along with any potential conflict. Nevertheless, the State cannot assert a conflict of interest owing to counsel's health, while simultaneously denying the existence of a stress-inducing funding issue that would account for counsel's alleged health problems.

The State's contradictory claims—that there exists a medical conflict in this case, where there are potential funding issues, and no medical conflict in *Maestas*, where there are funding issues—run contrary to reason. It is disconcerting that the State has taken these conflicting positions for the apparent purpose of picking its opposing counsel, and presumably, making it more likely Mr. Lovell's case will be affirmed on appeal and that it can succeed in *Maestas*. These concerns are compounded by the conspicuous conflict arising from Mr. Field's participation in this case.

Therefore, this court needs to allow the district court to inquire and find whether the medical conditions are related to a lack of funding created by the State.

### C. The Attorney General has knowingly violated a federal court order prohibiting Mark Field from appearing on capital cases in which he participated as a law clerk

Particularly problematic is that the federal district court ordered, in 2012, that Mr. Field not participate in a capital case in which he worked as a law clerk. By virtue of the fact that Mr. Field, as a law clerk for Judge Lyon, handled Mr. Lovell's case during state court proceedings, he is situated squarely and unabashedly in the gunsight of the rule. *See*

13

Utah R. Prof'l Cond. 1.12(a). Because the Attorney General knew of Mr. Field's clear conflict of interest, the Attorney General's office not only undertook to represent the State in this case, but also, in a unashamed display of apathy for the ethical rules and the federal court decision, selected Mr. Field as counsel on this case and did nothing to screen him for participation.

Rule 1.12 indicates that if Mr. Field is disqualified, then the entire firm—the Attorney General's office—is disqualified unless Mr. Field was "timely screened from any participation in the matter" and written notice is given to the parties. Utah R. Prof'l Cond. 1.12(c). The State gave no notice of this conflict and it was only after counsel's inquiry, two years into the case, that he discovered that Mr. Field worked on Mr. Lovell's case as a law clerk. This makes the Attorney's General's actions serious enough to merit disqualification of the entire office, since Mr. Field was not screened from work on the case.

> [T]o ensure faith in the impartiality and integrity of the criminal justice system, ... the entire prosecutor's office will be assumed to be privy to the confidences obtained by [a conflicted] lawyer. The prosecutor may rebut this presumption by showing that effective screening procedures have been used to isolate the [attorney] from the prosecution of the substantially related criminal charges.

*State v. McClellan,* 2009 UT 50, ¶ 19, 216 P.3d 956. Granted, Mr. Field was not a defense lawyer as *McClellan* involved, he worked as a clerk for the court, but the conflict is the same.

Mr. Lovell is understandably worried that the State is entirely seeking strategic advantage on this case. It has moved to have his counsel withdraw on this case for

14

concerns related to a separate case (while opposing his withdrawal on the other case). Then it has placed an attorney who was a law clerk, was familiar with the case and the judicial thinking on this case, as Mr. Lovell's chief opponent. He cannot have a fair proceeding under these circumstances.

Therefore, this court needs to allow the district court to inquire into the nature of this conflict and determine, specifically, whether Mr. Field specifically as well as the entire Attorney General's office needs to be conflicted off of the case because of his and its knowing violation of the Rules of Professional Conduct.

### D. The Weber County Attorney's Office should be disqualified from prosecuting this case or participating in funding requests

The Weber County attorney has similarly created serious problems in this case and this court should direct the district court to inquire into this conflict. Notably, the prosecuting authority and the funding authority sat in the same room on this case, erasing all semblance of a Chinese Wall or independence between the two divisions at that office. The civil division also filed a response to counsel's request to withdraw—a substantive motion—where it had not been granted permission to intervene on the criminal case.

Perhaps most problematically is that the county has told counsel that he must limit his conversations with Mr. Lovell and not "overbill" so much. This is in violation of the Sixth Amendment since Mr. Lovell's case is on direct appeal. "The Sixth Amendment right to counsel extends to a defendant's first appeal as of right. This right includes the right to *state-paid counsel* for indigent defendants." *State v. Gailey*, 2016 UT 35, ¶ 26, 379 P.3d 1278 (emphasis added) (citing *Pennsylvania v. Finley*, 481 U.S. 551, 554, 107 S.Ct.

15

1990, 95 L.Ed.2d 539 (1987) (("[D]enial of counsel to indigents on first appeal as of right amount[s] to unconstitutional discrimination against the poor."); *Gardner v. Holden*, 888 P.2d 608, 622 (Utah 1994) (statute "provides for the assignment of counsel at state expense only during the trial proceedings and the first appeal of right or other remedies before or after conviction that the attorney considers to be in the interest of justice.").

The county has also indicated that it will not contract with counsel in the future because of these concerns. This means a loss of counsel's entire livelihood because of his advocacy and representation of Mr. Lovell. This clearly indicates why funding requests should not be from the same office that prosecutes the case and that counsel should be sufficiently independent to be conflict free. This can only be accomplished if the funding is entirely independent of the prosecutor's office. *See ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, p. 1004 (2003) (emphasis added); 18 U.S.C. § 3006A(e)(1) (2000) (providing for *ex parte* hearings for requests for investigative, expert, or other services for indigent defendants). Mr. Lovell requests that this court (or the district court on remand) direct that funding questions be done either ex parte with the court or through a defense service organization.

"Defendants ... have the right to the effective assistance of counsel on direct appeal." *Gailey*, 2016 UT 35, ¶ 27 (citing *Bruner v. Carver*, 920 P.2d 1153, 1157 (Utah 1996) ("The Due Process Clause of the Fourteenth Amendment guarantees the right to effective assistance of appellate counsel."); *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) ("A first appeal as of right ... is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.").

16

Weber County 045

That means Mr. Lovell needs adequate resources. "For counsel to be effective in the case of an indigent defendant, the state must provide a defendant with access to 'the raw materials integral to the building of an effective defense.'" *State v. Carreno*, 2006 UT 59, ¶ 8, 144 P.3d 1152 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 76–77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Indeed, it creates a conflict of interest since counsel will have an incentive to work less—and may have to out of economic necessity—on the case given the lack of adequate funding.

As this court put it almost fifty years ago, "[w]e think a wise legislature intended to and did remove the burden of affording counsel for impecunious defendants in criminal cases from the tired shoulders of the legal profession and placed it upon society, where it has always rightfully belonged." *Washington Cty. v. Day*, 22 Utah 2d 6, 10, 447 P.2d 189, 191 (1968); *see also State v. Dixon*, 22 Utah 2d 58, 59–60, 448 P.2d 716, 717 (1968) ("the legislature obligated the counties to provide, at their expense, legal services for indigent defendants").

However, the county's lack of funding here places the burden squarely on Mr. Lovell's appellate counsel. The county should not be "in a poor position to try to avoid its statutory obligation" to provide the resources to an indigent's counsel. *Hatch v. Weber Cty.*, 23 Utah 2d 144, 148, 459 P.2d 436, 439 (1969).

17

It is interesting that the State has at least eight attorneys[5] who have appeared on this case, both from the Attorney General and the county attorney's office. Mr. Lovell has *one* attorney and one who is entirely underfunded. He needs the services of at least another lawyer and adequate resources. For example, the $15,000 the county has allowed for the remand proceeding also includes investigative services, which will be woefully lacking compared to the State, which has the investigative resources of two offices as well as many attorneys working on the case. The State will have eight sets of attorney eyes on its response, while Mr. Lovell has one solo practitioner who has limited time and extremely limited resources. The disparity is entirely unfair and this court should order the district court to inquire into and remedy this inequality.

### E. This court needs to fulfill its promise to strike down the imposition of a death sentence because of these issues

Almost ten years ago, this court indicated a very real concern that defense attorneys were not being adequately supported in capital casework. That has occurred in two cases in which counsel is personally involved—two of the nine on Utah's death row.

> In recent years, we have become especially concerned with the diminishing pool of competent counsel in capital cases. There is no acceptable justification for this trend. *Competent defense and appellate counsel are guaranteed by our constitution.* We cannot allow a defendant's life to be taken by the government without an adequate review of the conviction. Our judicial oath to support, protect, and defend the Constitution must, of necessity, include the requirement that we take measures without our authority and responsibility to see that the mandates of the Constitution are observed.

---

[5] Mark Field, Andrew Peterson and Aaron Murphy from the Attorney General's office, plus Christopher Allred, Bryan Baron, Gary Heward, Christopher Shaw and Jeffrey Thompson from the Weber County attorney's office.

18

> It is the duty of the legislative branch *to provide for adequate defense of capital defendants, including sufficient resources to attract, train, compensate, and support legal counsel.* It is left to the legislative branch to determine how best to accomplish this goal. However, it falls to us, as the court of last resort in this state, to assure that no person is deprived of life, liberty, or property, without the due—*and competent*—process of law. *Without a sufficient defense, a sentence of death cannot be constitutionally imposed.* This basic concept is bedrock upon which our constitutional government stands.
>
> If, in the future, we find that the unavailability of competent and willing counsel impedes prompt, constitutionally sound resolution in capital cases, we may be forced to hold that the lack of such counsel is sufficient grounds for outright reversal of a capital sentence and remand for the imposition of a sentence of life in prison without the possibility of parole, for which the required degree of sophistication and skill reposed in counsel is slightly less.

*Archuleta v. Galetka*, 2008 UT 76, ¶¶ 17-20, 197 P.3d 650 (emphasis added).

The time is now. On one of counsel's cases, he has personally lost tens of thousands of dollars and suffered serious medical conditions from the denial of funding. The Attorney General has used that case as leverage to remove counsel from this case (but not the case that created the conditions), all without revealing its own conflicts of interest. On this case, counsel faces a loss of his entire livelihood by litigating Mr. Lovell's case as he is constitutionally required to do. The county attorney's office has improperly influenced counsel's representation to create this conflict. It has also appeared with the prosecuting authorities, ending all semblance of independence between the prosecuting and funding authorities.

19

Weber County 048

This does not provide for the defense the Constitution requires and the State's litigation strategies have created this very problem. This court should end the punishment in this State once and for all and fulfill the promise it made in *Archuleta* or alternatively act to remedy the numerous problems from the State's actions here.

RESPECTFULLY SUBMITTED this 21 day of June, 2017.


_____ /s/ Samuel P. Newton _____
SAMUEL P. NEWTON
Attorney for Appellant

20

Weber County 049



**WEBER COUNTY adv NEWTON**
005678.00053

### Transcript from Court Hearing

SN:        Your honor, as Mr. Lovell is coming out we'd like to make a motion to have one of his hands uncuffed so that he can take notes.

Judge:     That is a request that's been made before and I have permitted Mr. Lovell, good morning, I have permitted him to have, I think it's his righthand that he uses to write, I'm fine with him taking notes.

SN:        Thank you, Your Honor.

Judge:     We've done that before, so I don't have any—

?          _____ on record that our policy is that we can't do that _____

Judge:     We did it during the trial. I don't know—

SN:        We've had a problem with proceedings

Judge:     We have, I wasn't hesitating because I was thinking I was going to do something differently, I was just thinking that today this is going to be fairly brief and so I wasn't sure how much note-taking there would be. But I'm comfortable with you being allowed and I'll order you to release, I think his righthand for the purpose of taking notes.

SN:        Thank you, Your Honor.

Judge:     Your welcome. Alright, let's turn to the matter of State of Utah vs Douglas Lovell, this is case 921900407. This is the time scheduled for the court to issue a decision on a motion to withdraw as counsel that Mr. Newton has filed. Mr. Newton is presently representing Mr. Lovell. The state is present represented by Mr. Field and Mr. Murphy. The motion to withdraw that was filed in this case by Mr. Newton was filed back in June on the 9th, I believe, and following the filing of that motion this court in an effort to proceed cautiously instructed Mr. Newton on a telephone conference that involved the state as well to bring that motion before the Supreme Court. This court's concern was that this matter was on appeal and this was an effort to withdraw as appellant counsel and the court felt that it was limited in the 23B order to only addressing questions dealing with ineffective assistance of counsel. And so, when the motion of withdrawal was made, the court suggested that that be reviewed by the supreme court. The supreme court looked at it and justicely issued an opinion, an order dated July 31, 2017, which instructed me to handle the motion to withdraw as counsel issue. And so, with that said, court conducted a telephone conference and put this on the calendar for today. The purpose for that, Mr. Lovell, was so that you could be here, of course, the court did not want to make decisions about your counsel without having you present and being a part of the discussion. And so, it was calendared for today, the attorneys were advised to be here.

We made an order instructing that you be transported. I previously indicated on the record that I perceive this motion to withdrawal of counsel is appropriately under Rule 38A of the rules of the appellant procedure and that is the rule that the court intends to apply in this particular case in evaluating this motion. We met briefly, well I shouldn't say briefly, we met for an extended period of time in chambers a moment ago to discuss a variety of issues and I know Mr. Newton you wanted to make a record on some of the issues that were discussed in the chamber. So, let me allow you to do that at this time, please.

SN:        Sure. Your honor, we discussed a variety of issues. The first being that Ms. Sandalvarus litigation investigator in this case turned over a USD disc to the state mistakenly believing that there was an order that she had to turn that over. Mistake has closed after the court and to me and they also disclosed the fact that Mr. Young may have been in conversations with Mr. Young who indicated his willingness to turn over his file to them or documents that he had ___. The court issued an order to the state to return the USD disc to, or USD drive to Ms. Sandalvarus and the state is not to receive, they don't intend to receive the documents from Mr. Young until the court has had an opportunity to rule on that issue. We discussed some other matters pertaining to the motions to withdraw but I don't know if we need to necessarily make record of those.

Judge:     Mr. Field, Mr. Murphy did you want to supplement on that?

Field:     Yep, your honor. Mr. Newton gave an accurate representation of what we talked about.

Judge:     Okay. And then it's my recollection Mr. Field was that the confusion created that resulted in Ms. Sandalvarus sending over to your office the flash drive was because of a proposed order that your office had sent to her and she didn't perceive it as proposed, it didn't have a signature on it but it also didn't have language that said "proposed" and I thought that you explained to me that that in your opinion was the reason she perceived she was under an obligation to send the flash drive and in fact did.

Field:     Yeah, that's correct your honor.

Judge:     Okay. Alright so I am ordering the state to return the flash drive to Ms. Sandalvarus. That flash drive, of course, is to be preserved in the condition that it was in when it was sent to the state and the condition that it's in, I would assume, upon its return. With respect to Mr. Young who was trial counsel for Mr. Lovell. Mr. Young I think was hoping to deliver his box of materials to the state to avoid the need to continue to preserve those documents. I have instructed the state at this point not to accept those materials from Mr. Young until the court can rule on the waiver issues that had been raised as part of the original 23B remand. So, with that said, let's turn now to the motion to withdraw and let me hear from you, Mr. Newton, on that motion.

SN:        If the court is okay, I'll make a brief record of why I made this motion and I know that if the court's okay with this, Mr. Lovell would like to address the court with his concerns about the motion and if he could be heard on that as well.

2

Weber County 2207

Judge:      Okay

SN:         I don't know if that's fine for me to speak and then have him speak.

Judge:      However you want to do it.

SN:         I think that would be the best. This motion is filed, was filed by me maybe extremely reluctantly after much deliberation. Just to give the court a little bit of background, I represent or represented Floyd Maestas on the capital case in post convection proceedings for the past 3-4 years and for reasons I won't get into here, I have been denied about $100,000 in attorney fees on that case. As a solo practitioner that ended up resulting in a lot of stress for me. I ended up having a cardiac event because of that. Visited my doctor and was referred to a cardiologist both of them said I needed to withdraw from the Maestas matter. I filed a motion in the Maestas case to withdraw based on that. And in a follow-up visit in May of this year my doctor indicated to me, he said I should get off the Maestas matter now that I've asked, assume I'm off that case and I said "no, I'm not." He wrote me a pretty strongly worded letter and gave me some strongly worded advice that that case in particular was causing me a significant amount of stress and that I needed to withdraw.

Judge:      Now this is the letter, well, I'm sorry.

SN:         Yes, that's fine. The letter dated—

Judge:      May 4, 2017 signed by Samuel Hill—

SN:         Shane Hill. Should be Shane Hill, yeah.

Judge:      Oh, I'm sorry.

SN:         That's my doctor that I had a follow-up visit with. And he, we didn't discuss the level matter in any way but we were discussing kind of the Maestas case and his indication to me was that I needed to get off that case in his opinion and I'll just use his words, personally he said "a stressed induced heart attack will kill you just as much as a non-stressed induced one." I asked him about my fitness to be counsel on other cases? Can I continue to practice law? And he said, "absolutely you can." I can tell you that that's, you just need to identify for you what are distressors in your life and you need to remove appropriate stressors and that case is one of them. Now, in response to me disclosing that letter to the state of the Maestas matter, the state sent me a letter telling me that they appreciate that there was a potential conflict of interest representing Mr. Lovell. At the time that I received that letter I had been fully funded by the Weber County attorney's office. They had funded Mr. Lovell's appeal and they knew and were aware of the supreme court's remand order and I had been in discussions with them about funding the remand. The county had indicated, we went back and forth, they would authorize an additional $15,000 to complete all remand proceedings. I told them I believe that was

3

Weber County 2208

unrealistic, given the nature of the remand and what needed to happen, and the county essentially said they weren't going to fund anything more beyond that. Given the nature of that allegation or that difficulty I move the court to fund, order the county to fund the additional work that would have to happen on this case. The court declined to do that indicating it believed that this was a contractual issue between the parties and it wasn't going to enter into a contract dispute between Weber County and me. Now I have not spoken, and I have not had a follow-up visit with my doctor, but I have not been paid by Weber County on Mr. Lovell's matter since January of this year and that was an inadvertent payment. Mr. Baron told me that the accountant accidentally paid it and was told specifically not to. So other than that payment I probably haven't been paid for a year on Mr. Lovell's case and I'm already approaching I think about $30,000 that the county owes me, and I am fearful that to continue involuntary pro-bono representation for Mr. Lovell comprises my ability to adequately represent him on appeal. I know the magnitude of this case, I know the magnitude of what a 23B hearing entails that involves 26 witnesses. I know the magnitude of what it will take to re-brief all of that issue and or to brief all the issues that come up in the 23B. I know what's expected of me in my decisions of the United States Supreme Court and by the American Bar Association's guidelines for representation in a capital case. I don't think I can ethically and zealously represent Mr. Lovell without the guarantees of funding or, it will not result in the same health concerns that I had in Maestas. So, I'm fearful that that compromises my ability to fairly and properly represent him. I think that's an adequate record. Doug, is there anything you feel like I need to say more beyond that?

Lovell:    No, I've got, my letter I want to read to you and then I also have a motion here for you that I'd like to read it.

SN:        I'm happy to hear from you.

Judge:     Why don't you read the letter.

Lovell:    Should I give the motion first?

SN:        Your honor, I know this motion, if I could speak for that quickly?

Judge:     Okay

SN:        It's a post A motion, he's anticipating that the court is going to order me removed so I think procedurally it would be proper to address that if the court removes me.

Judge:     Okay, so let's take it a step at a time. I haven't made the decision yet on allowing Mr. Newton to withdraw. If and when I permit him to do that then at that point you will be situated as a pro-say litigant and if you want to advance a motion you're certainly entitled to do so.

Lovell:    Okay

4

Judge:     So, we'll hold off on that. You said you had a letter you wanted to read, so--

Lovell:    Can I have a quick drink of water? I haven't had any liquid in me for hours here.

Judge:     Is that a problem?

?          Don't have any water here, _____ *(cannot hear this background talking)*

SN         Your Honor, may I share one more thing before he speaks? I should add that I feel
           tremendous loyalty to Mr. Lovell. And I feel like I know his case as well as anyone. And
           I think, I have spent the time to read 30 years of litigation and it's an enormous file. And
           I'm familiar with that entire file, I'm familiar with the trial, I'm familiar with, I have
           written, largely, I think 98% of the brief is completed on appeal. Because the Supreme
           Court initially denied our request for Rule 23B remand, we made it early on, so I was
           anticipating doing all the briefing. I largely completed it. And so, I think that background
           kind of needs to be addressed before Mr. Lovell says his concern.

Judge:     Okay. Please.

Lovell:    Dear Judge, attorney. Because of the problems I have had in the past with attorneys from
           Weber County, I feel the need to address this issue at this time before counsel is again
           appointed to represent me. In 1992 Weber County appointed John Caine and Burney
           Allen to represent me. From May of 1992 to August of 1993 I talked with Mr. Caine on
           the phone maybe one or two times and legal visits about the same. He filed 3 or 4
           motions, two of which were at my request. After I received the death penalty, Mr. Caine
           admitted in a deposition that he represented me for a total amount of $49. He also had
           admitted that had he done my direct appeal he would have received a total amount of
           $500. In a 2005 evidentiary hearing, he said that he didn't hire a mitigation specialist or
           have a mental evaluation done on me because things like that weren't being done in 1992
           or 1993. Mr. Caine obviously had no knowledge of the 1989, 88 guidelines. As for
           Mr. Burney Allen, although court dockets and records show that he was my attorney, I
           have no recollection of ever meeting Mr. Allen. I don't recall him ever being in a
           courtroom with me from May 1992 through August of 1993 including the 1993 penalty
           phase. After the Utah Supreme Court renatted my case back to the district court, Weber
           County appointed Jim Ortalic and Ryan Bushill to represent me. Although I liked both
           attorneys, they eventually informed a Utah Supreme Court that my case was too complex
           for them and that I needed more qualified representation. The court again sent my case
           back to the District Court to be assigned a more qualified attorney by the name of Dave
           Fillinson out of Salt Lake. In 2011 a Utah Supreme Court overturned my conviction and
           death sentence. Weber County then appointed Michael Bouwhuis, Sean Young to
           represent me. Now, here we are again. Mr. Young failed to contact over a dozen
           witnesses for the 2015 penalty phase. Once it was learned that Mr. Young failed to
           contact my character witnesses, Weber County terminated his contract solely because of
           my case. The Utah State Bar investigated Mr. Young and on March 2, 2017 voted to
           direct the office of professional conduct to file a formal complaint against Mr. Young in
           District Court. As for Mr. Balles, he was lead counsel in charge of Mr. Young. I believe

Weber County 2210

the upcoming hearing will clearly show that Mr. Ballis failed when it came to overseeing Mr. Young's work. The hearing will also show that there was a lot of confusion and a complete lack of communication when it came to my character witnesses. As for who my attorney will be going forward, I'm asking this court to order Mr. Newton and the Weber County finance department to work out a new contract. Regardless of who counsel is, Weber County will have to pay for them. The common-sense arrow clearly points to one person, Sam Newton. No other attorney knows me in the history of this 32-year-old case better than Mr. Newton. He and I have developed a good working and trusting relationship. This court has already ruled that Mr. Newton's qualified and competent to represent me. He's qualified at the trial at appellant level. To appoint new counsel would greatly delay the upcoming hearing which is set for September 25th. It would take new counsel many months to get familiarized with this case in preparation for the upcoming hearing. The complexity of this case is going to be much more than just contacting witnesses and putting them on the stand and asking some questions. If, however, Mr. Newton is not appointed to represent me under a new contract, I ask this court to appoint counsel outside of Weber County, someone with trial and appellant experience with capital cases. Someone who would not have a conflict of interest with Weber County or any of the previous attorneys who have represented me in the past. Finally, I'd like to thank you Judge Drayer for allowing me this opportunity to address my concerns on the record.

Judge:      You're welcome, thank you. Mr. Field.

Field:      Your honor, first of all we contest many of the facts that Mr. Lovell has just stated but we won't go into any of that because that's not the purpose of this hearing. We do believe that Mr. Newton has a conflict of interest and we don't think that there's really any rational basis to distinguish between the problems that are occurring or the problems that occurred with Mr. Newton's health problems and Maestas in those that he has admitted are also occurring in the Lovell case. We think that for those reasons that the court should grant Mr. Newton's motion to withdraw. We think that we view that if what Mr. Lovell has to say about re-appointing Mr. Newton we think that that's could be very, very problematic. Mr. Newton's representation is if he has a conflict of interest he has a conflict of interest. And in _____ or appointed as, or if he were doing the _____ case he would also raise the same sort of conflict issue as an argument why Mr. Lovell would get, should get post-conviction relief. We think that allowing Mr. Lovell or Mr. Newton to withdraw allows the case to go forward without that cloud of conflict and will down the road any further problems related to that. Does the court have any questions.

Judge:      No, thank you.

Field:      Thank you

Judge:      Did you want to make a final statement Mr. Newton, in as much as this is your motion.

6

JN:       Very, very brief. I didn't mention one other fact which I think clouds my judgement in
          this case. Which is, the county indicated to me action concerns about my billing. Of note,
          was I was speaking too frequently with Mr. Lovell. They indicated if I did not resolve
          those concerns about my billing that it would jeopardize my ability to contract with them.
          So, the court knows I, and the court is probably aware, I do all the appeals out of Weber
          County and I do feel that zealous advocacy for Mr. Lovell on this case may jeopardize
          my livelihood. And I hadn't mentioned that before but that is another factor I think that
          clouds my judgement and makes it difficult for me to adequately and zealously represent
          him. I will also note, and this is in the motion, that Mr. Lovell does have the right to have
          effective assistance of counsel in the 6th amendment which I think trumps everything
          we're doing here. And he's entitled to effective counsel and whether if, if it can be me, if
          it is me, it has to be remedied that those conflicts that I have have to be remedied. If not,
          then he needs someone who is appointed who does not have these conflicts.

Judge:    Thank you.  As I indicated at the outset this motion is governed in my opinion by Rule
          38A of the Utah rules of the appellate procedure. That rule specifically says, it's
          subparagraph A1 withdrawal in criminal cases and certain civil cases and it reads as
          follows: An attorney may not withdraw from a criminal case or from a civil case in which
          that attorney's client has the right to effective assistance of counsel except upon motion
          and order of the court. Absent, good cause shown, leave to withdraw will not be granted
          unless the motion to withdraw is accompanied by an entry of proposed appearance by
          new counsel or a representation by the withdrawing attorney, the client is entitled to the
          appointment of new counsel. So, the question in this particular case is whether or not the
          allegations raised by Mr. Newton and to a degree stipulated and/or agreed upon by the
          state, rise to the level of constituting good cause. There is no question that the Hallmark
          concern of the court in this case is that Mr. Lovell be provided with the effective
          assistance of counsel. He is entitled to it, no one disputes that and so then the question
          becomes how do we make sure that the attorney representing Mr. Lovell is effective and
          not saddled with some sort of conflict? The arguments that have been advanced by
          Mr. Newton in his motion and the attached declaration including the letter from his
          physician in this court's view are 3-fold. The first and biggest issue, of course, is the
          money, the payment, and as Mr. Newton accurately represented on the record, he sought
          this court's intervention in that fee dispute. And specifically asked the court to involve
          itself in the contract issues that had arisen between him and Weber County. This court
          was reluctant to do that because there is a specific statutory provision that allows for
          Weber County to contract with those that are going to provide appellant counsel. And
          when Weber County does so, it is up to Weber County and the attorney whom they're
          contracting with to enter into an agreement that both sides feel is fair. If in that
          negotiation process a fee is agreed upon that turns out later to be inadequate, that's a
          function of negotiating, a function of entering into a contract and in life sometimes
          people enter into contracts that wind up benefiting them greatly and other times not so
          much. But the court is not in a position to step into a contract between two people. In this
          case Mr. Newton and those representing Weber County and tell them that their contract is
          going to be set aside and the court is going to somehow reframe that contract. That's not
          my prerogative to do that, If Mr. Newton had come in under a different provision where
          the court had appointed him than a court would have more flexibility, of course, in

7

deciding what fees were reasonable and what fees were not. But that's not our situation.
So, with the money issue kind of out there, how does that relate to the motion to
withdraw in this case? Well, as the motion clearly outlines, the inadequate, to words that
Mr. Newton has used, inadequate funding in this particular case has led Mr. Newton to
experience a tremendous amount of stress. And as his doctor clearly indicates in the letter
that was attached to the motion to withdraw that stress has resulted in concerns for
Mr. Newton's cardiac health. As his doctor indicated a stress-induced heart attack is no
less deadly than one induced by a blockage. I think to use the words that were used in the
letter. And so, then the question becomes, well what do we do with the health concerns
that exists?  They're clearly identified, they're clearly serious, the state doesn't dispute
them. In fact, the state in response to the letter sent by the doctor wrote its own letter to
Mr. Newton saying we think there's a problem here because of what your doctor has said.
Now where it creates the conflict, a potential conflict for you Mr. Lovell, is that down the
road it would be reasonable, understandable and easy for you to say "I don't think
Mr. Newton represented me properly on my appeal and the reason that I don't think that
he did was because he wasn't being paid adequately and because he wasn't paid
adequately he had health issues. And because he had health issues, he in order to manage
his health didn't work as vigorously on my case as he should have. He was trying to look
after his own health issues, self-preservation, he put his needs above mine, didn't
vigorously and zealously represent me the way that he should have because he wasn't
getting paid. And so, with those things all sort of being interrelated and linked together,
Mr. Newton has identified a conflict. How does he continue to work without being paid?
How does he continue to zealously represent you without being paid when the payment is
resulting in him having these hypertension, stress related cardiac events that have resulted
in him seeking medical attention? The court is concerned that the issues raised in his
declaration and in the motion are so significant that at this point it would be unwise and a
mistake to permit him to continue representing Mr. Lovell. I think there is more than
good cause in this particular case based on the declaration that's been submitted, the
letter that was provided by his physician, the arguments outlined in the motion to
withdraw and those that are shared by the state in its response to the motion to withdraw.
And so, for the reasons that I have articulated, I'm going to grant Mr. Newton's motion to
withdraw. Now that puts us in a posture at this point where Mr. Lovell at least for the
present moment that you sit here before the court you are unrepresented. You indicated
that you had a motion that you wanted me to consider and if you would like to hand that
to my bailiff, I will look at that motion at this time. You'll note that under our rules of
procedure, rule 7 specifically, motions that are filed must be served upon the opposing
party and there is in the rule a time frame in which this state is permitted to file a
response to that motion and then you are permitted to file a reply and then once the
briefing is completed it's submitted to me for my decision. I assume, Mr. Field that
you've not seen this motion.

Field:       The state has not seen that motion, Your Honor.

Judge:      Okay.

SN:         And I represent that I have not either.

8

| | |
|---|---|
| Judge: | What do you, what is your position with respect to the court reviewing this motion at this time where you have not yet seen it? |
| Field: | Well when you say review, do you mean you're just going to read it? Or are you going to make a decision on it? |
| Judge: | Well I guess the issue is, should I even be reviewing it until it has been properly served upon you, you've had a chance to respond and it's been noticed up for a decision. |
| Field: | Well-- |
| Judge: | Because to review it at this point it's almost in a way form of an x-party communication. |
| Field: | Right, I think that we're happy to accept service if the court makes a copy and that would be great. So Mr. Lovell wouldn't have to put it in the mail. |
| Judge: | I'll have my clerk with the assistance of our standing machine make a copy of that. If you'll make two just so Mr. Newton as a courtesy to him can have it there. |
| ? | Sure |
| Judge: | To look at. We're making a copy and I'll have it delivered to you. And then if you want to look at it while I'm looking at it than at least we can be on the same page. |
| Field: | That would be great. |
| Judge: | Mr. Field, Mr. Murphy, how would you like to proceed on this motion that Mr. Lovell has brought to the court? Would you like to address it now? |
| Field: | Yeah, we're happy to respond right now. |
| Judge: | Okay |
| Field: | _____ we think the issues that he raises in here has already been decided by the court. There, I know he says that Mr. Newton does not have a conflict, Mr. Newton says he does have a conflict. If this court were to reappoint Mr. Newton to represent Mr. Lovell with the conflict that he has and bearing in mind that the court has already issued its own ruling months ago about the funding issues. There simply no way that this court can re-appoint Mr. Newton and we won't have exactly the same problems that we're discussing right at the moment. And so, it's the states position that Your Honor should deny the motion. |
| Judge: | Thank you, Mr. Lovell? Like to say anything to John what you've said in your typed motion? |

9

Lovell:  I'd would just like to say that his conflict is only if he's not getting paid, that's going to cause him problems.  They have to find new counsel for me and that's going to cost, to me that's going to cost a lot of money and great delay, going to cost a lot of money for them to get caught up to where he is now and to me it's going to cost a lot of delay. I don't see this September hearing happening now. And it's going to cost even further delay. So, if his conflict of interest is because he's not getting paid, they have to pay new counsel anyway. Why not just work up a new contract with a new, right now, not worried about what's happened in the past. A new contract and appoint him?

Judge:  Your logic is not flawed. It makes sense to me, but I can't order Weber County to contract with a particular person at this point in time. I can't order them to renegotiate with Mr. Newton. That's their prerogative. They are the contracting entity. They entered into a contract with your attorney. He sat down, and he said I'm willing to do the work for this amount of money. Now the problem that this situation creates is that even if hypothetically I granted your motion and I directed Weber County to pay Mr. Newton more money. Where does it end?  Is the problem. Because then we reach another point in time where Mr. Newton says, okay now I feel like I've earned what I've been paid, and I want more. And if you don't give me more, I have a conflict. The conflict being it's causing me health issues and the health issues are making it so that I can't adequately represent my client. And so, we just keep going around and we go around and we go around. Your position that Mr. Newton has worked more on this case than any other lawyer – again, it's not a flawed argument. I respect and appreciate that. I also respect and appreciate the delays that this will cause. I further appreciate the fact that Weber County will have to enter into a contract with new appellant counsel who will then have to spend an inordinate amount of time getting up to speed. I respect and appreciate all of that. But at the end of the day my primary concern is making sure that you have effective assistance of counsel and that that counsel not have a conflict. Not with you but a conflict that results in health issues that are generated because of a money dispute, a fee dispute. I didn't create this situation but now I have to sit back and say does this compromise Mr. Lovell?  My view is that it does. Does that mean that Mr. Newton hasn't done a herculean job of representing you? No. Does it mean that I'm somehow saying that I don't think that he's a good appellant lawyer? No. It just means that the situation has evolved to a point where I no longer feel that he can represent you without a potential conflict because of the problems that he has with Weber County. So, I now have got to find an attorney who doesn't have that kind of conflict who can zealously and adequately represent you without any sort of reservations without any sort of health issues that are related. So that, my focus is on making sure that you have adequate counsel not on robbing you of adequate counsel.

Lovell:  But are you finding me counsel or is it them finding me counsel?

Judge:  So, here's the answer to your question. And I should say prior to answering your question that because you're asking me essentially to revisit this contract issue and involve myself in it, I'm denying your motion. With that said, here's what I'm going to do. I'm going to draft an order that directs Weber County to identify new counsel within 20 days. Now the

Weber County 2215

reason for that 20 days is because rule 38A actually contains a 20-day notice to appear or appoint provision. It doesn't directly apply in our fact pattern, it really applies more in the civil context. It says if an attorney withdraws under subdivision B1, dies is suspended from the practice of law, is disbarred or is removed from the case by the court. Now I suppose we could argue that I'm removing Mr. Newton from the case. I'm not sure that's the contemplated scenario but it says the opposing party shall and the court may serve a notice on the unrepresented party informing the party of the responsibility to appoint new counsel or if the unrepresented party is a natural person the responsibility to appear personally or appoint new counsel. Copy of the notice served by the opposing party shall be filed with the court. No further proceedings shall be held in the case until 20 days after such a notice is served. Unless the unrepresented party waives the time requirement or unless the court otherwise orders. Now you don't have the ability as an indigent defendant to go out and find new counsel. This contemplates that the state would than submit a notice to you to find new counsel or represent yourself. I'm not directing that to occur. What I'm saying is I'm using this rule, this provision in the rule as a guide post and I'm saying I'm directing Weber County now because its statutorily obligated to do this. To go out and find new appellant counsel for you and enter into a contract with that appellant attorney. Now you mentioned a concern about someone outside of Weber County. Mr. Newton doesn't work in Weber County, he has a contract with Weber County but he's outside of Weber County. The attorneys that are on a list who are Rule 8 qualified to represent individuals situated like yourself in appeals. There's a list of attorneys. Many of them reside in Salt Lake County and as that's been pointed out by the state, that would be convenient in terms of appearing before the Supreme Court, visiting with you down at the prison. Really the only inconvenience would be coming to Ogden occasionally for a hearing or for our 23B matter. So, there is a list of attorneys and Weber County will be given 20 days in which to do that. Now if Weber County is unable to contract or to identify the attorney they intend to contract with in that period of time than this court intends to exercise its authority to identify an attorney and make that appointment. Under that scenario the court would then have the ability to oversee the payment of funds. It would no longer reside with Weber County in terms of a contract, it would then fall under the statutory provision of law that allows the court to make that appointment and then to oversee the attorney fees that are being earned and requested. That would all fall under my umbrella at that point. But for now, I'm allowing Weber County to proceed as it has in the past which is to enter into its own contract with an appellant attorney that is qualified to do this work and to move forward in that direction. If and when the time comes but that has not occurred than we'll proceed under a different provision of law

Lovell:      So, Your Honor, correct, you don't have the authority to order these two to come together and work out a new contract.

Judge:       Sadly, no. Sadly no. I mean, I don't know of a scenario that I could suggest to you that might exist in the prison that would be more, kind of able to, you would understand it better than this scenario but if you had fellow inmates and two of them entered into an agreement. One was going to do, clean the other cell in exchange for some extra food at the time of going to the mess hall or whatever it's called where you gentlemen eat and the

11

first person did the work and the second person didn't give extra food and they came to you and said – Hey, make him do it and you'd say, I'm not in charge of him. You guys entered into your own deal, you need to work it out. That's my point is that I'm not a party to this contract. They didn't come to me, I didn't sit down with them and discuss the fee and the three of us signed this agreement. They did this on their own and so the dispute is between them. And if Mr. Newton feels that they haven't honored the contract, then he certainly has the ability to file a lawsuit, claiming that they breached their contract. If he wants to go and sit down with them and renegotiate, he's free to do that. But if Weber County says we paid you what we're going to pay you and we're not paying you anymore, there's nothing I can do at that point.

Lovell:     _____ for a new contract going forward.

Judge:     Sure

Lovell:     Nothing to do with what's happened over here.

Judge:     Right. You mean if they were to find another attorney?

Lovell:     No, I'm talking about, you know, Weber County or you, a new contract to handle this 23B procedure--

Judge:     Sure

Lovell:     and the rest of the--

Judge:     But they're the two that have to enter into it. I can't create the contract for them.

Lovell:     But you see the problem, surely, to me it seems like you could be able to step in and say wait a minute there's a problem here and I'm going to deal with it.

Judge:     It's a fair point. The problem is is that my authority is limited. I don't have just unlimited authority to do whatever I want. That doesn't even occur in my own home. So, I say that obviously humorously but what I'm trying to say very seriously is that the court has limited authority and I don't have the authority to compel Weber County and Mr. Newton to sit down and enter into a new contract. I mean if Mr. Newton said Judge I can't do this anymore, is it my prerogative to tell him you're going to enter into a new contract. He's identified very real and serious health concerns and I'm inclined to take him at his word and his doctor's word and not second guess those concerns. Someone like you might say well Judge can't you just ignore what the doctor said and tell him he has to stay on my case?

Lovell:     I mean I wouldn't even be fighting this hard for Sam if he were to say hey Doug I just can't do this for health reason going forward. I mean he's made it very clear, I want to stay on your case. My conflict isn't with you it has to do with the funding. As long as they're willing to fund me for, I'd like to stay on your case.

12

Weber County 2217

Judge:     Sure, and I know but the funding has led to a health problem.

Lovell:    Because of the problems I've had with Weber County attorneys in the past, I've never
           complained or tried to fire an attorney outside of Weber County, I want to make that very
           clear. I've had issues with John and you know all of the other Weber County attorneys.
           I've never complained or tried to fire an attorney outside of Weber County. And I think a
           lot of that has to do with the people that they get. I think they just do, just the bare
           minimum and it causes problems with me. Say listen, I mean I'm not an attorney, but I do
           know that this, this and this needs to be done and when I don't see that being done, I raise
           problems. I've never had to do that with an attorney outside of Weber County, but I have
           with the three sets of attorneys that they have appointed to me in the past. That's why I
           was hoping that you would get involved so you know what? Enough is enough.

Judge:     Well, I again can't say enough that I respect the position you're in and how frustrating it
           is for you. My primary concern has and will continue to be making sure that you are
           adequately represented by an attorney who doesn't have a conflict of any kind. And the
           concern, of course, that was raised, and Mr. Newton supplemented the record and made
           an additional point that I had not included but I think it's worth mentioning. He addresses
           this in his declaration when he says that the county commission and the county attorney's
           office, I could be wrong in identifying both but one of the county entities had expressed
           concern about the frequency of contact that he was having with you. That's a problem. I
           mean when the funding entity is telling the appellant attorney we think you're calling him
           too much, we think you're visiting him too much, we're not going to pay you to do that.
           Right away, that creates a conflict for Mr. Newton because he's saying well if I'm not
           going to get paid to do this stuff then I'm not going to call him as much. I'm not going to
           go see him as much. And if that occurs he's not adequately representing you. You see the
           problem. So, I want an attorney that is not in that position. That can sit down with Weber
           County and say I can do this for this amount of money and I'm confident I can get it done
           and I'm going to go see him as much as I want to go see him and I'm not going to be
           constrained by my contract. You follow me?

Lovell:    Right, but I also see a scenario where they get paid a certain amount of money and he
           says okay if I'm talking to you this amount of time on the phone, it makes it to where I
           don't get as much money, do you know what I mean?

Judge:     I think I know what you mean. I'm not entirely sure. When you say it makes it so that he
           doesn't get as much money, I don't know—

Lovell:    Well, yeah, let's say he contracts for say a, let's just say $75,000--

Judge:     Okay--

Lovell:    to represent me on this and he's talking with me on a regular basis which we don't talk as
           near as often as people think that we do. But, well I can't spend as much time with you

13

Weber County 2218

on the phone, Mr. Lovell, come out and visit you because that's going to take from the $75,000—

Judge:   Cut into the money I'm getting--

Lovell:  Yeah, cut into the money—

Judge:   I get it. I completely get it. But I didn't create that contract, right? I mean--

Lovell:  And I guess that's one of the things I'm worried about is the contract.

Judge:   Yeah. Well I share your concerns. But I'm in the same, not in the same position but in somewhat the same position you're in and that is they're not going to negotiate with me or with you. That attorney is going to negotiate with the county—

Lovell:  That's why it would be nice to have you oversee it.

Judge:   Well, I'm giving them an opportunity, a very narrow and brief opportunity to find an attorney that will enter into a contract with them to provide the services that you are in need of. If that can't happen, then at that point I think I have the authority under that statute to step in and make that appointment on my own and then be overseer, if you will, of the funding. But before I step in in that way, I'm still permitting Weber County to proceed under the statutory authority that it has to enter into the contract. Once I've given them the opportunity to do that, if they're unable to because I'm going to move your case along because you have the right to have this case resolved. I think at that point I would be shaved to step in and say I'm going to make the appointment, I'm going to decide how much money is going to be paid along the way. It isn't that I create a contract, it's that the attorney comes in, does the work and then submits fee requests for reimbursement for the hours being worked and I have to look at them and determine if they're reasonable.

Lovell:  Right. The other thing that I strongly object to, Your Honor, and this is even the ABA guidelines is a cap. Say you're going to do this for say $50,000 and you don't get any more after that and then all of a sudden they're getting into this case and they're going – WOW, this case is huge so I'm going to start cutting, I'm going to start cutting back over here and we're not going to put these witnesses on because you know, we're not going to make any money if there's a cap here.

Judge:   And so, my response to that statement is that if there's a concern that caps are somehow violative of an individual's constitutional right to the effectiveness of counsel, effective assistance of counsel, than the remedy is for an attorney who feels that a cap is somehow unconstitutional or it violates public policy in some way, shouldn't be included in the contract. It's for that lawyer to challenge that contract. To file a separate action saying I don't think this cap is constitutional or I don't think this contract is legal.

Lovell:  But that's what I worry about. Like $75,000 is dangled out in front of that attorney or attorneys and they say yeah I want that money and then all of a sudden they get involved

14

in it and they find out the complexity of this case and then they can't go back to Weber County and ask for more money because Weber County will say you agreed to $75,000. Well the out for the attorney is to do as little as possible because and I'm the one that ends up paying for that and Weber County tax payers end up paying for that because we come back to this time after time after time. And Weber County, they say hey, you know, you agreed to this contract, therefore, we're not paying you a dime more. And so, honestly, It's to his advantage to do as little work as possible to talk to me as little as possible because it's getting into that money thing.

Judge:     I understand

Lovell:     And that's happened time after time after time on this case. That's why I was hoping that the court would—

Judge:     Step in and—

Lovell:     Say enough is enough

Judge:     Yeah. Well it's not that I don't feel enough is enough, it's that there's a difference between feeling it and being able to articulate it in terms of an order. I mean I don't think this scenario is a good scenario. But it is the statutory scenario that our legislature has created.

Lovell:     But you see they're wrong as being done.

Judge:     Well, and that's where I think that maybe you and I depart a bit is when you think that I'm making decisions that are not in your best interest. My goal is to make decisions that are in your best interest in the sense that I want to find an attorney for you that isn't going to be in this conflict situation that Mr. Newton finds himself in.

Lovell:     But he doesn't have a conflict as long as they're funding him. They will have to fund an attorney anyway and to get an attorney or attorneys up to speed to where he's, you know I am absolutely, positively convinced that he has read my file.

Judge:     Yeah. Okay. Well, I've made the best decision that I can under the challenging circumstances that the court has been presented with. I'm not going to take any action at all on this case although I think, let me just look here. I'd like to schedule us to come back together for a status conference. I think that we need to because we presently have evidentiary hearing scheduled. I'm not moving it at this point, but I think I anticipate that it's going to need to be moved but I don't want to make adjustments to that hearing until I see where we are with the new counsel. So, what I'd like to do is, I'd like to put this on 21 days from today is the 19th of September. And, let me just see, I would like to put this on the next day which is the 20th of September, Wednesday morning. I'd like to schedule this at 9:00. We can do that by way of telephone conference. I'll send notice, of course, out to Mr. Murphy and Mr. Field. And then we'll send notice to the county attorney's office so that they can be present and update the court on the status of the identification

15

Weber County 2220

of new appellant counsel. I will make sure to include you in that telephone conference, Mr. Lovell because I think it's important for you to kind of know where things are even though I'm not going to be making substantive decisions. I think the plan would be to at least have you on the line so that you know what's being done and can have a better sense for the time.

Lovell:     The 20th at 9:00 am?

Judge:      The 20th at 9:00 am. We'll make arrangements with the prison to have you available telephonically.

Lovell:     And Your Honor would you like this, those, the letter I read to the court?

Judge:      Hum, I'm happy to receive it and have it made a part of the file.

?           I would do that.

Judge:      I don't have a problem with that, so we'll go ahead and do that.

Lovell:     Thank you

Judge:      And then, let's see, did I give you _____

?           _____

Judge:      I gave it back to you? Okay, excellent. Okay, anything else?

SN:         Can I just ask one question about the order to withdraw? Is there a, I don't know how to phrase this, but "alt" provision or a no-fault provision? Meaning, and maybe I should express my concern which is I don't, I'm worried this has happened in other capital cases where the funding authority comes back at the attorney and says that I've created this conflict. And that I need to reimburse them all of the money I've paid or have been paid.

Judge:      Well, I don't think that's a question I can address today.

SN:         I don't know either, but the court is making fining us as to the reason for withdrawal and there's good cause--

Judge:      That's all I'm finding.

SN:         There's this good cause given the health concerns or is it---

Judge:      Well, I think I found it, it's kind of interrelated. It started with the money issue which led to health concern which then led to how that effects your ability to represent. If you're scaling back in your representation because you're concerned about your health because you're concerned about not getting paid. I mean they all sort of interrelates.

16

SN:        Yeah

Judge:     But ultimately, I found that there was good cause to withdraw--

SN:        Will be sufficient.

Judge:     Mr. Field, Mr. Murphy anything to put on the record before I take us into recess?

Field:     We have nothing more your honor.

Judge:     Okay, thank you gentlemen.

17

Weber County 2222

SAMUEL P. NEWTON (9935)
Counsel for Defendant/Appellant
Law Office of Samuel P. Newton, PC
The Historic KM Building
40 2nd Street E, Suite 222
Kalispell, MT 59901-2514
Tel. 801-624-6530 (UT)
Tel. 406-407-7323 (MT)
Fax 406-203-1144
sam@snewtonlaw.com

IN THE SECOND DISTRICT COURT
WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br>Plaintiff,<br><br>vs.<br><br>DOUGLAS A. LOVELL,<br>Defendant. | **MOTION FOR PAYMENT OF ATTORNEY FEES AND EXPENSES AND REQUEST TO FILE MONETARY REQUESTS UNDER SEAL**<br><br>Case No. 921900407<br><br>Judge Michael D. Direda |

Defendant, **DOUGLAS A. LOVELL**, by and through counsel of record, Samuel P.

Newton, submits the following motion in which he asks this Court to pay his attorney fees and

expenses associated with this matter. He also requests leave of the court to file this motion under

seal as it reveals attorney-client work product.

Counsel was appointed to represent Mr. Lovell on appeal. As part of that appeal, counsel

and the county agreed on a soft-cap of $75,000. *See* Exhibit A, attached. Counsel is $4,000 short

of exceeding that cap and the attorney fees in this matter have now exceeded the cap. The

contract indicates that counsel may only exceed this cap if approved by both the county and the

court. *Id.*

DEPOSITION
EXHIBIT
12
Baron

PENGAD 800-631-6989

State v. Lovell, Motion for Payment of Attorney Fees

## A. This court should allow Mr. Lovell to file his requests for funding ex parte and under seal

Mr. Lovell asks that the court allow him to file this request under seal. A copy of this motion has been provided electronically to Bryan Baron, a civil attorney representing Weber County.

Both the American Bar Association as well as the federal government have affirmed that courts should allow defendants to apply *ex parte* for funding.

> At every stage of the case, lead counsel is responsible, in the exercise of sound professional judgment, for determining what resources are needed and for demanding that the jurisdiction provide them. Because the defense should not be required to disclose privileged communications or strategy to the prosecution in order to secure these resources, it is counsel's obligation to insist upon making such requests *ex parte* and *in camera.*

*ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, p. 1004 (2003) (emphasis added); 18 U.S.C. § 3006A(e)(1) (2000) (providing for *ex parte* hearings for requests for investigative, expert, or other services for indigent defendants); *see also Ex Parte Moody*, 684 So. 2d 114, 120 (Ala. 1996) (citing the federal standard in concluding that defendants are entitled to apply ex parte for funding). The county is required to reasonably compensate appellate attorneys. *State v. Dixon*, 22 Utah 2d 58, 60, 448 P.2d 716, 717 (1968). Utah Code requires counsel to make this request to the court in the capital post-conviction context. Utah Code Ann. § 78B-9-202(d). Additionally, the Utah Supreme Court, in *Menzies v. Galetka*, 2006 UT 81, 150 P.3d 480, relied heavily on the ABA Guidelines in death penalty cases. As the Court affirmed, "the ABA standards ... represent 'well-defined norms' that provide guidance to courts" that the Supreme Court would rely on in defining standards for defense counsel. *Id.* at ¶ 90.

Given that counsel's contract requires disclosure to the court at this stage, and given that disclosure may well reveal matters of attorney client privilege and case strategy, he asks the court to allow him to make the request *ex parte* and under seal.

State v. Lovell, Motion for Payment of Attorney Fees                    **NEWTON000134**    2

**B. Counsel did not anticipate the scope the case would entail given Sean Young's misconduct on the case.**

The court must reimburse attorney fees which are "reasonably incurred" by counsel. Utah Code Ann. § 77-32-305.5(2). But Mr. Lovell has the obligation to make this request before the expenses are incurred.

Mr. Lovell has a need for the funding. Counsel has nearly completed Mr. Lovell's brief on appeal. However, the appeal has exceeded the contract amounts for reasons the parties did not anticipate at the outset. The parties did not anticipate that trial counsel Sean Young did not do the work he represented that he did at trial. Young failed to interview over a dozen witnesses and claimed to Mr. Lovell and to co-counsel that they were not cooperative, when in fact the witnesses were. Counsel had to begin the laborious process of locating, interviewing and obtaining affidavits from these witnesses. Once those were obtained, Mr. Lovell filed a motion for Rule 23B Remand with the Utah Supreme Court. The motion itself was 90 pages and the Addenda comprised 247 pages, attached as Exhibit B. Mr. Young was fired from Weber County because of his misconduct on Mr. Lovell's case. Additionally, the Utah State Bar has taken disciplinary action against Mr. Young, having made an initial finding that he violated the Rules of Professional Conduct in Mr. Lovell's case. *See* Exhibit C, attached. Indeed, counsel had to move for remand from the Supreme Court and hold a hearing before this court to compel Young to turn over his file—a process that took almost a year.

The Supreme Court, however, temporarily denied Mr. Lovell's motion for 23B remand, reasoning that it would defer ruling on the motion until after the briefing. In between that time, counsel wrote Mr. Lovell's appeal, which currently consists of over 300 pages of briefing. However, just before Mr. Lovell's brief deadline, the State filed a response to the 23B remand motion, indicating that it does not oppose a remand for many of the purposes stated in Mr. Lovell's motion.

*See* Exhibit D. Mr. Lovell now anticipates that the Utah Supreme Court will grant the 23B remand motion. This will necessitate evidentiary hearings and the collection of evidence. After that, Mr. Lovell will have to supplement and rewrite portions of his brief and then also draft a reply brief. For these reasons, counsel believes that the expenses will well-exceed the $75,000 soft-cap.[1]

Counsel anticipated that the record review for this case would be enormous—it is a decades old capital conviction where Mr. Lovell has been represented by many lawyers and on several appellate proceedings. But he did not anticipate that the case would demand the collection of evidence for an extensive 23B petition and an anticipated remand from the Utah Supreme Court.

## C. Mr. Lovell has demonstrated a need for funding on this latest invoice

Counsel spent this entire period essentially writing Mr. Lovell's opening brief. *See* Exhibit E (outline of hours spent). That document is nearly complete and is over 300 pages. It took a substantial period to write and to prepare. However, given that the State has agreed to a Rule 23B remand, counsel anticipates that the brief will need to be revised once a record is developed in this court. There were some expenses related to reading the State's response to the Rule 23B motion as well as some email correspondence with the Attorney General and a phone call with Mr. Lovell about the status of the case. All of these expenses were necessary to assist Mr. Lovell in his appeal.

Therefore, Mr. Lovell requests that the court approve his expenses as outlined.

RESPECTFULLY SUBMITTED this 2 day of January, 2017.


_____/s/ Samuel P. Newton_____
SAMUEL P. NEWTON
Attorney for Appellant

---

[1] In the event the Utah Supreme Court does not grant the 23B motion, Mr. Lovell will nonetheless exceed the contract caps at least to finish his appeal and write his reply brief. He anticipates this will at least take 150 hours.

State v. Lovell, Motion for Payment of Attorney Fees

**NEWTON000136**   4

# EXHIBIT A

**Contract for Services**

## CONTRACT FOR APPELLATE DEFENSE COUNSEL SERVICES
## FOR AN INDIGENT

THIS CONTRACT is made and entered into by and between Weber County, a body corporate, politic and political subdivision of the State of Utah, hereinafter "COUNTY," and Samuel Newton, who shall be called "APPELLATE COUNSEL" in this contract.

### RECITALS

**WHEREAS,** Douglas Lovell (hereinafter "the defendant"), an inmate in the Utah State Prison, was charged with the commission of the offense of Capital Murder; and

**WHEREAS,** the Court found the defendant to be indigent and entitled to the assignment of defense counsel pursuant to § 77-32-1, *Utah Code Ann.*, at public expense; and

**WHEREAS,** the defendant was convicted on March 18, 2015, by a duly seated jury of the offense of one count of Aggravated Murder, Aggravated Sexual Assault, Forcible Sodomy, Conspiracy to Commit Murder with William Wiswell, conspiracy to Commit Murder with Tom Peters and Witness Tampering and was also given a sentence of death by the jury on April 1, 2015; and

**WHEREAS,** the defendant has decided to appeal his conviction and under the provisions of Section 77-32-301(5) *Utah Code Ann.*, COUNTY is obligated to provide the services of legal appellate counsel for the first appeal of right of an indigent defendant in a criminal case; and

**WHEREAS,** APPELLATE COUNSEL is an attorney duly licensed to practice law in the State of Utah and is qualified to be appointed as defense APPELLATE COUNSEL in this first appeal of right; and

**WHEREAS,** The parties have negotiated a reasonable compensation for the services of APPELLATE Counsel as appellate counsel for the defendant for this appeal and it is the intent of the parties that the terms of that compensation be set forth in this contract;

**NOW THEREFORE,** in consideration of the mutual terms and conditions set forth herein, the parties hereto do hereby agree as follows:

### SECTION ONE
### SERVICES

APPELLATE COUNSEL shall represent the defendant, Douglas Lovell, in Criminal Case No. 921900407 before the Utah Supreme Court in the first appeal of right of the conviction of the offenses of Aggravated Murder, a capital offense. A first appeal of right shall not include other and discretionary appeals or discretionary writ proceedings.

Page 1 of 5

NEWTON000138

APPELLATE COUNSEL will file petitions for writs of certiorari to the Utah Supreme Court when, in the APPELLATE COUNSEL'S judgment, such petitions satisfy the grounds for certiorari review detailed in Utah Rule of Appellate Procedure 46. APPELLATE COUNSEL will also respond to petitions for writs of certiorari that the prosecution files.

APPELLATE COUNSEL may, if counsel deems it legally necessary, petition for certiorari to the United State's Supreme Court.

## SECTION TWO
## COMPENSATION

A.   The total compensation to be paid to APPELLATE COUNSEL in this case shall be at the rate of $150 per hour up to the amount of $75,000. The $75,000 limit may only be exceeded upon showing of good cause to both the court and the COUNTY.

B.   APPELLATE COUNSEL shall submit statements sufficiently itemizing and describing the services performed for which compensation is claimed and such other information as may be reasonably required by the COUNTY in order to properly review, evaluate, and process the statement.

C.   If the appeal is resolved, withdrawn, or rendered moot for whatever reason, COUNTY shall be obligated to pay and APPELLATE COUNSEL entitled to receive only those fees and expenses due up to and at that point.

D.   In the event APPELLATE COUNSEL receives payment from another source as payment of fees in representing the defendant in this appeal, APPELLATE COUNSEL shall reimburse COUNTY for any consideration paid under this contract to the extent of such payments.

## SECTION THREE
## REIMBURSEMENT OF EXPENSES

The COUNTY shall reimburse APPELLATE COUNSEL for the expenses of printing or typewriting briefs, including expenses of depositions and other transcripts as prescribed by §77-32-305, *Utah Code Ann.* The COUNTY will pay the cost of the transcript directly to the court reporter. The COUNTY shall also reimburse expenses, exclusive of overhead and extraordinary expense not approved by the court in accordance with §77-32-305.5, *Utah Code Ann.*, reasonably incurred by APPELLATE COUNSEL in hiring investigators, mental health or other experts, such as may be necessary if a Rule 23B motion is required. Travel reimbursement will be paid at the State of Utah rates. Investigators will be paid a maximum of $60 per hour and mitigations specialist will be paid a maximum of $75 per hour. "Extraordinary expense" means the collective expense which exceeds Five Hundred Dollars ($500) for any particular service or item such as experts, investigators, surveys, or demonstrative evidence

NEWTON000139

## SECTION FOUR
### WITHDRAWAL OR DISMISSAL

In the event APPELLATE COUNSEL is unable to undertake or continue the representation of the defendant or in the event of the court-approved dismissal or withdrawal of APPELLATE COUNSEL, compensation shall be paid only to the date of that dismissal or withdrawal.

## SECTION FIVE
### INDEPENDENT CONTRACTOR

APPELLATE COUNSEL is an independent contractor providing professional legal services and is not an employee of the COUNTY and is therefore not entitled to any of the benefits of employment such as, but not limited to, retirement, health, or Workers Compensation coverage.

## SECTION SIX
### INDEMNIFICATION AND INSURANCE

A.   APPELLATE COUNSEL shall indemnify and save the COUNTY and its officers, agents, and employees harmless from and against all claims for damages or injuries resulting from any claimed malpractice, injury, death, damages, and any other causes of action arising directly or indirectly from the performance of this contract by APPELLATE COUNSEL.

B.   APPELLATE COUNSEL shall maintain such insurance as will cover APPELLATE COUNSEL from any and all claims for malpractice, property damages, injuries, or death made by any person that may arise from the performance of this contract. APPELLATE COUNSEL shall provide the COUNTY with appropriate certificates of insurance as evidence of that coverage upon the execution of this contract. APPELLATE COUNSEL agrees not to cancel such insurance during the pendency of this contract.

## SECTION SEVEN
### RECORDS AND REPORTS

APPELLATE COUNSEL shall maintain such records and accounts as may be deemed reasonable and necessary by the COUNTY to assure a proper accounting for all compensation and reimbursements paid to APPELLATE COUNSEL under this contract. APPELLATE COUNSEL shall, upon request, make those records available to the COUNTY for audit purposes and shall maintain those records for a period of three (3) years or such other longer period as may be required by law after the expiration of this contract. Any attorney/client privileged information is specifically excluded from the terms of this disclosure provision, and will not be disclosed.

Page 3 of 5

NEWTON000140

## SECTION EIGHT
## NOTICE

All notices to be given under this contract shall be delivered to the parties at:

> Samuel Newton, Attorney at Law
> 1267 Quarter Horse Ln.
> Kalispell, MT 59901-2514
> info@snewtonlaw.com


> Weber County Clerk/Auditor's Office
> 2380 Washington Blvd., Ste 320
> Ogden, UT 84401

> with a copy to:

> David C. Wilson
> Civil Division Chief
> Weber County Attorney's Office
> 2380 Washington Blvd., Ste 230
> Ogden, UT 84401

## SECTION NINE
## MISCELLANEOUS

A.   APPELLATE COUNSEL may not assign this contract or the performance under it, in whole or in part, without the prior written approval of COUNTY.

B.   This contract sets forth the complete agreement between the parties and may be modified only by a subsequent written instrument approved and signed by both parties.

C.   This Agreement can be changed, modified or amended only by written agreement of the parties hereto.

D.   Attorney is an independent contractor and is responsible to pay any and all taxes and fees which may result from the compensation paid to Attorney pursuant to this Agreement.

E.   This Agreement shall constitute the entire agreement between the parties and by prior understanding or representation of any kind preceding the date of this Agreement shall not be binding upon either party except to the extent incorporated in this Agreement.

F.   This Agreement shall be governed by the laws of the State of Utah.

Page 4 of 5

NEWTON000141

**IN WITNESS WHEREOF** this contract has been signed in triplicate by the parties, each of which shall be deemed an original, on the ___day of April, 2015.

APPELLATE COUNSEL

By_____

Samuel P. Newton

BOARD OF COUNTY COMMISSIONERS
OF WEBER COUNTY

By_____

Kerry W. Gibson, Chair

ATTEST:

_____

Ricky Hatch, CPA
Weber County Clerk/Auditor

NEWTON000142

# EXHIBIT B

### Motion for Rule 23B Remand

NEWTON000143   6

**Baron, Bryan**

| | |
|---|---|
| **From:** | Joanna Landau <jlandau@utah.gov> |
| **Sent:** | Monday, December 18, 2017 9:40 AM |
| **To:** | Wilson, Dave C. |
| **Subject:** | Re: Grant Information and Application |

Hi Dave,

Slowed down? Not in the least. After a year we are running full steam ahead. I have time to talk next week if you're not off, or in the new year, but this week is nuts. Our grant application is on our webpage: https://justice.utah.gov/indigent-defense.html

Note that the IDC has adopted standards with which applicants must comply to be afforded our grants, so yes, there are strings attached. But if you were to apply for a grant to improve juvenile defense by contracting with an established firm like Utah Juvenile Defenders, that would go a long way towards improving Weber Counties defense services through near complete compliance with our standards.

I look forward to chatting.

Joanna

On Fri, Dec 15, 2017 at 4:56 PM, Wilson, Dave C. <dwilson@co.weber.ut.us> wrote:

Joanna,


I hope things are going well for you and that your work life may have slowed down a little.  I'm looking forward to retirement with great anticipation to do many of the things I still can't seem to fit it.


Would you have someone send me grant information and the application.  We would like to take a look at that and have our commissioners make a decision on whether it is something they want to pursue.


Also,  if you have some time someday I would like to give you the other side of the story relating to Sam Newton and his capital appeal.


Regards,


Dave



DEPOSITION EXHIBIT
13
Baron

PENGAD 800-631-6989

Weber County 1955

David C Wilson - Chief Civil Deputy

Weber County Attorney's Office

2380 Washington Blvd. Ste. 230

Ogden, UT 84401

(801)399-8377

dwilson@co.weber.ut.us



**Joanna E. Landau, Director**
Utah Indigent Defense Commission
370 East South Temple, Suite 500
Salt Lake City, Utah 84111
Cell: 801-209-5440

174

**Baron, Bryan**

| | |
|---|---|
| **From:** | Baron, Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Tuesday, February 13, 2018 4:41 PM |
| **To:** | Allred, Christopher F. |
| **Subject:** | RE: Capital Defense Costs for 2016 and 2017 |

Bouwhuis was paid substantially more than $21,672.50 for the Lovell case. The total was around $121,000. The other $100,000 payment may have been prior to 2016 though.

I'm wondering if Sam Newton's numbers aren't too high. Did Ricky include all payments to Sam or just the payments related to the Lovell case? He only made about $90,000 on Lovell.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Allred, Christopher F.
**Sent:** Tuesday, February 13, 2018 4:26 PM
**To:** Baron, Bryan <bbaron@co.weber.ut.us>
**Subject:** FW: Capital Defense Costs for 2016 and 2017

Bryan, Adam Trupp is looking for a ballpark figure of how much we spend on a capital cases. Would you mind looking at Ricky's attachment and discuss with me whether we think there are any other things that should be included. Thanks, CFA

**From:** Hatch, Ricky
**Sent:** Tuesday, February 13, 2018 4:09 PM
**To:** Allred, Christopher F.
**Subject:** FW: Capital Defense Costs for 2016 and 2017

Here are the detailed numbers that I used for my text to Adam Trupp.

--
Carpe Diem

**From:** Parke, Scott
**Sent:** Tuesday, February 13, 2018 2:28 PM
**To:** Hatch, Ricky <rhatch@co.weber.ut.us>
**Subject:** Capital Defense Costs for 2016 and 2017

Here is a quick and dirty estimate of the costs.

Scott

64



DEPOSITION
EXHIBIT
14
Baron
PENGAD 800-631-6989

Weber County 2035

**Baron, Bryan**

| | |
|---|---|
| **From:** | Wilson, Dave C. <dwilson@co.weber.ut.us> |
| **Sent:** | Tuesday, November 21, 2017 9:57 AM |
| **To:** | Allred, Christopher F. |
| **Subject:** | FW: Lovell case costs |

Chris,  I told Mark that I didn't know if we would have that data and I also told him I will be out of the office until the end of next week.  I'm not sure we will have such records without research but it may be one we consider doing to help inform the public of the costs of prosecuting and defending a confessed murderer.  Think about it and let me know your thoughts.

Dave

**From:** Mark Shenefelt [mailto:mshenefelt@standard.net]
**Sent:** Tuesday, November 21, 2017 9:49 AM
**To:** Wilson, Dave C. <dwilson@co.weber.ut.us>
**Subject:** Lovell case costs

Hi, Dave,

I'm looking for an estimate (or something exact would be a bonus) on the amount of money the Weber County Attorney's Office has spent over the years on prosecution and defense in the Doug Lovell capital murder case.

Any breakdown of that number would be appreciated. And if you have numbers on any associated costs I'm not thinking of, please include those too.

Thank you,

Mark


--
Mark Shenefelt, Reporter
mshenefelt@standard.net
STANDARD-EXAMINER | www.standard.net
801.452.1614

Follow
https://www.facebook.com/SEmarkshenefelt
https://twitter.com/mshenefelt



DEPOSITION
EXHIBIT
15
Baron

Weber County 1942



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT 59901-6114 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah 84401

## INVOICE 1109

**DATE** 08/03/2017   **TERMS** Net 30

**DUE DATE** 09/02/2017

| DATE | ACCOUNT SUMMARY | | | AMOUNT |
|------|-----------------|--|--|--------|
| 07/17/2017 | Balance Forward | | | $17,598.28 |
| | Payments and credits between 07/17/2017 and 08/03/2017 | | | 0.00 |
| | New charges (details below) | | | 1,294.90 |
| | Total Amount Due | | | $18,893.18 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 05/13/2017 | Weber County Litigation Expenses<br>State v. Garcia, Reply Brief | 1 | 77.44 | 77.44 |
| 06/26/2017 | Weber County Litigation Expenses<br>State v. Cowlishaw, Reply Brief | 1 | 61.88 | 61.88 |
| 06/26/2017 | Weber County Litigation Expenses<br>State v. Rogers, Reply Brief | 1 | 56.33 | 56.33 |
| 07/13/2017 | Weber County Litigation Expenses<br>State v. Vollmer, Brief | 1 | 117.81 | 117.81 |
| 07/20/2017 | Weber County Litigation Expenses<br>State v. Brocksmith, Brief | 1 | 66.44 | 66.44 |
| 08/01/2017 | Services:Lovell Attorney Fees<br>Lovell attorney fees, July 2017 | 6.10 | 150.00 | 915.00 |

*Jul pay these* (handwritten)

TOTAL OF NEW CHARGES    1,294.90

TOTAL DUE    $18,893.19



DEPOSITION
EXHIBIT
16
Baron



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT  59901-6114 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

## INVOICE 1106

**DATE** 07/17/2017   **TERMS** Net 30

**DUE DATE** 08/16/2017

| DATE | ACCOUNT SUMMARY | AMOUNT |
|---|---|---|
| 06/02/2017 | Balance Forward | $13,101.75 |
| | Payments and credits between 06/02/2017 and 07/17/2017 | 0.00 |
| | New charges (details below) | 4,651.41 |
| | Total Amount Due | $17,753.16 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| 07/01/2017 | Weber County Litigation Expenses<br>State v. Yang, Brief of Appellant | 1 | 117.68 | 117.68 |
| 07/01/2017 | Weber County Litigation Expenses<br>State v. Whitbeck, Reply Brief | 1 | 63.73 | 63.73 |
| 07/01/2017 | Lovell Litigation Expenses<br>Lovell attorney fees as detailed in attachment | 29.80 | 150.00 | 4,470.00 |

| | | |
|---|---|---|
| TOTAL OF NEW CHARGES | | 4,651.41 |
| TOTAL DUE | | $17,753.16 |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT 59901-6114 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah 84401

**INVOICE 1104**

**DATE** 06/02/2017   **TERMS** Net 30

**DUE DATE** 07/02/2017

| DATE | ACCOUNT SUMMARY | AMOUNT |
|---|---|---|
| 03/31/2017 | Balance Forward | $12,655.83 |
| | Payments and credits between 03/31/2017 and 06/02/2017 | -4,361.71 |
| | New charges (details below) | 4,652.75 |
| | Total Amount Due | $12,946.87 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| 04/27/2017 | Weber County Litigation Expenses<br>State v. Garcia, Reply Brief | 1 | 77.44 | 77.44 |
| 05/03/2017 | Weber County Litigation Expenses<br>State v. Wilder, Brief of the Appellant,<br>Supreme Court | 1 | 198.78 | 198.78 |
| 05/04/2017 | Weber County Litigation Expenses<br>State v. Martinez, Brief of the Appellant | 1 | 119.13 | 119.13 |
| 05/08/2017 | Weber County Litigation Expenses<br>State v. Beazer, Reply Brief | 1 | 128.33 | 128.33 |
| 05/13/2017 | Weber County Litigation Expenses<br>State v. Ogden, Reply Brief | 1 | 109.07 | 109.07 |
| 06/01/2017 | Lovell Litigation Expenses<br>Lovell Attorney hour (as detailed in<br>attachment) | 26.80 | 150.00 | 4,020.00 |

*Just pay these. Thanks!* (handwritten note)

| TOTAL OF NEW CHARGES | 4,652.75 |
|---|---|
| **TOTAL DUE** | **$12,946.87** |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT 59901-6114 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah 84401

## INVOICE 1099

DATE 03/31/2017   TERMS Net 30

DUE DATE 04/30/2017

| DATE | ACCOUNT SUMMARY | AMOUNT |
|---|---|---|
| 01/03/2017 | Balance Forward | $13,381.18 |
| | Payments and credits between 01/03/2017 and 03/31/2017 | -5,087.06 |
| | New charges (details below) | 4,361.71 |
| | Total Amount Due | $12,655.83 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| 01/09/2017 | Weber County Litigation Expenses State v. York, Brief of the Appellant | 1 | 113.24 | 113.24 |
| 01/24/2017 | Weber County Litigation Expenses State v. Wells, Reply Brief of the Appellant | 1 | 80.38 | 80.38 |
| 02/16/2017 | Weber County Litigation Expenses State v. Brocksmith Brief | 1 | 176.83 | 176.83 |
| 02/27/2017 | Weber County Litigation Expenses State v. Millerberg Brief | 1 | 481.31 | 481.31 |
| 03/24/2017 | Weber County Litigation Expenses State v. Garcia brief | 1 | 77.44 | 77.44 |
| 03/31/2017 | Lovell Litigation Expenses Attorney fees for 01/01/2017 to 03/31/2017 as detailed in attachment | 22.40 | 150.00 | 3,360.00 |
| 04/10/2017 | Weber County Litigation Expenses State v. York Reply Brief | 1 | 72.51 | 72.51 |

| | | |
|---|---|---|
| TOTAL OF NEW CHARGES | | 4,361.71 |
| TOTAL DUE | | $12,655.83 |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT  59901-6114 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

## INVOICE 1095

DATE 01/03/2017   TERMS Net 30

DUE DATE 02/02/2017

| DATE | ACCOUNT SUMMARY | AMOUNT |
|---|---|---|
| 12/01/2016 | Balance Forward | $31,748.89 |
| | Payments and credits between 12/01/2016 and 01/03/2017 | -28,842.07 |
| | New charges (details below) | 10,474.36 |
| | Total Amount Due | $13,381.18 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| 11/23/2016 | Weber County Litigation Expenses<br>State v. Gallegos, Brief of the Appellant | 1 | 437.88 | 437.88 |
| 12/05/2016 | Weber County Litigation Expenses<br>State v. Whitbeck, Brief of the Appellant | 1 | 225.34 | 225.34 |
| 12/09/2016 | Weber County Litigation Expenses<br>State v. Cowlishaw, Brief of the Appellant | 1 | 211.25 | 211.25 |
| 12/09/2016 | Weber County Litigation Expenses<br>State v. Wilder, Petition for Certiorari | 1 | 92.35 | 92.35 |
| 01/02/2017 | Weber County Litigation Expenses<br>State v. Wells, Reply Brief of the Appellant | 1 | 57.54 | 57.54 |
| 01/03/2017 | Lovell Litigation Expenses<br>Attorney hours as documented in attachment | 63 | 150.00 | 9,450.00 ~~4062.70~~ |

*Handwritten: 5087.06*

| | | |
|---|---|---|
| TOTAL OF NEW CHARGES | 10,474.36 | |
| TOTAL DUE | $13,381.18 | |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 235
59901-6114
(406) 407-7323
info@snewtonlaw.com

# INVOICE

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah 84401

**INVOICE #** 1091
**DATE** 12/01/2016
**DUE DATE** 12/31/2016
**TERMS** Net 30

| DATE | ACCOUNT SUMMARY | | | AMOUNT |
|---|---|---|---|---|
| 11/01/2016 | Balance Forward | | | $11,708.89 |
| | Payments and credits between 11/01/2016 and 12/01/2016 | | | 0.00 |
| | New charges (details below) | | | 20,040.00 |
| | Total Amount Due | | | $31,748.89 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| 12/01/2016 | Services:Lovell Attorney Fees<br>Attorney hours as detailed in attachment | 100.80 | 150.00 | 15,120.00 |
| 12/01/2016 | Lovell Litigation Expenses<br>Law clerk hours as detailed in attachment | 82 | 60.00 | 4,920.00 |

My brief is due 12/14/16, so this should be the end of the heavy hours

TOTAL OF NEW CHARGES   20,040.00

BALANCE DUE   **$31,748.89**



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 235
 59901-6114
(406) 407-7323
info@snewtonlaw.com

# INVOICE

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

**INVOICE #** 1090
**DATE** 11/01/2016
**DUE DATE** 12/01/2016
**TERMS** Net 30

| DATE | ACCOUNT SUMMARY | | | AMOUNT |
|------|------|------|------|------|
| 10/01/2016 | Balance Forward | | | $8,516.82 |
| | Payments and credits between 10/01/2016 and 11/01/2016 | | | -5,610.00 |
| | New charges (details below) | | | 8,802.07 |
| | Total Amount Due | | | $11,708.89 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 10/18/2016 | **Weber County Litigation Expenses** State v. Beazer, Brief of the Appellant | 1 | 417.07 | 417.07 |
| 11/01/2016 | **Services:Lovell Attorney Fees** As detailed in attachment | 55.90 | 150.00 | 8,385.00 |

|  | TOTAL OF NEW CHARGES | 8,802.07 |
|--|----------------------|----------|
|  | BALANCE DUE | **$11,708.89** |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 235
 59901-6114
(406) 407-7323
info@snewtonlaw.com

# INVOICE

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

**INVOICE #** 1082
**DATE** 06/07/2016
**DUE DATE** 07/07/2016
**TERMS** Net 30

| DATE | ACCOUNT SUMMARY | AMOUNT |
|------|-----------------|--------|
| 05/02/2016 | Balance Forward | $6,203.29 |
| | Payments and credits between 05/02/2016 and 06/07/2016 | -3,296.47 |
| | New charges (details below) | 6,620.90 |
| | Total Amount Due | $9,527.72 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 05/04/2016 | Lovell Litigation Expenses<br>Postage, 5/4/16, 5/10/16, 5/18/16 | 1 | 7.995 | 8.00 |
| 06/01/2016 | Services:Lovell Attorney Fees<br>Attorney hours as detailed in spreadsheet | 43.80 | 150.00 | 6,570.00 |
| 06/01/2016 | Lovell Litigation Expenses<br>Legal secretary hours, 5/1/2016-5/31/2016 | 0.40 | 20.00 | 8.00 |
| 06/01/2016 | Lovell Litigation Expenses<br>Copying of documents for mailing,<br>5/1/2016-5/31/2016 | 349 | 0.10 | 34.90 |

| | | |
|---|---|---|
| TOTAL OF NEW CHARGES | | 6,620.90 |
| BALANCE DUE | | **$9,527.72** |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 235
59901-6114
(406) 407-7323
info@snewtonlaw.com

# INVOICE

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

**INVOICE #** 1085
**DATE** 08/01/2016
**DUE DATE** 08/31/2016
**TERMS** Net 30

| DATE | ACCOUNT SUMMARY | | | AMOUNT |
|---|---|---|---|---|
| 07/05/2016 | Balance Forward | | | $5,396.42 |
| | Payments and credits between 07/05/2016 and 08/01/2016 | | | 0.00 |
| | New charges (details below) | | | 4,747.00 |
| | Total Amount Due | | | $10,143.42 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| 07/31/2016 | **Services:Lovell Attorney Fees**<br>Lovell attorney fees as described in attachment | 31.30 | 150.00 | 4,695.00 |
| 07/31/2016 | **Lovell Litigation Expenses**<br>Attorney time working with files (billed at secretary rate) | 2.60 | 20.00 | 52.00 |

I cannot figure out how to delete time entries for items which Weber County does not want to pay, so I merely deducted from the total hours.

I subtracted .3 and .4 hours for email conversations with Bryan Baron and subtracted 2.6 hours for work with files and added those back in at a secretary rate.

**TOTAL OF NEW CHARGES**                    4,747.00

**BALANCE DUE**                    **$10,143.42**



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 235
59901-6114
(406) 407-7323
info@snewtonlaw.com

# INVOICE

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah 84401

**INVOICE #** 1084
**DATE** 07/05/2016
**DUE DATE** 08/04/2016
**TERMS** Net 30

| DATE | ACCOUNT SUMMARY | | | AMOUNT |
|---|---|---|---|---|
| 06/07/2016 | Balance Forward | | | $9,527.72 |
| | Payments and credits between 06/07/2016 and 07/05/2016 | | | -6,620.90 |
| | New charges (details below) | | | 2,489.60 |
| | Total Amount Due | | | $5,396.42 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| 06/28/2016 | Weber County Litigation Expenses<br>State v. Garcia, Briefing copying/binding costs | 1 | 194.60 | 194.60 |
| 07/01/2016 | Services:Lovell Attorney Fees<br>State v. Lovell, Attorney Fees as reflected in attachment | 15.30 | 150.00 | 2,295.00 |

| | | |
|---|---|---|
| TOTAL OF NEW CHARGES | | 2,489.60 |
| BALANCE DUE | | **$5,396.42** |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 235
 59901-6114
(406) 407-7323
info@snewtonlaw.com

# INVOICE

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

**INVOICE #** 1087
**DATE** 09/01/2016
**DUE DATE** 10/01/2016
**TERMS** Net 30

| DATE | ACCOUNT SUMMARY | | | AMOUNT |
|------|-----------------|--|--|--------|
| 08/01/2016 | Balance Forward | | | $10,143.42 |
| | Payments and credits between 08/01/2016 and 09/01/2016 | | | -7,236.60 |
| | New charges (details below) | | | 8,679.43 |
| | Total Amount Due | | | $11,586.25 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 08/23/2016 | **Weber County Litigation Expenses**<br>State v. Ogden, Brief of the Appellant,<br>Copying/Binding/Printing | 1 | 273.43 | 273.43 |
| 09/01/2016 | **Services:Lovell Attorney Fees**<br>Attorney fees as detailed in attachment | 37.10 | 150.00 | 5,565.00 |
| 09/01/2016 | **Lovell Litigation Expenses**<br>Law Clerk hours | 47.35 | 60.00 | 2,841.00 |

|  | TOTAL OF NEW<br>CHARGES | 8,679.43 |
|--|------------------------|----------|
|  | BALANCE DUE | **$11,586.25** |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT  59901-6114 US
(406) 407-7323
info@snewtonlaw.com

# Statement

**TO**

Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

**STATEMENT NO.** 1015
**DATE** 05/25/2017

| DATE | ACTIVITY | AMOUNT | RECEIVED |
|------|----------|--------|----------|
| 01/01/2015 | Invoice #1054 | 503.77 | 0.00 |
| 02/01/2015 | Invoice #1058 | 446.27 | 446.27 |
| 03/01/2015 | Invoice #1061 | 87.74 | 87.74 |
| 05/01/2015 | Invoice #1066 | 2,403.05 | 0.00 |
| 06/01/2015 | Invoice #1069 | 1,116.51 | 1,116.51 |
| 08/11/2015 | Invoice #1071 | 5,152.94 | 5,152.94 |
| 09/30/2015 | Invoice #1073 | 8,022.11 | 8,022.11 |
| 12/01/2015 | Invoice #1074 | 11,004.70 | 11,004.70 |
| 01/01/2016 | Invoice #1075 | 4,383.92 | 4,383.92 |
| 02/02/2016 | Invoice #1076: I still have not seen payment for January's invoice, but Kim said it was coming. Thanks. | 5,009.69 | 5,009.69 |
| 03/03/2016 | Invoice #1077 | 5,731.58 | 5,731.58 |
| 04/01/2016 | Invoice #1078 | 7,323.61 | 7,323.61 |
| 05/02/2016 | Invoice #1081 | 3,296.47 | 3,296.47 |
| 06/07/2016 | Invoice #1082 | 6,620.90 | 6,620.90 |
| 07/05/2016 | Invoice #1084 | 2,489.60 | 2,489.60 |
| 08/01/2016 | Invoice #1085 | 4,747.00 | 4,747.00 |
| 09/01/2016 | Invoice #1087: Bryan, I have had two law clerks working on this case with me. They have done research and writing on issues I intend to pursue. I think it will save the county time and money for me to have this done by them as opposed to myself. I've attached their respective hours. One of them worked on a non-Lovell case and I did not bill that out. | 8,679.43 | 8,679.43 |
| 10/01/2016 | Invoice #1088 | 5,610.00 | 5,610.00 |
| 11/01/2016 | Invoice #1090 | 8,802.07 | 8,802.07 |
| 12/01/2016 | Invoice #1091 | 20,040.00 | 20,040.00 |
| 01/03/2017 | Invoice #1095 | 10,474.36 | 5,087.06 = 5,387.30 |
| 03/31/2017 | Invoice #1099 | ·4,361.71 | 4,361.71 paid |
| | 1104 | | 4000.00 |
| | 1109 | | 915.00 |
| | 1111 | | 1,605.00 |
| | | | 11,927.30 |

| TOTAL AMOUNT | TOTAL RECEIVED |
|---|---|
| $126,307.43 | $118,013.31 |



**Law Office of Samuel P. Newton, PC**
1267 Quarter Horse Ln.
Kalispell, MT  59901 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

## INVOICE 1111

**DATE** 09/04/2017   **TERMS** Net 30

**DUE DATE** 10/04/2017

| DATE | ACCOUNT SUMMARY | AMOUNT |
|------|-----------------|--------|
| 08/03/2017 | Balance Forward | $18,893.18 |
| | Payments and credits between 08/03/2017 and 09/04/2017 | -1,194.06 |
| | New charges (details below) | 1,682.44 |
| | Total Amount Due | $19,381.56 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 05/02/2017 | **Weber County Litigation Expenses**<br>State v. Garcia, Reply Brief | 1 | 77.44 | 77.44 |
| 09/04/2017 | **Services:Lovell Attorney Fees**<br>Lovell attorney fees as detailed in attachment | 10.70 | 150.00 | 1,605.00 |

| | | |
|---|---|---|
| | TOTAL OF NEW CHARGES | 1,682.44 |
| | TOTAL DUE | **$19,381.56** |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT  59901-6114 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

**INVOICE 1109**

**DATE** 08/03/2017   **TERMS** Net 30

**DUE DATE** 09/02/2017

| DATE | ACCOUNT SUMMARY | AMOUNT |
|------|-----------------|--------|
| 07/17/2017 | Balance Forward | $17,598.28 |
| | Payments and credits between 07/17/2017 and 08/03/2017 | 0.00 |
| | New charges (details below) | 1,294.90 |
| | Total Amount Due | $18,893.18 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 05/13/2017 | Weber County Litigation Expenses<br>State v. Garcia, Reply Brief | 1 | 77.44 | 77.44 |
| 06/26/2017 | Weber County Litigation Expenses<br>State v. Cowlishaw, Reply Brief | 1 | 61.88 | 61.88 |
| 06/26/2017 | Weber County Litigation Expenses<br>State v. Rogers, Reply Brief | 1 | 56.33 | 56.33 |
| 07/13/2017 | Weber County Litigation Expenses<br>State v. Vollmer, Brief | 1 | 117.81 | 117.81 |
| 07/20/2017 | Weber County Litigation Expenses<br>State v. Brocksmith, Brief | 1 | 66.44 | 66.44 |
| 08/01/2017 | Services:Lovell Attorney Fees<br>Lovell attorney fees, July 2017 | 6.10 | 150.00 | 915.00 |

| TOTAL OF NEW CHARGES | 1,294.90 |
|----------------------|----------|
| TOTAL DUE | **$18,893.18** |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT  59901-6114 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

**INVOICE 1106**

**DATE** 07/17/2017   **TERMS** Net 30

**DUE DATE** 08/16/2017

| DATE | ACCOUNT SUMMARY | AMOUNT |
|------|-----------------|--------|
| 06/02/2017 | Balance Forward | $13,101.75 |
| | Payments and credits between 06/02/2017 and 07/17/2017 | 0.00 |
| | New charges (details below) | 4,651.41 |
| | Total Amount Due | $17,753.16 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 07/01/2017 | Weber County Litigation Expenses<br>State v. Yang, Brief of Appellant | 1 | 117.68 | 117.68 |
| 07/01/2017 | Weber County Litigation Expenses<br>State v. Whitbeck, Reply Brief | 1 | 63.73 | 63.73 |
| 07/01/2017 | Lovell Litigation Expenses<br>Lovell attorney fees as detailed in attachment | 29.80 | 150.00 | 4,470.00 |

| | |
|---|---|
| TOTAL OF NEW CHARGES | 4,651.41 |
| **TOTAL DUE** | **$17,753.16** |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT  59901-6114 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

## INVOICE 1104

**DATE** 06/02/2017   **TERMS** Net 30

**DUE DATE** 07/02/2017

| DATE | ACCOUNT SUMMARY | AMOUNT |
|------|-----------------|--------|
| 03/31/2017 | Balance Forward | $12,655.83 |
| | Payments and credits between 03/31/2017 and 06/02/2017 | -4,361.71 |
| | New charges (details below) | 4,807.63 |
| | Total Amount Due | $13,101.75 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 04/27/2017 | Weber County Litigation Expenses<br>State v. Garcia, Reply Brief | 1 | 77.44 | 77.44 |
| 05/02/2017 | Weber County Litigation Expenses<br>State v. Garcia, Reply Brief | 1 | 77.44 | 77.44 |
| 05/03/2017 | Weber County Litigation Expenses<br>State v. Wilder, Brief of the Appellant,<br>Supreme Court | 1 | 198.78 | 198.78 |
| 05/04/2017 | Weber County Litigation Expenses<br>State v. Martinez, Brief of the Appellant | 1 | 119.13 | 119.13 |
| 05/08/2017 | Weber County Litigation Expenses<br>State v. Beazer, Reply Brief | 1 | 128.33 | 128.33 |
| 05/13/2017 | Weber County Litigation Expenses<br>State v. Ogden, Reply Brief | 1 | 109.07 | 109.07 |
| 05/13/2017 | Weber County Litigation Expenses<br>State v. Garcia, Reply Brief | 1 | 77.44 | 77.44 |
| 06/01/2017 | Lovell Litigation Expenses<br>Lovell Attorney hour (as detailed in<br>attachment) | 26.80 | 150.00 | 4,020.00 |

| | | |
|--|--|--|
| | TOTAL OF NEW<br>CHARGES | 4,807.63 |

| TOTAL DUE | $13,101.75 |
| --- | --- |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT  59901-6114 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

## INVOICE 1099

DATE 03/31/2017   TERMS Net 30

DUE DATE 04/30/2017

| DATE | ACCOUNT SUMMARY | AMOUNT |
|------|-----------------|--------|
| 01/03/2017 | Balance Forward | $13,381.18 |
| | Payments and credits between 01/03/2017 and 03/31/2017 | -5,087.06 |
| | New charges (details below) | 4,361.71 |
| | Total Amount Due | $12,655.83 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 01/09/2017 | **Weber County Litigation Expenses** <br> State v. York, Brief of the Appellant | 1 | 113.24 | 113.24 |
| 01/24/2017 | **Weber County Litigation Expenses** <br> State v. Wells, Reply Brief of the Appellant | 1 | 80.38 | 80.38 |
| 02/16/2017 | **Weber County Litigation Expenses** <br> State v. Brocksmith Brief | 1 | 176.83 | 176.83 |
| 02/27/2017 | **Weber County Litigation Expenses** <br> State v. Millerberg Brief | 1 | 481.31 | 481.31 |
| 03/24/2017 | **Weber County Litigation Expenses** <br> State v. Garcia brief | 1 | 77.44 | 77.44 |
| 03/31/2017 | **Lovell Litigation Expenses** <br> Attorney fees for 01/01/2017 to 03/31/2017 as detailed in attachment | 22.40 | 150.00 | 3,360.00 |
| 04/10/2017 | **Weber County Litigation Expenses** <br> State v. York Reply Brief | 1 | 72.51 | 72.51 |

| | | |
|---|---|---|
| TOTAL OF NEW CHARGES | | 4,361.71 |
| TOTAL DUE | | $12,655.83 |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 222
MT 59901-6114 US
(406) 407-7323
info@snewtonlaw.com

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah 84401

**INVOICE 1095**

**DATE** 01/03/2017   **TERMS** Net 30

**DUE DATE** 02/02/2017

| DATE | ACCOUNT SUMMARY | AMOUNT |
|------|-----------------|--------|
| 12/01/2016 | Balance Forward | $31,748.89 |
| | Payments and credits between 12/01/2016 and 01/03/2017 | -28,842.07 |
| | New charges (details below) | 10,474.36 |
| | Total Amount Due | $13,381.18 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 11/23/2016 | Weber County Litigation Expenses<br>State v. Gallegos, Brief of the Appellant | 1 | 437.88 | 437.88 |
| 12/05/2016 | Weber County Litigation Expenses<br>State v. Whitbeck, Brief of the Appellant | 1 | 225.34 | 225.34 |
| 12/09/2016 | Weber County Litigation Expenses<br>State v. Cowlishaw, Brief of the Appellant | 1 | 211.25 | 211.25 |
| 12/09/2016 | Weber County Litigation Expenses<br>State v. Wilder, Petition for Certiorari | 1 | 92.35 | 92.35 |
| 01/02/2017 | Weber County Litigation Expenses<br>State v. Wells, Reply Brief of the Appellant | 1 | 57.54 | 57.54 |
| 01/03/2017 | Lovell Litigation Expenses<br>Attorney hours as documented in attachment | 63 | 150.00 | ~~9,450.00~~<br>5,387.30 |

| | TOTAL OF NEW CHARGES | 10,474.36 |
|--|----------------------|-----------|

| | TOTAL DUE | **$13,381.18** |
|--|-----------|----------------|

| Project/Time entry | Start date | Stop date | Time (h) | Time (decimal) | Currency USD | Amount USD |
|---|---|---|---|---|---|---|
| Weber County Attorney - Lovell, Douglas | | | 22:24:00 | 22.400 | | 3 360.00 USD |
| Phone call with DL | 03/30/2017 | 03/30/2017 | 0:36:00 | 0.600 | 150.00 | 90.00 USD |
| Review of AG subpoena and phone call to David Christensen | 03/30/2017 | 03/30/2017 | 0:12:00 | 0.200 | 150.00 | 30.00 USD |
| Phone call with Doug Lovell | 03/24/2017 | 03/24/2017 | 0:24:00 | 0.400 | 150.00 | 60.00 USD |
| Preparation of documents | 03/17/2017 | 03/17/2017 | 0:24:00 | 0.400 | 150.00 | 60.00 USD |
| Email correspondence with Weber County Commission | 03/14/2017 | 03/14/2017 | 0:42:00 | 0.700 | 150.00 | 105.00 USD |
| Motion for payment of attorney fees | 03/14/2017 | 03/14/2017 | 0:30:00 | 0.500 | 150.00 | 75.00 USD |
| Phone call with Doug Lovell | 03/14/2017 | 03/14/2017 | 0:30:00 | 0.500 | 150.00 | 75.00 USD |
| Email to Juana Quintero | 03/10/2017 | 03/10/2017 | 0:06:00 | 0.100 | 150.00 | 15.00 USD |
| Email to Bryan Baron | 03/09/2017 | 03/09/2017 | 0:12:00 | 0.200 | 150.00 | 30.00 USD |
| Email from Mark Field | 03/09/2017 | 03/09/2017 | 0:06:00 | 0.100 | 150.00 | 15.00 USD |
| Phone call with Doug Lovell | 03/07/2017 | 03/07/2017 | 1:06:00 | 1.100 | 150.00 | 165.00 USD |
| Email to Mike Bouwhuis, Mark Field, Chris Allred | 03/07/2017 | 03/07/2017 | 0:24:00 | 0.400 | 150.00 | 60.00 USD |
| Email to Mike Bouwhuis | 03/06/2017 | 03/06/2017 | 0:06:00 | 0.100 | 150.00 | 15.00 USD |
| Phone call with DL | 03/06/2017 | 03/06/2017 | 0:18:00 | 0.300 | 150.00 | 45.00 USD |
| Affidavit of Sean Young | 03/03/2017 | 03/03/2017 | 1:12:00 | 1.200 | 150.00 | 180.00 USD |
| Meeting with Doug Lovell | 03/02/2017 | 03/02/2017 | 3:00:00 | 3.000 | 150.00 | 450.00 USD |
| Screening panel hearing, meeting with Sean Young | 03/02/2017 | 03/02/2017 | 3:36:00 | 3.600 | 150.00 | 540.00 USD |
| Email regarding Doug Lovell's phone call | 02/28/2017 | 02/28/2017 | 0:06:00 | 0.100 | 150.00 | 15.00 USD |
| Phone call with Doug Lovell | 02/22/2017 | 02/22/2017 | 0:30:00 | 0.500 | 150.00 | 75.00 USD |
| Letter to DL | 02/17/2017 | 02/17/2017 | 0:12:00 | 0.200 | 150.00 | 30.00 USD |
| Review of OPC file | 02/16/2017 | 02/16/2017 | 0:18:00 | 0.300 | 150.00 | 45.00 USD |
| Phone call to Brady Whitehead | 02/13/2017 | 02/13/2017 | 0:06:00 | 0.100 | 150.00 | 15.00 USD |
| Review of declaration of Richard Mauro | 01/31/2017 | 01/31/2017 | 0:06:00 | 0.100 | 150.00 | 15.00 USD |
| Phone call with Doug Lovell, phone call to Sharadee Fleming | 01/30/2017 | 01/30/2017 | 0:48:00 | 0.800 | 150.00 | 120.00 USD |
| Preparation of letter and documents for Doug Lovell | 01/25/2017 | 01/25/2017 | 0:24:00 | 0.400 | 150.00 | 60.00 USD |
| Preparation of letter and documents for Doug Lovell | 01/24/2017 | 01/24/2017 | 0:12:00 | 0.200 | 150.00 | 30.00 USD |
| Phone call from Doug Lovell | 01/17/2017 | 01/17/2017 | 0:30:00 | 0.500 | 150.00 | 75.00 USD |
| Phone call with Doug Lovell | 01/11/2017 | 01/11/2017 | 0:36:00 | 0.600 | 150.00 | 90.00 USD |
| Letter to Doug Lovell | 01/10/2017 | 01/10/2017 | 0:30:00 | 0.500 | 150.00 | 75.00 USD |
| Phone call with Doug Lovell | 01/06/2017 | 01/06/2017 | 0:30:00 | 0.500 | 150.00 | 75.00 USD |
| Phone call with Doug Lovell | 01/05/2017 | 01/05/2017 | 0:30:00 | 0.500 | 150.00 | 75.00 USD |
| Response to State's Rule 23B | 01/05/2017 | 01/05/2017 | 0:54:00 | 0.900 | 150.00 | 135.00 USD |
| Response to State's Rule 23B | 01/03/2017 | 01/03/2017 | 0:54:00 | 0.900 | 150.00 | 135.00 USD |
| Motion to Stay and Remand Pursuant to Rule 23B | 01/02/2017 | 01/02/2017 | 1:54:00 | 1.900 | 150.00 | 285.00 USD |
| Total | | | 22:24:00 | 22.400 | | 3 360.00 USD |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 235
 59901-6114
(406) 407-7323
info@snewtonlaw.com

# INVOICE

**BILL TO**
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

**INVOICE #** 1088
**DATE** 10/01/2016
**DUE DATE** 10/31/2016
**TERMS** Net 30

| DATE | ACCOUNT SUMMARY | | | AMOUNT |
|------|------------------|--|--|--------|
| 09/01/2016 | Balance Forward | | | $11,586.25 |
| | Payments and credits between 09/01/2016 and 10/01/2016 | | | -8,679.43 |
| | New charges (details below) | | | 5,610.00 |
| | Total Amount Due | | | $8,516.82 |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 10/01/2016 | **Services:Lovell Attorney Fees**<br>Lovell attorney fees as detailed in attachment | 37.40 | 150.00 | 5,610.00 |

| | | |
|--|--|--|
| | TOTAL OF NEW CHARGES | 5,610.00 |
| | BALANCE DUE | **$8,516.82** |



**Law Office of Samuel P. Newton, PC**
1267 Quarter Horse Lane
Kalispell, MT 59901-2514

(801)624-6530
info@snewtonlaw.com

# Invoice

BILL TO
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah 84401

INVOICE # 1076
TERMS Net 30
DATE 02/02/2016
DUE DATE 03/03/2016

| | AMOUNT DUE | ENCLOSED |
|---|---|---|
| | $12,300.43 | |

Please detach top portion and return with your payment.
✂

| DATE | ACCOUNT SUMMARY | AMOUNT |
|---|---|---|
| 01/01/2016 | Balance Forward | $7,290.74 |
| | Payments and credits between 01/01/2016 and 02/02/2016 | 0.00 |
| | New charges (details below) | 5,009.69 |
| | Total Amount Due (activity through 02/02/2016) | 12,300.43 |

| DATE | ACTIVITY | QUANTITY | RATE | AMOUNT |
|---|---|---|---|---|
| 01/06/2016 | Weber County Litigation Expenses<br>State v. Wilder, Reply Brief<br>Binding/Copying | 1 | 61.05 | 61.05 |
| 01/06/2016 | Weber County Litigation Expenses<br>State v. Richardson, Brief Binding/Copying | 1 | 132.06 | 132.06 |
| 01/20/2016 | Lovell Litigation Expenses<br>Letter to Doug Lovell, postage and copying | 1 | 1.58 | 1.58 |
| 02/01/2016 | Services:Lovell Attorney Fees<br>Attorney hours as reflected in attachment | 32.1 | 150.00 | 4,815.00 |

| | | |
|---|---|---|
| TOTAL OF NEW CHARGES | | $5,009.69 |
| TOTAL AMOUNT DUE | | **$12,300.43** |



**Law Office of Samuel P. Newton, PC**
1267 Quarter Horse Lane
Kalispell, MT 59901-2514

(801)624-6530
info@snewtonlaw.com

# Invoice

BILL TO
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah 84401

INVOICE # 1075
TERMS Net 30
DATE 01/01/2016
DUE DATE 01/31/2016

| | AMOUNT DUE | ENCLOSED |
|---|---|---|
| | $7,290.74 | |

Please detach top portion and return with your payment.
✂

| DATE | ACCOUNT SUMMARY | AMOUNT |
|---|---|---|
| 12/01/2015 | Balance Forward | $13,911.52 |
| | Payments and credits between 12/01/2015 and 01/01/2016 | -11,004.70 |
| | New charges (details below) | 4,383.92 |
| | Total Amount Due (activity through 01/01/2016) | 7,290.74 |

| DATE | ACTIVITY | QUANTITY | RATE | AMOUNT |
|---|---|---|---|---|
| 10/05/2015 | Services:Lovell Attorney Fees<br>Billing entry, invoice preparation and mailing | 1 | 150.00 | 150.00 |
| 10/05/2015 | Services:Lovell Attorney Fees<br>Record Review | 1.6 | 150.00 | 240.00 |
| 12/22/2015 | Lovell Litigation Expenses<br>Letter to Doug Lovell postage | 1 | 0.705 | 0.71 |
| 12/23/2015 | Lovell Litigation Expenses<br>Postage for letter to Doug Lovell | 1 | 0.705 | 0.71 |
| 12/23/2015 | Lovell Litigation Expenses<br>Copies for documents sent to Doug Lovell | 25 | 0.10 | 2.50 |

Continue to the next page

Inv# 1075          $4383.92
LAW OFFICE OF SAMUEL P. NEWTON, PC
01/12/2016  # Pages 2     FP2 DOC16S971

Page 2 of 2

| DATE | ACTIVITY | QUANTITY | RATE | AMOUNT |
|------|----------|----------|------|--------|
| 01/01/2016 | Services:Lovell Attorney Fees<br>Lovell attorney hours as detailed in attachment | 26.6 | 150.00 | 3,990.00 |

| | |
|---|---|
| TOTAL OF NEW CHARGES | $4,383.92 |
| TOTAL AMOUNT DUE | $7,290.74 |



**Law Office of Samuel P. Newton, PC**
1267 Quarter Horse Lane
Kalispell, MT  59901-2514

(801)624-6530
info@snewtonlaw.com

# Invoice

BILL TO
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

| | |
|---|---|
| INVOICE # | 1077 |
| TERMS | Net 30 |
| DATE | 03/03/2016 |
| DUE DATE | 04/02/2016 |

| AMOUNT DUE | ENCLOSED |
|---|---|
| $13,648.09 | |

Please detach top portion and return with your payment.
✂

| DATE | ACCOUNT SUMMARY | AMOUNT |
|---|---|---|
| 02/02/2016 | Balance Forward | $12,300.43 |
| | Payments and credits between 02/02/2016 and 03/03/2016 | -4,383.92 |
| | New charges (details below) | 5,731.58 |
| | Total Amount Due (activity through 03/03/2016) | 13,648.09 |

| DATE | ACTIVITY | QUANTITY | RATE | AMOUNT |
|---|---|---|---|---|
| 02/02/2016 | Lovell Litigation Expenses
Letter to Doug Lovell with attachments, postage and copying | 1 | 1.58 | 1.58 |
| 02/02/2016 | Lovell Litigation Expenses
Legal secretary hours, January 2016 (file organization and indexing) | 57 | 20.00 | 1,140.00 |
| 03/01/2016 | Services:Lovell Attorney Fees
Attorney fees for February 2016 as reflected in attachment | 1 | 4,590.00 | 4,590.00 |

| | |
|---|---|
| TOTAL OF NEW CHARGES | $5,731.58 |
| TOTAL AMOUNT DUE | $13,648.09 |



**Law Office of Samuel P. Newton, PC**
The Historic KM Building
40 2nd Street E, Suite 235
59901-6114

(406) 407-7323
info@snewtonlaw.com

# Invoice

BILL TO
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah  84401

| | |
|---|---|
| INVOICE # | 1081 |
| TERMS | Net 30 |
| DATE | 05/02/2016 |
| DUE DATE | 06/01/2016 |

| AMOUNT DUE | ENCLOSED |
|---|---|
| $6,203.29 | |

Please detach top portion and return with your payment.
✄

| DATE | ACCOUNT SUMMARY | AMOUNT |
|---|---|---|
| 04/01/2016 | Balance Forward | $15,962.01 |
| | Payments and credits between 04/01/2016 and 05/02/2016 | -13,055.19 |
| | New charges (details below) | 3,296.47 |
| | Total Amount Due (activity through 05/02/2016) | 6,203.29 |

| DATE | ACTIVITY | QUANTITY | RATE | AMOUNT |
|---|---|---|---|---|
| 04/07/2016 | Lovell Litigation Expenses<br>Letter to Doug Lovell with attachments, postage and copying | 1 | 0.885 | 0.89 |
| 04/12/2016 | Lovell Litigation Expenses<br>Letter to Doug Lovell with attachments, postage and copying | 1 | 3.58 | 3.58 |
| 04/30/2016 | Lovell Litigation Expenses<br>Legal secretary hours, April 2016 | 0.6 | 20.00 | 12.00 |
| 04/30/2016 | Services:Lovell Attorney Fees<br>Attorney and secretarial fees as detailed in supplemental attachment | 1 | 3,280.00 | 3,280.00 |

| | |
|---|---|
| TOTAL OF NEW CHARGES | $3,296.47 |
| TOTAL AMOUNT DUE | **$6,203.29** |



**Law Office of Samuel P. Newton, PC**
1267 Quarter Horse Lane
Kalispell, MT 59901-2514

(801)624-6530
info@snewtonlaw.com

# Invoice

BILL TO
Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden, Utah 84401

| | |
|---|---|
| INVOICE # | 1078 |
| TERMS | Net 30 |
| DATE | 04/01/2016 |
| DUE DATE | 05/01/2016 |

| AMOUNT DUE | ENCLOSED |
|---|---|
| $15,962.01 | |

Please detach top portion and return with your payment.
✂

| DATE | ACCOUNT SUMMARY | AMOUNT |
|---|---|---|
| 03/03/2016 | Balance Forward | $8,638.40 |
| | Payments and credits between 03/03/2016 and 04/01/2016 | 0.00 |
| | New charges (details below) | 7,323.61 |
| | Total Amount Due (activity through 04/01/2016) | 15,962.01 |

| DATE | ACTIVITY | QUANTITY | RATE | AMOUNT |
|---|---|---|---|---|
| 03/04/2016 | Lovell Litigation Expenses<br>Postage for letter to Doug Lovell | 1 | 5.75 | 5.75 |
| 03/04/2016 | Lovell Litigation Expenses<br>Copies of papers to Doug Lovell | 25 | 0.10 | 2.50 |
| 03/11/2016 | Lovell Litigation Expenses<br>Postage for letter to Doug Lovell | 1 | 0.485 | 0.49 |
| 03/14/2016 | Lovell Litigation Expenses<br>Postage for letter to Doug Lovell | 1 | 0.485 | 0.49 |
| 03/15/2016 | Lovell Litigation Expenses<br>Postage for letter to Doug Lovell | 1 | 0.485 | 0.49 |

**Continue to the next page**

Page 2 of 2

| DATE | ACTIVITY | QUANTITY | RATE | AMOUNT |
|---|---|---|---|---|
| 03/28/2016 | Lovell Litigation Expenses<br>Postage for letter to Doug Lovell | 1 | 0.485 | 0.49 |
| 04/01/2016 | Services:Lovell Attorney Fees<br>As described in attached XLS | 87.8 | 81.3439636 | 7,142.00 |
| 04/01/2016 | Weber County Litigation Expenses<br>State v. Sexton, Brief of the Appellant | 1 | 170.60 | 170.60 |
| 04/01/2016 | Lovell Litigation Expenses<br>Papers mailed to Doug Lovell between 3/4<br>and 3/31/2016 | 8 | 0.10 | 0.80 |

TOTAL OF NEW CHARGES        $7,323.61

TOTAL AMOUNT DUE    $15,962.01

| Vendor | Number | Date | Amount | Check | Check Date |
|--------|--------|------|--------|-------|------------|
| 3354 | 17/JUL/2017 | 10/26/2017 | 4,651.41 | 1261 | 11/09/2017 |
| 3354 | 1015 | 09/08/2017 | 11,927.30 | 1202 | 09/15/2017 |
| 3354 | 1109 | 08/09/2017 | 379.90 | 1166 | 08/11/2017 |
| 3354 | 1104 | 07/26/2017 | 632.75 | 1166 | 08/11/2017 |
| 3354 | 1106 | 07/26/2017 | 181.41 | 1166 | 08/11/2017 |
| 3354 | 1099 | 03/31/2017 | 4,361.71 | 1073 | 05/05/2017 |
| 3354 | 1095 | 01/03/2017 | 5,087.06 | 413207 | 01/13/2017 |
| 3354 | 1091 | 12/01/2016 | 20,040.00 | 412083 | 12/12/2016 |
| 3354 | 1090 | 11/01/2016 | 8,802.07 | 411436 | 11/18/2016 |
| 3354 | 1088 | 10/07/2016 | 5,610.00 | 410420 | 10/21/2016 |
| 3354 | 1087 | 09/01/2016 | 8,679.43 | 409267 | 09/16/2016 |
| 3354 | 1085 | 08/10/2016 | 4,747.00 | 408345 | 08/19/2016 |
| 3354 | 1084 | 07/05/2016 | 2,489.60 | 407550 | 07/29/2016 |
| 3354 | 1082 | 06/07/2016 | 6,620.90 | 405840 | 06/10/2016 |
| 3354 | 1081 | 05/02/2016 | 3,296.47 | 405120 | 05/20/2016 |
| 3354 | 1078 | 04/01/2016 | 7,323.61 | 404180 | 04/22/2016 |
| 3354 | 1077 | 03/03/2016 | 5,731.58 | 403023 | 03/18/2016 |
| 3354 | 1076 | 02/02/2016 | 5,009.69 | 401875 | 02/12/2016 |
| 3354 | 1075 | 01/25/2016 | 4,383.92 | 401103 | 01/29/2016 |



DEPOSITION
EXHIBIT
17
Baron

SAMUEL P. NEWTON (9935)
Counsel for Defendant/Appellant
Law Office of Samuel P. Newton, PC
The Historic KM Building
40 2nd Street E, Suite 222
Kalispell, MT 59901-2514
Tel. 801-624-6530 (UT)
Tel. 406-407-7323 (MT)
Fax 406-203-1144
sam@snewtonlaw.com

## IN THE SECOND DISTRICT COURT
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| STATE OF UTAH,<br>Plaintiff,<br><br>vs.<br><br>DOUGLAS A. LOVELL,<br>Defendant. | *** UNDER SEAL ***<br><br>**EX PARTE MOTION FOR PAYMENT OF ATTORNEY FEES AND LITIGATION EXPENSES**<br><br>Case No. 921900407<br><br>Judge Michael D. DiReda |

Defendant, DOUGLAS A. LOVELL, by and through counsel of record, Samuel P. Newton, submits the following motion in which he asks this Court to authorize additional expenditure of funds pursuant to the Utah Supreme Court's order remanding this case for further proceedings.

### RELEVANT FACTS

Counsel for Mr. Lovell has exhausted the $75,000 contracted for with Weber County for Mr. Lovell's appeal. Part of the difficulty was that this case has turned out to be anything but ordinary. Counsel anticipated the voluminous record, spanning decades, but what counsel did not anticipate was that at least one of Mr. Lovell's trial attorneys—Sean Young—did virtually nothing on the case. It took almost a year to even get Mr. Young's file. Counsel had to interview



dozens of witnesses and collect affidavits, all of which establish that Mr. Young did not

interview witnesses, did not talk to them, and even for the ones he spoke to, did not prepare them

for trial. This process had taken a significant amount of time and resources to complete. Counsel

drafted a Rule 23B Motion for Remand that was 90 pages in length. The addenda in support of

that motion comprised 247 pages of documentation, which was most of current counsel's work.

Indeed, counsel has now expended time and funds well beyond what Weber County has agreed

to pay since the County has not authorized any payments since the beginning of the year. Indeed,

counsel has worked $11,000 over that amount without compensation. Counsel continues to work

on the case without compensation.

Now, the Utah Supreme Court has remanded the matter for further proceedings. The

supreme court's order requires this court to make findings related to testimony from at least 22

named witnesses, as well as other contemplated witnesses, such as Mike Bouwhuis, Sean Young,

James Whitman, as well as attorneys representing the Church of Jesus Christ of Latter-day

Saints. The evidentiary hearing will likely take 10-14 days to complete.

Counsel anticipates that he will need to prepare for this witness testimony. Some of the

supreme court's listed witnesses counsel has been unable (because of a lack of funding) to

interview and would need some investigative resources so his investigator could speak with

those witnesses prior to their testimony.

After this court makes its findings, the new evidence will need to be incorporated into

Mr. Lovell's brief on appeal. Counsel will then need to draft a reply brief and orally argue the

case. Assuming Mr. Lovell loses his appeal, counsel will need to petition the United States

Supreme Court to review the case. Taken together, and recognizing that this process is difficult

to predict, counsel asks the court to preauthorize two hundred hours of attorney time.[1] While 200

hours may not cover all of Mr. Lovell's attorney fees, counsel could approach the court at that

time with a better explanation as to why additional funding is needed.

---

[1] In an email to the Weber County Commission, counsel indicated the following concerns, with the county's offer of 100 hours of additional time:

> 1. Right now, the county's current balance with me is $8294. That is billed amounts, (which I stopped billing in January 2017 because we went over the caps) that went over the $75,000 contract. For unbilled amounts from January to the present, it is now at $3015.00. That included attending a hearing at the Utah State Bar where I was asked to testify and a meeting with Sean Young, filing a reply to the State's 23B response and correspondence with Mr. Lovell. So, already, I have exceeded the contract by $11,000, leaving only $4,000 for the rest of the work.

> 2. The Supreme Court's remand contemplates over two dozen witnesses. It names 22, but I think I will have to call three or four other witnesses for much closer to 25 or 26 witnesses. I don't think their testimony is insignificant. I have interviewed most of them personally and find that their testimony would have been compelling in Mr. Lovell's case. I wouldn't have raised the issue if I did not think it meritorious. Indeed, I think it's important to consider that the Supreme Court deemed the issues I raised worthy of remand and required the trial court to consider that evidence. Because these witnesses did not testify, I will need to put their testimony on, as if this were the penalty phase of the capital case so the judge can decide if their testimony would have been helpful and if Sean was ineffective in not calling or preparing them. My review of Mr. Lovell's penalty phase shows that they called on average 5-7 witnesses a day.  One day, they called only two. That is why I assume that the evidentiary hearing will take about 10-14 days. Court time alone, not including witness and prep would take 40-60 hours.

> 3. From there, in my experience, it is not a simple revision of Mr. Lovell's appeal. These may be the major issues in his appeal. The average penalty phase transcript was around 250 pages. Multiply that by 10-14 and you get 2500 - 3000 pages of new record. The process of drafting, citing to, and creating an appellate document from that much information will not go quickly, especially if I decide that these are the critical issues to brief. I honestly believe that this will take at least 100-200 hours. Then you have to factor in a reply brief. My brief, as it stands now, is 307 pages. Adding this new information may well be 100-150 extra pages of briefing. The reply brief would arguably be upwards, then of 200 pages, which will be no small task to write. While I can write quickly, I'm not that fast! And, a reply brief is not a simple revision. In many ways, I will have to incorporate a host of

## ARGUMENT

"[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Because "death is different," the United States Constitution requires that "'extraordinary measures [be taken] to insure that [defendant] 'is afforded process that will guarantee, as much as is humanly possible, that [a sentence of death not be] imposed out of whim, passion, prejudice, or mistake.'" *Caldwell v. Mississippi*, 472 U.S. 320, 329 n.2 (1985) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1981) (O'Connor, J., concurring)). Indeed, "[t]ime and again the [Supreme] Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case." *Caspari v. Bolden*, 510 U.S. 383, 393 (1994) (quoting *Strickland v. Washington*, 466 U.S. 668, 704-05 (1984) (Brennan, J., concurring in part and dissenting in part)), *see also Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (noting that the Court's duty to search for constitutional error with painstaking care is never more exacting than in a capital case (internal citations omitted)).

The United States Supreme Court has held that defense counsel cannot be effective without "access to the raw materials integral to the building of an effective defense." *Ake v.*

---

unanticipated testimony.

Indeed, there are constitutional problems with Mr. Lovell even having to ask the county commission for funding in this matter. It violates principles of separation of powers, attorney-client privilege and independence. The State should have no part in the resources of their opponent. The court itself can sufficiently check these expenditures. Mr. Lovell would not have to make any of those requests were he independently wealthy. These requests ought to be able to be made *ex parte* and under seal.

*Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). This is a constitutional right based on the Sixth Amendment which provides that an accused has the right to counsel for his defense. U.S. Const. Amend. VI. The court has repeatedly held that this right to counsel involves the right to *effective* assistance of that counsel. *See Evitts v. Lucey*, 469 U.S. 387, 391–97, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Reece v. Georgia*, 350 U.S. 85, 89–90, 76 S.Ct. 167, 100 L.Ed. 77 (1955); *Powell v. Alabama*, 287 U.S. 45, 71–73, 53 S.Ct. 55, 77 L.Ed. 158 (1932). The United States Supreme Court has similarly held that the State "must 'provide indigent [defendants] with the basic tools of an adequate defense or appeal, when[ever] those tools are available for a price to other [defendants].'" *State v. Parduhn*, 2011 UT 55, ¶ 18, 283 P.3d 488 (quoting *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971) (alterations in *Parduhn*).

Weber County has an obligation to provide these resources. In *Parduhn*, the Supreme Court noted its prior decision in *State v. Burns*, which stated that "a county must provide the investigatory [resources] ... necessary for a complete defense to every indigent person ..." *Parduhn*, 2011 UT 55, ¶ 24 (quoting *State v. Burns*, 2000 UT 56, ¶ 28, 4 P.3d 795) (alterations in *Parduhn*).

Utah's Indigent Defense Act has several provisions that are applicable to this motion. The act requires the county to "provide the legal defense services necessary for an effective defense." Utah Code Ann. § 77-32-302. "Legal defense," the code says, includes a requirement to "provide the defense resources necessary for a complete defense," which includes "a competent investigator, expert witness, scientific or medical testing, or other appropriate means necessary, for an effective defense of an indigent." Utah Code Ann. § 77-32-201(3) and (8)(c).

Nor is the matter different because the case is on appeal. As the United States Supreme Court has stated, "[a] first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney." *Evitts*, 469 U.S. at 396. As the Court put it, the appellate attorney must have the resources to conduct an effective defense: "nominal representation on an appeal as of right—like nominal representation at trial—does not suffice to render the proceedings constitutionally adequate; a party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all." *Id.*

This court must authorize, under the constitution, additional funding so that Mr. Lovell has access to the counsel he is entitled. As the United States Supreme Court has said, "the short and perhaps the best answer to any objection [from the State] based upon expense was given by the Supreme Court of Wisconsin in a case much like the present one: 'We will not put a price tag upon constitutional rights.'" *Smith v. Hooey*, 393 U.S. 374, 381 n.11, 89 S. Ct. 575, 578, 21 L. Ed. 2d 607 (1969) (quoting *State ex rel. Fredenberg v. Byrne*, 20 Wis.2d 504, 512, 123 N.W.2d 305). The Ninth Circuit Court of Appeals emphasized that State must provide these resources, despite their cost:

> We conclude that the availability of constitutional rights does not vary with the rise and fall of account balances in the Treasury. Our basic liberties cannot be offered and withdrawn as "budget crunches" come and go, nor may they be made contingent on transitory political judgments regarding the advisability of raising or lowering taxes, or on pragmatic or tactical decisions about how to deal with the perennial problem of the national debt. In short, constitutional rights do not turn on the political mood of the moment, the outcome of cost/benefit analyses or the results of economic or fiscal calculations. Rather, our constitutional rights are fixed and immutable, subject to change only in the manner our forefathers established for the making of constitutional amendments. … There is no price tag on the continued existence of … any other constitutionally-provided right.

*Armster v. U.S. Dist. Court for the Cent. Dist. of California*, 792 F.2d 1423, 1429 (9th Cir. 1986); *see also Incarcerated Men of Allen Cnty. Jail v. Fair*, 507 F.2d 281, 285 (6th Cir. 1974) ("There should be no price tag on the enjoyment of constitutionally guaranteed freedoms").

## CONCLUSION

For these reasons, Mr. Lovell asks that the court preauthorize 200 hours of attorney work on the case. If those hours are exhausted, Mr. Lovell requests leave of the court to return and again request additional funding.

RESPECTFULLY SUBMITTED this 22 day of December, 2018.


_____/s/ Samuel P. Newton_____
SAMUEL P. NEWTON
Attorney for Appellant

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing MOTION FOR PAYMENT OF

ATTORNEY FEES AND LITIGATION EXPENSES was mailed by first class mail or

electronically delivered December 22, 2018 to the following:

Bryan Baron
Weber County Attorney
2380 Washington Blvd. #230
Ogden UT 84401


      /s/ Devlin Foubert
DEVLIN FOUBERT

## Baron, Bryan

| | |
|---|---|
| **From:** | Baron, Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Monday, June 5, 2017 3:57 PM |
| **To:** | 'Sam Newton' |
| **Cc:** | Harvey, Jim H. |
| **Subject:** | RE: [CAUTION]Re: Funding Request on Doug Lovell |

Sam,

I attended a meeting with elected officials here in the county, and we briefly discussed your request for additional funding for the Rule 23B motion. The county officials understand your argument as to why the 23B motion was necessary, and they are inclined to grant you additional funding for it, but they aren't happy about the cost of $22,500 for the motion and $15,000 for the evidentiary hearings.

As we got into the specifics of your invoices, the group expressed concern that you are taking advantage of the county by overbilling for your services. A few examples of their concerns include: (1) billing the county for work related to Sean Young's discipline with the Utah Bar (they are unsure why the county should pay anything for that as it is unrelated to your representation of Mr. Lovell in the appeal), (2) billing the county for your motion for additional fees and all of the work that was associated with that (the county didn't agree with your request for additional fees and neither did the judge, so why should the county pay for the time you spent on it?), and (3) billing for the frequent phone calls, letters, and meeting with Doug Lovell (they are unsure why you need to communicate with him so frequently on an appellate case).

The consensus from the meeting was that unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals. Again, they don't have a problem with the quality of your work. Their concern is with the amounts that you are billing and the items that you are billing them for.

I've been asked to give you an opportunity to revise your request for additional funding for the 23B motion as well as your most recent invoice in light of the county's concerns. Please examine those invoices and resubmit them once you have had an opportunity to revise them.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT 84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 3:47 PM
**To:** Baron, Bryan
**Cc:** Harvey, Jim H.
**Subject:** [CAUTION]Re: Funding Request on Doug Lovell

Whoops. I just realized I sent you the wrong Excel Spreadsheet.

##########################################################



DEPOSITION
EXHIBIT
19
Baron

25

```
Be the Human Firewall!

To prevent malicious software and viruses, NEVER open files
or click on links from unexpected or unknown sources.

Think Before You Click!

#########################################################
```

On May 25, 2017, at 3:44 PM, Sam Newton <<u>sam@snewtonlaw.com</u>> wrote:

Hey Bryan, the reason was that yesterday, I searched my billing for 23B. It turned up *just* the writing process for the 23B. I realized today that it did not include any of the time talking with witnesses, gathering affidavits, etc. which were all part of the 23B preparations. Today, when I went through the process of writing that email, I took *all* of my billing on the case and removed anything that was not related to the 23B. The remaining 2/3 of the time was spent getting ready for and writing the brief on appeal, which is largely done at this point (minus whatever comes up in remand). I hope this makes sense.



**Samuel P. Newton** / Attorney at Law<span style="color:red">sam@snewtonlaw.com</span>
**Law Office of Samuel P. Newton, PC**Office: (406) 407-7323 /
Fax: (406) 203-114440 2nd Street E, Suite 222Kalispell, MT
59901<span style="color:red">www.snewtonlaw.com</span>



On May 25, 2017, at 3:30 PM, Baron,Bryan <<u>bbaron@co.weber.ut.us</u>> wrote:

Sam,

In your email to Commissioner Harvey, you state that the work that went into the 23B motion totals $22,500; however, the email and the invoice that you sent me on Monday both indicate that it was a total of $8,730 (see attached).  Would you please help me understand the discrepancy?

Also, the Excel spreadsheet that was attached to the email to Commissioner Harvey appears to cover all billable time from January to the present and not the 23B motion.

**Bryan R. Baron**
**Deputy County Attorney**
**WEBER COUNTY ATTORNEY'S OFFICE**
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: <u>bbaron@co.weber.ut.us</u>

**From:** Sam Newton [<u>mailto:sam@snewtonlaw.com</u>]
**Sent:** Thursday, May 25, 2017 12:44 PM
**To:** Harvey, Jim H.
**Cc:** Baron,Bryan
**Subject:** [CAUTION]Fwd: Funding Request on Doug Lovell

26

Jim, this email bounced as too large. I'm sending all but the large attachment, but I'm putting a link to that file below.

https://www.dropbox.com/s/8hhqgld7pgwtxcz/Lovell%2C%20Douglas%2023B%20Addenda.pdf?dl=0

sam

 **Samuel P. Newton** / Attorney at Lawsam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC**Office: (406) 407-7323 / Fax: (406) 203-114440 2nd Street E, Suite 222Kalispell, MT 59901www.snewtonlaw.com



Begin forwarded message:

**From:** Sam Newton <sam@snewtonlaw.com>
**Subject: Funding Request on Doug Lovell**
**Date:** May 25, 2017 at 12:40:34 PM MDT
**To:** "Jim H. Harvey" <jharvey@co.weber.ut.us>
**Cc:** "Bryan R. Baron" <bryanrbaron@gmail.com>

Jim, I'm writing you after a conversation I had with Bryan Baron and Chris Allred yesterday regarding funding on the Doug Lovell matter. As you recall, the commissioners approved an additional $15,000 for work to be done on Mr. Lovell's remand, which was granted by the Utah Supreme Court.

My contract covered work to be done "before the Utah Supreme Court in the first appeal of right." When I entered into the contract, I did not anticipate that we would have remand proceedings. These are rarely done in appeals to begin with and especially are not done in capital cases. Ineffective assistance claims in a capital case are usually best brought in a post-conviction proceeding where an attorney can review the entire file, depose attorneys and make claims about the adequacy of their representation. Because remand proceedings in a direct appeal are extremely limited, capital defense lawyers are advised not to do them on appeal. That is standard practice.

However, it became abundantly clear soon into the representation that this was the unusual case where pursuing a remand would be appropriate. The Rules of Appellate Procedure allow a lawyer to move for remand, but he must supplement the record with affidavits. I had to gather, interview, collect and obtain affidavits from numerous witnesses (it was over 25). I also had to draft a Rule 23B remand motion. That motion was two to three times as large as a normal appeal: 90 pages and 247 pages of addenda. I am attaching both documents for your review. Clearly that motion was important because not only did the State stipulate to a remand upon receiving it, but the Utah Supreme Court granted it.

That process was quite time consuming and would not normally be part of an appeal. If I total up the time spent on drafting the 23B as well as preparing

27

affidavits and talking with witnesses, it totals $22,500. I have attached a spreadsheet where I have documented the hours spent on that project.

In other words, of the $75,000 I was authorized to prepare a direct appeal, I spent about 1/3 of that money on matters that are not normally part of the direct appeal at all.

I am hoping that the commissioners will approve a supplemental payment for that additional work. That will free up some money for work on the upcoming evidentiary hearings and revisions of the appeal. Bryan Baron and Chris Allred indicated to me that I should make this request directly to you and then cc at least Bryan on it. There are at least a few reasons why we may need more money. The State has filed a motion to receive all of Doug Lovell's private file. The Utah Supreme Court has held that if that happens, I have a duty to object to the disclosure and then I need to make an index of the entire file. The State has to then demonstrate why it needs a particular document and the court has to independently review each document it believes the State needs. Mr. Lovell's file is decades old and is enormous to say the least. It will likely take hundreds of hours to index. I may have to hire someone to do this and we'll see what the judge orders, because I know it would be quite a bit more expensive to have me do it. But I think we can play by ear and if we run out of funding, I can always reapproach you and explain the situation.

If the county is not inclined to approve payment for that full amount, I would ask that the county consider at least reimbursing me for time spent up to this point for which I have not been reimbursed. If I look at my records, I show that the county owes me $8,294 for work already performed on this case. (Please recognize that this statement includes payments for printing/binding briefs that are unrelated to Mr. Lovell.) I spoke with Bryan and Chris about this yesterday and they encouraged me to point out that this was extra work related to the remand that was not contemplated when we were contracted for the appeal.

I want to say that I am quite conscious of the county's money—how it comes from the taxpayers. I do not want to be wasteful of that resource. I appreciate your willingness to increase funds in the past and hope that you will consider doing so here. I am a solo practitioner and I support ten children, including foster children. Even this bit of lost income can cause a hardship on me and my family. Wishing you the best,

sam



**Samuel P. Newton** / Attorney at Lawsam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC**Office: (406) 407-7323 / Fax: (406) 203-114440 2nd Street E, Suite 222Kalispell, MT 59901www.snewtonlaw.com

###########################################################

Be the Human Firewall!

Weber County 1126

To prevent malicious software and viruses, NEVER open files
or click on links from unexpected or unknown sources.

Think Before You Click!

###########################################################

<2017_05_22, 23B time entries.pdf>

Weber County 1127

**Baron, Bryan**

| | |
|---|---|
| **From:** | Baron, Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Monday, June 5, 2017 3:57 PM |
| **To:** | Harvey, Jim H. |
| **Subject:** | RE: Funding Request on Doug Lovell |
| **Attachments:** | image001.jpg |

Thank you!  I appreciate you as well!

See you tomorrow at the library meeting!

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Harvey, Jim H.
**Sent:** Monday, June 05, 2017 3:40 PM
**To:** Baron, Bryan
**Subject:** RE: Funding Request on Doug Lovell

This is perfect....thank you for watching out for us !!! – I appreciate you...

James H. "**Jim**" **Harvey**



Commissioner
2380 Washington Blvd.
Ste-360
Ogden, UT  84401
(801) 399-8401

**From:** Baron, Bryan
**Sent:** Monday, June 5, 2017 11:34 AM
**To:** Harvey, Jim H.
**Subject:** RE: Funding Request on Doug Lovell

Jim,

19



DEPOSITION
EXHIBIT
20
Baron
PENGAD 800-631-6989

Weber County 1117

Chris Allred and I discussed Sam's request, and this is the direction that I have been given.  Let me know if you are okay with it.

Bryan

-------------------------------

Sam,

I attended a meeting with elected officials here in the county, and we briefly discussed your request for additional funding for the Rule 23B motion.  The county officials understand your argument as to why the 23B motion was necessary, and they are inclined to grant you additional funding for it, but they aren't happy about the price tag of $22,500 for the motion and $15,000 for the hearings.

As we got into the specifics of your invoices, the group expressed concern that you are taking advantage of the county by overbilling for your services.  Some of their specific concerns include: (1) billing the county for work related to Sean Young's discipline with the Utah Bar (they are unsure why the county should pay anything for that), (2) billing the county for your motion for additional fees and all of the work that was associated with that (the county didn't agree with your request for additional fees and neither did the judge, so why should the county pay for it?), and (3) billing for the frequent phone calls, letters, and meeting with Doug Lovell (they are unsure why you need to communicate with him so much on an appeal).

The consensus from the meeting was that the county plans to look for another attorney for future capital and aggravated murder cases.  There was also some discussion about whether they should start looking for a replacement for the public defender appellate contract.  Again, they don't have a problem with the quality of your work.  The concern is with the amounts that you are billing and the items that you are billing them for.

I've been asked to give you an opportunity to cut the fat out of the request for additional funding for the 23B motion as well as in your most recent invoice.  Please look those invoices over and resubmit them once you have had an opportunity to revise them.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 3:47 PM
**To:** Baron,Bryan
**Cc:** Harvey, Jim H.
**Subject:** [CAUTION]Re: Funding Request on Doug Lovell

Whoops. I just realized I sent you the wrong Excel Spreadsheet.

##########################################################

Be the Human Firewall!

Weber County 1118

```
To prevent malicious software and viruses, NEVER open files
or click on links from unexpected or unknown sources.

Think Before You Click!

##########################################################
```

On May 25, 2017, at 3:44 PM, Sam Newton <sam@snewtonlaw.com> wrote:

Hey Bryan, the reason was that yesterday, I searched my billing for 23B. It turned up *just* the writing process for the 23B. I realized today that it did not include any of the time talking with witnesses, gathering affidavits, etc. which were all part of the 23B preparations. Today, when I went through the process of writing that email, I took *all* of my billing on the case and removed anything that was not related to the 23B. The remaining 2/3 of the time was spent getting ready for and writing the brief on appeal, which is largely done at this point (minus whatever comes up in remand). I hope this makes sense.



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 /
Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT
59901 www.snewtonlaw.com



On May 25, 2017, at 3:30 PM, Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

In your email to Commissioner Harvey, you state that the work that went into the 23B motion totals $22,500; however, the email and the invoice that you sent me on Monday both indicate that it was a total of $8,730 (see attached). Would you please help me understand the discrepancy?

Also, the Excel spreadsheet that was attached to the email to Commissioner Harvey appears to cover all billable time from January to the present and not the 23B motion.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT 84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 12:44 PM
**To:** Harvey, Jim H.
**Cc:** Baron,Bryan
**Subject:** [CAUTION]Fwd: Funding Request on Doug Lovell

Jim, this email bounced as too large. I'm sending all but the large attachment, but I'm putting a link to that file below.

Weber County 1119

https://www.dropbox.com/s/8hhqgld7pgwtxcz/Lovell%2C%20Douglas%2023B%20Addenda.pdf?dl=0

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-11 4440 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com



Begin forwarded message:

**From:** Sam Newton <sam@snewtonlaw.com>
**Subject: Funding Request on Doug Lovell**
**Date:** May 25, 2017 at 12:40:34 PM MDT
**To:** "Jim H. Harvey" <jharvey@co.weber.ut.us>
**Cc:** "Bryan R. Baron" <bryanrbaron@gmail.com>

Jim, I'm writing you after a conversation I had with Bryan Baron and Chris Allred yesterday regarding funding on the Doug Lovell matter. As you recall, the commissioners approved an additional $15,000 for work to be done on Mr. Lovell's remand, which was granted by the Utah Supreme Court.

My contract covered work to be done "before the Utah Supreme Court in the first appeal of right." When I entered into the contract, I did not anticipate that we would have remand proceedings. These are rarely done in appeals to begin with and especially are not done in capital cases. Ineffective assistance claims in a capital case are usually best brought in a post-conviction proceeding where an attorney can review the entire file, depose attorneys and make claims about the adequacy of their representation. Because remand proceedings in a direct appeal are extremely limited, capital defense lawyers are advised not to do them on appeal. That is standard practice.

However, it became abundantly clear soon into the representation that this was the unusual case where pursuing a remand would be appropriate. The Rules of Appellate Procedure allow a lawyer to move for remand, but he must supplement the record with affidavits. I had to gather, interview, collect and obtain affidavits from numerous witnesses (it was over 25). I also had to draft a Rule 23B remand motion. That motion was two to three times as large as a normal appeal: 90 pages and 247 pages of addenda. I am attaching both documents for your review. Clearly that motion was important because not only did the State stipulate to a remand upon receiving it, but the Utah Supreme Court granted it.

That process was quite time consuming and would not normally be part of an appeal. If I total up the time spent on drafting the 23B as well as preparing affidavits and talking with witnesses, it totals $22,500. I have attached a spreadsheet where I have documented the hours spent on that project.

22

In other words, of the $75,000 I was authorized to prepare a direct appeal, I spent about 1/3 of that money on matters that are not normally part of the direct appeal at all.

I am hoping that the commissioners will approve a supplemental payment for that additional work. That will free up some money for work on the upcoming evidentiary hearings and revisions of the appeal. Bryan Baron and Chris Allred indicated to me that I should make this request directly to you and then cc at least Bryan on it. There are at least a few reasons why we may need more money. The State has filed a motion to receive all of Doug Lovell's private file. The Utah Supreme Court has held that if that happens, I have a duty to object to the disclosure and then I need to make an index of the entire file. The State has to then demonstrate why it needs a particular document and the court has to independently review each document it believes the State needs. Mr. Lovell's file is decades old and is enormous to say the least. It will likely take hundreds of hours to index. I may have to hire someone to do this and we'll see what the judge orders, because I know it would be quite a bit more expensive to have me do it. But I think we can play by ear and if we run out of funding, I can always reapproach you and explain the situation.

If the county is not inclined to approve payment for that full amount, I would ask that the county consider at least reimbursing me for time spent up to this point for which I have not been reimbursed. If I look at my records, I show that the county owes me $8,294 for work already performed on this case. (Please recognize that this statement includes payments for printing/binding briefs that are unrelated to Mr. Lovell.) I spoke with Bryan and Chris about this yesterday and they encouraged me to point out that this was extra work related to the remand that was not contemplated when we were contracted for the appeal.

I want to say that I am quite conscious of the county's money—how it comes from the taxpayers. I do not want to be wasteful of that resource. I appreciate your willingness to increase funds in the past and hope that you will consider doing so here. I am a solo practitioner and I support ten children, including foster children. Even this bit of lost income can cause a hardship on me and my family. Wishing you the best,

sam



**Samuel P. Newton** / Attorney at Lawsam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC**Office: (406) 407-7323 / Fax: (406) 203-114440 2nd Street E, Suite 222Kalispell, MT 59901www.snewtonlaw.com



\##########################################################

Be the Human Firewall!

To prevent malicious software and viruses, NEVER open files
or click on links from unexpected or unknown sources.

Weber County 1121

Think Before You Click!

###########################################################

<2017_05_22, 23B time entries.pdf>

24



DEPOSITION EXHIBIT 2 NEWTON

 Gmail

Bryan Baron <bryanrbaron@gmail.com>

**Fwd: Douglas Lovell Public Defender Appeal**
1 message

**Bryan R. Baron** <bryanrbaron@gmail.com>                                 Tue, Mar 7, 2017 at 12:02 PM
To: "Baron, Bryan" <bbaron@co.weber.ut.us>

DEPOSITION EXHIBIT 21 Baron

--------- Forwarded message ---------
From: Sam Newton <sam@snewtonlaw.com>
Date: Tue, Mar 7, 2017 at 11:38 AM
Subject: Re: Douglas Lovell Public Defender Appeal
To: jharvey@co.weber.ut.us, jebert@co.weber.ut.us, kgibson@co.weber.ut.us, "Bryan R. Baron" <bryanrbaron@gmail.com>
Cc: Mike Bouwhuis <barrister63@comcast.net>

Hello again Commissioners. Yesterday, the Utah Supreme Court issued an order remanding Doug Lovell's case for further proceedings in the trial court related to ineffective assistance of counsel. I have attached that order. The order involves calling at least 26 witnesses to testify and I would also include Mike Bouwhuis in there as well as attorneys for the LDS church and potentially some church leaders who communicated with witnesses. I anticipate that this will involve a week or two of evidentiary hearings. From there, I will need to revise Mr. Lovell's brief on appeal given a whole new record that will need to be developed.

As you recall, I am completely out of funding on Mr. Lovell's case. I, along with everyone, did not anticipate that there would be this level of ineffectiveness on appeal. In fact, I just attended bar disciplinary proceedings against Mr. Young for this case and the bar has determined the misconduct to be quite serious. I have continued to meet with Mr. Lovell and work on his case without pay. But I cannot continue on the appeal without further funding. This will need to be resolved expeditiously because the Supreme Court's order calls for the matter to be addressed and resolved in the next 90 days.

If the commission is not inclined to grant funding, then I will need to file something with the District Court asking for funding, or alternatively, to withdraw. If you could get back to me soon, that would be appreciated. Thanks for everything!

sam



**Samuel P. Newton** / Attorney at Law
sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC**
Office: (406) 407-7323 / Fax: (406) 203-1144
40 2nd Street E, Suite 222
Kalispell, MT 59901
www.snewtonlaw.com

On Jan 5, 2017, at 10:41 AM, Sam Newton <sam@snewtonlaw.com> wrote:

Hi Commissioners,

Bryan Baron asked me to contact you about funding on this case. I was appointed to represent Douglas Lovell on appeal to the Utah Supreme Court as his public defender. I have included a letter from the Utah State Bar.

Let me know if I can answer any questions. Thanks again!

sam



**Samuel P. Newton** / Attorney at Law
sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC**
Office: (406) 407-7323 / Fax: (406) 203-1144
40 2nd Street E, Suite 222
Kalispell, MT 59901
www.snewtonlaw.com



<2017_01_05, Letter to WCC.pdf>
<2016_12_13, Sean Young Complaint .pdf>

---

📄 **20150632-ORDER.pdf**
182K



 Gmail                                        Bryan Baron <bryanrbaron@gmail.com>

---

### RE: [CAUTION]Re: Douglas Lovell Public Defender Appeal
1 message

**Harvey, Jim H.** <jharvey@co.weber.ut.us>                          Tue, Mar 14, 2017 at 5:57 PM
To: Sam Newton <sam@snewtonlaw.com>, "Ebert,James" <jebert@co.weber.ut.us>, "Gibson,Kerry"
<kgibson@co.weber.ut.us>, "Bryan R. Baron" <bryanrbaron@gmail.com>
Cc: Mike Bouwhuis <barrister63@comcast.net>



Dear Mr. Newton

I received your email requesting additional funds on the Doug Lovell case. I also received the email that you sent to
Mr. Baron estimating that the remand to district court would add approximately 500 to 750 hours of work to the
case. After speaking with our civil attorneys and the other commissioners, the county is prepared to provide you with
an additional $15,000 to finish this appeal.

While we recognize that the remand of the Lovell case was unanticipated in the original contract and will cause you
additional work, we don't agree that it will take an additional 500 to 750 hours to complete that work. It is highly
likely that the majority of the witnesses you wish to call will have little to no helpful information. As such, we
estimate that it will only take approximately one week, or 40 hours, to conduct the hearings, 40 hours to prepare for
the hearings, and another 20 hours to revise your initial brief. The total additional hours of work should in no way
exceed 100. At $150 per hour that would equal a total of $15,000.

The $75,000 that was provided to you initially was intended to cover the Reply brief which shouldn't be impacted by
this remand, so we are not offering additional compensation for that.

Please advise me soon with acceptance of this offer so I can have Mr. Baron prepare a contract to that effect.

Regards,

James H. "Jim" **Harvey**





DEPOSITION
EXHIBIT
4
NEWTON

 Gmail

Bryan Baron <bryanrbaron@gmail.com>

## Re: [CAUTION]Re: Douglas Lovell Public Defender Appeal
1 message

**Sam Newton** <sam@snewtonlaw.com>
To: "Harvey, Jim H." <jharvey@co.weber.ut.us>
Cc: "Ebert,James" <jebert@co.weber.ut.us>, "Gibson,Kerry" <kgibson@co.weber.ut.us>, "Bryan R. Baron" <bryanrbaron@gmail.com>, Mike Bouwhuis <barrister63@comcast.net>

Tue, Mar 14, 2017 at 6:37 PM

Thanks for replying. I appreciate the commissioners considering additional funding and your offer of more funding. I have to disagree about the amounts for a few reasons:

1. Right now, the county's current balance with me is $8294. That is billed amounts, (which I stopped billing in January 2017 because we went over the caps) that went over the $75,000 contract. For unbilled amounts from January to the present, it is now at $3015.00. That included attending a hearing at the Utah State Bar where I was asked to testify and a meeting with Sean Young, filing a reply to the State's 23B response and correspondence with Mr. Lovell. So, already, I have exceeded the contract by $11,000, leaving only $4,000 for the rest of the work.

2. The Supreme Court's remand contemplates over two dozen witnesses. It names 22, but I think I will have to call three or four other witnesses for much closer to 25 or 26 witnesses. I don't think their testimony is insignificant. I have interviewed most of them personally and find that their testimony would have been compelling in Mr. Lovell's case. I wouldn't have raised the issue if I did not think it meritorious. Indeed, I think it's important to consider that the Supreme Court deemed the issues I raised worthy of remand and required the trial court to consider that evidence. Because these witnesses did not testify, I will need to put their testimony on, as if this were the penalty phase of the capital case so the judge can decide if their testimony would have been helpful and if Sean was ineffective in not calling or preparing them. My review of Mr. Lovell's penalty phase shows that they called on average 5-7 witnesses a day.  One day, they called only two. That is why I assume that the evidentiary hearing will take about 10-14 days. Court time alone, not including witness and prep would take 40-60 hours.

3. From there, in my experience, it is not a simple revision of Mr. Lovell's appeal. These may be the major issues in his appeal. The average penalty phase transcript was around 250 pages. Multiply that by 10-14 and you get 2500 - 3000 pages of new record. The process of drafting, citing to, and creating an appellate document from that much information will not go quickly, especially if I decide that these are the critical issues to brief. I honestly believe that this will take at least 100-200 hours. Then you have to factor in a reply brief. My brief, as it stands now, is 307 pages. Adding this new information may well be 100-150 extra pages of briefing. The reply brief would arguably be upwards, then of 200 pages, which will be no small task to write. While I can write quickly, I'm not that fast! And, a reply brief is not a simple revision. In many ways, I will have to incorporate a host of unanticipated testimony.

I have to be realistic here and I'm really not trying to waste everyone's money. I try to be very conservative with it. I recognize your stewardship over county funds and the importance of that. I have never, in all my years with Weber County, had to ask for more money than my contract. I recall in the Riqo Perea case actually coming in close to budget and offering to take a loss on that case. But I also have a family to feed and cannot afford to donate my services for what I know will take me a significant amount of work. I just cannot do what it takes with that amount of time.

What if we consider a few options: what if the county authorizes some funds now and we can revisit it as things go along? Say authorize past work and 100 hours of additional work. At 100 hours, I can give you a better estimate of where we are and what it will take. Perhaps I will have over-estimated and we won't need any or much more.

If this does not work, I will need to, as soon as possible, file a motion with the district court for funding or to allow me to withdraw as his attorney.

Thanks again.

sam



**Samuel P. Newton** / Attorney at Law
sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC**
Office: (406) 407-7323 / Fax: (406) 203-1144
40 2nd Street E, Suite 222

DEPOSITION
EXHIBIT
23
Baron



**Baron, Bryan**

| | |
|---|---|
| **From:** | Harvey, Jim H. |
| **Sent:** | Thursday, March 23, 2017 6:12 AM |
| **To:** | Sam Newton |
| **Subject:** | Re: [CAUTION]Re: Douglas Lovell Public Defender Appeal |

Dear Mr. Newton,

The original contract was for $75,0000 and additional funds are only authorized upon a showing of good cause. At this point, we feel that you have met that burden to some degree by demonstrating that the case has been remanded and will require additional work.

While it's uncertain how much time and effort will need to be put into the evidentiary hearings and revising the initial brief, 100 hours seems to be a reasonable estimate. If the remand takes longer than 100 hours, and you can justify the additional time, we will remain open to another request for additional funding.

Any work that has been completed to date and any work required for the reply brief or oral arguments we consider covered under the initial $75,000 amount.

Regards

Jim Harvey

**Baron,Bryan**

| | |
|---|---|
| **From:** | Sam Newton <sam@snewtonlaw.com> |
| **Sent:** | Tuesday, June 6, 2017 2:56 PM |
| **To:** | Baron,Bryan |
| **Cc:** | Harvey, Jim H. |
| **Subject:** | Re: [CAUTION]Re: Funding Request on Doug Lovell |

Bryan, thanks for the response. I try very very hard to be a good steward and I'm sorry there's a perception that I'm over-billing. If anything, I try to under bill. If I forget to turn on my timer, for example, I just don't bill the county for it. I frequently will omit items or round down. You may recall that in all the years I have represented defendants in Weber County, I have never had to ask for additional funding. This is the first time. I don't make these requests lightly and I'll only make them when I believe them to be necessary and I'm sorry if there is a perception that I'm doing something manipulative. In reality, I have a family to support and am only cognizant of the amount of time I know a case will take. Here, I face the possibility of working for free or losing money on this, which is a scary and stressful proposition for a sole practitioner.

Anyway, to address the concerns:

1) Doug filed a bar complaint on his own, but the complaint was about Sean Young's conduct in his case. This was critical to Mr. Lovell's appeal, because if the bar found/finds Sean disbarred for that conduct, then it's further evidence that Mr. Lovell was prejudiced during his trial. On top of that, the bar asked me to be a witness, asked me to give them documentation, and repeatedly consulted me on the case. So, not only did I have an obligation to respond, but I also felt like it was in Mr. Lovell's best interests for his appeal. Indeed, I indicated in filings with the court that Sean Young has been formally reprimanded and is facing possible disbarment.

2) I am willing to withdraw that. While I did believe the step was legally necessary, I recognize that I lost that issue and absent any other court order, I will withdraw that request.

3) Mr. Lovell is a client who likes communication about what is happening on his case. You may not recall, but almost a year or more of the case in litigation involved Mr. Lovell's complaints and attempts to fire Mike Bouwhuis because he felt he was not adequately communicating with him. But not only that, every legal standard regarding capital cases requires extremely frequent communication, especially since this impacts Mr. Lovell's Sixth Amendment right to the effective assistance of his counsel. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases, Guideline 10.5 ("Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case"). I have made arrangements with Mr. Lovell that he can call and that I will only have my secretary pick up the phone if there is something we need to discuss on his case. I find Mr. Lovell's assistance invaluable and I do not just choose to chat with him for no reason. There are a million other things I can be doing on his case rather than shoot the breeze with him, but he knows his case the best and when it is necessary, I will pick up the phone or go down to see him. I vigorously assert that these conversations are an absolute necessity and any attempt to limit those runs afoul of Mr. Lovell's right to a fair appeal and to the effective assistance of his counsel. The Rules of Professional Conduct require me to regularly communicate with my client. We are preparing for evidentiary hearings with 26-30 witnesses. That requires a significant amount of discussion. Since the commissioners believe that my communication is excessive, will you please delineate specifically what amount of time I am authorized to talk with him?

30



DEPOSITION
EXHIBIT
25
Baron

Weber County 1128

Let me know your response and if this resolves issues with the invoices I sent. I appreciate the county's willingness to increase the funding on this matter.

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com
**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com



On Jun 5, 2017, at 3:56 PM, Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

I attended a meeting with elected officials here in the county, and we briefly discussed your request for additional funding for the Rule 23B motion. The county officials understand your argument as to why the 23B motion was necessary, and they are inclined to grant you additional funding for it, but they aren't happy about the cost of $22,500 for the motion and $15,000 for the evidentiary hearings.

As we got into the specifics of your invoices, the group expressed concern that you are taking advantage of the county by overbilling for your services. A few examples of their concerns include: (1) billing the county for work related to Sean Young's discipline with the Utah Bar (they are unsure why the county should pay anything for that as it is unrelated to your representation of Mr. Lovell in the appeal), (2) billing the county for your motion for additional fees and all of the work that was associated with that (the county didn't agree with your request for additional fees and neither did the judge, so why should the county pay for the time you spent on it?), and (3) billing for the frequent phone calls, letters, and meeting with Doug Lovell (they are unsure why you need to communicate with him so frequently on an appellate case).

The consensus from the meeting was that unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals. Again, they don't have a problem with the quality of your work. Their concern is with the amounts that you are billing and the items that you are billing them for.

I've been asked to give you an opportunity to revise your request for additional funding for the 23B motion as well as your most recent invoice in light of the county's concerns. Please examine those invoices and resubmit them once you have had an opportunity to revise them.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT 84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

---

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 3:47 PM
**To:** Baron,Bryan

31

**Cc:** Harvey, Jim H.
**Subject:** [CAUTION]Re: Funding Request on Doug Lovell

Whoops. I just realized I sent you the wrong Excel Spreadsheet.

##########################################################

Be the Human Firewall!

To prevent malicious software and viruses, NEVER open files
or click on links from unexpected or unknown sources.

Think Before You Click!

##########################################################

On May 25, 2017, at 3:44 PM, Sam Newton <sam@snewtonlaw.com> wrote:

Hey Bryan, the reason was that yesterday, I searched my billing for 23B. It turned up *just* the writing process for the 23B. I realized today that it did not include any of the time talking with witnesses, gathering affidavits, etc. which were all part of the 23B preparations. Today, when I went through the process of writing that email, I took *all* of my billing on the case and removed anything that was not related to the 23B. The remaining 2/3 of the time was spent getting ready for and writing the brief on appeal, which is largely done at this point (minus whatever comes up in remand). I hope this makes sense.



**Samuel P. Newton** / Attorney at Lawsam@snewtonlaw.com
**Law Office of Samuel P. Newton, PC**Office: (406) 407-7323 /
Fax: (406) 203-114440 2nd Street E, Suite 222Kalispell, MT
59901www.snewtonlaw.com



On May 25, 2017, at 3:30 PM, Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

In your email to Commissioner Harvey, you state that the work that went into the 23B motion totals $22,500; however, the email and the invoice that you sent me on Monday both indicate that it was a total of $8,730 (see attached).  Would you please help me understand the discrepancy?

Also, the Excel spreadsheet that was attached to the email to Commissioner Harvey appears to cover all billable time from January to the present and not the 23B motion.

**Bryan R. Baron**
Deputy County Attorney

Weber County 1130

WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 12:44 PM
**To:** Harvey, Jim H.
**Cc:** Baron,Bryan
**Subject:** [CAUTION]Fwd: Funding Request on Doug Lovell

Jim, this email bounced as too large. I'm sending all but the large attachment, but I'm putting a link to that file below.

https://www.dropbox.com/s/8hhqgld7pgwtxcz/Lovell%2C%20Do
uglas%2023B%20Addenda.pdf?dl=0

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com



Begin forwarded message:

**From:** Sam Newton <sam@snewtonlaw.com>
**Subject: Funding Request on Doug Lovell**
**Date:** May 25, 2017 at 12:40:34 PM MDT
**To:** "Jim H. Harvey" <jharvey@co.weber.ut.us>
**Cc:** "Bryan R. Baron" <bryanrbaron@gmail.com>

Jim, I'm writing you after a conversation I had with Bryan Baron and Chris Allred yesterday regarding funding on the Doug Lovell matter. As you recall, the commissioners approved an additional $15,000 for work to be done on Mr. Lovell's remand, which was granted by the Utah Supreme Court.

My contract covered work to be done "before the Utah Supreme Court in the first appeal of right." When I entered into the contract, I did not anticipate that we would have remand proceedings. These are rarely done in appeals to begin with and especially are not done in capital cases. Ineffective assistance claims in a capital case are usually best brought in a post-conviction proceeding where an attorney can review the entire file, depose attorneys and make claims about the adequacy of their representation. Because remand proceedings in a direct appeal are extremely limited, capital

33

defense lawyers are advised not to do them on appeal. That is standard practice.

However, it became abundantly clear soon into the representation that this was the unusual case where pursuing a remand would be appropriate. The Rules of Appellate Procedure allow a lawyer to move for remand, but he must supplement the record with affidavits. I had to gather, interview, collect and obtain affidavits from numerous witnesses (it was over 25). I also had to draft a Rule 23B remand motion. That motion was two to three times as large as a normal appeal: 90 pages and 247 pages of addenda. I am attaching both documents for your review. Clearly that motion was important because not only did the State stipulate to a remand upon receiving it, but the Utah Supreme Court granted it.

That process was quite time consuming and would not normally be part of an appeal. If I total up the time spent on drafting the 23B as well as preparing affidavits and talking with witnesses, it totals $22,500. I have attached a spreadsheet where I have documented the hours spent on that project.

In other words, of the $75,000 I was authorized to prepare a direct appeal, I spent about 1/3 of that money on matters that are not normally part of the direct appeal at all.

I am hoping that the commissioners will approve a supplemental payment for that additional work. That will free up some money for work on the upcoming evidentiary hearings and revisions of the appeal. Bryan Baron and Chris Allred indicated to me that I should make this request directly to you and then cc at least Bryan on it. There are at least a few reasons why we may need more money. The State has filed a motion to receive all of Doug Lovell's private file. The Utah Supreme Court has held that if that happens, I have a duty to object to the disclosure and then I need to make an index of the entire file. The State has to then demonstrate why it needs a particular document and the court has to independently review each document it believes the State needs. Mr. Lovell's file is decades old and is enormous to say the least. It will likely take hundreds of hours to index. I may have to hire someone to do this and we'll see what the judge orders, because I know it would be quite a bit more expensive to have me do it. But I think we can play by ear and if we run out of funding, I can always reapproach you and explain the situation.

If the county is not inclined to approve payment for that full amount, I would ask that the county consider at least reimbursing me for time spent up to this point for which I have not been reimbursed. If I look at my records, I show that the county owes me $8,294 for work already performed on this case. (Please recognize that this statement includes payments for printing/binding briefs that are unrelated to Mr. Lovell.) I spoke

34

with Bryan and Chris about this yesterday and they encouraged me to point out that this was extra work related to the remand that was not contemplated when we were contracted for the appeal.

I want to say that I am quite conscious of the county's money— how it comes from the taxpayers. I do not want to be wasteful of that resource. I appreciate your willingness to increase funds in the past and hope that you will consider doing so here. I am a solo practitioner and I support ten children, including foster children. Even this bit of lost income can cause a hardship on me and my family. Wishing you the best,

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com



```
####################################################
#######

Be the Human Firewall!

To prevent malicious software and viruses, NEVER open
files
or click on links from unexpected or unknown sources.

Think Before You Click!

####################################################
#######
```

<2017_05_22, 23B time entries.pdf>

35

## Baron, Bryan

| | |
|---|---|
| **From:** | Baron,Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Tuesday, June 6, 2017 3:33 PM |
| **To:** | Allred, Christopher F. |
| **Cc:** | Wilson, Dave C. |
| **Subject:** | FW: [CAUTION]Re: Funding Request on Doug Lovell |

Looks like he isn't going to back down off the request for $22,500 for the motion, but he is willing to take out the time spent on his motion to the court for additional attorney fees.

I'm surprised that he isn't going to reduce the request at all. I expected some reduction. You can see my email to him below as well.

Let me know when you have a minute to talk. I'd like to know your opinion on how to handle it from here: pay the full $22,500 or pay a lesser amount.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT 84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Tuesday, June 06, 2017 2:56 PM
**To:** Baron,Bryan
**Cc:** Harvey, Jim H.
**Subject:** Re: [CAUTION]Re: Funding Request on Doug Lovell

Bryan, thanks for the response. I try very very hard to be a good steward and I'm sorry there's a perception that I'm over-billing. If anything, I try to under bill. If I forget to turn on my timer, for example, I just don't bill the county for it. I frequently will omit items or round down. You may recall that in all the years I have represented defendants in Weber County, I have never had to ask for additional funding. This is the first time. I don't make these requests lightly and I'll only make them when I believe them to be necessary and I'm sorry if there is a perception that I'm doing something manipulative. In reality, I have a family to support and am only cognizant of the amount of time I know a case will take. Here, I face the possibility of working for free or losing money on this, which is a scary and stressful proposition for a sole practitioner.

Anyway, to address the concerns:

1) Doug filed a bar complaint on his own, but the complaint was about Sean Young's conduct in his case. This was critical to Mr. Lovell's appeal, because if the bar found/finds Sean disbarred for that conduct, then it's further evidence that Mr. Lovell was prejudiced during his trial. On top of that, the bar asked me to be a witness, asked me to give them documentation, and repeatedly consulted me on the case. So, not only did I have an obligation to respond, but I also felt like it was in Mr. Lovell's best interests for his appeal. Indeed, I indicated in filings with the court that Sean Young has been formally reprimanded and is facing possible disbarment.



36    DEPOSITION
      EXHIBIT
      26
      Baron

Weber County 1134

2) I am willing to withdraw that. While I did believe the step was legally necessary, I recognize that I lost that issue and absent any other court order, I will withdraw that request.

3) Mr. Lovell is a client who likes communication about what is happening on his case. You may not recall, but almost a year or more of the case in litigation involved Mr. Lovell's complaints and attempts to fire Mike Bouwhuis because he felt he was not adequately communicating with him. But not only that, every legal standard regarding capital cases requires extremely frequent communication, especially since this impacts Mr. Lovell's Sixth Amendment right to the effective assistance of his counsel. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases, Guideline 10.5 ("Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case"). I have made arrangements with Mr. Lovell that he can call and that I will only have my secretary pick up the phone if there is something we need to discuss on his case. I find Mr. Lovell's assistance invaluable and I do not just choose to chat with him for no reason. There are a million other things I can be doing on his case rather than shoot the breeze with him, but he knows his case the best and when it is necessary, I will pick up the phone or go down to see him. I vigorously assert that these conversations are an absolute necessity and any attempt to limit those runs afoul of Mr. Lovell's right to a fair appeal and to the effective assistance of his counsel. The Rules of Professional Conduct require me to regularly communicate with my client. We are preparing for evidentiary hearings with 26-30 witnesses. That requires a significant amount of discussion. Since the commissioners believe that my communication is excessive, will you please delineate specifically what amount of time I am authorized to talk with him?

Let me know your response and if this resolves issues with the invoices I sent. I appreciate the county's willingness to increase the funding on this matter.

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com
**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 /
Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT
59901 www.snewtonlaw.com



On Jun 5, 2017, at 3:56 PM, Baron, Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

I attended a meeting with elected officials here in the county, and we briefly discussed your request for additional funding for the Rule 23B motion.  The county officials understand your argument as to why the 23B motion was necessary, and they are inclined to grant you additional funding for it, but they aren't happy about the cost of $22,500 for the motion and $15,000 for the evidentiary hearings.

As we got into the specifics of your invoices, the group expressed concern that you are taking advantage of the county by overbilling for your services.  A few examples of their concerns include: (1) billing the county for work related to Sean Young's discipline with the Utah Bar (they are unsure why the county should pay anything for that as it is unrelated to your representation of Mr. Lovell in the appeal), (2) billing the county for your motion for additional fees and all of the work that was associated with that (the county didn't agree with your request for additional fees and neither did the judge, so why should the county pay for the time you spent on it?), and (3) billing for the frequent phone calls, letters, and meeting with Doug Lovell (they are unsure why you need to communicate with him so frequently on an appellate case).

Weber County 1135

The consensus from the meeting was that unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals.  Again, they don't have a problem with the quality of your work.  Their concern is with the amounts that you are billing and the items that you are billing them for.

I've been asked to give you an opportunity to revise your request for additional funding for the 23B motion as well as your most recent invoice in light of the county's concerns.  Please examine those invoices and resubmit them once you have had an opportunity to revise them.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 3:47 PM
**To:** Baron,Bryan
**Cc:** Harvey, Jim H.
**Subject:** [CAUTION]Re: Funding Request on Doug Lovell

Whoops. I just realized I sent you the wrong Excel Spreadsheet.

```
#########################################################

Be the Human Firewall!

To prevent malicious software and viruses, NEVER open files
or click on links from unexpected or unknown sources.

Think Before You Click!

#########################################################
```

On May 25, 2017, at 3:44 PM, Sam Newton <sam@snewtonlaw.com> wrote:

Hey Bryan, the reason was that yesterday, I searched my billing for 23B. It turned up *just* the writing process for the 23B. I realized today that it did not include any of the time talking with witnesses, gathering affidavits, etc. which were all part of the 23B preparations. Today, when I went through the process of writing that email, I took *all* of my billing on the case and removed anything that was not related to the 23B. The remaining 2/3 of the time was spent getting ready for and writing the brief on appeal, which is largely done at this point (minus whatever comes up in remand). I hope this makes sense.



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com

38



On May 25, 2017, at 3:30 PM, Baron,Bryan
<bbaron@co.weber.ut.us> wrote:

Sam,

In your email to Commissioner Harvey, you state that the work that
went into the 23B motion totals $22,500; however, the email and the
invoice that you sent me on Monday both indicate that it was a total of
$8,730 (see attached).  Would you please help me understand the
discrepancy?

Also, the Excel spreadsheet that was attached to the email to
Commissioner Harvey appears to cover all billable time from January to
the present and not the 23B motion.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

---

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 12:44 PM
**To:** Harvey, Jim H.
**Cc:** Baron,Bryan
**Subject:** [CAUTION]Fwd: Funding Request on Doug Lovell

Jim, this email bounced as too large. I'm sending all but the large
attachment, but I'm putting a link to that file below.

https://www.dropbox.com/s/8hhqgld7pgwtxcz/Lovell%2C%20Do
uglas%2023B%20Addenda.pdf?dl=0

sam



**Samuel P. Newton** / Attorney at Lawsam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC**Office: (406) 407-7323 /
Fax: (406) 203-114440 2nd Street E, Suite 222Kalispell, MT
59901www.snewtonlaw.com



Begin forwarded message:

**From:** Sam Newton <sam@snewtonlaw.com>

39

**Subject: Funding Request on Doug Lovell**
**Date:** May 25, 2017 at 12:40:34 PM MDT
**To:** "Jim H. Harvey" <jharvey@co.weber.ut.us>
**Cc:** "Bryan R. Baron" <bryanrbaron@gmail.com>

Jim, I'm writing you after a conversation I had with Bryan Baron and Chris Allred yesterday regarding funding on the Doug Lovell matter. As you recall, the commissioners approved an additional $15,000 for work to be done on Mr. Lovell's remand, which was granted by the Utah Supreme Court.

My contract covered work to be done "before the Utah Supreme Court in the first appeal of right." When I entered into the contract, I did not anticipate that we would have remand proceedings. These are rarely done in appeals to begin with and especially are not done in capital cases. Ineffective assistance claims in a capital case are usually best brought in a post-conviction proceeding where an attorney can review the entire file, depose attorneys and make claims about the adequacy of their representation. Because remand proceedings in a direct appeal are extremely limited, capital defense lawyers are advised not to do them on appeal. That is standard practice.

However, it became abundantly clear soon into the representation that this was the unusual case where pursuing a remand would be appropriate. The Rules of Appellate Procedure allow a lawyer to move for remand, but he must supplement the record with affidavits. I had to gather, interview, collect and obtain affidavits from numerous witnesses (it was over 25). I also had to draft a Rule 23B remand motion. That motion was two to three times as large as a normal appeal: 90 pages and 247 pages of addenda. I am attaching both documents for your review. Clearly that motion was important because not only did the State stipulate to a remand upon receiving it, but the Utah Supreme Court granted it.

That process was quite time consuming and would not normally be part of an appeal. If I total up the time spent on drafting the 23B as well as preparing affidavits and talking with witnesses, it totals $22,500. I have attached a spreadsheet where I have documented the hours spent on that project.

In other words, of the $75,000 I was authorized to prepare a direct appeal, I spent about 1/3 of that money on matters that are not normally part of the direct appeal at all.

I am hoping that the commissioners will approve a supplemental payment for that additional work. That will free up some money for work on the upcoming evidentiary hearings and revisions of the appeal. Bryan Baron and Chris Allred indicated to me that I should make this request directly to you and then cc at least Bryan on it. There are at least a few reasons why we may need more money.

40

The State has filed a motion to receive all of Doug Lovell's private file. The Utah Supreme Court has held that if that happens, I have a duty to object to the disclosure and then I need to make an index of the entire file. The State has to then demonstrate why it needs a particular document and the court has to independently review each document it believes the State needs. Mr. Lovell's file is decades old and is enormous to say the least. It will likely take hundreds of hours to index. I may have to hire someone to do this and we'll see what the judge orders, because I know it would be quite a bit more expensive to have me do it. But I think we can play by ear and if we run out of funding, I can always reapproach you and explain the situation.

If the county is not inclined to approve payment for that full amount, I would ask that the county consider at least reimbursing me for time spent up to this point for which I have not been reimbursed. If I look at my records, I show that the county owes me $8,294 for work already performed on this case. (Please recognize that this statement includes payments for printing/binding briefs that are unrelated to Mr. Lovell.) I spoke with Bryan and Chris about this yesterday and they encouraged me to point out that this was extra work related to the remand that was not contemplated when we were contracted for the appeal.

I want to say that I am quite conscious of the county's money—how it comes from the taxpayers. I do not want to be wasteful of that resource. I appreciate your willingness to increase funds in the past and hope that you will consider doing so here. I am a solo practitioner and I support ten children, including foster children. Even bit of lost income can cause a hardship on me and my family. Wishing you the best,

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com



###################################################
#######

Be the Human Firewall!

To prevent malicious software and viruses, NEVER open files
or click on links from unexpected or unknown sources.

Think Before You Click!

Weber County 1139

##########################################################
#######

<2017_05_22, 23B time entries.pdf>

Weber County 1140

## Baron,Bryan

| | |
|---|---|
| **From:** | Baron,Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Thursday, June 8, 2017 12:26 PM |
| **To:** | Wilson, Dave C. |
| **Subject:** | RE: Funding Request on Doug Lovell |

Dave,

Would you be willing to give me your feedback on this response to Sam?  Is there anything you would add or change.  I personally wanted to say a lot more, but I felt that it wasn't very professional .  ☺

---------------------

Sam,

The county doesn't agree that the time you spent on Sean Young's bar complaint or disciplinary proceedings is sufficiently relevant to compensate you for that time.  I understand your argument that Sean's disbarment could be used as evidence, but the county doesn't agree that you, as appellate counsel, have an obligation to create new evidence for your client by pursuing disciplinary proceedings against Sean.

Thank you for agreeing to remove the time you spent requesting additional fees from the court.  I would add that any time spent negotiating requests for additional fees should not be billed to the county.

While we disagree about the amount of time you claim to need to speak with Mr. Lovell to adequately represent his interests and keep him informed on an appellate case, we won't require you to reduce that amount.

Lastly, I want to reiterate that unless significant changes are made to the invoices and future billing practices, the county plans to look for another attorney for future appeals.  $22,500 is an incredibly steep price to pay for any motion.  Add to that the $75,000 that has already been exhausted and the $15,000 that has been pre-approved for the evidentiary hearings and your constant assertions that it's going to cost more than that, and the county doesn't feel like you are being the "good steward" that you claim to be.

Please revise your request for additional funds and resubmit it.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

---

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Tuesday, June 06, 2017 2:56 PM
**To:** Baron,Bryan
**Cc:** Harvey, Jim H.
**Subject:** Re: [CAUTION]Re: Funding Request on Doug Lovell



DEPOSITION
EXHIBIT
27
Baron

PENGAD 800-631-6989

Weber County 1148

Bryan, thanks for the response. I try very very hard to be a good steward and I'm sorry there's a perception that I'm over-billing. If anything, I try to under bill. If I forget to turn on my timer, for example, I just don't bill the county for it. I frequently will omit items or round down. You may recall that in all the years I have represented defendants in Weber County, I have never had to ask for additional funding. This is the first time. I don't make these requests lightly and I'll only make them when I believe them to be necessary and I'm sorry if there is a perception that I'm doing something manipulative. In reality, I have a family to support and am only cognizant of the amount of time I know a case will take. Here, I face the possibility of working for free or losing money on this, which is a scary and stressful proposition for a sole practitioner.

Anyway, to address the concerns:

1) Doug filed a bar complaint on his own, but the complaint was about Sean Young's conduct in his case. This was critical to Mr. Lovell's appeal, because if the bar found/finds Sean disbarred for that conduct, then it's further evidence that Mr. Lovell was prejudiced during his trial. On top of that, the bar asked me to be a witness, asked me to give them documentation, and repeatedly consulted me on the case. So, not only did I have an obligation to respond, but I also felt like it was in Mr. Lovell's best interests for his appeal. Indeed, I indicated in filings with the court that Sean Young has been formally reprimanded and is facing possible disbarment.

2) I am willing to withdraw that. While I did believe the step was legally necessary, I recognize that I lost that issue and absent any other court order, I will withdraw that request.

3) Mr. Lovell is a client who likes communication about what is happening on his case. You may not recall, but almost a year or more of the case in litigation involved Mr. Lovell's complaints and attempts to fire Mike Bouwhuis because he felt he was not adequately communicating with him. But not only that, every legal standard regarding capital cases requires extremely frequent communication, especially since this impacts Mr. Lovell's Sixth Amendment right to the effective assistance of his counsel. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases, Guideline 10.5 ("Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case"). I have made arrangements with Mr. Lovell that he can call and that I will only have my secretary pick up the phone if there is something we need to discuss on his case. I find Mr. Lovell's assistance invaluable and I do not just choose to chat with him for no reason. There are a million other things I can be doing on his case rather than shoot the breeze with him, but he knows his case the best and when it is necessary, I will pick up the phone or go down to see him. I vigorously assert that these conversations are an absolute necessity and any attempt to limit those runs afoul of Mr. Lovell's right to a fair appeal and to the effective assistance of his counsel. The Rules of Professional Conduct require me to regularly communicate with my client. We are preparing for evidentiary hearings with 26-30 witnesses. That requires a significant amount of discussion. Since the commissioners believe that my communication is excessive, will you please delineate specifically what amount of time I am authorized to talk with him?

Let me know your response and if this resolves issues with the invoices I sent. I appreciate the county's willingness to increase the funding on this matter.

sam



**Samuel P. Newton** / Attorney at Lawsam@snewtonlaw.com
**Law Office of Samuel P. Newton, PC**Office: (406) 407-7323 /
Fax: (406) 203-114440 2nd Street E, Suite 222Kalispell, MT
59901www.snewtonlaw.com



On Jun 5, 2017, at 3:56 PM, Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

I attended a meeting with elected officials here in the county, and we briefly discussed your request for additional funding for the Rule 23B motion. The county officials understand your argument as to why the 23B motion was necessary, and they are inclined to grant you additional funding for it, but they aren't happy about the cost of $22,500 for the motion and $15,000 for the evidentiary hearings.

As we got into the specifics of your invoices, the group expressed concern that you are taking advantage of the county by overbilling for your services. A few examples of their concerns include: (1) billing the county for work related to Sean Young's discipline with the Utah Bar (they are unsure why the county should pay anything for that as it is unrelated to your representation of Mr. Lovell in the appeal), (2) billing the county for your motion for additional fees and all of the work that was associated with that (the county didn't agree with your request for additional fees and neither did the judge, so why should the county pay for the time you spent on it?), and (3) billing for the frequent phone calls, letters, and meeting with Doug Lovell (they are unsure why you need to communicate with him so frequently on an appellate case).

The consensus from the meeting was that unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals. Again, they don't have a problem with the quality of your work. Their concern is with the amounts that you are billing and the items that you are billing them for.

I've been asked to give you an opportunity to revise your request for additional funding for the 23B motion as well as your most recent invoice in light of the county's concerns. Please examine those invoices and resubmit them once you have had an opportunity to revise them.

**Bryan R. Baron**
**Deputy County Attorney**
**WEBER COUNTY ATTORNEY'S OFFICE**
**2380 Washington Blvd., Suite 230, Ogden, UT  84401**
**Office: 801.399.8471**
**Fax: 801.399.8304**
**Email:** bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 3:47 PM
**To:** Baron,Bryan
**Cc:** Harvey, Jim H.
**Subject:** [CAUTION]Re: Funding Request on Doug Lovell

Whoops. I just realized I sent you the wrong Excel Spreadsheet.

###########################################################

Be the Human Firewall!

To prevent malicious software and viruses, NEVER open files
or click on links from unexpected or unknown sources.

Weber County 1150

Think Before You Click!

#########################################################

On May 25, 2017, at 3:44 PM, Sam Newton <sam@snewtonlaw.com> wrote:

Hey Bryan, the reason was that yesterday, I searched my billing for 23B. It turned up *just* the writing process for the 23B. I realized today that it did not include any of the time talking with witnesses, gathering affidavits, etc. which were all part of the 23B preparations. Today, when I went through the process of writing that email, I took *all* of my billing on the case and removed anything that was not related to the 23B. The remaining 2/3 of the time was spent getting ready for and writing the brief on appeal, which is largely done at this point (minus whatever comes up in remand). I hope this makes sense.



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com
**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 /
Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT
59901 www.snewtonlaw.com



On May 25, 2017, at 3:30 PM, Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

In your email to Commissioner Harvey, you state that the work that went into the 23B motion totals $22,500; however, the email and the invoice that you sent me on Monday both indicate that it was a total of $8,730 (see attached). Would you please help me understand the discrepancy?

Also, the Excel spreadsheet that was attached to the email to Commissioner Harvey appears to cover all billable time from January to the present and not the 23B motion.

**Bryan R. Baron**
**Deputy County Attorney**
**WEBER COUNTY ATTORNEY'S OFFICE**
2380 Washington Blvd., Suite 230, Ogden, UT 84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 12:44 PM
**To:** Harvey, Jim H.
**Cc:** Baron,Bryan
**Subject:** [CAUTION]Fwd: Funding Request on Doug Lovell

Weber County 1151

Jim, this email bounced as too large. I'm sending all but the large attachment, but I'm putting a link to that file below.

https://www.dropbox.com/s/8hhqgld7pgwtxcz/Lovell%2C%20Douglas%2023B%20Addenda.pdf?dl=0

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com



Begin forwarded message:

**From:** Sam Newton <sam@snewtonlaw.com>
**Subject: Funding Request on Doug Lovell**
**Date:** May 25, 2017 at 12:40:34 PM MDT
**To:** "Jim H. Harvey" <jharvey@co.weber.ut.us>
**Cc:** "Bryan R. Baron" <bryanrbaron@gmail.com>

Jim, I'm writing you after a conversation I had with Bryan Baron and Chris Allred yesterday regarding funding on the Doug Lovell matter. As you recall, the commissioners approved an additional $15,000 for work to be done on Mr. Lovell's remand, which was granted by the Utah Supreme Court.

My contract covered work to be done "before the Utah Supreme Court in the first appeal of right." When I entered into the contract, I did not anticipate that we would have remand proceedings. These are rarely done in appeals to begin with and especially are not done in capital cases. Ineffective assistance claims in a capital case are usually best brought in a post-conviction proceeding where an attorney can review the entire file, depose attorneys and make claims about the adequacy of their representation. Because remand proceedings in a direct appeal are extremely limited, capital defense lawyers are advised not to do them on appeal. That is standard practice.

However, it became abundantly clear soon into the representation that this was the unusual case where pursuing a remand would be appropriate. The Rules of Appellate Procedure allow a lawyer to move for remand, but he must supplement the record with affidavits. I had to gather, interview, collect and obtain affidavits from numerous witnesses (it was over 25). I also had to draft a Rule 23B remand motion. That motion was two to three times as large as a normal appeal: 90 pages and 247 pages of addenda. I am

54

attaching both documents for your review. Clearly that motion was important because not only did the State stipulate to a remand upon receiving it, but the Utah Supreme Court granted it.

That process was quite time consuming and would not normally be part of an appeal. If I total up the time spent on drafting the 23B as well as preparing affidavits and talking with witnesses, it totals $22,500. I have attached a spreadsheet where I have documented the hours spent on that project.

In other words, of the $75,000 I was authorized to prepare a direct appeal, I spent about 1/3 of that money on matters that are not normally part of the direct appeal at all.

I am hoping that the commissioners will approve a supplemental payment for that additional work. That will free up some money for work on the upcoming evidentiary hearings and revisions of the appeal. Bryan Baron and Chris Allred indicated to me that I should make this request directly to you and then cc at least Bryan on it. There are at least a few reasons why we may need more money. The State has filed a motion to receive all of Doug Lovell's private file. The Utah Supreme Court has held that if that happens, I have a duty to object to the disclosure and then I need to make an index of the entire file. The State has to then demonstrate why it needs a particular document and the court has to independently review each document it believes the State needs. Mr. Lovell's file is decades old and is enormous to say the least. It will likely take hundreds of hours to index. I may have to hire someone to do this and we'll see what the judge orders, because I know it would be quite a bit more expensive to have me do it. But I think we can play by ear and if we run out of funding, I can always reapproach you and explain the situation.

If the county is not inclined to approve payment for that full amount, I would ask that the county consider at least reimbursing me for time spent up to this point for which I have not been reimbursed. If I look at my records, I show that the county owes me $8,294 for work already performed on this case. (Please recognize that this statement includes payments for printing/binding briefs that are unrelated to Mr. Lovell.) I spoke with Bryan and Chris about this yesterday and they encouraged me to point out that this was extra work related to the remand that was not contemplated when we were contracted for the appeal.

I want to say that I am quite conscious of the county's money— how it comes from the taxpayers. I do not want to be wasteful of that resource. I appreciate your willingness to increase funds in the past and hope that you will consider doing so here. I am a solo practitioner and I support ten children, including foster children. Even this bit of lost income can cause a hardship on me and my family. Wishing you the best,

Weber County 1153

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com



```
####################################################
#######

Be the Human Firewall!

To prevent malicious software and viruses, NEVER open
files
or click on links from unexpected or unknown sources.

Think Before You Click!

####################################################
#######
```

<2017_05_22, 23B time entries.pdf>

Weber County 1154

## Baron,Bryan

| | |
|---|---|
| **From:** | Wilson, Dave C. <dwilson@co.weber.ut.us> |
| **Sent:** | Friday, June 9, 2017 12:59 PM |
| **To:** | Baron,Bryan |
| **Subject:** | RE: Funding Request on Doug Lovell |

Bryan,  can this wait until Monday as I would like to visit with you about this.  Thx.

Dave

**From:** Baron,Bryan
**Sent:** Thursday, June 08, 2017 12:26 PM
**To:** Wilson, Dave C. <dwilson@co.weber.ut.us>
**Subject:** RE: Funding Request on Doug Lovell

Dave,

Would you be willing to give me your feedback on this response to Sam?  Is there anything you would add or change.  I personally wanted to say a lot more, but I felt that it wasn't very professional .  ☺

--------------------

Sam,

The county doesn't agree that the time you spent on Sean Young's bar complaint or disciplinary proceedings is sufficiently relevant to compensate you for that time.  I understand your argument that Sean's disbarment could be used as evidence, but the county doesn't agree that you, as appellate counsel, have an obligation to create new evidence for your client by pursuing disciplinary proceedings against Sean.

Thank you for agreeing to remove the time you spent requesting additional fees from the court.  I would add that any time spent negotiating requests for additional fees should not be billed to the county.

While we disagree about the amount of time you claim to need to speak with Mr. Lovell to adequately represent his interests and keep him informed on an appellate case, we won't require you to reduce that amount.

Lastly, I want to reiterate that unless significant changes are made to the invoices and future billing practices, the county plans to look for another attorney for future appeals.  $22,500 is an incredibly steep price to pay for any motion.  Add to that the $75,000 that has already been exhausted and the $15,000 that has been pre-approved for the evidentiary hearings and your constant assertions that it's going to cost more than that, and the county doesn't feel like you are being the "good steward" that you claim to be.

Please revise your request for additional funds and resubmit it.

**Bryan R. Baron**
**Deputy County Attorney**
**WEBER COUNTY ATTORNEY'S OFFICE**
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304



DEPOSITION
EXHIBIT
28
Baron

66

Weber County 1164

Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Tuesday, June 06, 2017 2:56 PM
**To:** Baron,Bryan
**Cc:** Harvey, Jim H.
**Subject:** Re: [CAUTION]Re: Funding Request on Doug Lovell

Bryan, thanks for the response. I try very very hard to be a good steward and I'm sorry there's a perception that I'm over-billing. If anything, I try to under bill. If I forget to turn on my timer, for example, I just don't bill the county for it. I frequently will omit items or round down. You may recall that in all the years I have represented defendants in Weber County, I have never had to ask for additional funding. This is the first time. I don't make these requests lightly and I'll only make them when I believe them to be necessary and I'm sorry if there is a perception that I'm doing something manipulative. In reality, I have a family to support and am only cognizant of the amount of time I know a case will take. Here, I face the possibility of working for free or losing money on this, which is a scary and stressful proposition for a sole practitioner.

Anyway, to address the concerns:

1) Doug filed a bar complaint on his own, but the complaint was about Sean Young's conduct in his case. This was critical to Mr. Lovell's appeal, because if the bar found/finds Sean disbarred for that conduct, then it's further evidence that Mr. Lovell was prejudiced during his trial. On top of that, the bar asked me to be a witness, asked me to give them documentation, and repeatedly consulted me on the case. So, not only did I have an obligation to respond, but I also felt like it was in Mr. Lovell's best interests for his appeal. Indeed, I indicated in filings with the court that Sean Young has been formally reprimanded and is facing possible disbarment.

2) I am willing to withdraw that. While I did believe the step was legally necessary, I recognize that I lost that issue and absent any other court order, I will withdraw that request.

3) Mr. Lovell is a client who likes communication about what is happening on his case. You may not recall, but almost a year or more of the case in litigation involved Mr. Lovell's complaints and attempts to fire Mike Bouwhuis because he felt he was not adequately communicating with him. But not only that, every legal standard regarding capital cases requires extremely frequent communication, especially since this impacts Mr. Lovell's Sixth Amendment right to the effective assistance of his counsel. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases, Guideline 10.5 ("Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case"). I have made arrangements with Mr. Lovell that he can call and that I will only have my secretary pick up the phone if there is something we need to discuss on his case. I find Mr. Lovell's assistance invaluable and I do not just choose to chat with him for no reason. There are a million other things I can be doing on his case rather than shoot the breeze with him, but he knows his case the best and when it is necessary, I will pick up the phone or go down to see him. I vigorously assert that these conversations are an absolute necessity and any attempt to limit those runs afoul of Mr. Lovell's right to a fair appeal and to the effective assistance of his counsel. The Rules of Professional Conduct require me to regularly communicate with my client. We are preparing for evidentiary hearings with 26-30 witnesses. That requires a significant amount of discussion. Since the commissioners believe that my communication is excessive, will you please delineate specifically what amount of time I am authorized to talk with him?

Let me know your response and if this resolves issues with the invoices I sent. I appreciate the county's willingness to increase the funding on this matter.

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com
**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 /
Fax: (406) 203-114440 2nd Street E, Suite 222 Kalispell, MT
59901 www.snewtonlaw.com



On Jun 5, 2017, at 3:56 PM, Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

I attended a meeting with elected officials here in the county, and we briefly discussed your request for additional funding for the Rule 23B motion.  The county officials understand your argument as to why the 23B motion was necessary, and they are inclined to grant you additional funding for it, but they aren't happy about the cost of $22,500 for the motion and $15,000 for the evidentiary hearings.

As we got into the specifics of your invoices, the group expressed concern that you are taking advantage of the county by overbilling for your services.  A few examples of their concerns include: (1) billing the county for work related to Sean Young's discipline with the Utah Bar (they are unsure why the county should pay anything for that as it is unrelated to your representation of Mr. Lovell in the appeal), (2) billing the county for your motion for additional fees and all of the work that was associated with that (the county didn't agree with your request for additional fees and neither did the judge, so why should the county pay for the time you spent on it?), and (3) billing for the frequent phone calls, letters, and meeting with Doug Lovell (they are unsure why you need to communicate with him so frequently on an appellate case).

The consensus from the meeting was that unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals.  Again, they don't have a problem with the quality of your work.  Their concern is with the amounts that you are billing and the items that you are billing them for.

I've been asked to give you an opportunity to revise your request for additional funding for the 23B motion as well as your most recent invoice in light of the county's concerns.  Please examine those invoices and resubmit them once you have had an opportunity to revise them.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 3:47 PM
**To:** Baron,Bryan
**Cc:** Harvey, Jim H.
**Subject:** [CAUTION]Re: Funding Request on Doug Lovell

Whoops. I just realized I sent you the wrong Excel Spreadsheet.

Weber County 1166

```
###########################################################
```
Be the Human Firewall!

To prevent malicious software and viruses, NEVER open files
or click on links from unexpected or unknown sources.

Think Before You Click!
```
###########################################################
```

On May 25, 2017, at 3:44 PM, Sam Newton <sam@snewtonlaw.com> wrote:

Hey Bryan, the reason was that yesterday, I searched my billing for 23B. It turned up *just* the writing process for the 23B. I realized today that it did not include any of the time talking with witnesses, gathering affidavits, etc. which were all part of the 23B preparations. Today, when I went through the process of writing that email, I took *all* of my billing on the case and removed anything that was not related to the 23B. The remaining 2/3 of the time was spent getting ready for and writing the brief on appeal, which is largely done at this point (minus whatever comes up in remand). I hope this makes sense.



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com



On May 25, 2017, at 3:30 PM, Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

In your email to Commissioner Harvey, you state that the work that went into the 23B motion totals $22,500; however, the email and the invoice that you sent me on Monday both indicate that it was a total of $8,730 (see attached). Would you please help me understand the discrepancy?

Also, the Excel spreadsheet that was attached to the email to Commissioner Harvey appears to cover all billable time from January to the present and not the 23B motion.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304

69

Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, May 25, 2017 12:44 PM
**To:** Harvey, Jim H.
**Cc:** Baron,Bryan
**Subject:** [CAUTION]Fwd: Funding Request on Doug Lovell

Jim, this email bounced as too large. I'm sending all but the large attachment, but I'm putting a link to that file below.

https://www.dropbox.com/s/8hhqgld7pgwtxcz/Lovell%2C%20Do
uglas%2023B%20Addenda.pdf?dl=0

sam

 **Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com



Begin forwarded message:

**From:** Sam Newton <sam@snewtonlaw.com>
**Subject: Funding Request on Doug Lovell**
**Date:** May 25, 2017 at 12:40:34 PM MDT
**To:** "Jim H. Harvey" <jharvey@co.weber.ut.us>
**Cc:** "Bryan R. Baron" <bryanrbaron@gmail.com>

Jim, I'm writing you after a conversation I had with Bryan Baron and Chris Allred yesterday regarding funding on the Doug Lovell matter. As you recall, the commissioners approved an additional $15,000 for work to be done on Mr. Lovell's remand, which was granted by the Utah Supreme Court.

My contract covered work to be done "before the Utah Supreme Court in the first appeal of right." When I entered into the contract, I did not anticipate that we would have remand proceedings. These are rarely done in appeals to begin with and especially are not done in capital cases. Ineffective assistance claims in a capital case are usually best brought in a post-conviction proceeding where an attorney can review the entire file, depose attorneys and make claims about the adequacy of their representation. Because remand proceedings in a direct appeal are extremely limited, capital defense lawyers are advised not to do them on appeal. That is standard practice.

However, it became abundantly clear soon into the representation that this was the unusual case where pursuing a remand would be appropriate. The Rules of Appellate Procedure allow a lawyer to move for remand, but he must supplement the record with affidavits. I had to gather, interview, collect and obtain affidavits from numerous witnesses (it was over 25). I also had to draft a Rule 23B remand motion. That motion was two to three times as large as a normal appeal: 90 pages and 247 pages of addenda. I am attaching both documents for your review. Clearly that motion was important because not only did the State stipulate to a remand upon receiving it, but the Utah Supreme Court granted it.

That process was quite time consuming and would not normally be part of an appeal. If I total up the time spent on drafting the 23B as well as preparing affidavits and talking with witnesses, it totals $22,500. I have attached a spreadsheet where I have documented the hours spent on that project.

In other words, of the $75,000 I was authorized to prepare a direct appeal, I spent about 1/3 of that money on matters that are not normally part of the direct appeal at all.

I am hoping that the commissioners will approve a supplemental payment for that additional work. That will free up some money for work on the upcoming evidentiary hearings and revisions of the appeal. Bryan Baron and Chris Allred indicated to me that I should make this request directly to you and then cc at least Bryan on it. There are at least a few reasons why we may need more money. The State has filed a motion to receive all of Doug Lovell's private file. The Utah Supreme Court has held that if that happens, I have a duty to object to the disclosure and then I need to make an index of the entire file. The State has to then demonstrate why it needs a particular document and the court has to independently review each document it believes the State needs. Mr. Lovell's file is decades old and is enormous to say the least. It will likely take hundreds of hours to index. I may have to hire someone to do this and we'll see what the judge orders, because I know it would be quite a bit more expensive to have me do it. But I think we can play by ear and if we run out of funding, I can always reapproach you and explain the situation.

If the county is not inclined to approve payment for that full amount, I would ask that the county consider at least reimbursing me for time spent up to this point for which I have not been reimbursed. If I look at my records, I show that the county owes me $8,294 for work already performed on this case. (Please recognize that this statement includes payments for printing/binding briefs that are unrelated to Mr. Lovell.) I spoke with Bryan and Chris about this yesterday and they encouraged me to point out that this was extra work related to the remand that was not contemplated when we were contracted for the appeal.

71

I want to say that I am quite conscious of the county's money—how it comes from the taxpayers. I do not want to be wasteful of that resource. I appreciate your willingness to increase funds in the past and hope that you will consider doing so here. I am a solo practitioner and I support ten children, including foster children. Even this bit of lost income can cause a hardship on me and my family. Wishing you the best,

sam



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com

**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 / Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT 59901 www.snewtonlaw.com



```
######################################################
#######

Be the Human Firewall!

To prevent malicious software and viruses, NEVER open
files
or click on links from unexpected or unknown sources.

Think Before You Click!

######################################################
#######
```

<2017_05_22, 23B time entries.pdf>

Weber County 1170

**Baron,Bryan**

| | |
|---|---|
| **From:** | Baron,Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Monday, June 12, 2017 9:14 AM |
| **To:** | Allred, Christopher F.;Wilson, Dave C. |
| **Subject:** | RE: [CAUTION]Lovell Withdrawal |

I'll stop in this afternoon and we can discuss how to respond.  My initial thoughts are below.

Options:
(1) Allow Sam to withdraw and hire a new attorney to pick up the Lovell appeal
(2) Object to the Motion to Withdraw and try to force Sam to finish the appeal
(3) Call Sam and discuss his misconceptions to try to convince him to stay on the case
   a. We didn't threaten to take away his contract.  We just said we would look elsewhere for future capital and aggravated murder cases.
   b. We haven't limited funding on the evidentiary hearing to $15,000, that is pre-approved estimate that he agreed to.
   c. We have not set a limit on how much he can talk to Doug Lovell.  We just raised the amount of time he has been spending with him as a concern.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

---

**From:** Allred, Christopher F.
**Sent:** Monday, June 12, 2017 8:52 AM
**To:** Baron,Bryan; Wilson, Dave C.
**Subject:** RE: [CAUTION]Lovell Withdrawal

I'll be around all week.

---

**From:** Baron,Bryan
**Sent:** Friday, June 9, 2017 1:58 PM
**To:** Allred, Christopher F.; Wilson, Dave C.
**Subject:** FW: [CAUTION]Lovell Withdrawal

Sam is moving to withdraw from the Lovell case.  He makes several misrepresentations of our position in doing so.  I'd like to file a response to clear those misrepresentations up with the court, but I'd like to discuss our options with you first.  Let me know when you're available to discuss it.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304



DEPOSITION
EXHIBIT
29
Baron
PENGAD 800-631-6989

Weber County 1175

Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Friday, June 09, 2017 11:58 AM
**To:** Baron,Bryan
**Subject:** [CAUTION]Lovell Withdrawal

Bryan, I have moved to withdraw as Mr. Lovell's counsel in a public filing. I am sending the motion for your review as it involves some of my conversations with you and the commissioners and I know you were preparing a response to my funding request.



**Samuel P. Newton** / Attorney at Law sam@snewtonlaw.com
**Law Office of Samuel P. Newton, PC** Office: (406) 407-7323 /
Fax: (406) 203-1144 40 2nd Street E, Suite 222 Kalispell, MT
59901 www.snewtonlaw.com


```
###########################################################

Be the Human Firewall!

To prevent malicious software and viruses, NEVER open files
or click on links from unexpected or unknown sources.

Think Before You Click!

###########################################################
```

Weber County 1176

**Baron,Bryan**

| | |
|---|---|
| **From:** | Wilson, Dave C. <dwilson@co.weber.ut.us> |
| **Sent:** | Monday, July 17, 2017 2:48 PM |
| **To:** | Allred, Christopher F.;Baron,Bryan |
| **Cc:** | Shaw, Chris |
| **Subject:** | RE: Attorney representing Utah death row inmates says he's not being paid adequately \| The Salt Lake Tribune |

Agreed. In my opinion he has lost his bearings as to his responsibilities in regard to his client. Perhaps his health problems have affected his judgment but I think it will be problematic for him to continue on Lovell and I believe his attitude is an indication of problems to come on all appeals. All of this for a defendant who admitted killing a person and then a witness. The world must laugh at our stupidity. I think we Bryan is going to issue an RFP for appellate counsel. We need appellate counsel to meet constitutional standards of defense but I think Sam has adopted his own rules.

**From:** Allred, Christopher F.
**Sent:** Monday, July 17, 2017 2:12 PM
**To:** Baron,Bryan <bbaron@co.weber.ut.us>; Wilson, Dave C. <dwilson@co.weber.ut.us>
**Cc:** Shaw, Chris <chshaw@co.weber.ut.us>
**Subject:** RE: Attorney representing Utah death row inmates says he's not being paid adequately \| The Salt Lake Tribune

I'm really sick of this BS! I at least want to expose just how much Sam is getting paid for these two cases at tax payer expense, and point out that although he's making hundreds of thousands of dollars (per his contracts) we have still never said we wouldn't pay for anything he can justify. Advise me whether you think we can (should) respond.

**From:** Baron,Bryan
**Sent:** Monday, July 17, 2017 11:55 AM
**To:** Allred, Christopher F.; Wilson, Dave C.
**Subject:** Attorney representing Utah death row inmates says he's not being paid adequately \| The Salt Lake Tribune

Chris and Dave,

Did you see this article? It looks like Sam is now going to the Salt Lake Tribune to try to put pressure on us to pay him more. The link is below.

https://shar.es/1ToeVD

Bryan



DEPOSITION EXHIBIT
30
Baron
PENGAD 800-631-6989

120

**Baron, Bryan**

| | |
|---|---|
| **From:** | Baron, Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Monday, July 17, 2017 2:56 PM |
| **To:** | 'jreidhead@utah.gov';'bsutherland@utah.gov' |
| **Subject:** | Maestas Billing & Payments |

John,

Pursuant to the Government Records Access and Management Act, I am requesting copies of the billing and payment history on the *State of Utah v. Floyd Eugene Maestas* case. Specifically, I am looking for billing and payment records for his current attorney Samuel Newton.

If you have any questions or concerns, please don't hesitate to call me at my office number listed below or on my cell phone at 801-645-4902.

Thank you!!!

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT 84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us



DEPOSITION
EXHIBIT
31
Baron

121

Weber County 1219

**Baron,Bryan**

| | |
|---|---|
| **From:** | Wilson, Dave C. <dwilson@co.weber.ut.us> |
| **Sent:** | Monday, July 17, 2017 3:46 PM |
| **To:** | Baron,Bryan;Allred, Christopher F. |
| **Cc:** | Shaw, Chris |
| **Subject:** | RE: Attorney representing Utah death row inmates says he's not being paid adequately | The Salt Lake Tribune |

So we have never reached that point since the Utah Supreme Court doesn't want this admitted murderer to die.

**From:** Baron,Bryan
**Sent:** Monday, July 17, 2017 3:30 PM
**To:** Wilson, Dave C. <dwilson@co.weber.ut.us>; Allred, Christopher F. <callred@co.weber.ut.us>
**Cc:** Shaw, Chris <chshaw@co.weber.ut.us>
**Subject:** RE: Attorney representing Utah death row inmates says he's not being paid adequately | The Salt Lake Tribune

The Division of Finance funding kicks in after the defendant "has been sentenced to death and whose conviction and sentence has been affirmed on appeal."  UCA 78B-9-202.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Wilson, Dave C.
**Sent:** Monday, July 17, 2017 2:48 PM
**To:** Allred, Christopher F.; Baron,Bryan
**Cc:** Shaw, Chris
**Subject:** RE: Attorney representing Utah death row inmates says he's not being paid adequately | The Salt Lake Tribune

Agreed.  In my opinion he has lost his bearings as to his responsibilities in regard to his client.  Perhaps his health problems have affected his judgment but I think it will be problematic for him to continue on Lovell and I believe his attitude is an indication of problems to come on all appeals.  All of this for a defendant who admitted killing a person and then a witness.  The world must laugh at our stupidity.  I think we Bryan is going to issue an RFP for appellate counsel.  We need appellate counsel to meet constitutional standards of defense but I think Sam has adopted his own rules.

**From:** Allred, Christopher F.
**Sent:** Monday, July 17, 2017 2:12 PM
**To:** Baron,Bryan <bbaron@co.weber.ut.us>; Wilson, Dave C. <dwilson@co.weber.ut.us>
**Cc:** Shaw, Chris <chshaw@co.weber.ut.us>
**Subject:** RE: Attorney representing Utah death row inmates says he's not being paid adequately | The Salt Lake Tribune

I'm really sick of this BS!  I at least want to expose just how much Sam is getting paid for these  two cases at tax payer expense, and point out that although he's making hundreds of thousands of dollars (per his contracts) we have still never said we wouldn't pay for anything he can justify.  Advise me whether you think we can (should) respond.

DEPOSITION
EXHIBIT
32
Baron
PENGAD 800-631-6989

126

**From:** Baron,Bryan
**Sent:** Monday, July 17, 2017 11:55 AM
**To:** Allred, Christopher F.; Wilson, Dave C.
**Subject:** Attorney representing Utah death row inmates says he's not being paid adequately | The Salt Lake Tribune

Chris and Dave,

Did you see this article?  It looks like Sam is now going to the Salt Lake Tribune to try to put pressure on us to pay him more.  The link is below.

https://shar.es/1ToeVD

Bryan

Weber County 1225

**Baron,Bryan**

| | |
|---|---|
| **From:** | Wilson, Dave C. <dwilson@co.weber.ut.us> |
| **Sent:** | Tuesday, August 22, 2017 3:09 PM |
| **To:** | Baron,Bryan;Allred, Christopher F. |
| **Subject:** | RE: State v. Lovell |

Let's talk when you get a minute.

**From:** Baron,Bryan
**Sent:** Tuesday, August 22, 2017 2:00 PM
**To:** Wilson, Dave C. <dwilson@co.weber.ut.us>; Allred, Christopher F. <callred@co.weber.ut.us>
**Subject:** FW: State v. Lovell

Below is an update from Mark Field on the Lovell case.  Any update from Rich Mauro on potential appellate attorneys?  If not, it sounds like the AG's office may have some recommendations for us next week.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT 84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Mark Field [mailto:markfield@agutah.gov]
**Sent:** Tuesday, August 22, 2017 1:21 PM
**To:** Baron,Bryan
**Cc:** Shaw, Chris; Aaron Murphy
**Subject:** State v. Lovell

Bryan, I wanted to give you a quick update on the telephonic hearing we had in Lovell yesterday. This is still tentative, but it looks like Judge DiReda is going to grant Sam's motion to withdraw. There is a hearing scheduled in Ogden on Tuesday, August 29th at 9:00 a.m. The judge is going to have Lovell transported and then issue his ruling from the bench so he can explain everything to Lovell in detail. Hopefully it will all go smoothly.

Also, based on Judge DiReda's reading of rule 38A(b)(3) of the Utah Rules of Appellate Procedure, once the motion is granted, he will be ordering the State and Weber County to find a replacement attorney within 20 days.

You may already have some attorneys in mind. But whether you do or not, Aaron and I have some suggestions that you may want to consider. We're still talking about them amongst ourselves, but we're hoping that by next week we'll have something to talk about with you.

If you can be at the hearing on the 29th, that would be great. If not, now worries. We will be in touch.

Let me know if you have any questions. Thanks Bryan.

Mark C. Field



DEPOSITION
EXHIBIT
33
Baron

Weber County 1288

Assistant Solicitor General

Criminal Appeals Division

Utah Attorney General's Office

160 East 300 South, 6th Floor

PO Box 140854

Salt Lake City, Utah 84114-0854

801-366-0180

markfield@agutah.gov

## Baron, Bryan

**From:** Baron, Bryan <bbaron@co.weber.ut.us>
**Sent:** Monday, September 25, 2017 2:53 PM
**To:** Ebert, James
**Subject:** Lovell Case Summary

Commissioner Ebert,

You asked that I provide you with a summary of where we are at in the Lovell case and how we got there.

First, the county has an obligation under 77-32-101 to provide an attorney and financing for an indigent defendant's appeal. If the county has an attorney under contract, the court will appoint that attorney to represent the defendant. If the county doesn't have an attorney under contract, then the court will appoint an attorney itself and order the county to pay the attorney fees.

When Doug Lovell's case was appealed back in 2015, the county hired Sam Newton to represent Mr. Lovell and he was subsequently appointed by the court. Sam's contract with the county paid him $150 per hour and had a soft cap of $75,000. Per the terms of the contract, any funds in excess of that soft cap had to be supported by good cause.

Sam hit the $75,000 cap in December, prior to even filing his first brief in the appellate case. He then submitted a couple of different requests to increase the cap. Although Commissioner Harvey agreed to increase the cap each time, once for $15,000 and once for just over $18,000, Sam complained to the court and the news media that the county wasn't paying him for his work and that the stress of not getting paid was causing him to have a heart condition. As a result, Sam filed a motion to withdraw from the case which was granted in August 2017.

After Sam withdrew from the case, the judge ordered the county to find a new attorney within 20 days. Because of the short timeline and because of the specialized skill required to appeal a capital case, the attorney's office decided not to go through the traditional RFP process.

We contacted the Salt Lake Legal Defenders Association in an attempt to hire them to represent Mr. Lovell. They indicated that they had too many cases to handle a capital appeal at this time. We then contacted Utah County Public Defender's to see if they would take the case. They also indicated that they had too many cases to take on a capital appeal. We then sent out notice to all of the public defenders in the state and specifically reached out to each attorney who had filed 2 or more criminal appeals in the last 2 years. Because of the complex nature of the Lovell case and because defense attorneys are skeptical that the county will actually pay them for their work, we had very little interest. Approximately 5 days prior to the judge's deadline, we only had one qualified attorney who was interested in taking the case. That attorney was Colleen Coeberg.

Ms. Coeberg initially proposed to handle the case for $125 per hour with a soft cap of $115,000. I negotiated her down to a $100,000 soft cap. Ms. Coeberg is well qualified to handle the case. She's a former prosecutor. She represented Uintah County for the past 4 years in criminal appeals, and she has won an "appellate attorney of the year" award twice recently from the parental defense alliance. She wouldn't be my first, second, or even third choice to handle this case, but we don't really have any other options.

I have some concerns that she will overbill, similar to Sam, and that she will be difficult to work with at times, but we really don't have any other good options. The only other option would be to tell the court that we couldn't find anyone and let the court appoint an attorney. The problem with that option is that the court would be in charge of negotiating the compensation, reviewing the invoices, and ordering the county to pay, and the county would have no say in the



490

DEPOSITION
EXHIBIT
34
Baron

Weber County 1588

matter.   At least with Ms. Coeberg, we were able to negotiate the terms of her contract, we have a soft cap to the contract, and we will be reviewing her invoices to ensure her work is reasonable.

The judge is expecting Ms. Coeberg's contract to be signed tomorrow, and he plans to appoint her this Friday.

You also asked why the county doesn't participate in the Utah Indigent Defense Fund.  It is my understanding that when the fund was set up, the county decided that it was too expensive to join and that the county could arrange for capital appeal representation for significantly less money.  Dave Wilson would know more about that decision.  I have tried to speak with him about it, but we haven't been able to get together today.

If you have any other questions, please call, email, text, or stop by.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

Weber County 1589

## Baron,Bryan

| | |
|---|---|
| **From:** | Baron,Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Thursday, August 31, 2017 10:45 AM |
| **To:** | 'Richard Mauro' |
| **Subject:** | RE: Capital Appeal Case |

Sam has handled 29 cases for us since January 1, 2015.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Richard Mauro [mailto:rmauro@sllda.com]
**Sent:** Wednesday, August 30, 2017 4:08 PM
**To:** Baron,Bryan
**Subject:** RE: Capital Appeal Case

Thanks for heads up. We'll keep it confidential.

**From:** Baron,Bryan [mailto:bbaron@co.weber.ut.us]
**Sent:** Wednesday, August 30, 2017 4:07 PM
**To:** Richard Mauro
**Subject:** RE: Capital Appeal Case

Rich,

Would you please keep confidential that the county is considering terminating Sam's contract?  While I am fairly confident that it will be terminated, I'd like Sam to hear about it from the county first.  Thanks!

I'll get you the numbers on Sam's caseload when our chief criminal deputy gets back.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Baron,Bryan
**Sent:** Wednesday, August 30, 2017 11:34 AM
**To:** 'rmauro@sllda.com'
**Subject:** Capital Appeal Case

Rich,



DEPOSITION
EXHIBIT
35
Baron

227

Weber County 1325

Weber County is looking for an appellate attorney that is qualified to take over the Douglas Lovell capital appeal case.  Sam Newton was Mr. Lovell's attorney, but he filed a motion to withdraw from the case, and it was granted yesterday.

The case is currently on remand on a 23B motion with an evidentiary hearing coming up.  According to Mr. Newton, the initial brief is all but done and just needs to be revised with the information from the 23B hearing.

Dave Wilson and I have both left messages for you in the last couple of weeks but have not heard back.  I hate to be a nuisance, but the county only has 20 days to find a replacement.  Please contact me at your earliest convenience to let me know if your organization has any interest in helping the county out with this case.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

Weber County 1326

## Baron, Bryan

| | |
|---|---|
| **From:** | Baron,Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Thursday, August 24, 2017 11:54 AM |
| **To:** | Allred, Christopher F.;Wilson, Dave C. |
| **Subject:** | RE: [CAUTION]Utah Court of Appeals Issuing Opinion: State v. Rogers |

Agree.  As stated by the court in paragraph 10, "the record does not support the claim."

If Sam is willing to misrepresent the facts in Lovell and in this case, how many other cases is he doing the same thing?

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Allred, Christopher F.
**Sent:** Thursday, August 24, 2017 11:09 AM
**To:** Wilson, Dave C.; Baron,Bryan
**Subject:** FW: [CAUTION]Utah Court of Appeals Issuing Opinion: State v. Rogers

This decision reveals, in my opinion, another instance of Sam's willingness to misrepresent facts.

**From:** Rachel Buchi [mailto:rachelb@utcourts.gov]
**Sent:** Thursday, August 24, 2017 3:01 AM
**To:** Allred, Christopher F.; Tree, Teral; Caine,Nicolas; Sam Newton; Maureen Magagna
**Subject:** [CAUTION]Utah Court of Appeals Issuing Opinion: State v. Rogers

The Utah Court of Appeals will no longer mail hard copies of opinions issued by the Court. Instead, all parties will receive opinions by email.

The attached opinion was issued on August 24, 2017, by the Utah Court of Appeals. Please forward this opinion to anyone in your organization you feel should receive a copy. Please let us know if you encounter any problems with this transmission.

Thank you.

--
Rachel Buchi
Judicial Secretary
Utah Court of Appeals
450 South State Street
P.O. Box 140230
Salt Lake City, Utah  84114-0230
P. 801-578-3906
www.utcourts.gov


##############################################################

Be the Human Firewall!

196



To prevent malicious software and viruses, NEVER open files or click on links from unexpected or unknown sources.

Think Before You Click!

##########################################################

**Baron, Bryan**

| | |
|---|---|
| **From:** | Baron, Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Thursday, September 14, 2017 3:30 PM |
| **To:** | 'Nadia Pflaum' |
| **Subject:** | RE: Question from Nadia at Standard-Examiner |

My responses are below in blue.  Let me know if you have any follow up questions.

Also, I've started working on gathering the emails between me and Sam that you requested.  I hope to have those to you by tomorrow afternoon.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Nadia Pflaum [mailto:npflaum@standard.net]
**Sent:** Thursday, September 14, 2017 1:15 PM
**To:** Baron, Bryan
**Subject:** Question from Nadia at Standard-Examiner

Hi Bryan,

I've confused my editor with my explanation of the timeline of issues on the Lovell case with Sam Newton and his funding, so I wanted to clear up a couple things.

If I understand correctly, Sam asked for permission to exceed the cap of his contract in order to interview 20+ witnesses in preparation for the weeklong hearing set to begin Sept. 25. He wanted $37,000, and the Commission granted 100 hours, or $15,000.

Sam sent an email to the commissioners on March 7th notifying them that his 23B motion had been granted and that he would need additional funding to handle the remand to the district court (which would involve bringing 20+ witnesses to court and asking them questions under oath).   In a follow up email on March 9th, Sam estimated that he would need an additional 500-700 hours ($75,000-$112,500) for the work.

Commissioner Harvey responded to Sam on March 14th that the county estimated that the remand would only take approximately 100 hours and that he would pre-approve 100 hours ($15,000) for the work.  Sam agreed in a March 15th email and said "[a]t 100 hours, I can give you a better estimate of where we are and what it will take."

I checked back with Sam, who said he'd been invoicing the county monthly from Jan. 2017 to Aug. 2017. You had said he hadn't invoiced the county for the over-the-cap hours he was approved. That's the sticking point with my editor - did he submit invoices or not? Were they not submitted the right way or something?

Yes, Sam has been invoicing the county monthly since January.  The county's position is that Sam contracted to represent Mr. Lovell in the appeal for $75,000.  That $75,000 should cover the initial brief, a reply brief, and oral argument.  Pursuant to the contract and for "good cause," Sam can exceed that cap.  The monthly invoices that Sam has

286



DEPOSITION
EXHIBIT
37
Baron

Weber County 1384

been submitting have been for work that should have been covered by the $75,000. He hasn't billed the county for working on the remand, the pre-approved $15,000, yet.

In an effort to get Sam additional funding, I suggested that he should request additional funding for the time he spent drafting the 23B motion. I asked him to total up those hours and send me an invoice for them. Sam totaled up the hours for the 23B motion and sent me an invoice on May 22nd for $8,730 for that work. On May 25th, Sam sent an email to Commissioner Harvey asking for $22,500 for the 23B motion. When asked about the discrepancy, Sam indicated that the $8,730 amount was for drafting the motion itself and the $22,500 amount was for drafting the motion as well as the work done to prepare for drafting the motion.

On June 6th I sent Sam an email expressing concerns over his invoice for $22,500. Two of the concerns I mentioned were that he was billing the county for work that wasn't related to the appeal and that his billing included frequent phone calls, letters, and meetings with Mr. Lovell. (Sam took this to mean that he had to reduce his level of communication with his client; however, I clarified in a phone call that I was only seeking an explanation as to why he needed such frequent contact since it is unusual to have so much client interaction on an appeal case.) I asked Sam to revise his invoice and send it back.

Sam filed his motion to withdraw on June 9th.

On June 30th Sam sent an email indicating that he would be sending in an updated invoice for the 23B motion. On July 18th, I sent Sam an email indicating that I still hadn't seen a revised invoice for the 23B motion. On July 18th, Sam sent me the same invoice that he had sent on June 6th for the $22,500 with no changes. I notified him that his updated invoice hadn't been updated, but he never sent a revised version.

Commissioner Harvey ultimately approved the request to exceed the contract for the 23B motion in the amount of $18,232.50. I sent Sam an email on August 31st notifying him of the approval. Because the 23B motion work was originally invoiced and paid as part of the $75,000, this approval meant that Sam could exceed the $75,000 by $18,232.50. As a result, Sam's invoices for the year were totaled ($11,927.30), and he was paid in full.

(I found Commission minutes that reflect a payment related to the Lovell case, to Michael Bouwhuis in March 2017, which might be the same payment you confirmed to me in our conversation, when I asked if Bouwhuis was still owed money on Lovell.)

Yes, March 2017 would have been when Mike Bouwhuis was paid in full for representation in the trial court.

I saw one other point in Commission minutes, I think from January, in which all public defenders contracts were renewed for the county, but those two meetings are the only ones for 2017 in which either "Sam Newton" or "Lovell" are mentioned in minutes. When the commission approved $15,000 for Newton's continued work, was that done outside of a public meeting? Was it not official?

While the initial contract had to be approved in commission meeting, the determination as to whether Sam had good cause to exceed the soft cap did not have to be approved in commission meeting. That decision was made by Commissioner Harvey who has the responsibility of overseeing public defender contracts.

Can I get a clearer explanation for why Sam Newton's invoices (if he did submit proof of his work) weren't paid, even after $15,000 was approved?

My explanation above should cover this question, but in short, Sam's invoices in 2017 were for work that exceeded the $75,000 cap on his contract and had not been otherwise approved. Sam didn't submit a request or explanation with any of those invoices as to why he had good cause to exceed the contract cap for the work that was done in the invoice.

287

Weber County 1385

The only two requests Sam made to exceed the cap were for $15,000 for the remand work (which was never billed) and for $22,500—both requests were ultimately approved.

If I can explain this in a better way to my editor, my day will vastly improve. Thanks in advance.


**Nadia Pflaum**
**Reporter,** *Standard-Examiner*
**office: (801) 625-4252**
**cell: (816) 716-2885**
**@NadiaPflaum**

Weber County 1386

## Baron, Bryan

**From:** Baron,Bryan <bbaron@co.weber.ut.us>
**Sent:** Monday, September 18, 2017 11:07 AM
**To:** Wilson, Dave C.;Allred, Christopher F.
**Subject:** Salt Lake Tribune Article

Here's the Salt Lake Tribune's article on Lovell:  http://www.sltrib.com/news/2017/09/18/two-death-row-inmates-need-new-attorneys-but-will-anyone-sign-up/

Jessica Miller, from the Tribune, is the one who didn't ask many questions and didn't request any emails.  I'm hoping the Standard Examiner's article is better.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us



DEPOSITION
EXHIBIT
38
Baron

337

Weber County 1435

## Baron, Bryan

**From:**      Baron, Bryan <bbaron@co.weber.ut.us>
**Sent:**      Wednesday, September 27, 2017 10:03 AM
**To:**        Allred, Christopher F.; Wilson, Dave C.
**Subject:**   Lovell Article from the Standard

It's not what I would have written, but it's not a bad article.  I would have titled it "Greedy defense lawyer drops case after county refuses to give him unlimited funds."  But I'm probably a little biased.

http://www.standard.net/Courts/2017/09/27/Weber-County-officials-pick-new-defense-lawyer-in-Lovell-death-penalty-case.html

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us



DEPOSITION
EXHIBIT
39
Baron

Weber County 1721

**Baron, Bryan**

| | |
|---|---|
| **From:** | Baron, Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Wednesday, September 27, 2017 10:17 AM |
| **To:** | Cordova, Carla Jean. |
| **Subject:** | RE: $10k retainer for Colleen Coebergh |

It does seem to be a common complaint from them.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

---

**From:** Cordova, Carla Jean.
**Sent:** Wednesday, September 27, 2017 10:14 AM
**To:** Baron, Bryan
**Subject:** RE: $10k retainer for Colleen Coebergh

Hahaha isn't that just part of being a public defender's job?

**From:** Baron, Bryan
**Sent:** Wednesday, September 27, 2017 9:56 AM
**To:** Cordova, Carla Jean. <ccordova@co.weber.ut.us>
**Subject:** RE: $10k retainer for Colleen Coebergh

Tuesday will work.  I don't want her to think that she can get paid on demand every time.  Thank you!

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

---

**From:** Cordova, Carla Jean.
**Sent:** Wednesday, September 27, 2017 9:50 AM
**To:** Baron, Bryan
**Subject:** RE: $10k retainer for Colleen Coebergh

Usually they get mailed out Tuesday, but if you want I can have it mailed out Friday

**From:** Baron, Bryan
**Sent:** Wednesday, September 27, 2017 9:34 AM
**To:** Cordova, Carla Jean. <ccordova@co.weber.ut.us>
**Subject:** RE: $10k retainer for Colleen Coebergh

635



DEPOSITION
EXHIBIT
40
Baron

PENGAD 800-631-6989

Weber County 1733

Thank you Carla!  You're amazing!  Do you know what day the check will be mailed out?

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Cordova, Carla Jean.
**Sent:** Wednesday, September 27, 2017 9:27 AM
**To:** Baron,Bryan
**Subject:** RE: $10k retainer for Colleen Coebergh

All done!

**From:** Baron,Bryan
**Sent:** Tuesday, September 26, 2017 4:59 PM
**To:** Cordova, Carla Jean. <ccordova@co.weber.ut.us>
**Subject:** FW: $10k retainer for Colleen Coebergh

See below.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Colleen Coebergh [mailto:ckc4thedefense@msn.com]
**Sent:** Tuesday, September 26, 2017 4:29 PM
**To:** Baron,Bryan
**Subject:** Re: $10k retainer for Colleen Coebergh

The 29 South State Street #7, SLC, UT  84111 address is fine.  The one on my w9 is my home, and I didn't know whether the IRS likes the address on there from your tax returns.  Sorry for any confusion.

Weber County 1734

## Baron,Bryan

| | |
|---|---|
| **From:** | Baron,Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Monday, October 23, 2017 10:03 AM |
| **To:** | Wilson, Dave C. |
| **Subject:** | FW: Jaime Martinez |

Dave,

Sam met with the 4th and last defendant from that aggravated robbery case, and he has determined that he cannot represent him either.  When I asked why he couldn't represent any of the defendants, this was his response (below).  Do you think that this is enough to require him to pay for conflict counsel?

Unfortunately, Emily is now saying that she doesn't think she can represent two defendants on appeal, so we need to hire another attorney.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Monday, October 23, 2017 9:45 AM
**To:** Baron,Bryan
**Subject:** Re: Jaime Martinez

I can't without necessarily revealing attorney-client privilege which is why I brought it up in an in camera meeting with Judge Valencia, who determined there's a conflict with all four. Let's just say that when I went forward with two of the defendants, conflicts developed between those two. After that, I could not represent the other two without creating conflicts with my former clients. It would have been a better practice to just give me one of the defendants from the beginning, then there would have been no issue. I was told by the attorneys and clients that there was no conflict between the two, but that turned out not to be the case as I got further along. I hope that's clear enough.

sam

On Mon, Oct 23, 2017 at 9:23 AM Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,


I'm not completely clear on the reasons why you are unable to represent any of the defendants in this case.  It seems that if there are conflicts between the defendants that you would still be able to represent at least one of them on appeal.  Can you help me to understand why you are not available to represent any of the defendants?



125   DEPOSITION
EXHIBIT
41
Baron

Weber County 1907

**Bryan R. Baron**

Deputy County Attorney

WEBER COUNTY ATTORNEY'S OFFICE

2380 Washington Blvd., Suite 230, Ogden, UT  84401

Office: 801.399.8471

Fax: 801.399.8304

Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, October 19, 2017 9:28 PM
**To:** Baron,Bryan
**Cc:** Emily Adams
**Subject:** Re: Jaime Martinez

Sorry Bryan I didn't get back to you earlier. I talked with Judge Valencia today and after we talked about it, she believes there is a conflict with Jaime too. We talked about whether Emily would have a conflict representing two of them. After having talked with all four and looking at the potential issues, Emily may want to be careful representing two of them because there are some conflicts. Thanks.

Sam

On Thu, Oct 19, 2017 at 4:44 PM Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

Any update on Jaime Martinz and whether you can represent him in his appeal?

Bryan

Weber County 1908

## Baron, Bryan

| | |
|---|---|
| **From:** | Baron,Bryan <bbaron@co.weber.ut.us> |
| **Sent:** | Monday, October 23, 2017 10:59 AM |
| **To:** | Arnold,Gage |
| **Subject:** | FW: Jaime Martinez |

Gage,

Sam is making it sound like the conflict wasn't his fault.  Do you have any information to the contrary?  I'd like to force him to pay for conflict counsel if he created this mess, but I need more to go on.

**Bryan R. Baron**
Deputy County Attorney
WEBER COUNTY ATTORNEY'S OFFICE
2380 Washington Blvd., Suite 230, Ogden, UT  84401
Office: 801.399.8471
Fax: 801.399.8304
Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Monday, October 23, 2017 9:45 AM
**To:** Baron,Bryan
**Subject:** Re: Jaime Martinez

I can't without necessarily revealing attorney-client privilege which is why I brought it up in an in camera meeting with Judge Valencia, who determined there's a conflict with all four. Let's just say that when I went forward with two of the defendants, conflicts developed between those two. After that, I could not represent the other two without creating conflicts with my former clients. It would have been a better practice to just give me one of the defendants from the beginning, then there would have been no issue. I was told by the attorneys and clients that there was no conflict between the two, but that turned out not to be the case as I got further along. I hope that's clear enough.

sam

On Mon, Oct 23, 2017 at 9:23 AM Baron,Bryan <bbaron@co.weber.ut.us> wrote:

> Sam,
>
>
> I'm not completely clear on the reasons why you are unable to represent any of the defendants in this case.  It seems that if there are conflicts between the defendants that you would still be able to represent at least one of them on appeal.  Can you help me to understand why you are not available to represent any of the defendants?
>
>
>
> **Bryan R. Baron**
>
> **Deputy County Attorney**

127



**DEPOSITION EXHIBIT**
42
Baron

Weber County 1909

WEBER COUNTY ATTORNEY'S OFFICE

2380 Washington Blvd., Suite 230, Ogden, UT  84401

Office: 801.399.8471

Fax: 801.399.8304

Email: bbaron@co.weber.ut.us

**From:** Sam Newton [mailto:sam@snewtonlaw.com]
**Sent:** Thursday, October 19, 2017 9:28 PM
**To:** Baron,Bryan
**Cc:** Emily Adams
**Subject:** Re: Jaime Martinez

Sorry Bryan I didn't get back to you earlier. I talked with Judge Valencia today and after we talked about it, she believes there is a conflict with Jaime too. We talked about whether Emily would have a conflict representing two of them. After having talked with all four and looking at the potential issues, Emily may want to be careful representing two of them because there are some conflicts. Thanks.

Sam

On Thu, Oct 19, 2017 at 4:44 PM Baron,Bryan <bbaron@co.weber.ut.us> wrote:

Sam,

Any update on Jaime Martinz and whether you can represent him in his appeal?

Bryan

Weber County 1910