Karra J. Porter, #5223
J. D. Lauritzen, #14237
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah  84111
Telephone: (801) 323-5000
Karra.Porter@chrisjen.com
JD.Lauritzen@chrisjen.com
*Attorneys for Plaintiff Samuel P. Newton*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| LAW OFFICE OF SAMUEL P. NEWTON, P.C. and SAMUEL P. NEWTON, an individual,<br><br>    Plaintiff,<br><br>v.<br><br>WEBER COUNTY, a municipal corporation; JAMES H. HARVEY, an individual; KERRY W, GIBSON, an individual; CHARLES J. EBERT, an individual,<br><br>    Defendants. | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>Civil No. 1:18-cv-00015-HCN-EJF<br><br>District Judge Howard C. Nielson, Jr<br>Magistrate Judge Evelyn J. Furse |

Plaintiffs Law Office of Samuel P. Newton, P.C., and Samuel P. Newton (hereinafter collectively "Newton" and "his" unless otherwise indicated) hereby submit the following Memorandum in Opposition to Defendants' Motion for Summary Judgment:[1]

---

[1] Unless otherwise noted, Newton refers to the defendants collectively as "the County" or "Defendants".

# TABLE OF CONTENTS

PRELIMINARY STATEMENT AND INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . iv

NEWTON'S STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

RESPONSE TO DISPUTED PARAGRAPHS IN "DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxiv

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AMENDMENT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.    Defendants have not shown as a matter of law that the speech leading to Newton's termination was pursuant to Newton's official duties . . . . . . . . . . 1

          1.    A jury could find that post-withdrawal speech was a motivating factor in the termination of Newton's contract . . . . . . . . . . . . . . . . . . . . . . . . 1

          2.    Defendants have not established that Newton's pre-August 29 statements were pursuant to his official duties . . . . . . . . . . . . . . . . . . . 2

     B.    Defendants have not shown as a matter of law that Newton's statements are not of public concern . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          1.    Newton's statements were on matters of "public concern." . . . . . . . 14

          2.    Defendants have not shown that their interests in promoting the efficiency of the public services outweighs Newton's interest in his speech . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          3.    An issue of fact exists as to whether Newton's protected speech was a motivating factor in his termination . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          4.    Weber County has not shown as a matter of law that it would have terminated Newton in the absence of his protected speech . . . . . . . . 24

     C.    Plaintiffs have shown the existence of a civil conspiracy under 42 U.S.C. 1985(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    II.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY . . . 27

**A.** **Qualified immunity does not apply to claims for declaratory relief and is not available to the County.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**B.** **Newton's rights were clearly established at the time he was terminated** . . . **27**

**CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

## PRELIMINARY STATEMENT AND INTRODUCTION

Under the Sixth Amendment to the United States Constitution, criminal defendants, both at trial and on the first appeal of right, are entitled to the basic tools of an adequate defense. Weber County is one of a handful of counties in Utah that does not fulfill its Sixth Amendment obligation by contributing to a statewide indigent defense fund.  Instead, Weber County tries to save money by self-funding indigent appeals.  It is thus both the entity obligated to fund a constitutionally proficient defense and the entity out of whose budget that funding comes.

In 2017, Weber County and its commissioners began to impose unconstitutional restrictions on the funding of a death row prisoner's appeal.  Sam Newton, the prisoner's appellate counsel, used this dispute to raise broader concerns about the death penalty itself and to call for its abolition.  He challenged the County's system of funding capital defenses.  He advocated that it is unconstitutional to leave death penalty funding decisions in the hands of government officials – who, in this case, were privately saying things like, "All of this for a defendant who admitted killing a person and then a witness.  The world must laugh at our stupidity," and "[W]e have never reached that point since the Utah Supreme Court doesn't want this admitted murderer to die."

The County's motion asks the Court to cast Newton's statements as purely personal, nothing of import to the general public.  As shown below, that is far from the case.  Few things have greater import in our society than guaranteeing a citizen his right to due process before the government takes his life.  The death penalty is one of the most controversial aspects of the America's justice system.  As such, public discourse about the death penalty, including how

much death penalty cases cost and how they are defended, is especially deserving of protection under the First Amendment.  The termination of Newton's contract violated those rights.

Plaintiffs request that the Court deny the motion for summary judgment because issues of fact exist as to their claims.

## NEWTON'S STATEMENT OF MATERIAL FACTS

1.    Sam Newton was a criminal defense and appellate attorney.  He worked with the Salt Lake Legal Defenders Association for seven years, later becoming a full-time professor at Weber State University.[2]

2.    During this time, Newton was granted half a contract for Weber County's indigent appeals, and eventually was offered the full contract (the "General Contract").[3]

### *The Lovell appeal*

3.    In 2015, Doug Lovell was convicted of murder and sentenced to death.  Weber County contracted with Newton to represent Lovell on appeal ("the Lovell Contract").[4]

4.    While investigating the appeal, Newton realized that trial counsel had failed to call "numerous witnesses who were on the witness list and available for trial,"[5] and he would need to file a "Rule 23B" motion.[6]  Because the Utah Supreme Court denies most such motions,

---

[2] *See* Exh. A, Deposition of Samuel P. Newton, pp. 12:3-7, 19:7-12.

[3] *See* Exh. B, Agreement for Indigent Defense Attorney Appeals (NEWTON000001-000006).

[4] *Id.*, pp. 13:24-14:3; *see also*, Exh. C, Contract for Appellate Defense Counsel Services for an Indigent (NEWTON000007-000011).

[5] *See* Exh. A, pp. 37:3-38:4.

[6] *Id.*, p. 38:6-19.  Rule 23B is a motion to remand for findings necessary to determination of an ineffective assistance of counsel claim.

after which the opening brief is then due, Newton also had to work on the opening brief.[7]

5.    In May 2016, Newton filed an 89-page Rule 23B motion.[8]  On January 5, 2017, Newton informed the County that the State (which handles appeals of felony cases) had just advised the Utah Supreme Court that it did not oppose the requested remand.  Newton explained that, from filings required by trial counsel's refusal to turn over his file, the Rule 23B motion, and the opening brief, the Lovell Contract's $75,000 cap was exhausted.  He estimated 600-700 hours on remand for the evidentiary hearings, briefing the new evidence, argument, and potentially petitioning for certiorari to the U. S. Supreme Court.  Newton wrote, "Of course these are unknown estimates and I would rather err on the side of caution than have to return and again request funding.  I am conscious of the county's budget. Had this been an ordinary appeal, I would not have to make this request, but because I did not anticipate that a trial attorney would do virtually no work on the case and would not cooperate with turning over his file, this appeal has been anything but ordinary."[9]

6.    On March 6, 2017, the Utah Supreme Court remanded Lovell's case.[10]  The Court's order was unusually broad, essentially requiring "a whole new proceeding" with dozens of witnesses; "an enormous remand proceeding that I've never seen in my practice, ever."[11]

---

[7] *Id.*, pp. 39:11-40:15.

[8] *See* Exh. D, Rule 23B Motion for Remand (without Exhs.) (NEWTON000012-000101).

[9] *See* Exh. E, 1/5/2017 letter from Newton to Commission, Email from Newton to Bryan Baron Re: Douglas Lovell Public Defender Appeal (WC 0699); and Exh. F, Email from Newton to Baron Re:  Funding questions (WC 1018-1020).  Plaintiffs' reference to "WC" is in relation to documents produced by Defendants labeled "Weber County."

[10] *See* Exh. G, Utah Supreme Court Order (NEWTON000121-000123).

7.     The next day, March 7, 2017, Newton informed the County about the order, again noting its impact on the appeal and that he was out of funding.[12]  Weber County Deputy Attorney Bryan Baron replied, "The Commissioners have reached out to me to discuss your request for additional funds with them.  How much additional money do you think you'll need to conduct the evidentiary hearings and to revise your brief?"[13]

8.     Newton replied:

This is so hard to know.  I told the commissioners that it will probably take several hundred hours (I think I ranged 500-700 or so).  I count over two-dozen witnesses on the remand, which I anticipate could take 2 weeks of evidentiary hearings, plus there's a ton of prep that will need to go into that.  The Supreme Court identified witnesses in the remand, such as LDS church officials and attorneys and a few other witnesses, who I will need to identify and see if they will talk with me.  There are also some witnesses, like Mike Bouwhuis, Sean Young, who may have to testify about what Sean's work was on the case.  This will necessitate some investigative funds.  That process of preparation alone will take some time (akin to what hours were spent getting the case ready for penalty phase, realistically).  Then after the hearing, I will need to incorporate several additional days of transcripts (could be as many as 10) into the briefing, potentially make all new claims based on that evidence, which will take quite a bit.  I would think a few hundred more for that end, which would include the reply brief, oral argument, etc.

Sorry to be so vague, but I've learned that these things can be very unpredictable and will always take more time than you think.[14]

---

[11] *See* Exh. A, pp. 45:18-46:15.

[12] *See* Exh. H, Email from Newton to Weber County Commissioners Re: Douglas Lovell Public Defender Appeal (WC 0780-0781).

[13] Exh. I, Email from Baron to Newton Re: Douglas Lovell Public Defender Appeal (WC 0798-0800).

[14] Exh. J, Email from Newton to Baron Re: Douglas Lovell Public Defender Appeal (WC 0802-0804).

9. In response to Newton's explanations, the County authorized an additional $15,000, but said "[t]he total additional hours of work should in no way exceed 100." Nothing was authorized for additional work the remand would create for the Supreme Court reply brief.[15]

10. Newton perceived that the Commission was going to take a "pretty hard line" on the $15,000. His impression derived from several aspects of the e-mail, including: The Commission's flat disagreement with Newton as to the work needed (offering 20 percent or less of his guesstimate); its bald assumption that most of the witnesses identified by the Supreme Court would have little to no helpful information; its estimate that the evidentiary hearings would only take one week; its refusal to consider any additional funds for the reply brief; its concluding statement, "Please advise me with an acceptance of this offer"; and its declaration that additional hours should "in no way" exceed 100.[16]

11. Newton responded with additional explanation of what the remand order would require. He noted that the County had a current balance with him of $8,294 and he had incurred another $3,015 since January, which (at the $15,000 authorized) would leave only $4,000 for the rest of the work. He explained his estimate that calling 22-26 witnesses would take 10-14 days, and additional "court time" would be 40-60 hours. He explained the number of new transcript pages likely to be generated, that it would add an estimated 100-150 extra pages to the opening brief, and that the reply brief would require up to 200 pages. Newton wrote:

> I have to be realistic here and I'm really not trying to waste everyone's money. I try to be very conservative with it. I recognize your stewardship over county funds and the importance of that. I have never, in all my years with Weber County, had to ask for more

---

[15] Exh. K, Email from Jim Harvey to Newton Re: Douglas Lovell Public Defender Appeal (WC 0836-0838).

[16] *See* Exh. A, pp. 50:2-54:7.

money than my contract.  I recall in the Riqo Perea case actually coming in close to budget and offering to take a loss on that case.  But I also have a family to feed and cannot afford to donate my services for what I know will take me a significant amount of work.[17]

12.    Newton suggested that the County fund the work already performed in addition to 100 prospective hours, at which point he could "give you a better estimate of where we are and what it will take.  Perhaps I will have over-estimated and we won't need any or much more.  If this does not work, I will need to, as soon as possible, file a motion with the district court for funding or to allow me to withdraw as his attorney."[18]

13.    Upon receiving no response, Newton filed an Ex Parte Motion for Payment of Attorney Fees and Litigation Expenses in the Lovell trial court.  Newton asked the court to preauthorize 200 hours, at which point Newton would update the court as to future work.[19]

14.    Newton's motion argued that "there are constitutional problems with Mr. Lovell even having to ask the county commission for funding in this matter.  It violates principles of separation of powers, attorney-client privilege and independence.  The State should have no part in the resources of their opponent."  He pointed out that "Mr. Lovell would not have to make any of those requests were he independently wealthy."[20]

---

[17] *See* Exh. L, Email from Newton Harvey Re: Douglas Lovell Public Defender Appeal (WC 0839-0842).

[18] *Id.*; *see also¸* Exh. A, p. 59:8-17 ("So already I have told them I'm 8,294 over budget.  So are you going to pay me the 8,900?  Let's pay me that and authorize this for future work.")

[19] *See* Exh. M, Ex Parte Motion for Payment of Attorney Fees and Litigation Expenses (Exh. 18 to the Rule 30(b)(6) Deposition of Weber County).

[20] *Id.*, pp. 3-4 n.1; *see also id.*, p. 6 ("[T]he availability of constitutional rights does not vary with the rise and fall of account balances in the Treasury.  Our basic liberties cannot be offered and withdrawn as 'budget crunches' come and go, nor may they be made contingent on transitory

15.     Three days later, March 23, 2017, the County sent Newton an email denying any additional funds for past work or the (future) Supreme Court reply brief.  Regarding other prospective work (the evidentiary hearings and revising the opening brief), the County reaffirmed its earlier estimate of 100 hours: "While it's uncertain how much time and effort will need to be put into the evidentiary hearings and revising the initial brief, 100 hours seems to be a reasonable estimate.  If the remand takes longer than 100 hours, and you can justify the additional time, we will remain open to another request for additional funding."[21]

16.     After sending this response, the County filed its opposition to Newton's motion, attaching the emails.  The County argued that the motion was not "ripe" because the County was open to a request for additional funding.  It did not mention that it had unconditionally denied compensation for work already performed and the reply brief.[22]

17.     Newton then asked Baron if the County was really refusing to pay "for over $7,000 of work I have already done on this case and will only pay me for future work?"  If so, "I need to file a reply [memorandum] and ask for a hearing with Judge DiReda."[23]   Baron

_____

political judgments regarding the advisability of raising or lowering taxes….   In short, constitutional rights do not turn on the political mood of the moment….") (citation omitted).

[21] *Id.*

[22] *See* Exh. N, Memorandum in Opposition to Ex Parte Motion for Payment of Attorney Fees and Litigation Expenses (NEWTON000314-000343).

[23] *See* Exh. O, Email from Newton to Baron Re: Telephone Conference (WC 0971-0974).

responded that the County might be willing to pay something for the 23B motion, but reiterated that nothing would be provided for the reply brief or oral argument.[24]

18.    Newton filed his reply memorandum, arguing that the dispute was ripe because, while the County said it would consider more funding, it was doubtful.[25]  Newton perceived this from the fact that the County had not found his prior explanations to be good cause beyond 100 hours, and had denied additional funds for past work and the reply brief.[26]

19.    On May 22, 2017, Newton learned that, despite having purportedly authorized $15,000 for additional work, the County had instructed personnel not to pay any of Newton's invoices, and that a partial payment in March 2017 had been inadvertent.  In an email that day, Baron stated, "Although they were instructed not to pay the Lovell Litigation Expenses, those were accidentally paid as well.  Unless you would prefer to refund that $3,360 to the county, I'll deduct it from the $15,000 that was pre-approved for the evidentiary hearing work."  Baron also

---

[24] *See* Exh. P, Email from Baron to Newton Re: Telephone Conference (Weber County 0975-0978).

[25] *See* Exh. Q, Reply to Memorandum in Opposition to Ex Parte Motion for Payment of Attorney Fees and Litigation Expenses (NEWTON000344-000357).

[26] *See* Exh. A, p. 63:4-18; *also id.*, pp. 64:20-66:18 ("[W]hen he tells me, 'I'm not going to pay you for the reply brief,' that is going to be enormous because I'm going to have to revise the entire thing.  I mean I can't imagine taking three weeks of evidence or two weeks of evidence and not – it's a whole new trial.  Doug's whole trial was like ten days.  So I'm doing a whole new trial.  And I can't just write an appeal on a whole new trial of evidence in 100 hours, there's no way.  And they're not going to cover any of that.  I mean, in no uncertain terms, in that last paragraph, I feel like he's shutting that down."); pp. 71:20-72:25 ("[M]y interpretation of those emails and these conversations and other things that have happened is, you know, we are not paying for the reply brief or anything more than that, and 100 hours seems to be a reasonable estimate.  My interpretation is the county is taking the position that this is – you know, this is all you're going to get.  You're getting this $15,000, you're not getting anything more beyond the $75,000 at all.  And so I'm saying to the court, now that I've lost $7,000-plus for work I've already done, this $15,000 is woefully inadequate to cover all the stuff I have to do."); p. 74:20-76:2 pp. 77:23-80:11; pp. 144:13-145:21.

told Newton that he had "misrepresented/misunderstood the county's position," and that "The county has never said that you wouldn't be allowed additional funding." Baron noted that one of the emails Newton had provided to the court said the county commissioners would be "willing to consider" additional funding.[27]

20.    In an effort to placate the County, Newton responded, "I guess I did misunderstand the county's position. There's quite a bit of discussion about how I only get $15,000 for preparing for this new hearing and revising the brief and the reply brief that I wouldn't get anything beyond that. I know it's going to be significantly more than that. I just ran a report for 4/1 to present and I've spent about $3,600 and I haven't even started the bulk of the preparations, which will probably take 10 times that number if not more." Newton then outlined again some of the extensive work the remand would require, and concluded, "I know we may disagree about what is needed. I guess we'll see what Judge DeRida thinks in the upcoming hearing."[28]

21.    Knowing that the County had found all of his prior explanations of the work supported only $15,000, and having just learned that County personnel had been directed not to pay any of his Lovell invoices, Newton retained significant doubt about the County's intentions, despite its claimed "willingness to consider" more funding down the road after Newton had put hundreds more hours into the case.[29]

---

[27] *Id.*, pp. 84:23-86:13.

[28] *See* Exh. R, Email string between Baron and Newton Re: Funding Questions (WC 1016-1027); *see also*, Exh. A, pp. 92:22-95:1.

[29] *See* Exh. A, pp. 52:14-54:8, 71:20-72:25, 74:8-75:19, 77:14-80:16, 84:23-89:3, 92:21-95:1, 106:15-107:22, 124:8-127:22, 136:3-138:20.

22.     On May 24, 2017, the Lovell trial court ruled that it lacked subject matter jurisdiction to address the merits of Newton's motion.[30]

23.     Newton, meanwhile, explained again why the Rule 23B motion was needed and why it cost $22,500.  Baron replied that County officials were inclined to grant some additional funds for it, but "aren't happy about the cost of $22,500 for the motion and $15,000 for the evidentiary hearings."  Baron then said "the group" had expressed concern about what it called "overbilling," including "billing the county for work related to [trial counsel] Sean Young's discipline with the Utah Bar (they are unsure why the county should pay anything for that as it is unrelated to your representation of Mr. Lovell in the appeal)", and "billing for the frequent phone calls, letters and meeting with Doug Lovell (they are unsure why you need to communicate with him so frequently on an appellate case)."[31]

24.     Baron's June 5 email ended:

> The consensus from the meeting was that unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals.  Again, they don't have a problem with the quality of your work. Their concern is with the amounts that you are billing and the items that you are billing them for.
>
> I've been asked to give you an opportunity to revise your request for additional funding for the 23B motion as well as your most recent invoice in light of the county's concerns.  Please examine these invoices and resubmit them once you have had an opportunity to revise them.[32]

---

[30] *See* Exh. S, Ruling and Order on Defendant's Ex Parte Motion for Payment of Attorney Fees and Litigation Expenses (NEWTON000358-000365).

[31] *See* Exh. T, Email from Baron to Newton Re: Funding Request on Doug Lovell (WC 1123-1127).  The email also complained about Newton billing for the motion for fees.  Newton agreed to withdraw that request given that the motion had been denied.

[32] *Id.*

25.     In the draft of this email, only Newton's Lovell Contract was threatened. Before it was sent to Newton, the County revised it to include all "future appeals."[33]

26.     Upon receipt of this email, Newton told his wife, "I've lost my job," because the request that was being made to him was to violate the Sixth Amendment or to keep his job.[34] Newton knew that – especially with Rule 23B proceedings in a death penalty case, which focus on what witnesses might know or say about the defendant to mitigate the penalty – it is untenable to require an attorney to limit his communications with a death row prisoner.  But the email tied payment for the Rule 23B motion and future appeals to Newton "revising" his invoices to reduce or eliminate those communications.[35]

27.     Newton also disagreed that representing a client in Bar proceedings involving trial counsel's performance in the client's capital murder trial is not important to an appeal.[36]

28.     Newton also noted that the email appeared to contemplate an inflexible $15,000 for future work.[37]

---

[33] *See* Exh. U, Rule 30(b)(6) deposition of Weber County, pp. 139:14-140:6.

[34] *See* Exh. A, p. 112:7-19; *also id.*, p. 113:10-23 ("All of a sudden, they're threatening my contract, my entire livelihood, if I don't stop talking to Mr. Lovell so frequently.  [']You can revise your request.[']  So my choice is to remove my frequent phone conversations with Mr. Lovell and submit those to them, or – which violates his right to counsel, his Sixth Amendment right to counsel, and that is not negotiable to me even at all.").

[35] *Id.*, pp. 112:7-115:4; *also id.*, pp. 131:1-132:16; pp. 148:1-150:15 ("that threat is putting me in a compromise that I either violate the Sixth Amendment or I – you know, and jeopardize Mr. Lovell's constitutional rights, or I sacrifice my own practice.").

[36] *Id.*, pp. 115:5-120:11 ("What they told  me was I was taking advantage by overbilling, for something I think is absolutely necessary, if not critical, to his representation.").

[37] *Id.*, pp. 106:19-107:22 (noting that the email said the county is "not happy" with "'the $15,000 for the evidentiary hearings,' not that we can revisit later.").

29.     Despite the threat to "future appeals" conveyed in the June 5, 2017, email, Weber County has testified that Newton's General Contract was not at risk at that time.[38]

30.     On June 9, 2017, Newton filed a motion to withdraw.[39]  Newton used the funding issues in Lovell's case to illustrate why Utah should eliminate the death penalty altogether.[40]

31.     The County disputed Newton's characterizations of the funding issues, but did not oppose Newton's withdrawal.[41]

32.     On July 16, 2017, *The Salt Lake Tribune* published an article titled, "Attorney representing Utah death row inmates says he's not being paid adequately – and he's not the first to raise concerns," discussing the funding issues in Lovell's and other death penalty cases.  The *Tribune* article discussed the costs of Utah's death penalty, and that Newton was citing this and other funding disputes to urge its abolition.  The article included this observation:

> In an amicus brief filed by the Utah Association of Criminal Defense Lawyers in [Floyd] Menzies' case in 2007, several well-known defense attorneys wrote affidavits detailing the financial difficulties they encountered by accepting death penalty appeals.  One lawyer wrote that his hourly wage came to under $17 an hour, though he normally bills at a rate about ten times higher than that.  Another said he made $19 an hour representing a death row inmate in a state appeal ….[42]

---

[38] *See* Exh. U, pp. 58:23-60:25.  The County says the same was true as of June 21, 2017.  *Id.*, pp. 83-84.

[39] *See* Exh. V, Motion to Withdraw (NEWTON000366-000388).

[40] *See* Exh. W, "Attorney representing Utah death row inmates says he's not being paid adequately and he's not the first to raise concerns," Salt Lake Tribune (NEWTON000401-000414).

[41] *See* Exh. X, Weber County's Response to Motion to Withdraw (NEWTON000389-000400).

[42] *See* Exh. W.

33.     On August 29, 2017, the court granted Newton's motion to withdraw.[43]   No subsequent filings were made by Newton in the Lovell case.

34.     According to the County, Newton's General Contract was not at risk as of August 29, 2017.  The County says it had decided to terminate the contract at the end of August, but when the Legal Defenders Association declined to assume it, "that issue was set aside and largely forgotten about."[44]

35.     The County later authorized $18,232.50 for work on the 23B motion.[45]  This was the County's first payment to Newton in 2017, apart from the "inadvertent" payment in May.[46]

*Post-withdrawal events and statements*

36.     On September 2, 2017, the *Tribune* published an article regarding the Lovell case, Newton's withdrawal, and the underlying allegations of ineffective assistance of counsel. The following statements were attributed to Newton:

> Newton told the Tribune on Friday, "It is unfortunate that I was placed in a position where I had to cho[o]se between supporting my family and representing Mr. Lovell.
>
> "I hope that the state of Utah and Weber County will commit in the future to adequately and fully paying for these necessary appellate reviews in such serious matters."[47]

---

[43] *See* Exh. Y, Order Authorizing Withdrawal of Appellate Counsel and Directing Weber County to Assign New Counsel Pursuant to Utah Code Ann. §77-32-302 (NEWTON000415-000418).

[44] *See* Exh. U, pp. 90:25-91:3; p. 96:22-97:23.

[45] *See* Exh. A, pp. 122:1-123:6.

[46] *Id.*, pp. 125:2-126:23; *also id.*, pp. 136:4-139:4.

[47] *See* Exh. Z, "Appellate attorney withdraws from Utah death penalty case, saying, 'I had to choose' between financially supporting family or representing Douglas Lovell," Salt Lake Tribune (NEWTON000419-000424).

  
37.     On September 18, 2017, a *Tribune* article discussed costs of the death penalty and whether it should be abolished.  The article said that Newton and others have expressed concern that state and county officials so far have disproportionately funded prosecutors' offices who are seeking an execution and have not done the same for the defense.  "The state gives enormous resources to the prosecution…. The state must similarly commit to equally and adequately support criminal defense attorneys, which is a right guaranteed by the United States Constitution.  The defense attorney, especially a solo practitioner, should not have to personally bear and front the financial cost for the enormous review required in a capital case."[48]

38.     According to the County, as of September 20, 2017, Newton's General Contract was not at risk; although there had been previous discussion about terminating the contract, it would have been forgotten.[49]

39.     On October 2, the [Ogden] *Standard-Examiner* Editorial Board gave a "thumbs down" to the Weber County Commission and the Weber County Attorney's Office "for their slow, clumsy handling of funding for Doug Lovell's capital defense case."  It wrote:

> Capital defense cases are expensive.  But the Sixth Amendment guarantees the right to counsel.
>
> Sam Newton was on Doug Lovell's case for more than a year, amassing thousands of pages of research, interviews and case material.  He was initially given $75,000, with a clause to request more but the money ran out in December.  He removed himself from the case after saying Weber County was not paying him enough – or at all.
>
> Now, newly selected Colleen Coebergh, a Salt Lake City attorney, has to study that material and effectively start over on the 32-year-old case.

---

[48] *See* Exh. AA, "Two death row inmates need new attorneys — but will anyone sign up?", Salt Lake Tribune (NEWTON000425-000431).

[49] *See* Exh. U, p. 19:2-9.

Court documents show Newton was asking for an additional $37,000, which would have brought the county's total to a little over $100,000. Instead, the county will be spending at least $174,000 with no guarantees Coebergh will be able to catch up with and surpass Newton's work before the money runs out.

This is inept management of tax dollars and bad stewardship of the Constitution.[50]

40.     On October 21, the *Tribune* published a robust attack on the death penalty,

mentioning Newton and the Lovell case in the context of this larger controversy.[51]

41.     Five days later, Weber County terminated Newton's General Contract.   On

October 26, 2017, it sent Newton a letter stating:

Over the past several years, you have provided representation to indigent defendants on behalf of the County.  While we have appreciated your hard work and dedication, this past year you have made various representations to the media and to the court that have been untruthful and harmful to the County's reputation.  As a result, we have made the decision to terminate your contract and seek new appellate counsel.

This letter constitutes notice under paragraph 27 of your contract that we intend to terminate the contract.  We would like you to continue your work as appellate counsel for indigent defendants through January 31st with the expectation that the new attorney will begin work on February 1st.  Please let me know if you are willing to continue through January 31st or if we will need the new attorney to start sooner.[52]

42.     Another Weber County deputy civil attorney, Courtlan Erickson expressed to

Baron that it was a "breath of fresh air" to give a reason for the termination.[53]

43.     The County has not challenged statements by Newton relating to his General

Contract.  Thus, that contract was terminated for statements involving an unrelated (Lovell) case.

---

[50] *See* Exh. BB, "Who deserves praise and criticism this week in Northern Utah?", Standard-Examiner (NEWTON000435-000437).

[51] *See* Exh. CC, "Tribune Editorial: It's time for Utah to kill the death penalty," Salt Lake Tribune (NEWTON000438-000439).

[52] *See* Exh. DD, Termination Letter (NEWTON000440).

[53] *See* Exh. U, p. 14:13-18.

44.     According to the County, it is purely coincidental that Newton was fired shortly after County officials were blistered by two local newspapers.  The County says it just happened to "remember" at this time that it wanted to terminate Newton's General Contract.  It was "reminded" to fire Newton not by the recent negative media coverage, the County says, but rather by a rumor it heard that conflict counsel would need to be hired in a case because Newton had met with two appellate defendants at the same time.[54]

45.     There is evidence from which a jury could disbelieve this claim, including:

a.     The County never asked Newton if he had met with the two defendants at the same time.[55]  (He had not.)

b.     The County knew that the person from whom it heard the rumor was opposing counsel who had no personal knowledge, and that it could not rely on mere rumor.[56]

c.     The County never asked anyone nor conducted any investigation as to whether Newton had met with the two defendants at the same time.[57]

d.     This "met with two defendants at the same time" allegation was not mentioned in the letter stating the reasons for Newton's firing.

---

[54] *Id.*, pp. 20:21-21:9, 22:3-15.

[55] *See* Exh. U, pp. 99:5-100:14; *see also*, Exh. EE, Email from Baron to Dave Wilson Re: FW: Jaime Martinez (WC 1907-1908).

[56] *See* Exh. U, pp. 99:5-9, 180:21-184:17; p. 99:12-14 ("Right.  We didn't have grounds.  We didn't even feel that we had enough information to pursue this to require him to pay for conflict counsel.").

[57] *Id.*, pp. 99:5-23, 180:21:-184:23.

e.      Baron can only remember one conversation with Commissioner Harvey (who signed the letter) about terminating Newton's General Contract, and that conversation was "right around the time the letter was sent out, October 25th or 26th."[58]

f.      Baron and his bosses in the County Attorney's Office (David C. Wilson and Chris Allred) regularly discussed media coverage.  For example, with respect to a September 21, 2017, article, Baron complained, "Jessica Miller, from the Tribune, is the one who didn't ask many questions and didn't request any emails.  I'm hoping the Standard Examiner's article is better."[59]  On September 27, Baron circulated a link to a *Standard Examiner* article.[60]

g.      The County had previously sought to retaliate against Newton in response to a *Tribune* article.  On July 17, 2017, Baron sent Wilson and Allred an article about Newton/the Lovell case.  Wilson's response included, "All of this for a defendant who admitted killing a person and then a witness.  The world must laugh at our stupidity."  Allred chimed in, "I'm really sick of this BS!  I at least want to expose just how much Sam is getting paid for these two cases as taxpayer expense."  "Within minutes," Baron was assigned to investigate payments to Newton by the State of Utah in an unrelated death penalty case (Maestas).[61]  Later that day,

---

[58] *Id.*, pp. 23:19-24:4.

[59] *Id.*, pp. 177:18-178:1.  Baron "did not recall" that Miller had asked the county if it had any more comments or wanted to add any information.  (She had.)  *See* Exh. FF, Email from Jessica Miller to Allred Re: Doug Lovell case (WC 1380)).

[60] *See* Exh. U, p. 178:13-17.

[61] *Id.*, pp. 160:21-163:22.  Baron claims he "does not recall" whether the assignment was made in connection with Allred's exclamation minutes earlier that he "want[ed] to expose" how much Newton was paid for his death penalty cases.  *See also id.*, p. 162:24-163:5.  A jury could certainly conclude that it was, especially when Baron sent the Maestas payment information to Allred as requested.  *See also id.*, p. 164:16-19.

Wilson wrote, "So we have never reached that point since the Utah Supreme Court doesn't want this admitted murderer to die."[62]

       h.     It was Wilson who told the county manager to take steps to fire Newton.[63]

46.    On October 29, 2017, the *Tribune* published an op-ed by Newton titled, "Capital punishment system unfair to defendants and attorneys." Citing funding issues on the Maestas death penalty case, Newton criticized the effect of such issues on the capital punishment system overall. Among other things, Newton wrote:

> In capital cases, states provide counsel to the lowest bidder and encourage attorneys to do little work and then get out. And courts don't fix the problems either. They have refused to find that a defendant was deprived an effective attorney, even if he sleeps or is drunk during trial. In my case, the state believes my client has no right to an effective attorney at all and that he should be grateful they even gave him someone.
>
> The system is full of errors. Since 1976, we have executed 1,452 nationally but exonerated 159, a shocking number for so serious a penalty. An astonishing 47 of 100 death sentences are reversed at some point. These reversals happen because of good lawyering, but this safety net is often lacking. Nationwide, public defenders work under enormous pressure, with massive caseloads and have seen little sign of reprieve.
>
> Our capital punishment system is a charade. We provide a "defense lawyer" but either give someone with no experience or refuse to give the necessary resources to experienced attorneys. In Utah, a state with one of the lowest death penalty populations in the United States, which has not executed a defendant since 2010, almost every attorney to take a death penalty case has suffered extreme personal loss. The result is a crisis-level lack of qualified attorneys willing or able to take on capital cases.
>
> If we have the death penalty, we must commit to protecting the innocent from execution. We must also commit to adequately support the attorneys who are called upon to perform these difficult tasks.[64]

---

[62] *Id.*, p. 164:6-10; *see also*, Exh. GG, Email from Wilson to Baron and Allred Re: Attorney representing Utah death row inmates says he's not being paid adequately (WC 1224-1225).

[63] *See* Exh. U, pp. 22:3-23:11.

[64] *See* Exh. HH, "Commentary: Capital punishment system unfair to defendants and attorneys," Salt Lake Tribune (NEWTON000441-000444).

47.     On November 6, 2017, the *Tribune* published an article regarding the termination of Newton's General Contract titled, "Appellate attorney fired for speaking about lack of funding in Utah death penalty case."  As with other articles, the article addressed the Lovell case and Weber County's funding system in the larger context of the death penalty debate.[65]

48.     On November 9, 2017, the *Tribune* published an editorial, illustrated by a photograph of Newton, titled "Indigent defense should be independent of county pursestrings." The editorial cited the termination of Newton's contract in the larger death penalty debate.[66]

49.     Shortly thereafter, the *Standard-Examiner* mentioned the Lovell funding issues again in discussing death penalty costs in Utah and a legislator's proposal to study those costs.[67]

*Contracting with new counsel for Lovell*

50.     The Lovell trial court ordered that new counsel be under contract by a specific date, or it would appoint defense counsel and supervise payment itself.[68]

51.     Baron told Commissioner Harvey that, if the court took over, it could "very well" approve the payment of more fees than the county.[69]  Baron said he "wasn't impressed" from his

---

[65] *See* Exh. II, "Appellate attorney fired for speaking about lack of funding in Utah death penalty case," Salt Lake Tribune (NEWTON000445-000451).

[66] *See* Exh. JJ, "Tribune Editorial: Indigent defense should be independent of county pursestrings," Salt Lake Tribune (NEWTON000453-000455).

[67] *See* Exh. KK, "Layton lawmaker wants deeper look at Utah death penalty costs," Standard-Examiner (NEWTON000456-000459).

[68] *See* Exh. U, pp. 167:16-168:2.

[69] *Id.*, pp. 168:13-169:3.

interview and calls to counsel's references.  He said she would not be his "first, second, or even third choice to handle this case, but we don't really have any other options."[70]

52.     The County did have another option, which was to let the Court assume supervision of the appointment and payment of defense counsel.[71]  Baron was so eager to avoid this possibility that, when the court's deadline came and Baron had not received authority from the attorney to file a Statement of Qualifications, Baron filed it anyway.[72]

53.     The County's contract with successor counsel generated more media coverage.[73]

*Lack of harm*

54.     When asked in its 30(b)(6) deposition what "harm" it had incurred from Newton's alleged misrepresentations (as stated in the termination letter), the County's only example was that it heard from an attorney, Emily Adams, that she had heard unspecified things and seen unspecified comments on a defense counsel forum regarding concerns about payment.[74] The County has not proffered any admissible evidence from Ms. Adams and, in fact, she applied for the job.  She did not have the required qualification but was sufficiently keen that she sought

---

[70] *Id.*, p. 171:11-16; *see also*, Exh. LL, Email from Baron to James Ebert Re: Lovell Case Summary (WC 1588-1589).

[71] *See* Exh. U, pp. 171:24-172:6.

[72] *Id.*, pp. 169:4-170:7.

[73] *See*, *e.g.*, Exh. MM, Standard-Examiner Article "Weber County officials pick new defense lawyer in Lovell death penalty case" (NEWTON000432-000434).

[74] *See* Exh. U, pp. 69:11-71:5.

to enlist a qualified attorney whose workload would not permit it.   Ms. Adams and others also

applied for conflict work.[75]

**RESPONSE TO DISPUTED PARAGRAPHS IN "DEFENDANTS'
STATEMENT OF UNDISPUTED MATERIAL FACTS"**

5.   The contract with Plaintiff provided $75,000 to represent Lovell on appeal at a rate of $150 per hour.  The contract also provides that the $75,000 limit may only be exceeded upon showing of good cause.

**RESPONSE:**  No dispute, other than to note that it is hourly, "up to $75,000".

6.   In Section Three, the contract provides that the County will reimburse expenses for investigative service and other costs.

**RESPONSE:**  Disputed.  The cited contract provides for reimbursement of expenses "in

hiring investigators, mental health or other experts," but not for "extraordinary expense not

approved by the court in accordance with §77-32-305.5, Utah Code Ann…," defining

"extraordinary expense" as "the collective expense which exceeds Five Hundred Dollars ($500)

for any particular service or item such as experts, investigators…"

14.   Plaintiff responded to Commissioner Harvey immediately, providing additional information about remand proceedings, and suggesting that the County authorize approval of his past work, in addition to 100 hours of future work, stating that after he completed the 100 hours on remand, he would be able to better estimate if additional time were needed, and indicating that there was a chance he overestimated the necessary work.

**RESPONSE:**  Disputed as materially incomplete.  Newton's March 14 email provided

additional explanation of the extensive work required and stated that the parties had a

disagreement about what was needed, and that they could see what Judge DeRida did.[76]

---

[75] *See* Exh. NN, Emails between Emily Adams and Baron (WC 1309-1312, 1413) and Emails between Weber County and counsel applying for conflict work (WC 1709-1711, 1797-1799, 1800-1806, 1812-1815, 1833-1840).

16.   Commissioner Harvey responded to Plaintiff's supplemental request on March 23, 2017, indicating that he felt that Plaintiff had shown good cause for additional funds, and while they considered 100 hours to be a reasonable estimate, he assured Plaintiff that if the remand did take longer than 100 hours, the Commission would consider additional funding requests.

**RESPONSE:**  Disputed as materially incomplete.  As shown in SOMF ¶¶ 15, 18, *supra*, the County unconditionally denied funding for any past work and for the reply brief.  (Also disputed that this email was a "reassur[ance]," for the reasons articulated above.)

23.  In his Reply, Plaintiff made the following statements:

a.     Plaintiff states that the County only authorized $15,000 for work related to the 23B remand, claiming that "[t]he county has plainly indicated that counsel will not be allowed additional funding."

b.     Plaintiff informed the Court that "[t]he hearings alone will take fifty-plus hours and preparation will take two or three times that number of hours."

c.     Plaintiff indicated that "[t]here is already a clash of interests over payment of fees, since the county will not reimburse Mr. Lovell for actual expenditures already made, and this issue will imminently escalate to greater detriment to Mr. Lovell when the county refuses to fund anything beyond its offer of $15,000 which Mr. Lovell contends is not adequate for the remainder of work to be done."

**RESPONSE:**  Disputed.  Regarding (a):  The County omits surrounding language in the document wherein Newton says the County is not paying for past work.  Regarding (b):  No dispute except that Newton also identified other work that would be required by the remand.  Regarding (c):  Disputed.  Newton was responding to an argument that his motion was not "ripe" by noting that the County had refused funding for past work.  Newton was simply predicting it

---

[76] *See* SOMF ¶ 8, *supra*.

would reject such requests (hence the predictive language "will imminently escalate" "when" the county "refuses").[77]

      31.   Mr. Baron also included that refusal to correct Plaintiff's invoices, or future billing practices, would result in the County looking for a new appellate attorney.

**RESPONSE:**  Disputed.  The email said "revise," not "correct."  There was no error to correct.

      34.   Shortly after he sent that email, possibly the next day, Mr. Baron contacted Mr. Newton by telephone to provide additional explanation for his email. Mr. Baron told Plaintiff that the county did not intend to limit Plaintiff's ability to communicate with his client, but was simply inquiring why such extensive communication was needed on an appeal.

**RESPONSE:**  Disputed.  Newton denies that this call took place, nor is there any written documentation of it.[78]  It is also implausible, as this was the second time that Commissioners had warned Newton not to speak to his death row client too often.[79]

      35.   Mr. Baron also informed Plaintiff on that phone call that the County's statement about seeking new appellate counsel referred to capital cases, not Plaintiff's underlying appellate contract.

**RESPONSE:**  Disputed.  Newton denies that this call took place, nor is there any written documentation of it.[80]  It is also implausible:  Mr. Baron himself had revised the original draft (which did not threaten the General Contract) to include all future appeals.[81]

---

[77]  *See* Exh. Q, pp. 4, 6.

[78] *See* Exh. A, p. 111:4-9.

[79] *See* Exh. OO, 7/18/16 Email from Baron to Newton Re: Invoice from Law Office of Samuel P. Newton (WC 433-434).

[80] *See* Exh. A, p. 111:4-9.

[81] *See* SOMF ¶ 25, *supra*.

38.     On June 8, 2017, Mr. Baron circulated an email within the county which indicated that while the county disagreed with the amount of communication need to adequately represent Lovell on appeal, they would not require that he reduce his requested amount related to those communications.

**RESPONSE:**  No dispute, except noting the cited document is a draft.  It was sent to Mr. Baron's bosses, not county commissioners, and there were no indications of assent.  To the contrary, instead of concurring, Chief Civil Deputy Wilson requested a meeting to discuss it.[82]

40.     In his Motion to Withdraw, Plaintiff made various misrepresentations regarding his communication with the County:

a.     Plaintiff estimates that it may take 252 hours for the remand proceeding, totaling $37,800 "which the county is currently taking a position that they will likely refuse to pay."

b.     Plaintiff also stated that "[h]e can abandon his own interests in getting paid and not try to compel the county to pay for his services and talk or speak with Mr. Lovell less" and that "[i]n essence, the county has told counsel that he must not bill them for what he believes to be necessary work on Mr. Lovell's case, such as communications, or it will terminate him from his major contract.  This irreparably puts counsel's and Mr. Lovell's interests at odds."

c.     Plaintiff states that the County and the state have created the conflict between Mr. Lovell and himself "[b]y underfunding Mr. Lovell, by telling counsel that he must limit his communications with Mr. Lovell or not insist on full funding or risk his appellate contract."

d.     Plaintiff stated "[t]he county attorney's suggestion that counsel limit his conversations with Mr. Lovell is equally problematic."

e.     Plaintiff also stated that "[b]ecause the county will not guarantee funding and has created an ethical quandary: represent Lovell and lose your contract, Mr. Lovell has lost the effective assistance of the counsel to which he is entitled."

**RESPONSE:**  Disputed.  On their face, these statements are not factual in nature (versus expressions of opinion, advocacy, interpretation, or prediction).  Indeed, to even claim they are

---

[82] *See* Exh. PP, Email from Wilson to Baron Re: Funding Request on Doug Lovell (WC 1164-1170).

misrepresentations, the County is required to omit the fact that – in this same document – Newton told the trial court that the County said it was willing to consider additional funding.[83]

a.    First, the document states that the 252 hours refers only to the remand proceeding itself (e.g., interviewing, subpoenaing, and preparing witnesses, and attending the evidentiary hearings).  The document also identifies other work that will be required, such as revising briefing and litigating the State's demand for access to the defense file.  Second, as with all of these claimed "misrepresentations," the County omits that Newton told the court that the county had "indicated that it would consider granting additional funding on the case[.]"[84]

b.    The County omits that – immediately preceding this statement – Newton tells the court that the County has said it will consider additional funding.  Newton is expressing skepticism and his interpretation of the County's communications.  This is reinforced by Newton's use of the phrase "in essence," an express indicium of interpretation or characterization.

c.    On its face, this is a statement of opinion and interpretation of the June 5, 2017, email, which Newton reasonably interpreted as suggesting less communication with his client.  (Indeed, it is hard to read it any other way, given that it orders Newton to "revise" his invoices to remove the areas of concern (which included communications with Lovell) or lose future work.)[85]   Newton

---

[83] Defs.' Exh. R, p. 4.

[84] *Id.*

[85] *See* SOMF ¶ 24.

also had a reasonable basis for opining that the County was underfunding the appeal, citing in this document the County's refusal to pay for past work and for additional work that would be required on the Supreme Court reply brief.

      d.     This was true; the County had "expressed concern" (twice) about Newton's communications with his death row client and referred to it as "overbilling," which could certainly be interpreted as a suggestion that he do it less often.[86] "Problematic" is an opinion.

      e.     On its face, this is primarily statement of opinion and legal argument. The statement that the County had not guaranteed payment is true. At most, it claimed a willingness to "consider" it, which is far from a guarantee.[87]

      41.     At the time Plaintiff filed his motion to withdraw, the County believed that Plaintiff's motion contained misrepresentations.

**RESPONSE:** Objection and Disputed. Newton objects to this self-serving reference to "the County believed…" as lacking foundation. Who is "the County" for purposes of this stated belief? Moreover, there is ample reason to believe this contention is pretextual, and instead that County officials were angry or embarrassed at having their unconstitutional death penalty system exposed, especially given the Chief Civil Deputy's derogation of the Utah Supreme Court's protection of Lovell's constitutional rights.[88] The County did not terminate Newton's General

---

[86] *See* Exh. QQ, Emails between Baron and Newton (WC 435-437, 1123-1133)

[87] See SOMF ¶¶ 18-19, 21, *supra*.

[88] *See* Exh. GG; *see also*, Exh. RR, Email from Wilson to Allred Re: FW: Lovell case costs (WC 1942).

Contract at this time, and testified that the contract was not at risk as late as September 20, 2017, more than three months after the motion was filed.[89]

      42.     On or around June 21, 2017, Plaintiff also filed a Response to the State's Motion to Inquire Into Defense Counsel's Potential Conflict of Interest to the Utah Supreme Court, which contained the following misrepresentations:

      a.     "Despite counsel's recommendation that the remand proceeding and revisions to the brief would take between 200-400 hours, conservatively, the Commissioners would only authorize an additional $15,000, or 100 hours of work.  The commissioners indicated that they would not authorize any additional funds for the remand proceeding, the brief, reply brief or other work on appeal."

      b.     "Though they did indicate that if those funds were exhausted, counsel could  reapproach the Commission for more funding, both [*sic*] only if he demonstrated good cause, which they believed was doubtful.  They do not intend to reimburse counsel for work done on the appeal totaling almost $10,000."

      c.     "[T]he county has not only refused to adequately fund the appeal and remand, but has indicated that it would 'need[ ] to look for another attorney for future appeals.' "

      d.     "Because the bulk of counsel's income comes from an appellate contract with Weber County, he faces a terrible catch-22: represent Mr. Lovell zealously and lose his livelihood or compromise Mr. Lovell's case and save his practice."

      e.     "The county attorney told counsel that if he revised his invoices to remove the disputed items that the commissioners would likely grant some additional funding.  However, he also indicated that the commissioners were not pleased with what they deemed counsel's over-billing and that they would no longer be contracting with counsel in the future."

      f.     "Counsel asked specifically if that meant that he would lose his major contract (and his livelihood by association) and the attorney told him that the commissioners had yet to make their decision.  However, counsel takes the statement for what it means: the county will no longer contract with him, so whether he loses his appellate contract sooner or later, he must begin the process to seek different employment."

---

[89] *See* SOMF ¶¶ 29, 34, 38, *supra.*

g.      "[the county] has indicated it will not pay for any more than $15,000 for the entire remand proceeding."

h.      "Perhaps most problematically is that the county has told counsel that he must limit his conversations with Mr. Lovell and not 'overbill' so much."

i.      "The county has also indicated that it will not contract with counsel in the  future because of these concerns,  This means a loss of counsel's entire livelihood…"

j.      "For example, the $15,000 the county has allowed for the remand proceeding also includes investigative services, which will be woefully lacking."

k.      "On this case, counsel faces a loss of his entire livelihood by litigating Mr. Lovell's case…"

**RESPONSE:**   Disputed.   First, when asked in its 30(b)(6) deposition to identify the alleged misrepresentations upon which the County allegedly relied in terminating Newton, the statements in paragraphs (h) and (j) were not included.[90]   A jury could find them to be post-litigation add-ons.  Second, the above are not misrepresentations in any event:

(a)      This is a reasonable interpretation of the County's emails and intent.  It was also accompanied by a footnote which the County has not quoted.  (It has instead cited the footnote as a separate sub(b).)  In the footnote, Newton advised the court that the County had said he could ask for more funding.[91]

(b)      As noted, this is the footnote that accompanied the text referenced by the County in sub(a).  In it, Newton discloses that the County said he could ask for more funding, but it is a reasonable interpretation that the County also had conveyed doubt, for the reasons set

---

[90] *See* Exh. U, pp. 26:19-30:10, 34:4-52:13, 71:8-96:12, 126:2-127:12.

[91] *See* Defs.' Exh. T, p. 3 n.1.

forth above.[92]   Newton correctly states that the County had denied reimbursement for nearly $10,000 in past work, and in fact had ordered personnel not to pay his prior invoices.[93]

(c) and (d) are, on their face, statements of opinion, prediction, and interpretation. The County had indeed indicated that, if Newton did not limit his communications with his client (and "revise" his earlier invoices to remove/reduce such communications), it would seek new counsel for future appeals.[94]

(e) and (f) are Newton's recounting of a communication he had with the County. (In Newton's memorandum, these are adjacent sentences.)  They advise the court that the County says it has not made a final decision, and then offers his opinion/prediction/characterization of the county's communications.

(g) omits important language elsewhere in the cited document, including immediately preceding the quoted words.  For example, the County omits this statement that expressly indicates that Newton is predicting the county will refuse additional funding:  "The only reason counsel moved to withdraw from this case was based on an *anticipated* deprivation of funding from the county."  (Emphasis added.)  The County also starts its quote in the middle of a sentence, The entire quote, with the important omitted words in italic, is:  "*The county has refused to pay almost $10,000 it owes counsel for prior work* and it has indicated it will not pay for any more than $15,000 for the entire remand proceeding."

---

[92] *Id.*

[93] *See* SOMF ¶¶ 15, 18, 19.

[94] *Id.*, ¶¶ 24-25, 26.

(h), (i) and (k) are reasonable interpretations of the June 5, 2017, email, especially in light of similar "concerns" about communicating too much with his client expressed by the County in 2016.[95]   Newton did not intend to limit his contact with his client (especially on a Rule 23B remand), upon which the June 5 email expressly conditioned future appeals.[96]   This did, indeed, threaten Newton's entire livelihood.

(j) Newton does not recall whether the reference to "investigative services" includes his own services.[97]   As noted in the contract, investigative services under the contract appear to have been limited to $500.[98]   In any event, however, the County acknowledges that Newton's reference to investigative services was a "minor" thing.[99]

43.  In June 2017, the County first discussed potential finding a replacement for Plaintiff, to take over the indigent appeals contract.

**RESPONSE:**  No dispute.  However, the County admits that, when the Legal Defenders Association declined, the County dropped the idea of replacing Newton.[100]

47.  The Salt Lake Tribune published an article on July 18, 2017, which stated: "Newton says the hearing will require hundreds of hours of investigation and preparation, which he estimates will cost more than $37,000.  The county, however, has only authorized $15,000, up to this point.  County officials also have expressed concern

---

[95] *See* Newton's Response to Defendants' Statement of Undisputed Material Facts, Fact No. 40(d).

[96] *See* SOMF ¶ 26.

[97] *See* Exh. A, pp. 154:20-155:15; *see also*, Exh. SS, Email from Newton to Baron Re: Invoice from Law Office of Samuel P. Newton (WC 435-437) (referring to reviewing the record and contacting un-called witnesses as "investigating" the appeal).

[98] *See* Exh. D.

[99] *See* Exh. U, p. 96:1-7.

[100] *Id.*, p. 18:5-19:9.

that Newton was overbilling, he wrote, and said he spoke to Lovell too frequently. County officials indicated in an email to Newton that if his billing practices don't change, they will have to find someone else for future appeals. 'That's the bind,' Newton said in a recent interview. 'Do I represent my client zealously like I'm constitutionally required to do? Or do I tread lightly so I don't lose my livelihood?'"

**RESPONSE:**   No dispute.   However, the County omits extensive discussion in this article about the cost and future of the death penalty in Utah.[101]

48.  On August 29, 2017, Plaintiff appeared in court with Mr. Lovell to argue his Motion to Withdraw.  During his oral argument, he repeated the allegation that the County would not provide him with anything more than $15,000 that had been pre-authorized.  He also told the court that the county had taken issue with the frequency of his communication with Mr. Lovell and threatened to terminate his contract.

**RESPONSE:**  Disputed in part.  First, this was argument on the written motion that Newton had submitted acknowledging the County's claimed "willingness to consider" additional funding after the work was done (but expressing skepticism).  Second, Newton's argument is expressed in terms of anticipated refusal based on past conduct.  For example, Newton stated, "The county had indicated, we went back and forth, they would authorize an additional $15,000 to complete all remand proceedings.  I told them I believe that was unrealistic, given the nature of the remand and what needed to happen, and the county essentially said they weren't going to fund anything more than that.  …  [I] have not been paid by Weber County on Mr. Lovell's matter since January of this year and that was an inadvertent payment.  Mr. Baron told me that the accountant accidentally paid it and was told specifically not to.  So other than that payment I probably haven't been paid for a year on Mr. Lovell's case and I'm already approaching I think about $30,000 that the county owes me, and I am fearful that to continue involuntary pro bono representation of Mr. Lovell compr[om]ises my ability to adequately represent him on appeal."

---

[101] *See* Exh. W.

He said he was "fearful" that his ability to represent Lovell was compromised. As noted above, the June 5, 2017, had taken issue with his conduct (*e.g.*, speaking with his client) and threatened future work. Newton expressed concern in terms of personal feelings, stating the County's allegation that he was overbilling by speaking to his client too much "I think clouds my judgment and makes it more difficult for me to adequately and zealously represent him," and "I do feel that zealous advocacy for Mr. Lovell may jeopardize my livelihood." [102]

53. By the end of August 2017, the County decided that they would terminate Plaintiff's underlying appellate contract and began looking at options for his replacement.

**RESPONSE:** Disputed. According to Weber County itself, although County officials had previously discussed terminating Newton's General Contract, the idea had generally been set aside and "forgotten" until October 2017.[103]

55. During their search for qualified counsel to represent Lovell after Plaintiff's withdrawal the County only had one applicant due to the belief that the county would not pay defense attorneys.

**RESPONSE:** Disputed. No admissible evidence is cited, and available evidence is to the contrary: The County's own records reflect that attorneys actually declined because of their workloads or lack of qualifications.[104]

56. Because of Plaintiff's misrepresentations, the attorney who did agree to represent Lovell asked for additional contractual considerations and refused to begin work until after she had received a payment from the County.

---

[102] *See* Exh. TT, Transcript from Hearing on Motion to Withdraw in the Lovell matter (WC 2206-2222).

[103] *See* SOMF, ¶ 34, *supra*.

[104] *See* Exh. UU, Email from Emily Adams to Baron Re: Capital Appeal Attorney Needed (WC 1311-1312).

**RESPONSE:**   Disputed.   No admissible evidence is cited that counsel's expectations were "because of Plaintiff's misrepresentations," or were unreasonable or unexpected.[105]

58.   In October 2017, Mr. Baron again discussed terminating Plaintiff's contract with county officials, including Commissioner Harvey, and the County decided it would not be in the best interests of the County to continue contracting with an attorney that was willing to misrepresent facts to both the court and to the media.

**RESPONSE:**   Disputed.   As described above (SOMF ¶¶ 32, 36-37, 39-40), a reasonable jury could infer that the true motivation for Newton's termination was unflattering media coverage of Weber County Commissioners and other officials in October 2017.   That is especially true when the County had "forgotten" that it wanted to fire Newton until after those editorials appeared.

---

[105] The emails from successor counsel referenced by the County also indicated that Newton had been "very diplomatic" about the county when discussing the case with her.  *See* Exh. VV, Email from Colleen Coebergh to Baron Re: Telephone Interview (WC 1453-1457).

**ARGUMENT**

Defendants seek summary judgment on two grounds.  First, they argue that 1) Newton's "actions in representing [Lovell], and the misrepresentations he made to the court and news media, constituted speech pursuant to his official capacity and is not protected under the First Amendment."[106]  Second, "[e]ven if the Court finds that Plaintiff did not speak pursuant to his official capacity, his constitutional rights were not denied, as the *Garcetti/Pickering* analysis does not weigh in his favor for the following reasons: his speech did not affect a public concern; his interest in his speech did not outweigh Defendants' interest; and any protected speech by the Plaintiff did not substantially motivate Defendants' decision to terminate his contract, as Plaintiff's contract would have been terminated even in the absence of the protected speech."[107]

I.   **DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AMENDMENT CLAIMS.**

    A.   **Defendants have not shown as a matter of law that the speech leading to Newton's termination was pursuant to Newton's official duties.**

        1.   **A jury could find that post-withdrawal speech was a motivating factor in the termination of Newton's contract.**

Defendants ask the Court to assume that the sole impetus for terminating Newton's contract were the "misrepresentations" alleged above from May, June, and August 2017.  These dates are not coincidental; they appear to recognize that Defendants cannot even theoretically argue "official duties" after August 29, 2017, when Newton withdrew as Lovell's counsel.

A jury could reasonably find that post-August 29 statements – including local media coverage directly criticizing county commissioners – were motivating factors in Newton's

---

[106] *See* Defs.' Mot., pp. ii, 2-8.

[107] *Id.*, pp. ii, 8-19.

termination.  Indeed, that is the most likely scenario.  The County had not terminated Newton's General Contract before his withdrawal.  The County's story that everyone had "forgotten" about firing Newton is implausible.  The event that supposedly "reminded" the County it wanted to fire Newton is dubious.  County officials tracked media coverage, and had sought to retaliate against Newton in June 2017 for another unflattering article.  The first time Baron spoke with a county commissioner about firing Newton was in October 2017, shortly after the *Standard-Examiner* called out the commissioners' "ineptness".[108]

Defendants have not argued that summary judgment is appropriate if any post-August 29 speech was a motivating factor in Newton's termination.  Because questions of fact exist in that regard, that in itself compels denial of the Defendants' motion.

## 2.    Defendants have not established that Newton's pre-August 29 statements were pursuant to his official duties.

The Supreme Court has sought to strike a balance between a public employee's interests "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[109]   As noted in *Pickering v. Board of Education*, "'[t]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected."[110]   However, "it cannot be gainsaid that the

---

[108] *See* SOMF ¶ 39.

[109] *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968).  The Supreme Court has held that First Amendment standards applicable to government employees also apply to government contractors.  *Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 673 (1996).

[110] *Id.* (*quoting Keyishian v. Board of Regents*, 385 U.S. 589, 605-606 (1967)).

State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."[111]

In *Connick v. Meyers*, the court noted that "[f]or at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."[112]  "The repeated emphasis in *Pickering* on the right of a public employee as a citizen, in commenting on matters of public concern, was not accidental."[113]  Post-*Pickering* cases followed from the understanding that "[t]he First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"[114]  Thus the court has reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."[115]

"When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the

---

[111] *Id.*

[112] 461 U.S. 138, 142 (1983).

[113] *Id.* at 143 (internal quotations omitted).

[114] *Id.* at 145 (*quoting Roth v. United States*, 354 U.S. 476, 484 (1957); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964)).

[115] *Id.* (*quoting NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982); *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

First Amendment."[116]  However, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."[117]  Turning to the challenged speech in that case, the *Connick* court concluded that Myers's questions to her co-workers, with one exception, were outside the "rubric of matters of 'public concern.'"[118]  In the court's view, the other questions posed by Myers were not "of public import in evaluating the performance of the District Attorney as an elected official," and "Myers did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases."[119]  The court also noted that Myers did not "seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others."[120]

With respect to statements regarding official pressure being put on employees to work in political campaigns, the court sided with the government after balancing its interests against Myers' interests in her speech.  However, the court cautioned that a "stronger showing" might be required of "the government's interest in the effective and efficient fulfillment of its responsibilities to the public" when "the employee's speech more substantially involved matters of public concern."[121]

---

[116] *Id.* at 146.

[117] *Id.* at 147-48.

[118] *Id.* at 148.

[119] *Id.*

[120] *Id.*

[121] *Id.* at 150, 152.

In 2004, the court decided *City of San Diego v. Roe*.[122]  The court noted that, because of their positions, public employees may be "uniquely qualified" to have "informed opinions" about matters of public concern."[123]  The court observed:

> Underlying the decision in *Pickering* is the recognition that public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public.  Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.[124]

Public concern, the court wrote, "is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."[125]  Two years later, the court decided *Garcetti v. Ceballos*.[126]  In that case, the court identified "two inquiries" that had arisen from *Pickering* and its progeny:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.[127]

---

[122] 543 U.S. 77 (2004) (*per curiam*).

[123] *Id.* at 80 (*citing Connick* and *Pickering*).

[124] *Id.* at 82-83.

[125] *Id.* at 83-84.

[126] 547 U.S. 410 (2006).

[127] *Id.* at 418 (internal citations omitted).

After discussing the interests that a public employer has in "the efficient provision of public services," the court wrote:

> [T]he Court has recognized that a citizen who works for the government is nonetheless a citizen. The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens.  So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.[128]

The court further emphasized that "the First Amendment interests at stake extend beyond the individual speaker," and include "the public's interest in receiving the well-informed views of government employees engaging in civic discussion.[129]  The court reaffirmed the need for "informed, vibrant dialogue in a democratic society," and further "suggested … that widespread costs may arise when dialogue is repressed".[130]

In *Garcetti*, the court said it was not dispositive that Ceballos's memorandum to his supervisor, in which he "conveyed his opinion and recommendation" regarding an "affidavit used to obtain a search warrant contained serious misrepresentations," "concerned the subject matter of Ceballos' employment[.]"[131]  The court cited the example of public schoolteachers:

> Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.[132]

---

[128] *Id.* at 419 (internal citations omitted).

[129] *Id.*

[130] *Id.* (*citing Roe*).

[131] *Id.* at 421.

[132] *Id.* (*quoting Pickering*, 391 U.S. at 572).

6

"The same is true of other categories of public employees," the court observed.[133]

The "controlling factor" in *Garcetti* was that Ceballos had made the statements "pursuant to his duties as a calendar deputy," and "the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case— distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline." Thus, the court held, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."[134]

The court clarified that "employees retain the prospect of constitutional protection for their contributions to the civic discourse," and that "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government."[135]   The court noted that neither party "dispute[d] that Ceballos wrote his disposition memo pursuant to his employment duties," which ended the inquiry.[136]

The court clarified *Garcetti* in *Lane v. Franks*.[137]   Speech that relates to public employment, or concerns information learned in the course of public employment, may still be of public concern, the court said – "The First Amendment protects some expressions related to the

---

[133] *Id.*

[134] *Id.*

[135] *Id.* at 422, 423.

[136] *Id.* at 424.

[137] 573 U.S. 228 (2014).

speaker's job.'"[138]   "In other words, the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee— rather than citizen—speech."[139]

"The critical question under *Garcetti* is whether the speech at issue is itself *ordinarily within the scope of an employee's duties*, not whether it merely *concerns* those duties," the court wrote.[140]   "[O]ur precedents dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment."[141]

In analyzing whether speech was pursuant to official duties, the central inquiry is 'whether the speech activity stemmed from and [was of] the type… that [employee] was paid to do."[142]   "Examples of the kinds of speech that are generally protected include 'communicating with newspapers or legislators or performing some similar activity afforded citizens.'"[143] Similarly, "speech directed at an individual or entity outside of an employee's chain of command is often outside of an employee's official duties."[144]   By contrast, statements that are "directed at

---

[138] *Id.* at 239-40.

[139] *Id.* at 240.

[140] *Id.* (emphasis added).

[141] *Id.*

[142] *Vercos v. Board of County Commr's for County of El Paso*, 259 F. Supp. 3d 1169, 1173 (*quoting Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010)).

[143] *Id.* at 1174 (*quoting Rohrbough*, 596 F.3d at 746).

[144] *Rohrbough*, 596 F.3d at 747.

an individual or entity within an employee's chain of command [are] often found to be pursuant to ... official duties."[145]

In *Casey v. West Las Vegas Independent School Dist.*, the Tenth Circuit distinguished between statements a school superintendent made to the school board and federal officials from those she made to the state attorney general.[146]  Regarding the latter, the court found "[t]his speech was protected since it was directed to 'outside authorities' and concerned a matter for which plaintiff had not been given responsibility."[147]  In *Thomas v. City of Blanchard*, the court likewise held that a city code inspector's report to police of a fraudulent certificate of occupancy was protected by the First Amendment; the "speech ceased to be merely 'pursuant to his official duties and became the speech of a concerned citizen.'"[148]  In so concluding, the court noted that the official-duties inquiry turns on "whether the speech was commissioned by the employer," and "reasonably contributes to or facilitates the employee's performance of the official duty."[149]

Akin to the holding in *Thomas*, the court in *Reinhardt v. Albuquerque Public Schools Board* held that a speech-language pathologist's filing of a complaint with the state department of education after her internal complaints were ignored was protected because the pathologist

---

[145] *Id.*

[146] 473 F.3d 1323, 1329 (10th Cir. 2007).

[147] *Id.*

[148] 548 F.3d 1317, 1325 (10th Cir. 2008).

[149] *Id.* 1323-24.

"was not hired to ensure IDEA compliance," and her complaint to the department of education was "not pursuant to official duties, but rather was the speech of a concerned citizen."[150]

Defendants argue that this case is analogous to *Garcetti*.  To that end, they assert that Newton's statements to the court in the Lovell matter were pursuant to his official duties as the defense attorney contracted by Weber County to represent Lovell.[151]  According to Defendants, Newton's arguments were not "general" complaints regarding the rights secured by the Sixth Amendment.  Rather, such complaints were specific to Lovell and Newton's representation and, but for Newton's representation of Lovell, Newton "would not have communicated with the court regarding a detriment to, or a conflict with, Lovell…."[152]

Defendants likewise argue that Newton's statements to the media occurred pursuant to Newton's duties as Mr. Lovell's attorney.[153]  Defendants say there is no evidence that Newton would have communicated his concerns to the court in the Lovell matter, or that he would have even had the necessary information to provide, if he had not been acting as Lovell's attorney under his contract with the county.[154]  Defendants further argue that the content of Newton's statements to the media suggest that Newton was acting pursuant to his official duties as Lovell's attorney.[155]

---

[150] 595 F.3d 1126, 1136-37 (10th Cir. 2010).

[151] *See* Defs.' Mot., p. 5.

[152] *Id.*

[153] *Id.*, p. 6.

[154] *Id.*

[155] *Id.*

Defendants' arguments are unavailing for several reasons.  First, Defendants' argument is inapplicable to a contract attorney.  Under ethical rules, a contracting attorney undertakes no duties for the county; his duties extend solely to his client.  The county just happens to provide funding (per its constitutional obligation).  Thus, none of Newton's duties to his client would fall within *Garcetti/Pickering*, which solely involve duties performed for, or on behalf of, the government employer.

Similarly, Newton's statements to the media and court were made outside his job description under either the Lovell Contract or General Contract.  Neither contract includes bringing to light actual or potential malfeasance by Weber County officials.[156]  Nor did they require him to comment on or otherwise take issue with the state's death penalty system and its (un)constitutionality, or to speak to the media.[157]  The fact that Newton continued to make similar attacks on the death penalty before and after his withdrawal supports this conclusion.

Second, Defendants seek to improperly limit the scope of the subject matter of Newton's statements.  Defendants seek a ruling as a matter of law that Newton's statements were nothing more than those of an attorney representing his client requesting additional funding or the ability to withdraw.  The first problem with this contention is that several of the statements were made after Newton was off the Lovell case.  Equally important is the much broader issues that Newton sought to bring to light through his court filings and his comments to the media.  Those broader issues involved potential or actual wrongdoing on the part of Weber County (including the county's violation of constitutional rights), the operation of the courts, and constitutional

---

[156] *See* Exhs. B and C.

[157] *Id.*

infirmities in Utah's death penalty system.  A jury could conclude from Newton's statements that he was not just speaking narrowly in relation to just his representation of Mr. Lovell, but also as a concerned citizen.  At the very least, a question of fact exists.

Newton's statements to the media and court were made outside his direct chain of command (if an adverse party can be characterized as such).  This fact weighs against any finding that Newton's statements were made pursuant to his official duties.  The fact that Newton might not have learned the damning information, or had occasion to make these statements, absent his representation of Mr. Lovell, do not affect the public nature of the statements.  The County's contention that the inquiry turns on a speaker's "capacity," rather than the nature and content of the speech itself, was expressly rejected in *Lane v. Franks*.[158]

Because Newton had no "official duties" for, to, or on behalf of the County, and his statements were outside his job description, implicated potential or actual wrongdoing by the County, raised important constitutional issues, and Newton was not obligated to make them, the pre-August 29 statements were not pursuant to his official duties.

**B.    Defendants have not shown as a matter of law that Newton's statements are not of public concern.**

In addressing whether Newton's statements are entitled to First Amendment protection, Defendants assert that Newton "repeatedly misrepresented his interactions with the County about funding, resources, his communications with his client, and his underlying appellate contract."[159]

---

[158] 573 U.S. at 240 (noting that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech").

[159] *See* Defs.' Mot., p. 15.

Defendants contend that Newton made several knowingly false statements, which Defendants contend abrogate, or weigh substantially against, a finding that such statements are protected.[160]

There are several flaws with this contention.  First, as shown above, Newton's statements are true, and/or obvious statements of opinion/interpretation/prediction/personal feeling.  Second, even if Newton had made "false" statements, the County is required to show that they were made knowingly, recklessly, or maliciously.[161]

Moreover, only (alleged) misrepresentations that cause "legally cognizable harm" lose First Amendment protection.[162]  At most, Defendants have alleged that Newton's statements "interfered" with the county's ability to provide counsel for indigent defendants by "disrupting the internal affairs of the office and the County's employment and contractual relationships."[163] More specifically, Defendants argue that Newton's speech "interfered with the County's ability to find qualified attorneys to provide appellate services to indigent individuals and caused additional work and disarray as County employees struggled to meet court deadlines and find new counsel."[164]  Defendants claim that, due to Newton's statements, the county had "difficulty finding a qualified attorney to take [Newton's] place as Lovell's counsel," and the lone attorney

---

[160] *Id.*, pp. 15, 18.

[161] *Wulf v. City of Wichita*, 883 F.2d 842, 858-59 & n.24 (10th Cir. 1989).

[162] *See Animal Legal Defense Fund v. Herbert*, 263 F. Supp. 3d 1193, 1201 (D. Utah 2017) (*citing United States v. Alvarez*, 567 U.S. 709, 719 (2012)).

[163] *See* Defs.' Mot., p. 16.

[164] *Id.*, pp. 16-17.

who applied, and was hired, to replace Newton on the Lovell matter required the county to pay

her a "premium … presumably due to Plaintiff's comments."[165]

These contentions are unsupported (and demonstrably incorrect).[166]  In short, the County

has no evidence of cognizable harm.  Indeed, the County was able to persuade successor counsel

to take a $25/hour pay cut, and to take a lower cap, negotiating her $115,000 demand down to

$100,000.[167]

Defendants conclude by speculating that Newton's statements "may continue to affect the

County's reputation and ability to serve its residents and indigent defendants for years to

come."[168]  This is wholly unsupported (and implausible, particularly where the County had

contemporaneous opportunities to respond to each of Newton's statements, whether in court or to

the media).  Because Defendants have not shown any cognizable harm from Newton's allegedly

false statements, the Court cannot rule as a matter of law that Newton's statements are outside

the protections of the First Amendment even if they were assumed to be misrepresentations.

### 1. Newton's statements were on matters of "public concern."

"Matters of public concern are 'those of interest to the community, whether for social,

political, or other reasons.'"[169]  Put somewhat differently, "'public concern is something that is a

---

[165] *Id.*, p. 17.

[166] *See*, *e.g.*, SOMF, ¶¶ 50-54, *supra*; *see also*, Exh. VV.

[167] *See* Exh. WW, Email string between Coebergh and Baron Re: Telephone interview (WC 1571-1577).

[168] *See* Defs.' Mot., p. 17.

[169] *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1205 (10th Cir. 2007) (*quoting Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000).

subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.'"[170] "In deciding what is a matter of public concern, we are required to consider 'the content, form, and context of a given statement, as revealed by the whole record.'"[171]

Not surprisingly, "[s]tatements revealing official impropriety usually involve matters of public concern."[172]   In *Trant v. Oklahoma*, the court determined that "[i]rregularity in a grand jury investigation into a public agency's alleged misconduct is a matter of public concern," and "[a]lthough Trant's speech may have been motivated in part by his riff with the Board, the subject matter of the dispute concerned misconduct in a grand jury investigation involving official impropriety, which is undoubtedly of interest to the community."[173]

The Tenth Circuit's analysis in *Eisenhour v. Weber County* is further illustrative.  In that case, the court initially observed that "[s]peech involves a public concern when the speaker intends to 'bring to light actual or potential wrongdoing or breach of public trust' by a public official or to 'disclose[ ] any evidence of corruption, impropriety, or other malfeasance' within a governmental entity."[174]

The court found that "when Ms. Eisenhour spoke to the media, the subject-matter involved *not only* her employment dispute, but *also* her complaints about the work of the Judicial

---

[170] *Deutsch v. Jordan*, 618 F.3d 1093, 1099-1100 (10th Cir. 2010).

[171] *Brammer-Hoelter*, 492 F.3d at 1205 (*quoting Connick*, 461 U.S. at 147-48).

[172] *Id.*

[173] 754 F.3d 1158, 1165-66 (10th Cir. 2014).

[174] 744 F.3d at 1228-29.

Conduct Committee."[175]   The court rejected Weber County's argument that Ms. Eisenhour's statements were not on a matter of public concern because her motivation was personal or because the statements involved a purely private matter (sexual harassment):

> [A] mixed motive is not fatal to [Ms. Eisenhour's claim] … The existence of an interest that is public, as well as private, is also borne out by the forum and timing of Ms. Eisenhour's speech. She chose to speak with the media, through a public forum, only *after* the Commission had allegedly failed to carry out its investigatory obligation … Ms. Eisenhour's statements to the media addressed not only sexual harassment, but also the failure of a governmental entity to properly carry out its public responsibilities … Ms. Eisenhour presented evidence not only of sexual harassment, but also of a lapse by a public body charged with overseeing the judiciary. Viewing this evidence in the light most favorable to Ms. Eisenhour, we conclude that her statements to the media involved a matter of public concern, as well as private concern.[176]

A similar analysis applies to Newton's right to petition claim.  "As under the Speech Clause, whether an employee's petition relates to a matter of public concern will depend on 'the content, form, and context of [the petition], as revealed by the whole record."[177]  "The forum in which a petition is lodged will be relevant to the determination of whether the petition relates to a matter of public concern."[178]  "A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context."[179]  "The right of a public employee under the Petition Clause is a right to participate as a citizen, through petitioning activity, in the

---

[175] *Id.* (emphases added).

[176] *Id.* at 1228-29 (internal citations omitted and italics in original).

[177] *Borough of Duryea v. Guarnieri*, 564 U.S. 369, 398 (2011) (*quoting Connick*, 461 U.S. at 147-48, and n.7).

[178] *Id.* (*citing Snyder v. Phelps*, 562 U.S. 443 (2011)).

[179] *Id.*

democratic process."[180]   Following *Guarnieri*, the Tenth Circuit has concluded that the court's analysis is the same whether an employee's retaliation claim is made "under the Free Speech or Petition clauses of the First Amendment."[181]

Defendants assert that Newton's statements were not on a matter of public concern. Defendants suggest that Newton's statements are of a "personal nature," relating merely to a compensation dispute with Weber County.[182]   Defendants also assert that Newton's alleged misrepresentations, which the County says continued even after it allegedly "reassured" Newton, weigh against protection for Newton's statements.[183]

This argument is also flawed for multiple reasons.  First, Defendants are improperly narrowing the scope of Newton's statements.  Newton was giving voice not only to the constitutional rights of Lovell, but also to broader issues involving the Sixth Amendment and Utah's death penalty system.  He was also shedding light on potential or actual malfeasance by the County, which is inherently of public concern.  Whether Newton was motivated in part by concerns about payment would not erase their public import.

Newton's statements also related to a subject of legitimate news interest, as evidenced by extensive media coverage that included more than just Newton's own statements, and which expressly recognized the Lovell funding issues as an integral part of the overall death penalty

---

[180] *Id.* at 399.

[181] *Fields v. City of Tulsa*, 753 F.3d 1000, 1013 n.1 (10th Cir. 2014).

[182] *See* Defs.' Mot., pp. 9, 13-15.

[183] *Id.*, pp. 9, 15.

debate.[184]   Newton's filings noted the costs associated with an overturned conviction or sentence, which Newton cited as one reason to abolish the death penalty, and his advocacy against the death penalty continued after his withdrawal.  Because Newton's statements related to important issues surrounding indigent defense, the death penalty in Utah, and wrongdoing by Weber County officials, such statements were on matters of public concern.

> **2.     Defendants have not shown that their interests in promoting the efficiency of the public services outweighs Newton's interest in his speech.**

Once a plaintiff has made a *prima facie* case that he spoke as a citizen on a matter of public concern, the burden shifts to the defendant to show "the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests"[185]  "[A] court next examines 'whether the government had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'"[186]  While there is "no easy formula for weighing an employee's First Amendment speech against an employer's interest in an efficient and  disciplined work environment," the "question is whether the employer has an efficiency interest which would justify it in restricting the particular speech at issue."[187]

---

[184] *See* SOMF ¶¶ 32, 36-37, 39-40, 46-49.

[185] *Trant*, 754 F.3d at 1165.

[186] *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1222 (10th Cir. 2017) (*quoting Lane*, 573 U.S. at 237).

[187] *Brammer-Hoelter*, 492 F.3d at 1207 (internal quotations and citations omitted).

In balancing the interests of the employee and the government, courts "do not consider the employee's speech in a 'vacuum.'"[188]   "Rather, 'the manner, time, and place of the employee's expression are relevant.'"[189]   "Pertinent factors to consider include whether the statement: '[1] impairs discipline by superiors or harmony among coworkers, [2] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or [3] impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'"[190]   "[T]he *employer* bears the burden of justifying its regulation of the employee's speech."[191]

"'The only public employer interest that outweighs the employee's free speech interest is avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships'"[192]   "A public employer's burden to justify its restriction on speech 'increases in proportion to the value of that speech in the public debate.'"[193]   "And where the employee is acting as a whistleblower, exposing government corruption, his or her interest is

---

[188] *Helget*, 844 F.3d at 1222 (*quoting Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

[189] *Id.* (*quoting Rankin*, 483 U.S. at 388).

[190] *Id.* (*quoting Rankin*, 483 U.S. at 388).

[191] *Brammer-Hoelter*, 492 F.3d at 1207 (italics in original).

[192] *Trant*, 754 F.3d at 1166.

[193] *Helget*, 844 F.3d at 1222 (*quoting Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998));  *see also*, *Lane*, 573 U.S. at 237 ("We have also cautioned, however, that 'a stronger showing [of government interests] may be necessary if the employee's speech more substantially involve[s] matters of public concern.'") (quoting *Connick*, 461 U.S. at 152).

entitled to greater weight."[194]   Moreover, "'[t]he government… cannot rely on purely speculative allegations that certain statements caused or will cause a disruption to justify the regulation of employee speech.'"[195]   "[T]he government must articulate specific concerns about the impact of an employee's speech, and those concerns must be reasonable and formed in good faith."[196]

    In support of its argument that Newton's interest in his speech is outweighed by Weber County's interests in promoting the efficiency of its public service, Defendants argue that Newton's speech "directly interfered" with its provision of indigent defense "by disrupting the internal affairs of the office and the County's employment and contractual relationships."[197] Without evidentiary support, Defendants argue that Newton's speech interfered with the county's ability to find qualified counsel to represent indigent defendants on appeal (including Mr. Lovell), which allegedly caused "additional work and disarray as County employees struggled to meet court deadlines and find new appellate counsel."[198]   As it related to Mr. Lovell specifically, Defendants contend that Newton's speech made it "difficult[ ]" to find replacement counsel, and that it had to offer her a premium, that the comments caused extra work, etc.[199]   The rather patent error of these contentions has been addressed above.

---

[194] *Id.* at 1223 (*citing Lytle v. City of Haysville, Kan.*, 138 F.3d 857, 865 (10th Cir. 1998)).

[195] *Andersen v. McCotter*, 205 F.3d 1214, 1217-18 (10th Cir. 2000) (*quoting Gardetto v. Mason*, 100 F.3d 803, 815-16 (10th Cir. 1996)).

[196] *Id.* (internal citations omitted).

[197] *See* Defs.' Mot., p. 16.

[198] *Id.*, p. 17.

[199] *Id.*

With respect to the county's search for replacement counsel on the Lovell matter, Defendants have adduced no evidence that Newton's statements caused only a single qualified attorney to apply for the contract to represent Mr. Lovell.  Nor have Defendants shown that Newton's speech was the driving force behind the "concerns" that Newton's eventual replacement raised regarding prompt payment in this massive undertaking.

Regarding the payment of Newton's replacement in the Lovell matter, Defendants fail to include in their motion that they were able to negotiate the total amount of payment down.  They also fail to mention that they believed the concerns raised by Newton's replacement were largely related to generalized concerns that public defenders had expressed to the county regarding their frustrations over payment.[200]  Any other issues related to Newton's replacement or payment cited by the Defendants are speculative or otherwise unsupported.

Defendants' contention that its reputation may be affected in the future due to Newton's speech is purely speculative.  This is especially true where Defendants have not shown any cognizable harm flowed from Newton's statements.   By all appearances, Weber County continues to provide indigent defendants appellate counsel, and the Rule 23B evidentiary hearing necessitated by Newton's work has or will conclude shortly.[201]  Without more, allegations of future reputational harm do not outweigh Newton's interests in his speech.

Defendants do not address Newton's interests in his speech in their motion, other than to say that Weber County does not dispute that providing indigent defendants counsel is "an

---

[200] *See* Exh. U, 180:3-16.

[201] *See* Exh. XX (Lovell docket from August 29, 2017, through the present).  (Plaintiffs note that the evidentiary hearing appears to still be ongoing after two weeks, consistent with Newton's predictions.)

important service required by the U.S. Constitution, which includes ensuring that individuals charged with capital crimes are provided effective counsel."[202]  If providing an adequate and effective defense is important, then so too is shedding light on potential or actual malfeasance related to the provision of such a defense, as well as the cost to taxpayers of this form of punishment.  Newton's interests in such speech are entitled to greater weight, and Defendants have not made the necessary, stronger showing to overcome Newton's interests.

>   **3.   An issue of fact exists as to whether Newton's protected speech was a motivating factor in his termination.**

Under the fourth step in the *Garcetti/Pickering* analysis, the employee must show that his protected speech was a "substantial or motivating factor" in the adverse employment decision.[203]  Establishing this causal link is fact-intensive, and thus ordinarily reserved for the jury.[204]

"An employee 'need not prove his speech was the sole reason for defendant's action.'"[205] "Nor is the employee required to show 'but-for' causation; that is, to demonstrated but-for the employee's speech the subsequent employment action would not have occurred."[206]  "Rather, the

---

[202] *See* Defs.' Mot., p. 16.

[203] *Couch v. Board of Trustees of Memorial Hosp. of Carbon County*, 587 F.3d 1223, 1236 (10th Cir. 2009) (*quoting Maestas v. Segura*, 416 F.3d 1182, 1188 and n.5 (10th Cir. 2005)).  *See Brammer-Hoelter*, 492 F.3d at 1203 ("Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in [a] detrimental employment decision.") (internal quotations omitted).

[204] *Id.*

[205] *Maestas*, 416 F.3d at 1187 (*quoting Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1554 (10th Cir.1989)).

[206] *Id.* (*citing Spiegla v. Hull*, 371 F.3d 928, 941-43 (7th Cir. 2004)).

employee must show the protected speech played a substantial part in the employer's decision to adversely alter the employee's conditions of employment."[207]

Retaliatory motive on the part of the government may be inferred when the adverse employment action occurred in close proximity to the employee's statements:

> Adverse action in close proximity to protected speech may warrant an inference of retaliatory motive. But temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision. An employer's knowledge of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment. Other evidence of causation may include evidence the employer expressed opposition to the employee's speech, or evidence the speech implicated the employer in serious misconduct or wrongdoing. On the other hand, evidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link.[208]

Defendants argue that "it is undisputed that the County based its decision to terminate Plaintiff's contract on a few specific statements."[209] As shown above, that is incorrect – the basis for the County's decision is hotly disputed. It is far more likely that pointed and embarrassing media coverage in September-October 2017 was *a* (if not *the*) motivating factor.

---

[207] *Id.* (*citing Anderer v. Jones*, 385 F.3d 1043, 1052 n. 14 (7th Cir.2004); *Quinn v. Monroe County*, 330 F.3d 1320, 1329 n. 10 (11th Cir.2003); *Ostad v. Oregon Health Sciences Univ.*, 327 F.3d 876, 885 (9th Cir.2003); *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir.2003); *Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir.2000)). *See also Deschenie v. Board of Education of Central Consolidated School Dist. No. 22*, 473 F.3d 1271, 1277 (10th Cir. 2007) (*quoting Baca v. Sklar*, 398 F.3d 1210, 1220 (10th Cir. 2005)).

[208] *Maestas*, 416 F.3d at 1189.

[209] *See* Defs.' Mot., p. 18.

Newton is not required to show that his protected speech was the only reason for his termination.  He need only show that his protected speech was a motivating factor.  He has done so, or at the very least an issue of fact exists.

> **4.    Weber County has not shown as a matter of law that it would have terminated Newton in the absence of his protected speech.**

The final step in the *Garcetti/Pickering* analysis against shifts the burden to the government to show that, "by a preponderance of the evidence … it would have reached the same decision… even in the absence of the protected conduct."[210]  This is colloquially referred to as the "anyway" defense.[211]  As the Tenth Circuit indicated in *Trant*:

> This inquiry, also known as the *Mt. Healthy* analysis, arises from the Supreme Court's recognition that a "rule of causation which focuses solely on whether protected conduct played a part" in an adverse employment decision "could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing."[212]

Defendants ask the Court to rule as a matter of law that they would have terminated Newton even in the absence of his protected speech.  They contend that, even if Newton's statements to the media are protected, those statements "represent only a portion of the misrepresentations and falsehood communicated by Plaintiff."[213]  Defendants argue that the majority of Newton's allegedly false statements were made to the court, which they contend

---

[210] *Baca v. Sklar*, 398 F.3d 1210, 1219 (10th Cir. 2005) (*quoting Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

[211] *See Ballard v. Muskogee Regional Medical Center*, 238 F.3d 1250, 1253 (10th Cir. 2001).

[212] *Trant*, 754 F.3d at 1167 (*quoting Mt. Healthy*, 429 U.S. at 287).

[213] *See* Defs.' Mot., p. 18.

"represent more serious misconduct."[214]  Such statements to the court, as asserted by Defendants, "were more numerous, and were repeated more than once over a significant period of time," and that Newton's "misrepresentations to the news media duplicated other misrepresentations made by Plaintiff…."[215]  The County asks the Court to assume as a matter of law that "communications to the court, on their own, represent more serious errors and a refusal to address errors after correction," and so "the County can show that it would have taken the same action, even in the absence of a protected statement."[216]

These are  obvious questions of fact.  Moreover, defendants' argument is belied by the evidence.  Weber County has admitted that Newton's appellate contract was not at risk until at least September 20, 2017.[217]  A jury could disbelieve the contention that, shortly after two strong editorials in local media (one of which labeled the County Commissioners "inept"), the County suddenly "remembered" that it wanted to fire Newton for completely coincidental reasons.   A jury could conclude that, if these months-old "misrepresentations" were so inconsequential that the County had "forgotten" to fire Newton over them, it would not really have fired Newton for those same statements.  The County was unhappy that Newton had exposed its unconstitutional funding system and was making it the poster child for abolishing the entire death penalty.

C.     **Plaintiffs have shown the existence of a civil conspiracy under 42 U.S.C. 1985(2).**

---

[214] *Id.*

[215] *Id.*, p. 19.

[216] *Id.*

[217] *See* SOMF ¶¶ 29, 34, 38, *supra*.

Defendants argue that Newton has not pleaded facts that a meeting of the minds occurred such as is required to support a civil conspiracy under 42 U.S.C. 1985(a).[218]  This argument is perplexing; it was the Weber County Commission (a body of three individuals) who decided to terminate the contract that the same body had voted to adopt.  To rule otherwise, the jury would have to conclude that one or more commissioners acted *ultra vires*.  The County's answer admits otherwise.[219]

Defendants further argue that "there are no facts to support a claim that the County, or any of its officers or employees, intended or attempted to deter Plaintiff from attending or testifying in court, or acted to intimidate or injure him."[220]  To support this contention, Defendants state that, even after Newton withdrew, "the County continued to work with him to address his requests for additional funds and provide payment for work he had completed."[221]

This, again, is a question of fact.  A jury could easily conclude that when the County (finally) made a payment to Newton after his withdrawal, it was because it would have looked even worse not to, especially where local media were closely scrutinizing its actions.  Indeed, a continued refusal to pay Newton could have led to involvement of the court, which the County was eager to avoid.[222]

---

[218] *See* Defs.' Mot., p. 19.

[219] *See* DE-7, ¶¶ 12, 38, 41.  *See also*, Exh. YY, Deposition of Allred, p. 25:18-25 (Commissioner Harvey's letter terminating Newton's contract would likely have required the assent of other commissioners).

[220] *See* Defs.' Mot., p. 19.

[221] *Id.*, p. 20.

[222] *See* SOMF ¶¶ 50-52, *supra*.

## II.      DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

In addition to arguing that no constitutional violation occurred, Defendants assert that, "even if the court finds that Defendants violated one of Plaintiff's constitutional rights, they are entitled to qualified immunity, as the law relating to Plaintiff's rights is not clear, as the Tenth Circuit has not addressed independent contractors under *Garcetti v. Ceballos*...."[223]  As argued by Defendants, "while the courts [have] previously treated employees and independent contractors in a similar manner following *Pickering*, counsel for Defendants could not find authority to show that the balancing test had been applied to an independent contractor since the Supreme Court added additional considerations to that test in *Garcetti*."[224]

### A.      Qualified immunity does not apply to claims for declaratory relief and is not available to the County.

As an initial matter, qualified immunity is a defense only to a damages award against an individual defendant, it is not a defense to declaratory relief.[225]  Accordingly, if the jury finds that a constitutional violation occurred, Newton is entitled to a judgment regardless of whether the law was clearly established.  Moreover, qualified immunity is not available to the County.[226]

### B.      Newton's rights were clearly established at the time he was terminated.

Under the clearly established prong of the qualified immunity analysis, the focus is on the government official's conduct.  As the Supreme Court has indicated, "'[q]ualified immunity

---

[223] *See* Defs.' Mot., pp. ii, 21-22.

[224] *Id.*, p. 21.

[225]  *See*, *e.g.*, *Cannon v. City and County of Denver*, 998 F.2d 867, 876 (10th Cir.1993) ("Unlike the claim for money damages, there is no qualified immunity to shield the defendants from claims for [declaratory and injunctive] relief.").

[226]  *Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 697 (10th Cir. 1988).

attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[227] "'Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.'"[228] The same is true in the Tenth Circuit. "The second prong of the qualified immunity analysis shields a governmental official from liability unless 'at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[229]

Applying these principles, the focus is whether Defendants' conduct violated Newton's constitutional rights of which a reasonable individual in the Defendants' position would have known. The focus is not on whether *Garcetti* applies to independent contractors as Defendants argue. It is beyond dispute that the First Amendment applies to independent contractors.[230] The Tenth Circuit has applied the Supreme Court's holding in *Umbehr* even after *Garcetti* was decided.[231] Moreover, *Garcetti* did not alter the First Amendment analysis in the context of

---

[227] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*quoting White v. Pauly*, 137 S. Ct. 548, 551 (2017) (*per curiam*)); *see also*, *Distrct of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) ("Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.").

[228] *Id.* (*quoting Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*)).

[229] *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 884 (10th Cir. 2014) (*quoting Ashcroft v. al-Kidd*, ).

[230] *See Umbehr*, 518 U.S. at 674 (1996) (First Amendment protects independent contractors from termination or prevention of automatic renewal of at-will government contracts in retaliation for their exercise of freedom of speech).

[231] *See*, *e.g.*, *Planned Parenthood Association of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016); *Hogan v. Utah Telecommunication Open Infrastructure Agency*, 566 Fed. Appx. 636 (10th Cir. 2014); *Glover v. Mabrey*, 384 Fed. Appx. 763 (10th Cir. 2010).

public employment.   *Garcetti* merely clarified that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."[232]   There is nothing in *Garcetti*, or the Tenth Circuit's post-*Garcetti* jurisprudence, supporting Defendants' contention that contractors' protections under the First Amendment were displaced by *Garcetti*, or that the analysis of contractors' claims is different following *Garcetti*.

"Ordinarily, '[a] plaintiff may satisfy this [clearly-established-law] standard by identifying an on-point Supreme Court or published Tenth Circuit decision [that establishes the unlawfulness of the defendant's conduct]; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'"[233] "Although there need not be a case with identical facts, the constitutional issue must be placed beyond debate by previous jurisprudence."[234]

Newton contends that he was terminated for protected speech that, among other things, sought to bring to light actual or potential malfeasance by Weber County officials, that included a violation of Lovell's Sixth Amendment rights, along with constitutional infirmities in the state's death penalty system.   Newton's statements were not made within the chain of command, although Newton attempted to resolve the issues related to Weber County's unwillingness to abide by the Sixth Amendment internally (but without success).   It was not Newton's duty to uncover wrongdoing in the county's indigent defense system.   There was no obligation for Newton to speak on these matters to either the media or the court in the Lovell matter.

---

[232] *See Garcetti*, 547 U.S. at 421.

[233] *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (*quoting Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015)).

[234] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*).

Furthermore, any statements attributed to Newton after August 29, 2017 (the date Newton withdrew from the Lovell case) that were a motivating factor in his termination were – by definition – made purely as a concerned citizen and not as Mr. Lovell's attorney.

Facts similar to those above have garnered First Amendment protection in the Tenth Circuit.  For example, in *Casey v. W. Las Vegas Indep. Sch. Dist.* and *Thomas v. City of Blanchard*, the court found that both Ms. Casey's and Mr. Blanchard's statements to those outside the chain of their command about matters that were not committed to their care were protected by the First Amendment.[235] As it relates to uncovering corruption, impropriety, and malfeasance, in *Worley v. Board of County Com'rs of Park County*, the Tenth Circuit determined that the speech of the Park County attorney that related to attorney's efforts to redress other county employees' discrimination grievances, was a matter of public concern for purposes of employee's § 1983 claim under First Amendment because it disclosed evidence of corruption, impropriety, or other malfeasance on part of public officials.  The court reached a similar conclusion in *Conaway v. Smith*, holding that the employee's reports to his superiors regarding his concerns that building inspection department was not properly discharging its governmental responsibilities, constituted comment on matter of public concern entitled to First Amendment protection.[236]

As a separate ground for denial of qualified immunity, it has been clearly established since 2012 that government officials cannot penalize (alleged) false statements unless it can show cognizable harm caused by the statements.  That is presumably why the termination letter

---

[235] *See Casey*, 473 F.3d at 1332-33; *Thomas*, 548 F.3d at 1324-25.

[236] 853 F.2d 789, 795-99 (10th Cir. 1988).

referred to unspecified "harm" that had allegedly been caused by Newton's "misrepresentations." The defendants knew they could not show such harm, especially where they had opportunities to respond to each statement.  Accordingly, the defendants were on notice, and in fact knew, that termination of Newton's contract was unconstitutional.

**CONCLUSION**

For the reasons set forth above, Newton respectfully requests that the Court deny the defendants' motion for summary judgment, and to set this case for trial.

DATED this 6th day of September, 2019.

CHRISTENSEN & JENSEN, P.C.


/s/ Karra J. Porter
Karra J. Porter
J. D. Lauritzen
*Attorneys for Plaintiff Samuel P. Newton*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of September, 2019, a copy of the foregoing **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was delivered via the court's electronic filing system to the following:

Kristin A. VanOrman
Matt Harrison
Strong & Hanni
Kvanorman@strongandhanni.com
mharrison@strongandhanni.com

/s/ *Miranda Riley*