Exhibit YY

LAW OFFICE OF SAMUEL P. NEWTON, P.C.

vs

WEBER COUNTY


CHRISTOPHER ALLRED

April 18, 2019





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

```
            IN THE UNITED STATES DISTRICT COURT
            DISTRICT OF UTAH, NORTHERN DIVISION
```

| | |
|---|---|
| LAW OFFICE OF SAMUEL P. NEWTON, P.C. and SAMUEL P. NEWTON, an individual, | ) ) ) ) |
| Plaintiff, | ) Civil No. 1:18-cv-00015 ) RJS |
| vs. | ) ) Judge Robert Shelby |
| WEBER COUNTY, a municipal corporation; JAMES H. HARVEY, an individual; KERRY W. GIBSON, an individual; CHARLES J. EBERT, an individual, | ) ) ) ) ) ) ) |
| Defendants. | ) |

**COPY**

```
        DEPOSITION OF:  CHRISTOPHER ALLRED

                 APRIL 18, 2019

            1:08 P.M. TO 2:35 P.M.


        Location:  CHRISTENSEN & JENSEN
              257 East 200 South, Suite 1100
                Salt Lake City, Utah

            Reporter:  Brandy Harris, RPR
        Notary Public in and for the State of Utah
```

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

2

                          A P P E A R A N C E S

1

2    FOR THE PLAINTIFF:

3            Karra J. Porter
             CHRISTENSEN & JENSEN
4            257 East 200 South, Suite 1100
             Salt Lake City, Utah 84111
5            Telephone:  801.323.5000
             Email:  Karra.Porter@chrisjen.com
6

7    FOR THE DEFENDANTS:

8            Kristin A. VanOrman
             STRONG & HANNI
9            102 South 200 East, Suite 800
             Salt Lake City, Utah 84111
10           Telephone:  801.532.7080
             Email:  Kvanorman@strongandhanni.com

11   ALSO PRESENT:

12           Bryan R. Baron - Weber County Attorney's Office

13

14

15

16

17

18

19

20

21

22

23

24

25

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred
April 18, 2019

3

```
 1              I N D E X

 2   WITNESS:   CHRISTOPHER ALLRED              PAGE

 3      Examination by Ms. Porter                 4

 4      Examination by Ms. VanOrman              59

 5      Further Examination by Ms. Porter        60

 6

 7              E X H I B I T S

 8   NO.              DESCRIPTION               PAGE

 9   16  Email string (Weber County 1293)      41

10   17  Email string (Weber County 2012)      50

11   18  Email string (Weber County 2153-2155) 54

12

13         I T E M S   R E Q U E S T E D

14   NO.                          LINE   PAGE

15          (No items were requested.)

16

17

18

19

20

21

22

23

24

25
```

4

1            P R O C E E D I N G S

2            CHRISTOPHER ALLRED,

3      called as a witness, being first duly sworn,

4            was examined and testified as follows:

5                    EXAMINATION

6   BY MS. PORTER:

7      Q.    Could you please state your name for the

8   record?

9      A.    Chris Allred.

10     Q.    And is Chris short for --

11     A.    Christopher.

12     Q.    Okay.  Are you currently employed by Weber

13  County?

14     A.    I am.

15     Q.    How long have you worked for Weber County?

16     A.    About 22 years.

17     Q.    Can you very briefly walk us through your

18  employment history at Weber County?

19     A.    I began as a law clerk while I was in law

20  school and I was hired on after I graduated in the civil

21  department.  I served as a deputy county attorney in the

22  civil department until about five years ago when I became

23  county attorney.

24     Q.    Did you become county attorney through

25  election?

5

1     A.    I did.

2     Q.    Are you currently the Weber County attorney?

3     A.    Yes.

4     Q.    Do your duties currently involve supervision of

5     the civil department and the criminal department?

6     A.    Yes.

7     Q.    What role, if any, do you play in connection

8     with the funding of criminal defenses for indigent

9     defendants?

10    A.    I don't play a very direct role most of the

11    time.  The County Commission funds our defense services.

12    Do you mean on a case-by-case basis or the overall?

13    Q.    Yes.  I mean, I saw your name on a lot of

14    emails so I know you had some role, at least with respect

15    to the Lovell case.

16    A.    Yeah.

17    Q.    But I kind of wanted to start off more

18    generally to see if there's a general function and then

19    narrow it to Lovell.

20    A.    Yeah.  So I'm involved and aware of the overall

21    contracts that we have with our public defenders.  I

22    don't usually involve myself in the decisions in who gets

23    a contract, that sort of thing.  Is that what you're

24    asking?

25    Q.    I don't know what your role is.  So I'm asking

6

1  for anything that -- I guess that you've done or maybe

2  done more than once in connection with the funding of

3  criminal defenses for indigent defendants.

4      A.   So as county attorney, it's pretty limited.  I

5  used to do essentially what Bryan Baron does when I was

6  in the civil department, so I had a lot more involvement

7  in the day-to-day goings-on.  As county attorney, my role

8  is quite limited.  I leave that to the civil division, at

9  least at the trial level.  In the Lovell case, I was

10  involved to some degree where -- primarily where Bryan

11  asked my opinions or involvement in the case because it

12  was on appeal so I didn't feel it was the same concerns

13  that we have at the trial level.

14      Q.   What concerns at the trial level were you

15  referring to?

16      A.   So at the trial level we often have requests

17  for expert witnesses and things like that.  Statutorily

18  at the trial level an indigent defense counsel is

19  required by statute to make a motion whenever they are

20  seeking a defense resource in excess of $500, and -- I

21  think I lost my train of thought.  What was I --

22      Q.   You wouldn't be the first one.

23      MS. PORTER:  Can I have the question back,

24  please.

25          (The previous question was read by the court

1   reporter.)

2        THE WITNESS:  Oh, the concerns of the trial

3   level.  So those are the concerns.  Years ago when I was

4   essentially in Bryan's position, we had some cases come

5   up where defense counsel had raised the issue that they

6   felt there was a conflict for the prosecution to be

7   involved in decisions that were made.  So they are

8   statutorily required to make these motions, but they

9   didn't want the prosecution responding.  So we set up

10  what we'd call the "Chinese wall" at that time so only

11  the civil department would handle those motions for

12  indigent resources.

13       Q.   (By Ms. Porter)  And that Chinese wall is not

14  in place with respect to appeals?

15       A.   Correct.  And, in fact, I don't know that I've

16  ever had the issue come up on appeal again because our

17  office is not ordinarily handling the appeal.  It's the

18  AG's office.

19       Q.   Now, if a case is -- or if a conviction is

20  reversed on appeal and goes back to trial, does Weber

21  County then recuse itself?

22       A.   Does Weber County recuse itself altogether?

23       Q.   Well, let me back up and ask that in maybe a

24  more sensible way.

25            The reason the Chinese wall doesn't exist with

1    respect to appeals is because the county attorney doesn't

2    handle the appeals, the State of Utah does, right?

3        A.    Correct.

4        Q.    If a case comes back from the Supreme Court,

5    like let's say a conviction is reversed or overturned,

6    then what would the policy be then?  Because you've been

7    hearing about things on appeal and now you are, in fact,

8    prosecuting at the trial court level.

9        A.    So Lovell, for instance, came back to be tried

10   again and I didn't make any of the decisions in the

11   underlying trial portion, which, again, was just on the

12   sentencing phase.  It wasn't the guilt or innocence

13   phase.  But to the extent there were requests made for

14   indigent resources, I did not involve myself in those,

15   but our office certainly did.

16       Q.    So when you say you weren't -- you did not

17   involve yourself or you were not involved in those, are

18   you saying that you were not consulted in any way on

19   those?

20       A.    Correct.

21       Q.    Were you kept apprised of any of those?  I

22   mean, for example, when I GRAMA these things, which I

23   would be doing, are you saying you're not going to be

24   cc'd on any of those communications?

25       A.    Not necessarily.  I don't recall every request

1    that was made.  But occasionally defense counsel will not

2    see it necessary to have a Chinese wall.  They'll make

3    motion.  It's public.  It's in the press and everything

4    else.  I wouldn't have weighed in.  I wouldn't have made

5    the decision on that, but I would have been aware of some

6    of those kinds of things.  And certainly once experts

7    were retained and testified and that sort of thing, yes,

8    I knew what was going on and we might have had

9    discussions about how that was going, but I didn't make

10   any decisions on their hiring or --

11        Q.   Did you have any involvement in any

12   decision-making -- let me stop that and try to rephrase

13   it.  I'm hoping that maybe we can cut this down a little

14   bit, so let me try to ask it in a sensible way.

15             At some point, did you become aware that Sam

16   Newton was requesting more funds in connection with the

17   Doug Lovell representation?

18        A.   Yes.

19        Q.   Did you have any involvement in the

20   decision-making with respect to responding to those

21   requests?

22        A.   Yes, I would say I did.  I had discussions with

23   Bryan.  I had discussions with Dave about some of those

24   requests for additional funds, yes.

25        Q.   Let me ask you to look at what was previously

1    marked in Mr. Wilson's deposition as Exhibit-1.  You'll

2    probably have to go to the bottom of the stack there.

3         A.   Okay.

4         Q.   Would you look at Exhibit-1 and let me know

5    when you're ready for a question?

6         A.   I have Exhibit-1.  Did you want me to read it

7    first?

8         Q.   It's up to you.  I can ask you the question --

9         A.   Why don't you ask and I'll see if I can --

10        Q.   Some people like to do it differently, but

11   that's fine.

12             Okay.  So do you see that at the bottom of the

13   first page of Exhibit-1 that this is -- the first email

14   in this string is from Sam Newton dated July 28, 2016?

15        A.   First email is from Sam, did you say?  Yes,

16   uh-huh.

17        Q.   So let me ask you to turn to the second page of

18   Exhibit-1, the second paragraph.  And it says:  "Lovell

19   is in a place right now where he says he would be willing

20   to withdraw his appeal if the state would agree to a new

21   penalty phase.  He would waive all of his guilt phase

22   issues and we could proceed to the latter half of the

23   case."

24        A.   Okay.

25        Q.   And in response to this email, I see that you

11

1    asked Bryan Baron, Dave Wilson, and some others to have a

2    meeting about this as soon as possible.  Do you see that?

3         A.    Is that in this email chain?

4         Q.    Yes.

5         A.    Let's see.  Yes.

6         Q.    Okay.  And then you said you wanted Dave Wilson

7    to be there, Chris Shaw, Bryan Baron, and yourself?

8         A.    Yes.

9         Q.    And I apologize.  I don't remember.  Who was

10   Chris Shaw?

11        A.    Chris Shaw was the prosecutor.  He and Gary

12   Heward.

13        Q.    So he was the prosecutor in the -- if there

14   had -- if this offer had been accepted about giving

15   Mr. Lovell a new jury on the penalty phase, Mr. Shaw

16   would have been involved in that prosecution or that

17   proceeding?

18        A.    Correct.

19        Q.    Did have you any reservations about inviting

20   him to this meeting at which something would be discussed

21   that he would have direct involvement with?

22        A.    I did not.

23        Q.    Okay.  Did that meeting occur?

24        A.    I assume that it did, but I honestly don't

25   remember if it did.

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
April 18, 2019                                           Christopher Allred

12

1      Q.    Do you remember any discussions in which you

2   participated about Lovell's offer to waive his appeal if

3   he could just have a new jury in the -- you know, another

4   crack at a jury in the penalty phase?

5      A.    I don't remember them with any specificity.  I

6   only vaguely remember that that was an issue.

7      Q.    Is it your understanding that this offer was

8   turned down?

9      A.    Yes.

10     Q.    Do you know any reasons for that?

11     A.    I can't say that I recall specifically, no.

12     Q.    Did you understand from this email that if the

13  offer was accepted, that Mr. Newton would no longer have

14  to do the appeal that he had been hired to do?

15     A.    That would have been my understanding, yes.  I

16  think he said that he would withdraw the appeal.

17     Q.    Let's see.  Can you please look at deposition

18  Exhibit-2.

19     A.    Okay.

20     Q.    Again, this was marked as 2 in the deposition

21  of Mr. Wilson.  Do you remember the seeing the emails

22  that are contained within Exhibit-2?

23     A.    Yes.

24     Q.    Okay.  In the email from Mr. Baron, he states

25  that he would like to sit down with you and Mr. Wilson

13

1  and "discuss how you would like to handle the inevitable

2  request to exceed the contract cap."  And this is on

3  December 5th of 2016.  Did that sit-down occur?

4      A.   I can't remember specifically.  It probably

5  did.  But I honestly don't remember if we sat down

6  together or what.

7      Q.   Do you remember any conversations with

8  Mr. Baron and/or Mr. Wilson regarding the subject matter

9  of Exhibit-2?

10     A.   I remember having discussions about the fact

11 that he was likely to exceed the cap, but I don't

12 remember specifically what was said.

13     Q.   What about generally?

14     A.   Generally, I think we referred back to the

15 contract and what the contract said, that it said that

16 Mr. Newton could ask for additions if he were to provide

17 an explanation for them.  I think that would have been

18 our direction at the time, would be to just ask that he

19 supplement any requests with an explanation for them.

20     Q.   Did you draft any communications to Mr. Newton?

21     A.   Not that I can recall.

22     Q.   Did you have any direct communication with

23 Mr. Newton of any kind between December 5th of 2016 and

24 when he withdrew?

25     A.   I don't recall having any direct conversations

14

1    with him, no.

2         Q.    Let me ask you to look at what was marked as

3    Exhibit-3 to Mr. Wilson's deposition.  And is that Weber

4    County 789?

5         A.    Yes.

6         Q.    I failed to write it.  Do you remember

7    receiving the emails that are contained within Exhibit-3?

8         A.    Let's see.  Yeah, I don't remember

9    specifically, but I guess generally.  It's been a couple

10   of years.

11        Q.    Do you remember having a discussion with either

12   Mr. Baron and/or Mr. Wilson about Mr. Newton's request

13   for additional funding?

14        A.    I do remember having discussions about that

15   generally.  I can't remember exactly when and precisely

16   what was said.

17        Q.    And I don't have to have exact and precise

18   memories.  I'll take the gist or the general memories.

19        A.    Sure.

20        Q.    So generally, do you recall anything about

21   discussions in response to this March 7, 2017, email from

22   Mr. Newton?

23        A.    And this is the one where he's saying that the

24   Supreme Court had issued the order remanding Doug

25   Lovell's case for further proceedings in the trial court

15

1   related to ineffective assistance of counsel.

2       Q.   Often referred to as the 23B?

3       A.   The 23B.  So, yes, I do remember having

4   discussions about the 23B motion.  What is it that you

5   want to know about that?

6       Q.   I want to know generally what was said during

7   those discussions.

8       A.   Okay.  I believe we would have talked about --

9       Q.   I'm going to stop you.  The "would have" -- "I

10  believe we would have discussed," is going to be messy on

11  the record.  If you have a memory, then it can be general

12  and you can tell me.  If you're just saying, "well, I

13  think I" or "I would have done this or that," it doesn't

14  really help anybody.

15      A.   Okay.  I just don't remember specific to this

16  email.  If I may speak if general terms, the discussions

17  we had about the 23B remand, I'm happy to do that.  Is

18  that what you would like me to do?

19      Q.   Well, I need to tie it to the March 7th.  And

20  if you're unable to, sort of, break out discussions you

21  had --

22      A.   Let me read this a little closer and see if it

23  refreshes my memory.  Okay.  I know that we talked about

24  the fact that he said that he has -- he said he attended

25  the bar disciplinary proceeding against Mr. Young.  I

16

1   know we talked about whether billing for that was

2   appropriate.  We didn't think it was.  And at some point

3   I know we received billing for his attending bar

4   disciplinary actions against Mr. Young.  We had that

5   discussion.

6          We talked about how much time it would cost and

7   whether he had made a sufficient explanation for the

8   additional hours that he needed.

9      Q.   And he didn't include an estimate of hours in

10  this particular email, correct?

11     A.   No.

12     Q.   So what hours was it that you were wondering if

13  he had sufficiently justified?

14     A.    I think we were wondering -- sorry.  We were

15  wondering generally whether he had provided in some other

16  letter or communication the number of hours he was

17  requesting.

18     Q.   Okay.  Did you do anything to determine what

19  role Mr. Newton had played with the disciplinary

20  proceedings against Mr. Young?

21     A.    I did not do anything to determine that.  That

22  was brought to my attention.

23     Q.   By?

24     A.   Bryan or Dave.

25     Q.   And what were you told?

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred
April 18, 2019

17

1    A.    I was told that he had submitted a bill for

2 some work in excess of the $75,000 cap that included

3 hours billed for attending and participating in the

4 disciplinary proceedings before the bar in Mr. Young's

5 case.

6    Q.    And what were you told with respect to what

7 role he had played?

8    A.    I was told that he had participated in that

9 proceeding, I think as a witness, as I recall.  But just

10 that he had participated in those proceedings.

11    Q.    And that would have been later, right?  Because

12 that's -- you hadn't received a bill for that as of March

13 7th, correct?

14    A.    Yeah.  I wouldn't have had that discussion

15 until I received the bill.

16    Q.    Did you have anything to do with authorizing

17 payment of invoices received from Mr. Newton on the

18 Lovell case?

19    A.    I'm sorry.  Say again.

20         (The previous question was read by the court

21 reporter.)

22         THE WITNESS:  I had discussions about some of

23 the invoices.  I did not ultimately authorize the

24 payments.  That was done by county commissioners.

25    Q.    (By Ms. Porter)  What was that process for

18

1   county commissioners to authorize payments on

2   Mr. Newton's invoices?

3        A.   They would receive invoices and the county

4   commissioners -- primarily Commissioner Harvey, who was

5   the county attorney liaison, would ask Bryan, I think

6   first and foremost, whether he had looked at that and

7   whether he thought those were appropriate bills.

8        Q.   And in what context?  I mean, like a work

9   session or some executive session or what?

10       A.   I don't know for sure whether it was over the

11  phone or whether they met in person.

12       Q.   Did you ever conduct any review to determine --

13  strike that.

14            At any point did you become aware that

15  Mr. Newton had not received any payment from the county

16  in the year 2017, except for an inadvertent payment?  I

17  mean, for the year 2017.

18       A.   I'm not aware that he was not paid anything in

19  2017.

20       Q.   Except for the -- let's back it up so that --

21  let's narrow it down.  I'll make my question --

22       A.   I apologize.  I don't remember the timelines

23  exactly.

24       Q.   All right.  At any point, did you become aware

25  that Mr. Newton was alleging that he had not been paid

19

1    for any of his 2017 time except for one inadvertent

2    payment in March, approximately March of 2017?

3         A.    I do not remember that specifically, no.

4         Q.    So this will go without saying then, but -- so

5    you never did anything to determine whether or not

6    Mr. Newton's invoices were being held up?

7         A.    No.

8         Q.    Did you ever have any conversations with

9    Mr. Baron and/or Mr. Wilson about the frequency with

10   which Mr. Newton was communicating with his client?

11        A.    Yes.

12        Q.    And is there any way you can help pinpoint that

13   time?

14        A.    I can't pinpoint the time.

15        Q.    If I were to represent to you that this was

16   brought to Mr. Newton's attention in 2016 and then again

17   in 2017, would you have any reason to dispute that?

18        A.    No.

19        Q.    So do you believe that you were involved in the

20   discussions about that issue both times or just one time?

21        A.    Both times.

22        Q.    So let's go with the earlier of the two, and

23   the record will reflect when that was.

24        A.    Sure.

25        Q.    How did that subject arise the first time,

20

1   which would have been in 2016?

2       A.   So it would have arisen from Sam's billing.  I

3   would assume that's the first place it was seen.  It was

4   brought to my attention, as I recall, by Bryan.  And he

5   would have seen that in the billing and would have asked

6   questions as to why he was spending so much time visiting

7   with his client on an appeal case that would have been

8   primarily a legal argument.

9       Q.   And who was telling you that it would have been

10  primarily a legal argument?

11      A.   Well, appeals generally are that.

12      Q.   Well, this is a very different appeal.  I mean,

13  did you just assume that this was going to be a primarily

14  legal argument, or did you do any investigation to

15  determine if that was, in fact, true?

16      A.   I didn't do any investigation.

17      Q.   Okay.  Is it a fair statement that you

18  delegated most of the legwork or the investigation

19  relating to Sam Newton and the Lovell case to Mr. Baron?

20      A.   Yes.

21      Q.   Did you ever do any independent review of

22  Mr. Newton's bills, for example?

23      A.   I looked at the bills.  If by review you mean

24  did I contact witnesses or things like that, no.

25      Q.   Well, I'll give you an example and ask you if

21

1    you did something about this.

2        A.    Sure.

3        Q.    At one point Mr. Newton was told by the County

4    that a majority of the witnesses that were going to be

5    called in a 23B remand proceeding were unlikely to have

6    helpful information, or words to that effect.

7        A.    Okay.

8        Q.    Did you do anything to verify whether that was

9    true or where Mr. Baron was coming up with that notion?

10       A.    No.

11       Q.    Would it have concerned you if Mr. Baron was

12   relying on the prosecutor to form that opinion?

13       A.    No.

14       Q.    Why not?

15       A.    Because, again, the case had already been

16   handled from the prosecution end, and I think the

17   prosecutor would have had the best knowledge of the facts

18   and background of the case.  So it wouldn't surprise me

19   that Mr. Baron would have spoken with him.

20       Q.    At one point Mr. -- I believe that Mr. Newton

21   was told that on remand this proceeding should only take

22   a week.  I mean, the exact words will be in the record so

23   if I'm off a bit, I apologize.

24       A.    Who told him?

25       Q.    I believe that was in an email from Mr. Baron.

22

1   And I can actually dig up some of these things, but I'm

2   seeing if we can get out of here.

3        A.   Sure.  You bet.  I'm just making sure I follow

4   you.

5        Q.   And anything that's in the record, obviously,

6   is going to trump anything that I might misstate in some

7   way?

8        A.   Of course.

9        Q.   Okay.  So let me ask you this question:  Did

10  you ever do anything to determine how long the 23B remand

11  proceedings would be expected to take?

12       A.   Yes, at a very cursory level.  Initially he had

13  submitted a bill that said it would take 6- to 700 hours.

14  I just did some initial math.  And in my mind at $150 an

15  hour, what Sam was proposing was to work on this project

16  every minute of every eight-hour working day, five days a

17  week for nearly four and a half months.  That raised a

18  red flag with me.  It didn't sound reasonable.  And so I

19  had the discussion with Mr. Baron about whether that

20  appeared to be reasonable, and our conclusion was Sam had

21  not provided the basis for that request.

22       Q.   You said 600 to 700.  Did you mean to say 500

23  to 700?

24       A.   No.  I mean 600 to 700 is what I recall.  I may

25  be wrong, but that's my recollection.

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

23

1    Q.   All right.  Well, we're both in the same boat

2    that if there's something in writing that clears it up

3    for us --

4    A.   Sure.

5    Q.   -- will make it easier for us.

6         Do you know how much has been paid to Colleen

7    Coebergh so far on the Lovell case?

8    A.   I do not.

9    Q.   Have you seen anything figures with respect to

10   payments to Ms. Coebergh?

11   A.   No.

12   Q.   Did you have any involvement in bringing her on

13   board or negotiating her contract?

14   A.   I had discussions with Bryan and probably Dave

15   about who had responded to the RFP, who was available,

16   were they qualified, would they do it for the -- would

17   they accept the contracted amount.

18   Q.   Let me ask you to look at Exhibit-5 previously

19   marked in Mr. Wilson's deposition.  The second email from

20   the top, Mr. Wilson says:  "I think we should move

21   forward with an RFP for appellate services including

22   conflicts."  That sentence referred to all appellate work

23   that Mr. Newton was doing?

24   A.   I'm sorry.  I'm looking for which -- referring

25   to Exhibit-5.  Oh, "That works for me.  I think we should

24

1   move forward with an RFP for appellate services including

2   conflicts."  I'm sorry.  What was the question?

3       Q.   You understood that reference to be to

4   appellate work that Mr. Newton -- or all appellate

5   contracts that Mr. Newton had; is that true?

6       A.   Yes.  I don't remember this at the time, but

7   that's what it says.

8       Q.   And that RFP did not actually end up happening,

9   correct?

10      A.   It did not.  At least not at that time.

11      Q.   Mr. Newton's contract wasn't terminated until

12  October of 2017, correct?

13      A.   I don't remember exactly.  But if that's what

14  the record reflects, yes.

15      Q.   Did you have any role in making the decision to

16  terminate Mr. Newton's contracts in, I'll say, October of

17  2017?  Was it is October or September?  It was October,

18  isn't it?

19          MS. VANORMAN:  I think it was October.

20          MS. PORTER:  I think it was.

21          THE WITNESS:  That's when it was terminated?

22          MS. PORTER:  Yeah.  Now I'm going to look

23  because now I'm --

24          THE WITNESS:  Sure.

25          MS. VANORMAN:  How about you say "the fall"?

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

25

1       MS. PORTER:  Well, now I'm just wondering if

2   I'm -- yeah, it's going to be October.  Let me reask the

3   question.

4       Q.   (By Ms. Porter)  Did you have any involvement

5   in the decision-making process as to the termination of

6   Mr. Newton's contracts in the fall of 2017?

7       A.   Yes.

8       Q.   What role did you have?

9       A.   I had discussions with Bryan and Dave and

10  possibly Jim Harvey.

11      Q.   And why do you say possibly Jim Harvey?

12      A.   Because I don't remember for sure whether he

13  was a part of those discussions or not.

14      Q.   Who was the final decision-making authority

15  with respect to the decision to terminate Mr. Newton's

16  contracts?

17      A.   The County Commission.

18      Q.   The commission as a body, or did Mr. Harvey

19  have authority on his own to terminate the contract?

20      A.   I think the commission as a body ultimately.  I

21  don't believe they would have had to hold a County

22  Commission meeting for that, but it would have to be a

23  commission decision.  But, again, Jim was our point

24  commissioner on these discussions because he was assigned

25  to our office.

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
April 18, 2019                                    Christopher Allred

26

1     Q.   Did you have any discussions with Mr. Baron in

2  which Mr. Baron claimed that Sam Newton had made

3  misrepresentations to the media?

4     A.   Yes.

5     Q.   Did Mr. Baron identify the misrepresentations

6  to you?

7     A.   I spoke with Mr. Baron about the

8  misrepresentations and subsequently Mr. Baron told me

9  that he had felt that the exact words were not

10  necessarily incorrect, but that the -- the suggestion

11  from the articles were incorrect.

12     Q.   And with respect to or -- I've already

13  withdrawn more questions this afternoon than the entire

14  morning, but I'm tired.

15          Did Mr. Baron tell you that Mr. Newton had made

16  misrepresentations to the court?

17     A.   Yes.

18     Q.   And did he identify those misrepresentations?

19     A.   He did.

20     Q.   What did he tell you?

21     A.   He told me that there were at least two

22  misrepresentations.  One was a misrepresentation about

23  investigative resources which were provided in the

24  contract.  He told me that Mr. Newton had told the Court

25  that the County refused to provide him investigation

1    resources, and that that was false.  He also told me that

2    Mr. Newton had made a statement in a hearing with Judge

3    DiReda that the County had flatly refused to pay anything

4    more than the $15,000 or the 100 hours in connection with

5    the 23 remand motion and associated issues.

6         Q.    And did Mr. Baron show you documentation of

7    those two misrepresentations he was claiming?

8         A.    Yes.

9         Q.    What did he show you?

10        A.    He showed me -- well, let me take that back.

11   In at least two additional places, he showed me where the

12   misrepresentations were made.  He told me that the

13   misrepresentation was made in the hearing with Judge

14   DiReda.  So he just told me that, he didn't show me a

15   transcript or something like that.

16        Q.    And I'm sorry.  What two additional places are

17   you referring to?

18        A.    So there was another in -- where he made that

19   in response to the attorney general's motion to -- I

20   can't remember exactly the term, but it was a motion

21   essentially to clarify whether Sam had a conflict or

22   whether he could go forward on their cases based on, I

23   think, primarily his health issues that he had put into

24   the record.  He also made the assertion that the County

25   would not give him any more than $15,000 for the 23

1    remand issues in his motion to withdraw in Weber County.

2         Q.    And did you review those documents yourself?

3         A.    Yes.

4         Q.    Did you also read the County's reply on the

5    motion to withdraw?

6         A.    I don't remember.

7         Q.    Let me ask you more directly:  At some point,

8    did you become aware that some of the emails upon which

9    Weber County was relying to claim that there had been a

10   misrepresentation had not been sent to Mr. Newton until

11   after he had filed the alleged misrepresentation?

12        A.    So that -- if I understand you correct, you're

13   saying the emails that were exchanged amongst Weber

14   County identifying those were not sent to Mr. Newton; is

15   that correct?

16        Q.    No.  I'll just indicate, have you ever come to

17   learn -- and I'm not interested in anything you have ever

18   spoken to with your attorney about any subject.  But have

19   you ever come to learn that as of the date upon which an

20   alleged misrepresentation was made by Mr. Newton, some of

21   the emails to which the county later pointed had not even

22   been sent yet?

23        A.    I don't believe I'm aware of that timing.

24        Q.    Okay.  Did Mr. Baron identify any other

25   misrepresentations to the Court when you were having that

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred
April 18, 2019

29

1   conversation or those conversations with him?

2       A.   Did he -- I don't think he identified them to

3   the Court.  My recollection is the Court didn't give him

4   an opportunity to respond.

5       Q.   And I apologize.  My wording is getting really

6   sloppy.

7            I meant during your discussions with Mr. Baron,

8   did Mr. Baron identify any other alleged

9   misrepresentations that he believed Sam Newton had made

10  to the Court, other than what you have described for us?

11      A.   That he made to the Court?

12      Q.   Yes.  You've mentioned --

13      A.   Yes.  I think I said -- don't know that he made

14  any other mention to the Court of other

15  misrepresentations.  We thought there were other concerns

16  with his billing and things, but I don't know that that

17  went to the Court, if that's what you're asking.

18      Q.   Well, Mr. Newton was fired for alledgedly

19  making misrepresentations to the media and to the Court,

20  which had allegedly harmed the County, correct?

21      A.   Correct, in part.

22      Q.   Well, have you seen the termination letter to

23  Mr. Newton?

24      A.   I have, yes.

25      Q.   It doesn't mention any other reason, does it?

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
April 18, 2019
Christopher Allred

30

1       A.   No, it does not.  But that doesn't mean there

2    weren't further reasons.  It only means that the letter

3    identified some of the reasons.

4       Q.   Did it say "these are some of the reasons"?

5       A.   No.

6       Q.   Did you have a chance to look over the letter

7    of termination that went to Mr. Newton before it went

8    out?

9       A.   Yes.

10      Q.   All right.  Let me -- are we looking at

11   Exhibit-6?  Or if not, would you please?

12      A.   Yes.

13      Q.   Okay.  Exhibit-6, which was marked in

14   Mr. Wilson's deposition contains an email string.  And

15   you're welcome to look at any part of it, but I'm just

16   going to ask you a little bit about the draft email that

17   Mr. Baron was sending to you for review.

18      A.   Okay.

19      Q.   It's on the first page.  Are you with me?

20      A.   Yes.

21      Q.   Okay.  The third paragraph states -- of the

22   draft says:  "The $75,000 that was provided to you

23   initially should be sufficient to cover the reply brief,

24   so we are not offering additional compensation for that."

25           Was that consistent with your understanding at

1    that time?

2        A.    Yes.

3        Q.    And, in fact, Mr. Newton was definitively told

4    that he would not be offered any additional compensation

5    for the reply brief period, correct?

6        A.    No, incorrect.

7        Q.    Can you identify for me any email in which

8    Mr. Newton was ever told that he could actually apply for

9    more money for the reply brief?

10       A.    I don't have them in front of me and I don't

11   know, to tell you the truth, whether they were emails

12   between Bryan and me.  But I believe they were emails

13   between Bryan and Sam where they talked about an

14   additional $22,000 that could be -- at least that was the

15   bill received from Sam.  There was some discussion about

16   how much of that was appropriate.  But there was clearly

17   an understanding on Sam's part that he was applying for

18   additional funning.  I believe he was paid 18,000 in

19   addition.  And that had to do with, I believe, the

20   drafting of the 23B motion.  So there were subsequent

21   discussions to this email in which he discussed

22   additional pay and received additional pay.

23       Q.    So was it your understanding that Mr. Baron was

24   supposed to convey to Sam Newton that he could apply for

25   additional funding attributable to extra work on the

32

1   reply brief?

2       A.   I think that was stated in the underlying

3   contract.

4            MS. PORTER:  Would you read my question back,

5   please.

6            (The previous question was read by the court

7   reporter.)

8            THE WITNESS:  Did I misunderstand?

9            MS. PORTER:  I don't believe you answered my

10  question.

11           THE WITNESS:  Okay.  Try again.

12           (The previous question was read by the court

13  reporter.)

14           THE WITNESS:  I don't know that it was his

15  obligation to do so, but it's my understanding that he

16  did tell him that he could ask for additional money,

17  which was consist with the contract itself.

18      Q.   (By Ms. Porter)  Additional money for the reply

19  brief?

20      A.   Yes.

21      Q.   Would you be surprised if Mr. Baron never did

22  that?

23      A.   No, not really, because I might be talking

24  about a different brief.  I may be confused about which

25  brief you're talking about.

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

33

1      Q.    I'm just talking about the reply belief on

2   appeal.  You know what that is, right?

3      A.    Not the 23B.

4      Q.    Right.  Have you done any appellate work?

5      A.    No.

6      Q.    Have you ever written an appellate brief?

7      A.    Yes.

8      Q.    On how many occasions?

9      A.    Sorry.  That didn't make sense.  Two that I can

10   think of that I have personally written a brief to the

11   appellate court.

12      Q.    What types of cases were they?

13      A.    Land use.

14      Q.    Have you ever written any criminal appellate

15   briefs?

16      A.    No.

17      Q.    Have you ever written any appellate briefs in a

18   death penalty case?

19      A.    I haven't written any other appellate briefs.

20      Q.    But you know what a reply brief is?

21      A.    I do.

22      Q.    Did you understand that as part of the appeal

23   for Mr. Lovell that there would be an initial brief by

24   the appellate, then the state would file a brief on

25   behalf of the prosecution, the appellee brief, and then

34

1    there would be a reply brief?

2         A.   I'm aware of that, yes.

3         Q.   Okay.  All right.  I want to make sure that you

4    understand what I'm saying when I refer to the reply

5    brief.

6         A.   I do understand.  And I have misstated because

7    I was talking about the 23B motion.  That's what Bryan

8    talked about.  That's what the 22,000 was about.  So

9    you're correct, I misstated.  On the reply brief, I don't

10   remember any additional discussions that Bryan had or

11   emailed with Sam about that.  I believe it was in the

12   contract that he could ask for more money so that was

13   available to him.

14        Q.   So if Mr. Newton was told by the County that he

15   could not ask for more money for the reply brief, then

16   you're saying that is inconsistent with your

17   understanding of his contract?

18        A.   Yes.

19        Q.   Okay.  Skip some of these -- I apologize.  Some

20   of these we went over with Mr. Wilson.  I probably should

21   have done this during the break.  I apologize.

22        A.   That's fine.

23        Q.   Could you look at Exhibit-9 previously marked

24   in Mr. Wilson's deposition?  If we look at the top of the

25   page of Exhibit-9, there is an email that Mr. Wilson told

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
April 18, 2019                                          Christopher Allred

35

1    us that he sent on July 17, 2017, at 2:48 p.m.  Do you

2    see that part of the page?

3         A.    Is it the one in the middle?

4         Q.    No.

5         A.    Top one?

6         Q.    The one at 2:48 p.m.

7         A.    2:48 p.m., yes, it's at the top.

8         Q.    Yeah, the top one.  In the middle of that

9    paragraph, Mr. Wilson makes the statement:  "All of this

10   for a defendant who admitted killing a person and then a

11   witness.  The world must laugh at our stupidity."

12         When you read that, did you consider removing

13   Mr. Wilson from the -- from having any role with respect

14   to the funding in the Lovell case?

15        A.    No.

16        Q.    Did you ask Mr. Wilson what he was referring to

17   when he said "the world must laugh at our stupidity"?

18        A.    No.

19        Q.    What did you take that to refer to, if

20   anything?

21        A.    I didn't give it a lot of thought.

22        Q.    When you saw this email, did it cause you any

23   concern that Mr. Wilson's personal views about the death

24   penalty, at least relating to Doug Lovell, were

25   influencing his actions?

36

1     A.    No.  I know Mr. Wilson.  I've known him for

2   years.  I know that he takes the Constitution and the

3   obligation of our office very seriously.  I've had many,

4   many conversations with him.  I didn't doubt for one

5   minute that he would do anything that would intentionally

6   or otherwise run afoul of his Constitutional obligations.

7     Q.    Did he ever express disrespect for the Utah

8   Supreme Court to you?

9     A.    No.

10     Q.    Would you look at Exhibit-10.  You're welcome

11   to look at any part of this exhibit, but at the very top

12   do you see that Mr. Wilson wrote:  "So we have never

13   reached that point since the Utah Supreme Court doesn't

14   want this admitted murderer to die."

15          Do you remember seeing that at the time?

16     A.    I do now.

17     Q.    Okay.  Did you receive this and see that on

18   July 17, 2017?

19     A.    Yes.

20     Q.    Did that statement raise any red flags with you

21   that maybe Mr. Wilson's personal views about the death

22   penalty as it relates to Mr. Lovell were influencing his

23   actions?

24     A.    No.  I didn't see anything in his actions that

25   was contrary to the course he should have taken at any

37

1    given time.

2        Q.    Did it cause you any concerns to see someone

3    involved in the decision-making process in a death

4    penalty appeal to use words such as "since the Utah

5    Supreme Court doesn't want this admitted murderer to

6    die"?

7        A.    It did not cause me concern.  It sounded like

8    Mr. Wilson was blowing off some steam.

9        Q.    And it also sounded like he believed Doug

10   Lovell should be put to death, correct?

11       A.    "So we have reached the point since the Utah

12   Supreme Court doesn't want this admitted murderer to

13   die."  I think that expresses some frustration with the

14   Supreme Court.  I don't think it maligns the Supreme

15   Court.

16            MS. PORTER:  Could I have my question back,

17   please.

18            (The previous question was read by the court

19   reporter.)

20       Q.    (By Ms. Porter)  Isn't that how you interpreted

21   that language when you saw it, that among other things,

22   Mr. Wilson believe that Doug Lovell should be put to

23   death?

24       A.    I don't know that that's exactly what you can

25   take from that, but I'll leave that up to you.

38

1    Q.   Did it at least raise some red flags with you?

2    A.   It did not.  Like I said, I've known Mr. Wilson

3  for many years.  I've watched him in action.  He's never

4  shown any actions that would give me any concern.  He's

5  blowing off a little bit of steam here.  I didn't think

6  it was that big of a deal.

7    Q.   Please look at what was previously marked as

8  Deposition Exhibit-11, and I mean marked in Mr. Wilson's

9  deposition.  Do you recognize Exhibit-11 as an email

10  string in which you sent an email to Mr. Baron and he

11  responded?

12    A.   Yes.

13    Q.   Okay.  So you had read a ruling in State vs.

14  Rogers, and you had concluded from your review of that

15  that this -- that it included or reflected an instance of

16  Sam Newton's willingness to misrepresent facts?

17    A.   Correct.

18    Q.   Did you check with someone with more appellate

19  experience to see how common the language was that you

20  were relying on?

21    A.   No.

22    Q.   Did you check with anyone qualified in

23  appellate practice as to whether or not that case really

24  did reflect an instance of Sam Newton's willingness to

25  misrepresent facts?

parGeneral

39

1    A.    No.   That was my opinion from reading the

2  decision.

3    Q.    Your opinion based on --

4    A.    Based on that decision alone.

5    Q.    And no further investigation?  Let me ask you

6  this.

7    A.    I didn't raise it in the court or anything like

8  that.  This was a comment amongst us, so, no, I didn't do

9  a lot of research.  I don't typically write a brief when

10  I'm just offering an offhand comment to someone in my

11  office.

12    Q.    Were you hoping that you could use State vs.

13  Rogers to justify terminating Sam Newton's contract on a

14  pretext that he makes misrepresentations to court?

15    A.    No.   There were no pretexts involved.  We know

16  he's made misrepresentations to court.

17    Q.    Did you do any double-checking to see whether

18  any misrepresentations had been made by Weber County to

19  the Court in the Doug Lovell case?

20    A.    No.

21    Q.    Have you checked recently to see if there have

22  been alleged misrepresentations by Mr. Lovell's current

23  counsel?

24    A.    No.

25    Q.    Are you aware of any of the things that have

40

1    happened in the Doug Lovell case over the past four or

2    five months?

3         A.    No.

4         Q.    Have you asked anyone to please monitor the

5    Doug Lovell case to make sure that Doug Lovell's new

6    attorney doesn't make any misrepresentations to the

7    court?

8         A.    Yes.

9         Q.    And in what context did you make that request?

10        A.    Just speaking with Bryan informally.

11        Q.    Has Mr. Baron updated you on any of the

12   goings-on in the Lovell case in the past four or five

13   months?

14        A.    Mr. Baron has not told me of any

15   misrepresentations, no.

16        Q.    Has he said anything to you about what's going

17   on in the Lovell case?

18        A.    We did discuss it briefly.  I'm trying to

19   remember what he told me.  It didn't stand out

20   particularly.  I asked him what the status was and I

21   don't remember.

22        Q.    So Mr. Baron hasn't raised any red flags with

23   you about anything that's gone on in the Lovell case in

24   the last five months; is that a fair statement?

25        A.    That is a fair statement.

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

41

1      (EXHIBIT-16 marked.)

2      THE WITNESS:  Is this 16 for me that we're

3   looking at?

4      Q.   (By Ms. Porter)  Yes.  Please look at

5   Exhibit-16.  And is that an email that you sent on

6   August 24, 2017?

7      A.   Apparently, yes.

8      Q.   And that's on that same State vs. Rogers case,

9   right?

10      A.   Let's see.  The subject is State vs. Rogers.  I

11   say:  "Congratulations once more on your excellent

12   lawyering."

13      Q.   Why didn't -- why didn't you ask those

14   attorneys, since you were emailing them anyway, whether

15   they believed that this opinion reflected another -- an

16   instance of Sam Newton's willingness to misrepresent

17   facts?

18      A.   Because the court stated essentially that.

19      Q.   And you -- and you didn't -- all right.  That

20   was your only reason for not asking the actual lawyers on

21   the other side?

22      A.   Like I said, it was sort of in passing.  I

23   didn't intend to write an additional brief or something.

24      Q.   Well, you're intending to use it as -- to try

25   to bolster your misrepresentation defense in this case,

42

1  right?

2      A.   It's a very small part of it, perhaps.

3      Q.   And, actually, after supposedly forming this

4  opinion that the Court was saying that Sam was

5  misrepresenting facts, did you ask anyone to go back and

6  look at any of Sam Newton's other briefings to make sure

7  that he hadn't been misrepresenting facts in any other

8  opinions?

9      A.   No.  We're a busy office.  We have a lot of

10  things to do.  We can't delve into everything.

11     Q.   Well, wouldn't it have been important if the

12  lawyer representing the defendant that you guys had been

13  paying had been making misrepresentations of fact?

14     A.   We already knew he was making misrepresentation

15  of fact.

16     Q.   Of the ones that you described earlier, right?

17     A.   Correct.

18     Q.   And, by the way, you understood that

19  misrepresentation of future intent and opinions and

20  characterizations of -- well, how do I word that?  Let me

21  back that up.  Never mind.  I'll skip that.

22          At some point, did you become aware that there

23  was a deadline for replacing Sam Newton in the Lovell

24  case?

25     A.   Yes.

43

1    Q.    And did you become aware that the court had

2  ordered that certain documents be filed by Mr. Lovell's

3  new counsel by a certain date?

4    A.    I don't remember specifically, but that stands

5  to reason.

6    Q.    Did you become aware that Mr. Baron had --

7  having not heard from counsel, went ahead and filed those

8  documents himself without authority from counsel?

9    A.    I'm not aware of that.

10    Q.    Would that cause you any concern if the emails

11  reflected that that happened?

12    A.    I guess it depends on what the documents are

13  and what the obligations were.  I really don't know

14  exactly what we're talking about.

15    Q.    So it wouldn't bother you if he filed something

16  that you consider not important without authority?  Is

17  that what you're saying?

18    A.    Without authority?

19    Q.    Yeah.

20    A.    Well, I guess it depends on what we're talking

21  about.  If he files some innocuous document, that

22  wouldn't bother me too much.  If he filed something

23  meaningful without authority, that would bother me.

24    Q.    I apologize.  I think I asked you this and I

25  just don't remember.  But do you have any clue whatsoever

44

1    about how much Ms. Coebergh has been paid to date?

2        A.   I do not know.

3        Q.   I think I did ask that.  I apologize.

4             Did Sam Newton ask the County to give him

5    unlimited funds?

6        A.   Not directly.

7        Q.   By the way, what does "not directly" mean?

8        A.   Means the implication, I think, of submitting

9    requests for 700 hours that aren't very well supported,

10   suggesting in the newspapers that he couldn't put food on

11   the table if we wouldn't pay him what he was asking for,

12   suggesting that the County wasn't paying him and the

13   reason was for some sort of nefarious purposes, suggested

14   that he wanted nobody to ask him any questions about

15   money anymore which suggested that he wanted an open

16   checkbook.  That was a concern.

17           MS. PORTER:  Could I have that answer back,

18   please.

19           (The previous answer was read by the court

20   reporter.)

21       Q.   (By Ms. Porter)  What are you referring to when

22   you say that Sam Newton, I guess, suggested or said he

23   didn't want anyone to ask him any questions anymore?

24   What are you referring to that is the basis of that

25   statement?

45

1    A.    I'm suggesting he was unhappy with the County

2  requiring him to justify his requests for money.

3    Q.    That's not what you said, though, the first

4  time.  You said that he had suggested that he did not

5  want anyone to ask him any questions anymore.  Were you

6  just sort of using hyperbole?

7    A.    I'm talking about money.  I'm talking about

8  money.

9    Q.    You said that he had suggested he didn't want

10  anyone to ask him any questions anymore.  Do you have any

11  factual basis for the misrepresentation that you just

12  made?

13    A.    Just what I just told you.  It was -- I'm not

14  telling you that he said that in exactly the words.  I

15  think I explained it adequately in my first response.

16    Q.    Is it a fair statement that you're just taking

17  what he said and, sort of, either imputing an intent to

18  him or interpreting what he's saying?

19    A.    I'm interpreting what he's saying.

20    Q.    And, of course, he had the same right to do

21  that with respect to what the County was saying, right?

22    MS. VANORMAN:  Objection.  Calls for

23  speculation.  Lack of foundation.  Go ahead.

24    THE WITNESS:  I'm sorry.  What did you say?

25    MS. PORTER:  Can I have the question back,

46

1  please.

2          (The previous question was read by the court

3  reporter.)

4          Q.   (By Ms. Porter)  Mr. Newton had the same right

5  to interpret what the County was saying, that you just

6  did in this deposition?

7          A.   Sure.  He's got a right to say what he wants or

8  to interpret how he wants.

9          Q.   Now, you mentioned 700 hours again.  Did you

10  mean to say 500 to 700, or are you just going to stick

11  with the 700?

12          A.   It may have been 5- to 700, but I believe his

13  outside was 700, so I used that as an example.

14          Q.   Well, you didn't say it was an example.  You

15  said it was something he had --

16          A.   Well, he did.  He said -- whether it was 5- or

17  6- to 700, I'm fairly certain he did use the number 700.

18          Q.   But if he said 500 to 700, do you believe it is

19  a fair interpretation for you to only mention the 700 and

20  not the 500?  I'm curious how you pick and choose from

21  what he was saying.

22          A.   Because that's the outside of what he was

23  asking.  We had to evaluate whether that's what he was

24  really asking for, whether that was a request that he was

25  serious about.  So I do a little basic math to say what's

1   the outside that we're looking at here in order to advise

2   the County Commission on what it is he's requesting.

3   They would ask -- they're not lawyers -- is that

4   reasonable in my mind to suggest that he was going to

5   spend every minute of every eight-hour day, five days a

6   working week for nearly four and a half months doing

7   nothing but this one issue.   Sounds a little outlandish.

8        Q.   Have you looked at Ms. Coebergh billings?

9        A.   No, I have not.

10       Q.   Have you read any of the material where she

11   talks about how much time she has had to spend on this

12   case?

13       A.   I have not.

14       Q.   Is that something that you consider important

15   to do since you're saying that Mr. Newton's estimates

16   were so outlandish?

17            MS. VANORMAN:   Objection as to relevance.

18            You can answer.

19            THE WITNESS:   So if Bryan came to me and had a

20   concern, expressed that, and those were the same sorts of

21   things, I would have the same type of response.

22       Q.   (By Mr. Porter)   Did Mr. Baron ever raise an

23   issue with you about a case -- strike that.

24            I think earlier you mentioned that you had had

25   a chance to review the termination letter before it went

1    out to Sam Newton.  Do you recall making any suggested

2    changes to a draft or anything like that?

3         A.    I don't recall doing that.

4         Q.    Do you believe that your involvement in that

5    was simply reviewing a document and then not making any

6    suggestions on it?

7         A.    Yes.

8         Q.    Could you look at what was previously marked as

9    Exhibit-15 in Mr. Wilson's deposition.  So Mr. Wilson

10   indicated that this was an email that he sent to you.

11   And is it fair to say that the impetus for this email was

12   a request from the Standard-Examiner for information

13   about how much the prosecution and defense of the Doug

14   Lovell capital murder case had cost?

15        A.    Yes.  There was a letter from Mark Shenefelt of

16   the Standard-Examiner to Dave that looks like he's

17   responding to me about that rather than to Mr. Shenefelt.

18        Q.    And in response to -- or, excuse me, in

19   Mr. Wilson's email to you, the second sentence says:

20   "I'm not sure we will have such records without research

21   but it may be one we consider doing to help inform the

22   public of the costs of prosecuting and defending a

23   confessed murderer."

24              Did that sentence raise any red flags with you

25   about Mr. Wilson's feelings towards the death penalty, at

1    least as it relates to Doug Lovell?

2        A.    I don't think it's the death penalty so much

3    that he's concerned about.  I think it's the process,

4    once again.  He's obviously -- he's said it more than

5    once, he's referred to him as a "confessed murderer,"

6    which is factually correct.  He is a confessed murderer.

7    This was a sentencing.  That portion had been decided, so

8    it's factually correct.

9            Whether it's politically correct or whatever,

10   perhaps not.  But it's factually correct.  And I don't

11   think that it was a matter of he's concerned about the

12   death penalty, per se, so much as the process.  Doug

13   Lovell had been tried 20 or so years before.  It's been

14   going on for many, many years.  I know that's a cause of

15   frustration, not only for Mr. Wilson, but some people in

16   general feel that that's problematic that the legal

17   system takes so long to accomplish things.

18       Q.    And that's one of the considerations for -- in

19   introducing legislation to do away with the death

20   penalty?

21       A.    Sure.

22       Q.    Is it your testimony that you don't read

23   anything in that sentence to suggest that Mr. Wilson has

24   strong views about the death penalty?

25       A.    I don't read that from that.  I think it's more

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

50

1    a concern with the process.

2         Q.   And, of course, the process is a process that

3    had been directed by the Utah Supreme Court, correct?

4         A.   Correct.

5         Q.   Did it cause you any concern that Mr. Wilson

6    was using that type of wording in describing a process

7    that had been directed by the Utah Supreme Court?

8         A.   No.  I don't think it's inappropriate to

9    express some concern without overstepping that line and

10   indirectly maligning the Supreme Court or something like

11   that.  It wasn't published publicly.

12             (EXHIBIT-17 marked.)

13        Q.   (By Ms. Porter)  Let me show you what's been

14   marked as deposition Exhibit-17, and I'll ask if that's

15   an email that you sent on February 6, 2018?

16        A.   Yeah.  Let me just read.  Yes, I recognize

17   that.  That is my email.

18        Q.   What is the $1.6 million comprised of?  You're

19   not suggesting you paid $1.6 million to defense counsel

20   annually, are you?

21        A.   So I can't tell you right now.  It's been a

22   while.  I don't remember exactly what all that includes

23   or exactly how I arrived at that number.

24        Q.   I'll take generally.

25        A.   Yeah, so that would probably include our

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

51

1  defense contract to pay all the public defenders as well

2  as appeals and experts' defense resources.

3       Q.   And do you recall what you looked at in order

4  to come up with that figure?

5       A.   I don't recall.

6       Q.   If you wanted to recreate that figure or come

7  up with a figure now, what would you -- what kind of data

8  would you ask for?

9       A.   I would ask for the amount that of all of

10  the -- if I were trying to come up with that same answer,

11  essentially?

12       Q.   Right.  If you were doing it right now, what

13  would you ask Mr. Baron or somebody else to provide to

14  you?

15       A.   Probably look at all of the defense -- the

16  indigent defense contracts, appellate work, capital

17  defense, indigent defense resources outside of counsel.

18       Q.   And I apologize, but what does that mean,

19  resources outside of counsel?

20       A.   Experts, investigators, those kinds of things,

21  transcripts.

22       Q.   And that information would -- where would you

23  get it from?

24       A.   I would probably assign Bryan or someone else

25  to do it.

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

52

1    Q.    Do you happen to know which department or

2    employee or something would normally --

3    A.    I think our clerk would have copies of all the

4    contracts.  Our office manager would probably have a good

5    sense of how much was paid for expert resources.  So most

6    of that could be found between my office manager and

7    probably the clerk's office.

8    Q.    The next sentence, it says:  "During his

9    representation of Mr. Lovell, Mr. Newton made repeated

10   misrepresentations to the press and the Court concerning,

11   among other things, the County's willingness to pay for

12   his services."

13        Are the misrepresentations to the press and the

14   Court that you're referring to in this email the ones

15   that you already described for us in this deposition?

16   A.    Yes.

17   Q.    Are you aware of any effort during your tenure

18   to quantify the amount spent on prosecution of capital

19   cases?

20   A.    Yes.

21   Q.    What effort?

22   A.    So we have had a number of capital cases over

23   the years.  And I haven't done a formal in the form of a

24   memo, but I have asked on given cases approximately what

25   the State spends on experts.  We don't spend any more on

1    prosecutors.  They simply get paid what they're paid.  So

2    the only difference is what the state spends on experts,

3    and so I had looked at that a time or two.  I don't

4    remember what the answer was, but we don't pay our

5    prosecutors a dime more for a capital case than they get

6    for a misdemeanor or some other case.

7        Q.   No, but they're going to spend more time on a

8    capital case than they are on a misdemeanor, right?

9        A.   Oh, yeah.  Sure, they spend plenty of time on

10   capital cases, obviously.

11       Q.   Are you aware of any effort during your tenure

12   to quantify how much extra effort prosecutors have to put

13   in on capital cases?

14       A.   Not in any sort of exact numerical form.  We

15   haven't tried to break down exactly the hours.  Like I

16   said, I think the only thing I've tried to add up was the

17   additional costs of experts.

18       Q.   Who is Adam Troop; do you know?

19       A.   Yes.  Adam Troop is a UAX lobbyist.

20       Q.   So in February of 2018, you were looking for

21   information to provide to Adam Troop about capital

22   defense costs for 2016 and 2017.  Do you remember that?

23       A.   I do remember vaguely.  I think that had to do

24   with the death penalty legislation.

25       Q.   Do you know what the purpose was for which

54

1    Mr. Troop was requesting the information?

2         A.   Yes.   I think he was trying to determine the

3    cost overall of prosecuting and defending, all of the

4    costs of a death penalty case, what it costs the state,

5    to help legislators understand whether the death penalty

6    should remain or not.

7         Q.   And it looks like the only thing the County was

8    able to give him was how much was spent on the defense

9    and nothing on the prosecution; is that your memory?

10        A.   I don't remember.   And I don't even remember if

11   he asked specifically for one side or the other.

12             (EXHIBIT-18 marked.)

13        Q.   (By Ms. Porter)   Could you please look at

14   Exhibit-18.   And you're welcome to look at any part of

15   it, but I'm not necessarily going to ask you about the

16   content.

17        A.   Okay.

18        Q.   Okay.   Hang on one second.   Let me refer you

19   briefly back to Exhibit-5, but hang on to Exhibit-18.

20   And then just go back and take a quick look at Exhibit-5.

21        A.   Exhibit-5?

22        Q.   Yeah.

23        A.   All right.

24        Q.   Do you see towards the bottom of the page the

25   email from Mr. Newton to Mr. Baron?

55

1    A.    Uh-huh.

2    Q.    Which ultimately was forwarded to you.  Do you

3    see that?

4    A.    I do.

5    Q.    And in that email Mr. Newton says that he had

6    estimated 500 to 700 hours.  Do you see that?

7    A.    I do see that.

8    Q.    So in Exhibit-18, where are you getting that

9    600, or was that just a misstatement?

10   A.    Either I took it from somewhere else or it was

11   a misstatement.  I don't recall, but I see it in Bryan's

12   summary here.  In paragraph 7 in Exhibit-18, Bryan says

13   6- to 700 hours.  And so I either got that from Bryan or

14   another email somewhere.  But 6- to 700 is what Bryan

15   said at one point.

16   Q.    Did you do any checking to make sure that your

17   factual statements to Mr. Harris were accurate?

18   A.    I just sent him what -- these paragraphs that

19   you see in the email.  I forwarded those and my

20   statements are based on those.

21   Q.    Okay.  So and that -- that helps me figure

22   out -- so the first part of this email in Exhibit-18, the

23   first four paragraphs are what you wrote?  And then is

24   the rest cut and paste from Mr. Baron?

25   A.    Yes.

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

56

1    Q.   When you were writing this email on
2  July 18, 2018, did you go back and try to recreate the
3  timeline yourself, or did you rely entirely on what
4  Mr. Baron had here in this cut and paste?

5    A.   I relied on what was in the cut and paste.

6    Q.   In the third paragraph where you wrote -- you
7  say:  "Despite this arrangement" -- and then you have a
8  quote -- "the County refuses to fund anything."  Do you
9  see that?

10   A.   Uh-huh.

11   Q.   Can you help me -- you don't remember what the
12 beginning of that sentence was, do you?

13   A.   I don't.

14   Q.   Did you ever learn that Mr. Baron was actually
15 omitting the opening words or clauses of sentences by
16 Mr. Newton in order to claim a misrepresentation?

17        MS. VANORMAN:  Objection.  Mischaracterizes the
18 evidence.

19        THE WITNESS:  And I apologize.  I forgot your
20 question.

21        (The previous question was read by the court
22 reporter.)

23        THE WITNESS:  I don't believe Mr. Baron
24 misrepresented anything that I could see having looked at
25 things in context.

57

1    Q.    (By Ms. Porter)  Well, did you ever, for

2   example, look at a partial quote that Mr. Baron was using

3   to make sure that he was, in fact, fairly quoting the

4   entire sentence, or did you just rely on whatever he was

5   telling you?

6    A.    So I relied to a great deal on what he was

7   telling me, and sometimes I read the documents in which

8   the statements -- from which the statements were taken as

9   well.  I don't remember exactly which documents and when,

10  but I do remember from time to time looking at things

11  that Bryan provided and reading it in context as well.

12   Q.    And I apologize.  At what time did you do that?

13  At what point in the process?

14   A.    I don't remember.  And I don't even know to

15  exactly which statements we're referring, because we're

16  speaking broadly, I think, about statements that you've

17  indicated he left portions out.

18   Q.    I'm just asking you when, if ever, did you look

19  at underlying documents beyond what you may have

20  described earlier in the deposition?

21   A.    Uh-huh.  I don't recall.

22   Q.    Does that mean you don't remember one way or

23  the other or you don't think there were any others?

24   A.    It means I don't remember when I looked at

25  them.

58

1      Q.    Can you remember any documents that you did

2   look at to verify what Mr. Baron was telling you that you

3   haven't already described in this deposition?

4      A.    I don't remember any other specific documents,

5   no.

6      Q.    At some point, did Weber County suggest that if

7   a lawyer wanted to do contract work for Weber County that

8   they would have to agree to reimburse the County if they

9   withdrew from the case?

10     A.    I believe there was a provision in the

11  appellate contract that required reimbursement if they

12  withdrew or had a conflict and had to be taken off the

13  case, as I recall.

14     Q.    And was that removed from the contract?

15     A.    Was that language removed from the contract?

16     Q.    Yes.

17     A.    I don't recall.

18     Q.    Did you have any discussions with anyone about

19  whether that was a violation of the 6th Amendment to

20  include a clause in a criminal defense contract that

21  required reimbursement for withdrawal?

22     A.    I don't remember having that conversation.

23     Q.    Did you ever consult anyone about whether that

24  would be a 6th Amendment violation?

25     A.    No.

1   Q.   Did you ever speak with the media directly, and

2   I mean orally, about the Lovell case or Sam Newton?

3   A.   I don't recall speaking to them orally.  You've

4   obviously identified a couple of emails where I spoke

5   with them through email.  I can't say for sure that I

6   didn't, but I don't remember speaking with them orally.

7   Q.   Did you ever have an opportunity to speak with

8   the media and decline?

9   A.   Most likely.

10  MS. PORTER:  Let me just take a quick look.  We

11  might be out of here.

12  I don't have any further questions.

13  THE WITNESS:  Are you sure, because I'm having

14  so much fun.

15  MS. PORTER:  I know.  People love my

16  depositions.  They do.  They try to schedule one

17  annually.

18  MS. VANORMAN:  I do have one follow-up

19  question.

20  EXAMINATION

21  BY MS. VANORMAN:

22  Q.   So you were asked by counsel regarding

23  Mr. Newton's right to make interpretations?

24  A.   Yes.

25  Q.   Do you believe that he has the right to express

60

1    those interpretations as stated facts to the Court?

2        A.   If he expresses them to the Court as an opinion

3    or an interpretation, yes.  If he states them as fact,

4    no.

5             MS. VANORMAN:  Thank you.

6                  FURTHER EXAMINATION

7    BY MS. PORTER:

8        Q.   So just to clarify this, for example, suppose

9    Mr. Newton quoted an email from the County and then said,

10   you know, based on that quotation, "In essence the County

11   is saying this," he has the right to do that, right?

12       A.   I think if he says "in essence," yes.  If he

13   says, "The County is saying this," knowing that there are

14   subsequent follow-up emails clarifying that that is not

15   the County's position, then I think that would be an

16   improper misrepresentation.

17       Q.   Even if he's just characterizing one email and

18   then discussing another one later on in context, you're

19   saying he can't do that?

20       A.   I'm saying if he states as fact that the County

21   refused to pay him more than $15,000 knowing that that is

22   not true because of the other emails, then that would be

23   a misrepresentation to the Court that would not be an

24   appropriate assertion.

25            MS. PORTER:  Okay.  I understand what you're

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

61

1     saying.   I don't have anything further.

2              MS. VANORMAN:   I do want to him to read and

3     sign.

4              (The proceedings concluded at 2:35 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

62

1                          CERTIFICATE

2     State of Utah            )
                               ss.
3     County of Wasatch        )

4

5            I, Brandy Harris, a Registered Professional
      Reporter and Notary Public in and for the State of Utah,
      do hereby certify:

6

7            That the testimony of CHRISTOPHER ALLRED, the
      witness in the foregoing proceeding named, was taken on
      April 18, 2019; that said witness was by me, before
8     examination, duly sworn to testify the truth, the whole
      truth, and nothing but the truth in said cause;

9

10           That the testimony of said witness was reported
      by me in stenotype and thereafter transcribed into
      typewritten form;

11

12           That the same constitutes a true and correct
      transcription of said testimony so taken and transcribed
      and that the said witness testified as in the foregoing
13    annexed pages set out.

14           I further certify that I am not of kin or
      otherwise associated with any of the parties of said
15    cause of action and that I am not interested in the event
      thereof.

16
             WITNESS MY HAND at Heber City, Utah, this 30th
17    day of April, 2019.

18

19

20                          Brandy Harris

21           _____
             Brandy Harris, RPR
22           Utah License No. 5262004-7801
             State of Utah Notary Public
23           Commission Expires:
             September 24, 2021

24

25

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

63

1    Case:  Newton vs. Weber County
     Civil No.:  1:18-cv-00015 RJS
2    Date:  April 18, 2019
     Reporter:  Brandy Harris
3
                     WITNESS CERTIFICATE
4
     State of Utah          )
5                           ss.
     County of Wasatch      )
6
7       I, CHRISTOPHER ALLRED, HEREBY DECLARE:  That I am the
     witness referred to in the foregoing testimony; that I
     have read the transcript and know the contents thereof;
8    that with these corrections I have noted this transcript
     truly and accurately reflects my testimony.
9
     PAGE-LINE          CHANGE/CORRECTION              REASON
10
11   ____  ____    _____    _____
12   ____  ____    _____    _____
13   ____  ____    _____    _____
14   ____  ____    _____    _____
15   ____  ____    _____    _____
16   ____  ____    _____    _____
17   ____  ____    _____    _____
18   ____  ____    _____    _____
19   ____  ____    _____    _____
20      _____     No corrections were made.
21
22                    _____
                      CHRISTOPHER ALLRED
23   SUBSCRIBED and SWORN to before me on this _____day of
24   _____, 2019, by CHRISTOPHER ALLRED.
25                    _____
                      Notary Public

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

**Exhibits**

**Allred Exhibit 16** 41:1,5
**Allred Exhibit 17** 50:12, 14
**Allred Exhibit 18** 54:12, 14,19 55:8,12,22

**$**

**$1.6** 50:18,19
**$15,000** 27:4,25 60:21
**$150** 22:14
**$22,000** 31:14
**$500** 6:20
**$75,000** 17:2 30:22

**1**

**100** 27:4
**16** 41:2
**17** 35:1 36:18
**18** 56:2 62:7 63:2
**18,000** 31:18
**1:18-cv-00015** 63:1

**2**

**2** 12:20
**20** 49:13
**2016** 10:14 13:3,23 19:16 20:1 53:22
**2017** 14:21 18:16,17,19 19:1,2,17 24:12,17 25:6 35:1 36:18 41:6 53:22
**2018** 50:15 53:20 56:2
**2019** 62:7,17 63:2,23
**2021** 62:23
**22** 4:16
**22,000** 34:8
**23** 27:5,25
**23B** 15:2,3,4,17 21:5 22:10 31:20 33:3 34:7
**24** 41:6 62:23
**28** 10:14
**2:35** 61:4
**2:48** 35:1,6,7

**3**

**30th** 62:16

**5**

**5-** 46:12,16
**500** 22:22 46:10,18,20 55:6
**5262004-7801** 62:22
**5th** 13:3,23

**6**

**6** 50:15
**6-** 22:13 46:17 55:13,14
**600** 22:22,24 55:9
**6th** 58:19,24

**7**

**7** 14:21 55:12
**700** 22:13,22,23,24 44:9 46:9,10,11,12,13,17,18,19 55:6,13,14
**789** 14:4
**7th** 15:19 17:13

**A**

**accept** 23:17
**accepted** 11:14 12:13
**accomplish** 49:17
**accurate** 55:17
**accurately** 63:8
**action** 38:3 62:15
**actions** 16:4 35:25 36:23, 24 38:4
**actual** 41:20
**Adam** 53:18,19,21
**add** 53:16
**addition** 31:19
**additional** 9:24 14:13 16:8 27:11,16 30:24 31:4,14,18, 22,25 32:16,18 34:10 41:23 53:17
**additions** 13:16
**adequately** 45:15
**admitted** 35:10 36:14 37:5,12
**advise** 47:1
**afoul** 36:6
**afternoon** 26:13
**AG's** 7:18
**agree** 10:20 58:8
**ahead** 43:7 45:23

**alledgedly** 29:18
**alleged** 28:11,20 29:8 39:22
**allegedly** 29:20
**alleging** 18:25
**Allred** 4:2,9 62:6 63:6,22, 23
**altogether** 7:22
**Amendment** 58:19,24
**amount** 23:17 51:9 52:18
**and/or** 13:8 14:12 19:9
**annexed** 62:13
**annually** 50:20 59:17
**anymore** 44:15,23 45:5,10
**apologize** 11:9 18:22 21:23 29:5 34:19,21 43:24 44:3 51:18 56:19 57:12
**Apparently** 41:7
**appeal** 6:12 7:16,17,20 8:7 10:20 12:2,14,16 20:7,12 33:2,22 37:4
**appeals** 7:14 8:1,2 20:11 51:2
**appeared** 22:20
**appellate** 23:21,22 24:1,4 33:4,6,11,14,17,19,24 38:18,23 51:16 58:11
**appellee** 33:25
**apply** 31:8,24
**applying** 31:17
**apprised** 8:21
**approximately** 19:2 52:24
**April** 62:7,17 63:2
**argument** 20:8,10,14
**arise** 19:25
**arisen** 20:2
**arrangement** 56:7
**arrived** 50:23
**articles** 26:11
**assertion** 27:24 60:24
**assign** 51:24
**assigned** 25:24
**assistance** 15:1
**assume** 11:24 20:3,13
**attended** 15:24
**attending** 16:3 17:3
**attention** 16:22 19:16 20:4
**attorney** 4:21,23,24 5:2 6:4,7 8:1 18:5 27:19 28:18 40:6
**attorneys** 41:14

**attributable** 31:25
**August** 41:6
**authority** 25:14,19 43:8, 16,18,23
**authorize** 17:23 18:1
**authorizing** 17:16
**aware** 5:20 9:5,15 18:14, 18,24 28:8,23 34:2 39:25 42:22 43:1,6,9 52:17 53:11

**B**

**back** 6:23 7:20,23 8:4,9 13:14 18:20 27:10 32:4 37:16 42:5,21 44:17 45:25 54:19,20 56:2
**background** 21:18
**bar** 15:25 16:3 17:4
**Baron** 6:5 11:1,7 12:24 13:8 14:12 19:9 20:19 21:9,11,19,25 22:19 26:1, 2,5,7,8,15 27:6 28:24 29:7, 8 30:17 31:23 32:21 38:10 40:11,14,22 43:6 47:22 51:13 54:25 55:24 56:4,14, 23 57:2 58:2
**based** 27:22 39:3,4 55:20 60:10
**basic** 46:25
**basis** 5:12 22:21 44:24 45:11
**began** 4:19
**beginning** 56:12
**behalf** 33:25
**belief** 33:1
**believed** 29:9 37:9 41:15
**bet** 22:3
**big** 38:6
**bill** 17:1,12,15 22:13 31:15
**billed** 17:3
**billing** 16:1,3 20:2,5 29:16
**billings** 47:8
**bills** 18:7 20:22,23
**bit** 9:14 21:23 30:16 38:5
**blowing** 37:8 38:5
**board** 23:13
**boat** 23:1
**body** 25:18,20
**bolster** 41:25
**bother** 43:15,22,23
**bottom** 10:2,12 54:24
**Brandy** 62:4,21 63:2

April 18, 2019

**break** 15:20 34:21 53:15

**briefings** 42:6

**briefly** 4:17 40:18 54:19

**briefs** 33:15,17,19

**bringing** 23:12

**broadly** 57:16

**brought** 16:22 19:16 20:4

**Bryan** 6:5,10 9:23 11:1,7 16:24 18:5 20:4 23:14 25:9 31:12,13 34:7,10 40:10 47:19 51:24 55:12,13,14 57:11

**Bryan's** 7:4 55:11

**busy** 42:9

---

**C**

**call** 7:10

**called** 4:3 21:5

**Calls** 45:22

**cap** 13:2,11 17:2

**capital** 48:14 51:16 52:18, 22 53:5,8,10,13,21

**case** 5:15 6:9,11 7:19 8:4 10:23 14:25 17:5,18 20:7, 19 21:15,18 23:7 33:18 35:14 38:23 39:19 40:1,5, 12,17,23 41:8,25 42:24 47:12,23 48:14 53:5,6,8 54:4 58:9,13 59:2 63:1

**case-by-case** 5:12

**cases** 7:4 27:22 33:12 52:19,22,24 53:10,13

**cc'd** 8:24

**CERTIFICATE** 62:1 63:3

**certify** 62:5,14

**chain** 11:3

**chance** 30:6 47:25

**CHANGE/CORRECTION** 63:9

**characterizations** 42:20

**characterizing** 60:17

**check** 38:18,22

**checkbook** 44:16

**checked** 39:21

**checking** 55:16

**Chinese** 7:10,13,25 9:2

**choose** 46:20

**Chris** 4:9,10 11:7,10,11

**Christopher** 4:2,11 62:6 63:6,22,23

**City** 62:16

**civil** 4:20,22 5:5 6:6,8 7:11 63:1

**claim** 28:9 56:16

**claimed** 26:2

**claiming** 27:7

**clarify** 27:21 60:8

**clarifying** 60:14

**clause** 58:20

**clauses** 56:15

**clears** 23:2

**clerk** 4:19 52:3

**clerk's** 52:7

**client** 19:10 20:7

**closer** 15:22

**clue** 43:25

**Coebergh** 23:7,10 44:1 47:8

**Colleen** 23:6

**comment** 39:8,10

**commission** 5:11 25:17, 18,20,22,23 47:2 62:23

**commissioner** 18:4 25:24

**commissioners** 17:24 18:1,4

**common** 38:19

**communicating** 19:10

**communication** 13:22 16:16

**communications** 8:24 13:20

**compensation** 30:24 31:4

**comprised** 50:18

**concern** 35:23 37:7 38:4 43:10 44:16 47:20 50:1,5,9

**concerned** 21:11 49:3,11

**concerns** 6:12,14 7:2,3 29:15 37:2

**concluded** 38:14 61:4

**conclusion** 22:20

**conduct** 18:12

**confessed** 48:23 49:5,6

**conflict** 7:6 27:21 58:12

**conflicts** 23:22 24:2

**confused** 32:24

**Congratulations** 41:11

**connection** 5:7 6:2 9:16 27:4

**considerations** 49:18

**consist** 32:17

**consistent** 30:25

**constitutes** 62:11

**Constitution** 36:2

**Constitutional** 36:6

**consult** 58:23

**consulted** 8:18

**contact** 20:24

**contained** 12:22 14:7

**content** 54:16

**contents** 63:7

**context** 18:8 40:9 56:25 57:11 60:18

**contract** 5:23 13:2,15 23:13 24:11 25:19 26:24 32:3,17 34:12,17 39:13 51:1 58:7,11,14,15,20

**contracted** 23:17

**contracts** 5:21 24:5,16 25:6,16 51:16 52:4

**contrary** 36:25

**conversation** 29:1 58:22

**conversations** 13:7,25 19:8 29:1 36:4

**convey** 31:24

**conviction** 7:19 8:5

**copies** 52:3

**correct** 7:15 8:3,20 11:18 16:10 17:13 24:9,12 28:12, 15 29:20,21 31:5 34:9 37:10 38:17 42:17 49:6,8, 9,10 50:3,4 62:11

**corrections** 63:8,19

**cost** 16:6 48:14 54:3

**costs** 48:22 53:17,22 54:4

**counsel** 6:18 7:5 9:1 15:1 39:23 43:3,7,8 50:19 51:17,19 59:22

**county** 4:13,15,18,21,23, 24 5:2,11 6:4,7 7:21,22 8:1 14:4 17:24 18:1,3,5,15 21:3 25:17,21 26:25 27:3, 24 28:1,9,14,21 29:20 34:14 39:18 44:4,12 45:1, 21 46:5 47:2 54:7 56:8 58:6,7,8 60:9,10,13,20 62:3 63:1,5

**County's** 28:4 52:11 60:15

**couple** 14:9 59:4

**court** 6:25 8:4,8 14:24,25 17:20 26:16,24 28:25 29:3, 10,11,14,17 30:6,12,14 33:11 36:8,13 37:5,12,14, 15,18 39:7,14,16,19 40:7 41:18 42:4 43:1 44:19 46:2 50:3,7,10 52:10,14 56:21 60:1,2,23

**cover** 30:23

**crack** 12:4

**criminal** 5:5,8 6:3 33:14 58:20

**curious** 46:20

**current** 39:22

**cursory** 22:12

**cut** 9:13 55:24 56:4,5

---

**D**

**data** 51:7

**date** 28:19 43:3 44:1 63:2

**dated** 10:14

**Dave** 9:23 11:1,6 16:24 23:14 25:9 48:16

**day** 22:16 47:5 62:17 63:23

**day-to-day** 6:7

**days** 22:16 47:5

**deadline** 42:23

**deal** 38:6 57:6

**death** 33:18 35:23 36:21 37:3,10,23 48:25 49:2,12, 19,24 53:24 54:4,5

**December** 13:3,23

**decided** 49:7

**decision** 9:5 24:15 25:15, 23 39:2,4

**decision-making** 9:12,20 25:5,14 37:3

**decisions** 5:22 7:7 8:10 9:10

**DECLARE** 63:6

**decline** 59:8

**defendant** 35:10 42:12

**defendants** 5:9 6:3

**defenders** 5:21 51:1

**defending** 48:22 54:3

**defense** 5:11 6:18,20 7:5 9:1 41:25 48:13 50:19 51:1,2,15,16,17 53:22 54:8 58:20

**defenses** 5:8 6:3

**definitively** 31:3

**degree** 6:10

**delegated** 20:18

**delve** 42:10

**department** 4:21,22 5:5 6:6 7:11 52:1

**depends** 43:12,20

**deposition** 10:1 12:17,20 14:3 23:19 30:14 34:24 38:8,9 46:6 48:9 50:14

April 18, 2019

52:15 57:20 58:3

**depositions** 59:16

**deputy** 4:21

**describing** 50:6

**determine** 16:18,21 18:12 19:5 20:15 22:10 54:2

**die** 36:14 37:6,13

**difference** 53:2

**differently** 10:10

**dig** 22:1

**dime** 33:5

**direct** 5:10 11:21 13:22,25

**directed** 50:3,7

**direction** 13:18

**directly** 28:7 44:6,7 59:1

**Direda** 27:3,14

**disciplinary** 15:25 16:4,19 17:4

**discuss** 13:1 40:18

**discussed** 11:20 15:10 31:21

**discussing** 60:18

**discussion** 14:11 16:5 17:14 22:19 31:15

**discussions** 9:9,22,23 12:1 13:10 14:14,21 15:4, 7,16,20 17:22 19:20 23:14 25:9,13,24 26:1 29:7 31:21 34:10 58:18

**dispute** 19:17

**disrespect** 36:7

**division** 6:8

**document** 43:21 48:5

**documentation** 27:6

**documents** 28:2 43:2,8, 12 57:7,9,19 58:1,4

**double-checking** 39:17

**doubt** 36:4

**Doug** 9:17 14:24 35:24 37:9,22 39:19 40:1,5 48:13 49:1,12

**draft** 13:20 30:16,22 48:2

**drafting** 31:20

**duly** 4:3 62:8

**duties** 5:4

---

**E**

**earlier** 19:22 42:16 47:24 57:20

**easier** 23:5

**effect** 21:6

**effort** 52:17,21 53:11,12

**eight-hour** 22:16 47:5

**election** 4:25

**email** 10:13,15,25 11:3 12:12,24 14:21 15:16 16:10 21:25 23:19 30:14, 16 31:7,21 34:25 35:22 38:9,10 41:5 48:10,11,19 50:15,17 52:14 54:25 55:5, 14,19,22 56:1 59:5 60:9,17

**emailed** 34:11

**emailing** 41:14

**emails** 5:14 12:21 14:7 28:8,13,21 31:11,12 43:10 59:4 60:14,22

**employed** 4:12

**employee** 52:2

**employment** 4:18

**end** 21:16 24:8

**entire** 26:13 57:4

**essence** 60:10,12

**essentially** 6:5 7:4 27:21 41:18 51:11

**estimate** 16:9

**estimated** 55:6

**estimates** 47:15

**evaluate** 46:23

**event** 62:15

**evidence** 56:18

**exact** 14:17 21:22 26:9 53:14

**examination** 4:5 59:20 60:6 62:8

**examined** 4:4

**exceed** 13:2,11

**excellent** 41:11

**excess** 6:20 17:2

**exchanged** 28:13

**excuse** 48:18

**executive** 18:9

**exhibit** 36:11

**Exhibit-1** 10:1,4,6,13,18

**Exhibit-10** 36:10

**Exhibit-11** 38:8,9

**Exhibit-15** 48:9

**exhibit-16** 41:1,5

**exhibit-17** 50:12,14

**exhibit-18** 54:12,14,19 55:8,12,22

**Exhibit-2** 12:18,22 13:9

**Exhibit-3** 14:3,7

**Exhibit-5** 23:18,25 54:19, 20,21

**Exhibit-6** 30:11,13

**Exhibit-9** 34:23,25

**exist** 7:25

**expected** 22:11

**experience** 38:19

**expert** 6:17 52:5

**experts** 9:6 51:20 52:25 53:2,17

**experts'** 51:2

**Expires** 62:23

**explained** 45:15

**explanation** 13:17,19 16:7

**express** 36:7 50:9 59:25

**expressed** 47:20

**expresses** 37:13 60:2

**extent** 8:13

**extra** 31:25 53:12

---

**F**

**fact** 7:15 8:7 13:10 15:24 20:15 31:3 42:13,15 57:3 60:3,20

**facts** 21:17 38:16,25 41:17 42:5,7 60:1

**factual** 45:11 55:17

**factually** 49:6,8,10

**failed** 14:6

**fair** 20:17 40:24,25 45:16 46:19 48:11

**fairly** 46:17 57:3

**fall** 24:25 25:6

**false** 27:1

**February** 50:15 53:20

**feel** 6:12 49:16

**feelings** 48:25

**felt** 7:6 26:9

**figure** 51:4,6,7 55:21

**figures** 23:9

**file** 33:24

**filed** 28:11 43:2,7,15,22

**files** 43:21

**final** 25:14

**fine** 10:11 34:22

**fired** 29:18

**flag** 22:18

**flags** 36:20 38:1 40:22 48:24

**flatly** 27:3

**follow** 22:3

**follow-up** 59:18 60:14

**food** 44:10

**foregoing** 62:7,12 63:7

**foremost** 18:6

**forgot** 56:19

**form** 21:12 52:23 53:14 62:10

**formal** 52:23

**forming** 42:3

**forward** 23:21 24:1 27:22

**forwarded** 55:2,19

**found** 52:6

**foundation** 45:23

**frequency** 19:9

**front** 31:10

**frustration** 37:13 49:15

**fun** 59:14

**function** 5:18

**fund** 56:8

**funding** 5:8 6:2 14:13 31:25 35:14

**funds** 5:11 9:16,24 44:5

**funning** 31:18

**future** 42:19

---

**G**

**Gary** 11:11

**general** 5:18 14:18 15:11, 16 49:16

**general's** 27:19

**generally** 5:18 13:13,14 14:9,15,20 15:6 16:15 20:11 50:24

**gist** 14:18

**give** 20:25 27:25 29:3 35:21 38:4 44:4 54:8

**giving** 11:14

**goings-on** 6:7 40:12

**good** 52:4

**graduated** 4:20

**GRAMA** 8:22

**great** 57:6

**guess** 6:1 14:9 43:12,20 44:22

**guilt** 8:12 10:21

**guys** 42:12

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

**H**

half 10:22 22:17 47:6
HAND 62:16
handle 7:11 8:2 13:1
handled 21:16
handling 7:17
hang 54:18,19
happen 52:1
happened 40:1 43:11
happening 24:8
happy 15:17
harmed 29:20
Harris 55:17 62:4,21 63:2
Harvey 18:4 25:10,11,18
health 27:23
heard 43:7
hearing 8:7 27:2,13
Heber 62:16
held 19:6
helpful 21:6
helps 55:21
Heward 11:12
hired 4:20 12:14
hiring 9:10
history 4:18
hold 25:21
honestly 11:24 13:5
hoping 9:13 39:12
hour 22:15
hours 16:8,9,12,16 17:3
22:13 27:4 44:9 46:9 53:15
55:6,13
hyperbole 45:6

**I**

identified 29:2 30:3 59:4
identify 26:5,18 28:24 29:8
31:7
identifying 28:14
impetus 48:11
implication 44:8
important 42:11 43:16
47:14
improper 60:16
imputing 45:17
inadvertent 18:16 19:1
inappropriate 50:8

include 16:9 50:25 58:20
included 17:2 38:15
includes 50:22
including 23:21 24:1
inconsistent 34:16
incorrect 26:10,11 31:6
independent 20:21
indigent 5:8 6:3,18 7:12
8:14 51:16,17
indirectly 50:10
ineffective 15:1
inevitable 13:1
influencing 35:25 36:22
inform 48:21
informally 40:10
information 21:6 48:12
51:22 53:21 54:1
initial 22:14 33:23
initially 22:12 30:23
innocence 8:12
innocuous 43:21
instance 8:9 38:15,24
41:16
intend 41:23
intending 41:24
intent 42:19 45:17
intentionally 36:5
interested 28:17 62:15
interpret 46:5,8
interpretation 46:19 60:3
interpretations 59:23
60:1
interpreted 37:20
interpreting 45:18,19
introducing 49:19
investigation 20:14,16,18
26:25 39:5
investigative 26:23
investigators 51:20
inviting 11:19
invoices 17:17,23 18:2,3
19:6
involve 5:4,22 8:14,17
involved 5:20 6:10 7:7
8:17 11:16 19:19 37:3
39:15
involvement 6:6,11 9:11,
19 11:21 23:12 25:4 48:4
issue 7:5,16 12:6 19:20
47:7,23
issued 14:24

issues 10:22 27:5,23 28:1

**J**

Jim 25:10,11,23
Judge 27:2,13
July 10:14 35:1 36:18 56:2
jury 11:15 12:3,4
justified 16:13
justify 39:13 45:2

**K**

killing 35:10
kin 62:14
kind 5:17 13:23 51:7
kinds 9:6 51:20
knew 9:8 42:14
knowing 60:13,21
knowledge 21:17

**L**

Lack 45:23
Land 33:13
language 37:21 38:19
58:15
laugh 35:11,17
law 4:19
lawyer 42:12 58:7
lawyering 41:12
lawyers 41:20 47:3
learn 28:17,19 56:14
leave 6:8 37:25
left 57:17
legal 20:8,10,14 49:16
legislation 49:19 53:24
legislators 54:5
legwork 20:18
letter 16:16 29:22 30:2,6
47:25 48:15
level 6:9,13,14,16,18 7:3
8:8 22:12
liaison 18:5
License 62:22
limited 6:4,8
lobbyist 53:19
long 4:15 22:10 49:17
longer 12:13
looked 18:6 20:23 47:8
51:3 53:3 56:24 57:24

lost 6:21
lot 5:13 6:6 35:21 39:9 42:9
love 59:15
Lovell 5:15,19 6:9 8:9 9:17
10:18 11:15 17:18 20:19
23:7 33:23 35:14,24 36:22
37:10,22 39:19 40:1,5,12,
17,23 42:23 48:14 49:1,13
52:9 59:2
Lovell's 12:2 14:25 39:22
40:5 43:2

**M**

made 7:7 8:13 9:1,4 16:7
26:2,15 27:2,12,13,18,24
28:20 29:9,11,13 39:16,18
45:12 52:9 63:19
majority 21:4
make 6:19 7:8 8:10 9:2,9
18:21 23:5 33:9 34:3 40:5,
6,9 42:6 55:16 57:3 59:23
makes 35:9 39:14
making 22:3 24:15 29:19
42:13,14 48:1,5
maligning 50:10
maligns 37:14
manager 52:4,6
March 14:21 15:19 17:12
19:2
Mark 48:15
marked 10:1 12:20 14:2
23:19 30:13 34:23 38:7,8
41:1 48:8 50:12,14 54:12
material 47:10
math 22:14 46:25
matter 13:8 49:11
meaningful 43:23
means 30:2 44:8 57:24
meant 29:7
media 26:3 29:19 59:1,8
meeting 11:2,20,23 25:22
memo 52:24
memories 14:18
memory 15:11,23 54:9
mention 29:14,25 46:19
mentioned 29:12 46:9
47:24
messy 15:10
met 18:11
middle 35:3,8
million 50:18,19
mind 22:14 42:21 47:4

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

**minute** 22:16 36:5 47:5
**Mischaracterizes** 56:17
**misdemeanor** 53:6,8
**misrepresent** 38:16,25 41:16
**misrepresentation** 26:22 27:13 28:10,11,20 41:25 42:14,19 45:11 56:16 60:16,23
**misrepresentations** 26:3,5,8,16,18,22 27:7,12 28:25 29:9,15,19 39:14,16, 18,22 40:6,15 42:13 52:10, 13
**misrepresented** 56:24
**misrepresenting** 42:5,7
**misstate** 22:6
**misstated** 34:6,9
**misstatement** 55:9,11
**misunderstand** 32:8
**money** 31:9 32:16,18 34:12,15 44:15 45:2,7,8
**monitor** 40:4
**months** 22:17 40:2,13,24 47:6
**morning** 26:14
**motion** 6:19 9:3 15:4 27:5, 19,20 28:1,5 31:20 34:7
**motions** 7:8,11
**move** 23:20 24:1
**murder** 48:14
**murderer** 36:14 37:5,12 48:23 49:5,6

**N**

**named** 62:7
**narrow** 5:19 18:21
**necessarily** 8:25 26:10 54:15
**needed** 16:8
**nefarious** 44:13
**negotiating** 23:13
**newspapers** 44:10
**Newton** 9:16 10:14 12:13 13:16,20,23 14:22 16:19 17:17 18:15,25 19:10 20:19 21:3,20 23:23 24:4,5 26:2,15,24 27:2 28:10,14, 20 29:9,18,23 30:7 31:3,8, 24 34:14 42:23 44:4,22 46:4 48:1 52:9 54:25 55:5 56:16 59:2 60:9 63:1
**Newton's** 14:12 18:2 19:6, 16 20:22 24:11,16 25:6,15

**38**:16,24 39:13 41:16 42:6 47:15 59:23
**Notary** 62:5,22 63:25
**noted** 63:8
**notion** 21:9
**number** 16:16 46:17 50:23 52:22
**numerical** 53:14

**O**

**Objection** 45:22 47:17 56:17
**obligation** 32:15 36:3
**obligations** 36:6 43:13
**occasionally** 9:1
**occasions** 33:8
**occur** 11:23 13:3
**October** 24:12,16,17,19 25:2
**offer** 11:14 12:2,7,13
**offered** 31:4
**offering** 30:24 39:10
**offhand** 39:10
**office** 7:17,18 8:15 25:25 36:3 39:11 42:9 52:4,6,7
**omitting** 56:15
**open** 44:15
**opening** 56:15
**opinion** 21:12 39:1,3 41:15 42:4 60:2
**opinions** 6:11 42:8,19
**opportunity** 29:4 59:7
**orally** 59:2,3,6
**order** 14:24 47:1 51:3 56:16
**ordered** 43:2
**ordinarily** 7:17
**outlandish** 47:7,16
**overstepping** 50:9
**overturned** 8:5

**P**

**p.m.** 35:1,6,7 61:4
**PAGE-LINE** 63:9
**pages** 62:13
**paid** 18:18,25 23:6 31:18 44:1 50:19 52:5 53:1
**paragraph** 10:18 30:21 35:9 55:12 56:6

**paragraphs** 55:18,23
**part** 25:13 29:21 30:15 31:17 33:22 35:2 36:11 42:2 54:14 55:22
**partial** 57:2
**participated** 12:2 17:8,10
**participating** 17:3
**parties** 62:14
**passing** 41:22
**past** 40:1,12
**paste** 55:24 56:4,5
**pay** 27:3 31:22 44:11 51:1 52:11 53:4 60:21
**paying** 42:13 44:12
**payment** 17:17 18:15,16 19:2
**payments** 17:24 18:1 23:10
**penalty** 10:21 11:15 12:4 33:18 35:24 36:22 37:4 48:25 49:2,12,20,24 53:24 54:4,5
**people** 10:10 49:15 59:15
**period** 31:5
**person** 18:11 35:10
**personal** 35:23 36:21
**personally** 33:10
**phase** 8:12,13 10:21 11:15 12:4
**phone** 18:11
**pick** 46:20
**pinpoint** 19:12,14
**place** 7:14 10:19 20:3
**places** 27:11,16
**play** 5:7,10
**played** 16:19 17:7
**plenty** 53:9
**point** 9:15 16:2 18:14,24 21:3,20 25:23 28:7 36:13 37:11 42:22 55:15 57:13 58:6
**pointed** 28:21
**policy** 8:6
**politically** 49:9
**Porter** 4:6 6:23 7:13 17:25 24:20,22 25:1,4 32:4,9,18 37:16,20 41:4 44:17,21 45:25 46:4 47:22 50:13 54:13 57:1 59:10,15 60:7, 25
**portion** 8:11 49:7
**portions** 57:17
**position** 7:4 60:15

**possibly** 25:10,11
**practice** 38:23
**precise** 14:17
**precisely** 14:15
**press** 9:3 52:10,13
**pretext** 39:14
**pretexts** 39:15
**pretty** 6:4
**previous** 6:25 17:20 32:6, 12 37:18 44:19 46:2 56:21
**previously** 9:25 23:18 34:23 38:7 48:8
**primarily** 6:10 18:4 20:8, 10,13 27:23
**problematic** 49:16
**proceed** 10:22
**proceeding** 11:17 15:25 17:9 21:5,21 62:7
**proceedings** 14:25 16:20 17:4,10 22:11 61:4
**process** 17:25 25:5 37:3 49:3,12 50:1,2,6 57:13
**Professional** 62:4
**project** 22:15
**proposing** 22:15
**prosecuting** 8:8 48:22 54:3
**prosecution** 7:6,9 11:16 21:16 33:25 48:13 52:18 54:9
**prosecutor** 11:11,13 21:12,17
**prosecutors** 53:1,5,12
**provide** 13:16 26:25 51:13 53:21
**provided** 16:15 22:21 26:23 30:22 57:11
**provision** 58:10
**public** 5:21 9:3 48:22 51:1 62:5,22 63:25
**publicly** 50:11
**published** 50:11
**purpose** 53:25
**purposes** 44:13
**put** 27:23 37:10,22 44:10 53:12

**Q**

**qualified** 23:16 38:22
**quantify** 52:18 53:12
**question** 6:23,25 10:5,8 17:20 18:21 22:9 24:2 25:3

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
Christopher Allred

April 18, 2019

32:4,6,10,12 37:16,18
45:25 46:2 56:20,21 59:19
**questions** 20:6 26:13
44:14,23 45:5,10 59:12
**quick** 54:20 59:10
**quotation** 60:10
**quote** 56:8 57:2
**quoted** 60:9
**quoting** 57:3

**R**

**raise** 36:20 38:1 39:7
47:22 48:24
**raised** 7:5 22:17 40:22
**reached** 36:13 37:11
**read** 6:25 10:6 15:22 17:20
28:4 32:4,6,12 35:12 37:18
38:13 44:19 46:2 47:10
49:22,25 50:16 56:21 57:7
61:2 63:7
**reading** 39:1 57:11
**ready** 10:5
**reask** 25:2
**reason** 7:25 19:17 29:25
41:20 43:5 44:13 63:9
**reasonable** 22:18,20 47:4
**reasons** 12:10 30:2,3,4
**recall** 8:25 12:11 13:21,25
14:20 17:9 20:4 22:24
48:1,3 51:3,5 55:11 57:21
58:13,17 59:3
**receive** 18:3 36:17
**received** 16:3 17:12,15,17
18:15 31:15,22
**receiving** 14:7
**recently** 39:21
**recognize** 38:9 50:16
**recollection** 22:25 29:3
**record** 4:8 15:11 19:23
21:22 22:5 24:14 27:24
**records** 48:20
**recreate** 51:6 56:2
**recuse** 7:21,22
**red** 22:18 36:20 38:1 40:22
48:24
**refer** 34:4 35:19 54:18
**reference** 24:3
**referred** 13:14 15:2 23:22
49:5 63:7
**referring** 6:15 23:24 27:17
35:16 44:21,24 52:14
57:15

**reflect** 19:23 38:24
**reflected** 38:15 41:15
43:11
**reflects** 24:13 63:8
**refreshes** 15:23
**refused** 26:25 27:3 60:21
**refuses** 56:8
**Registered** 62:4
**reimburse** 58:8
**reimbursement** 58:11,21
**related** 15:1
**relates** 36:22 49:1
**relating** 20:19 35:24
**relevance** 47:17
**relied** 56:5 57:6
**rely** 56:3 57:4
**relying** 21:12 28:9 38:20
**remain** 54:6
**remand** 15:17 21:5,21
22:10 27:5 28:1
**remanding** 14:24
**remember** 11:9,25 12:1,5,
6,21 13:4,5,7,10,12 14:6,8,
11,14,15 15:3,15 18:22
19:3 24:6,13 25:12 27:20
28:6 34:10 36:15 40:19,21
43:4,25 50:22 53:4,22,23
54:10 56:11 57:9,10,14,22,
24 58:1,4,22 59:6
**removed** 58:14,15
**removing** 35:12
**repeated** 52:9
**rephrase** 9:12
**replacing** 42:23
**reply** 28:4 30:23 31:5,9
32:1,18 33:1,20 34:1,4,9,
15
**reported** 62:9
**reporter** 7:1 17:21 32:7,13
37:19 44:20 46:3 56:22
62:5 63:2
**represent** 19:15
**representation** 9:17 52:9
**representing** 42:12
**request** 8:25 13:2 14:12
22:21 40:9 46:24 48:12
**requesting** 9:16 16:17
47:2 54:1
**requests** 6:16 8:13 9:21,
24 13:19 44:9 45:2
**required** 6:19 7:8 58:11,21
**requiring** 45:2

**research** 39:9 48:20
**reservations** 11:19
**resource** 6:20
**resources** 7:12 8:14 26:23
27:1 51:2,17,19 52:5
**respect** 5:14 7:14 8:1 9:20
17:6 23:9 25:15 26:12
35:13 45:21
**respond** 29:4
**responded** 23:15 38:11
**responding** 7:9 9:20
48:17
**response** 10:25 14:21
27:19 45:15 47:21 48:18
**rest** 55:24
**retained** 9:7
**reversed** 7:20 8:5
**review** 18:12 20:21,23
28:2 30:17 38:14 47:25
**reviewing** 48:5
**RFP** 23:15,21 24:1,8
**RJS** 63:1
**Rogers** 38:14 39:13 41:8,
10
**role** 5:7,10,14,25 6:7 16:19
17:7 24:15 25:8 35:13
**RPR** 62:21
**ruling** 38:13
**run** 36:6

**S**

**Sam** 9:15 10:14,15 20:19
22:15,20 26:2 27:21 29:9
31:13,15,24 34:11 38:16,
24 39:13 41:16 42:4,6,23
44:4,22 48:1 59:2
**Sam's** 20:2 31:17
**sat** 13:5
**schedule** 59:16
**school** 4:20
**seeking** 6:20
**sending** 30:17
**sense** 33:9 52:5
**sentence** 33:22 48:19,24
49:23 52:8 56:12 57:4
**sentences** 56:15
**sentencing** 8:12 49:7
**September** 24:17 62:23
**served** 4:21
**services** 5:11 23:21 24:1
52:12

**session** 18:9
**set** 7:9 62:13
**Shaw** 11:7,10,11,15
**Shenefelt** 48:15,17
**short** 4:10
**show** 27:6,9,14 50:13
**showed** 27:10,11
**shown** 38:4
**side** 41:21 54:11
**sign** 61:3
**simply** 48:5 53:1
**sit** 12:25
**sit-down** 13:3
**skip** 34:19 42:21
**sloppy** 29:6
**small** 42:2
**sort** 5:23 9:7 15:20 41:22
44:13 45:6,17 53:14
**sorts** 47:20
**sound** 22:18
**sounded** 37:7,9
**Sounds** 47:7
**speak** 15:16 59:1,7
**speaking** 40:10 57:16
59:3,6
**specific** 15:15 58:4
**specifically** 12:11 13:4,12
14:9 19:3 43:4 54:11
**specificity** 12:5
**speculation** 45:23
**spend** 47:5,11 52:25 53:7,
9
**spending** 20:6
**spends** 52:25 53:2
**spent** 52:18 54:8
**spoke** 26:7 59:4
**spoken** 21:19 28:18
**ss** 62:2 63:5
**stack** 10:2
**stand** 40:19
**Standard-examiner**
48:12,16
**stands** 43:4
**start** 5:17
**state** 4:7 8:2 10:20 33:24
38:13 39:12 41:8,10 52:25
53:2 54:4 62:2,5,22 63:4
**stated** 32:2 41:18 60:1
**statement** 20:17 27:2 35:9
36:20 40:24,25 44:25
45:16

LAW OFFICE OF SAMUEL P. NEWTON, P.C. vs WEBER COUNTY
April 18, 2019
Christopher Allred

**statements** 55:17,20 57:8, 15,16
**states** 12:24 30:21 60:3,20
**status** 40:20
**statute** 6:19
**statutorily** 6:17 7:8
**steam** 37:8 38:5
**stenotype** 62:10
**stick** 46:10
**stop** 9:12 15:9
**strike** 18:13 47:23
**string** 10:14 30:14 38:10
**strong** 49:24
**stupidity** 35:11,17
**subject** 13:8 19:25 28:18 41:10
**submitted** 17:1 22:13
**submitting** 44:8
**SUBSCRIBED** 63:23
**subsequent** 31:20 60:14
**subsequently** 26:8
**sufficient** 16:7 30:23
**sufficiently** 16:13
**suggest** 47:4 49:23 58:6
**suggested** 44:13,15,22 45:4,9 48:1
**suggesting** 44:10,12 45:1 50:19
**suggestion** 26:10
**suggestions** 48:6
**summary** 55:12
**supervision** 5:4
**supplement** 13:19
**supported** 44:9
**suppose** 60:8
**supposed** 31:24
**supposedly** 42:3
**Supreme** 8:4 14:24 36:8, 13 37:5,12,14 50:3,7,10
**surprise** 21:18
**surprised** 32:21
**sworn** 4:3 62:8 63:23
**system** 49:17

**T**

**table** 44:11
**takes** 36:2 49:17
**taking** 45:16
**talked** 15:8,23 16:1,6 31:13 34:8

**talking** 32:23,25 33:1 34:7 43:14,20 45:7
**talks** 47:11
**telling** 20:9 45:14 57:5,7 58:2
**tenure** 52:17 53:11
**term** 27:20
**terminate** 24:16 25:15,19
**terminated** 24:11,21
**terminating** 39:13
**termination** 25:5 29:22 30:7 47:25
**terms** 15:16
**testified** 4:4 9:7 62:12
**testify** 62:8
**testimony** 49:22 62:6,9,12 63:7,8
**thereof** 62:15 63:7
**thing** 5:23 9:7 53:16 54:7
**things** 6:17 8:7,22 9:6 20:24 22:1 29:16 37:21 39:25 42:10 47:21 49:17 51:20 52:11 56:25 57:10
**thought** 6:21 18:7 29:15 35:21
**tie** 15:19
**time** 5:11 7:10 13:18 16:6 19:1,13,14,20,25 20:6 24:6,10 31:1 36:15 37:1 45:4 47:11 53:3,7,9 57:10, 12
**timeline** 56:3
**timelines** 18:22
**times** 19:20,21
**timing** 28:23
**tired** 26:14
**told** 16:25 17:1,6,8 21:3, 21,24 26:8,21,24 27:1,12, 14 31:3,8 34:14,25 40:14, 19 45:13
**top** 23:20 34:24 35:5,7,8 36:11
**train** 6:21
**transcribed** 62:10,12
**transcript** 27:15 63:7,8
**transcription** 62:12
**transcripts** 51:21
**trial** 6:9,13,14,16,18 7:2,20 8:8,11 14:25
**Troop** 53:18,19,21 54:1
**true** 20:15 21:9 24:5 60:22 62:11
**trump** 22:6

**truth** 31:11 62:8
**turn** 10:17
**turned** 12:8
**type** 47:21 50:6
**types** 33:12
**typewritten** 62:10
**typically** 39:9

**U**

**UAX** 53:19
**uh-huh** 10:16 55:1 56:10 57:21
**ultimately** 17:23 25:20 55:2
**unable** 15:20
**underlying** 8:11 32:2 57:19
**understand** 12:12 28:12 33:22 34:4,6 54:5 60:25
**understanding** 12:7,15 30:25 31:17,23 32:15 34:17
**understood** 24:3 42:18
**unhappy** 45:1
**unlimited** 44:5
**updated** 40:11
**Utah** 8:2 36:7,13 37:4,11 50:3,7 62:2,5,16,22 63:4

**V**

**vaguely** 12:6 53:23
**VANORMAN** 24:19,25 45:22 47:17 56:17 59:18, 21 60:5 61:2
**verify** 21:8 58:2
**views** 35:23 36:21 49:24
**violation** 58:19,24
**visiting** 20:6

**W**

**waive** 10:21 12:2
**walk** 4:17
**wall** 7:10,13,25 9:2
**wanted** 5:17 11:6 44:14,15 51:6 58:7
**Wasatch** 62:3 63:5
**watched** 38:3
**Weber** 4:12,15,18 5:2 7:20, 22 14:3 28:1,9,13 39:18 58:6,7 63:1

**week** 21:22 22:17 47:6
**weighed** 9:4
**whatsoever** 43:25
**willingness** 38:16,24 41:16 52:11
**Wilson** 11:1,6 12:21,25 13:8 14:12 19:9 23:20 34:20,25 35:9,13,16 36:1, 12 37:8,22 38:2 48:9 49:15,23 50:5
**Wilson's** 10:1 14:3 23:19 30:14 34:24 35:23 36:21 38:8 48:9,19,25
**withdraw** 10:20 12:16 28:1,5
**withdrawal** 58:21
**withdrawn** 26:13
**withdrew** 13:24 58:9,12
**witnesses** 6:17 20:24 21:4
**wondering** 16:12,14,15 25:1
**word** 42:20
**wording** 29:5 50:6
**words** 21:6,22 26:9 37:4 45:14 56:15
**work** 17:2 18:8 22:15 23:22 24:4 31:25 33:4 51:16 58:7
**worked** 4:15
**working** 22:16 47:6
**works** 23:25
**world** 35:11,17
**write** 14:6 39:9 41:23
**writing** 23:2 56:1
**written** 33:6,10,14,17,19
**wrong** 22:25
**wrote** 36:12 55:23 56:6

**Y**

**year** 18:16,17
**years** 4:16,22 7:3 14:10 36:2 38:3 49:13,14 52:23
**Young** 15:25 16:4,20
**Young's** 17:4