Kristin A. VanOrman (7333)
Matt Harrison (13735)
**STRONG AND HANNI**
102 South 200 East, Suite 800
Salt Lake City, Utah 84111
Telephone: (801) 532-7080
Facsimile: (801) 596-1508
kvanorman@strongandhanni.com
mharrison@strongandhanni.com

*Attorneys for Defendant Weber County,*
*James H. Harvey, Kerry W. Gibson, and Charles J. Ebert*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| LAW OFFICE OF SAMUEL P. NEWTON, P.C. and SAMUEL P. NEWTON, an individual,<br><br>     Plaintiffs,<br><br>vs.<br><br>WEBER COUNTY, a political subdivision of the state of Utah; JAMES H. HARVEY, KERRY W. GIBSON, and CHARLES J. EBERT, in their official and individual capacities<br><br>     Defendant. | **DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT**<br><br><br>Civil No.1:18-cv-00015 HCN-EJF<br><br>Judge Howard C. Nielson, Jr.<br>Magistrate Judge Evelyn J. Furse |

Defendants Weber County, James H. Harvey, Kerry W. Gibson, and Charles J. Ebert (collectively "Defendants" or "the County"), by and through their counsel of record, hereby submit their Reply in Support of Defendants' Amended Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

# Table of Contents

INTRODUCTION....................................................................................................iii

RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS...........................iv

ARGUMENT........................................................................................................1

I.   PLAINTIFF'S FIRST AMENDMENT CLAIMS FAIL AS A MATTER OF LAW........1

  A.   Plaintiff's Termination Resulted From Speech Made in His Official Capacity...........2

    1.   Whether Plaintiff's statements were made pursuant to his official duties is a threshold matter.....................................................................................................2

    2.   Plaintiff's statements were made pursuant to his official duties. ...............................3

    3.   There is no genuine dispute of material fact concerning the statements the County considered in its termination of Plaintiff..............................................................8

  B.   Plaintiff Cannot Demonstrate an Inference Supporting the Remaining Essential Elements of the Garcetti/Pickering Analysis...........................................................13

    1.   Plaintiff's statements were not on a matter of public concern..................................13

    2.   Plaintiff's interests are outweighed by the County's interests in efficiency. ..........18

    3.   Plaintiff cannot show a reasonable inference that the County terminated his contract because of protected speech. ....................................................................19

    4.   The County Would Have Terminated Plaintiff's Contract in the Absence of Any Protected Conduct.............................................................................................22

II.   PLAINTIFF CANNOT SHOW A CIVIL CONSPIRACY .........................................23

III.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ..............................24

  A.   Plaintiff's Has not Shown the His Rights Were Clearly Established..........................24

  B.   Plaintiff's Claims for Equitable Relief Fail as Matter of Law...................................27

CONCLUSION .....................................................................................................29

**INTRODUCTION**

Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Opp.") argues that Defendants are not entitled to summary judgment on Plaintiff's First Amendment claims, under the *Garcetti/Pickering* analysis. Specifically, Plaintiff argues that his statements were not made pursuant to his official duties, that they were on matter of public concern, and that the County's interests in promoting the efficiency of its public services does not outweigh Plaintiff's interests in his speech. Plaintiff also argues that his protected speech was a motivating factor in his termination, and that Defendants' would not have made the same decision, minus the protected speech.

First, there are no facts that support a reasonable inference that Plaintiff's statements did not occur pursuant to his official duties, representing Lovell under contract with the County. Even if the Court finds that statements the County considered were not given as part of Plaintiff's official duties, he cannot show that those statements were a matter of public concern. Plaintiff claims his statements addressed broader issues, but in the proper context the misrepresentations were specific to his representation and akin to his regular duties. Furthermore, the County's interest in the efficiency of their services outweighed Plaintiff's, considering that his speech included knowingly false statements and disrupted the County's its ability to find qualified appellate counsel. Also, Plaintiff cannot meet his burden to show a motivating factor as his unprotected speech occurred in court communications, pursuant to his representation. For those reasons, the County also would have made the same decision without protected statements.

Plaintiff's claim for a civil conspiracy also fails as a matter of law, as he has failed to show a conspiracy, which requires a specific agreement to deter attendance or cause injury.

Plaintiff also fails to show that Defendants' are not entitled to qualified immunity, for same reasons, above, and because he cannot show precedent that the *Garcetti* inquiry has been applied in these particular circumstances to an independent contractor. Thus, even if the Court finds that Plaintiff's speech was protected, his rights were not clearly established at the time of his termination and Defendants are entitled to qualified immunity. Finally, Plaintiff has no standing for his claims of declaratory and injunctive relief, and they should be dismissed.

### RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

6.     On March 6, 2017, the Utah Supreme Court remanded Lovell's case. The Court's order was unusually broad, essentially requiring "a whole new proceeding" with dozens of witnesses; "an enormous remand proceeding that I've never seen in my practice, ever."

**DISPUTED**. While Newton testified in his deposition that he felt like the remand was a "whole new trial,"[1] the order of the Supreme Court limited the scope of the review to Sean Young's representation in the case, and delineated specific items related to Mr. Young's conduct to be addressed in the 23B remand.[2]

9.     In response to Newton's explanations, the County authorized an additional $15,000, but said "[t]he total additional hours of work should in no way exceed 100." Nothing was authorized for additional work the remand would create for the Supreme Court reply brief.

**UNDISPUTED, but misleading.** The County's authorization of additional funding indicated it was an estimate and explained the factors underlying its belief that it would take considerably less time than Plaintiff had requested.[3] The County did not deny an actual request

---

[1] Deposition of Samuel Newton ("Newton Dep."), 46:5-11, Exh. A to Plaintiff's Opp.
[2] Utah Supreme Court Order, Exh. G to Plaintiff's Opp.
[3] March 14, 2017, email from Jim Harvey, Exh. K to Plaintiff's Opp.

iv

for additional funds related to the reply brief, and Plaintiff's March 7, 2017, email did not request authorization of additional funds for that purpose.[4]

10.     Newton perceived that the Commission was going to take a "pretty hard line" on the $15,000. His impression derived from several aspects of the e-mail, including: The Commission's flat disagreement with Newton as to the work needed (offering 20 percent or less of his guesstimate); its bald assumption that most of the witnesses identified by the Supreme Court would have little to no helpful information; its estimate that the evidentiary hearings would only take one week; its refusal to consider any additional funds for the reply brief; its concluding statement, "Please advise me with an acceptance of this offer"; and its declaration that additional hours should "in no way" exceed 100.

**DISPUTED IN PART.** Defendants' email did not refuse to consider additional funds for the reply brief, or deny the possibility of additional funds for that purpose in the future, but clarified that the additional $15,000 was authorized for the unexpected 23B remand.[5] In addition, the County's estimate as to the work was reasonable, evidenced by the fact that Plaintiff only requested that the trial court pre-authorize 200 hours of attorney work on the case, and while Plaintiff stated that he assumed the hearing would take 10-14 days, the trial court originally set the hearing for only six.[6] Later, the County clarified that, as noted under the contract, the County would be willing to consider additional funding for Plaintiff's previous work on the 23B

---

[4] *Id.*

[5] *Id.*

[6] March 14, 2017,email from Newton to Harvey, Exh. L to Plaintiff's Opp.; Motion to Withdraw, p. 3, Exh. V to Plaintiff's Opp.

remand,[7] which would effectively increase the amount of funding available for the Reply Brief and oral argument.

13.    Upon receiving no response, Newton filed an Ex Parte Motion for Payment of Attorney Fees and Litigation Expenses in the Lovell trial court. Newton asked the court to preauthorize 200 hours, at which point Newton would update the court as to future work.

**UNDISPUTED, but additional clarification required.** Newton filed his motion less than a week after he sent his email requesting that the County reconsider its original authorization of additional time for the 23B remand.[8]

15.    Three days later, March 23, 2017, the County sent Newton an email denying any additional funds for past work or the (future) Supreme Court reply brief. Regarding other prospective work (the evidentiary hearings and revising the opening brief), the County reaffirmed its earlier estimate of 100 hours: "While it's uncertain how much time and effort will need to be put into the evidentiary hearings and revising the initial brief, 100 hours seems to be a reasonable estimate. If the remand takes longer than 100 hours, and you can justify the additional time, we will remain open to another request for additional funding."

**DISPUTED.** The County's March 23, 2017, email did not deny an actual request for additional funds related to the reply brief to be filed with the Utah Supreme Court.[9] Plaintiff's March 14, 2017, email did not identify good cause for additional funds to be authorized for the reply brief, as it only provided a summary of the amounts that Plaintiff had gone over the

---

[7] Baron email, April 11, 2017, Exh. K to Defendants' Amended Motion for Summary Judgment ("Defendant's Motion").
[8] March 14, 2019 email from Newton, Exh. L to Plaintiff's Opp.; Ex Parte Motion for Attorney's Fees "Ex Parte Motion"), Exh. M to Plaintiff's Opp.; Memorandum in Opposition to Ex Parte Motion, p. 3, fact no. 13, Exh. N to Plaintiff's Opp.
[9] March 23, 2017 email from Jim Harvey, Exh. J to Defendant's Motion.

original contract amount.[10] The email first reiterated the contract's provision that additional funds would be authorized on a showing a good cause, and noted that it considered the previous work and additional work required for the reply brief to be covered under the initial contract amount.[11] Once Plaintiff specifically requested whether the County would not pay for previous billed work, the County indicated that the County would be willing to consider additional funding related to the 23B motion.[12]

16.     After sending this response, the County filed its opposition to Newton's motion, attaching the emails. The County argued that the motion was not "ripe" because the County was open to a request for additional funding. It did not mention that it had unconditionally denied compensation for work already performed and the reply brief.

**DISPUTED.** The County had not made an unconditional denial, but merely stated a position on the reply brief at the time, which also included a reminder that additional funding may be authorized on a showing of good cause, and later clarified that additional funding for past work may be authorized, as explained further in response to Plaintiff's Statement of Material Facts ("Plaintiff's SMF") nos. 10 and 15.

17.     Newton then asked Baron if the County was really refusing to pay "for over $7,000 of work I have already done on this case and will only pay me for future work?" If so, "I need to file a reply [memorandum] and ask for a hearing with Judge DiReda." Baron responded that the County might be willing to pay something for the 23B motion, but reiterated that nothing would be provided for the reply brief or oral argument.

---

[10] *Id.*
[11] *Id.*
[12] Baron and Newton Email exchange, April 10-11, 2017, Exh. P to Plaintiff's Opp.

**DISPUTED.** Baron's indication that the County was not open to paying additional money for the oral argument or reply brief was based on the fact that Plaintiff had made no showing that additional funds were needed for the reply brief or oral argument.  The cost for the work done on those aspects of the appeal was included in the $75,000 contract price. Approval of additional funding for the work spent on the 23B motion would free up funding for the reply brief and oral argument.[13]

20.      In an effort to placate the County, Newton responded, "I guess I did misunderstand the county's position. There's quite a bit of discussion about how I only get $15,000 for preparing for this new hearing and revising the brief and the reply brief that I wouldn't get anything beyond that. I know it's going to be significantly more than that. I just ran a report for 4/1 to present and I've spent about $3,600 and I haven't even started the bulk of the preparations, which will probably take 10 times that number if not more." Newton then outlined again some of the extensive work the remand would require, and concluded, "I know we may disagree about what is needed. I guess we'll see what Judge DeRida thinks in the upcoming hearing."

**DISPUTED.** While Newton claims that his statement that he misunderstood the County's position was just an effort to placate the County, the documents show that Plaintiff's statement to the court that "county has plainly indicated that counsel will not be allowed additional funding"[14] occurred after Plaintiff had received correspondence from Baron that he was sure the County

---

[13] Baron Email to Nadia Pflaum, Exh. AA to Defendants' Motion.
[14] Plaintiff's Reply in Support of Ex Parte Motion, p. 3, Exh. Q to Plaintiff's Opp.

would consider a request "for additional funding for the time you spent putting together the 23B motion."[15]

21.      Knowing that the County had found all of his prior explanations of the work supported only $15,000, and having just learned that County personnel had been directed not to pay any of his Lovell invoices, Newton retained significant doubt about the County's intentions, despite its claimed "willingness to consider" more funding down the road after Newton had put hundreds more hours into the case.

**DISPUTED.** The County had pre-approved 100 hours for the remand and took the position that invoices for work other than for the remand would not be paid unless they were separately approved.[16]

22.      On May 24, 2017, the Lovell trial court ruled that it lacked subject matter jurisdiction to address the merits of Newton's motion.

**UNDISPUTED, but incomplete.** The trial court found that "Mr. Newton's arguments extend beyond the criminal court's duty to ensure Defendant has been provided counsel and adequate defense resources as described in the state and federal constitutions, the Indigent Defense Act, and rule 8 of the Rules of Criminal Procedure."[17] The trial court also found "any dispute about the amount or adequacy of attorney compensation provided by the contract is a matter more appropriately addressed in civil court in a suit *between the parties in controversy*."[18]

26.      Upon receipt of this email, Newton told his wife, "I've lost my job," because the request that was being made to him was to violate the Sixth Amendment or to keep his job.

---

[15] Baron and Newton Email exchange, April 10-11, 2017, Exh. P to Plaintiff's Opp.
[16] *Id*. at Weber County 0976; April 10-11 email chain, Exh. K to Defendants' Motion.
[17] Ruling and Order on Ex Parte Motion, NEWTON 0364, Exh. S to Plaintiff's Opp.
[18] *Id*. (emphasis added).

Newton knew that – especially with Rule 23B proceedings in a death penalty case, which focus on what witnesses might know or say about the defendant to mitigate the penalty – it is untenable to require an attorney to limit his communications with a death row prisoner. But the email tied payment for the Rule 23B motion and future appeals to Newton "revising" his invoices to reduce or eliminate those communications.

> Footnote 34: *See* Exh. A, p. 112:7-19; *also id.*, p. 113:10-23 ("All of a sudden, they're threatening my contract, my entire livelihood, if I don't stop talking to Mr. Lovell so frequently. [']You can revise your request.['] So my choice is to remove my frequent phone conversations with Mr. Lovell and submit those to them, or – which violates his right to counsel, his Sixth Amendment right to counsel, and that is not negotiable to me even at all.").

**DISPUTED.** The County did not require that Plaintiff reduce or eliminate his communications with his client, or remove those communications from his billing.[19] The email addressing communications with Lovell, only noted that the commissioners were "unsure" of the need for such frequent communications "on an appellate case."[20] Further, Plaintiff's reaction to the email is unreasonable, as the County had previously requested clarification for frequent communications, when Baron indicated on July 18, 2016, that "[he] had a few concerns that [he] would like to discuss" with Plaintiff, including:[21]

> Your invoices contain regular charges for phone calls and letters to Doug Lovell. I understand the need to keep your client updated on things, but I don't understand why on an appellate level you would need to speak with him 5 times in one month

---

[19] June 5, 2017, email from Baron to Newton, Exh. T to Plaintiff's Opp.
[20] *Id.*
[21] July 18, 2016, email from Baron to Newton, attached as Exhibit DD.

x

for a total of 132 minutes. As I've looked back over the past several invoices, I've
realized this is a regular pattern.[22]

Plaintiff's response indicating the need for the communications satisfied the County and his

invoices, including the communications with Lovell, were approved for payment.[23] Plaintiff's

response in 2016 also stated that "as the appeal goes on, there won't be too much more to talk

about on these calls. He'll mostly want to know when I'm going to file the brief, which is

coming up in the next 60 days or so. From there, it will be a waiting game, so I don't anticipate

much more conversation, other than an occasional update call."[24] Further justifying the County's

later inquiry into the continued frequent communications.

28.     Newton also noted that the email appeared to contemplate an inflexible $15,000

for future work.

**DISPUTED.** The email did not state that the $15,000 previously authorized for work on

the 23B remand was inflexible.[25] Further, as noted above, the County had already indicated to

Plaintiff on March 23, 2017, that if the remand took longer than the pre-authorized 100 hours,

and Plaintiff could justify the additional time (as required by the contract), the County would

remain open to requests for additional funding.[26]

30.     On June 9, 2017, Newton filed a motion to withdraw. Newton used the funding

issues in Lovell's case to illustrate why Utah should eliminate the death penalty altogether.

**DISPUTED.** Plaintiff's Motion to Withdraw references case law related to representation

in capital cases, but does not make a general statement about the death penalty or representation

---

[22] *Id*.
[23] *Id*.
[24] *Id*.
[25] June 5, 2017, email from Baron to Newton, Exh. T to Plaintiff's Opp.
[26] March 23, 2017 email from Jim Harvey, Exh. J to Defendant's Motion.

of a capital client beyond that specific to his own clients.[27] In his Response to the State's Motion to Inquire into Defense Counsel's Potential Conflict of Interest, Plaintiff refers a Supreme Court decision which contemplated imposing a penalty restricting the state to the punishment of life imprisonment if capital defendants were not adequately defended.[28] Plaintiff's reference, however, is not to the broader issue, but specific to his argument for Lovell.[29] There is also no evidence that the County took issue with those statements. The news article also draws its own conclusions, and its references to Plaintiff do not provide statements about a broader societal goal; the only comments attributed to Plaintiff, aside from those made in court documents, relate directly to his representation of Lovell and his personal dispute with the County over funding.[30]

32.     On July 16, 2017, *The Salt Lake Tribune* published an article titled, "Attorney representing Utah death row inmates says he's not being paid adequately – and he's not the first to raise concerns," discussing the funding issues in Lovell's and other death penalty cases. The *Tribune* article discussed the costs of Utah's death penalty, and that Newton was citing this and other funding disputes to urge its abolition. The article included this observation:

> In an amicus brief filed by the Utah Association of Criminal Defense Lawyers in [Floyd] Menzies' case in 2007, several well-known defense attorneys wrote affidavits detailing the financial difficulties they encountered by accepting death penalty appeals. One lawyer wrote that his hourly wage came to under $17 an hour, though he normally bills at a rate about ten times higher than that. Another said he made $19 an hour representing a death row inmate in a state appeal ….

**DISPUTED, and immaterial.** The quotation does not reference Plaintiff or relate to the Lovell case; further disputes are addressed in Defendants' response to Plaintiff's SMF no. 30.

---

[27] Motion to Withdraw, Exh. V to Plaintiff's Opp.
[28] Response to the State's Motion to Inquire into Defense Counsel's Potential Conflict of Interest, pp. 18-19, Exh. T to Defendant's Motion.
[29] *Id.*
[30] Tribune Article, July 16, 2017, at NEWTON 0403, Exh. W to Plaintiff's Opp.

34. According to the County, Newton's General Contract was not at risk as of August 29, 2017. The County says it had decided to terminate the contract at the end of August, but when the Legal Defenders Association declined to assume it, "that issue was set aside and largely forgotten about."

**DISPUTED IN PART, and incomplete.** Baron stated that Plaintiff misrepresented in his oral argument on his Motion to Withdraw that his general appellate contract would be threatened by his advocacy of Lovell, because the County had not "threatened the underlying contract." [31] The County had not previously informed Plaintiff of a threat to that contract, but following the hearing at the end of August the County decided to terminate Plaintiff's general appellate contract, and contacted the Legal Defender's Office to inquire about that office taking over that contract and the Lovell appeal. [32] The County's decision was "set aside and largely forgotten about" and Baron testified that due to a deadline in the Lovell case, the County got sidetracked as their focus shifted to replacing Plaintiff as counsel in that case. [33] However, the County did not chang its decision regarding termination. [34]

38. According to the County, as of September 20, 2017, Newton's General Contract was not at risk; although there had been previous discussion about terminating the contract, it would have been forgotten.

---

[31] Deposition of Bryan Baron ("Baron Dep."), 90:18-91:3, Exh. O to Defendants' Motion; August 30 – September 5, 2017, email chain between Baron and Legal Defenders, attached as Exh. EE.
[32] *Id*. at 16:13-17:7.
[33] *Id*. at 18:19-19:1.
[34] *Id*. at 20:25-21:9.

**DISPUTED.** The County did not state that Plaintiff's contract was no longer at risk, but that issue had been sidetracked because of the need to focus on quickly finding an attorney to replace Plaintiff as Lovell's counsel.[35]

39.     On October 2, the [Ogden] *Standard-Examiner* Editorial Board gave a "thumbs down" to the Weber County Commission and the Weber County Attorney's Office "for their slow, clumsy handling of funding for Doug Lovell's capital defense case." It wrote: Capital defense cases are expensive. But the Sixth Amendment guarantees the right to counsel.

> Sam Newton was on Doug Lovell's case for more than a year, amassing thousands of pages of research, interviews and case material. He was initially given $75,000, with a clause to request more but the money ran out in December. He removed himself from the case after saying Weber County was not paying him enough – or at all. Now, newly selected Colleen Coebergh, a Salt Lake City attorney, has to study that material and effectively start over on the 32-year-old case. Court documents show Newton was asking for an additional $37,000, which would have brought the county's total to a little over $100,000. Instead, the county will be spending at least $174,000 with no guarantees Coebergh will be able to catch up with and surpass Newton's work before the money runs out.

This is inept management of tax dollars and bad stewardship of the Constitution.

**UNDISPUTED, but immaterial.** The article does not mention that Plaintiff contributed to the article or provided a statement but merely makes a generalized statement about the case.[36]

40.     On October 21, the *Tribune* published a robust attack on the death penalty, mentioning Newton and the Lovell case in the context of this larger controversy.

**UNDISPUTED, but immaterial.** The article does not provide a statement from Plaintiff, and only indicates generally that Plaintiff had a payment dispute with the County.[37]

---

[35] *Id*. at 18:21-19:9.
[36] October 2, 2017, Standard-Examiner news article, Newton 0437, Exh. BB to Plaintiff's Opp.
[37] October 21, 2017, Tribune Article, Exh. CC to Plaintiff's Opp.

43.     The County has not challenged statements by Newton relating to his General Contract. Thus, that contract was terminated for statements involving an unrelated (Lovell) case.

**DISPUTED.** Plaintiff's general appellate contract contained a clause that allowed either the County or Plaintiff to terminate the agreement with sixty-days' notice without cause.[38] In addition, the County's contract included a termination provision "at any time for cause." Cause included "behavior which brings disrepute to other contract attorneys or to County."[39] The termination letter to Plaintiff cited the provision indicating that the termination was being made without cause; however, the termination letter also indicated that the motivation behind the termination was Plaintiff's misrepresentations in Lovell's case. Although the Lovell case was unrelated to the general appellate contract, the misrepresentations made in that case brought disrepute to the County which was cause for termination of the general appellate contract.[40]

44.     According to the County, it is purely coincidental that Newton was fired shortly after County officials were blistered by two local newspapers. The County says it just happened to "remember" at this time that it wanted to terminate Newton's General Contract. It was "reminded" to fire Newton not by the recent negative media coverage, the County says, but rather by a rumor it heard that conflict counsel would need to be hired in a case because Newton had met with two appellate defendants at the same time.

**DISPUTED.** Plaintiff provides no evidence to support this alleged fact, attempting to discredit  Baron's sworn testimony with conjecture. Baron's testimony is supported by extensive documentary evidence. Baron testified that the County was sidetracked from its decision to

---

[38] Indigent Defense Attorney Contract, Exh. B to Plaintiff's Opp.
[39] *Id*. at ¶ 28.
[40] Termination Letter, Exh. DD to Plaintiff's Opp.

terminate Newton's Indigent Defense Contract as it hurried to find new representation based on a

deadline from the Court.[41] The trial court granted Plaintiff's motion to withdraw from the Lovell

case on August 29, 2017, and ordered the County to have representation for Lovell within 20

days.[42] The next day, the County contacted the Legal Defenders Association, to ask if the

organization could take over the Lovell appeal and to discuss whether they could take over

Plaintiff's regular appellate contract, as well.[43] The County last communicated with Legal

Defenders regarding Plaintiff's contracts on Friday, September 8, 2017.[44] On Monday

September 8, 2017, the County sent out emails requesting applications from qualified appellate

attorneys which indicated that the County wanted an attorney under contract by September 19,

2017.[45] Five days before the deadline set by the trial court, the County only had one qualified

applicant, Colleen Coebergh.[46] The negotiation between Ms. Coebergh and the County, and the

process to have her contract approved and processed for her retainer payment, lasted from

September 15- 26, 2017.[47] Ms. Coebergh informed the County that she would address her

affidavit with the court once she received her retainer, which was mailed on October 3, 2017.[48]

　　　A rumor did not cause a conflict to arise, but Plaintiff informed the County that a conflict

precluded him from representing any defendants on appeal in a case that involved four

---

[41] Baron Dep., 18:21-19:9, Exh. O to Defendants' Motion.
[42] *Id*. at 167:12-23.
[43] Exh. EE, August 30 – September 5, 2017, email chain between Baron and Legal Defenders; Baron Dep. 173:5-20, Exh. O to Defendants' Motion.
[44] September 8, 2017, email from Baron to Richard Mauro at Legal Defenders, attached as Exh. FF.
[45] Baron Dep. 17:25-18:9, Exh. O to Defendants' Motion; September 11, 2017, emails from Baron requesting applications for Lovell case, attached as Exh. GG.
[46] September 25, 2017, email from Baron to Ebert, attached as Exh. HH.
[47] September 15-26, 2017, emails between Baron and Coebergh, attached as Exh. II.
[48] September 29 – October 2, 2017, emails between Baron and Coebergh, attached as Exh. JJ.

individuals. On September 26, 2017, Baron sent out emails requesting applications for attorneys to act as conflict counsel for those four appellate defendants.[49] On October 3, 2017, the County informed three of the responding attorneys that they had been selected to act as conflict counsel.[50] The conflict contracts were approved by the commission on October 10, 2017.[51] On October 12, 2017, Baron informed one of the conflict attorneys, Emily Adams, that Newton would be speaking to one of the four defendants to determine if Newton could provide representation, or if he had a conflict.[52] If Newton did have a conflict, Baron requested that Ms. Adams enter an appearance for that additional defendant as well.[53] After requesting an update on October 19, 2017, the County learned from Newton that could not represent the defendants, and that it would be a conflict for Ms. Adams to represent two of the defendants together.[54] On October 23, 2017, Baron requested clarification about the conflict to determine if Plaintiff had caused the conflict and could therefore be responsible for the cost of conflict counsel under his contract.[55] Plaintiff responded that after he had begun representing two of the defendants a conflict arose between them.[56] Newton also stated that representing the other defendants would create a conflict with the two defendants he had initially represented.[57] Plaintiff did not provide any specifics about those conflicts, claiming attorney-client privilege.[58] That same day, Baron

---

[49] September 26 – October 3, 2017, emails from Baron to conflict counsel, attached as Exh. KK.
[50] *Id.*
[51] October 5, 2017, email from Baron requesting contracts be placed on commission's agenda, attached as Exh. LL.
[52] Exh. MM, October 12, 2017, email from Baron to Adams.
[53] *Id.*
[54] Oct 19-23 emails regarding Newton conflict, attached as Exh. NN.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*

sent an email to Dave Wilson, requesting input on whether Plaintiff's response would be sufficient to require that he pay for conflict counsel.[59] Three days later, Baron sent out a termination letter for review.[60]

45. There is evidence from which a jury could disbelieve this claim, including:

a. The County never asked Newton if he had met with the two defendants at the same time. (He had not.)

**UNDISPUTED, but immaterial and misleading.** The County did ask Plaintiff about the reason for the conflict, and while he would not provide specifics, citing attorney-client privilege, he admitted that the conflict arose during his representation of two of the defendants.[61]

b. The County knew that the person from whom it heard the rumor was opposing counsel who had no personal knowledge, and that it could not rely on mere rumor.

**DISPUTED and misleading.** The County did not know for certain that Mr. Gage did not have personal knowledge but believed it to be the case.[62] The County also did not rely on a rumor, or take action against Plaintiff based on a rumor, but testified that this interaction served to remind them of their decision to terminate Plaintiff's contract, and that explanation is supported by the documentary evidence which shows that Plaintiff's communications about the conflict occurred after the October 21, 2017, news article cited by Plaintiff, and only three days before the County sent his termination letter.[63]

---

[59] *Id*.
[60] Termination Letter, Exh. BB to Defendants' Motion.
[61] Exh. NN, Oct 19-23 emails regarding Newton conflict.
[62] Baron Dep. 99:5-100:14, Exh. O to Defendants' Motion.
[63] *Id*. at 100:9-14; Oct 19-23 emails regarding Newton conflict, attached as Exh. NN; Termination Letter, Exh. DD to Plaintiff's Opp.

c. The County never asked anyone nor conducted any investigation as to whether

Newton had met with the two defendants at the same time.

**Undisputed, but misleading.** The County testified that it felt that an investigation would

be pointless, as only Plaintiff had the necessary information, but he would not discuss the

specifics of the conflict due to the attorney-client privilege.[64]

d. This "met with two defendants at the same time" allegation was not mentioned in

the letter stating the reasons for Newton's firing.

**UNDISPUTED, but immaterial.** As noted above, the County did not claim it terminated

Plaintiff's contract because of the conflict, but that the interaction reminded them of the decision

to terminate the contract which had been sidetracked by more pressing concerns.[65]

e. Baron can only remember one conversation with Commissioner Harvey (who

signed the letter) about terminating Newton's General Contract, and that

conversation was "right around the time the letter was sent out, October 25th or

26th."

**UNDISPUTED, but misleading.** Baron stated that he remembered "at least one"

conversation but could not recall specifically.[66]

f. Baron and his bosses in the County Attorney's Office (David C. Wilson and Chris

Allred) regularly discussed media coverage. For example, with respect to a

September 21, 2017, article, Baron complained, "Jessica Miller, from the Tribune,

is the one who didn't ask many questions and didn't request any emails. I'm

---

[64] Baron Dep. 99:18-100:4, Exh. O to Defendants' Motion.
[65] *Id*. at 100:9-14.
[66] *Id*. at 23:19-24:4.

hoping the Standard Examiner's article is better." On September 27, Baron

circulated a link to a *Standard Examiner* article.

**DISPUTED in part, and immaterial in part.** There is no evidence that employees in

the County Attorney's Office regularly discussed media coverage, and discussion of media

coverage is irrelevant to the extent it does not address speech by Plaintiff. Further, Baron's

statement that Jessica Miller did not ask many questions is borne out by her email, where she

only asked one specific question: whether the county had found a new attorney to represent

Lovell. [67] The other two questions asked by Ms. Miller were vague: how the search for counsel

was going; and whether there was anything the County would like to say about the payment

situation.[68] In contrast, a representative from the Standard Examiner, Nadia Pflaum, asked

numerous questions, including: specifics relating to Plaintiff's compensation; negotiations and

communications between the County and Newton; clarification on County documents; etc., and

also requested documents related to her queries.[69]

      g. The County had previously sought to retaliate against Newton in response to a

         *Tribune* article. On July 17, 2017, Baron sent Wilson and Allred an article about

         Newton/the Lovell case. Wilson's response included, "All of this for a defendant

         who admitted killing a person and then a witness. The world must laugh at our

         stupidity." Allred chimed in, "I'm really sick of this BS! I at least want to expose

         just how much Sam is getting paid for these two cases as taxpayer expense."

         "Within minutes," Baron was assigned to investigate payments to Newton by the

---

[67] September 14, 2017, email from Jessica Miller, Exh. FF to Plaintiff's Opp.
[68] September 14, 2017, email from Jessica Miller, Exh. FF to Plaintiff's Opp.
[69] Nadia Pflaum emails, attached as Exh. OO.

State of Utah in an unrelated death penalty case (Maestas). Later that day, Wilson

wrote, "So we have never reached that point since the Utah Supreme Court doesn't

want this admitted murderer to die."

**DISPUTED.** The County did not retaliate against Plaintiff or take negative action against

him due to media coverage. More than a month earlier, Weber County had expressed concern

about several of Plaintiff's billing practices.[70] There was also support for the County's concern,

as Plaintiff withdrew his billing related to his motion for additional fees following the County's

communication about the same.[71] The County also testified that it wanted information about how

another agency had dealt with Plaintiff, due to its previous concerns about Plaintiff's billing.[72]

h. It was Wilson who told the county manager to take steps to fire Newton.

**DISPUTED.** Wilson directed Baron to contact Mr. Allred and Mr. Harvey, but Baron

testified that the termination of the contract needed to come from Commissioner Harvey.[73]

Because of that, Baron contacted the Commissioner and discussed "whether he was prepared to

move forward with the termination."[74]

Plaintiff's Statement of Material Facts, nos. 46-49.

**UNDISPUTED, but immaterial.** The news articles cited by Plaintiff in the above facts

all took place after Plaintiff's contract had been terminated.

51.     Baron told Commissioner Harvey that, if the court took over, it could "very well"

approve the payment of more fees than the county. Baron said he "wasn't impressed" from his

---

[70] June 5 – June 9, 2017, emails related to Plaintiff's billing, Exh. Q to Defendants' Motion.
[71] *Id.*
[72] Baron Dep. 163:13-18, Exh. O to Defendants' Motion.
[73] *Id.* 23:3-14.
[74] *Id.* 23:3-14.

interview and calls to counsel's references. He said she would not be his "first, second, or even third choice to handle this case, but we don't really have any other options."

**UNDISPUTED, but incomplete.** Baron also noted that there were multiple benefits for the County to contract directly with Ms. Coebergh, including: it allowed the County to negotiate the terms of the contract; it allowed the County to put a soft cap in place; and it allowed the County to review her invoices to ensure that her work was reasonable.[75] Baron also stated that Ms. Coebergh was "well qualified to handle the case" and his listed concerns were not related to her abilities or qualifications as an attorney.[76]

54.    When asked in its 30(b)(6) deposition what "harm" it had incurred from Newton's alleged misrepresentations (as stated in the termination letter), the County's only example was that it heard from an attorney, Emily Adams, that she had heard unspecified things and seen unspecified comments on a defense counsel forum regarding concerns about payment. The County has not proffered any admissible evidence from Ms. Adams and, in fact, she applied for the job. She did not have the required qualification but was sufficiently keen that she sought to enlist a qualified attorney whose workload would not permit it. Ms. Adams and others also applied for conflict work.

**DISPUTED.** The County testified that Plaintiff's untruthful statements had caused the County difficulty in obtaining appellate counsel to take over the Lovell Case after Plaintiff's withdrawal.[77] For instance, Baron stated in an email to Ebert that only one qualified attorney had

---

[75] September 25, 2017, email from Baron to Ebert, Exh. LL to Plaintiff's Opp.
[76] *Id.*
[77] Baron Dep. 68:25-69:2, Exh. O to Defendants' Motion.

applied to represent Lovell.[78] Other facts also indicate that Plaintiff's misrepresentations harmed the County. In her negotiation, Ms. Coebergh mentioned the court's denial of Plaintiff's motion for fees as justification for her request that the County provide additional provisions for funding in excess of the soft cap, and also requested additional contract concessions related to paying expenses, investigators, and evaluators up-front, instead of reimbursing her, and she insisted that the County pay a $10,000 retainer before she would begin work on the case.[79]

---

[78] September 25, 2017, email from Baron to Ebert, Exh. LL to Plaintiff's Opp.
[79] Exh. II; Baron Dep. 179:20-180:2; , Exh. O to Defendants' Motion.

**ARGUMENT**

As noted in Defendants' Amended Motion for Summary Judgment ("Defendants'

Motion"), under Fed. R. Civ. P. 56(c), summary judgment is appropriate if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine dispute as to any material fact and that the moving party is

entitled to judgment as a matter of law." "A dispute over a material fact is genuine if a rational

jury could find in favor of the nonmoving party on the evidence presented." [80] The Court must

determine "whether the evidence proffered by the plaintiff, if believed by the factfinder, would

be sufficient to sustain the claim . . . and draw all *reasonable inferences* from the evidence in the

manner most favorable to the plaintiff."[81] Notwithstanding that standard, the Tenth Circuit has

held that the non-movant must "marshal sufficient evidence requiring submission to the jury to

avoid summary judgment."[82] To avoid summary judgment, "the party opposing the motion must

establish, *at a minimum*, an inference of the existence of each essential element to the case." [83]

## I.     PLAINTIFF'S FIRST AMENDMENT CLAIMS FAIL AS A MATTER OF LAW

As noted in Defendants' Motion, the Supreme Court has held that to determine if an

employee's constitutional rights were restricted, the Court must apply the five prongs of the

*Garcetti/Pickering* analysis to determine if: (1) the speech was made pursuant to an employee's

official duties; (2) the speech was on a matter of public concern; (3) the government's interests,

as employer, are sufficient to outweigh the plaintiff's free speech interests; (4) the protected

---

[80] *Becker v. Kroll*, 494 F.3d 904, 913 (10th Cir. 2007) (emphasis added, citations omitted).
[81] *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
[82] *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (quotations omitted, citing *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1281 (10th Cir. 2015).
[83] *Foster*, 293 U.S. at 192 (emphasis added, citations omitted).

speech was a motivating factor; and (5) the defendant would have reached the same employment decision without protected conduct.[84] As "[i]ndependent government contractors are similar in most relevant respects to government employees" the same form of balancing analysis applies.[85] Specifically, in order for a public contractor to show that her or his criticism "of the contracting government agency is protected activity" it must pass the *Garcetti/Pickering* test.[86]

### A. Plaintiff's Termination Resulted From Speech Made in His Official Capacity.

1. Whether Plaintiff's statements were made pursuant to his official duties is a threshold matter.

Plaintiff spends significant time addressing First Amendment case law since *Pickering v. Board of Education*, 391 U.S. 563 (1968).[87] *Pickering* and its subsequent cases identify two inquiries to assist interpretation of the constitutional protections for public employee speech.[88] First, the court would determine "whether the employee spoke as a citizen on a matter of public concern."[89] If the employee did not speak on a matter of public concern, the employee had "no First Amendment cause of action based on his or her employer's reaction to the speech."[90] If the employee spoke on a matter of public concern, the possibility of a First Amendment claim arose and the question became "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."[91]

---

[84] *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009) (citations omitted).
[85] *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 684–85 (1996).
[86] *Glover v. Mabrey*, 384 F. App'x 763, 769 (10th Cir. 2010).
[87] Plaintiff's Opp., pp. 2-7.
[88] *Garcetti*, 547 U.S. at 423.
[89] *Id*. at 418.
[90] *Id*.
[91] *Id.*

The Supreme Court's decision in *Garcetti* "profoundly alter[ed] how courts review First Amendment retaliation claims."[92] The holding in *Garcetti* clarified the first prong of the *Pickering* analysis finding that "when public employees speak 'pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'"[93] This holding created a five-step inquiry, referred to as the *Garcetti/Pickering* analysis, where the court must first determine "whether the employee speaks 'pursuant to his official duties.'"[94] If the employee spoke pursuant to his official duties "there is no constitutional protection." The court only determines whether the subject of the speech is a matter of public concern if the speech did not occur pursuant to the employee's official duties.[95] Whether speech is a matter of public concern then, is a secondary consideration to whether the speech occurred pursuant to official duties. Plaintiff's arguments relating to public concern are addressed below, in section I(B)(1).

2.     Plaintiff's statements were made pursuant to his official duties.

It is well settled that "[i]f the employee speaks pursuant to his official duties, then there is no constitutional protection."[96] *Garcetti's* progeny has clarified what constitutes an employee's official duties, stating: "that speech relating to tasks within an employee's uncontested employment responsibilities is not protected from regulation;"[97] "speech is made pursuant to official duties if it is generally consistent with the 'type of activities the employee was paid to

---

[92] *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1325 (10th Cir. 2007)
[93] *Id*. at 1328 (quoting *Garcetti* 547 U.S. at 421.)
[94] *Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1202 (10th Cir. 2007)* (citing *Garcetti* 547 U.S. at 422 (2006).
[95] *Id*. (*See also Garcetti* 547 U.S. at 460 (2006).
[96] *Brammer-Hoelter*, 492 F.3d at 1202 (citing *Garcetti v. Ceballos,* 547 U.S. 410, 422 (2006).
[97] *Id.* at 1203.

do;'"[98] and, "if an employee engages in speech during the course of preforming an official duty, and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties."[99]

Plaintiff arguments that his statements were not made pursuant to his official duties include: his statements to the court and media were outside his job description and did not include reporting malfeasance by the County, require him to take issue with the death penalty, or speak to the media; and that his statements were outside the chain of command.[100] [101] These arguments ignore the guidelines the courts use to determine if speech is made pursuant to official duties. Per his contract with the County, Plaintiff received payment for acting as Lovell's representative and advocate in his appeal.[102] Further, the County contracted with Plaintiff to represent Lovell as an attorney and work pursuant to that representation would fall under Plaintiff's official duties.[103] An attorney's duties representing clients in criminal and civil litigation are well known and include drafting motions, presenting evidence, arguing to the court, and acting as an advocate to "zealously assert[] the client's position."[104] Similarly, Plaintiff's

---

[98] *Id.* (quoting *Green v. Bd. of Cty. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007).

[99] *Id.* (citations omitted).

[100] Plaintiff's Opp., p. 11-12.

[101] Plaintiff also argues that several statements were made after he withdrew, and so were not made in his official capacity. Plaintiff's Opp., p. 11. As explained in section I(A)(3), below, Plaintiff does not provide specific statements to support that claim, and in section I(A)(1) of Plaintiff's Opposition, he cites to only one article which does include speech by Plaintiff. *Id.* at pp. 2, 11; October 2, 2017, Standard Examiner Article, Exh. BB to Plaintiff's Opp.

[102] Contract to represent Lovell, Exh. C to Plaintiff's Opp.

[103] *See Brammer-Hoelter*, 492 F.3d at 1203 ("The ultimate question is whether the employee speaks as a citizen or instead as a government employee—an individual acting 'in his or her professional capacity.'") (citing *Garcetti*, 126 S.Ct. at 1960).

[104] Utah Judicial Code of Judicial Administration, Ch 13:Rules of Professional Conduct, Preamble: A Lawyer's Responsibilities, ¶ 2.

actions to draft motions and represent Lovell's interests in court and other situations, as well as other actions taken to zealously assert his client's position, fall under his official duties. [105]

Plaintiff cites to *Casey* for the proposition that speech made outside of the employee's official duties and to an outside authority, is protected.[106] In *Casey*, the court distinguished between comments that were and were not protected. For instance, speech which was part of her official duties and was not protected included: comments to the School Board about the Head Start program, which fell within "her portfolio;" her direction to a subordinate to report federal Head Start officials; and her report of a violation of the open meetings act to the School Board.[107] However, the court found that her report to the New Mexico Attorney General about open meetings act violations fell outside the scope of her office.[108] Plaintiff also cites *Thomas v. City of Blanchard*, for the same proposition, that a city code inspector's report to police of a fraudulent certificate of occupancy was protected by the First Amendment, as it fell outside the scope of his official duties.[109] Neither of these cases are dispositive, however, as Plaintiff's statements were made pursuant to his official duties as Lovell's counsel. While the trial court may not have acted as his supervisor, his representation of Lovell encompassed that type of his work, and the County compensated him for that representation, including his representation in front of the court.

---

[105] *Id*.; Ex Parte Motion, Exh. M to Plaintiff's Opp.; Reply In Support of Ex Parte Motion, Exh. Q to Plaintiff's Opp.; Motion to Withdraw, Exh. V to Plaintiff's Opp.; and Transcript on Motion to Withdraw, Exh. TT to Plaintiff's Opp.; Newton Response to State's Motion to Inquire into Defense Counsel's Conflict of Interest, Exh. T to Defendants' Motion; Newton Time records, 2016-2017, Exh. Y to Defendants' Motion.

[106] Plaintiff's Opp., p. 9; 473 F.3d 1323 (10th Cir. 2007).

[107] *Id*. at1329, 1331.

[108] *Id*. at 1332.

[109] 548 F.3d 1317, 1325 (10th Cir. 2008).

Additionally, Plaintiff's own records support such a finding, demonstrating that his representations regularly included drafting motions and other documents, participating in hearings, and communicating with the court, opposing counsel, and the County.[110] The record also supports that Plaintiff's representation included providing information to news services.[111]

In Defendants' Motion, section (I)(B)(1), the County identified specific statements where the Plaintiff materially misrepresented the County's actions or positions.[112] These misrepresentations were all made in the context of Plaintiff's representation, and the majority were made in motions and related oral arguments, including Plaintiff's Ex Parte Motion for Attorney's Fees,[113] Plaintiff's Motion to Withdraw,[114] and Plaintiff's Response to State's Motion to Inquire into Defense Council's Potential Conflict of Interest.[115] There is no genuine dispute that Plaintiff's statements to the trial court in the motions listed above were made as part of his official duties, as all were filed by Plaintiff on Lovell's behalf, in his official capacity.

What's more, Plaintiff's statements also reasonably contributed to and facilitated Plaintiff's representation of Lovell. Not only did Plaintiff's statements facilitate his representation, in that many statements were related to his compensation, but their context indicates their contribution to Plaintiff's representation of Lovell and are replete with references to protection of Lovell's rights. For example, Plaintiff states in the Ex Parte Motion he filed on Lovell's behalf that the court must authorize additional funding "so that Mr. Lovell has access to

---

[110] Newton Time Records, 2016 and 2017, Exh. Y to Defendants' Motion.
[111] July 16, 2017, article, Exh. W to Plaintiff's Opp., NEWTON 0403; September 2, 2017, article, Exh. Z to Plaintiff's Opp., NEWTON 0421
[112] Defendants' Motion, pp. 10-11.
[113] Ex Parte Motion, Exh. M to Plaintiff's Opp.; Reply in Support of Ex Parte Motion, Exh. L to Defendants' Motion.
[114] Motion, Exh. L to Defendants' Motion; Hearing Transcript, Exh. CC to Defendants' Motion.
[115] Response to State's Motion, Exh. T to Defendants' Motion.

the counsel he is entitled."[116] In his response to that motion Plaintiff states that the court has the responsibility "to guarantee that Mr. Lovell has adequately funded counsel."[117]No reasonable jury could find that Plaintiff's statements were made outside the scope of his official role.

Plaintiff also claims that Defendants' arguments are unavailing for a contract attorney, as his ethical obligations were to Lovell, and not the County, but Plaintiff cites no legal support.[118] In contrast to that argument, and as the Supreme Court noted in *Umbehr*, "[i]ndependent government contractors are similar in most relevant respects to government employees," and concluded "that the same form of balancing analysis should apply to each."[119] As such, the analysis laid out in *Garcetti* must be applied and the threshold inquiry focuses on whether the speech occurred within the individual's official duties. Once again, Plaintiff's duties pursuant to his contract with the County were to represent Lovell, and his speech occurred during the types of duties that such a role regularly required, and for which he received compensation.

Plaintiff's Opposition also claims his statements were an effort to bring to light broader social issues.[120] However, once again, Plaintiff does not marshal the facts to support his argument, or otherwise explain how his statements could be interpreted in that manner. The articles attached as exhibits to Plaintiff's Opposition contain statements which are by and large taken directly from the court documents and were made by Plaintiff pursuant to his official duties representing Lovell.[121] While the County has noted that it took issue with two statements

---

[116] Ex Parte Motion, p. 6, Exh. M to Plaintiff's Opp.
[117] Reply In Support of Ex Parte Motion, p. 4, Exh. Q to Plaintiff's Opp.
[118] Plaintiff's Opp., p. 11.
[119] *Umbehr*, 518 U.S. at 684–85.
[120] Plaintiff's Opp., pp. 11-12.
[121] July 16, 2017, article, Exh. W to Plaintiff's Opp., NEWTON 0401-0402; September 2, 2017, article, Exh. Z to Plaintiff's Opp., NEWTON 0419-0420; September 18, 2017, article, Exh. AA

in the media that misrepresented the County's communications regarding billing,[122] there is no

other evidence that the County considered, took issue with, and/or knew about other statements

in the media related to Plaintiff's representation of Lovell.

For these reasons, there is no genuine dispute of material fact that the statements

considered by the County as the basis for Plaintiff's termination were made pursuant to

Plaintiff's official duties, and as such are not protected by the First Amendment. For that reason,

Plaintiff's First Amendment claims fail as a matter of law.

3.   There is no genuine dispute of material fact concerning the statements the
County considered in its termination of Plaintiff.

As noted above, Plaintiff argues that a jury could determine that the County relied on

statements made which Plaintiff made after the Court granted his Motion to Withdraw.[123]

Plaintiff's argument, however, is a red herring: it states a conclusion based on the dates of

Plaintiff's representations, but fails to provide facts which support an inference that the County

relied on those statements. Plaintiff's arguments that lack factual support include: that the

County's story regarding Plaintiff's termination is "dubious" and "implausible;" that the County

officials tracked media coverage; and that Baron spoke with the County Commissioners about

terminating Plaintiff's contract for the first time shortly after an October 2, 2017, news article

commented on the Commissioners handling of the Lovell case.[124] These arguments are

speculative, and Plaintiff has not shown facts which reasonably support such inferences.

---

to Plaintiff's Opp., NEWTON 0428; October 2, 2017, article, Exh. BB to Plaintiff's Opp.,
NEWTON 0437.
[122] Defendants' Motion, pp. 10-11.
[123] Plaintiff's Opp., pp. 1-2.
[124] *Id*. at p. 2.

First, while Plaintiff scoffs at the County's reasons for the delay in terminating Plaintiff, those reasons are born out by the documentary evidence. Baron testified that the County decided at the end of August 2017 that Plaintiff would be terminated, but the trial court's 20-day deadline to replace Plaintiff on the Lovell case sidetracked that decision.[125] In support of the County's position, the evidence shows that Immediately after the August 29, 2017, hearing, the County contacted Legal Defenders, to inquire if it could take over both the Lovell appeal and Plaintiff's regular appellate contract.[126]

As Legal Defenders could not take over Plaintiff's contracts, the County sent out emails on September 11, 2017, requesting applications to take over the Lovell Appeal; indicating that the County wanted an attorney under contract by September 19, 2017.[127] The County only had one qualified applicant, Colleen Coebergh, and the process to have her contract processed and payment approved was not completed until September 26, 2017, and she did not begin work until after receiving her retainer payment, sent after October 3, 2017.[128] This rush to address the immediate need in the Lovell case delayed Plaintiff's termination.

During the delay caused by the search for new counsel, the County had to seek conflict counsel for four appellate defendants that would normally have been represented by Plaintiff.[129] On October 3, 2017, the County informed three attorneys that they had been selected as conflict

---

[125] Baron Dep., 16:11-20; 18:21-19:9, Exh. O to Defendants' Motion.
[126] Exh. EE, August 30 – September 5, 2017, email chain between Baron and Legal Defenders, Baron Dep. 173:5-20, Exh. O to Defendants' Motion.
[127] Baron Dep. 17:25-18:9, Exh. O to Defendants' Motion; Exh. GG, September 11, 2017, emails from Baron requesting applications for Lovell case.
[128] Exh. HH, Sep. 25, 2017, email from Baron to Ebert; Exh. II, Sep. 15-26, 2017, and Exh. JJ, Sep. 29 - Oct. 2, 2017, emails between Baron and Coebergh.
[129] Exh. KK, September 26 – October 3, 2017, emails from Baron to conflict counsel.

counsel, and their contracts were approved by the commission on October 10, 2017.[130] The

County planned to have either Plaintiff or one of the conflict attorneys represented the fourth

defendant.[131] On October 19, 2017, Plaintiff informed the County that he would have a conflict

representing any of the defendants, and that it would cause a conflict for another attorney to

represent two of the defendants together.[132] On October 23, 2017, Baron inquired of Plaintiff as

to the reason for the conflict.[133] If Plaintiff had caused the conflict, he could be held responsible

for the cost of conflict counsel pursuant to his contract.[134] Plaintiff responded that the conflict

arose after he began representing two of the defendants together, but he did not provide any

specifics, claiming attorney-client privilege.[135] After that, Baron contacted Dave Wilson to

discuss whether Plaintiff could be required to pay for conflict counsel, and that discussion

reminded the County of the decision to terminate the contract, which occurred three days later.[136]

To show a connection between his cited articles and his termination, Plaintiff argues that

the County tracked media coverage.[137] Plaintiff's SOF ¶ 45(f) states that Baron and Mr. Wilson

regularly discussed media coverage, but both articles which the County commented on were

written by individuals who had contacted Baron about Lovell's case.[138] Further, neither email

that Plaintiff cites regarding the September 21 and 27, 2017, articles, identifies or addresses a

---

[130] *Id*.; Exh. LL, October 5, 2017, email from Baron requesting contracts be placed on commission's agenda, attached as.

[131]

[132] Exh. NN, Oct 19-23 emails regarding Newton conflict.

[133] *Id*.

[134] *Id*.

[135] *Id*.

[136] *Id*.; Baron Dep., 20:25-21:9, Exh. O to Defendants' Motion; Termination Letter, Exh. DD to Plaintiff's Opp.

[137] Plaintiff's Opp., p. 2.

[138] September 14, 2017, email from Jessica Miller, Exh. FF to Plaintiff's Opp.; Exh. OO, Tim Vandenack and Nadia Pflaum emails.

statement or speech by Plaintiff. In the September 21st email, Baron only notes that "I'm hoping the Standard Examiner's article is better."[139] He clarified in his deposition that by better, he meant only that the Salt Lake Tribune Article "was telling Mr. Newton's side of the Lovell Litigation. And [he] was hopeful that the Standard Examiner's article would provide more information from the county's perspective."[140] Plaintiff has not indicated that the County considered any other news articles, and does not provide any indication that Baron or the County took any issue with statements made by Plaintiff in the September 21st or 27th articles. Without some evidence or support for a connection between the articles and his termination, Plaintiff cannot show a reasonable inference to be drawn.[141]

What's more, the October articles that he claims were the impetus for his termination by the County's do not contain any statements or speech by Plaintiff, and only refer to him and his representation of Lovell generally.[142] Without speech by Plaintiff, the First Amendment is not implicated. An entity cannot be found to have retaliated against an individual for making a statement if no statement has been made. Furthermore, there is no evidence that the County saw

---

[139] September 18, 2017, email from Baron Salt Lake Tribune Article, attached as Exh. PP.
[140] Baron Dep., 178:5-11, Exh. O to Defendants' Motion
[141] Plaintiff's SOF ¶ 36 also lists a September 2, 2017, news article as post-withdrawal speech. Exh. Z to Plaintiff's Opp. However, the statement in the article is comparable to Plaintiff's speech before his withdrawal, is based on his representation of Lovell, and echoes similar comments made to the court. *Id.* at NEWTON 0421. His claim that he had to choose "between supporting [his] family and representing Mr. Lovell" also misrepresents the facts of the case. *Id.* As noted below, his speech does not address a matter of public concern, its falsity weighs heavily against protection, and he cannot show that the statement, on its own, was a motivating factor in his termination, especially as he made numerous similar misrepresentations to the trial court.
[142] Plaintiff's Opp., p. 2. *See also* Plaintiff's Opp. Statement of Material Facts ("Plaintiff's SOF"), ¶ 39 (citing to Standard Examiner article, October 2, 2017, Exh. BB to Plaintiff's Opp.); and ¶ 40 (citing The Salt Lake Tribune article, October 21, 2017, Exh. CC to Plaintiff's Opp.).

or took issue with either October article identified by Plaintiff, and no reasonable inference can be drawn to indicate that either article prompted the action by the County.

Finally, Plaintiff attempts to connect these later articles to Plaintiff's termination by arguing that the County had sought to retaliate against Plaintiff in June 2017 because of another unflattering article. Plaintiff's SOF ¶ 45(g) states that the County retaliated against him by investigating payments made to him by the State of Utah in another case.[143] However, Plaintiff cannot show that the County took negative action against him because of that article. First, an investigation itself does not constitute adverse action, and more importantly, the reasons for the investigation stemmed from concerns that had been raised with Plaintiff regarding his billing practices more than a month earlier.[144] Besides, the County had brought up questions relating to Plaintiff's frequent communications with Lovell a year earlier, as well.[145] Clearly, the County's concerns for Plaintiff's billing practices extended from the billing practices themselves, and were not motivated by Plaintiff's comments to news media.

For these reasons, Plaintiff cannot show that the County took any action based on the news articles addressed above, and more importantly, cannot demonstrate any evidence that the County took issue with any statements made by Plaintiff in those articles. The evidence provides for only one reasonable inference, that the County terminated Plaintiff's contract based on misrepresentations he made in the course of his official duties, and Defendants' respectfully request that the Court grant their motion for summary judgment.

---

[143] Plaintiff's SOF, ¶ 45(g).
[144] June 5 – June 9, 2017, emails related to Plaintiff's billing, Exh. Q to Defendants' Motion.
[145] Exh. DD, July 18, 2016, emails between Baron and Newton; *See also* Defendants' Response to Plaintiff's Statement of Facts ("Defendants' Response to SOF") ¶¶ 26, 45(g).

**B.   Plaintiff Cannot Demonstrate an Inference Supporting the Remaining Essential Elements of the Garcetti/Pickering Analysis.**

1.   Plaintiff's statements were not on a matter of public concern.

As noted previously, even if the Court finds that all or some of Plaintiff's statements were made as a citizen, and not pursuant to his official duties, Plaintiff still cannot demonstrate that his speech is protected, as it did not concern a matter of public concern. Plaintiff argues the County is improperly narrowing the scope of his speech, claiming his statements were related to the broader issues of the Sixth Amendment and Utah's death penalty system. He also claims that his statements shed light on potential or actual malfeasance by the County, and that the statements related to a subject of legitimate news interest. These arguments again miss the mark, attempting to reposition the focus on issues attendant to Lovell's case, and away from where they belong: Plaintiff's speech. When Plaintiff's statements are viewed in their correct context, it is apparent that they are not on matters of public concern.

If the court finds that the speech is not a matter of public concern, "then the speech is unprotected, and the inquiry ends."[146] Speech "aimed at airing grievances of a purely personal nature is generally not on a matter of public concern."[147] When an employee's expression is not related to a "matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."[148] Furthermore"[s]peech that exposes official impropriety

---

[146] _Brammer-Hoelter_, 492 F.3d at 1203.
[147] _Id_. at 656 (citations and quotations omitted).
[148] _Id_. (quoting _Connick_, 461 U.S. at 146).

generally involves matters of public concern, while speech that simply airs grievances of a purely personal nature typically does not."[149]

Here, Plaintiff attempts to broaden the inquiry without addressing the specific statements that the County relied on in terminating his employment. Tellingly, he does not provide evidence that the County relied on or considered statements outside of those identified in Defendants' Motion,[150] except for speculation that the County considered articles published after his withdrawal, as addressed in section I(A)(3), above. Those statements, considered together, misrepresent specific topics: that the County refused to fund anything beyond $15,000 for the work of the remand proceeding, or provide any additional funding; that the County required that he limit or discontinue communications with his client, and that his contract would be terminated if he did not do so; that he did not have access to investigative resources; and that the County had threatened his general appellate contract.[151] Plaintiff's misrepresentations on these topics, made in the course of his representation of Lovell, formed the basis for his termination.

Plaintiff's next contention, that his statements address the broader topic of the Sixth Amendment or Utah's Death Penalty, is not supported by the speech or the trial court's rulings. Plaintiff argued to the trial court that the County acted unconstitutionally by indicating that Lovell "would not be allowed additional funding" and that the County refused to fund additional work related to revising the brief or writing the reply.[152] Notwithstanding this reasoning, the trial court found that "Mr. Newton's arguments extend beyond the criminal court's duty to ensure Defendant has been provided counsel and adequate defense resources as described in the state

---

[149] *Id.* (Citations and quotations omitted).
[150] Defendants' Motion, 10-11.
[151] *Id.*
[152] Reply in Support of Ex Parte Motion, pp. 3-4, Exh. L to Defendants' Motion.

and federal constitutions, the Indigent Defense Act, and rule 8 of the Rules of Criminal Procedure."[153] The trial court also stated that "any dispute about the amount or adequacy of attorney compensation provided by the contract is a matter more appropriately addressed in civil court in a suit *between the parties in controversy*."[154] This further supports the County's argument that Plaintiff's statements, although couched in constitutional terms, do not address constitutional issues, but are personal and business matters between the parties.

Plaintiff's claim that his statements attempted to shed light on potential or actual malfeasance by the County also fails, and for similar reasons. While Plaintiff does not specify what conduct constituted malfeasance, or what laws were allegedly violated, the County assumes he refers to the misrepresentations he made pursuant to his representation of Lovell. Here, again, the issues were considered and dismissed by the trial court, including any duty under the state and federal constitutions to provide additional compensation to Plaintiff.[155] Plaintiff's argument is further undermined by the fact that he entered into the contract with the County to represent Lovell under the agreed terms, he had experience representing clients in similar matters, his contentions about the lack of funding only arose after he had exhausted the original $75,000 agreed to in the contract, and furthermore, by March 23, 2017, the County had agreed to provide additional funding beyond the original amount.[156] Even more concerning it that by April 11, 2017, the County had clarified it would be willing to consider additional requests regarding work performed previously, all of which occurred before he filed his Reply in Support of Ex Party

---

[153] Ruling and Order on Ex Parte Motion, NEWTON 0364, Exh. S to Plaintiff's Opp.
[154] *Id.* (emphasis added).
[155] *Id.*
[156] Contract to represent Lovell, Exh. C to Plaintiff's Opp.; March 23, 2017, email from Harvey to Newton, Exh. J to Defendants' Motion.

Motion on April 17, 2017.[157] Consequently, not only had the trial court determined that the County's actions did not violate his client's constitutional rights, but Plaintiff knew or should have known that his statements alleging malfeasance were incorrect.

In a similar vein, Plaintiff claims that his statements were matters of public concern because they had legitimate news interest fails for two reasons. First, the statements themselves were not of legitimate news interest, but were included due to the newsworthy nature of Lovell's appeal. Additionally, as noted above, while Plaintiff argued that his statements had constitutional significance, the trial court disagreed. Second, the statements were made more newsworthy because they contained misrepresentations or errors, which, as described below, weighs strongly against protection under the First Amendment.

While Plaintiff claims that his statements were "true, and/or obvious statements of opinion/interpretation/prediction/personal feeling,"[158] he fails to marshal any evidence in support of that claim. His only response is that if the statements were false, the County is required to show that they were made knowingly, recklessly, or maliciously.[159] As the Supreme Court noted, evidence that the plaintiff's testimony was false or erroneous may tip the scale in the employer's favor.[160] Moreover, there is an assumption that "deliberately false or recklessly false statements by public employees are either unprotected by the First Amendment or, at least, that such intentional falsity would weigh heavily against protection."[161]

---

[157] April 10-11 emails between Baron and Newton, Exh. K to Defendants' Motion; Reply In Support of Ex Parte Motion, Exh. L to Defendants' Motion.
[158] Plaintiff's Opp., p. 13.
[159] *Id.*
[160] *Lane v. Franks*, 134 S. Ct. 2369, 2373 (2014)
[161] *Moore v. City of Wynnewood*, 57 F.3d 924, 933 (10th Cir. 1995) (citing *Pickering*, 391 U.S. at 574).

So too here. As set out in Defendants' Motion, Plaintiff represented to the trial court that "[t]he county had plainly indicated that counsel will not be allowed additional funding" beyond the additional $15,000 already authorized, even after the County had informed him via email that it would be willing to consider additional requests for funding.[162] Additionally, Plaintiff claimed in various court filings that the County was requiring that he limit his communications with Lovell.[163] This misrepresented the County's position, as it had only indicated to Plaintiff that the commissioners were "unsure" of the need for such frequent communications on appeal.[164] Further, Plaintiff had no basis to assume that the County intended to limit legitimate communications, as the County had requested clarification regarding Newton's communications with Lovell a year earlier.[165] At that time, the County approved his invoices for payment after considering his reasons for the communications.[166] Finally, the County's request for clarification about Plaintiff's communications were further justified, as he had informed them a year earlier that "as the appeal goes on, there won't be too much more to talk about on these calls . . . so I don't anticipate much more conversation, other than an occasional update call."[167] These examples show that Plaintiff knowingly misrepresented the County's position, which weighs heavily against finding the speech should be protected.

---

[162] Reply in Support of Ex Parte Motion, p. 3, Exh. L to Defendants' Motion; April 11, 2017, email from Baron to Newton, Exh. K to Defendants' Motion.

[163] Motion to Withdraw, p. 4, Exhibit RR to Defendants' Motion; Salt Lake Tribune Article, July 18, 2017, p. 4, Exh. W to Defendants' Motion; Plaintiff's Response to State's Motion to Inquire into Defense Council's Potential Conflict of Interest, p. 15, Exh. T to Defendants' Motion; August 29, 2017, Hearing on Motion to Withdraw, p. 30, Exh. CC to Defendants' Motion.

[164] June 5, 2017, email from Baron to Newton, Exh. T to Plaintiff's Opp.

[165] Exh. DD, July 18, 2016, email from Baron to Newton.

[166] *Id.*

[167] *Id.*

For all these reasons, Plaintiff cannot show a genuine dispute of material fact that his statements were not on a matter of public concern. As Plaintiff's statements were not a matter of public concern, "the speech is unprotected and the inquiry ends."[168]

        2.    <u>Plaintiff's interests are outweighed by the County's interests in efficiency.</u>

Plaintiff argues that his interests outweigh the County's for several reasons: that the County has not shown that his statements affected qualified applicants from applying; or that the eventual contract with Ms. Coebergh was affected by Plaintiff's statements.[169] These arguments, however, fail to address the evidence that the disruption that Plaintiff's statements caused to the County's internal operations and employee (and contractor) relationships.

As noted above, the facts from September and October 2017 speak for themselves. The County contacted not only the Legal Defenders, but also various attorneys who were qualified to represent Lovell, but only one qualified attorney, Ms. Coebergh, applied.[170] While Plaintiff highlights the County's ability to negotiate Ms. Coebergh's contract amount down from her original request, he fails to acknowledge the additional terms the County had to include because of Plaintiff's Statements.[171] Specifically, while Ms. Coebergh's hourly rate was less than Plaintiff's, the soft cap on her contract was $25,000 higher than the original cap on Plaintiff's contract.[172] Further, during the negotiation Ms. Coebergh mentioned the court's denial of Plaintiff's motion for fees, using it as justification that the County provide additional provisions

---

[168] *Brammer-Hoelter*, 492 F.3d at 1203.
[169] Plaintiff's Opp., p. 21.
[170] Exh. EE, August 30 – September 5, 2017, email chain between Baron and Legal Defenders; Exh. GG, September 11, 2017, emails from Baron requesting applications for Lovell case; Exh. HH, September 25, 2017, email from Baron to Ebert.
[171] Plaintiff's Opp., p. 21.
[172] Exh. II, Emails between Baron and Coebergh, WEBER COUNTY 1675; Lovell Contract, Exh. C to Plaintiff's Opp.

for requesting funding in excess of the cap, which included: that the County pay expenses, investigators, and evaluators up-front, instead of reimbursing her; and that the County pay her a $10,000 retainer before she began work on the case.[173]

Considered together, these factors exhibit the disruption placed on the County's offices because of Plaintiff's statements. When combined with the fact that Plaintiff's statements were not of public concern, or of very little, considering the content and misrepresentations, the County's interest in an efficient and disciplined work environment, including the ability to retain qualified and competent counsel for indigent appeals, outweigh Plaintiff's interest in his speech..

       3.    <u>Plaintiff cannot show a reasonable inference that the County terminated his contract because of protected speech.</u>

Plaintiff bears the burden in demonstrating that his speech was a motivating factor in the County's decision.[174] To support this burden, Plaintiff claims that the likely cause of the termination was news articles written in September and October, 2017.[175] Plaintiff also notes that a retaliatory motive may be inferred, quoting the Tenth Circuit, who states:

> Adverse action in close proximity to protected speech may warrant an inference of retaliatory motive. But temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision . . . evidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link.[176]

These factors show that the County did not have a retaliatory motive in terminating Plaintiff.

---

[173] Exh. II; Baron Dep. 179:20-180:2; , Exh. O to Defendants' Motion.
[174] B*rammer-Hoelter* 492 F.3d at 1207.
[175] Plaintiff's Opp., p. 23.
[176] *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005) (citations omitted).

In his statement of facts, Plaintiff refers to articles published on September 2 and 18, 2017, both by the *Salt Lake Tribune*.[177] As noted above, no protection applied to Plaintiff's quoted speech in the September 2nd, as it occurred pursuant to his representation of Lovell, and contained a misrepresentation.[178] Secondly, Plaintiff show the County considered the September 18th article. Plaintiff notes that Baron circulated a link to Mr. Wilson and Mr. Allred about the article, but beyond that he hoped the *Standard-Examiner's* article would be "better" (clarified above) there is no evidence that the County took issue with Plaintiff's speech in the article.

It is also of note that, with the exception of statements from court proceedings, the only statement by Plaintiff in the September 18th article is that "[t]he state gives enormous resources to the prosecution, . . . the state must similarly commit to equally and adequately support criminal defense attorneys" and "[t]he defense attorney, especially as a solo practitioner, should not have to personally bear and front the financial cost for the enormous review required in a capital case."[179] In spite of Plaintiff's conclusions, there is no evidence to link that statement to the County's termination decision. It does not address the County or Lovell's case and only generally refers to the state's responsibility to criminal defense attorneys. Furthermore, the statement does not address the subjects misrepresented previously by Plaintiff, and so is dissimilar to the statements considered by the County.

Plaintiff's arguments relating to the October articles are even less compelling: there is no evidence to link those articles to the County's decision, and more importantly, the articles contain no speech by Plaintiff, negating the need to apply the *Garcetti/Pickering* analysis, and

---

[177] Plaintiff's SOF, ¶¶ 36-37; September 2, 2017, article, Exh. Z to Plaintiff's Opp.; September 18, 2017 article, Exh. AA to Plaintiff's Opp.
[178] *See* note 141, above.
[179] *Id.* at NEWTON 0429

removing any claim of retaliation against Plaintiff stemming from those articles. Both caselaw and reason would support that the first element of a First Amendment retaliation claim is "he was engaged in constitutionally protected activity."[180] Plaintiff's claim that the County based its decision to terminate Plaintiff, even in part, on articles published in October 2017, is based on two articles, one published on October 2, 2017, in the *Standard-Examiner*, and another on October 21, 2017, in the *Salt Lake Tribune*.[181] However, Plaintiff does not provide any documents or testimony to support his claim that the County, and especially the County Commissioners, knew of those articles, or had knowledge of their content. Over and above that, the articles referenced by Plaintiff that were published in October do not contain any statements or speech by Plaintiff. The October 2nd article only refers to court documents generally, and the October 21st article merely notes that Plaintiff had recently withdrawn from representing Lovell.[182] Neither article provides a statement from Plaintiff nor indicates that he contributed. As the articles contain no protected activity, there is no violation of the First Amendment.

Furthermore, as noted in section I(A)(3), above, there were various events that delayed or took precedence over the termination of Plaintiff's contract, but that coincide with the County's testimony. For these reasons, Plaintiff cannot show a reasonable inference that the County terminated his contract in retaliation for speech in October, or that it considered a protected statement in making that decision. As Plaintiff cannot meet his burden to show that his protected speech was a motivating factor in the County's decision, his First Amendment claims fail.

---

[180] *Nielander v. Bd. of Cty. Comm'rs of Cty. of Republic, Kan.*, 582 F.3d 1155, 1165 (10th Cir. 2009) (citations omitted).

[181] Plaintiff's SOF, ¶¶ 38-39; October 2, 2017, article, Exh. BB to Plaintiff's Opp.; October 21, 2017 article, Exh. CC to Plaintiff's Opp.

[182] *Id.*

4.    The County Would Have Terminated Plaintiff's Contract in the Absence of Any Protected Conduct.

Plaintiff argues again that the October articles, alone, are sufficient to show retaliation of Plaintiff's First Amendment rights.[183] As also outlined above, that argument fails for two reasons: there is no facts to support a reasonable inference that the County considered the articles; and they contain no speech by Plaintiff and so no First Amendment protection applies.

Plaintiff also takes issue with the argument that misrepresentations to the trial court represent more serious misconduct.[184] However, even if the Court determines that Plaintiff's statements to the media were protected speech, Defendants can still show as a matter of law that the County would have terminated Plaintiff due to the misrepresentations he made to the court. First, as noted previously, the County took issue with multiple misrepresentations Plaintiff made to the trial court.[185] Furthermore, as an attorney, Plaintiff had an obligation to be honest in his representation, and took an oath to that effect upon admittance to practice law in the State of Utah.[186] Because of this, a misrepresentation made to the Court or in the course of an attorney's representation is a serious matter. Furthermore, the misrepresentations considered by the County were repeated across different proceedings, and a finding that one misrepresentation might be protected does not change or lessen the effect of the other misrepresentations that were made, which were enough to warrant termination. For these reasons, as well as those addressed in Defendants' Amended Motion, the Court can find that the County would have terminated Plaintiff's contract as a matter of law, even in the absence of any protected conduct.

---

[183] Plaintiff's Opp., p. 25
[184] *Id.* at 24-25.
[185] Defendants' Motion, p. 10-11.
[186] Utah Judicial Code of Judicial Administration, Ch 13:Rules of Professional Conduct, Preamble: A Lawyer's Responsibilities, ¶ 1.

## II.     PLAINTIFF CANNOT SHOW A CIVIL CONSPIRACY

Plaintiff argues that a meeting of the minds occurred because the Commissioners decided together to terminate Plaintiff's contract.[187] This argument confuses a decision by the Commissioners, with the standard required to show that the conspirators had a meeting of the minds. The Tenth Circuit clarified that in order to show a meeting of the minds under § 1985, the defendants must have "agreed specifically to deter [plaintiff]'s attendance in court or to injure him as a result of his attendance in court."[188] To meet this standard, Plaintiff must show more than a decision to terminate his contract, it requires that he show that the Commissioners had agreed to act to deter Plaintiff's attendance in court, specifically, or to injure him because of his attendance. An agreement alone is not enough, it must be an agreement to specifically deter or injure an individual. The evidence is undisputed that the Commissioner's intended only to terminate Plaintiff's contract; there is no evidence of an unsavory agreement, or any action taken by the County to deter Plaintiff from attending court or injure him for having done so.

Further, Plaintiff claims that the County's efforts to process his requests for payment is not evidence against a civil conspiracy. What Plaintiff fails to provide, however, is any sort of fact or evidence to show that the County intended to injury or intimidate Plaintiff in the manner required by the statute. Under § 1895(2), "a claim fails when the complaint does not allege either that the defendant's actions in some way were designed to intimidate or deter the plaintiff from appearing in a judicial proceeding."[189] Plaintiff has provided no more than conjecture of a conspiracy, and at this stage of litigation, more is required. Plaintiff has not marshalled the

---

[187] Plaintiff's Opp., p. 26.
[188] *Hogan v. Winder*, 762 F.3d 1096, 1114 (10th Cir. 2014).
[189] *Id*.

evidence or shown facts which would support an inference of the essential elements of this claim, and it should be dismissed as a matter of law.

## III.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

### A.   Plaintiff's Has not Shown the His Rights Were Clearly Established

Once a defendant asserts a qualified immunity defense, "the burden shifts to the plaintiff."[190] Plaintiff must show that: "(1) the individual Defendants violated [Plaintiff's] constitutional rights, and that (2) those rights were clearly established at the time of the alleged violation."[191] "If the plaintiff does not satisfy either portion of the two-pronged test, the Court must grant the defendant qualified immunity."[192] A "clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[193] While the courts do not require "a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate."[194] Finally, the Supreme Court has "repeatedly told lower courts not to define clearly established law at a high level of generality"[195] as doing so "avoids the crucial question of whether the official acted reasonably in the *particular* circumstances."[196]

---

[190] *Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003) (citations and quotations omitted).
[191] *Butler*, 920 F.3d at 655.
[192] *Verdecia*, 327 F.3d at 1174 (citations omitted).
[193] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotations and citations omitted).
[194] *Id*.
[195] *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quotations omitted, citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).
[196] *Id*. at 1240 (emphasis in original, quotations omitted, citing *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

To dispute the County's claim of qualified immunity, Plaintiff reiterates his argument that his speech did not occur pursuant to his official duties.[197] These arguments, which are addressed in section I(A)(2), above, fail to demonstrate that their is a genuine disputes of material fact that his statements were not made pursuant to his official duties.[198]

In addition, these claims mischaracterize Defendants' arguments and fail to address the key question under qualified immunity: whether Plaintiff's rights were clearly established at the time. The County does not argue that *Garcetti* displaced protection of the rights of independent contractor, but Plaintiff errs in declaring that "*Garcetti* did not alter the First Amendment analysis in the context of public employment" and that the analysis of contractor's claims is not different following *Garcetti*.[199] As noted by the Tenth Circuit, *Garcetti* "profoundly alter[ed] how courts review First Amendment retaliation claims."[200] In particular, the courts were told to first analyze whether the speech occurred pursuant to the employee's official duties. While *Garcetti* clarified how speech by public employees would be analyzed for protection under the First Amendment, neither that court, nor its progeny, have addressed the question presented here. The caselaw states that "[i]ndependent government contractors are similar in most relevant respects to government employees," and concluded "that the same form of balancing analysis

---

[197] Plaintiff's Opp., p. 29.
[198] Plaintiff's cites to *Casey*, 473 F.3d at 1332, and to *Thomas*, 548 F.3d at 1324, relating to his claim that his statements to the Court were outside of the chain command. Plaintiff also cites to *Worley v. Bd. of Cty. Comm'rs of Park Cty.*, 44 F. App'x 892 (10th Cir. 2002), and *Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988), regarding reports of malfeasance, impropriety, etc. Both arguments are addressed in section I(A)(2), above, however, *Conaway* and *Worley* were decided prior to *Garcetti*, and are not dispositive, as they lack the official duties inquiry.
[199] Plaintiff's Opp., pp. 28-29.
[200] *Casey*, 473 F.3d at 1325.

should apply to each"[201] However, those cases note that independent contractors are different from public employees in some respects, stating that the balancing test must be "adjusted to weigh the government's interests as contractor rather than as employer."[202] That difference, which has not been addressed by this circuit, may be at issue here.

Plaintiff is correct that after *Garcetti* the Tenth Circuit has continued to apply the Supreme Court's holding in *Umbehr*, and the County does not dispute that under *Umbehr* that the same form of balancing would be applied in both cases for claims of retaliation under the First Amendment.[203] However, to the extent that the court finds that the first inquiry under *Garcetti*, whether Plaintiff statements' occurred pursuant to his official duties, applies differently to Plaintiff as an independent contractor than if he were an employee, such a precedent has not been clearly established. In other words, Plaintiff's statements, if made as an employee, would not have been protected, as noted in the central analysis in *Garcetti*.[204] This is further supported by *Pickering's* precedent where courts have overwhelmingly treated employees and independent contractors similarly. Therefore, if the Court determines that Plaintiff's speech merits First Amendment protection, it would be a departure from the similar treatment afforded to employees and contractors in the past. Such a ruling would also indicate that the law had not been clearly established and the County did not have notice of how to act in these particular circumstances.

Moreover, Plaintiff fails to meet his burden to show existing precedent that places the constitutional question beyond debate. While Plaintiff cites to several cases to support his

---

[201] *Umbehr*, 518 U.S. at 684–85.
[202] *Glover v. Mabrey*, 384 F. App'x 763, 769 (10th Cir. 2010) (quotations omitted, citing *Umbehr*, 518 U.S. at 673).
[203] *Umbehr*, 518 U.S. at 685.
[204] *Garcetti* 547 U.S. at 413-423; *see also* Defendants' Motion, pp. 2-5.

(undisputed) claim that *Umbehr* continues as good law after *Garcetti*, none of those cases support his contention that contractor First Amendment retaliation claims have been addressed under *Garcetti*. For instance, Plaintiff cites to *Planned Parenthood Ass'n of Utah v. Herbert,* while that case cites *Umbehr*, it does not address First Amendment retaliation or apply the *Garcetti/Pickering* analysis.[205] Plaintiff's reference to *Glover v. Mabrey* also fails to add support as it does not address the *Garcetti* inquiry either.[206] In a footnote, the court acknowledges the recently changed the analysis for determining if a public employee's speech is protected under the First Amendment in *Garcetti*, but also states  that the Supreme Court has not yet spoken "on whether or how this modification may affect the analysis in the context of an independent contractor."[207] The court also notes that as the plaintiff's criticism of ODOT was not pursuant to his official duties, the court did not apply the inquiry added under *Garcetti*.[208] Consequently, Plaintiff cannot demonstrate clear precedent to show how the *Garcetti/Pickering* analysis should be applied in the context of a First Amendment retaliation claim brought by an independent contractor, either generally, or in these particular circumstances. As Plaintiff cannot show that his rights were clearly established, Defendants are entitled to qualified immunity.

### B.    Plaintiff's Claims for Equitable Relief Fail as Matter of Law.

Plaintiff claims that qualified immunity does not apply to declaratory and injunctive relief.[209] While Defendants do not dispute that claim, it is important to note that Plaintiff has not

---

[205] 828 F.3d 1245 (10th Cir. 2016). Plaintiff also cites to *Hogan v. Utah Telecomm. Open Infrastructure Agency*, 566 F. App'x 636 (10th Cir. 2014), (*Umbehr* is mentioned, but the court applies the *Garcetti/Pickering* analysis regarding a public employee, not a contractor).
[206]  384 F. App'x 763 (10th Cir. 2010).
[207] *Id*. at 769, n. 4.
[208] *Id*.
[209] Plaintiff's Opp., p. 27.

established standing as to his declaratory judgment and injunctive relief claims, and those claims should also be dismissed. To establish Article III standing, "a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."[210] In a case requesting injunctive relief, the Supreme Court has held that an "[a]bstract injury is not enough" the plaintiff must show that "he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical."[211] Furthermore, even in cases where the plaintiff has suffered from unconstitutional practices previously, "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects."[212] Finally, redressability requires that a party "show that a favorable court judgment is likely to relieve the party's injury."[213]

Here, Plaintiff cannot show the first or third prong of the required analysis, and his claims of declaratory and injunctive relief must be dismissed. First, there is no dispute that Plaintiff is not in danger of continuing, present adverse effects from the County. Plaintiff's alleged harm occurred in the past, and as he is no longer in a contractual relationship with the County, there is no danger of ongoing harm or a continuing threat. Without an immediate injury, he does not have standing for such a claim. Similarly, Plaintiff is not currently in a position threatened by an alleged unconstitutional practice by the County, and any possibility that he might be in such a

---

[210] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (citations and quotations omitted).
[211] *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (citations and quotations omitted).
[212] *Id.* at 201.
[213] *City of Hugo v. Nichols (Two Cases)*, 656 F.3d 1251, 1264 (10th Cir. 2011).

position in the future would be pure speculation or strictly hypothetical. Because of this, a declaratory order by the Court will be of no effect to his current situation.

For these reasons, Plaintiff cannot show injury or redressability and therefore cannot demonstrate standing on his claims for declaratory and injunctive relief. As Plaintiff does not have standing for those claims, Defendants respectfully request that his declaratory and injunctive relief claims be dismissed.

## CONCLUSION

As noted above, Defendants can show as a matter of law that Plaintiff's statements were made pursuant to his official duties, and they are not protected under the First Amendment. Even if the Court determines that some of Plaintiff's statements are protected, there is no genuine dispute of material fact that the *Garcetti/Pickering* analysis weighs against protection of Plaintiff's speech. Furthermore, Defendants have failed to raise sufficient facts to show an inference supporting any element of his Civil Conspiracy claim. In addition, if the Court finds a constitutional violation, Defendants have shown that Plaintiff's rights were not clearly established at the time of his termination, and Defendants are entitled to qualified immunity. Finally, as Plaintiff cannot show the elements of injury and redressability under the three-prong test for Article III standing, his claims for declaratory and injunctive relief fail as a matter of law. For all these reasons, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss Plaintiff's claims with prejudice.

DATED this 18th day of November, 2019.

            **STRONG & HANNI**

            */s/ Matt Harrison*
            Kristin A. VanOrman
            Matt Harrison
            *Attorneys for Defendants Weber County,*
            *James H. Harvey, Kerry W. Gibson, and*
            *Charles J. Ebert*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of November, 2019, I did cause a true and correct copy of the foregoing **DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS'S AMENDED MOTION FOR SUMMARY JUDGMENT** to be served via email, upon the following:

> Karra J. Porter
> J.D. Lauritzen
> CHRISTENSEN & JENSEN
> 257 East 200 South, Suite 1100
> Salt Lake City, UT 84111
> karra.porter@chrisjen.com
> jd.lauritzen@chrisjen.com

*/s/ Jennifer L. Blazek*