## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LAW OFFICE OF SAMUEL P. NEWTON; and SAMUEL P. NEWTON, Plaintiffs, v. WEBER COUNTY; JAMES H. HARVEY; KERRY W. GIBSON; and CHARLES J. EBERT, Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.**<br><br>Civil No. 1:18-cv-000015-HCN-DAO<br><br>Howard C. Nielson, Jr.<br>United States District Judge<br><br>FOR PUBLICATION |

Plaintiffs, Samuel P. Newton and his law firm, the Law Offices of Samuel P. Newton, sued Defendants Weber County and its three Commissioners, alleging that Defendants' termination of Mr. Newton's contract with the County violated his First Amendment rights and that Defendants conspired against him to obstruct justice in violation of 42 U.S.C. § 1985(2). Defendants have moved for summary judgment. For the following reasons, Defendants' motion is granted in part and denied in part.

**I.**

Samuel Newton is a criminal defense attorney who specializes in handling appeals. He has extensive experience in his field: among other things, he worked with the Salt Lake Legal Defenders Association for seven years.[1]

Weber County contracted with Mr. Newton to represent indigent criminal defendants on appeal, and it renewed that contract on January 1, 2017. Under the contract, Mr. Newton "agree[d] to provide competent legal counsel to any person convicted of a felony or a misdemeanor who is deemed by a district or justice court in Weber County to be indigent." Dkt. No. 33-3 at 2.

Weber County separately contracted with Mr. Newton to represent Doug Lovell, a capital defendant. *See* Dkt. No. 33-4. Mr. Lovell's case has a protracted history. The murder with which he was charged occurred 35 years ago, and his prosecution has involved multiple trips to the Utah Supreme Court. *See*, *e.g.*, *State v. Lovell,* 262 P.3d 803 (Utah 2011); *State v. Lovell*, 114 P.3d 575 (Utah 2005); *State v. Lovell*, 984 P.2d 382 (Utah 1999).

After his previous conviction and sentence were vacated, Mr. Lovell was again convicted and sentenced to death in 2015. The County hired Mr. Newton to represent Mr. Lovell on appeal to the Utah Supreme Court. The contract contemplated that Mr. Newton would be paid $150 per hour for up to 500 hours of work—for a potential total of $75,000—though the contract provided that Mr. Newton could obtain additional compensation "upon showing of good cause to both the court and the County." Dkt. No. 33-4 at 3.

---

[1] Given that Defendants have moved for summary judgment, the court recites the facts in the light most favorable to Plaintiffs. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

Mr. Newton's initial advocacy was successful. The State did not oppose his motion to remand the case for an additional fact-finding hearing regarding the constitutional adequacy of Mr. Lovell's representation during his 2015 sentencing proceedings. And the Utah Supreme Court "temporarily remanded for an evidentiary hearing" regarding trial counsel's decision not to call various potential witnesses, his allegedly inadequate preparation or examination of several witnesses who did testify, and his allegedly insufficient preparation of a mitigation specialist during the sentencing stage. Dkt. No. 33-8 at 2–3. Prior to obtaining this relief, Mr. Newton filed both an opening brief and an 89-page remand motion. *See* Dkt. No. 33-5 (motion to remand).

After the remand order issued, Mr. Newton informed the County that he had already worked more than the allotted 500 hours on Mr. Lovell's representation, and he requested more money both to represent Mr. Lovell on remand and then to file a reply brief in the Utah Supreme Court addressing the issues developed at the evidentiary hearing. *See* Dkt. No. 33-12 at 3; *see also* Dkt. No. 33-6 (letter prior to remand). Mr. Newton estimated that completing Mr. Lovell's case would take 500–750 additional hours. *See* Dkt. No. 33-12 at 2. Among other things, Mr. Newton indicated that he needed to interview each of the witnesses that trial counsel had failed to call. *See id.*

Defendant Commissioner Harvey responded, indicating that "the county [was] prepared to provide [Mr. Newton] with an additional $15,000 to finish this appeal." Dkt. No. 33-12 at 2. Commissioner Harvey explained:

> While we recognize that the remand of the Lovell case was unanticipated in the original contract and will cause you additional work, we don't agree that it will take an additional 500 to 750 hours to complete that work. It is highly likely that the majority of the witnesses you wish to call will have little to no helpful information. As such, we estimate that it will only take approximately one week, or 40 hours, to conduct the hearings, 40 hours to prepare for the hearings, and another 20 hours to revise your initial brief. The total additional hours of work

should in no way exceed 100. At $150 per hour that would equal a total of $15,000.

*Id.* The County offered this additional money for the remand proceeding only, explaining that "[t]he $75,000 that was provided to you initially was intended to cover the Reply brief which shouldn't be impacted by this remand, so we are not offering additional compensation for that." *Id.* Mr. Newton later testified at his deposition that he understood from this email that "[the County was] going to take a pretty hard line on $15,000"—that is, the 100 additional hours of work the County had approved for the remand. Dkt. No. 33-2 at 52.

The same day Mr. Newton responded:

> The Supreme Court's remand contemplates over two dozen witnesses. It names 22, but I think I will have to call three or four other witnesses for much closer to 25 or 26 witnesses. I don't think their testimony is insignificant. I have interviewed most of them personally and find that their testimony would have been compelling in Mr. Lovell's case. I wouldn't have raised the issue if I did not think it meritorious. Indeed, I think it's important to consider that the Supreme Court deemed the issues I raised worthy of remand and required the trial court to consider that evidence.

Dkt. No. 33-13 at 2. Mr. Newton also asked for more negotiation:

> What if we consider a few options: what if the county authorizes some funds now and we can revisit it as things go along? Say authorize past work and 100 hours of future work. At 100 hours, I can give you a better estimate of where we are and what it will take. Perhaps I will have over-estimated and we won't need any or much more.

> If this does not work, I will need to, as soon as possible, file a motion with the district court for funding or to allow me to withdraw as his attorney.

*Id.* at 2–3.

After the County failed to respond for five days, Mr. Newton filed a motion for attorney fees on March 20, 2017. Dkt. No. 33-14; *see also* Dkt. No. 33-15 at 4. That motion quoted much of his most recent email to the County. *See* Dkt. No. 33-14 at 4–5, n.1. Mr. Newton asked the court to preauthorize 200 hours, at which point Mr. Newton would update the court regarding the

4

need for additional work. *Id.* at 4. Mr. Newton also explained that he had "now expended time and funds well beyond what Weber County has agreed to pay since the County has not authorized any payments since the beginning of the year." *Id.* at 3. Mr. Newton represented that, nevertheless, he had already "worked $11,000 over that amount without compensation" and was "continu[ing] to work on the case without compensation." *Id*. Mr. Newton also stated that "counsel has been unable (because of a lack of funding) to interview" some of the relevant witnesses and "would need some investigative resources so his investigator could speak with those witnesses prior to their testimony." *Id*.

On March 23, 2017, the County responded to Mr. Newton's email and opposed his motion for fees. In the email, Commissioner Harvey stated that the County agreed to pay for 100 hours of additional work, but not to pay for extra work that Mr. Newton had already performed:

> While it's uncertain how much time and effort will need to be put into the evidentiary hearings and revising the initial brief, 100 hours seems to be a reasonable estimate. If the remand takes longer than 100 hours, and you can justify the additional time, we will remain open to another request for additional funding.
>
> Any work that has been completed to date and any work required for the reply brief or oral arguments we consider covered under the initial $75,000 amount.

Dkt. No. 33-15 at 28.

> In its brief, the County argued that
>
> [b]ecause it has been 25 years since Defendant was first convicted, there is a high likelihood that many of the witnesses remember little about Defendant. After contacting those witnesses through his investigator, Mr. Newton may even decide that many of them don't need to appear in court to testify on the record. Even if some of the witnesses have relevant information, it is highly speculative that it will take a full 10 to 15 days to question them.

Dkt. No. 33-15 at 8. The County also represented that although "Mr. Newton argues in Defendant's Motion that he doesn't have an investigator . . . his contract specifically provides

that Mr. Newton will be reimbursed for investigator fees at the rate of $60 per hour." *Id.* at 6

(citation omitted). It added that "Mr. Newton is well aware of that provision as he has hired an

investigator for this case in the past." *Id.*

After the briefs were filed, Mr. Newton continued to negotiate further with Deputy

County Attorney Bryan Baron. On April 10th, Mr. Baron wrote:

> As I understand the [Commissioners'] position, they have pre-approved 100 hours to go towards the work that is required on the remand. That includes the evidentiary hearing and reworking your initial brief. The county will not release additional funds until that work has been done. Any other work (e.g., the last invoice for 2016 as well as any work that is required for your reply brief and oral arguments) should be covered by the $75,000.

Dkt. No. 33-17 at 3.

Mr. Newton responded within a half-hour:

> Bryan, I sure hope I'm misunderstanding. Is the county's position that they will not pay me for over $7,000 of work I have already done on this case and will only pay me for future work? The end of last year's invoice was related to preparing the brief, which was over 300 pages, before the State stipulated to a remand. The stuff this year has had to do with responding to the Motion for 23B remand (which the Supreme Court granted), issues with Doug Lovell's bar complaint (which I was asked to testify to by the bar and which the Supreme Court screening panel recommended a formal district court proceeding against Sean Young) and responding to the AG's subpoenas for the 23B remand. All of the work to date has been related to getting the brief and remand motion ready and dealing with issues related to the now granted remand. There would be a significant number of hours I would have to donate to this case and as a solo practitioner, I cannot afford to work for free on this.
>
> Anyway, unless I'm misunderstanding, it sounds like I need to file a reply and ask for a hearing with Judge DiReda. If you're willing to stipulate and avoid the hearing, let me know.

*Id.* at 2.

Mr. Baron replied the next day:

> The commissioners' position is that you signed a contract to handle this appeal for $75,000. . . .

6

> If you want to make a request for additional funding for the time you spent putting together the 23B motion, I'm sure they would be willing to consider that, but they are not open to paying you additional money for the oral arguments or the reply brief because those were both contemplated in the original contract.

Dkt. No. 33-17 at 2.

Mr. Newton next filed a reply brief in support of his motion for attorneys' fees. He argued that he should be paid for the work that he had not been paid for. Dkt. No. 33-18 at 5. While he speculated that "this issue will imminently escalate to greater detriment to Mr. Lovell when the county refuses to fund anything beyond its offer of $15,000 which Mr. Lovell contends is not adequate for the remainder of work to be done," *id.*, he also acknowledged that "the county argues that counsel is being generously compensated, and he will continue to be compensated so long as he justifies the expenditure," *id.* at 3 (cleaned up). Ultimately, the state trial court concluded that it lacked jurisdiction to rule on Mr. Newton's motion. *See* Dkt. No. 33-20.

The disputes about payment continued. The County sent Mr. Newton a payment but, on May 22, Mr. Baron explained to Mr. Newton that he had been paid in error:

> I followed up with the Clerk/Auditor's Office, and they have paid the March 31st invoice. Although they were instructed not to pay the Lovell Litigation Expenses, those were accidentally paid as well. Unless you would prefer to refund that $3,360 to the county, I'll deduct it from the $15,000 that was pre-approved for the evidentiary hearing work.

Dkt. No. 33-19 at 12. In the email, Mr. Baron also disagreed with assertions Mr. Newton made in his Reply Brief:

> The county has never said that you wouldn't be allowed additional funding. In fact, in the very email that you attached to your Reply as Exhibit A, I stated that "if you want to make a request for additional funding for the time you spent putting together the 23B motion, I'm sure [the County Commissioners] would be willing to consider that."

> The key is that requests for additional funding have to be supported by
> "good cause." You can't just demand that all of your invoices be paid without
> question.

*Id.* at 13.

Responding, Mr. Newton stated that

> I guess I did misunderstand the county's position. There's quite a bit of
> discussion about how I only get $15,000 for preparing for this new hearing and
> revising the brief and the reply brief but that I wouldn't get anything beyond that.
> I know it's going to be significantly more than that. I just ran a report for 4/1 to
> present and I've spent about $3600 and I haven't even started the bulk of the
> preparations, which will probably take 10 times that number if not more. I've had
> to respond to the State's motion to provide all of Doug's file to them, including
> privileged attorney-client information. If that goes the way the Utah Supreme
> Court has dictated these should go, I will have to prepare a master index of
> Doug's file, which is enormous and we'll have to litigate the particulars of
> disclosure of this information. That process alone may take months and may delay
> his hearings. We'll have to have a hearing on that coming up. I still have yet to
> use an investigator or get the investigation process going because I'm not sure I
> can guarantee her that she'll be paid (unless you think otherwise).

Dkt. No. 33-7 at 2. Mr. Newton then requested additional funding for the 23B Motion and

remand and also submitted an invoice for time that he attributed to these matters. *Id.* at 3.

Mr. Baron replied:

> I attended a meeting with elected officials here in the county, and we
> briefly discussed your request for additional funding for the Rule 23B motion.
> The county officials understand your argument as to why the 23B motion was
> necessary, and they are inclined to grant you additional funding for it, but they
> aren't happy about the cost of $22,500 for the motion and $15,000 for the
> evidentiary hearings.

> As we got into the specifics of your invoices, the group expressed concern
> that you are taking advantage of the county by overbilling for your services. A
> few examples of their concerns include: (1) billing the county for work related to
> Sean Young's discipline with the Utah Bar (they are unsure why the county
> should pay anything for that as it is unrelated to your representation of Mr. Lovell
> in the appeal), (2) billing the county for your motion for additional fees and all of
> the work that was associated with that (the county didn't agree with your request
> for additional fees and neither did the judge, so why should the county pay for the
> time you spent on it?), and (3) billing for the frequent phone calls, letters, and
> meeting with Doug Lovell (they are unsure why you need to communicate with
> him so frequently on an appellate case).

The consensus from the meeting was that unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals. Again, they don't have a problem with the quality of your work. Their concern is with the amounts that you are billing and the items that you are billing them for.

I've been asked to give you an opportunity to revise your request for additional funding for the 23B motion as well as your most recent invoice in light of the county's concerns. Please examine those invoices and resubmit them once you have had an opportunity to revise them.

Dkt. No. 33-21 at 2.

On June 9, 2017, Mr. Newton filed a motion to withdraw from representing Mr. Lovell. Dkt. No. 33-23. He told the court he was owed $100,000 by Salt Lake County in another death penalty case and that the stress of that case had caused him heart problems. *Id.* at 3. Mr. Newton again included summaries of his correspondence with the County, noting that

[w]hile the county indicated that it would consider granting additional funding on the case, counsel has been placed in a veritable catch-22. He can abandon his own interests in getting paid and not try to compel the county to pay for his services [or] talk or speak with Mr. Lovell less. Additionally, counsel has the appellate contract for Weber County, which provides the vast majority of his income. In essence, the county has told counsel that he must not bill them for what he believes to be necessary work on Mr. Lovell's case, such as communications, or it will terminate him from his major contract. This irreparably puts counsel's and Mr. Lovell's interests at odds.

*Id.* at 5 (citation omitted).

On June 21, 2017, Mr. Newton responded to a motion the State had filed with the Utah Supreme Court regarding Mr. Newton's potential conflict of interest. *See* Dkt. No 26-21. Mr. Newton reiterated his characterization of his dispute with the County and stated that "he faces a terrible catch-22: represent Mr. Lovell zealously and lose his livelihood or compromise Mr. Lovell's case and save his practice." *Id.* at 7.

When it responded to Mr. Newton's motion to withdraw on August 29, 2017, the County disputed Mr. Newton's characterizations of the funding dispute but did not oppose Mr. Newton's withdrawal. *See* Dkt. No. 33-25. The state trial court granted the motion. *See* Dkt. No. 33-26.

Mr. Newton's story generated publicity and he gave a number of statements to the press. First, *the Salt Lake Tribune* published a story on July 16, 2017, that focused on Mr. Newton's dispute with the County. *See* Dkt. No. 33-24. The story reported that "Newton . . . said that defense attorneys are not being given enough money to support thorough death penalty case reviews—and in the cases for two Utah death row inmates Newton represents, he said he has had trouble getting paid." *Id.* at 3. It also provided some details regarding Mr. Newton's dispute with the County regarding payment for the Lovell litigation, quoting both Mr. Newton and the County. *Id.* at 3–4.

Following Mr. Newton's withdrawal, the *Salt Lake Tribune* published another article on September 2, 2017. *See* Dkt. No. 33-27. The article quoted Mr. Newton as saying,

> It is unfortunate that I was placed in a position where I had to [choose] between supporting my family and representing Mr. Lovell.
>
> I hope that the state of Utah and Weber County will commit in the future to adequately and fully paying for these necessary appellate reviews in such serious matters.

*Id.* at 4.

Similarly, a September 18, 2017, article in the *Salt Lake Tribune* quoted Mr. Newton as saying,

> The state gives enormous resources to the prosecution . . . . The state must similarly commit to equally and adequately support criminal defense attorneys, which is a right guaranteed by the United States Constitution. The defense attorney, especially a solo practitioner, should not have to personally bear and front the financial cost for the enormous review required in a capital case.

Dkt. No. 33-28 at 6.

10

On October 2, 2017 the *Standard-Examiner* published an article admonishing the Weber County Commission and the Weber County Attorney's Office "for their slow, clumsy handling of funding for Doug Lovell's capital defense case." Dkt. No. 33-29 at 3. The article relied on court documents filed by Mr. Newton in giving the Weber County Commission and Attorney's Office a "thumbs down" for their management of the Lovell case. *Id.*

On October 26, 2017, the County terminated Mr. Newton's general appellate contract. The termination letter, signed by Commissioner Harvey on behalf of the Commissioners, stated that

> [w]hile we have appreciated your hard work and dedication, this past year you have made various representations to the media and to the court that have been untruthful and harmful to the County's reputation. As a result, we have made the decision to terminate your contract and seek appellate counsel.

Dkt. No. 33-31 at 2.

Mr. Newton then sued the County and its three Commissioners, alleging that the Defendants had violated his First Amendment rights and conspired to obstruct justice.[2] Defendants moved for summary judgment. *See* Dkt. No. 26. They argued that the termination of Mr. Newton's contract was justified, that the individual county officials were entitled to qualified immunity, and that the conspiracy claim lacked merit. *See generally id.*

## II.

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Material facts are those which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[2] Although the Plaintiffs are technically both Mr. Newton and his law offices, the court will refer to Mr. Newton as the Plaintiff for convenience.

248 (1986). A "dispute about a material fact is 'genuine'. . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted) "Courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).

**III**.

The court first addresses the legal framework that governs Mr. Newton's First Amendment claim.

In their briefs, the parties evaluated this claim under *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny—the line of Supreme Court cases addressing the First Amendment rights of government employees or contractors who have been fired, terminated, or otherwise disciplined based on their speech. While the parties were certainly correct to address these cases, in other precedents, including *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), and *Polk County v. Dodson*, 454 U.S. 312 (1981), the Supreme Court has drawn a sharp distinction between ordinary government employees or contractors and attorneys engaged by the government to represent indigent individuals in litigation against the government. Prior to oral argument, this court instructed counsel to address the potential relevance, if any, of these cases to the issues presented in this case. *See* Dkt. No. 56. At oral argument, counsel for both parties acknowledged that these cases are relevant here.

The court agrees.

**A.**

The Supreme Court has recognized that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos,*

547 U.S. 410, 418 (2006). But it "has rejected for decades now the proposition that a public employee has no right to a government job and so cannot complain that termination violates First Amendment rights, a doctrine once captured in Justice Holmes' aphorism that although a policeman 'may have a constitutional right to talk politics . . . he has no constitutional right to be a policeman.'" *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 716–17 (1996) (quoting *McAuliffe v. Mayor of New Bedford*, 29 N.E. 517, 517 (Mass.1892) (Holmes, J.)).

In the seminal case of *Pickering v. Board of Education*, the Supreme Court addressed a First Amendment claim brought by Mr. Pickering, a public school teacher who had been dismissed for submitting a letter to the editor that "[a]ttack[ed] . . . the School Board's handling of . . . bond issue proposals and . . . charged the superintendent of schools with attempting to prevent teachers in the district from opposing or criticizing the proposed bond issue." 391 U.S. 563, 566 (1968). The Supreme Court squarely rejected the proposition that public employees "may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Id.* at 568. It nevertheless recognized that the State "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id*. The Court accordingly held that the "the interests of the [public employee], as a citizen, in commenting upon matters of public concern" must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*.

The Supreme Court also rejected the argument that Mr. Pickering's dismissal could be justified simply because his letter contained false statements. The Court characterized the case as one "in which a teacher has made erroneous public statements upon issues then currently the

subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." *Id*. at 572–73. The Court held that "in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id*. at 574. Because the Court concluded that Mr. Pickering's statements "were not knowingly or reckless false" it left open "the additional question whether a statement that was knowingly or recklessly false would, if it were neither shown nor could reasonably be presumed to have had any harmful effects, still be protected by the First Amendment." *Id*. at 574 n.6.

The Supreme Court further clarified the First Amendment rights of government employees in *Connick v. Myers*, 461 U.S. 138 (1983). There, the Court addressed free speech claims brought by a district employee who had been fired for distributing a questionnaire "soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id*. at 141. The Court limited application of the *Pickering* balancing test to cases where a public employee is disciplined for statements that can be "fairly characterized as constituting speech on a matter of public concern." *Id*. at 146. The Court explained that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id*. at 147.

14

Although the Court concluded that most of the questions on the questionnaire implicated only private concerns, it found that "one of the questions in Myers' survey touched upon a matter of public concern, and contributed to her discharge." *Id*. at 149. The Court therefore found it necessary to engage in a "particularized balancing . . . of the competing interests." *Id* at 150. The Court thus made clear that when a government employee is fired for speech that deals in part with matters of public concern and in part with matters of private concern, the *Pickering* balancing test applies.

In *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, the Supreme Court extended the *Pickering* test to independent contractors who work for the government. 518 U.S. 668, 673 (1996). The Court determined that "[i]ndependent government contractors are similar in most relevant respects to government employees, although both the speaker's and the government's interests are typically—though not always—somewhat less strong in the independent contractor case." *Id.* at 684. The Court also found that "a nuanced approach, which recognizes the variety of interests that may arise in independent contractor cases, is superior to a bright-line rule distinguishing independent contractors from employees" because a "bright-line rule would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake." *Id.* at 678–79. The Court thus ruled "that independent contractors are protected, and that the *Pickering* balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of their protection." *Id.* at 673.

Most recently, the Supreme Court significantly refined the *Pickering* test in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). There, a Deputy District Attorney was fired after writing a

memorandum stating that an "affidavit contained serious misrepresentations" and testifying in court about these allegations. *Id.* at 414, 416–17. The Court determined that the Deputy District Attorney had written the memorandum and testified as part of his job, and it held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. Because the Deputy District Attorney was "simply performing his . . . job duties," there was thus "no warrant" to perform "a delicate balancing of the competing interests surrounding the speech and its consequences." *Id*. at 423.

The Court explained that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22. In reaching this conclusion, the Court relied on the frequently reiterated principle that "when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Id.* at 422 (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995), in turn quoting *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)). The Court also reasoned that "[e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id*. at 422–23.

*      *      *

From this line of cases, the court draws the following test that courts should apply to most government employees or contractors who are disciplined because of their speech:[3]

First, the court asks whether the government employee or contractor spoke pursuant to his or her official duties. If so, the government prevails. *See Garcetti*, 547 U.S. at 421, 423.

Otherwise, the court asks whether the employee or contractor spoke at least in part on a matter of public concern. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418; *see also Connick*, 461 U.S. at 147.

If the employee or contractor's speech does relate to a matter of public concern, the court asks whether it was knowingly or recklessly false. *See Pickering*, 391 U.S. at 574. If it was, the government may well prevail without further inquiry. *See, e.g.*, *Brenner v. Brown*, 36 F.3d 18, 20 (7th Cir. 1994) (holding that "an employee's speech is not protected where it is . . . made with reckless disregard for the truth"); *Gossman v. Allen*, 950 F.2d 338, 343 (6th Cir. 1991) ("*Pickering* does not prevent a public employer from terminating employees who knowingly or reckless make false statements."). At a minimum, the recklessly false character of the speech weighs heavily in favor of the government at the next stage of the analysis. *See, e.g.*, *Johnson v. Multnomah County*, 48 F.3d 420, 424 (9th Cir. 1995) ("[R]ecklessly false statements are not per se unprotected by the First Amendment when they substantially relate to matters of public concern. Instead, the recklessness of the employee and the falseness of the statements should be

---

[3] Although it believes that its formulation of this test is fully consistent with Supreme Court and Tenth Circuit precedent, the court recognizes that its formulation is considerably more granular than frequently recited alternatives. *See, e.g., Lane v. Franks*, 573 U.S. 228 (2014); *Dixon v. Kirkpatrick*, 553 F.3d 1294 (10th Cir. 2009).

considered in light of the public employer's showing of actual injury to its legitimate interests, as part of the *Pickering* balancing test.")[4]

Finally, if the government has not prevailed at an earlier stage of the inquiry, the court balances the government's interests against those of the terminated employee or contractor. *See Pickering*, 391 U.S. at 568; *Umbehr*, 518 U.S. at 673.

> The question becomes whether the relevant government entity has an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it speaks in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti*, 547 U.S. at 418 (internal citation omitted).[5]

## B.

Although *Pickering* and its progeny provide a general framework governing the First Amendment rights of government employees and contractors, the court concludes that these are not the only precedents relevant to the specific controversy here. In a separate line of cases, the Supreme Court has addressed the government's relationship with the attorneys it engages to

---

[4] Like the Supreme Court, *see Pickering*, 391 U.S. at 574 & n.6, the Tenth Circuit has left this question open. *See Moore v. City of Wynnewood,* 57 F.3d 924, 933 (10th Cir. 1995) ("We may assume that deliberately or recklessly false statements by public employees are either unprotected by the First Amendment or, at least, that such intentional falsity would weigh heavily against protection."); *Wulf v. City of Wichita*, 883 F.2d 842, 858 (10th Cir. 1989) ("[A] knowingly or recklessly false statement is unlikely to be protected under the First Amendment, although the Supreme Court has left open the possibility that even such a statement might merit First Amendment protection where no harmful effects can be shown."). As the authorities cited above illustrate, other courts of appeals have adopted varying views. *See generally* Howard C. Nielson, Jr., *Recklessly False Statements in the Public-Employment Context*, 63 U. Chi. L. Rev. 1277 (1996) (discussing split in authority on this issue).

[5] In addition to these factors, courts consider "whether the protected speech was a motivating factor in the adverse employment action" and "whether the defendant would have reached the same employment decision in the absence of the protected conduct." *Dixon*, 553 F.3d at 1302.

represent indigent litigants. The court concludes that when the government seeks to discipline

such attorneys based on their speech, these cases significantly limit both the application of

*Garcetti* and the relevant government interests that may be considered under the *Pickering*

balancing test.

As discussed, in concluding "that when public employees make statements pursuant to

their official duties, . . . the Constitution does not insulate their communications from employer

discipline," the Court relied on the principle, previously articulated in *Rust* and *Rosenberger*, that

"when the government appropriates public funds to promote a particular policy of its own it is

entitled to say what it wishes." *Garcetti*, 547 U.S. at 421– 22. The Court thus gave significant

weight to the government's interests in exercising "control over what the [government] itself has

commissioned or created," and ensuring that public "employees' official communications . . .

promote the [government's] mission." *Id*. at 422, 423.

But in our adversarial legal system, when the government hires or contracts with

attorneys to represent indigent criminal defendants or other litigants in suits against it, the role of

those attorneys is to convey speech that *opposes* the position of the government.

In *Legal Services Corp. v. Velazquez*, the Supreme Court held unconstitutional a law

purporting to limit the types of arguments that could be made in welfare benefits claims against

the government by attorneys receiving federal grants to enable them to provide free

representation to indigent clients. *See* 531 U.S. 533, 536–37 (2001). The Court concluded that

the rule enunciated in *Rust* and *Rosenberger*, on which the court later relied in *Garcetti*, did not

apply in this context. *See Legal Services Corp.*, 531 U.S. at 541–43.

As the Court explained, the Legal Services Corporation ("LSC") program was not

intended "to promote a governmental message." *Id*. at 542. Rather, "[t]he Government has

19

designed this program to use the legal profession and the established Judiciary of the States and the Federal Government to accomplish its end of assisting welfare claimants in determination or receipt of their benefits." *Id*.; *see also id*. ("Congress funded LSC grantees to provide attorneys to represent the interests of indigent clients."). Thus, when

> an LSC-funded attorney speaks on behalf of the client in a claim against the government for welfare benefits . . . [t]he lawyer is not the government's speaker. The attorney defending the decision to deny benefits will deliver the government's message in the litigation. The LSC lawyer, however, speaks on behalf of his or her private, indigent client.

*Id*. It followed, the Court held, that "[t]he advice from the attorney to the client and the advocacy by the attorney to the courts cannot be classified as governmental speech even under a generous understanding of the concept." *Id*. at 542 –543; *see also id*. at 543 (holding that "[i]n this vital respect this suit is distinguishable from *Rust*").

The Court in *Legal Services Corp*. relied on its previous decision in *Polk County v. Dodson*, which held that "a public defender does not act 'under color of state law' because he 'works under canons of professional responsibility that mandate his independent judgment on behalf of his client' and because there is an 'assumption that counsel will be free of state control.'" *Legal Services Corp*., 531 U.S. at 542 (quoting *Polk County*, 454 U.S. 312, 321–22 (1981)). *In Polk County*, the Supreme Court relied extensively on the role and duties of defense attorneys in distinguishing attorneys paid by the government from other public employees:

> In our system a defense lawyer characteristically opposes the designated representatives of the State. The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness. But it posits that a defense lawyer best serves the public, not by acting on behalf of the State or in concert with it, but rather by advancing "the undivided interest of his client."

454 U.S. at 318–19 (quoting *Ferri v. Ackerman*, 44 U.S. 193, 204 (1979)). As the Court further explained, "[t]his is essentially a private function, traditionally filled by retained counsel, for which state office and authority are not needed." *Polk County*, 454 U.S. at 319; *see also id*. at

318 (Public defender's assignment to represent criminal defendant "entailed functions and obligations in no way dependent of state authority."). Indeed, "[e]xcept for the source of payment," the relationship between a public defendant and his or her client is "identical to that existing between any other lawyer and client. 'Once a lawyer has undertaken the representation of an accused, the duties and obligations are the same whether the lawyer is privately retained, appointed, or serving in a legal aid or defender program.'" *Id*. at 318 (quoting ABA Standards for Criminal Justice 4-3.9 (2d ed. 1980)).

The Court in *Polk County* then expressly rejected the argument that "a public defender's employment relationship with the State, rather than his function, should determine whether he acts under color of state law." *Polk County*, 454 U.S. at 319. The Court acknowledged that "the employment relationship is certainly a relevant factor," but found it outweighed by two other considerations:

> First, a public defender is not amenable to administrative direction in the same sense as other employees of the State. Administrative and legislative decisions undoubtedly influence the way a public defender does his work. State decisions may determine the quality of his law library or the size of his caseload. But a defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior. Held to the same standards of competence and integrity as a private lawyer, . . . a public defender works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client. "A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services."

*Id*. at 321 (quoting DR 5-107(B), ABA Code of Professional Responsibility (1976)).

> Second, and equally important, it is the constitutional obligation of the State to respect the professional independence of the public defenders whom it engages. This Court's decision in *Gideon v. Wainwright* established the right of state criminal defendants to the "guiding hand of counsel at every step in the proceedings against them." Implicit in the concept of a "guiding hand" is the assumption that counsel will be free of state control. There can be no fair trial unless the accused receives the services of an effective and independent advocate.

*Id*. at 321–22 (quoting *Gideon*, 372 U.S. 335, 345 (1963) (cleaned up)).

To be sure, neither *Legal Services Corp.* nor *Polk County* directly addressed the government's authority to terminate an attorney whom it has engaged to represent criminal defendants based on the attorney's speech. The Supreme Court thus had no occasion in either case to consider how the *Pickering* test would apply in this context.

But after comparing the rationale of these cases to the rationale of *Pickering* and *Garcetti*, this court concludes that *Legal Services Corp.* and *Polk County* substantially limit the government's authority in this context and thus require modification of the *Pickering*/*Garcetti* framework in at least two significant respects. First, because defense attorneys' advocacy for their clients "cannot be classified as governmental speech even under a generous understanding of the concept," *Legal Services Corp.*, 531 U.S. at 542–43, the court cannot treat statements made "pursuant to their official duties" as *per se* unprotected by the First Amendment, *Garcetti*, 547 U.S. at 421. In this context, it is emphatically not the case that "[r]estricting speech that owes its existence to a public employee's professional responsibilities . . . simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22.

Second, because "it is the constitutional obligation of the State to respect the professional independence of the public defenders whom it engages," *Polk County*, 454 U.S. at 321–22, the court finds that, for purposes of any particularized balancing of the competing interests of the government and the attorney under *Pickering* and its progeny, the governmental interests that may justify terminating or disciplining the attorney are much more limited than in the case of other government employees or independent contractors. While the government may have some interest in regulating "certain administrative and possibly investigative functions" performed by the attorneys it engages to represent criminal defendants, such attorneys are simply "not

amenable to administrative direction in the same sense as other employees of the State." *Id*. at 321, 325.[6]

## C.

To be sure, three lower court decisions have applied the *Pickering*/*Garcetti* framework to public defenders or other attorneys appointed to represent criminal defendants without modification. But none of these decisions persuade this court that *Legal Services Corp.* and *Polk County* do not apply here.

In *Jacobson v. Schwarzenegger*, a magistrate judge rejected the argument that *Legal Services Corp.* altered application of the *Pickering* test in a suit brought by a terminated attorney who had represented parolees. The court held that "there is nothing in *Garcetti* to suggest that the Supreme Court contemplated that there would be exceptions to its scope—situations where a public employee's or contractor's speech would be deemed protected by the First Amendment even though the speech fell within the scope of his or her professional duties." 650 F. Supp. 2d 1032, 1055 (C.D. Cal. 2009). But the court in *Jacobson* failed even to recognize, let alone grapple with, the essential point that speech made on behalf of a client by an attorney engaged to oppose the government's views "cannot be classified as governmental speech even under a

---

[6] The court's holding is consistent with at least some commentary on *Garcetti*. One commentator noted that "[a]s *Garcetti* recognized, 'the First Amendment protects a public employee's right, in certain circumstances, to speak as citizens addressing matters of public concern.' A public defender's speech when serving in the traditional role of a criminal defense attorney would qualify for this protection. The government, as defender program employer, violates a staff public defender's First Amendment rights by restricting or restraining that staff lawyer from exercising his or her independent professional judgment on behalf of the indigent client." *See* J. Vincent Aprile II, *Public Defenders, Official Duties, and the First Amendment*, 22 Crim. Just. 5 (2007) (quoting *Garcetti*, 547 U.S. at 417). Another commentator observed that the difference in nature between the speech of a public defender and the speech of a prosecutor appears "to have influenced" the differing outcomes in *Legal Services Corp.* and *Garcetti*. Elizabeth Dale, *Employee Speech & Management Rights: A Counterintuitive Reading of* Garcetti v. Ceballos, 29 Berkeley J. Emp. & Lab. L. 175, 210 (2008).

generous understanding of the concept," *Legal Services Corp.*, 531 U.S. at 542–43, and thus differs in kind from the speech made by an employee hired to promote or support the government's views—the type of speech at issue in *Garcetti*.

In another case, the Third Circuit recently applied the *Pickering* test in rejecting a First Amendment claim brought by a public defender without citing *Legal Service Corp.* or *Polk County*. *See De Ritis v. McGarrigle*, 861 F.3d 444 (3d Cir. 2017). But in that case the public defender was fired by a superior in the public defenders' office. In such a case, the superior may well have had an interest in ensuring that his subordinate's "official communications are accurate, demonstrate sound judgment, and promote the [public defenders' office's] mission." *Garcetti*, 547 U.S. at 423. The Third Circuit ruled in favor of a public defender in another case, but it suggested there that the public defender's speech was outside his "ordinary job duties" under *Garcetti* rather than relying on *Legal Services Corp.* and *Polk County*. *See Flora v. County of Luzerne*, 776 F.3d 169, 180 (3d Cir. 2015).

**IV.**

Based on its review of the record here, the court concludes that genuine issues of material fact foreclose summary judgment on Plaintiffs' First Amendment claim against the County.[7]

As noted, the County offered the following contemporaneous explanation for terminating Mr. Newton's contract: "While we have appreciated your hard work and dedication, this past

---

[7] While it is well settled "that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978), it is equally clear that a municipality may be held liable for "decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality," *Board of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). There is little doubt that decisions of the individual defendants—the County's Commissioners—satisfy this standard here, and Defendants do not contend otherwise.

year you have made various representations to the media and to the court that have been

untruthful and harmful to the County's reputation. As a result, we have made the decision to

terminate your contract and seek appellate counsel." Dkt. No. 33-31 at 2.

In this litigation, Defendants claim that Mr. Newton was fired based solely on the

following statements:

- Statements in three court filings and at a court hearing in which Mr. Newton allegedly
  "misrepresented that the County had refused to fund anything beyond $15,000 for the
  remand hearing." Dkt. No. 26 at 28; *id.* at 29 (similar).

- Statements in multiple filings and to the press in which Mr. Newton allegedly
  "misrepresented that the County would refuse to provide additional funding in the future"
  or otherwise allegedly misrepresented that the County underfunded him. *See id.* at 28–29.

- Statements in multiple filings, at a court hearing, and to the press in which Mr. Newton
  allegedly misrepresented his discussion with the County regarding his billing practices,
  including the discussion regarding the amount of time billed for communications with
  Mr. Lovell. *See id.*

- Statements in multiple filings, at a court hearing, and to the press in which Mr. Newton
  allegedly misrepresented that his general appellate contract was in danger. *See id.*

- Statements in multiple filings in which Mr. Newton allegedly misrepresented the
  availability of funding to hire an investigator. *See id.*

Defendants assert that "[w]hile Plaintiff made various other statements to the court and news

media, the County did not consider those in its decision to terminate Plaintiff's contract, and

there is no evidence that the County considered any other statements beyond those outlined above." *Id.* at 29.[8]

**A**.

In their motion for summary judgment, Defendants' primary argument was that, under *Garcetti*, the County could terminate Mr. Newton's contract without First Amendment scrutiny because all of Mr. Newton's specific statements that Defendants now claim formed the basis for the termination were made "pursuant to his official duties as Lovell's attorney." Dkt. No. 26 at 21. Most of these statements were made in briefing and argument to the court, and Defendants maintain that "there is no dispute that Plaintiff's communications with the court were pursuant to his official duty as a defense attorney contracted with the County to represent Lovell." *Id.* at 23. As for Mr. Newton's remaining comments that Defendants allege were also a basis for the termination, Defendants argue that "[t]he specific nature of his comments to the news media, as well as his apparent intent to use that medium to advocate for his client's rights, further clarifies that Plaintiff [was] commenting in his official role as Lovell's attorney." *Id.* at 24.

For the reasons discussed, the court rejects the proposition that the government can terminate an attorney whom it has engaged to represent indigent criminal defendants based on his or her official communications without further First Amendment scrutiny. As noted, Defendants conceded this point at oral argument, at least with respect to most speech by such attorneys.

---

[8] Defendants also represent that the County decided to terminate Mr. Newton's underlying general appellate contract and began looking at options for his replacement at the end of August 2017 but that Mr. Newton's termination was not discussed again until October 2017. *See* Dkt. No. 26-16 at 18, 23–26.

Defendants, however, invoke language in *Polk County* disclaiming any holding that "a public defender never acts" under the color of state law, noting that the Court had previously "found that a public defender so acted when making hiring and firing decisions on behalf of the State," and leaving open the possibility that "[i]t may be—although the question is not present in this case—that a public defender also would act under color of state law while performing certain administrative and possibly investigative functions." 454 U.S. at 324–25 (citing *Branti v. Finkel*, 445 U.S. 507 (1980)). Based on this language, Defendants argue that when defense attorneys engaged by the government make official statements related to administrative functions, they should be treated the same as other public employees with respect to that speech for purposes of *Garcetti*. Defendants further contend that in making the statements for which he was fired, "Newton… was acting in his official capacity in connection with the administration of his contract." Oral Argument at 3:00-4:00. It follows, Defendants argue, that Mr. Newton may be fired for these statements without further First Amendment inquiry.

Even assuming that statements made by attorneys engaged to defend indigent defendants in the course of performing certain administrative functions can be viewed as unprotected speech similar to that made by ordinary public employees as part of their official duties, the court is skeptical whether statements made by such an attorney in court—or even out of court, but on behalf of his client—can properly be regarded as furthering only administrative functions. To the contrary, when such an attorney "speaks on behalf of the client" he is emphatically "not the government's speaker." *Legal Services Corp.*, 531 U.S. at 541–43. Indeed, such advocacy "cannot be classified as government speech even under a generous understanding of the concept." *Id.* at 542–543.

In addition, the communications for which Mr. Newton was fired were bound up with his representation of Mr. Lovell and reflected disputes with the County regarding matters that implicated Mr. Newton's "exercise of independent judgment on behalf of the client," *Polk County*, 454 U.S. at 321, such as whether witnesses were likely to have useful information and the proper amount of communication between Mr. Newton and his client. *See supra* at 3–5. The court cannot dismiss these communications as involving only Mr. Newton's administrative functions.

The court accordingly holds that Mr. Newton could not be terminated for these statements without further inquiry under *Garcetti* solely because he made them in the course of his official duties representing Mr. Lovell.

**B**.

The court likewise rejects the County's argument that Mr. Newton could be terminated without further First Amendment scrutiny because the communications for which he was terminated did not involve matters of public concern but instead "were of a personal nature, generally related to his contract." Dkt. No. 26 at 27. Even limiting its inquiry to the specific statements that the County now claims formed the basis for the termination, the court cannot say that these communications involved "matters only of personal interest" to Mr. Newton. *Connick*, 461 U.S. at 147.

To the contrary, these communications implicated matters such as whether the County was underfunding the defense in a high-profile capital case, whether the County was seeking to limit Mr. Newton's communications with his client, and whether the County was second guessing and undermining Mr. Newton's "exercise of independent judgment on behalf of the client" despite its "constitutional obligation . . . to respect the professional independence of the

28

public defenders whom it engages." *Polk County*, 454 U.S. at 321–22. The court has little doubt that to the extent Mr. Newton's communications implicated these issues, they are "fairly characterized as constituting speech on a matter of public concern." *Connick*, 461 U.S. at 146.

And under *Connick*, so long as the communications for which Mr. Newton was terminated involved some matters of public concern, he cannot be fired for those communications without further First Amendment inquiry, even if the communications also involved matters of only private concern. *See id.* at 149 ("Because *one* of the questions in Myers' survey touched upon a matter of public concern, and contributed to her discharge, we must determine whether Connick was justified in discharging Myers.") (emphasis added); *see also Eisenhour v. Weber County*, 744 F.3d 1220, 1228–29 (10th Cir. 2014) (when a public employee's motivation for speaking is "personal, as well as public" the employee's "mixed motive is not fatal" to a First Amendment claim).

In addition, based on its review of the evidence presented by both parties, the court concludes that a reasonable jury could find that Mr. Newton was terminated not solely because of the specific statements now identified by the County in this litigation but at least in part because of other statements he made as well.[9] These other statements clearly implicated matters of public concern.

---

[9] As the Tenth Circuit has explained, "(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; [and] (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests" are "issues of law to be decided by the court." *Dixon*, 553 F.3d at 1302. "[W]hether the protected speech was a motivating factor in the adverse employment action" and "whether the defendant would have reached the same employment decision in the absence of the protected conduct," however "are factual issues to be decided by the factfinder." *Id.*

For example, the *Salt Lake Tribune* published a July 2017 story that focused on Mr. Newton's dispute with the County. *See* Dkt. 33-24. The story explained that "Newton . . . said that defense attorneys are not being given enough money to support thorough death penalty case reviews—and in the cases for two Utah death row inmates Newton represents, he said he has had trouble getting paid." *Id.* at 3. And in briefing, Mr. Newton argued that the County's failure to adequately fund Mr. Lovell's defense violated the Constitution. *See* Dkt. No. 33-14 at 4–7.

A September 18, 2017 article in the *Salt Lake Tribune* quoted similar comments from Mr. Newton:

> The state gives enormous resources to the prosecution . . . . The state must similarly commit to equally and adequately support criminal defense attorneys, which is a right guaranteed by the United States Constitution. The defense attorney, especially a solo practitioner, should not have to personally bear and front the financial cost for the enormous review required in a capital case.

Dkt. No. 33-28 at 6.

The court accordingly holds that both the statements that Defendants now claim formed the sole basis of Mr. Newton's termination and other statements by Mr. Newton that a jury could reasonably find also contributed to the termination implicated matters of public concern—at least in part.

## C.

Defendants also argue that they were justified in terminating Mr. Newton's contract in light of "his repeated misrepresentation of material facts, to the court and others, which continued after he had been corrected by the County." Dkt. No. 26 at 27; *see also id*. at 29 (arguing that the statements for which Mr. Newton was fired "should not be considered protected, as they either misrepresented material facts known to Plaintiff when he made the

statement, or he continued to make an incorrect statement after he had been informed of his error").

Following the Tenth Circuit's lead, this court will "assume that deliberately or recklessly false statements by public employees are either unprotected by the First Amendment or, at least, that such intentional falsity would weigh heavily against protection." *Moore*, 57 F.3d at 933; *see also supra* n.4. But although Defendants assert that various statements made by Mr. Newton were knowingly or recklessly false, the court concludes that a reasonable jury could find that the statements were true, or at least that Mr. Newton did not know that they were false and was not reckless with regard to their truth or falsity.[10] The court thus cannot grant summary judgment for the County on the ground that Mr. Newton's statements were knowingly or recklessly false.

### 1.

Defendants argue that Mr. Newton's statements that the County had pressured him to limit his conversations with Mr. Lovell and had threatened his appellate contract were knowingly or recklessly false. For example, Defendants argue that Mr. Newton misrepresented its position when he told the court that "[i]n essence, the county has told counsel that he must not bill them for what he believes to be necessary work on Mr. Lovell's case, such as communications, or it will terminate him from his major contract." Dkt. No. 33-23 at 5.

But, as explained, *see supra* at 8, the County had sent Mr. Newton an email expressing "concern that you are taking advantage of the county by overbilling for your services," listing

---

[10] This court agrees with other courts that have held that, for purposes of the *Pickering* analysis, whether statements are in fact false and whether false statements were made knowingly or recklessly are jury questions. *See, e.g.*, *Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 851–52 (E.D. Mich. 2015), *aff'd*, 655 F. App'x 495 (6th Cir. 2016); *Shands v. City of Kennett*, 993 F.2d 1337, 1342 (8th Cir.1993); *Bennis v. Gable*, 823 F.2d 723, 729 (3rd Cir. 1987); *Biggs v. Village of Dupo*, 892 F.2d 1298, 1300 n.1 (7th Cir. 1990).

"billing for the frequent phone calls, letters, and meeting with Doug Lovell" as an example of this concern, stating that "unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals," and inviting Mr. Newton to "revise . . . your most recent invoice in light of the county's concerns" and to "examine those invoices resubmit them once you have had an opportunity to revise them." Dkt. 33-21 at 2. The court finds that a reasonable jury could find that Mr. Newton reasonably—or even correctly—interpreted this email as pressuring him to limit his conversations with Mr. Lovell.

To the extent Defendants argue that the email was a request for additional justification for the billed hours rather than a request to bill fewer hours, *see* Oral Argument at 15:00, the court concludes that a reasonable jury could find that this is a less natural reading of the email—which requested not that Mr. Lovell justify his time with Mr. Lovell but that he "revise" his invoice "in light of the county's concerns"—and that the more natural reading was corroborated by other efforts by the County to second-guess Mr. Newton's litigation judgments, such as his opinions regarding the importance of potential witnesses. *See* Dkt. No. 33-15 at 8; Dkt. No. 33-12 at 2.

A reasonable jury could also find that Mr. Newton's understanding of the email was supported by the fact that the County had raised a similar concern in July 2016. *See* Dkt. No. 33-44 at 2–3. The jury could find that the County's repetition of this concern reflected pressure not for Mr. Newton to better justify his conversations with Mr. Lovell, but to reduce them.

A reasonable jury could likewise find that Mr. Newton correctly—or at least reasonably—understood the email's explicit statement that "unless significant changes are made to the invoices and future billing practices, the county needs to look for another attorney for future appeals," Dkt. No. 33-21 at 2, as a threat to his general appellate contract.

For all of these reasons, the court cannot say, as a matter of law, that Mr. Newton's statements that the County had pressured him to reduce his communications with Mr. Lovell and threatened his appellate contract were false—let alone knowingly or recklessly false.

**2.**

Defendants also contend that Mr. Newton knowingly or recklessly misrepresented that the County would not pay more than the $15,000 for the remand proceedings and that it would refuse requests for additional funding. There is no question that Mr. Newton did make such statements, repeatedly. But based on the record here, the court concludes that a reasonable jury could find that these statements were not knowingly or recklessly false.

First, a reasonable jury could find that Mr. Newton acknowledged that additional funding was technically available. As explained, *see supra* at 3–4, in two of his three briefs raising this concern, Mr. Newton acknowledged the possibility that the County might in fact provide additional funds. For example, although in his reply brief Mr. Newton speculated that "this issue will imminently escalate to greater detriment to Mr. Lovell when the county refuses to fund anything beyond its offer of $15,000 which Mr. Lovell contends is not adequate for the remainder of work to be done," Dkt. No. 33-18 at 5, he also acknowledged that "the county argues that counsel 'is being generously compensated, and he will continue to be compensated' so long as he justifies the expenditure," *id.* at 3. And in the first brief, Mr. Newton noted that he had not yet been paid, but did not assert that he would never be paid.

Second, a reasonable jury could find that these statements were simply predictions based on past experience and that Mr. Newton had good reason to be skeptical that the County would in fact authorize additional funding despite its technical availability under the contract. Indeed, Commissioner Harvey had said the hours spent on the remand "should in no way exceed 100."

Dkt. No. 33-12 at 2. The County had also repeatedly taken a hard line on providing more than $75,000 for Mr. Newton's work on the appeal, even though this limit was in theory a soft cap. *See* Dkt. No. 33-15 at 28. Commissioner Harvey had indicated that no more funding would be authorized for the appeal beyond the $75,000 that had already been exhausted: "[t]he $75,000 that was provided to you initially was intended to cover the Reply brief which shouldn't be impacted by this remand, so we are not offering additional compensation for that." Dkt. No. 33-12 at 2. Mr. Baron likewise explained that "[t]he commissioners' position is that you signed a contract to handle this appeal for $75,000, [and that] they are not open to paying you for additional money for the oral arguments or the reply brief because those were both contemplated in the original contract." Dkt. No. 33-17 at 2. In addition, the County was refusing to pay Mr. Newton's invoices—indeed, it appears that the only 2017 payment that had been made at the time of Mr. Newton's statements was paid by mistake. *See* Dkt. No. 33-19 at 12.[11]

Viewing the facts in the light most favorably to Mr. Newton, the court cannot say as a matter of law that his statements that the County would not pay more than the $15,000 for the remand proceedings and that it would refuse requests for additional funding were knowingly or recklessly false.

---

[11] Defendants argue that Mr. Newton acknowledged he had misrepresented the County's position. And, to be sure, Mr. Newton began one email with the statement: "I guess I did misunderstand the county's position." Dkt. No. 33-19 at 4. But for the reasons explained, a reasonable jury could find that Mr. Newton's statements were based not on misunderstanding but rather on skeptical prediction. Moreover, a reasonable jury could find that this statement was not a genuine acknowledgement of error but simply an attempt to negotiate and lower tensions. Indeed, the very next sentence explains Mr. Newton's reasons for skepticism regarding additional payments: "[t]here's quite a bit of discussion about how I only get $15,000 for preparing for this new hearing and revising the brief and the reply brief *but that I wouldn't get anything beyond that*." *Id.* (emphasis added).

**3.**

Defendants also argue that Mr. Newton falsely stated that he lacked funds for investigative resources. For example, Defendants argue that Mr. Newton's representation to the court that "counsel has been unable (because of a lack of funding) to interview" some of the relevant witnesses and "would need some investigative resources so his investigator could speak with those witnesses prior to their testimony" was false. Dkt. No. 33-14 at 3.

But a reasonable jury could find that Mr. Newton's statement reflected concern that the County would not provide adequate funding for investigative resources despite the technical availability of such funding under the contract. Certainly, Mr. Newton expressed such skepticism in his communications with the County. In an email to Mr. Baron he explained: "I still have yet to use an investigator or get the investigation process going because I'm not sure I can guarantee her that she'll be paid (unless you think otherwise)." Dkt. No. 33-19 at 7. The court has found nothing in the record indicating that Mr. Baron or anyone else guaranteed payment in response to this email.

A reasonable jury could also find that Mr. Newton's concern was justified. The contract authorized only $500 for investigative or expert services, absent court approval, *see* Utah Code Ann. 77-32-305.5; Dkt. No. 33-4 at 3; Dkt. No. 33 at 24, and a reasonable jury could find this was not enough to pay for the amount of investigative work that would be required.

In addition, although the $500 limit could be exceeded with court approval, given how hard of a line Mr. Newton believed the County was taking on the $75,000 soft cap for the Lovell appeal, a reasonable jury could find that Mr. Newton reasonably feared that the County would

take a similarly hard line on the $500 limit for investigative and expert services and oppose any requests for judicial approval of funds in excess of this amount.[12]

Once again, the court cannot find as a matter of law that Mr. Newton's statements were knowingly and reckless false.

## D.

Finally, the court cannot find that the County is entitled to summary judgment on the ground that its "interests in promoting the efficiency of its public service outweigh Plaintiff's interest in his speech." Dkt. No. 26 at 34.

As explained, because the County contracted with Mr. Newton to represent indigent criminal defendants, the government interests that could have justified terminating Mr. Newton's contract are more limited than those that might justify terminating other government employees or independent contractors. While the government may have some interest in regulating "certain administrative and possibly investigative functions" performed by the attorneys it engages to represent criminal defendants, such attorneys are simply "not amenable to administrative direction in the same sense as other employees of the State." *Polk County*, 454 U.S. at 321, 325.

Among other things, because the County has a "constitutional obligation . . . to respect the professional independence of the public defenders whom it engages," disagreement with Mr. Newton's "exercise of independent judgment on behalf of the client," could not form a legitimate basis for terminating his contract. *Id.* at 321–22. And because Mr. Newton's advocacy on behalf of Mr. Lovell "cannot be classified as government speech even under a generous understanding

---

[12] The Lovell contract provided that the $75,000 cap could be exceeded based on a showing of good cause to "the court and the County." Dkt. No. 33-4 at 3. A reasonable jury could find it significant that the County not only itself refused Mr. Newton's requests for more than $75,000 for the appeal (apart from the remand proceeding) but also opposed his attempt to obtain judicial authorization of payment in excess of that amount.

of the concept," *Legal Services Corp*., 531 U.S. at 542 –543, the County had no legitimate interest in "the exercise of employer control over what the employer has commissioned or created." *Garcetti*, 547 U.S. at 422. It thus had no interest in limiting or regulating Mr. Newton's arguments to ensure their consistency with any "particular policy of its own," and little if any interest in ensuring that his "official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id*. at 422, 423.[13]

It does not follow that the County lacked any legitimate interests that could have potentially justified its actions. It undoubtedly has an interest in the wise stewardship of public funds. And the County may well have other legitimate interests as well, including avoiding contention and disruption and maintaining good working relationships with its independent contractors. But it almost certainly does not have a legitimate interest simply in avoiding truthful but negative publicity for its actions.

The court need not decide the exact scope of the County's interests at this time, however. As discussed, the court concludes that there are genuine disputes of material fact regarding what statements in fact formed the basis for Mr. Newton's termination and whether these statements were knowingly and recklessly false. Whether the County's interests outweigh Mr. Newton's is ultimately a question of law, *see supra* n.9, but the court cannot perform the required balancing until these factual disputes are resolved.

*       *       *

For all of these reasons, the court denies Defendants' motion for summary judgment on Mr. Newton's First Amendment claim for damages against the County.

---

[13] In addition, the County's interests are weaker than with an ordinary public employee because Mr. Newton was an independent contractor. *See Umbehr*, 518 U.S. at 673.

**V.**

The court next turns to Mr. Newton's First Amendment claim against the Commissioners in their individual capacities. The court concludes that the Commissioners are entitled to qualified immunity, which shields them from liability for damages for this claim.

To overcome the Commissioners' assertion of qualified immunity, Mr. Newton must show both that the Commissioners "violated a federal statutory or constitutional right," and that "the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). For the same reasons that the court denies Defendants' motion for summary judgment on Mr. Newton's First Amendment claim against the County, it cannot conclude, as a matter of law, that the Commissioners did not violate Mr. Newton's constitutional rights.

Whether the Commissioners are entitled to qualified immunity thus turns on whether "the unlawfulness of their conduct was clearly established at the time." *Wesby*, 138 S. Ct. at 589. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (cleaned up). Here, the court finds that the Commissioners could have reasonably believed, based on the Supreme Court's decision in *Garcetti*, that they could terminate Mr. Newton's contract based on communications made as part of his official duties without further First Amendment scrutiny.[14]

---

[14] To be sure, the court has held that a reasonable jury could find that statements other than those identified by Defendants played a role in their decision to terminate Mr. Newton's appellate contracts. *See supra* Part IV.B. Many of these other statements were made by Mr. Newton in briefing or to the media while he was representing Mr. Lovell; Defendants' arguments that such statements were made as part of Mr. Newton's official duties as Mr. Lovell's counsel would apply equally to these statements. But a few such statements were made by Mr. Newton to

38

Although the court has concluded, based on the Supreme Court's decisions in *Legal Services Corp.* and *Polk County*, that *Garcetti* does not apply to attorneys engaged by the government to represent indigent criminal defendants in the same way that it applies to other public employees, this court's conclusion is far from clearly established. Neither *Legal Services Corp.* nor *Polk County* involved a public employer's firing of a public employee or termination of an independent contractor. Plaintiffs have not cited, and this court has not found, any decision from the Supreme Court or the Tenth Circuit—or any other court, for that matter—that holds or even suggests that *Legal Services Corp.* or *Polk County* limits *Garcetti*'s application when the government fires or terminates its contractual relationship with an attorney it had engaged to represent indigent criminal defendants based on the attorney's official speech. Given the complete absence of such precedent, the law was not "sufficiently clear that every reasonable official would understand" that the Commissioners' actions were unlawful.[15]

---

the *Salt Lake Tribune after* he withdrew as Mr. Lovell's counsel. Given that the relatively few such statements made by Mr. Newton after he withdrew as Mr. Lovell's attorney are substantially similar to numerous statements made in briefing and to the media by Mr. Newton before he withdrew as Mr. Lovell's counsel, however—including statements that Defendants claim played no role in their decision—the court concludes that a jury could not reasonably find that the post-withdrawal statements were a but-for cause of Mr. Newton's termination. The court likewise concludes that an objectively reasonable county official could have believed that statements made by Mr. Newton while engaged as Mr. Lovell's attorney fully justified his termination under *Garcetti*.

[15] Although Mr. Newton also requests declaratory relief, the Court finds that Mr. Newton is not entitled to a declaratory judgment against the Commissioners. Courts may grant such relief "only in respect to controversies which are such in the constitutional sense." *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 239–40 (1937). Under binding Supreme Court precedent, the "question whether the defendants would have been liable apart from their defense" of qualified immunity is too "hypothetical" to warrant declaratory relief. *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (per curiam). And absent evidence that Mr. Newton faces a real likelihood that he will be again injured in the same manner by the Commissioners, the possibility of future injury lacks "sufficient immediacy and reality to warrant the issuance of declaratory judgment." *Golden v. Zwickler*, 394 U.S. 103, 108–09 (1969).

## VI.

Mr. Newton also argues that Defendants violated the prohibition on civil conspiracies found in 42 U.S.C. § 1985(2). In relevant part, this statute applies to conspiracies "to deter, by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified."

By its plain terms, this statute protects *parties* and *witnesses*. Mr. Newton offers no authority for the proposition that it protects attorneys as well. In addition, it is far from clear that Mr. Newton has even adequately pled a claim under this statute. While he does allege that "Defendants operated in concert to violate Newton's rights, both among each other and in concert with the Weber County Attorney," Dkt. No. 2 at 22, he does not even allege a separate claim based on Section 1985(2), let alone identify or attempt to plead the elements of such a claim. Rather, in the course of laying out his First Amendment claim against the Commissioners, he simply asserts that "Defendants are jointly and severally liable for these constitutional violations under 42 U.S.C. § 1983 and 42 U.S.C. § 1985(2)." *Id.* In his summary judgment briefing, Mr. Newton likewise fails to identify, much less point out evidence supporting, each required element of a Section 1985(2) claim. For all of these reasons, the court grants Defendants' motion for summary judgment on this claim.

## CONCLUSION

Defendants' motion for summary judgment is **GRANTED** with respect to the First Amendment claim against the Commissioners in their individual capacities and the Section

1985(2) claim. The motion is **DENIED** with respect to the First Amendment claim against the County.

       **IT IS SO ORDERED**.

                     DATED this 30th day of September, 2020.

                     BY THE COURT:

                     _____
                     Howard C. Nielson, Jr.
                     United States District Judge